**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN,
MELISSA CARRIGAN,
KOLBY MARTIN, and
TRAVIS THRELKEL

      Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual capacity, and
MARK HANCOCK, in his official and individual capacity,

      Defendants.

---

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiffs, by and through their attorneys, Elkus & Sisson, P.C., hereby submit their First Amended Complaint and Jury Demand.

## I.    <u>INTRODUCTION</u>

      1.    The grossly negligent decision making of the Park County Sheriff's Office, Sheriff Fred Wegener, and Captain Mark Hancock created a dangerous situation that resulted in life threatening injuries to Kolby Martin, injury to Travis Threlkel, and the death of Nate Carrigan. The actions of the Defendants were not just a lapse in judgment or honest mistake; rather, those actions shock the conscience and exposed Deputies Martin, Threlkel, and Carrigan to dangers that should have been entirely preventable.

2.      Deputies Martin, and Carrigan were shot by Martin Wirth, an individual known by the Defendants to have a history of violent behavior with aggressive and threatening tendencies towards the Sheriff Deputies of Park County.  Despite that knowledge, however, the Defendants ignored their own training, and national standards, in dealing with overt threats made to law enforcement by Mr. Wirth.  Defendants ordered Deputies Martin, Threlkel, and Carrigan into action without the necessary skills, training, equipment, or back-up to address the threat these officers were presented with.  As a consequence of the Defendants' gross negligence, the Plaintiffs' federal rights have been violated.

## II.      JURISDICTION, VENUE, AND NOTICE

3.      This actions arises under the Constitution and laws of the United States, including Article III, Section 1 of the United States Constitution and is brought pursuant to 42 U.S.C. §§ 1983 and 1988.  The Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331.

4.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

5.      Timely Notices of Claim under the Colorado Governmental Immunity Act have been given by Plaintiffs Estate of Nate Carrigan and Kolby Martin to redress the willful and wanton conduct alleged in this lawsuit.

## III.      PARTIES

6.      Plaintiff Estate of Nate Carrigan is asserting the rights of the decedent, Nate Carrigan, who during his life and at all relevant times was a resident of the State of Colorado and citizen of the United States, and who died in Park County, Colorado, on February 24, 2016.

2

Melissa Carrigan, the mother of Nate Carrigan, is the personal representative, and authorized to act on behalf of, the Estate of Nate Carrigan, duly appointed by the Park County District Court, Case No. 16PR30048.

7.      At all times relevant, Plaintiff John Carrigan was the father of Nate Carrigan, a resident of the State of Colorado, and a citizen of the United States.

8.      At all times relevant, Melissa Carrigan was the mother of Nate Carrigan, a resident of the State of Colorado, and a citizen of the United States.

9.      Plaintiff Kolby Martin was at all times relevant a resident of the State of Colorado and citizen of the United States, and injured in Park County, Colorado, on February 24, 2016.

10.     Plaintiff Travis Threlkel was at all times relevant a resident of the State of Colorado and citizen of the United States, and injured in Park County, Colorado, on February 24, 2016.

11.     At all relevant times, the Park County Sheriff's Office ("PCSO") is an independent agency of Park County in the State of Colorado.  This Defendant, at all times relevant hereto, is the legal entity responsible for itself and for its agents and employees.

12.     PCSO is properly sued directly under 42 U.S.C. § 1983 for its own, and its final delegated decision makers', deliberately indifferent training/supervision which were moving forces in the complained of constitutional and statutory violations and resulting injuries.

13.     At all pertinent times mentioned herein, the individual Sheriff Fred Wegener ("Sheriff Wegener"), in his official and individual capacities, was the duly elected Sheriff of Park County.  At the time of the incidents described herein, Sheriff Wegener served as a final decision maker and was acting under color of state law in his capacity as the Sheriff of PCSO.

