IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
KOLBY MARTIN, and
TRAVIS THRELKEL

      Plaintiff(s),
v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual
capacity, and
MARK HANCOCK, in his official and individual capacity,

      Defendant(s).

_____

## MARK HANCOCK'S MOTION FOR SUMMARY JUDGMENT

_____

**COMES NOW** Defendant Mark Hancock, who moves for summary judgment on all of the claims in the Amended Complaint (# 32) pursuant to Fed.R.Civ.P. 56.[1]

The undersigned discussed the grounds for this motion on the afternoon of March 22, 2018. Plaintiffs counsel indicated they oppose the relief requested herein and will respond to the legal arguments in this motion accordingly.

## I.      CHRONOLOGICAL SUMMARY OF FACTS

This case stems from the February 24, 2016 shoot-out between Martin Wirth and deputies from the Park County Sheriff's Office ("PCSO"), specifically, Cpl. Nate Carrigan, Dptys. Kolby

_____

[1] This Court previously dismissed the claims asserted by John and Melissa Carrigan, in their individual capacities against Mr. Hancock. [*See* Order Granting Motion to Dismiss, # 44.] Ms. Carrigan only remains in this case in her capacity as Personal Representative of the Estate of Nate Carrigan. *Id.*

Martin and Travis Threlkel (collectively "Plaintiffs"), Dpty. Jeremy Lowrance, and Cpt. Hancock, while they attempted to perform a lawful eviction.  The undersigned reference the following facts in their argument, below.

1.      Mr. Wirth has been the focus of two eviction proceedings in Park County, once in 2014 as well as the eviction which is the focus of this lawsuit.  [**Exh. A**, Dep. Trans. Welles Tonjes, 37:23-24.]  In 2014, the PCSO peaceably evicted Mr. Wirth from his home without incident.  [**Exh. A**, 37:23-38:9.]  At some point, Mr. Wirth returned to his property and the bank initiated the eviction process again in December of 2015 or January of 2016.  [**Exh. A**, 39:5-18.] County Court Judge Brian Green granted the writ of restitution on January 25, 2016, and Medved Dale Decker & Deere, LLC, a Lakewood based law firm, requested that the PCSO evict Mr. Wirth from his property on or about January 28, 2016.  [**Exh. B**, Dep. Trans. Monte Gore, 331:25-335:12; **Exh. C**, Order and Writ of Restitution; **Exh. D**, PCSO Service Form.]

2.      On January 20, 2016, Mr. Wirth attempted to reinstate his driver's insurance at a State Farm office in Golden.  When the agent informed Mr. Wirth she could not help him, most likely due to an unpaid parking ticket, Mr. Wirth commented that he would just "go home and get his gun and shoot the first cop he [saw]."  After he left the office, the agent notified the police.  The Jefferson County Sheriff's Office contacted Mr. Wirth as he drove home to Park County, and because he did not stop, Jefferson County and the PCSO deputies followed him home.  This contact resulted in the PCSO issuing Mr. Wirth a summons for driving under restraint and without insurance, eluding a peace officer, and obstructing a peace officer.  [*See* **Exh. E**, PCSO Offense Report 2016000052.]   Between January 20 and February 24, 2016, there

is no evidence Mr. Wirth threatened or acted violently toward any law enforcement officer. [**Exh. F**, Dep. Trans. Kolby Martin, 276:1-278:4, 291:14-292:22.]

3.      Captain Hancock was the senior officer in-charge of the eviction of Mr. Wirth on February 24, 2016.   [**Exh. G**, Dep. Trans. Mark Hancock, 139:8-18.]   To prepare for the eviction, Cpt. Hancock held a briefing at the PCSO Bailey substation with everyone involved – Plaintiffs, Dpty. Lowrance, Det. D.J. Hannigan, and Dpty. Dave Leffler.   [**Exh. F**, 131:23-132:1.]  Dpty. Threlkel testified at his deposition that Cpt. Hancock asked the deputies whether they believed the PCSO SWAT team should perform the eviction.  [**Exh. H**, Dep. Trans. Travis Threlkel, 67:21-68:20.]  The majority voted against elevating the eviction to a SWAT call-out, (**Exh. H**, 68:20-70:17), despite discussion of the removal of Mr. Wirth turning into a "shootout and O.K. Corral" situation, (**Exh. F**, 140:19-24).   However, the team had significant SWAT experience - Captain Hancock was the PCSO SWAT Commander, Dpty. Martin was a PCSO SWAT team leader, and Dpty. Threlkel and Lowrance were members of the PCSO SWAT team. [**Exh. H**, 60:19-61:1; **Exh. F**, 65:20-23, 145:9-146:5; **Exh. G**, 20:15-22.]

