```
                                                                  1

 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     and KOLBY MARTIN,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12   DEPOSITION OF:  WELLES E. TONJES - September 13, 2017
     _____
13
                    PURSUANT TO NOTICE, the deposition of
14   WELLES E. TONJES was taken on behalf of the Plaintiffs
     at 501 South Cherry Street, Suite 920, Denver,
15   Colorado 80246, on September 13, 2017, at 9:09 a.m.,
     before Darcy Curtis, Registered Professional Reporter
16   and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966　　1900 Grant Street, Suite 1025　　■ www.huntergeist.com
800.525.8490　　Denver, CO 80203　　　　　　　　■ scheduling@huntergeist.com

Your Partner in Making the Record

**EXHIBIT A**

Court Reporting, Legal Videography, and Videoconferencing

Case No. 1:16-cv-03079-MSK-NRN   Document 54-1   filed 03/23/18   USDC Colorado   pg 2 of 2

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

37

1  A. Depending on what the eviction was.
2  Okay. If it was one we anticipated an issue with,
3  then I would help set that up.
4  Q. Okay. Backing up a little bit, what
5  would be a situation of an eviction where you're
6  anticipating a problem or a concern or something along
7  those lines?
8  A. Well, okay, Wirth would have been one.
9  Q. Okay.
10  A. The Wirth eviction.
11  Q. Did you have any involvement in the Wirth
12  eviction?
13  A. Initially I did, not in the actual
14  eviction itself.
15  Q. Okay. We're going to get to that in a
16  minute.
17  A. Okay.
18  Q. Did you have any involvement in a 2014
19  eviction of Martin Wirth?
20  A. Not -- okay. That's a yes-and-a-no
21  answer.
22  Q. Okay. Go ahead.
23  A. So there was an eviction for Martin Wirth
24  that was posted and set up in 2014. And I had
25  actually contacted Martin Wirth and spoke with him,

38

1  because at that time, Martin Wirth -- I don't know --
2  I think it was the homeless coalition from the Denver
3  area got involved and they were going to march on
4  Martin's house or, you know, stage a -- I don't know.
5  Q. Protest?
6  A. -- protest, yeah, that he not be evicted.
7  I had completely spaced this, that this had occurred,
8  until my memory was refreshed by the sheriff. I
9  actually had talked Martin into moving.
10  Q. Okay.
11  A. And I got him to move. And I don't know
12  what happened after that, but he eventually ended back
13  up on the property.
14  Q. So just so I understand, make sure I have
15  this right, there was a three-day notice posted on the
16  Wirth property in 2014?
17  A. Yes.
18  Q. Same property that we're dealing with in
19  2016?
20  A. Yeah. I think it's No. 36 Iris or
21  something like that was the address. I'm not real
22  sure.
23  Q. Okay. Ultimately do you know if you or
24  other patrol people show up three days later for that
25  second step that you described earlier?

39

1  A. I don't remember. I don't believe we
2  showed up to evict because he moved out prior to that.
3  Q. That was, you think, based on a phone
4  call you had with Mr. Wirth?
5  A. Yeah, and then the bank even acknowledged
6  that. The mortgage company even acknowledged that he
7  had moved.
8  Q. Okay. And then when did you learn that
9  he moves back into the property, if you will?
10  A. I'm not sure on an exact date.
11  Q. No, that's fine. But was it three days
12  later?
13  A. No, no, no.
14  Q. Two years later?
15  A. It would have been we got notice to do
16  another eviction in -- I would say somewhere probably
17  around January, maybe December, December of 2015,
18  January of 2016.
19  Q. Okay. So just leading up to the event
20  that we're here to talk about today?
21  A. Yes.
22  Q. Okay. So from the date of the first
23  eviction to the one that we're here to talk about
24  today --
25  A. Yes.

40

1  Q. -- just so I'm clear, at no point did the
2  training ever change?
3  A. No.
4  MR. SCHIMBERG: Form.
5  MR. GOLDFARB: Objection. Form.
6  Q. (BY MR. SISSON) Let me be a little bit
7  more clear on that. At no point did the eviction
8  training change?
9  MR. SCHIMBERG: Same objection.
10  MR. GOLDFARB: Same here.
11  A. Answer?
12  Q. (BY MR. SISSON) Yes. Sorry.
13  A. No.
14  Q. No?
15  A. No, the training didn't change.
16  Q. Okay. Let's go back to the situation
17  with the individual -- and we're talking in general
18  here -- that won't vacate a property, right? You said
19  you would -- you would basically just leave?
20  A. Yes, sir.
21  Q. Then it would be on somebody else to go
22  get a failure to comply warrant?
23  A. Yes. It would be on probably the law
24  firm that represented the mortgage company or the
25  mortgage company itself.