1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
     Civil Action No. 1:16-cv-03079-MSK-MJW
3
     ESTATE OF NATE CARRIGAN,
4    JOHN CARRIGAN, MELISSA CARRIGAN,
     and KOLBY MARTIN,
5
     Plaintiffs,
6
     v.
7
     PARK COUNTY SHERIFF'S OFFICE,
8    SHERIFF FRED WEGENER, in his
     official and individual capacity,
9    and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12       DEPOSITION OF:  MONTE GORE - June 20, 2017
         (CONFIDENTIAL AND NONCONFIDENTIAL TRANSCRIPT)
13   _____

14            PURSUANT TO NOTICE, the deposition of
     MONTE GORE was taken on behalf of the Plaintiffs at
15   501 South Cherry Street, Suite 920, Denver, Colorado
     80246, on June 20, 2017, at 9:08 a.m., before Darcy
16   Curtis, Registered Professional Reporter and Notary
     Public within Colorado.

17

18

19

20

21

22

23   **H+G**

24

25   Hunter + Geist, Inc.

303.832.5966     1900 Grant Street, Suite 1025     ■ www.huntergeist.com
800.525.8490     Denver, CO 80203                   ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT B

**MONTE GORE - CONFIDENTIAL AND NONCONFIDENTIAL - 6/20/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

121

1    a Google Map just to get an aerial of the structure or
2    location where we're going to be.
3        Q.   Now, in terms of your tactical plan, did
4    you look at topography and terrain and those kinds of
5    factors in devising your tactical plan?
6        A.   No.
7        Q.   Why not?
8        A.   Usually that would have been the
9    responsibility of the SWAT commander.
10       Q.   Okay.  Now, seven -- I'm going to call
11   them deputies.  I know they weren't all deputies, but
12   different ranks within the deputy -- Park County
13   deputies.  But there's seven different deputies -- I
14   know detective and captain and so on and so forth, but
15   seven different people utilized on this operation.  Is
16   that a significant amount of manpower for an agency of
17   your size?
18       A.   Yes.
19       Q.   Are you aware of any other eviction event
20   prior to the Wirth incident that ever approached seven
21   people?
22       A.   No.
23       Q.   Okay.  Have you ever been staged like you
24   were in the Wirth incident on any other eviction
25   proceeding?

---

122

1        A.   No.
2            MR. SCHIMBERG:  Form.  Foundation.
3        Q.   (BY MR. SISSON)  You mentioned that the
4    tactical plan was if Wirth went back into the
5    structure, that the deputies were going to retreat?
6        A.   Withdraw, yes.
7        Q.   Withdraw.  Okay.  Withdraw.  And that
8    Hancock would give you a phone call?
9        A.   Right.
10       Q.   Okay.  And you actually had a channel set
11   up so that you were ready to field that kind of
12   communication?
13       A.   We had the special Ops 5 channel set up
14   which was specific for this operation.
15       Q.   So it would have been clear of any other
16   types of communication or events?
17       A.   Yes.
18       Q.   Okay.  And did you ever receive a
19   communication from Hancock on February 24, 2016, after
20   there was contact with Wirth and prior to the breach
21   of the structure?
22       A.   No.
23       Q.   Okay.  Do you think you should have?
24           MR. SCHIMBERG:  Form.  Foundation.
25       A.   I had received a phone call from Hancock

---

123

1    prior to the operation being executed.  And, once
2    again, we kind of reiterated what we were going to do
3    and the plan and that he would be in contact with me
4    during the operation.  Before the operation was
5    executed, I wanted to be able to have a clear format
6    where I could listen to the radio traffic, so I ended
7    up going to Park County Communications and donning a
8    headset so that I could listen to the operation as it
9    unfolded.
10       Q.   (BY MR. SISSON)  Okay.  And did you do
11   that?
12       A.   I did.
13       Q.   Okay.  That communication that you had
14   with Hancock on February 24, 2016, it sounds like it
15   was after his 8:30 briefing to the team but before the
16   contact with Wirth.  Is that your understanding?
17       A.   Yes.
18       Q.   Okay.  So at any point did Hancock
19   communicate to you, you know, Hey, Undersheriff, I'm
20   not sure if your tactical plan is going to work based
21   on the topography of the Wirth home?
22       A.   No.
23       Q.   Okay.  Now, you basically deferred to
24   Hancock in terms of the topography and that part of
25   the plan; is that fair?

---

124

1        A.   That's fair.
2        Q.   Is that something that should have been
3    considered by Hancock?
4            MR. SCHIMBERG:  Form.
5        A.   Yes.
6        Q.   (BY MR. SISSON)  I mean, based on your
7    understanding, is this the first time Park County
8    deputy sheriffs or Hancock had ever been to the Wirth
9    residence?
10       A.   No.
11       Q.   So was the topography and the structure
12   known to the agency?
13       A.   Yes.
14       Q.   Okay.  So 8:30 briefing, you basically go
15   to the communications room, you're staged, you have a
16   headset on so you're able to listen to the
17   communications; is that right?
18       A.   Correct.
19       Q.   You do receive a call from Hancock or you
20   receive a communication.  Was the communication over
21   the radio?
22       A.   No.  I had actually talked to Hancock
23   prior to leaving to go to communications.
24       Q.   I'm sorry.  I butchered that.  You talked
25   to Hancock via cell phone?

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**EXHIBIT B**

**MONTE GORE - CONFIDENTIAL AND NONCONFIDENTIAL - 6/20/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

153

1  go in.  Nobody would want to go in.  And that's when
2  the sheriff gave the order and he said breach, breach,
3  and that should be recorded on that Ops 5 recording
4  from communications.
5      **Q.  So in terms of the sequence of events, do**
6  **you know at what point the sheriff actually arrived on**
7  **scene?**
8      A.  My recollection is he arrived on scene
9  just as they were getting ready to walk up to the
10  residence.
11     **Q.  But prior to knocking on the door?**
12     A.  Yes.
13     **Q.  Okay.  You obviously weren't there and so**
14 **you don't know for sure; is that right?**
15     A.  That is correct.
16     **Q.  Is your recollection based on the radio**
17 **communications?**
18     A.  Yes.
19     **Q.  Now, let's assume that the sheriff --**
20 **that you're correct, that the sheriff pulls up on**
21 **scene as they're approaching the Wirth residence.**
22 **Okay.  Based on your knowledge of the events, do you**
23 **think the sheriff would have had adequate information**
24 **to be able to give an order to breach, breach, breach?**
25     MR. SCHIMBERG:  Object to form.