14.     At all pertinent times mentioned herein, the individual Captain Mark Hancock ("Captain Hancock"), in his official and individual capacities, served as a member of Nate Carrigan, Travis Threlkel, and Kolby Martin's chain of command and/or was involved in the incident that resulted in the death of Nate Carrigan, the serious injuries of Kolby Martin, and injury to Travis Threlkel.  At the time of the incidents described herein, Captain Hancock was a final decision maker and was acting under color of state law in his capacity as a Captain of PCSO and as a tactical command of the February 24, 2016, eviction of Mr. Wirth.

## IV.     STATEMENT OF FACTS

### A.     BACKGROUND

15.     Prior to the eviction of Mr. Wirth on February 24, 2016, the Defendants were aware that Mr. Wirth had violent tendencies towards law enforcement.  For instance, on January 20, 2016, Mr. Wirth went to the State Farm Insurance Office at 26881 Main Street, Golden, Colorado, to obtain automobile insurance.  During Mr. Wirth's interactions with the State Farm agent, Mr. Wirth was advised that State Farm would not provide him with insurance because Mr. Wirth did not have a valid driver's license.  When the State Farm agent told Mr. Wirth that he was not eligible for obtaining insurance Mr. Wirth got extremely upset and exclaimed as he was leaving the office: "I should just get my gun and shoot the first cop I see."  Based on this threat, Jefferson County Sheriff Department, along with PCSO, were dispatched to Mr. Wirth's residence to investigate. Among the PCSO officers that assisted Jefferson County in the investigation was Detective David Leffler, who was also one of the Sheriff Deputies participating in the February 24th eviction of Mr. Wirth.  Detective Leffler was present when Mr. Wirth was contacted by Jefferson County Sheriff Deputies at the Wirth residence.  Upon contact, Mr. Wirth became combative with officers on

scene and was restrained.  During the struggle, Detective Leffler heard Mr. Wirth make comments consistent with hating law enforcement to include that Mr. Wirth was going to "have it out with law enforcement."

16.     Mr. Wirth's neighbor, Rich Gabrish, also informed PCSO of Mr. Wirth's violent tendencies towards law enforcement.  According to Mr. Gabrish, he reported to PCSO on multiple occasions that Mr. Wirth would shoot law enforcement.  The first reporting occurred in 2014 when Mr. Gabrish was told by Mr. Wirth that Mr. Wirth may be losing his home due to a forced eviction. Based on specific conversations Mr. Gabrish had with Mr. Wirth at the time, Mr. Gabrish contacted Sheriff Wegener and advised him that if the Sheriff was going to evict Mr. Wirth that Mr. Wirth stated that "he would shoot at Sheriff Deputies."  Sheriff Wegener thanked Mr. Gabrish for making PCSO aware of it.  Then, just a couple months before February 24, 2016, Mr. Wirth again admitted to Mr. Gabrish that he was "adamant about shooting somebody" and that Mr. Wirth said that "all police should be dead, there's no need."  Based on these statements, Mr. Gabrish again promptly contacted PCSO and reported Mr. Wirth's statements.

17.     Another instance occurred in July, 2015.  On July, 2015, Mr. Scott Crowder was acting on behalf of a property management company to mow the lawn at the property that Mr. Wirth was occupying at the time.  Mr. Crowder had difficulty locating the property so he contacted PCSO to assist in locating the residence.  Mr. Crowder was told by PCSO: "good luck going on that property because the Sheriff's Office was already aware that there were squatters on the property."  Mr. Crowder was further informed that because of who the squatter was (*i.e.*, Martin Wirth) PCSO would not go onto the property.

18.     Finally, Mr. Wirth posted anti-law enforcement rhetoric on social media sites, including: "abolish the police," "this is why I hate cops," and "it's time to treat them (cops) like assassins."  Specific examples include, but are not limited to:



Martin Wirth
November 4, 2015 · 🌐

If there's a war on cops, where's the recruitment center?

19.     In light of the above events, and upon information and belief, PCSO knew that Mr. Wirth posed a violent threat towards law enforcement and because of that threat PCSO was reluctant to go onto Mr. Wirth's property unless ordered to do so.  That order ultimately came by way of a Court issued Writ of Restitution that was dated for February 24, 2016.  While the Writ may have compelled PCSO to go into the "lion's den," it did not compel Defendants to dispatch and order Deputies Carrigan, Threlkel, and Martin into action without sufficient training, skills, equipment, and back-up.