4.      During the pre-eviction briefing Cpt. Hancock diagramed Mr. Wirth's home and assigned each deputy a role.  [**Exh. F**, 135:6-23, 145:3-8.]  Captain Hancock sent Dpty. Leffler to surveil Mr. Wirth's property, so he left the briefing early.  [**Exh. F**, 137:1-6.]  Then, Captain Hancock decided he and Cpl. Carrigan, who had a good relationship with Mr. Wirth, would approach the home together and to contact him, while the rest of the deputies approached the home from the woods behind the house and set up a perimeter.  [**Exh. F**, 158:8-24; **Exh. G**, 143:19-144:7.]  The hope was that Cpt. Hancock and Cpl. Carrigan would be able to speak with Mr. Wirth and convince him to leave the property without the need for further involvement by

the deputies.   [**Exh. G**, 143:19-144:7]   Undersheriff Monte Gore stationed himself at the communications center in Fairplay, where he had the ability to not only listen to the group's radio transmissions, but also to communicate directly with the deputies on Channel Ops 5 ("Ops 5").  [**Exh. B**, 123:6-9, 156:22-157:2, and 341:1-6.]

5.      However, Dpty. Threlkel noted during his deposition that the group planned for the possibility of breaching Mr. Wirth's home.  [**Exh. H**, 155:11-25.]   According to Dptys. Martin and Threlkel, a lawful writ of restitution permitted the deputies to make entry and forcibly remove Mr. Wirth from the property.  [**Exh. C**; **Exh. F**, 312:5-10; **Exh. H**, 282:5-24.] Deputy Threlkel further explained Cpl. Carrigan was going to be their "breacher" since, due to his size, everyone knew "he could kick the door down."  [**Exh. H**, 155:13-26.]  Deputy Threlkel continued, "it's like if you guys have to go in, this is the team I want.  So, of course, Kolby is the SWAT team leader and he also has the most seniority out of us there.  So it was Kolby, myself, and then Lowrance was put on to go in the house if we had to, if he was immediately available." [**Exh. H**, 155:17-25.]  Captain Hancock confirmed these assignments by placing stars next to the names of the deputies who would enter the home, and writing "breach" next to Cpl. Carrigan's name on a whiteboard in the briefing room.  [**Exh. I**, Photo of Whiteboard from Briefing Room; **Exh. H**, 155:17-25; **Exh. F**, 141:21-142:4; **Exh. G**, 159:6-25.]  No deputy objected to this plan. [**Exh. H**, 299:7-20; *see also* **Exh. F**, 290:22-291:8 (voicing no objection despite knowing medical personnel would be placed on stand-by for the operation, indicating there was a potential for injuries).]  Corporal Carrigan's sole role in the event entry was necessary was to "breach the door and move out of the way."  [**Exh. G**, 144:16-18.]

6.      At the conclusion of the briefing, Cpt. Hancock permitted the deputies to wear whatever type of body armor they preferred.  [**Exh. F**, 160:2-13.]  Deputy Martin wore a ballistic vest underneath his uniform while Dpty. Threlkel chose to wear a Level IV plate carrier, which is designed to take "quite a bit more brunt, if that's what happened."  [**Exh. F**, 293:9-22; **Exh. H**, 191:17-192:15.]

7.      Per the plan, Cpt. Hancock and Cpl. Carrigan arrived simultaneously at Mr. Wirth's property, Cpt. Hancock in an unmarked vehicle and Cpl. Carrigan in a patrol car with PCSO markings, while the other deputies walked through the woods to establish a perimeter around the home.  Mr. Wirth was standing on his front deck as Cpl. Carrigan and Cpt. Hancock drove up the driveway.  [**Exh. F**, 170:13-21; **Exh. G**, 224:20-226:15.]

8.      Captain Hancock and Cpl. Carrigan spoke with Mr. Wirth, informing him they were there to evict him from his residence and requested that he exit his home.  [**Exh. G**, 224:20-226:15.]  Mr. Wirth calmly responded, "you're not even going to give me time to move my stuff out?"  [**Exh. G**, 225:5-15.]  No other deputy had any verbal communications with Mr. Wirth as he stood on the deck, nor was anyone else in position to hear the full conversation between Mr. Wirth, Cpt. Hancock, and Cpl. Carrigan.  [*See* **Exh. F**, 170:16-171:7 (explaining he was positioned such that he could see Mr. Wirth's interaction with Cpl. Carrigan and Cpt. Hancock, but was too far away to hear exactly what was said).]

9.      At the conclusion of their conversation, Mr. Wirth placed his hands in the air, turned around, and entered the home.  [**Exh. F**, 171:22-25.]  He did not threaten Cpl. Carrigan or Cpt. Hancock, nor did he appear to be armed or demonstrate any signs of physical aggression or unwillingness to comply with the eviction order.  [**Exh. G**, 225:5-227:6; **Exh. F**, 171:12-17,

173:3-13; **Exh. H**, 208:3-8 (acknowledging Mr. Wirth "didn't have any weapons in his hands" while he was on the deck), 305:22-306:5.]  Captain Hancock then radioed to everyone over Ops 5 that Mr. Wirth went back in the house.  [**Exh. G**, 233:4-18; **Exh. J**, Ops 5 Transcript.]

10.     Once Mr. Wirth entered the residence, Cpt. Hancock and Cpl. Carrigan walked from their position below the deck to meet Mr. Wirth at the front door.  [**Exh. G**, 227:7-9.] There are no stairs leading from the deck to ground level.  [*See* **Exh. K**, Photos of Mr. Wirth's Home; **Exh. F**, 296:21-24; **Exh. H**, 303:5-22.]  Thus, the only way for Mr. Wirth to come outside to meet the officers was to go inside and exit through the front door.  [**Exh. F**, 296:25-297:6, 20-23.]