---

154

1      A.  I think the sheriff would have had
2  information concerning how dangerous this operation
3  was, how dangerous Wirth was.  I'm not sure how much
4  information on the tactical operation the sheriff
5  would have had or the information that Hancock most
6  probably would have briefed him on.
7      **Q.  (BY MR. SISSON)  Okay.  Well, let's**
8  **assume that the sheriff had the full universe of**
9  **information that you did.**
10     A.  Okay.
11     **Q.  Okay.  You spent weeks preparing your**
12 **tactical plan, doing your threat assessment, talking**
13 **to Hancock, everything we've -- we've gone through it**
14 **numerous times.  You had a lot of information; is that**
15 **fair?**
16     A.  That's correct.
17     MR. SCHIMBERG:  Form.
18     **Q.  (BY MR. SISSON)  First of all, do you**
19 **believe that the sheriff had the same level of**
20 **knowledge that you did?**
21     A.  Yes.
22     **Q.  Okay.  If the sheriff possessed the same**
23 **level of knowledge that you did about the threat and**
24 **about the tactical plan and phase one and phase two of**
25 **the tactical plan, do you believe that the sheriff's**

---

155

1  **actions in ordering the breach -- do you believe they**
2  **were reasonable?**
3      A.  No.
4      **Q.  Do you believe that they -- do you**
5  **believe that the sheriff willfully disregarded a known**
6  **risk?**
7      MR. SCHIMBERG:  Form and foundation.
8      A.  Yes.
9      **Q.  (BY MR. SISSON)  Why would he do that?**
10     MR. SCHIMBERG:  Form and foundation.
11     A.  I have asked myself that question on
12 numerous occasions.  And his actions were unreasonable
13 and I have no idea why anyone in any universe would
14 have ordered those young men to go into that
15 residence.  They weren't prepared.  They weren't
16 equipped.  It goes against barricaded -- everybody's
17 policy on a barricaded suspect.  It should not have
18 happened in any universe.
19     **Q.  (BY MR. SISSON)  Do you believe the**
20 **sheriff's actions rise to the level of gross**
21 **negligence?**
22     MR. SCHIMBERG:  Object to form.
23     A.  Yes, I do.
24     **Q.  (BY MR. SISSON)  Do you say that lightly?**
25     A.  No.

---

156

1      **Q.  Do you have an ax to grind with the**
2  **sheriff over this?**
3      A.  No.  I think this whole event was
4  preventable and it is so tragic.
5      **Q.  I'm just trying to -- looking at**
6  **Hancock's thing here, is there any plausible**
7  **explanation that you can think of that would justify**
8  **the actions of either Hancock or the sheriff?**
9      A.  No.
10     **Q.  Now, let's keep going with this paragraph**
11 **9.  "I placed Kolby Martin in the front because he was**
12 **our most experienced SWAT member.  Given the above,**
13 **and having to assess the situation in an extremely**
14 **short duration, I thought it was the most reasonable**
15 **approach given our position and circumstances."  Do**
16 **you agree with that?**
17     A.  No.
18     **Q.  "I had experienced and well-trained**
19 **officers with me.  No one voiced any objection to**
20 **making entry."  Do you see that?**
21     A.  I do.
22     **Q.  So let's talk about that.  You're on Ops**
23 **5, right?**
24     A.  Yes.
25     **Q.  Do you have the ability to speak on Ops**

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

# EXHIBIT B

**MONTE GORE - CONFIDENTIAL AND NONCONFIDENTIAL - 6/20/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

157

1　5?
2　　　A.  I do.
3　　　Q.  Did you voice a concern?  So you hear --
4　however you hear it, whether you heard the captain ask
5　permission, the sheriff say yes, or I think the way
6　you recollect is Hancock saying if we're going to do
7　something, we need to do it now, and the next thing
8　you hear is the sheriff saying breach, breach, breach?
9　　　A.  Just twice, breach, breach.
10　　　Q.  I'm sorry, just twice.  If you heard that
11　communication on Ops 5, did you voice concern at that
12　moment?
13　　　A.  I was absolutely taken aback by the
14　order, and there wasn't enough time to stop it at that
15　point.  The next instant the door was breached, shots
16　were fired, and it was a very chaotic scene.
17　　　Q.  So you didn't voice any concern on Ops 5
18　at that moment?
19　　　A.  Excuse me?
20　　　Q.  You didn't say anything on the radio at
21　that time?
22　　　A.  I did not.
23　　　Q.  And it unfolded so quickly, you didn't
24　have the time to do that?
25　　　A.  I did not.  And also, typically the

---

158

1　commander on scene has the authority.  And the reason
2　to do that is there may be something that changes that
3　they may need to readjust, but this happened in an
4　instant, this situation.
5　　　Q.  Okay.  I want to look at Exhibit 9 in the
6　binder in front of you.
7　　　A.  Okay.
8　　　Q.  Do you got it?
9　　　A.  I do.
10　　　Q.  You've made reference to this policy a
11　few times today; is that fair?
12　　　A.  Yes.
13　　　Q.  This is what you're talking about with
14　the hostage/barricaded subject incidents policy?
15　　　A.  Correct.
16　　　Q.  Is that correct?
17　　　A.  Yes, it is.
18　　　Q.  Is it your understanding that this policy
19　was effective and in force on the date of the Wirth
20　incident?
21　　　A.  Yes.
22　　　Q.  I want to go through this policy.  Now
23　this policy -- is this a policy that it's your
24　understanding that the members of the Park County
25　Sheriff's Office, including the sheriff, are obligated

---

159

1　to follow?
2　　　A.  Yes.
3　　　Q.  Is it something that members of the
4　sheriff's department train on?
5　　　A.  Yes.
6　　　Q.  Okay.  I just want to go through a few
7　things on this.  "Definitions:  Barricaded Subject,"
8　do you see that, subsection II?
9　　　A.  Yes, I do.
10　　　Q.  Did you believe that Martin Wirth when
11　they're knocking on the door and he's not coming to
12　the door, at that point is he a barricaded subject?
13　　　A.  The fact that he came out, looked around
14　and went back in the house, did not respond to knocks
15　on the door, I would have considered this and it
16　should have been treated as a barricaded suspect
17　situation.
18　　　Q.  He became barricaded when he came out and
19　then went back in, or was he barricaded the second he
20　didn't respond to knocking on the door?
21　　　A.  Even if he did not respond, I mean, you
22　couldn't be sure that he was in there and barricaded.
23　The house may be vacant, but I would have -- based on
24　the information we had, I would have made the
25　assumption that he was -- that this was a barricaded