**B.     THE EVENTS OF FEBRUARY 24, 2016**

20.     On February 24, 2016, between 8:00 and 8:30 a.m., Sheriff Deputies of Park County began arriving at the Park County Sheriff's Office for a briefing.

21.     During the February 24th briefing, Captain Mark Hancock of PCSO was discussing with the Sheriff Deputies the eviction of Mr. Wirth.  During the briefing, Captain Hancock advised the Sheriff Deputies that this was going to be a high risk eviction because the information he (individually and as agent of PCSO) received was that Mr. Wirth may be physically combative and that the eviction may become a barricade situation.  Sheriff Fred Wegener was present during the briefing.

22.     At all times relevant, Captain Hancock was the SWAT Commander for PCSO. During briefing, Captain Hancock, who was charged with the tactical operation for evicting Mr. Wirth, did not feel that a SWAT presence was warranted for the eviction; however, Captain Hancock felt a minimum of six officers were required for the operation.

23.     The six officers that were called to assist in evicting Mr. Wirth were: (1) Dave Leffler; (2) Kolby Martin; (3) Nate Carrigan; (4) D.J. Hannigan; (5) Jeremy Lowrance; and (6) Travis Threlkel.

24.     During the February 24th briefing Captain Hancock devised a plan that had four officers coming to the front door of Mr. Wirth's residence and two officers covering the rear of the residence.  In addition to officer presence, Captain Hancock also had a marked patrol vehicle going first in the driveway to let Mr. Wirth know that there was law enforcement presence.  The patrol vehicle was also going to serve as a form of protection in the event that Mr. Wirth engaged the officers in gunfire, which would then allow the officers to retreat and provide cover and protection.  In addition, Captain Hancock advised that if Mr. Wirth did not come out, or went back into the residence, that the officers would back off, consider it a barricade situation, and engage SWAT.  Captain Hancock further advised that if Mr. Wirth remained in his residence that the officers would not breach, *i.e.*, go inside the residence.

25.     With the tactical plan in place the officers proceeded to go to Mr. Wirth's home.

26.     The plan at Mr. Wirth's residence was that Deputy Martin was to be at the north/right side of the home with Deputies Hannigan, Threlkel, and Lowrance going to the west/rear side of the residence.  Captain Hancock and Deputy Carrigan were to make contact at the front door.  Captain Hancock wanted Deputy Carrigan at the front door because Deputy

Carrigan had a nice demeanor that may diffuse an otherwise hostile situation. With this understanding, and because the Deputies were advised that if Mr. Wirth would be forcefully evicted he would engage law enforcement in "a shootout like the OK Corral," Deputy Lowrance again asked Captain Hancock whether they would breach the residence if Mr. Wirth refused to leave. Captain Hancock again reaffirmed that the officers would not breach the residence should Mr. Wirth refuse to leave.

27.     The officers arrived at Mr. Wirth's residence and went to their assigned locations.

28.     Captain Hancock and Deputy Carrigan went to the front of the residence and observed Mr. Wirth on his deck. Deputy Carrigan advised Mr. Wirth that they were there to evict him from the premises. Mr. Wirth responded "you're not even going to give me time to move my stuff out!" At which point Mr. Wirth went and retreated back into his residence. Upon entering the property, Captain Hancock began to feel uncomfortable and promptly ordered the four other officers to get up next to the house. Captain Hancock had a further concern in that Mr. Wirth had a tactical advantage over the officers by virtue of the fact that the house was up on a hill and the officers were below the residence placing them at an obvious disadvantage. Instead of withdrawing from the residence given the threat and risk of harm, and despite having made a plan to withdraw in the briefing earlier the same day, Captain Hancock shockingly went up to the door with Deputy Carrigan and proceeded to knock on the door and announced their presence.