11.     At the front door, Cpt. Hancock and Cpl. Carrigan announced their presence and told Mr. Wirth to, "Come to the door."  [**Exh. G**, 227:13-24.]  Mr. Wirth did not tell them to leave, make any threats, or indicate he was armed.  [**Exh. G**, 228:4-15.]  He did not respond at all, and when Cpt. Hancock looked inside the home through the window in the front door, he could not see any movement inside.  [**Exh. G**, 228:16-229:13.]  When Mr. Wirth did not respond, Cpt. Hancock felt uncomfortable because he did not know Mr. Wirth's location and whether he might have a weapon, so he called for Dptys. Martin, Threlkel, and Lowrance to join him and Cpl. Carrigan at the front door.  [**Exh. G**, 227:25-228:3, 232:2-14.]

12.     Shortly after Cpt. Hancock and Cpl. Carrigan began their efforts to contact Mr. Wirth at the front door, Sheriff Wegener arrived at the property.  [**Exh. G**, 256:15-21.]  Over the course of the next 88 seconds, Cpt. Hancock expressed - over Ops 5 - that he tried to contact Mr. Wirth, Mr. Wirth was not coming to the door, and that he intended to make entry.  [*see* **Exh. B**, 299:15-312:7; *see also* **Exh. J**.]  The Sheriff did not object to the deputies entering the home.

[**Exh. J**.]  Undersheriff Gore, listening to the transmissions and able to interject, did not object. Specifically, Undersheriff Gore testified at his deposition, that "it is the responsibility of the SWAT commander to make those decisions [regarding entry].  The communication that was taking place concerned me, but I did not have eyes on, and it would [have] been inappropriate for me to attempt to interfere at that point."  [**Exh. B**, 340:13-17.]  Similarly, once Cpt. Hancock gave the command to breach, none of the deputies at the front door voiced any objection.  [**Exh. F**, 187:18-25, 302:24-303:9.]  The deputies formed a stack, with Dpty. Martin in front, followed by Dptys. Threlkel and Lowrance.  [**Exh. H**, 213:23-214:4.]  Corporal Carrigan kicked the door in and stacked deputies entered the home.  [**Exh. F**, 226:20-24.]

13.     Captain Hancock felt that entering the home quickly provided his team a tactical advantage; specifically, that they could prevent Mr. Wirth from fortifying himself inside his home.  [**Exh. G**, 161:1-16, 248:13-21.]

14.     The stack team entered Mr. Wirth's home through a mudroom into a kitchen area. [**Exh. F**, 190:2-191:2.]  Mr. Wirth, hidden in the stairwell leading to the lower floor of his home, ambushed the stack team deputies as they were in the kitchen.  [**Exh. F**, 180:2-4, 191:7-25.]  Corporal Carrigan remained near the front door, and never entered the kitchen area.  [**Exh. F**, 226:20-24.]  Mr. Wirth shot and killed Cpl. Carrigan.  [**Exh. F**, 240:23-25; **Exh. H**, 180:8-10.]  Mr. Wirth shot and wounded Dpty. Martin and Cpt. Hancock.  [**Exh. F**, 241:1-5; **Exh. H**, 180:11-16.]

15.     At all times relevant to this operation, the deputies were acting within the course and scope of their employment with the PCSO.  [**Exh. F**, 304:22-305:1.]

16.     Although Plaintiffs challenge Cpt. Hancock's decision to enter the home, there is no disagreement that law enforcement is an inherently dangerous profession.  [**Exh. L**, Dep. Trans. Melissa Carrigan, 69:24-70:2; **Exh. F**, 258:19-259:4; **Exh. H**, 138:17-21.]  The parties also agree that no evidence demonstrates Cpt. Hancock intended to kill or injure any of the deputies by ordering them to enter Mr. Wirth's home.  [**Exh. L**, 111:7-25; **Exh. F**, 303:17-304:7; **Exh. B**, 346:20-347:5.]

## II.     CLAIMS UPON WHICH JUDGMENT IS SOUGHT

### A.     Captain Hancock is entitled to Summary Judgment on his Fourth Affirmative Defense: Qualified Immunity.

#### 1.     Burden of proof and elements.

Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law. *Margheim v. Buljko*, 855 F.3d 1077, 1087 (10th Cir. 2017).  Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so (2) that the right was clearly established at the time of the defendant's unlawful conduct. *Id.*; *see also White v. Pauly*, 137 S.Ct. 548, 551 (2017).  The Court is free to begin its analysis with either prong.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, it is plain that the constitutional right at issue – whether the Fourteenth Amendment protects a law enforcement officer from exposure to violence in the course of a tactical operation – is not clearly established so Cpt. Hancock begins his analysis with the clearly established prong.