---

160

1　situation.
2　　　Q.  Okay.  Go ahead.
3　　　A.  And that's why the instruction was to
4　withdraw, whether he -- if he didn't answer the door
5　or if he came out and looked around, withdraw.
6　　　Q.  If he comes out, looks around and then
7　goes back in, you don't have to make any assumptions,
8　you know he's barricaded; is that true?
9　　　A.  I think you would reasonably assume that
10　and especially based on the information and knowledge
11　we had about Mr. Wirth, that this was now a barricaded
12　situation.
13　　　Q.  Okay.  Let's just look at the definition.
14　"Any individual who's reasonably believed to be a
15　threat to commit serious bodily injury or death."  Do
16　you think that was a reasonable belief, that he was a
17　threat?
18　　　A.  I do.
19　　　Q.  To officers in the community?
20　　　A.  Yes.
21　　　Q.  "and who is in a stronghold position," do
22　you see that?
23　　　A.  Yes.
24　　　Q.  What does that term, stronghold position,
25　mean?  Does that mean it has to be a fox hole or a

---

40 (Pages 157 to 160)

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 1:16-cv-03079-MSK-MJW
 3
    ESTATE OF NATE CARRIGAN,
 4  JOHN CARRIGAN, MELISSA CARRIGAN,
    and KOLBY MARTIN,
 5
    Plaintiffs,
 6
    v.
 7
    PARK COUNTY SHERIFF'S OFFICE,
 8  SHERIFF FRED WEGENER, in his
    official and individual capacity,
 9  and MARK HANCOCK, in his official
    and individual capacity
10
    Defendants.
11  _____

12  DEPOSITION OF:  MONTE GORE - Volume II
                    October 26, 2017
13  _____

14              PURSUANT TO NOTICE, the deposition of
    MONTE GORE was taken on behalf of the Defendants Park
15  County Sheriff's Office and Sheriff Fred Wegener at 1640
    Grant Street, Suite 150, Denver, Colorado 80203, on
16  October 26, 2017, at 10:14 a.m., before Shauna T. Dietel,
    Registered Professional Reporter and Notary Public within
17  Colorado.

18

19

20

21

22        H+G

23

24  Hunter + Geist, Inc.

25  303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
    800.525.8490    Denver, CO 80203                 ■ scheduling@huntergeist.com