29.     Captain Hancock's assessment of the situation at this point was as follows:

I knocked, reached around Nate, knocked and announced several times. Nate knocked and announced and I made a couple of calls maybe to the Sheriff who was for some reason on his way there. I think he just had a bad feeling and I might have saw Fred [the Sheriff[ pull up or I knew he was near and I said, Sheriff you know, there's too much of a delay from this to here and I really feel like he's barricading

or, you know, something bad's going to happen and **I really regret that I'm a Marine sometimes because I am super aggressive and I don't like to give people the opportunity to plan, fortify and take us out, so I asked a second time, I believe, and I don't know if I even got permission or not.  I can't remember. But I told Nate to take the door**.

30.     Prior to Deputy Carrigan being ordered to breach the residence by kicking the door, Sheriff Wegener was listening to radio traffic of the eviction process.  While listening to what was transpiring over the radio the Sheriff "had a bad feeling and I thought well, you know what, let me go back there and I thought if nothing else, if it had ended up being maybe some sort of barricaded, you know, situation, that I could at least always talk to him and say well, the Sheriff's here and what's your issues and maybe see if I could, you know, resolve that."  Upon going to Mr. Wirth's residence, Sheriff Wegener heard on the radio that Mr. Wirth was retreating back into his home. At that time, Sheriff Wegener received a call on the radio from Captain Hancock who advised the Sheriff that Mr. Wirth entered the residence and that too much time has passed.  Captain Hancock advised the Sheriff that "we need to breach the door."  Instead of treating the situation as a barricade and getting highly skilled, trained, and equipped SWAT officers involved, per the plan previously explained by Captain Hancock, the Sheriff gave Captain Hancock the go ahead to breach the residence.  This order came without the Sheriff first electing to talk the issues out with Mr. Wirth and without being in full view of the events on scene.  Accordingly, the Sheriff also ratified and approved the decision by Captain Hancock to breach the residence.

31.     Captain Hancock ordered Deputy Carrigan to "breach the door and get the fuck out of my way."  Following his superior's order, Deputy Carrigan proceeded to kick the door open. After Deputy Carrigan kicked the door open, Deputy Martin was the first to enter the Wirth residence through the front door with Deputy Threlkel behind him and then Deputy Lowrance.

32.     Upon entering the residence, Deputy Martin announced "Sheriff's Office! Show me your hands!"  As Deputy Martin proceeded around the corner of a wall, Mr. Wirth began shooting with the first shot hitting Deputy Martin in the pelvis.  The next shots hit Deputy Martin in the legs.  Deputy Martin was screaming in pain as he was being dragged out of the residence by Deputy Threlkel.

33.     Deputy Threlkel entered the residence with Deputy Martin.  Following Deputy Martin into the residence, Deputy Threlkel heard Deputy Martin giving orders for Mr. Wirth to show his hands.  Upon hearing the orders being given to Mr. Wirth, Deputy Threlkel saw Mr. Wirth disappear behind a wall and Deputy Threlkel thought at that time, "that's when I felt fearful for myself and the other officers in the house…it was just that kind of moment, I realized -- I said to myself, I remember thinking is we just fucked ourselves.  We're done."  At which point Deputy Threlkel heard gunfire.  After hearing gunfire, Deputy Threlkel heard screaming from Deputy Martin.  Deputy Threlkel explains the situation as follows:

> I reached down.  I tried to grab him [Deputy Martin], just grab handles.  At that point in time, that was it, we're getting the fuck out of there.  I don't know what else we were going to do….I ended up sticking my hand I believe right through his vest itself, kind of grabbed onto the shirt with my left hand.  I had my rifle in my right and we drug all the way out….I seen Carrigan was over here.  This was such a tight area.  There was no way I could drag Martin there.  The snowbank that came down here.  I drug Martin down here which is unfortunate because there was a big window right there and then our entry door there and Martin's screaming, I'm hit, I'm hit, I'm hit.  I looked down.  I could see the blood somewhat on his leg and I could see it on the snow below me.  Looked up.  I could just see the window.  I could see the glass shattering outside the house and it was going on.  I could see Jeremy [Lowrance] behind me.  He opens up.  I don't know how many rounds he put down but to me I heard –heard a magazine.  I heard a distinct sound of a magazine trying to go into a mag well….Martin's screaming.  I'm looking down at him.  I'm trying to focus on the doorway, on the glass, trying to figure out or he's going to come in or out or if he's [Wirth] posting up at the window getting ready to shoot, shoot me.  **We're both sitting ducks.**