    **2.**      **Elements that cannot be proven by the Plaintiffs.**

        **a.**      **Clearly established law element.**

Only government conduct which is arbitrary or conscience shocking in a constitutional sense can form the basis of a substantive due process violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 116 (1992). The Supreme Court has admonished expanding "the concept of substantive due process because guideposts for responsible decision making in this uncharted area are scarce and open-ended." *Id.* (citations omitted). This unwillingness to grow the bounds of substantive due process jurisprudence has resulted in no precedent – much less a controlling case or a robust consensus of cases – holding that the Fourteenth Amendment protects a law enforcement officer from exposure to violence in the course of a tactical operation. To satisfy this prong, Plaintiffs must demonstrate that the law as of February 2016 would have placed the constitutionality of Cpt. Hancock's conduct "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This is a demanding standard meant to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018). The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), meaning it is dictated by "controlling authority" or a "robust consensus of cases of persuasive authority," *al-Kidd*, 563 U.S. at 741-42 (internal quotations and citations omitted). The precedent must be clear enough that every official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle v. Howards*, 566 U.S. 658, 666 (2012). Otherwise, the rule is not one that "every reasonable official" would know. *Id.* at 664.

Most importantly, this standard demands that the legal precedent "clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590.  It is not enough to merely rely on general statements of law concerning Fourteenth Amendment substantive due process. *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009).  Plaintiffs must identify legal authority that focuses on the particular circumstances of the specific case before the court. *Mullenix v. Luna*, 136 S.Ct. 305, 309 (2015); *Estate of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016).  Thus, the cases from the preexisting legal landscape must have substantial factual correspondence.  This requires Supreme Court or Tenth Circuit precedent close enough on point to make the unlawfulness of an officer's conduct apparent. *Pauly v. White*, 874 F.3d 1197, 1222 (10th Cir. 2017) (quoting *Mascorro v. Billings*, 656 F.3d 1198, 1208 (10th Cir. 2011).  Reliance upon unpublished decisions provides little support for the "notion that the law is clearly established" on any point. *Morris v. Noe*, 672 F.3d 1185, 1197 n.5 (10th Cir. 2012) (internal quotation and citation omitted).

### (1)   The Fourteenth Amendment does not extend to guarantee employees a safe work environment.

First, the Supreme Court's decision in *Collins v. City of Harker Heights* makes clear that substantive due process is not a guarantor of workplace safety.  There, the decedent's representative sued Harker Heights under § 1983 for providing an unsafe workplace when it caused the decedent, a City sanitation department employee, to enter a sewer without adequate ventilation and he died as a result.  The Court began its analysis by instructing, "Neither the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." *Collins*, 503 U.S. at 126.  The *Collins* Court held the

City did not violate the decedent's substantive due process rights, and explained that substantive due process "is not a guarantee against incorrect or ill-advised personnel decisions.  Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm."  *Id*. at 129 (internal quotations omitted).

The Tenth Circuit, in *Moore v. Guthrie*, 438 F.3d 1036 (10th Cir. 2006), followed *Collins* and found that an employee does not have a cognizable claim against his supervisor for decisions which may cause a workplace injury.  There, Michael Guthrie, the Chief of Police for the City of Evans, Colorado, directed the plaintiff police officer, Tracy Moore, and other officers participating in a live-fire training exercise to wear riot helmets rather than the protective equipment, including facemasks, recommended by the manufacturer of the liquid-filled bullets the officers used during the exercise.  *Id*. at 1038.  Mr. Moore was injured during the training when a bullet flew up beneath his helmet and caused him to loose a significant percentage of vision in one eye.  *Id*.  The Court determined Mr. Moore's injury was the "result of allowing a risk, perhaps even an unreasonable one, to persist in the workplace," *id*. at 1041, or what might be better characterized as a "workplace hazard." *See id*. (citing *Collins*, 503 U.S. at 128).  Since the injury occurred in the workplace, a live-fire police training, Mr. Moore failed to a legally cognizable state a substantive due process claim.  *Id*. at 1043.

*Collins* and *Moore* make clear that the Plaintiffs cannot proceed under a Fourteenth Amendment substantive due process theory for injuries arising out of their workplace environment and its associated workplace hazards.  There is no dispute this incident occurred while Plaintiffs were acting within the course and scope of their employment as PCSO deputies.  [Chronological Summary of Facts ("CSF"), ¶ 15.]  To date, no Supreme Court or Tenth Circuit

decision has applied *Collins* to any circumstances which even approach the facts of this case. But *Moore* made clear that being shot at, in the law enforcement context, constitutes a workplace hazard for which there is no substantive due process protection.

**(2)     Prior danger-creation precedent is too factually distinct to speak clearly to the specific circumstances of this case.**

Even if this Court disregards *Collins'* clear instruction that substantive due process does not apply under these circumstances and considers this a "danger-creation" case, there was no developed body of law in February 2016 finding liability under a danger-creation theory for a private act of violence. *See, e.g.*, *Estate of Reat*, 824 F.3d at 965 (granting qualified immunity to 911 operator who instructed victim of crime to return to the scene); *Moore*, 438 F.3d at 1042 (affirming grant of qualified immunity and describing state-created danger theory as "a *narrow exception,* which applies only when a state actor affirmatively acts to create, or increase[ ] a plaintiff's vulnerability to, danger from private violence. It does not apply when the injury occurs due to the action of another state actor."); *Perez v. Unified Gov't of Wyandotte Cty./Kansas City*, 432 F.3d 1163, 1168 (10th Cir. 2005) (granting summary judgment to firefighter who crashed his truck into a car, killing its occupant); *Radecki v. Barela*, 146 F.3d 1227, 1232 (10th Cir. 1998) (applying the doctrine to a deputy sheriff who caused the death of a bystander by instructing him to physically help him subdue a criminal suspect who then shot the civilian and granting summary judgment on qualified immunity grounds); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995) (affirming grant of summary judgment on qualified immunity grounds for mental health administrators who eliminated a special unit for the criminally insane, causing the transfer of a murderer to the general hospital, where he killed his therapist).