                    Your Partner in Making the Record
```

EXHIBIT B

**MONTE GORE - VOLUME II - 10/26/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

299

1    Q   Yeah.  It would make sense.  We can -- we can
2  read or listen to those dispatches and find out exactly
3  what people said, right?
4    A   Yes.
5    Q   Okay.  And what you heard?
6    A   Yes.
7    Q   Have you ever read the dispatch transcript?
8    A   No.
9    Q   Have you listened to the dispatch calls?
10   A   No.
11   Q   I think it's Exhibit 30, Monte?
12   A   Exhibit what?
13   Q   30.
14   A   Okay.
15   Q   I'll represent to you that this is a portion of
16  the transcript made of the radio transmissions on that
17  day.  Okay?
18   A   Is it the regular law enforcement transmissions
19  or the Ops 5 transmissions?
20   Q   Yeah, this is Ops 5.
21   A   Okay.
22   Q   And it was created by the CBI, and as you see
23  at the bottom, it's transcribed by a certified court
24  reporter.  Do you see that at the bottom?
25   A   Yes.

---

300

1    Q   Okay.  Okay.  Let's just walk through it.
2  Middle of the page 14, are you with me at 9:45:14?  Middle
3  of the page.
4    A   2/24, 9:45.
5    Q   Okay.  And that's going to be the header for a
6  sequence of radio transmissions.  Okay?
7    A   Okay.
8    Q   They're all going to be February 24, 2016, and
9  they're going to be over a period of so many minutes.
10  Okay?
11   A   Okay.
12   Q   All right.  Here's something I don't know after
13  representing law enforcement for decades:  If you and I
14  are in radio contact, and you report to me something that
15  you're doing -- let's make something up.  What -- what
16  would that be that you're -- you're reporting to me what
17  you're about to do?
18   A   Relaying information.
19   Q   Well, yeah.  Let's use an example.  Like, let's
20  -- and I'm struggling with this to give us one.  Let's say
21  you're pulling DJ over on Highway 285.  Okay?
22   A   Okay.
23   Q   And would you radio, I'm pulling over this
24  vehicle for speeding or no lights, something like that?
25   A   On a normal law enforcement channel, yes --

---

301

1    Q   Okay.
2    A   -- that would be correct.
3    Q   Okay.  And if I was the recipient and I said,
4  Copy -- you guys do that, right?
5    A   Under a normal dispatch operations, yes.
6    Q   Okay.  And copy means understood?
7    A   Yes.
8    Q   I know what you're doing, right?
9    A   Yes.
10   Q   Okay.  I just wasn't sure of that nomenclature.
11      Okay.  Here we are at 9:45:14.  We have an
12  unidentified speaker at line 18 saying, Movement.
13      Do you have any idea who 182 is or what that
14  means?
15   A   No.
16   Q   Okay.  And then we have another speaker say,
17  Front porch.  Next line, Male party on the deck.
18      Did I read that correctly?
19   A   Yes.
20   Q   Okay.  And when you were listening to this, did
21  you assume that male party was Mr. Wirth?
22   A   Yes.
23   Q   Okay.  So at this point he's on the deck,
24  right?
25   A   Yes.

---

302

1    Q   Okay.  And then let's just go to the next
2  section, down to the very last line.  Subject's going back
3  in the house.
4      Do you see that?
5    A   Yes.
6    Q   So you were aware at that point, in terms of
7  your phase operation, that was an important event, right?
8    A   Yes.
9    Q   That was -- that was significant to you?
10   A   Yes.
11   Q   Okay.  I was waiting for you to answer.  One of
12  my "duh" questions.
13      All right.  And is it at that point that Phase
14  2 should have kicked in, or you thought would kick in?
15   A   Yes.
16   Q   Okay.  So you anticipated a communication from
17  Sergeant -- or Captain Hancock at that point?
18   A   No.
19   Q   What did you anticipate?
20   A   I would have anticipated at that point a
21  withdrawal.
22   Q   Okay.  But wouldn't you anticipate a radio
23  communication, We're going to withdraw?
24   A   Well, it could have been a hand signal to
25  withdraw.

---

20 (Pages 299 to 302)

## EXHIBIT B

MONTE GORE - VOLUME II - 10/26/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

303

1    Q  Okay.  You didn't necessarily anticipate a
2  transmission to you that we're -- we're now withdrawing?
3    A  Correct.
4    Q  Okay.  But the next line on page 15, at line 5,
5  we have, You guys move up, correct?
6    A  Correct.
7    Q  Do you know -- do you have a recollection of
8  whose comment that was?
9    A  I would assume it would be the SWAT commander,
10  but I can't specifically say that.
11    Q  Okay.  It makes sense to you in the context?
12    A  Yes.
13    Q  Do you recall having an understanding of what
14  was meant by "you guys move up"?
15    A  I wasn't sure --
16    Q  Okay.
17    A  -- what was meant by that.
18    Q  All right.  Did you call any of the guys and
19  say, What's going on?
20    A  No.  Nor would that be appropriate.
21    Q  Okay.
22    A  This is a volatile situation and --
23    Q  I -- I understand.
24    A  Okay.
25    Q  I just -- it was --

304

1    A  Okay.
2    Q  -- sort of yes or no.  But you've already told
3  me.
4      All right.  Let's go down to line 11, Monte.
5    A  Okay.
6    Q  Get up here.  Get up here.  Do you have a
7  recollection of hearing that?
8    A  I recall that there was radio traffic about him
9  going in and movement of the officers, yes.
10    Q  Okay.  But do you recall the movement of the
11  officers of moving up, Get up here?
12    A  I don't know that I recalled moving up, but I
13  do remember there was radio traffic with the officers and
14  movement of the officers.
15    Q  Okay.  So it's a general recollection you have
16  there was movement?
17    A  Yes.
18    Q  Okay.  Fair enough.
19      And then down on line 15, this is the
20  transmission of 9:46:20, there's an unidentified speaker.
21  Dave, if you can come up to the driveway they'd much
22  appreciate it.
23      Do you know who said that?
24    A  No.
25    Q  Do you know who Dave was?

305

1    A  I would assume it was Dave Leffler.
2    Q  Do you have an understanding of where Dave was
3  at the time he was requested to come up the driveway?
4    A  Once again, I would assume he was close to the
5  driveway.
6    Q  But do you know?
7    A  No.
8    Q  Okay.  Do you know what Leffler's role was that
9  morning up to that point?
10    A  Not specifically.  I would assume he was kind
11  of on perimeter.
12    Q  Okay.  I don't want you to assume.
13    A  Okay.
14    Q  Do you know?
15    A  No.
16    Q  Okay.  Thank you.
17      All right.  Then we have line 21, Command 1
18  coming up the drive.  Do you see that?
19    A  Yes.
20    Q  Do you know who Command 1 is?
21    A  That would be the sheriff.
22    Q  Okay.  So looking at the dispatch, we now know
23  that the sheriff appeared in the driveway after Mr. Wirth
24  had come out on the deck and had gone back inside,
25  correct?

306

1    A  Yes.
2    Q  Okay.  So we can be confident that the sheriff
3  had no opportunity to assess Mr. Wirth's demeanor while he
4  was out on that deck?
5    MR. RAY:  Objection.
6    A  I can't make that assumption either.
7    Q  (BY MR. SCHIMBERG)  Well, he wasn't there.
8    MR. RAY:  Objection.
9    A  I don't know where he was or how close to the
10  driveway or if he was on perimeter.
11    Q  (BY MR. SCHIMBERG)  Okay.  Well, we know he's
12  coming up the drive, right?
13    A  At this point.
14    Q  Okay.  Have you ever been to the location?
15    A  Yes.
16    Q  Okay.  Do you have any idea of the distance
17  from the deck where Mr. Wirth would have come out and off