34.     Captain Hancock heard gun fire while he was in the residence.  One of the shots grazed his ear and his neck.  Captain Hancock saw Deputy Carrigan turn around and appeared to be scrambling.  As the officers were retreating from the residence, gun shots were coming out of the Wirth home.

35.     Deputy Lowrance saw bullets blasting through the siding of the home and knew that Mr. Wirth "had every intention on killing every one of us and he would have."  In fact, Deputy Lowrance saw that Mr. Wirth had a tactically superior position over the officers by virtue of the fact that Mr. Wirth was on higher ground shooting down upon the officers.  While he had concern for his own safety, Deputy Lowrance had more concern for his fellow officers as they were sitting in front of the residence and under fire.  Deputy Lowrance shot approximately 12 shots into the residence to protect himself and his fellow officers.

36.     After Deputy Carrigan kicked the door open shots were fired by Mr. Wirth.  At least one of the shots entered 3" posterior to the apex of the left axilla of Deputy Carrigan and entered into his chest.  According to Deputy Martin he heard Deputy Carrigan scream that he was hit.  While the gunfight was ensuing, officers were trying to give medical assistance to Deputy Carrigan by giving CPR and telling him to breathe.  Sheriff Wegener describes the situation with Deputy Carrigan as follows:

> They wanted to get the second ambulance in but looking at Nate, not seeing any obvious signs, it wasn't until they looked underneath his armpit and then they saw that single bullet hole…somebody had rolled him over and he, and his pupils were already fixed.  There was, you know, he had that slight opening of his eyelids, fluid just starting to come out of his mouth and there was no, no obvious signs. Apparently when they checked the carotid, there was no pulse at all and everybody knew he was probably dead.

37.     With the pandemonium and chaos of the events that were unfolding in the front of the Wirth residence, Mr. Wirth escaped through the back of the home.  In the back of the residence, Deputy Hannigan observed Mr. Wirth take a position at the rear of the home.  Knowing that Mr. Wirth had already fired on law enforcement, and knowing that Deputies were injured, Deputy Hannigan had the opportunity and took a shot at the suspect.  Not being fazed by gunfire, Mr. Wirth--who was still armed and was now lying prone on the ground--was searching the woods for where Deputy Hannigan was located.  Having locked on Deputy Hannigan and about to fire, Captain Hancock made it to the back of the residence and opened fire on Mr. Wirth.  Mr. Wirth died on scene.

38.     Defendants' decision to order the breach and entry into the premises under the circumstances runs afoul of the training and standard operating procedures for law enforcement. Once Mr. Wirth retreated back into his residence, and knowing that Mr. Wirth had made threats to shoot at law enforcement, and that a barricade was occurring, a tactical decision should have been made to order the Sheriff Deputies to retreat back to a safe position and not enter the residence. At that point, SWAT should have been called and activated.  Once activated the SWAT officers would establish a tight perimeter surrounding the Wirth residence.  The central point is to isolate the suspect in the residence and engage in a waiting game with the attempt to negotiate a safe resolution for everyone involved.  With a tight perimeter PCSO would be able to rotate teams and officers as needed.  In the event, however, that negotiating a safe resolution cannot be made then a SWAT tactical entry team could be utilized which has far superior training, knowledge, skill, and equipment, including protective equipment for improved officer safety in situations that present more risk of harm, such as were clearly present here.

39.     SWAT entry team gear include: flashbang stun grenades, battering rams, Halligan tools, ballistic shields, tactical radios and flexi-cuffs, superior body armor with increased areas of protection, ballistic helmets, eye wear, assault webbing for holding magazines, knee pads, and gloves.