Even if Plaintiffs are able to locate a private act of violence case which does find liability, no case has facts which are substantially similar this case - a third party who fires at deputies while they participate in a tactical operation. *Estate of Reat*, despite post-dating the events of this case, clarified in disposing of the case under the clearly established law prong that without any previous Tenth Circuit decisions focusing on the responsibilities of 911 operators, no reasonable 911 operator could have known their actions under substantially similar facts would have resulted in a substantive due process violation. *Estate of Reat*, 824 F.3d at 967. The same is true here - no Supreme Court of Tenth Circuit case has applied the danger-creation theory to a case arising out of a tactical situation involving law enforcement officers and found a violation of the substantive due process clause. Even at the district court level, in *Moriarty v. Bd. of Cnty. Com'rs for Cnty. Of Sandoval*, 931 F.Supp.2d 1142, 1174 (D.N.M. 2013), the Court performed a thorough danger-creation analysis related to a tactical operation to track a burglar, during which the burglar killed one officer and wounded another. The District Court found the danger-creation exception did not apply and granted summary judgment on qualified immunity grounds. Since no case law, at any level, has the applied danger-creation and found liability, Plaintiffs cannot demonstrate the law was clearly established in their favor at the time Mr. Wirth killed Cpl. Carrigan, wounded Dpty. Martin and Cpt. Hancock, and shot at Dpty. Threlkel.

    b.  **<u>Constitutional violation element.</u>**

      (1)  **Substantive due process does not apply to the facts if this case.**

Plaintiffs attempt to avoid *Collins* by ignoring the context in which their injuries arose – a shooting which occurred during the course of the PCSO's execution of a lawful writ of restitution. In *Collins*, the plaintiff asserted a § 1983 claim based upon an alleged violation of

the due process clause when her husband was killed in a workplace accident which resulted from a known risk or harm. This case is no different. Execution of a writ of restitution falls squarely within the job description and responsibilities of a deputy sheriff. COLO.REV.STAT. §13-40-122(1). Again, there is no question that this incident occurred while the deputies were acting within the course and scope of their employment as members of the PCSO. [CSF, ¶ 15.] In preparing for the eviction, Cpt. Hancock and the Plaintiffs, pursuant to a lawful eviction order, planned for how to evict Mr. Wirth from the property. [CSF, ¶¶ 1, 3-6.] They even considered the potential danger posed by Mr. Wirth in creating their eviction plan, to include the consideration of elevating the matter to a SWAT call-out (CSF, ¶ 3), coordinating the deputies' approach to the property (CSF, ¶¶ 4 and 5), and wearing body armor (CSF, ¶ 6). Thus, this case falls squarely under *Collins'* prohibition on extending substantive due process protections to guarantee workplace safety. *Uhlrig*, 64 F.at 573 (quoting *Collins*, 503 U.S. at 129) ("[t]he Due Process Clause 'is not a guarantee against incorrect or ill-advised [government] decisions' nor does it guarantee municipal employees a workplace that is free of unreasonable risks."). Since there is no substantive due process "right to bodily integrity in a safe work environment," *Moore*, 438 F.3d at 1040, Plaintiffs cannot assert a viable Fourteenth Amendment claim here.

> **(2)** **Captain Hancock's actions were not "conscience shocking" so as to satisfy the elements of the danger-creation doctrine.**

Even if the Court disagrees and expands the reach of its substantive due process evaluation, to invoke the danger-creation theory, Plaintiffs must show: (1) they were members of a limited and specifically definable group; (2) Cpt. Hancock's conduct put them and other members of that group at substantial risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) Cpt. Hancock acted recklessly in conscious disregard of the risk; and

(5) such conduct, when viewed in total was conscious shocking.  *See Estate of Reat*, 824 F.3d at 965 (setting forth elements of state-created danger exception).  The danger-creation doctrine is "an exception; that is, a narrow basis on which if every element is proven, state actors can be sued for harm caused by a third party."  *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 920 n. 8 (10th Cir. 2012).  Captain Hancock addresses each element in-turn, except for the first.

**(a)     No substantial risk of serious, immediate and proximate harm.**

With regard to the second factor, there is no evidence Cpt. Hancock's decision to breach Mr. Wirth's residence created a high probability of serious and substantial harm.  Risks inherent to a profession, warnings about a risk, and the ability to plan and prepare to mitigate the risk all serve to reduce the probability of serious and substantial harm.  *Uhlrig* 64 F.at 757.  In *Uhlrig*, the defendant hospital notified the decedent, Stephanie Uhlrig, not only of the general risks associated with working with mentally-ill inmates, but it also informed her of the assaultive history of the inmate-patient who murdered her.  *Id*.  These  "warnings [were] sufficient to minimize the risk inherent in her job, so that the risk facing Uhlrig could *not* fairly be described as presenting a substantial risk of serious harm."  *Id*. (emphasis added).