18  site, in other words, at the end of the driveway or out in
19  any of the streets in the neighborhood?
20    A  Yes.
21    Q  Okay.  How far would you guesstimate that to
22  be?
23    A  Be a little bit more specific on how far from
24  -- from what?
25    Q  Well, do you know from the deck to, let's say,

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
EXHIBIT B

**MONTE GORE - VOLUME II - 10/26/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

307

1  the start of the driveway at 36 Iris.
2      A   I would say the driveway maybe I would estimate
3  it at about 65, 75 yards.
4      Q   Okay.  All right.  And do you know if there's a
5  clear view from the front of the driveway, the entry
6  itself, all the way to the deck?
7      A   I believe there's a pretty clear view.
8      Q   Okay.  I'm belaboring it too much and taking
9  your time.  If I understand your testimony, you don't know
10  if, in fact, the sheriff was able to view or observe
11  Mr. Wirth on the deck prior to coming up the driveway, do
12  you?
13      A   No.
14      Q   Okay.  Should have just asked you that five
15  minutes ago.
16      A   For clarification, is that the deck on --
17  that's -- it's not ground level, it's actually up,
18  correct?
19      Q   Yeah.  Well, for clarification, what do you
20  know about any other deck at that residence?
21      A   I don't know.  I'm not aware of any other deck.
22  The only deck that I'm aware of was a deck off the second
23  floor, which should have provided ample opportunity to be
24  viewed.
25      Q   By whom?

---

308

1      A   By people walking up the driveway.
2      Q   Okay.  By the people you mentioned earlier were
3  deploying?
4      A   Correct.
5      Q   Okay.  All right.  Let's go to the next page,
6  Monte.
7      A   Okay.
8      Q   The first line, He saw us from the upper deck,
9  talked to us, and then went back inside.
10         Do you see that?
11      A   Not yet.  Let me see.
12      Q   Right at the top.  I'm sorry.  I'll just point
13  it out.
14      A   I'm going to --
15         MR. RAY:  What page are we on, Tim?
16         MR. SCHIMBERG:  16.
17      A   Okay.  Got it.
18      Q   (BY MR. SCHIMBERG)  All right.  Did I read that
19  correctly?
20         He saw us from the upper deck, talked to us,
21  then went back inside.  Do you see that?
22      A   I do.
23      Q   All right.  Do you remember that transmission?
24      A   I do.
25      Q   Okay.  Do you know whose voice that is?

---

309

1      A   I believe it was Hancock.
2      Q   And then let's go to the next section, which is
3  line 6.  Sheriff, I'm going to go.  Do you see that?
4      A   Yes.
5      Q   And the response is -- or do you know who said
6  that?
7      A   I believe it would have been Hancock.
8      Q   Okay.  And then the next line is, You guys are
9  going to go up to the door?  Do you see that?
10      A   Yes.
11      Q   Do you know who asked that question?
12      A   No.
13      Q   And the response is what, at line 9?
14      A   I'm going through the door.
15      Q   Okay.  And we know this, I guess, but let me
16  ask it again:  You didn't make any comment from your
17  command center at that time?
18      A   No.  Nor would I --
19      Q   No caution, No, don't do that, anything like
20  that?
21      A   Per our policy and procedure, once this is
22  enacted and on the ground, it's the SWAT commander's
23  decision.
24      Q   Okay.  That's -- that's your reason for not
25  speaking up, correct?

---

310

1      A   Correct.
2      Q   All right.  But the fact is you didn't?
3      A   Correct.
4      Q   Okay.  Do you remember hearing this, I'm going
5  through the door?
6      A   I do not.
7      Q   Line 13, sir:  DJ, Kolby, where are you at?
8  Did I read that correctly?
9      A   Yes.
10      Q   Do you recall that transmission?
11      A   I do.  I think that was Captain Hancock.
12      Q   Let's go down to line 19.  Unidentified
13  speaker, Okay, Sheriff, we're giving too much time.  I
14  need to -- do you see that?
15      A   I do.
16      Q   Do you remember that transmission either
17  specifically or generally?
18      A   I remember that very specifically, and that was
19  Captain Hancock.
20      Q   And then the next line at 24, Okay, see if you
21  can get him -- get his attention at the door.
22         Do you remember that transmission?
23      A   Yes.
24      Q   Do you know who made that statement or request?
25      A   No.

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT B**

**MONTE GORE - VOLUME II - 10/26/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

311

1  Q   Could have been Fred Wegener, correct?
2  A   Could have been, but I'm not sure.
3  Q   Okay.  And the substance is, try to get
4  Mr. Wirth's attention at the door, right?  Just what it
5  says, right?
6  A   Yes.
7  Q   Okay.  Let's go to the next page.  Line 1.  I'm
8  going to try that.  He's not coming.
9     Do you see that?
10  A   Yes.
11  Q   Okay.  Do you know who made that statement?
12  A   No.
13  Q   Then at line 6 we have, Come up here.
14     Do you see that?
15  A   Yes.
16  Q   Do you have any idea who said that or a
17  recollection of who did?
18  A   No.
19  Q   Line 11, We're going to go through the door.
20     Do you see that?
21  A   Yes.
22  Q   Do you have a recollection, and if so, do you
23  know who said it?
24  A   No.
25  Q   Next line, Copy; breaching the door.

---

312

1     Do you see that?
2  A   I do.
3  Q   All right.  And do you know who said that?
4  A   I believe it would have been Captain Hancock.
5  Q   And then the next line, unfortunately, Shots
6  fired, shots fired, correct?
7  A   Yes.
8  Q   Okay.  So if I understand your testimony,
9  Monte, nowhere can you identify the sheriff saying, Breach
10  breach; is that correct?
11  A   In what has been presented, that's correct.
12  Q   I can assure you I haven't doctored this in any
13  way, and it's an exact duplicate of the radio
14  transmissions.
15  A   I heard, Breach, breach, by the sheriff.
16  Q   Okay.  This would indicate you're hearing was
17  incorrect, or your recollection of your hearing?
18     MR. RAY:  Objection --
19     MR. ELKUS:  Objection.  Form, foundation.
20  Q   (BY MR. SCHIMBERG)  Do you agree?
21  A   I would disagree.
22  Q   Okay.  Well, do you have any other place where
23  we could go to find out whether or not Fred Wegener said,
24  Breach, breach, because it's not here?
25  A   That would be something that would have to be

---

313

1  looked into.
2  Q   Okay.  Well, you're the guy that testified that
3  since we have the dispatch, the truth would come out,
4  correct?
5  A   Correct.
6  Q   Okay.  Unless you have some other source, I
7  must ask you on behalf of the sheriff to please not state
8  to the public anymore that you heard him say, Breach,
9  breach.
10     MR. RAY:  I'm going to object.  Tim, you can't
11  instruct him not to say --
12     MR. SCHIMBERG:  Adam, it was a request.
13     MR. ELKUS:  Tim, you know what -- well, you're
14  his counsel.
15     MR. RAY:  Yeah.  You don't -- you don't need to
16  answer that.
17     MR. SCHIMBERG:  Yeah, there's nothing to
18  answer.  It's a request.
19  Q   (BY MR. SCHIMBERG)  You're running on a
20  platform of integrity, correct?
21  A   That's correct.
22  Q   And that's important to you --
23     MR. RAY:  Tim, come on.
24  Q   (BY MR. SCHIMBERG)  -- correct?
25  A   I think integrity is very important, Tim.

---

314

1  Q   Yeah, I'm with you.
2     MR. ELKUS:  Let me -- let me just say this,