40.     In a typical SWAT situation, when the decision is made to engage the SWAT entry team, the entry team enters the room as quickly and smoothly as possible and clears the doorway immediately.  If possible the team moves from a covered or concealed position already in their entry order.  Ideally, the team arrives at and passes through the entry point without having to stop. The door is the focal point of anyone in the room.  It is known as the fatal funnel, because it focuses attention at the precise point where the individual team members are the most vulnerable.  Moving into the room quickly reduces the chance anyone will be hit by gun fire directed at the doorway. The team may choose to create a diversion (use a stun-hand grenade) to momentarily distract the threat while it enters and achieves domination of the room.  On the signal to go, the clearing team moves through the door quickly and takes up positions inside the room that allow it to completely dominate the room and eliminate the threat.  Team members stop movement only after they have cleared the door and reached their designated point of domination.  Each member of the team must know his sector of fire and how his sector overlaps and links with the sectors of the other team members.  Team members do not move to the point of domination and then engage their targets. They engage targets as they move to their designated point.  However, engagements must not slow movement to their points of domination.  Team members may shoot within a range of as little as 1 to 2 inches.  They engage the most immediate threats first.

41.     As set forth herein, Defendants failed to follow standard operating procedures when the decision was made to breach the residence knowing that Mr. Wirth retreated back into his residence, and without engaging SWAT.  In fact, Captain Hancock admitted as such when he said: "I was worried about barricaded and which I talked to the Sheriff about and I thought if it's a barricaded party, I'll back off perimeter and do that but no answer."  Captain Hancock did not back off to the perimeter but instead ordered a breach.  Looking back Captain Hancock stated: "[y]ou know I'm second guessing and worrying that I messed something up…."

42.     As a result of the incident, Deputy Martin was airlifted to St. Anthony Hospital. Deputy Martin sustained eight gunshot entry wounds to the following areas: (1) supra-pubic area; (2) right groin; (3) right mid-thigh; (4) right posterior thigh; (5) right buttock; (6) left posterior thigh; and (7-8) two in the left anterior thigh.  The bullet to the left thigh caused an open femur fracture.  As of the filing of this Complaint, Deputy Martin is still undergoing rehabilitation for his injuries.

43.     As a result of the incident, Deputy Threlkel suffered injury, including but not limited to mental pain and suffering.

44.     Deputy Carrigan died on scene.  He leaves behind his mother, Melissa Carrigan, his father, John Carrigan, his brothers, John and Jeremiah Carrigan and his sister, Alicia Bellomy.

45.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Carrigan's estate has suffered injuries and losses, including the death of Nate Carrigan, entitling the estate to recover his compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, lost past and future earnings, permanent

lost earnings capacity for the expected productive working lifetime of Nate Carrigan under the mortality tables, all in amounts to be proven at trial.

46.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Martin has suffered injuries and losses, entitling him to recover his compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

47.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Threlkel has suffered injuries and losses, entitling him to recover his compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

48.     Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, pre-judgment interest and costs as allowable by federal law.

## V.      CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Violation of Due Process Under The Fourteenth Amendment
(*All Plaintiffs v. All Defendants*)

49.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully set forth herein.

50.     42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress….

51.     All Plaintiffs in this action are citizens or permanent residents of the United States and the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

52.     At all times relevant, Sheriff Wegener and Captain Hancock were acting under color of state law in their capacity as employees and final decision makers of PCSO.

53.     At the time of the complained of events, Nate Carrigan, now proceeding through the Plaintiff Estate of Nate Carrigan as his successor, had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

54.     At the time of the complained of events, Kolby Martin had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

55.     At the time of the complained of events, Travis Threlkel had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

56.     At the time of the complained of events, Plaintiffs Melissa and John Carrigan had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

57.     Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

58.     Defendants actively took steps to put Plaintiffs, including Nate Carrigan, Kolby Martin, and Travis Threlkel at substantial risk of serious, immediate, and proximate harm by placing them in a position of danger, and increasing their vulnerability to such danger, for private acts of violence.