This case is identical.  First, the parties do not dispute that law enforcement is an inherently dangerous profession.  [CSF, ¶ 16.]  Next, the deputies involved in the eviction were aware of the potential risk Mr. Wirth posed to them; specifically, that he threatened to shoot any law enforcement official he came into contact with.  [CSF, ¶¶ 2 and 3.]  That Mr. Wirth might make the eviction into a "shootout and O.K. Corral" situation was discussed at the pre-eviction briefing attended by all the Plaintiffs.  [CSF, ¶ 3.]  Captain Hancock allowed the deputies present to vote on whether or not to make the eviction a formal SWAT operation, and a majority of the

deputies concluded this was an unnecessary precaution.   [CSF, ¶ 3.]   And Cpt. Hancock permitted each deputy to wear the armor and bring the equipment they believed was necessary for the operation.  [CSF, ¶ 6.]  Factoring in the deputies' acknowledgment of the danger posed by Mr. Wirth at the pre-eviction briefing, election to not elevate the operation to a SWAT call-out, and ability to prepare for the risk, the pre-eviction planning and preparation by all the deputies involved, including Cpt. Hancock, was "sufficient to minimize the risk inherent in [their] job" that day.  *Uhlrig*, 64 F.3d at 575.

### (b)      No obvious or known risk.

As to the third factor – the risk was obvious or known -  although the deputies may have understood that Mr. Wirth might pose a risk, no facts suggest Cpt. Hancock knew Mr. Wirth was set up to ambush the stack team before he ordered the entry.   Corporal Carrigan and Cpt. Hancock spoke with Mr. Wirth as he stood on his front deck upon their arrival at his home. [CSF, ¶¶ 7-9.]  At no time during this initial contact did Mr. Wirth verbally refuse to leave the residence, nor did he indicate that any further law enforcement involvement would result in a shoot-out.   [CSF, ¶¶ 8 and 9.]  Moreover, between the time Mr. Wirth threatened to shoot law enforcement officers on January 20, 2016 and the eviction, Mr. Wirth did not engage in any acts of violence against any member of law enforcement, including the PCSO.  [CSF, ¶ 2.]  Finally, although Mr. Wirth threw his hands in the air as he turned and entered his home (CSF, ¶ 9), this single act can hardly be described as a clear indication by Mr. Wirth that he intended to shoot the first person who entered his home.  Rather, Mr. Wirth's act of turning around and going back inside, coupled with his calm  statement about packing up his belongings, without any physical

sign of frustration or aggression, would have led a reasonable officer to believe that Mr. Wirth intended to grab a few of his belongings and leave the house.  [CSF, ¶¶ 8 and 9],[2]

**(c)      No reckless or conscience disregard of risk.**

Fourth, Cpt. Hancock did not concisely disregard a known and serious risk in ordering the stack team to enter the home.  To the contrary, as evidenced by the pre-eviction briefing, Cpt. Hancock established a plan in the event he determined it was necessary to enter the home and remove Mr. Wirth.  [CSF, ¶ 5.]  And he involved deputies on the stack team who had the requisite training and experience to complete a dynamic entry.  [CSF, ¶¶ 3 and 5.]  Moreover, the Court should not second guess Cpt. Hancock's decisions based on the benefit of hindsight. *Uhlrig*, 64 F.3d at 576.  Only now do we know that once Mr. Wirth returned inside from speaking with Cpl. Carrigan and Cpt. Hancock he armed himself with a rifle, hid in the stairway leading to the lower level of his home, and waited to ambush anyone who entered through the front door.  Rather, the facts show that Cpt. Hancock, despite his and Cpl. Carrigan's knocking on the door and requesting that Mr. Wirth exit the residence, did not know Mr. Wirth's location inside the home, that he refused to come outside, or that he intended to shoot anyone.  [CSF, ¶¶ 8, 9, and 14.]

---

[2]  Even if Plaintiffs can establish that this minor gesture should have indicated to Cpt. Hancock that Mr. Wirth intended to engage in acts of violence, their own expert agreed that (1) nothing can be done when an assailant hides himself to ambush officers; (2) nothing would prevent Mr. Wirth from shooting the first person through the door; and (3) that he only person who could control Mr. Wirth's actions was Mr. Wirth.  [**Exh. M**, Dep. Trans. Dan Montgomery, 43:20-44:7 ("…the bottom line, take ambushes, for example, your tactics and judgment can be perfect, but if you don't even know they are there and you're ambushed, not much you can do.", 241:10-14,  246:12-247:1.]