3  guys, we've already -- we're well past the seven hours --
4     MR. SCHIMBERG:  Yeah, I'm done.
5     MR. ELKUS:  -- so if we're going to shore this
6  up, I need to know -- okay.
7     MR. SCHIMBERG:  I'm done other than to say
8  thank you.
9     MR. GOLDFARB:  Does anybody need a break or can
10  I -- Mr. Gore?
11     THE DEPONENT:  I think I'm good.
12     EXAMINATION
13  BY MR. GOLDFARB:
14  Q   Mr. Gore, I'll introduce myself on the record.
15  I did so off the record this morning, but it's been a
16  while.  My name is DJ Goldfarb, and I represent Mark
17  Hancock in this lawsuit.  Okay?
18     If at any time you don't understand any of my
19  questions, will you please let me know?
20  A   Okay.
21  Q   And if at any time you need a break, would you
22  please let me know?
23  A   Okay.
24  Q   All right.  I wasn't present for the first part
25  of your deposition, so I just want to run through a couple

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT B**

331

1    there would be backup of some sort, right?
2            MR. ELKUS:  Object to form --
3        A   Yes.
4            MR. ELKUS:  Object to the form of the question.
5        Q   (BY MR. GOLDFARB)  And, again, you never
6    checked to make sure that Martin Wirth was, in fact, red
7    flagged within your internal system, correct?
8        A   I didn't specifically check.
9        Q   Did you ever instruct anyone to input any such
10   notations into the system regarding Martin Wirth?
11       A   I thought that that had already been -- been
12   conducted.
13       Q   Okay.  So the answer is no, you did not?
14       A   No.
15       Q   Did you personally brief the sheriff about the
16   risks that Mr. Wirth posed to the deputies?
17       A   Not personally.
18       Q   Is there any sort of paperwork that's created
19   when the sheriff's office receives notice of an eviction
20   that needs to be carried out?
21       A   Yes.  The office -- or the administrative
22   personnel start processing that.
23           (Deposition Exhibit 35 was marked.)
24       Q   (BY MR. GOLDFARB)  All right.  You have
25   Deposition Exhibit 35 in front of you?

332

1        A   What's that?
2        Q   Do you have Deposition Exhibit 35 in front of
3    you?
4        A   Yes.
5        Q   Okay.  Is this that administrative form that
6    the Park County Sheriff's Office creates upon receipt of
7    notification of an eviction that needs to be carried out?
8        A   It looks like it.
9        Q   Okay.  And there's a date up top there; is
10   there not?
11       A   1/28/2016.
12       Q   Are you aware of any Park County internal
13   documents prior to January 28th of 2016 initiating the
14   eviction process?
15       A   Repeat that again.
16       Q   Sure.
17           Are you aware of any internal documents created
18   by the Park County Sheriff's Office that were created to
19   initiate this eviction prior to January 28th of 2016?
20       A   I'm not aware of any written paperwork, but I
21   knew that there was an eviction coming down the pike.
22       Q   So you were planning for this eviction nearly a
23   month before the sheriff's office began things internally,
24   started the paperwork for it, correct?
25       A   Repeat your question.

333

1        Q   Sure.
2            You were planning for the eviction of Martin
3    Wirth nearly a month before the sheriff's office initiated
4    the paperwork to actually carry out that eviction?
5        A   I think we were aware that the eviction was
6    coming down the pike.
7        Q   And how would you have been aware of that?
8        A   I think I was advised.
9        Q   By whom?
10       A   Captain Hancock.
11       Q   Okay.
12           (Deposition Exhibit 36 was marked.)
13       Q   (BY MR. GOLDFARB)  Mr. Gore, Deposition Exhibit
14   Number 36 is titled Order of Writ of Restitution Proposed.
15           Did I read that correctly?
16       A   Order of Writ of Restitution Proposed.
17       Q   Did I read that correctly?
18       A   Yes, you did.
19       Q   Okay.  And it is dated -- it says date filed --
20   or sorry --
21       A   Date issued --
22       Q   -- issue date January 25th, 2016?
23       A   Correct.
24       Q   And then there is a signature there?
25       A   Yes.

334

1        Q   And it says it's from the County Court Judge
2    Brian Lewis Green?
3        A   Yes.
4        Q   Okay.  And it's in the matter of Federal
5    National Mortgage Association versus Martin Wirth, et al.?
6        A   Yes.
7        Q   Okay.  So I'll represent to you that this is
8    the order granting the writ of restitution to ultimately
9    remove Mr. Wirth from his property.
10           Do you dispute that?
11       A   Yes.
12       Q   You do dispute this?
13       A   Oh, I'm sorry.  What was your question?
14       Q   Do you dispute that this is this order?
15       A   No, I do not.
16       Q   Okay.  And, again, that's dated 1/25/2016?
17       A   Yes.
18       Q   Okay.  So, again, you knew about the need to
19   evict Martin Wirth from his property nearly a month before
20   the judge even issued an order permitting the eviction to
21   take place?  Is that your testimony?
22       A   My testimony would be when this came down --
23   and I think I testified to a couple weeks or more -- I
24   couldn't be specific -- before the Wirth eviction -- that
25   I had had a conversation with Captain Hancock.

EXHIBIT B

**MONTE GORE - VOLUME II - 10/26/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

335

1    Q   Question:  I'm reading through your prior
2  transcript, and this is -- I mean, what period of time are
3  you digesting this information and formulating your plan?
4        Answer:  Six to eight weeks.
5        So you were planning for this eviction six to
6  eight weeks before it occurred, yet there's a court order
7  which didn't -- doesn't match up with that timeline,
8  right?
9    A   It doesn't appear to.
10   Q   Okay.  So is it possible that your timeline
11 could be confused?
12   A   Yeah, it could be.
13   Q   Okay.  If you would turn your attention back to
14 Deposition Exhibit 35 there.
15   A   Okay.
16   Q   There's a note section down midway -- midway
17 down the page.
18   A   Notes.
19   Q   And then it says schedule for February 17,
20 2016?
21   A   Yes.
22   Q   Do you recognize that handwriting?
23   A   I do not.
24   Q   Okay.  If there were a warning about the person
25 with whom the deputies would be interacting, evicting from

336

1  the property, could that have been put in the note
2  section?
3    A   It should have been.
4    Q   Okay.  It's not there, is it?
5    A   No.
6    Q   Do you know if Sergeant Tonjes briefed the
7  sheriff prior to the originally scheduled eviction?
8        MR. SCHIMBERG:  Form.  Foundation.
9    A   No.
10   Q   (BY MR. GOLDFARB)  Now, during your meeting
11 with Mark Hancock -- and, again, when did that occur?
12   A   I believe that would have occurred February
13 26th.
14   Q   Let me ask a better question.  Your
15 pre-eviction meeting with Mark Hancock --
16   A   Okay.
17   Q   -- when did that occur where you tell him not
18 to enter the home?
19   A   I think that was about two weeks prior to the
20 actual eviction.
21   Q   Okay.  And where did that occur?
22   A   That occurred in my office and I think
23 proceeded down in the patrol room.
24   Q   Okay.  And it was just you and Mark Hancock in
25 your office?

337

1    A   Correct.
2    Q   Did you author any sort of memo to memorialize
3  your conversation with Mr. Hancock?