59.     Deputies Carrigan, Martin, and Threlkel were members of a limited and specifically definable group and Defendants' conduct described herein put these Deputies at substantial risk of serious, immediate, and proximate harm.

60.     As a result of the acts described above, the Defendants created and increased the danger that led to Nate Carrigan's death and the serious threats to the life, safety, and bodily integrity of Deputy Martin and the life, safety, and bodily integrity of Deputy Threlkel.  Both Sheriff Wegener and Captain Hancock knowingly instructed the Deputies to breach the residence when Sheriff Wegener and Captain Hancock knew of the dangers waiting behind the door of the Wirth residence, and knowing that such order conflicted with standard operating procedures.

61.     In so consciously instructing and intentionally directing Deputy Carrigan to kick down the residence door of Mr. Wirth and requiring Deputy Carrigan, Deputy Martin, and Deputy Threlkel to breach the residence, which residence was occupied by Mr. Wirth, an individual known to want to shoot law enforcement officers, and thereby creating and/or greatly increasing and exacerbating the danger to Deputies Carrigan, Martin, and Threlkel, Defendants, through their agents, were consciously aware/knew variously during this event, inter alia, that:

- Martin Wirth had a history of violent tendencies towards law enforcement officers, including wanting to shoot them;

- That should Mr. Wirth retreat back into his residence, the tactical plan was to treat it as a barricade and no officer would enter the residence;

- Despite the tactical plan not to enter the residence, that Captain Hancock called the Sheriff and advised the Sheriff that "we need to breach the door";

- The Sheriff initially felt that if a barricade situation was occurring that he would want to talk out the issues with Mr. Wirth;

- Without being at the location to see what was transpiring, the Sheriff ordered the breach;

- Captain Hancock felt that as a "Marine sometimes because I am super aggressive and I don't like to give people the opportunity to plan, fortify and take us out, so I asked a second time, I believe, and I don't know if I even got permission or not.  I can't remember. But I told Nate to take the door";

- Captain Hancock ordered Nate Carrigan to kick down the door at the Wirth residence;

- Captain Hancock ordered Kolby Martin and Travis Threlkel to breach the residence;

- Neither Captain Hancock nor Sheriff Wegener ordered for a SWAT entry team that had fortified shields, vests, helmets, and other superior protective equipment to enter the residence; and

- Neither Captain Hancock nor Sheriff Wegener did anything within their power or pursuant to standard operating procedures to secure the safety of the people involved before ordering the breach of the Wirth residence.

62.     These dangers and risks to Plaintiffs' lives, safety, and bodily integrity were obvious, entirely foreseeable, and actually known to Defendants, as the Defendants acted with a

high degree of outrage and shockingly created this danger, and took the affirmative moving force steps pled herein that essentially altered the status quo by directing Plaintiffs to engage in an action that was completely outside the training and standards adopted by law enforcement nationwide, and threw Plaintiffs into a "lion's den," and thereby placed Nate Carrigan, Kolby Martin, and Travis Threlkel in a much worse position to suffer private violence than they would have been in had Captain Hancock and Sheriff Wegener  not acted at all.

63.     Defendants acted recklessly in conscious disregard of the risks described herein.

64.     The Defendants' conduct described herein, when viewed in total, is conscience shocking.

65.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Carrigan's estate has suffered injuries and losses, including the death of Nate Carrigan, entitling it to recover his compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, lost past and future earnings, permanent lost earnings capacity for the expected productive working lifetime of Nate Carrigan under the mortality tables, all in amounts to be proven at trial.

66.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Martin has suffered injuries and losses, entitling him to recover compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

67.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Threlkel has suffered injuries and losses, entitling him to recover

compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Deliberately Indifferent Training and Supervision**
(*All Plaintiffs v. All Defendants*)

68.     Plaintiffs hereby incorporate the foregoing paragraphs as if fully set forth herein.

69.     42 U.S.C. §1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress….

70.     All Plaintiffs in this action are citizens or permanent residents of the United States and the Defendants to this claim are persons for purposes of 42 U.S.C. § 1983.