   **(d)**  **Captain Hancock's conduct, when viewed in total, was not conscience shocking.**

Finally, Cpt. Hancock's conduct does not shock the conscience.  Conduct "shocks the conscience" when it demonstrates such "a degree of outrageousness and a magnitude of potential or actual harm" that it "'shocks the conscience of federal judges.'" *Uhlrig*, 64 F.3d at 573–74 (quoting *Collins*, 503 U.S. at 126).  In *Cnty of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Supreme Court described the shock the conscience standard as reflecting a spectrum of due process limits on state action.  At one end of the spectrum was negligently inflicted harm, which can never meet the shock the conscience test: "Liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id*. at 849.  At the other end of the spectrum is the intentional infliction of injury, "unjustifiable by any government interest …." *Id*.  The *Lewis* Court applied this spectrum to circumstances involving a high-speed police chase, noting that police find themselves in an unenviable position. *Id*.  Law enforcement's "duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs." *Id*.  Officers are supposed to "act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." *Id*.; *cf. City and Cnty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1775 (2015)("The Constitution is not blind to the fact that police officers are often forced to make split-second judgments."); *Graham v. Connor*, 490 U.S. 386, 397 (1989)("[P]olice officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving.")  Thus, the *Lewis* Court held that "high-speed chases with no intent to harm the suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by any action under § 1983." *Id*. at 853-54.

While *Lewis'* holding is narrowly tailored to police chases, its reasoning is directly applicable here. Like the defendant officer in *Lewis*, Cpt. Hancock did nothing to cause Mr. Wirth to hide in his home, arm himself, and lie in wait for someone to enter, (*see* CSF, ¶¶ 10, 11, and 14). *See Lewis*, 523 U.S. at 855. When Mr. Wirth did not come to door after several minutes, Cpt. Hancock acted with an instinctive response – enter the home and subdue Mr. Wirth, thereby ensuring the safety of his officers. [CSF, ¶¶ 11 and 13.] It is reasonable for police to move quickly if "delay would gravely endanger their lives or the lives of others." *Sheehan*, 135 S.Ct. at 1775 (internal quotations and citations omitted). This is true even when, judged with the benefit of hindsight, the officers made a mistake. *Id.*; *see also Moriarty*, 931 F.Supp.2d at 1174 (rejecting plaintiff's speculative argument concerning the design of a tactical operation – "it is not at all clear that if the operation were designed as she says it should have been, the outcome would have been entirely different.").

Captain Hancock's instinct was to enforce a lawful court order and prevent Mr. Wirth from fortifying his position and escalating the situation into something extremely more dangerous for the deputies; not induce Mr. Wirth's lawless actions, or "to terrorize, cause harm, or kill" anyone, *Lewis*, 523 U.S. at 855, including the Plaintiffs. [CSF, ¶ 16.] Not only did none of the deputies, Undersheriff Gore, or Chief Wegener object to the order to enter, (CSF, ¶ 12), but there is also no reason to believe Cpt. Hancock's order was "tainted by an improper or malicious motive on his part." *Id.* at 855. Quite simply, Cpt. Hancock had no way to know that Mr. Wirth positioned himself such that he could ambush anyone who entered the home, whether it was the deputies, a bank representative, or someone else associated with the eviction process.

19

[CSF, ¶ 14.]  Regardless of whether Cpt. Hancock's behavior offended the reasonableness held up by tort law or the balance struck by any general sentiment of what constitutes sound police practices, his actions under the circumstances do not shock the conscience so as to support any violation of the Fourteenth Amendment under the danger-creation exception.

**B.     Captain Hancock is entitled to Summary Judgment on Claim 2: Deliberately Indifferent Training and Supervision.**

**1.     <u>Burden of proof and elements</u>.**

Plaintiffs fail to clearly define whether they allege their Second Claim for Relief against Cpt. Hancock in his official or individual capacity.  Nevertheless, there can be no liability for deliberate indifference to training or supervision where there is no underlying constitutional violation.  *See Hinton v. City of Elwood, Kan*, 997 F.2d 774, 782 (10th Cir. 1993)("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers";  see also *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 768 (10th Cir. 2013) ("The plaintiff must show an affirmative link between the supervisor and the constitutional violation.")

A plaintiff may demonstrate municipality liable under § 1983 for employing a policy or custom which directly caused the alleged injury.  *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).  Deliberate indifference to training or supervision is one of several avenues for proving such a claim.  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010).

With respect to the claim against Cpt. Hancock in his individual capacity, Plaintiffs must show an affirmative link between Cpt. Hancock and the constitutional violation.  *Schneider*, 717 F.3d at 767.  This requires "more than a supervisor's mere knowledge of his subordinate's

conduct." *Id.* (quotations omitted).   Rather, Plaintiffs must satisfy three elements against to establish a successful claim against Cpt. Hancock based on his supervisory responsibilities: (1) personal involvement; (2) causation; and (3) state of mind.  *Id.*

### 2.     Elements that cannot be proven by Plaintiffs.

#### (1)     Official capacity.

For the reasons stated below in Section C, Plaintiffs cannot demonstrate any official capacity claim against Cpt. Hancock.  Cpt. Hancock also incorporates the PCSO's arguments concerning municipal liability as if fully set forth herein.

#### (2)     Individual capacity.

To the extent this is an individual capacity claim, Plaintiffs cannot establish the first two threshold requirements.   First, as discussed at length above, Cpt. Hancock did not violate anyone's civil rights here.