4    A   No.
5    Q   Did you ever author a memo stating, Under no
6  circumstances shall any deputy enter the Wirth home?
7        MR. RAY:  Asked and answered.
8        Go ahead.
9    A   No.
10   Q   (BY MR. GOLDFARB)  Did you send anyone any
11 e-mails saying, Do not go into the home?
12   A   No --
13       MR. RAY:  Asked and answered.
14   A   -- this was a conversation that Captain Hancock
15 and I had.
16   Q   (BY MR. GOLDFARB)  When was the first time that
17 you told anyone that deputies were not going to enter the
18 home for the Wirth eviction?
19   A   That was in the meeting I had with Hancock.
20   Q   Okay.  And so that was nearly a month and a
21 half after you started thinking about evicting Martin
22 Wirth in December of 2015, correct?
23   A   Well, like you said, my timeline might have
24 been off, but I had that conversation with Captain
25 Hancock.

338

1    Q   Okay.  Are you aware Welles Tonjes came up with
2  a completely different eviction plan than the one that you
3  had devised?
4    A   I know he had been thinking about an eviction
5  plan, but I'm not aware of the specifics of that.
6    Q   And you were greatly concerned about by Martin
7  Wirth, correct?
8    A   Yes.
9    Q   And does it concern you that communication
10 within your department wasn't airtight?
11       MR. ELKUS:  Objection to the form of the
12 question.
13       MR. RAY:  Objection.  Join.
14   Q   (BY MR. GOLDFARB)  Does it concern you that
15 there were multiple plans related to this eviction that
16 were being thought out within the department?
17       MR. ELKUS:  Objection, foundation.
18       MR. RAY:  Join.
19   A   I think the sergeant was looking at it from a
20 eviction perspective.  My conversation with Captain
21 Hancock, I was looking at it as a tactical operation, and
22 I was concerned for the safety and security of the
23 officers involved.
24   Q   (BY MR. GOLDFARB)  And was that your utmost
25 concern, the safety and security of the officers?

29 (Pages 335 to 338)

Case No. 1:16-cv-03079-MSK-NRN   Document 54-2   filed 03/23/18   USDC Colorado   pg 12 of 14

MONTE GORE - VOLUME II - 10/26/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

339

1    A   Yes.
2    Q   It would be improper, in your view, to send
3 only one deputy to evict Martin Wirth from his property?
4    A   Yes.
5    Q   It would be improper and dangerous, in your
6 view, to send only four deputies to evict Martin Wirth
7 from his property?
8    A   Yes.
9    Q   Would it surprise you if Welles Tonjes
10 testified under oath in his deposition that it was his
11 belief that Mark Hancock was not involved in the eviction
12 of Martin Wirth until the morning of February 24, 2016?
13    A   Yes.
14    Q   Because that would be contrary to your
15 involvement with him, right?
16    A   Correct.
17    Q   You testified at your initial deposition that
18 there wasn't enough time to stop the entry from occurring
19 once you heard the order to enter into the home.
20        Do you remember that?
21    A   I do.
22    Q   Okay.  Reviewing the transcript today of the
23 radio callouts, do you still maintain that position?
24        MR. ELKUS:  Objection.  It's been asked and
25 answered.

340

1    A   Yes.
2    Q   (BY MR. GOLDFARB)  Okay.  Do you know exactly
3 how much time passed between the -- the moment that entry
4 was initially vocalized and the time that the entry
5 actually occurred?
6    A   No.
7    Q   Okay.  According to the transcript, it's 88
8 seconds.  Do you have any reason to dispute that?
9    A   No.
10    Q   Okay.  And it's your testimony that within 88
11 seconds, you couldn't have spoken up?
12    A   Once again, when we have an operation like this
13 that's being executed, it is the responsibility of the
14 SWAT commander to make those decisions.  The communication
15 that was taking place concerned me, but I did not have
16 eyes on, and it would have been inappropriate for me to attempt
17 to interfere at that point.
18    Q   But you gave a crystal clear command to Mark
19 Hancock about not going into that house?
20    A   I did.
21    Q   Okay.  And that the safety was of the -- of the
22 deputies was of the utmost concern to you, right?
23    A   Yes.
24    Q   That's what you just told me?
25    A   (The deponent nodded.)

341

1    Q   So as you're listening in to the radio traffic
2 -- because you were listening intently, right?
3    A   Yes.
4    Q   Okay.  Because you were invested in this
5 operation?
6    A   Yes.
7    Q   Okay.  And you'd been planning for it for
8 upwards of two months at that point?
9    A   Well, based on the recent information, sounds
10 like I had the conversation about two weeks prior.
11    Q   But you'd spent at least two weeks intently
12 thinking about this operation, right?
13    A   Correct.
14    Q   And you believed Mr. Wirth to be volatile and
15 dangerous, right?
16    A   I did.
17    Q   Okay.
18    A   And I do.
19    Q   And so as you're listening to this unfold, you
20 don't speak up because it's not proper procedure?
21    A   At the time that the officers are deployed, it
22 is the responsibility of the SWAT commander to make that
23 kind of decisions.
24    Q   So as you're listening to this unfold, again,
25 you have zero responsibility to protect the life and

342

1 health and safety of your deputies?
2    A   At this point I'm having to rely on the SWAT
3 commander to do that.
4    Q   Because you're not there, right?
5    A   Because I'm not there.
6    Q   You don't see what's happening?
7    A   Correct.
8    Q   Okay.  This -- this mandate not to enter the
9 home, I've just got some questions about that.  If
10 Mr. Wirth came out of his front door and said, Guys, I
11 need help moving my stuff, would you come in and help me,
12 if he invited them into the -- the home, could he -- could
13 Nate Carrigan or Mark Hancock go inside the home?
14    A   That's why the SWAT commander has a lot of
15 responsibility on him at these operations, because he had
16 eyes on.  With the scenario that you just related, if
17 Mr. Wirth opened the door and his demeanor was friendly or
18 it appeared that he was wanting to work with the eviction,
19 then I think the SWAT commander could have made a decision
20 to enter the residence if he felt it was safe and secure
21 to do so.
22    Q   You gave a crystal clear order that no deputy
23 was to enter that home --
24    A   Yes.
25    Q   -- right?

EXHIBIT B

MONTE GORE - VOLUME II - 10/26/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

343

So that would be a violation of your order?
A   It would be a violation of the order, but once again, I give discretion to the SWAT commander to make those kind of decisions, if it appeared to be safe and secure.
Q   So let me ask you this question then, and -- and maybe I missed this:  But you've actually been to the Wirth property?
A   Yes.
Q   Okay.  And so there's that deck out front as you come up with the driveway, right?
A   Yes.
Q   And there's no staircase from the deck leading down to the ground, right?
A   I believe that's correct.
Q   Okay.  So if Mr. Wirth is standing out on the deck and he wants to come outside to meet the officers, he would have to go inside the house to come out, right?
A   Yes.
Q   Or I suppose he could jump off the deck?
A   Do you want me to answer that?
Q   Yeah.  I mean, there's only -- there's only two ways for him to get from the deck to the officers, right?
A   Based on your scenario, he could jump off the deck or go into the house and come down the stairs.

344