71.     At all times relevant, Sheriff Wegener and Captain Hancock were acting under color of state law in their capacity as employees of PCSO.

72.     At the time of the complained of events, Nate Carrigan, now proceeding through the Plaintiff Estate of Nate Carrigan as his successor, had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

73.     At the time of the complained of events, Kolby Martin had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

74.     At the time of the complained of events, Travis Threlkel had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

75.     At the time of the complained of events, Plaintiffs Melissa and John Carrigan had a clearly established substantive due process constitutional right under the Fourteenth Amendment to life, liberty, and bodily integrity.

76.     Any reasonable law enforcement officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

77.     The reckless and deliberately indifferent acts and omissions of Defendants by PCSO's top level final decision makers or delegated final decision makers, as described herein, were moving forces in the deprivation of Plaintiffs' constitutional and statutory rights and caused Plaintiffs' damages.

78.     Sheriff Wegener was at all times relevant the policy and decision maker for PCSO, and in that capacity established training and supervision including monitoring, and sufficient discipline for the same, or through the delegated final policy and decision makers at PCSO.

79.     In addition, Captain Hancock was at all times relevant the policy and decision maker for PCSO, and in that capacity established training and supervision including monitoring, and sufficient discipline for the same, or through the delegated final policy and decision makers at PCSO.

80.     Defendants and/or their final delegated policy and decision makers, including Sheriff Wegener and/or Captain Hancock, with actual knowledge of the obvious need for additional supervision including monitoring Captain Hancock as described in the factual

allegations section above, and with deliberate indifference, did not reasonably provide such sufficient supervision including monitoring Captain Hancock concerning the February 24, 2016, incident, which created danger of private violence which caused the death of Nate Carrigan and the injuries to Kolby Martin and Travis Threlkel.

81.     In addition, Defendants were deliberately indifferent in regard to the training and/or supervision they gave to Sheriff Deputies which resulted from a conscious or deliberate choice to follow a course of action that ran in conflict with PCSO's training and/or supervision standards and practices.  Such action was a moving force that caused the constitutional and federal violation injuries as complained of by these Plaintiffs.

82.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Carrigan's estate has suffered injuries and losses, including the death of Nate Carrigan, entitling the estate to recover his compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, lost past and future earnings, permanent lost earnings capacity for the expected productive working lifetime of Nate Carrigan under the mortality tables, all in amounts to be proven at trial.

83.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Martin has suffered injuries and losses, entitling him to recover compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

84.     As a direct and proximate cause and result of the wrongful conduct of the Defendants, Deputy Threlkel has suffered injuries and losses, entitling him to recover

compensatory and special damages, including the loss of constitutional and federal rights, pain and suffering, and lost past and future earnings, all in amounts to be proven at trial.

## VI.   PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment for the Plaintiffs and against the Defendants and award to the Plaintiffs:

(a)   Appropriate declaratory and/or equitable relief;

(b)   Compensatory and consequential damages, including damages for physical injury, emotional distress, loss of enjoyment of life, and other pain and suffering allowed by law in an amount to be determined at trial;

(c)   All economic losses allowed by law;

(d)   Exemplary damages as allowed by law in an amount to be determined at trial;

(e)   Attorneys' fees and costs associated with this action;

(f)   Pre- and post-judgment interest at the lawful rate; and

(g)   Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL CLAIMS AND ISSUES SO TRIABLE.**

Dated: April 20, 2017

*/s/ Donald C. Sisson*
Reid J. Elkus
Donald C. Sisson
Lucas Lorenz
Zachary D. Wagner
ELKUS & SISSON, P.C.
501 S. Cherry Street, Suite 920

23

Denver, Colorado 80246
Telephone: (303) 567-7981
relkus@elkusandsisson.com
dsisson@elkusandsisson.com
llorenz@elkusandsisson.com
zwagner@elkusandsisson.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on April 20, 2017, a true and correct copy of the foregoing was

electronically filed via CM/ECF.


*/s/Keri A. Roberts*
Keri A. Roberts