Next, the logic of this claim is at odds with the claim's elements.   Typically, a supervisory liability claim seeks to extend constitutional liability to a supervisor based on a subordinate's conduct during the course of implementing a policy which is constitutionally infirm.  *See Schneider*, 717 F.3d at 767 (including a "subordinate's conduct" as a precondition for supervisory liability).  This claim, as pled, would require that Plaintiffs violated a third-party's constitutional rights pursuant to some lack of training or supervision provided by Cpt. Hancock.  But that is not the case here.  Plaintiffs allege Cpt. Hancock violated their substantive due process rights, meaning that he was deliberately indifferent to the training and supervision of himself, rendering the claim no different than the First Claim for Relief to which Cpt. Hancock is entitled to qualified immunity.  This also demonstrates the lack of any legal precedent showing

that Cpt. Hancock should have known that his exposing himself and Plaintiffs to violence in the course of executing normal function of their jobs as law enforcement officers violated the constitution.

Even if the Court looks past the logic problem here, there is no evidence of any deficiency in training or supervision by Cpt. Hancock to satisfy the causation element.  There is no doubt Plaintiffs received training from the PCSO and that Cpt. Hancock may have played a role in that training.  But Plaintiffs have not identified what training/supervision was deficient. Further, Plaintiffs all played a role in their own training and supervision.  Deputy Martin developed and led trainings for the PCSO, including training related to the entry of structures. [**Exh. F**, 254:3-14.]  Deputy Threlkel was a field training officer in charge  of training new PCSO deputies.  [**Exh. H**, 57:12-21, 58:8-15.]  And Cpl. Carrigan played a role in Dpty. Threlkel's training.  [**Exh. H**, 53:10-17.]

Finally, for the reasons discussed in Section A, above, Plaintiffs cannot demonstrate Cpt. Hancock acted with the requisite state of mind – that being conscience shocking behavior.  As a result, Cpt. Hancock is entitled to qualified immunity on the Second Claim for Relief.

**C.    Captain Hancock, in his Official Capacity, is entitled to Summary Judgment on Claims 1 and 2.**

**1.    Burden of proof and elements.**

A claim against a public official that is brought in his official capacity is the same as a claim brought against the public entity for which that official works.  *Moss v. Kopp*, 559 F.3d 1155, 1168 n. 13 (10th Cir. 2009).  A municipality may not be held liable under § 1983 merely on the basis of its status as an employer. Rather, to establish municipal liability, a plaintiff must demonstrate two elements: (1) a municipal employee committed a constitutional violation; and

(2) a direct causal link between the injury alleged and a municipal policy or custom. *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

### 2. Elements that cannot be proven by Plaintiffs.

#### a. Element 1.

In the event the Court dismisses Claims 1 and 2 because Cpt. Hancock, in his individual capacity, has qualified immunity for the reasons argued in Section A and B, above, summary judgment must also enter in favor of Cpt. Hancock in his official capacity on Claims 1 and 2 because there is no underlying constitutional violation by a municipal employee.[3]

## III. CONCLUSION

In light of the foregoing, Cpt. Hancock has come forward with sufficient undisputed evidence to establish: (1) the affirmative defense of qualified immunity which requires the dismissal of the Plaintiffs' claims for relief against him in his individual capacity; and (2) in the event the Claims 1 and 2 are dismissed, Plaintiffs cannot prove their official capacity claim against Cpt. Hancock. The applicable Fourteenth Amendment case law does not apply to matters arising from the work environment. And, even if the Court disagrees, the undisputed facts fall short of satisfying the elements of the danger-creation exception. Consequently, summary judgment should be granted and the case against Cpt. Hancock should be dismissed in its entirety.

---

[3] In addition to there being no constitutional violation which supports any claim against Cpt. Hancock in his official capacity, Cpt. Hancock made clear at his deposition that he retired from the PCSO in January 2017. [**Exh. G**, 19:11-22.] Since Cpt. Hancock is no longer a PCSO employee, any claim against him in his official capacity is inappropriate. *See* Fed.R.Civ.P. 25(d). This claim is also duplicative of that which the Plaintiffs asserted against Sheriff Wegener in his official capacity and the PCSO, and therefore subject to dismissal. *Kentucky v. Graham*, 473 U.S. 159, 166, (1985) ("an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *see also Kiley v. Jefferson Cty. Sch. Dist.*, No. 17-CV-01783-CMA-NYW, 2018 WL 828021, at *4 (D. Colo. Feb. 12, 2018) (dismissing official capacity claim as "duplicative" when plaintiff also named municipal entity as a defendant).

Respectfully submitted this 23rd day of March, 2018.

BERG HILL GREENLEAF RUSCITTI LLP


*s/ Josh A. Marks*
Josh A. Marks
David J. Goldfarb
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  jam@bhgrlaw.com
            djg@bhgrlaw.com

*Attorneys for Defendant Mark Hancock*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of March, 2018, I electronically filed the foregoing **MARK HANCOCK'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses:

Donald C. Sisson
Reid J. Elkus
Lucas Lorenz
Elkus and Sisson, P.C.
501 South Cherry Street, Suite 920
Denver, CO 80246
dsisson@elkusandsisson.com
relkus@elkusandsisson.com
llorenz@elkusandsisson.com

Timothy P. Schimberg
Fowler, Schimberg, Flanagan &
McLetchie, P.C
1640 Grant Street, Suite 300
Denver, CO 80203
t_schimberg@fsf-law.com

*s/ Cheryl Stasiak*

_____

Cheryl Stasiak