Q   Okay.  So by Mr. Wirth going inside the home, when you hear the radio traffic about him turning around and going back inside, is that, per se, barricading himself?
A   Based on the knowledge and information that we had, I would consider that a barricaded suspect.
Q   All right.  So how were the deputies, in your mind, supposed to make personal contact with Mr. Wirth when they went to go speak with him?
MR. ELKUS:  Object to the form of the question.
A   Just the way they did.  He came out; he went back in.  At that point, he becomes a barricaded suspect, and they needed to withdraw.
Q   (BY MR. GOLDFARB)  I -- I get that, but my question is more refined.
Did you expect the deputies to contact Mr. Wirth on the deck and tell him to remain on the deck without going back into the house?
A   That could have been an option, yes.
Q   Did you communicate that to Mark Hancock in your meeting?
A   No.
Q   Okay.  And so let's say hypothetically that they say, Mr. Wirth, we need you to stay on the deck, and he complies.  How were they supposed to get to him?

345

A   Then they could go in the house.
Q   Despite the fact that there's a crystal clear order saying that they could not enter the home?
A   Yes.  I would give the captain that discretion.
Q   Okay.  So then under your order, Captain Hancock did have discretion to act, correct?
A   In those -- in -- in the situation -- in the scenarios that we've discussed, yes.
Q   Okay.  Now, if Captain Hancock believed, I'm going to meet Mr. Wirth at his front door, would that be appropriate?
A   If Mr. Wirth came out of the front door.
Q   Okay.  So Captain Hancock would have to actually wait for Mr. Wirth to go back into the house and then come out of the front door?
A   Correct.
Q   Okay.  But I thought if he goes back in the house he's a barricaded suspect?
A   That would be my feeling, that if he went back in the house, he was a barricaded suspect.  Under the circumstances, if Hancock wanted to give it a few minutes to have him see if he would appear at the front door, he would have had that discretion.
Q   So are you critical of Mark Hancock moving from his position below the porch to the front door?

346

A   No.
Q   Okay.  So he had the discretion to move from the porch to the door, right?
A   Correct.
Q   Okay.  And did you tell Mark Hancock that he had discretion to move from the porch to the door?
A   No.
Q   Because you rely on his being an experienced SWAT commander, right?
A   Correct.
Q   To make smart decisions on the ground?
A   Correct.
Q   And, again, he hadn't let you down before, right?
A   He what?
Q   He had not let you down before, right?
A   That's correct.
Q   You trusted Mark Hancock, correct?
A   I did.
Q   Do you believe it was Mark Hancock's intent to terrorize any of the deputies who entered into that home?
MR. ELKUS:  Objection, form and foundation.
A   Do I believe it was his intent to terrorize?
Q   (BY MR. GOLDFARB)  Yes.
A   No.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

EXHIBIT B

**MONTE GORE - VOLUME II - 10/26/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

347

1      Q   Do you believe it was Mark Hancock's intent to
2 cause any emotional harm to any of the deputies who
3 entered into that home?
4        MR. ELKUS: Objection, form and foundation.
5      A   I do not believe that that was his intent.
6      Q   (BY MR. GOLDFARB) Now, on the Friday after the
7 eviction as you are driving with Mr. Tonjes to go visit
8 Mr. Martin and Mr. Hancock, you were talking about this
9 incident, right?
10      A   That's correct.
11      Q   Okay. And at that time, it was your belief
12 that both the sheriff and Mark Hancock were to blame for
13 what had occurred, correct?
14      A   I heard the sheriff give the order to, Breach,
15 breach.
16      Q   Okay.
17      A   I feel Captain Hancock, as the SWAT commander,
18 should not, under any circumstances, have breached that
19 door.
20      Q   Okay. As you're sitting in the car with
21 Mr. Tonjes, did you believe that Mark Hancock was to blame
22 for what occurred?
23      A   I felt he shared responsibility and was
24 accountable. I felt he should have not breached the
25 residence.

348

1      Q   So at what point did you come to think that
2 Mark Hancock was to blame for what occurred?
3      A   I felt the sheriff was more to blame, and I
4 still do. I feel Captain Hancock was in a tough situation
5 and followed the directive of the sheriff. I do feel
6 Hancock, with his knowledge and experience, should have
7 under no circumstances breached that door.
8        MR. SCHIMBERG: Move to strike. Unresponsive.
9      Q   (BY MR. GOLDFARB) Okay. And, again, my
10 question was, at what point in time did you come to the --
11 the belief that Mark Hancock was to blame for what
12 occurred on February 24, 2016?
13      A   As soon as the breach occurred and we had shots
14 fired and officers shot and lost Nate.
15      Q   Okay. So the answer, then, is you believe Mark
16 Hancock was to blame on February 24, 2016, immediately
17 after this incident occurred?
18      A   Yes.
19      Q   Okay. Did you tell Mark Hancock when you
20 visited him at his home on the Friday after this incident
21 that you had held Sheriff Wegener fully responsible and to
22 blame for the unnecessary violence, death, and injury at
23 the Wirth eviction?
24      A   We had been visiting. I could tell Mark was
25 upset. I did tell Captain Hancock that I held the sheriff

349

1 responsible.
2      Q   Okay. Have you read Welles Tonjes' federal
3 complaint?
4      A   I think I had read an excerpt I think; it was
5 in Denver Post.
6      Q   Okay. Why don't you turn to Tab 13 in your
7 binder there.
8      A   Okay.
9      Q   And if you would turn to page 8 of the document
10 there.
11      A   Okay. Okay.
12      Q   And you'll see at the top of the paragraph is
13 paragraph 31.
14        Are we on the same page?
15      A   Yes.
16      Q   Okay. Paragraph 32 -- well, paragraph 31 sets
17 the stage about visiting Captain Hancock at his home.
18      A   Yes.
19      Q   All right. And his wife was present during
20 that meeting?
21      A   Yes.
22      Q   In the same room?
23      A   Yes.
24      Q   Okay. And his daughter was there as well?
25      A   Yes.

350

1      Q   Okay. And so they heard everything that you
2 communicated, presumably, to Mr. Hancock?
3      A   No. That would not be correct.
4      Q   Okay. So they weren't there the whole time?
5      A   We -- this was a social visit. Even though I
6 felt, and still do, that Hancock should have never have
7 made the breach, and I feel that the sheriff is ultimately
8 responsible, I wanted to convey to him that I heard who
9 gave the order over the radio to breach.
10        And so I waited for an opportune time when
11 Mr. Hancock's -- when -- when Mark's family were in the
12 kitchen; they were preparing pizzas and stuff. I think
13 they were going to be visited later that day by some of
14 the kids that he coaches on the football team.
15        And I wanted to be -- this to be this
16 conversation to be between him and I, so I actually stood
17 up and approached Mark where he was sitting and expressed
18 to him that I heard who gave the order to breach and that
19 I held the sheriff responsible for that.
20      Q   Did you tell this to him in a hush tone almost?
21      A   I did.
22      Q   Just for something between the two of you?
23      A   That's correct.
24      Q   You didn't want other people to hear that?
25      A   That's correct.

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT B**