IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN, MELISSA CARRIGAN,
KOLBY MARTIN, and TRAVIS THRELKEL,

Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his
official and individual capacity,
and MARK HANCOCK, in his official
and individual capacity,

Defendants.
_____

DEPOSITION OF:  KOLBY MARTIN - October 11, 2017
                (Confidential Designations Pending)
_____

        PURSUANT TO NOTICE, the deposition of
KOLBY MARTIN was taken on behalf of the Defendants
Park County Sheriff's Office and Sheriff Fred Wegener
at 501 South Cherry Street, Suite 920, Denver,
Colorado 80246, on October 11, 2017, at 9:58 a.m.,
before Darcy Curtis, Registered Professional Reporter
and Notary Public within Colorado.

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

65

1    **Q.  What was your motivation to apply at Park**
2  **County?**
3        A.  Just saw that the position was open and
4  wanted to try out working in the mountains.
5        **Q.  I shouldn't be so sloppy, but when I say**
6  **Park County, please understand I'm referring to the**
7  **sheriff's office of Park County.  Okay?**
8        A.  Understand.
9        **Q.  All right.  So it wasn't that you had a**
10  **connection or knew somebody on the force?**
11        A.  No.
12        **Q.  What are your basic job duties when you**
13  **were serving as a patrol deputy with Park County**
14  **Sheriff's Office?**
15        A.  Patrol the areas that I'm supposed to
16  cover, serve civils, serve warrants, handle calls when
17  they come out via our dispatch.  And then I became a
18  Taser instructor and an Intoxilyzer instructor, was
19  able to also get on to the SWAT team.
20        **Q.  When were you accepted on the SWAT team?**
21        A.  2006.
22        **Q.  Who was the commander then?**
23        A.  Captain Hancock.
24        **Q.  Okay.  Were your basic job duties as a**
25  **patrol deputy at PCSO any different in any significant**

---

66

1  **way than your duties at Elbert County?**
2        A.  No.
3        **Q.  You remained a patrol deputy up to what**
4  **date?**
5        A.  I want to say February of this year.
6        **Q.  I don't know if it was your interview**
7  **with CBI or somewhere else, but were you a master**
8  **patrol deputy?**
9        A.  Yes.  I'm still a master patrol deputy.
10        **Q.  What does that mean?**
11        A.  Basically just -- they call it master
12  patrol deputy.  It's basically a senior deputy.
13        **Q.  Do you get any more money being a master**
14  **versus a regular patrol deputy?**
15        A.  I believe I did get a raise due to that,
16  yes.
17        **Q.  So when I hear master, I can equate that**
18  **with you've got experience under your belt as a patrol**
19  **deputy?**
20        A.  Yes.
21        **Q.  So they kind of value that by title also?**
22        A.  Yeah.  Yes.
23        **Q.  Okay.  When you become a master patrol**
24  **deputy, does that change your duties or**
25  **responsibilities in any way?**

---

67

1        A.  No, it has not.
2        **Q.  Have you garnered any other**
3  **certifications while with Park County Sheriff's**
4  **Office?**
5        MR. ELKUS:  I'm sorry.  Could you repeat
6  the question again?
7        MR. SCHIMBERG:  Can you read that back?
8        (The last question was read back as
9  follows:  "Have you garnered any other certifications
10  while with Park County Sheriff's Office?")
11        A.  As in have I received any more
12  certifications?
13        **Q.  (BY MR. SCHIMBERG)  Sure.**
14        A.  As in an instructor, or what are you
15  trying to ask?
16        **Q.  I don't know.  Why don't we start with**
17  **what certifications you've received while you've**
18  **been with the Park County Sheriff's Office?**
19        A.  Intoxilyzer, Taser, SWAT training, and
20  that's pretty close to where I -- that's the only
21  thing I've really received.
22        **Q.  Okay.  And let me pester you a little**
23  **bit, because you were confused by my question.  Are**
24  **you an instructor-level certification since you've**
25  **become a member of the Park County Sheriff's Office?**

---

68

1        A.  For Taser and Intoxilyzer.
2        **Q.  Okay.  Tell me just a little bit about**
3  **what's entailed to become certified and a certified**
4  **instructor in Intoxilyzer and Taser.**
5        A.  For the Intoxilyzer it's a two-day course
6  that's put on by the Department of Health at their
7  facility, and that's the one out in Lowry.  And they
8  go over the legal aspects of it, how it works, the
9  history of it, to that effect on the first day, and
10  the second day it's all practical hands on, working
11  with the actual instrument.
12        **Q.  And how about the Taser?**
13        A.  Taser is also a two-day course to be an
14  instructor.  Again, they go over the history, how it
15  works, why it works, what it does to a body when a
16  person is tased via the probes or being drive-stunned.
17  And then like the second day is, again, all practical
18  hands-on scenarios, shooting the actual Taser at
19  targets or with training cartridges that are
20  nonconductive, as in there's no electricity that goes
21  down the wire, to a person that's in a Taser suit that
22  does scenarios for us, stuff like that.
23        **Q.  Okay.  And who puts on the Taser**
24  **instructor certification course?**
25        A.  It's through Taser International.  Now

---

17 (Pages 65 to 68)

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

129

1  from the Fairplay side over to the Bailey side for an
2  eviction?
3      A.  No.  I've gone from working the Fairplay
4  side and then halfway through my shift going over to
5  the Bailey side, so not anything abnormal, no.
6      Q.  Okay.  How many evictions had you done
7  with the Park County Sheriff's Office up to that
8  point?
9      A.  All I can think of offhand is one other
10  one.  That was also in the Bailey area.
11      Q.  Okay.  Did you go with anybody in
12  effectuating that eviction?
13      A.  No.  I was by myself.
14      Q.  When was that?
15      A.  I couldn't tell you on the date.  I know
16  it was wintertime because the ground was covered in
17  snow.
18      Q.  Okay.  No incident arising out of that?
19      A.  No, just the typical trying to calm them
20  down because they're ticked off about being evicted.
21      Q.  Any resistance other than verbal?
22      A.  A little passive resistance, yeah, of
23  leaving the residence and wanted to get possessions
24  out before the bank or whatever moving company that
25  they used to start moving stuff out.

---

130

1      Q.  Okay.  Do you recall what your state of
2  mind was because your one prior eviction you did
3  yourself and here you and Travis are being asked to go
4  over to Bailey?  Do you recall thinking that's odd or
5  anything like that?
6      A.  Yeah, I totally thought that, wondering
7  why there's so many people going to be involved in
8  this.
9      Q.  Well, did you ask Tonjes?
10      A.  No, I did not.
11      Q.  Okay.  I take it you guys went?
12      A.  Yes, we did.
13      Q.  Any idea what time you got to the
14  substation?
15      A.  I want to say it was close to 9:00, maybe
16  9:30.
17      Q.  And when you entered, walk me through
18  that.  Where did you go and what did you see?
19      A.  Well, it's a small office for our
20  substation.  And everybody was over where our
21  computers are at that most of the patrol deputies use.
22  And it seemed like the briefing on the eviction was
23  wrapping up and pretty much over with.
24      Q.  Okay.  I've been there several times.
25  Let me make sure we're talking about the same room.

---

131

1  You walk into the foyer and you deputies are to the
2  right side part of that building?
3      A.  Yes, we are.
4      Q.  So you might go in a different door.
5      A.  Well, if you're talking about going in
6  the front like where the DMV is, you go around to the
7  side door, go through that door, you go past the
8  receptionist, you go all of the way down to where it
9  T's, you would take a left, and that's the computers
10  we always use.  To the right is the victim advocates
11  and usually the supervisors' office.
12      Q.  Okay.  So if I understand you right, you
13  went left to the -- I'll call it patrol room.  Does
14  that work?
15      A.  That will work, yes.
16      Q.  All right.  And you said the what was
17  wrapping up?
18      A.  The briefing of the eviction.
19      Q.  Okay.  And what made you think that?
20      A.  Because people started getting up and
21  starting to grab their stuff and about to walk out the
22  door.
23      Q.  Okay.  And who do you recall being there?
24      A.  Corporal Nate Carrigan, Investigation
25  Corporal D.J. Hannigan, Captain Mark Hancock, Deputy

---

132

1  Jeremy Lowrance.
2      MR. ELKUS:  Tim.
3      MR. SCHIMBERG:  Thanks, Reid.
4      (Interruption in the proceedings.)
5      Q.  (BY MR. SCHIMBERG)  All right.  Jeremy
6  Lowrance.
7      A.  And I believe that was everybody in the
8  patrol room when me and Travis walked in.
9      Q.  At any time while you were there, did you
10  see the sheriff?
11      A.  Yes, he did come in briefly.
12      Q.  Okay.  After you guys?
13      A.  Yes, he was -- I think it was after us.
14  I can't remember, but I remember seeing him there for
15  a brief moment.
16      Q.  Okay.  So by your observation, he wasn't
17  a participant in this briefing that had been going on?
18      A.  No.
19      Q.  So with as much detail as you can, Kolby,
20  just tell me, you know, what happened, who you talked
21  to, and things like that there at the substation.
22      A.  Basically got orders from Captain Hancock
23  where myself and Travis were going to go when we
24  respond to the residence.  When we did walk in,
25  Corporal Carrigan was on the phone.  I'm not sure

---

33 (Pages 129 to 132)

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

133

1  exactly who he was on the phone with.  I remember
2  D.J. -- I want to say it was D.J. Hannigan saying, you
3  know, are we going to put medical on standby?  I
4  thought, to me, that was odd, but I just continued on
5  with the scenario and my location where I was going to
6  go to the residence.
7      Q.  Okay.  Who did you get the information of
8  where you were supposed to go?
9      A.  Captain Hancock.
10     Q.  Okay.  I'm trying to picture this and
11 have been ever since you filed your lawsuit.  Were
12 people standing and kind of getting ready to go when
13 you walked in or was everybody seated?
14     A.  In that area, there's no place for
15 everybody to sit, so the only person I remember
16 sitting was D.J. Hannigan, and he was off to the left
17 where the filing cabinets were lined up against that
18 back wall.  He was sitting in the chair.
19     Q.  Okay.  And as to your location where you
20 were supposed to go, is this verbal?
21     A.  Yes.
22     Q.  Do you remember seeing a diagram or
23 anything?
24     A.  Not an actual diagram, but on a white
25 chalkboard, it just had our names on there and who

134

1  we're going with and who was going to be doing what.
2      Q.  I'm going to show you a photograph of
3  that.
4      A.  Okay.
5      Q.  I kind of want to test your memory of
6  what you saw and heard before I do that.  Okay?
7      A.  Okay.
8      Q.  It's not a test.  I just kind of want to
9  figure out what you recall --
10     A.  Okay.
11     Q.  -- without that.  Whatever was on the
12 board, was that put on there prior to your arrival?
13     A.  Yes, it was.
14     Q.  Okay.  After you got there, was there
15 anything added or taken off that you recall?
16     A.  I don't believe so.
17     Q.  Okay.  Here is a book of our exhibits.
18 Okay?
19     A.  Okay.
20     Q.  I'll show you Exhibit 6.  Can you tell me
21 what that is?
22     A.  That is the white chalkboard there at the
23 Bailey substation.
24     Q.  That you just got done describing for us?
25     A.  Yes.

135

1      Q.  Okay.  Again, I'm trying to get a flavor
2  for when you and Travis walked in.  Did Hancock then
3  take you two guys over to this board and describe what
4  was going to take place?
5      A.  Yes.
6      Q.  Okay.  Tell me about that.  What were you
7  told?
8      A.  He just pointed out who is going what and
9  what's on the board, what channel we're going to be
10 on, what location I was going to go and who I was
11 going to go with, and did the same thing for Travis.
12     Q.  Let's role play a little bit.  I'm you
13 and you're Hancock.
14     A.  Okay.  Basically turning me towards the
15 white chalkboard, pointing out to my name and D.J.,
16 saying you two are going to be at the side of the
17 house or back towards the back of the house.  And then
18 he looks over at Travis, says, Travis, you're going to
19 be going with -- what it says on there -- J-Low, but
20 that's Jeremy Lowrance, and that you're also going to
21 be back towards the house.  And basically Jeremy
22 Lowrance and Travis are going to be together; myself
23 and D.J. Hannigan were going to be together.
24     Q.  Do you have any recollection of the
25 rectangle placed around PCFD?

136

1      A.  No.  It was already there when we were
2  walking in.
3      Q.  Do you remember Captain Hancock sharing
4  anything with you about PCFD?
5      A.  That's just Platt Canyon Fire Department.
6      Q.  That part I know, but do you remember
7  Hancock sharing with you any reason why that was on
8  there?
9      A.  Just the suggestion for medical to be on
10 standby.
11     Q.  He told you that?
12     A.  No.  I just assumed it because I've seen
13 that, those initials, and Dave is one of the guys that
14 works for the fire department.
15     Q.  Oh, okay.  Dave who?  Do you know?
16     A.  Well, maybe it's not Dave.  That could be
17 another Dave, but there is a Dave that works for that
18 fire department, but it might be not be the same Dave
19 that I'm thinking of.
20     Q.  There was a Dave working wit Park County
21 Sheriff's Office?
22     A.  Yeah, Dave Leffler.
23     Q.  Was Mr. Leffler there when you arrived?
24     A.  I don't believe so.  He was already out
25 close to the residence.

34 (Pages 133 to 136)

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

137

Q.  Okay.  Did Hancock share with you what Leffler was doing?

A.  That he just had eyes on to the property.

Q.  Okay.

A.  Eyes on, meaning as in he was watching the property for us.

Q.  Okay.  I'm going to keep after you for detail because you lived through it.  I didn't.  I want to walk out of here understanding what you recall.

A.  Okay.

Q.  In the lower right-hand corner of Exhibit 6 is a hand-drawn diagram, correct?

A.  Yes.

Q.  Was that on there when you arrived?

A.  I can't recall if it was.  I might have briefly looked at it, but I don't think I acknowledged it.

Q.  Okay.  Was that diagram used by Captain Hancock to share with you where he wanted you to go?

A.  I can't remember if he did.

Q.  Okay.  By looking at this diagram and then the reality of being there, can you make out where you were supposed to be positioned?

A.  Pretty much to the backside towards

---

138

the -- if I can give terms or whatnot, but backside of the residence towards this side over here.

Q.  Okay.  There's a very faint line -- and don't mark that quite yet.

A.  I wasn't going to mark anything.  I just wanted to point.

Q.  There's sort of a faint line between that rectangle and then some squiggles on what appears to be a road.  Is that sort of the general area you understood where you were going to go?

A.  Yes.

Q.  All right.  And then below that or next to it appears to be a Google Map.  Do you recall that being there?

A.  I can't remember if it was there or not.

Q.  Okay.  If you flip the page, there's more of a closeup of that.

A.  Okay.

Q.  And some prior witnesses have marked that up.  Do you have any recollection, as we sit here today, taking time to look at the Google Map of the residence you were going to go?

A.  Yeah.  I recognize it pretty clearly.

Q.  Okay.  Can you point to me to the residence that the eviction was going to take place?

---

139

A.  Right there.

Q.  Almost dead center?

A.  Yes.

Q.  Okay.  Now, do you recall any conversation with Hancock, in terms of this Google Map, as to where he wanted you guys to go?

A.  Yeah, to the rear of the residence.  To our knowledge at the time and to my prior knowledge of this subdivision from working, to my knowledge, the front of the house was right here where the porch was at, and I was going to be towards the rear.

Q.  Okay.  So you were going to -- how were you going to access the property?

A.  Through the treeline right here.

Q.  Okay.

A.  Off of South Pine.

Q.  Is that, in fact, what you did?

A.  Yes, I did.

Q.  Did you walk through that area with your colleagues?

A.  Yes.

Q.  Okay.  Who did you walk through those trees with?

A.  D.J. Hannigan, Travis Threlkel, and Jeremy Lowrance.

---

140

Q.  All right.  Now, while you and Hancock were talking, were the other guys dispersing or were they standing there with you?

A.  Everybody was still in the room --

Q.  Okay.

A.  -- with us.

Q.  All right.  What other information regarding the eviction process did Captain Hancock share with you?

A.  That it's going to be an eviction.  I remember brief, small, little conversations on stuff.  I do remember someone -- I'm not sure exactly who -- in the room asked Hancock basically the term -- I'm pretty sure it was like the rules of engagement type of thing, not the actual exact term, but I'm going on that same line.  Someone asked if he refuses to come out, are we going inside the residence, and Hancock said, no, we're not.

Q.  Okay.  Was there any information shared with you about Martin Wirth or the person being evicted?

A.  All I remember is something to the effect of if he gets removed, it's going to be some type of shootout and O.K. Corral.

Q.  And who said that?

---

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

141

1    A.  I cannot remember.
2    Q.  Any information about any prior history
3  with Martin Wirth and your department that you recall
4  being shared at that time?
5    A.  No.  No, I can't.
6    Q.  You'll see some asterisks behind some
7  names, such as yourself, Travis, Nate, and
8  Mr. Lowrance.  Any recollection of why those asterisks
9  are there?
10    A.  No, I can't remember exactly the reason
11  why those asterisks were there.
12    Q.  You were the fellas that eventually
13  stacked up at the front door, isn't it?
14    A.  Yes, it is.
15    Q.  Okay.  Was there any conversation about
16  you were -- the people with asterisks behind their
17  name were going to be a part of a stack at the front
18  door?
19    A.  I can't recall if we had that
20  conversation or not.
21    Q.  And then next to Nate's name and the
22  asterisk is breach.  Do you have any recollection of a
23  conversation with Hancock or anybody else that morning
24  about why that word "breach" is behind Nate's name?
25    A.  No, I do not.

---

142

1    Q.  Would it indicate to you that at least
2  there was some anticipation of breaching the
3  residence?
4    A.  Yes.
5    Q.  Were you part of any such conversation?
6    A.  I can't remember.  I can't recall on that
7  day.
8    Q.  Any other conversations, exchange of
9  information, that you can recall at the substation at
10  that time?
11    A.  No, not any more than I've already
12  stated.
13    Q.  Let's go back to whomever it was that
14  said -- I forget.  So clear it up for me if I don't
15  get it.  I think you said that if he stays in, are we
16  going to go in after him, something to that effect?
17    A.  Yes.
18    Q.  All right.  Did I not listen very well?
19  Do you know who said that?
20    A.  No, I can't recall who asked it.  The
21  room was full of us deputies and stuff like that, and
22  I cannot remember who asked that.
23    Q.  And your testimony is that Captain
24  Hancock said, no, we aren't?
25    A.  Yes.

---

143

1    Q.  Would you agree with me that seems to be
2  inconsistent recollection with the word "breach"
3  behind Nate Carrigan's name?
4    MR. ELKUS:  Objection.  Form and
5  foundation of the question.
6    A.  Yeah.  It would be a conflict basically,
7  yeah.
8    Q.  (BY MR. SCHIMBERG)  Did that raise any
9  question by you as to, wait a minute, there seems to
10  be kind of a discrepancy here between breach and your
11  comment to whomever it was that asked that question?
12    A.  I never made a comment to anybody in
13  reference to that question.  I just remember the
14  question being asked and the captain stating, no,
15  we're not going inside the residence.
16    Q.  Fair enough.  Thank you.  Do you recall
17  that generating any conversation by anyone else?
18    A.  I believe it did, but I couldn't tell you
19  what the conversation was about.  I just remember that
20  pretty much the short briefing that myself and Travis
21  were involved in was brief with -- no more than a
22  regular briefing would be and then we're all kind of
23  rustling out the door to get equipment and get ourself
24  set up with equipment out of our vehicles.
25    Q.  Okay.  And you are a SWAT team leader,

---

144

1  right?
2    A.  Yes.
3    Q.  If you had any concern or had questions,
4  you would have felt free to raise your hand or voice
5  and say, wait, I need some more information, something
6  like that?
7    A.  Yes, but this wasn't a SWAT mission.
8    Q.  Right.  Well, even so, it's a mission,
9  right?
10    MR. ELKUS:  Object to the form and
11  foundation of the question.
12    A.  It was an eviction.
13    Q.  (BY MR. SCHIMBERG)  Fair enough.  But
14  because it was an eviction, we had several of you guys
15  getting ready to go effectuate the eviction.  If you
16  had any questions about the process or the plan, you
17  could have asked?
18    A.  Yes.
19    Q.  Okay.  But as we sit here today, you
20  don't recall asking any questions?
21    A.  No, I did not.
22    Q.  Other than where am I to go?
23    A.  Yes.
24    Q.  Okay.  Did you have any sense,
25  Mr. Martin, as to how long everybody had been there

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

145

1  talking about this before you and Travis entered?

2      A.  Maybe 10, 15 minutes, maybe more.

3      Q.  Okay.  What gave you that impression?

4      A.  Just because the chalkboard or --

5  correction -- the white dry-erase board was already

6  documented and posted with people on it, who was

7  involved, plus where they're going to go, a diagram of

8  the property, and the picture.

9      Q.  Okay.  Were there any other SWAT team

10 members other than yourself and Hancock?

11     A.  Travis Threlkel and Jeremy Lowrance.

12     Q.  Okay.  I didn't know about Jeremy.

13     A.  He was, I believe, just about to come on

14 or just came on to the SWAT team.

15     Q.  Okay.  So we have some experienced dudes

16 here, do we not?  We've got a commander in Hancock,

17 correct?

18     A.  Yes.

19     Q.  And he's the commander of SWAT, even

20 though this was just an eviction, right?

21     A.  Yes.

22     Q.  And we had you as a team leader SWAT

23 trained?

24     A.  Uh-huh.

25     Q.  Is that yes?  I'm sorry.

---

146

1      A.  Yes.  I'm sorry.

2      Q.  No, that's fine.  Travis and Jeremy.  And

3  Nate has spent several years with the sheriff's

4  office, correct?

5      A.  Yes.

6      Q.  Okay.  So in terms of Sheriff Wegener, do

7  you think it was reasonable for he to rely upon this

8  experienced group of guys to develop a proper plan?

9      A.  I believe so, yes.

10     Q.  Do you remember him, in the brief time he

11 was there, making any comments or input to this board?

12     A.  No, I do not.

13     Q.  Okay.  Did you and Travis walk in

14 together or was it staggered?

15     A.  We walked in together.

16     Q.  Okay.  So you leave the patrol room, as I

17 called it, and what did you do?  Where did you go?

18     A.  All of us basically followed each other

19 up to the fire station that's basically on top of what

20 we call -- it's called Crow Hill, just up the mountain

21 basically.  And we went to the fire station that's up

22 at the top of the hill.

23     Q.  The Platt Canyon group?

24     A.  Yeah.  Platt Canyon Fire Station 2.

25     Q.  Before you went there, did you kit up?

---

147

1      A.  We got whatever equipment we were going

2  to use out of our vehicles, yes.

3      Q.  As a SWAT member, do you carry your SWAT

4  gear in your vehicle all of the time?

5      A.  Yes, I do.

6      Q.  Okay.  Do you remember what you put on?

7      A.  It was not my SWAT vest, no.  It was just

8  basically a load-bearing vest, is what we call it,

9  that's not ballistic panels.  It's just something I

10 can carry equipment on.

11     Q.  Was there any reason for that equipment

12 versus putting on your SWAT gear?

13     A.  I gathered that this was just an

14 eviction, it's not a SWAT incident, and we didn't need

15 to go in full bore on something that's an eviction.

16     Q.  Was that something discussed, or are you

17 sharing with me what your mental processes were

18 thinking?

19     A.  Mental and the way the conversation was

20 pretty much going from everybody in the patrol room.

21     Q.  Okay.  Anything specifically?

22     A.  No, I could not tell you that.

23     Q.  All right.  Do you recall anybody raising

24 the specter of a SWAT callout in the substation when

25 you were there?

---

148

1      A.  There may have, but I don't remember it.

2      Q.  Okay.  What is Ops 5?

3      A.  It's a radio channel that we can switch

4  to other than the normal primary channel that

5  everybody talks across.

6      Q.  Let me put it in my own layperson's

7  terms.  It would be dedicated to this eviction?

8      A.  Yes.

9      Q.  If I'm somewhere else on the Fairplay

10 side and pulled somebody over, I would use a different

11 channel than Ops 5?

12     A.  Yes.

13     Q.  Okay.  What do you recall -- here is one

14 for you.  Did you go up to Platt Canyon in your own

15 vehicle?

16     A.  Yes.  I went in my own patrol vehicle,

17 yes.

18     Q.  With anybody?

19     A.  No.  By myself.

20     Q.  And tell me what you recall, with as much

21 detail as possible, the conversations or what you

22 observed there.

23     A.  We got to the fire station.  Everybody

24 parked pretty much out in front.  Most of us got out

25 of our cars.  We met with the paramedics that were

---

37 (Pages 145 to 148)

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

157

1    A.  No, I do not.

2    Q.  That doesn't ring a bell one way or the

3    other, either a phone communication or a text or --

4    A.  I don't -- no, I don't remember.

5    Q.  Okay.  Fair enough.

6    MR. ELKUS:  We've been going a little bit

7    over an hour, if it's a good time to take a break.

8    MR. SCHIMBERG:  Go ahead.  Yes.

9    (Recess taken, 2:59 p.m. to 3:13 p.m.)

10    Q.  (BY MR. SCHIMBERG)  Let me go back, sir,

11    to the patrol room.

12    A.  Okay.

13    Q.  When you were shown where you were to

14    position yourself, was there any conversation of why

15    do you want me there or why there, Captain, anything

16    like that?

17    A.  No.

18    Q.  Okay.  In your mind, were you setting a

19    perimeter?

20    A.  Yes.

21    Q.  Okay.  And how about Travis, where he was

22    to be positioned?  Did you have a sense or impression

23    or think that he was part of setting a perimeter?

24    A.  Yes, because he was basically going to

25    follow myself, D.J., and Jeremy Lowrance pretty much

158

1    to the same -- what do you want to call it -- drop-off

2    point or approach point, if you call it.

3    Q.  Okay.  So I could ask that question in

4    this way.  Your information was that you, Travis,

5    Mr. Hannigan, and Jeremy were all positioned as if

6    you're setting a perimeter?

7    A.  Yes.

8    Q.  Did you have any understanding of what

9    Mark Hancock and Nate were left to do?

10    A.  Yes.

11    Q.  What was that?

12    A.  To approach the front of the residence,

13    that Nate Carrigan's vehicle would be first due to it

14    being a marked patrol unit, and then Captain Hancock

15    would follow him in his black patrol unit and they

16    would initiate contact.

17    Q.  Was there any discussion as to why Nate's

18    vehicle with the sheriff's office emblem was -- why it

19    was discussed that it would be first?

20    A.  Just so that Mr. Wirth would know the

21    sheriff's department was there.

22    Q.  No confusion as to who is on his

23    property?

24    A.  Correct.

25    Q.  Any criticism of that?

159

1    A.  No.

2    MR. ELKUS:  Object to the form of the

3    question.

4    Q.  (BY MR. SCHIMBERG)  Okay.

5    MR. ELKUS:  Let me get my objection in.

6    THE DEPONENT:  Sorry.

7    MR. ELKUS:  You're fine.  Go ahead.

8    Q.  (BY MR. SCHIMBERG)  What is the purpose

9    of a perimeter or setting one?

10    A.  Just basically to watch the house and

11    see, you know, if anybody leaves or comes and goes.

12    Q.  When you kitted up, that's a decision

13    that you made on your own?

14    MR. ELKUS:  I'm sorry.  Can you read the

15    question back?

16    (The last question was read back as

17    follows:  "When you kitted up, that's a decision that

18    you made on your own?")

19    MR. ELKUS:  Kitted up?

20    MR. SCHIMBERG:  Yes.

21    MR. ELKUS:  Object to the form of that.

22    Go ahead.

23    A.  No, it was not.

24    Q.  (BY MR. SCHIMBERG)  Why wasn't it?

25    A.  It was not my decision to kit up.  It was

160

1    Captain Hancock's idea to do that.

2    Q.  All right.  So these are why I asked you

3    what was said by whom.  What did Captain Hancock say

4    in terms of either equipment or uniform or what you

5    were to wear?

6    A.  To that, exactly what you just said,

7    equipment or kit up or whatever you're going to take

8    with you is pretty much what I gathered and what I

9    heard before we left.

10    Q.  Okay.  Well, maybe we're on the same

11    wavelength.  In other words, he was leaving it up to

12    you guys to decide how to gear up?

13    A.  Yes.

14    Q.  All right.  So I think where I've gotten

15    you as far as you're en route to the location on Iris.

16    A.  Yes.

17    Q.  Okay.  You're familiar with that

18    subdivision?

19    A.  Yes, I am.

20    Q.  Okay.  Just as part of your patrol

21    duties?

22    A.  Yes.

23    Q.  Okay.  Any callouts that you're aware of

24    that you responded to in that area?

25    A.  Yeah.  I've been to that area for

**Hunter + Geist, Inc.**

**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

169

1       A.   Radio traffic from the captain asking if
2   we're all set.  And set means if we're at our location
3   that we're supposed to be.  I can't recall if I heard
4   Travis, I believe I did, or to a certain extent I
5   heard we're set, and then I said on the radio to the
6   captain that we're also set.
7       Q.   Okay.
8       A.   And then that's when -- a few minutes
9   later, that's when Carrigan -- Nate Carrigan's vehicle
10  came up the drive and then Captain Hancock's.
11      Q.   So you guys were set in your locations
12  before Carrigan and Hancock pulled up?
13      A.   Yes.
14      Q.   All right.  Here is a black pen.  Where
15  do you recall observing Nate's vehicle and Hancock's
16  vehicle being parked?
17      A.   I can't specifically tell you exactly
18  where due to this camper trailer sitting there
19  blocking my vision from this -- sorry -- from this
20  tree right here.  I did see them start coming up, so
21  I'm assuming -- because I didn't see their vehicle
22  until they appeared -- they had to have parked right
23  around here somewhere in this location right here.
24  The pen doesn't want to work here.
25      Q.   You've now just put sort of a circle area

---

170

1   where it makes sense to you where they parked?
2       A.   Yeah.  Pretty much right there in that
3   black area.
4       Q.   Very good.  Thanks.  Now, as you were in
5   your position, you could not make eye contact with
6   their vehicle?
7       A.   Only when they first initially came up
8   the driveway and then I lost visual of them because of
9   the RV, this tree, and where I was standing.
10      Q.   And then you observed them walking up the
11  driveway?
12      A.   Yes.
13      Q.   Okay.  Share with us what you recall, in
14  as much detail as you can, sir, from that point
15  forward.
16      A.   I'm gathering about the same time Hancock
17  and Carrigan came up the driveway, Mr. Wirth, I'm
18  assuming, saw them starting to come up the driveway,
19  because by the time they started walking up here --
20  and they might have been out of the vehicle already --
21  Mr. Wirth was out on the porch.
22      Q.   Okay.
23      A.   And then the conversation started.
24      Q.   All right.  And tell me about that
25  conversation.

---

171

1       A.   I could not tell you.  I was too far away
2   to hear the conversation.
3       Q.   Okay.  Did you hear anything?
4       A.   You could tell they're talking, the
5   demeanor.  It's one of those things you can hear a
6   conversation going but you can't determine exactly
7   what they were saying.
8       Q.   Okay.  In hearing the conversation, as
9   you just described it, any indication of elevated
10  voices or anger, anything like that?
11      A.   No.
12      Q.   Okay.  More conversational?
13      A.   It was conversational.  And then the only
14  thing I could tell from Mr. Wirth that he was
15  irritated that we're there is the last part of the
16  conversation where he throws up his hands and then
17  turns around and walks back in the residence.
18      Q.   Okay.  But while they're talking, you
19  didn't hear any elevated tone or volume out of any of
20  them?
21      A.   No.
22      Q.   Okay.  So you see him throw up his hands,
23  turn to walk back towards the house?
24      A.   Yes.  And then I want to say -- I'm not
25  sure exactly where the door is, but it's somewhere

---

172

1   exactly on the porch, I'm not sure.
2       Q.   Sure.  Did you verbalize anything at that
3   point?
4       A.   I said, sir, do not go back inside the
5   residence.
6       Q.   Do you think he heard you?
7       A.   No, he did not.
8       Q.   How do you know that?
9       A.   Because he didn't look towards me, didn't
10  even stop to kind of recognize that he heard something
11  off to his right or whatever, other than what was the
12  conversation between him and Carrigan and Hancock, and
13  then he just continued on inside the residence.
14      Q.   Let's role play a little bit.  Why don't
15  you say it with the same volume and words that you
16  recall using.
17      A.   Sir, don't go back inside the residence.
18      Q.   Okay.  That gives me a flavor.  Any doubt
19  that he was within hearing range?
20      A.   He could have been.  I'm not sure.
21      Q.   Okay.  He could have been just flipping
22  you off and ignoring you, right?
23      A.   Yes.
24      Q.   Okay.  Was that significant to you that
25  he didn't react to your request?

---

43 (Pages 169 to 172)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

173

1    A.  Yes.
2    Q.  In what way?
3    A.  Like I said, he never responded, he never
4  looked towards my direction or to the direction of my
5  voice.  His demeanor of walking was not slowed that he
6  recognized that someone was saying something to him.
7    Q.  Did it raise your level of sensitivity,
8  or how would I say it?  Yeah, that's as good as any.
9    A.  As in?
10    Q.  Well, did it make you tense?  Did it make
11  you anticipate anything?
12    A.  Just to my wondering is why he was, you
13  know, going back inside the residence.
14    Q.  Okay.  Did you satisfy yourself that
15  there was a court order to evict him?
16    A.  Yes.
17    Q.  Okay.  Was that discussed back at the
18  substation?
19    A.  No.  Not at that time, no.
20    Q.  Okay.  When did you kind of satisfy
21  yourself that you had a proper court order?
22    A.  I can't remember exactly when, but I had
23  seen the actual documents prior to that day.
24    Q.  Oh, okay.  So he goes back inside?
25    A.  Yes.

---

174

1    Q.  Did you communicate with Mark or Nate
2  about what that meant to you or anything like that?
3    A.  No.
4    Q.  What's your next recollection?
5    A.  I actually approached the residence to
6  kind of get a look and see what was going on.  There's
7  actually -- on this diagram, it's not shown.  I don't
8  know why.  There's a small jetty of some type of a
9  wall that kind of sticks out right here where I've put
10  the black mark.  It's just a wall that sticks out.
11  And right on the inside of this there's another
12  sliding glass door that goes into the basement.
13    Q.  Would you just put door or basement door?
14    A.  On that gray part, my pen doesn't want to
15  write.
16    Q.  I don't know if the ballpoints are
17  better.
18    A.  Yeah.  For some reason, that doesn't want
19  to write on the gray part from where it's printed.
20    Q.  All right.  So you're giving us some
21  detail there now leading up to where you went to?
22    A.  Yes.
23    Q.  Which was where?
24    A.  I just went up to the sliding glass door.
25  It was extremely tinted, mirror tinted, if you will,

---

175

1  where I couldn't even see, going up like this, to look
2  inside the residence.
3    Q.  Did you actually do that, cup your hands
4  over your eyes and try to peer in?
5    A.  Yes, I did.  And then from -- I'm not
6  sure exactly what point, when I was here, the radio
7  traffic from Mark Hancock calling us, myself, Travis
8  Threlkel, and Jeremy Lowrance, to the front door.
9    Q.  Okay.  So when you're peering in, did you
10  see any evidence of Mr. Wirth?
11    A.  I didn't see anything.  It was so dark
12  and tinted.  Like I said, it was extremely dark and
13  tinted that I couldn't even see anything.
14    Q.  Okay.
15    A.  He could have been standing right on the
16  other side of the glass and I wouldn't have seen him.
17    Q.  So you were pretty exposed?
18    A.  Yes.
19    Q.  Okay.  If he had weapons?
20    A.  Yes.
21    Q.  So you're called up to the front door?
22    A.  Yes.
23    Q.  Share with us your mental impression, if
24  any, hearing that request.
25    A.  Why are we getting called up to the door?

---

176

1  There shouldn't be any reason.  He's not coming out.
2    Q.  Did you ask?
3    A.  No, I did not.
4    Q.  Okay.  And I think we know this.  You
5  went up to the front door?
6    A.  Yes, I did.
7    Q.  Do you remember how you got up there?
8    A.  Pretty much from where that sliding glass
9  door -- I can't recall if there was a side window to
10  this area, because below the deck is the two-car
11  garage and there's literally two garage doors, not one
12  full-size one, there's two.  I can't remember if I
13  peered into any of these windows, but I took a trek
14  between the front porch and the camper trailer that
15  was parked out, walked around over to the front porch
16  where Captain Hancock and Nate Carrigan were already
17  standing.
18    Q.  All right.
19    A.  I don't know if you need to see it, I
20  just drew black where I went here, up and around.
21    Q.  Pretty much a semicircle around to the
22  front?
23    A.  Yes.
24    Q.  Thanks for doing that.  Now, when you got
25  to the front door, any conversation?

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

177

1   A.  I'm not sure on timeline what was
2   conversated before or after.  I do remember the radio
3   traffic from Captain Hancock to the sheriff on the
4   aspects that there's too much time going by.  We need
5   to get in there.  And I'm not sure exactly what else
6   was transpiring on the radio.  The question was asked
7   to myself, Travis, and Jeremy -- and I'm not sure when
8   Jeremy and Travis got to the front door.  I just know
9   all of a sudden they're standing around me.  The
10  question was who has a flashlight.  And the aspects
11  was who has a flashlight on their rifle.  I said I am,
12  because I was the only one who had a flashlight on the
13  rifle.
14      Q.  Who asked the question?
15      A.  Hancock.
16      Q.  Okay.
17      A.  He said, okay, you're first.
18      Q.  Okay.  Let me back up, because I didn't
19  ask you a very good question.  When you went up to the
20  front door, were Nate and Hancock announcing
21  themselves or knocking on the door?  Do you recall any
22  of that?
23      A.  If I remember, I remember seeing Nate
24  knocking on the door when I got up there.
25      Q.  Okay.  Do you remember either one of them

---

178

1   verbalizing that they're with the sheriff's office?
2       A.  I can't recall, no.
3       Q.  Okay.  Did you?
4       A.  No, I did not.
5       Q.  Okay.  Did you call Travis and Jeremy to
6   come down to the front door?
7       A.  No, I did not.
8       Q.  Who do you think did?
9       A.  Hancock.
10      Q.  Okay.  Was it the one directive to come
11  to the front door to all of you, or was there
12  subsequent ones to call Travis and Jeremy down there?
13      A.  I can't remember if it was one or a
14  couple.  I just know that, hey, guys -- to the avenue,
15  hey, guys, I need you at the front door and I need you
16  here now.
17      Q.  Okay.  When you get there and you've
18  thought to yourself why are we going there, did you
19  verbalize that question?
20      A.  No, I did not.
21      Q.  Is there any reason why not?
22      A.  Not following orders, being
23  insubordinate.
24      Q.  Well, there's no order that you couldn't
25  ask a question, was there?

---

179

1       MR. ELKUS:  Object to the form of the
2   question.
3       A.  What do you mean?
4       Q.  (BY MR. SCHIMBERG)  Well, there was an
5   opportunity for you when you got there, even before
6   Travis and Jeremy showed up, to say, Captain, what are
7   we doing up here?
8       A.  Yeah, there was an opportunity, but I
9   never asked.
10      Q.  Okay.  Did anybody before you entered?
11      A.  I don't recall.
12      Q.  Okay.  That's all we can go by, is what
13  you recall.  Your impression was, when you heard this
14  request, why are we being asked to go to the front
15  door?
16      A.  Yes.
17      Q.  Is that correct?
18      A.  Yes.
19      Q.  And you get there.  And do you have any
20  sense of the time before Travis and Jeremy got there?
21      A.  No, I do not.  Like I said, all I
22  remember is all of a sudden they're standing next to
23  me.
24      Q.  Okay.  Was there any conversation between
25  you, Jeremy, and Travis when they got up there?

---

180

1       A.  No, there wasn't.
2       Q.  Were you standing in sort of a cell
3   group, or were you already sort of lined up?
4       A.  Semi lined up.
5       Q.  Okay.  And tell me what order.  Who was
6   where?
7       A.  Well, I was --
8       Q.  Let's leave that one.  Let me see if I
9   have a better one for you.  I don't know if I do,
10  quite honestly.  Just so we can kind of keep things
11  separate, let me show you another diagram from the
12  CBI.
13      (Deposition Exhibit 28 was marked.)
14      Q.  I've marked Exhibit 28, which is another
15  diagram of the 36 Iris Drive location.  It's a little
16  larger photograph of the residence there showing some
17  of the locations here.  Now, there's a rectangle
18  called mud room.  Do you see that on your exhibit?
19      A.  Yes, I do.
20      Q.  All right.  Is that what you've been
21  referring to as the front door?
22      A.  Yes.
23      Q.  Now, outside the mud room on the outside
24  of it, are there steps?
25      A.  There was one step in like -- I think it

---

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

185

1    Q.   So you are some 10 to 15 feet away from
2  Nate and Hancock when he asked that question?
3    A.   Yes.
4    Q.   Okay.  So he says to you, you're first?
5    A.   Yes.
6    Q.   Any explanation needed?
7    A.   No, just because I had a flashlight on my
8  rifle.
9    Q.   What's the connection between -- I think
10  I know, but the connection between a flashlight and
11  you being first?
12    A.   Just in case the interior was dark and we
13  can illuminate it.
14    Q.   Did you turn your flashlight on?
15    A.   No, I did not.
16    Q.   Ever?
17    A.   No, I did not.
18    Q.   All right.  Walk me through this.  What
19  happens next, to your recollection?
20    A.   I can explain a little bit more, if you
21  have a diagram, of the actual interior of the
22  residence.
23    Q.   I do.
24    A.   That will work right there.
25    Q.   Let's mark it.

---

186

1        (Deposition Exhibit 29 was marked.)
2    Q.   Did you have any intel on the layout of
3  the interior of the residence?
4    A.   No, I did not.
5    Q.   Again, this comes out of the CBI report,
6  the investigation.  You'll see in the lower right-hand
7  corner is some Bates stamp numbering, Carrigan 018835.
8  Do you see that?
9    A.   Yes.
10    Q.   I got it from your attorneys, but also
11  the CBI.  Does this work for you to explain what
12  happens next from the outside?
13    A.   Yes.  This one and this one will be
14  perfect for explaining.
15    Q.   Just for our record, when you said this
16  one and this one --
17    A.   I'm sorry.
18    Q.   That's all right.
19    A.   Exhibit 28 will work on the starting of
20  it and then continuing on it will be Exhibit 29, when
21  we actually enter the residence.
22    Q.   All right.  Before you enter, do you get
23  into a conga line?
24    A.   I don't believe so.
25    Q.   Do you know who went where?  If you were

---

187

1  going to be first, do you know who followed?
2    A.   I knew I was going to be first.  I just
3  gathered Travis was going to be second and Jeremy
4  Lowrance would be third.
5    Q.   And why did you think that, just because
6  of your positioning outside?
7    A.   Yes.
8    Q.   Okay.  And where was Mark Hancock going
9  to be?
10    A.   He was still behind Nate Carrigan right
11  there next to the door.
12    Q.   Was there any discussion as to who was
13  going to go in when?
14    A.   No.  Just that I was going to be first.
15  And I assume that's why Travis and Jeremy were right
16  next to me, that they were going to be second and
17  third.
18    Q.   When it was announced that you were going
19  to be first, did you ask any question like are we
20  really breaching or anything like that or I don't
21  think we were going in, anything like that?
22    A.   I had thoughts of it, but, no, I did not
23  state it verbally.
24    Q.   Okay.  Did anybody else say anything?
25    A.   Not that I can remember.

---

188

1    Q.   Okay.  What do you recall happening next?
2    A.   Like I said, with the conversation across
3  the radio between Hancock and the sheriff, I heard,
4  okay, go ahead and breach.  And that's when Hancock
5  looked at Nate Carrigan and said go ahead and breach
6  or breach, and Nate started kicking the door with his
7  foot.
8    Q.   Okay.  Was there any doubt, in your mind,
9  you were going to breach when it was pointed out to
10  you you're first?
11    A.   There was no doubt that we're going in.
12    Q.   Okay.  And that had occurred prior to
13  communication with the sheriff?
14    A.   I think it was kind of intertwined with
15  everything, of us walking up there, Travis and Jeremy
16  walking up there, and them knocking and announcing.
17  It was like all wrapped up in the same timeline.
18    Q.   Okay.
19    A.   All kind of occurring in the same time.
20    Q.   Okay.  Did you see the sheriff on the
21  site?
22    A.   No, I did not.
23    Q.   Okay.  You didn't see him at the time you
24  observed the conversation out on the deck --
25    A.   No, I didn't.

---

47 (Pages 185 to 188)

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

189

1  Q. -- between Wirth and Hancock and
2  Carrigan?
3  A. No, I didn't.
4  Q. Okay. Do you recall a question to
5  Hancock, try to call him out or knock on the door,
6  from the sheriff?
7  A. I can't remember.
8  Q. Okay. What happens next after Hancock
9  says -- what did he say?
10  A. He says, breach, and he's saying that to
11  Nate Carrigan.
12  Q. All right. And you recall Nate kicking
13  the door three times?
14  A. Approximately three times. The door
15  didn't open and I actually started advancing or
16  stepping towards the front door when the door didn't
17  come open after the multiple kicks. And I can't
18  exactly give you a number that Nate kicked the door.
19  And, actually, my thought was the door is not opening,
20  so that's when I started advancing towards the door
21  and I was going to put a boot to it and get the door
22  to come open. And at the same time of thinking that,
23  you know, because I was going to assist Nate with
24  breaching the door, that's when the door opened and
25  Nate was successful to get it to open.

190

1  Q. Okay.
2  A. So I started advancing into the
3  residence. I don't know how many steps I got into the
4  residence -- that would be in the actual mud room
5  first -- I announced Park County Sheriff's Office.
6  And, yes, I did say, show me your fucking hands. I
7  did not have any eyes on or a visual on anybody in the
8  residence yet when I announced myself and said, show
9  me your fucking hands. I got into the kitchen area.
10  And on the diagram, if you guys look at the diagram,
11  kitchen -- mud room, kitchen. I, to a certain extent,
12  basically just focused down line. I was basically the
13  pointman, so I was focused down line. I didn't see
14  that that was a stove or anything right there. I just
15  knew it was a wall.
16  I know Travis was still behind me or, as
17  we would call it, he was on my six, my rear-end. I
18  got to the end of the wall right here. I don't know
19  if you guys are familiar with the term of pieing a
20  corner. Basically I started pieing the corner,
21  looking and cutting it into a pie around the corners.
22  Look here, start going here, start going here, because
23  my thought, since I was primary or first in, I was
24  going to do a hook, basically a 180, and go to, what
25  we call it, a deep threat, because I don't know what's

191

1  here. I've basically already seen all of this, so I'm
2  going to go this direction.
3  Q. And on Exhibit 29, that would be around
4  the kitchen corner there into the living room?
5  A. Correct.
6  Q. Okay.
7  A. When I got to that corner that enters
8  into basically the dining room where the dinner table
9  was and basically into the front room, I took one step
10  and started leaning around the corner to start pieing.
11  When I took that one step, that's when I took the
12  first round into my pelvic triangle.
13  Q. Did you ever lay eyes on Wirth?
14  A. No, I did not.
15  Q. Do you have an idea where the shot came
16  from?
17  A. No.
18  Q. To this day?
19  A. No. Well, I take that back. Now I do,
20  yes, after the fact.
21  Q. And what's your information of where he
22  was?
23  A. On the diagram of 29, if you see where it
24  has the stair represented and it goes down into the
25  basement, he proned out in that stairwell. Where

192

1  these lines are, here and here, is kind of like a
2  hallway that goes from the front room into the back
3  bedrooms and where the bathroom is at, that area right
4  here drops down, I want to say, approximately 6
5  inches. I was told he was laying right there.
6  Q. Who told you that?
7  A. I think it was one of the CBI guys.
8  Q. Okay.
9  A. I can't remember exactly who told me
10  where he was at.
11  Q. Why don't you write in where you've now
12  been told Wirth was when he shot you.
13  A. I'm going to draw a line with this pink
14  pen, was right pretty much where I was told he was
15  proned out. And proned out means he was laying on the
16  ground.
17  Q. Yes. Would you put an MW there?
18  A. Pretty much where he was layed out.
19  Q. All right. If I understand it, what you
20  were describing earlier is if you continued to walk
21  straight from where you were, there would have been a
22  step down?
23  A. No, not until you get to where those
24  lines are. That's actually a step down and then you
25  have a step back up.

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**
# EXHIBIT F

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

225

1   you see that, line 14?
2       A.  Yes, I do.
3       Q.  And then the agent who was interviewing
4   you said, "Were you concerned about him going back in
5   the house?"  And you answer, "Yes, very much so."  Do
6   you see that?
7       A.  Yes.
8       Q.  And you're asked, "What concerned you
9   about him being in the house?"  Your response is
10  "Possible firearms."
11      A.  Correct.
12      Q.  That was part of your mindset as this was
13  going on?
14      A.  Yes.
15      Q.  Page 29, line 5, the agent asks you, "And
16  then before entry was made into the house, was there a
17  period of time where someone was knocking on the door
18  and announcing?"  And you answer, "Yes, Nate Carrigan
19  was knocking and announcing."  Do you see that?
20      A.  Yes, I do.
21      Q.  Line 11 says he was yelling come on -- I
22  can't think of his damn name now.  He supplied Wirth.
23  Anyway, Nate was knocking and announcing and yelling;
24  is that correct?
25      A.  Correct.

---

226

1       Q.  And line 14 says Nate was saying, "Come
2   on, I need you to come to the door.  You're being
3   evicted.  Come on out."  Is that consistent with your
4   recollection today?
5       A.  I believe so, yes.
6       Q.  Okay.  Did you think Wirth was taking too
7   long to come to the door?
8       A.  No, not necessarily.  That day with
9   everything that was going on, I was so focused on the
10  task at hand, what I'm supposed to do, basically time
11  kind of stopped for me.  I didn't know if it was
12  10 minutes, 20 minutes, an hour, 5 minutes, 2 seconds.
13  So, no, I don't believe that even crossed my mind that
14  he was taking too long.
15      Q.  Okay.  What was the goal or purpose of
16  entering, in your mind?
17      A.  To get him out of the residence.
18      Q.  Evict him, right?
19      A.  Yes.
20      Q.  Do you know if Mr. Carrigan ever actually
21  got inside the residence or stayed where you last saw
22  him at the doorjamb, so to speak?
23      A.  He stayed where he was at after he kicked
24  the door.
25      Q.  Do you have any sense of the distance

---

227

1   between you and the last person to enter the
2   residence?
3       A.  From?
4       Q.  Right before you took a shot.
5       A.  From the door we went into to the point
6   where I started pieing, approximate distance?
7       Q.  It's a bad question.  You're first and
8   you get to that corner and you start to pie, correct?
9       A.  Uh-huh.
10      Q.  Do you know how far Travis was behind you
11  at the time?
12      A.  I don't believe he was very -- I believe
13  he was literally on top of me.
14      Q.  As if in a conga line?
15      A.  Correct.
16      Q.  Do you know or have any feel for distance
17  between Travis and Jeremy?
18      A.  No, I don't.
19      Q.  How about Jeremy and Mr. Hancock?
20      A.  To my knowledge, Hancock never came
21  inside the residence.
22      Q.  Do you have any knowledge that he got
23  into the mud room?
24      A.  No.
25      Q.  Neither?

---

228

1       A.  Neither coming inside the residence or
2   getting into the mud room, I don't recall him ever
3   entering the doorway.
4       Q.  Okay.  He took a shot as well, maybe two,
5   right?
6       A.  I've learned this after the fact, that he
7   got skinned.
8       Q.  Yeah.  Did you attend any briefings or
9   debriefings at Park County Sheriff's Office after this
10  event?
11      A.  It was sometime ago after the incident.
12  It was after I was out of the hospital and after I was
13  out of that rehab facility.  I couldn't tell you.
14  Maybe -- it was probably the month of June or July.
15      Q.  And where did it take place?
16      A.  At the sheriff's office in the
17  investigation trailer.
18      Q.  Do you remember who was present?
19      A.  Everybody that was involved that day.
20      Q.  Was this sort of a self-analysis of what
21  happened, or was it more of a cathartic or -- bad
22  question.  Was there a mental health counselor
23  present?
24      A.  I can't remember if there was one there
25  or not.

---

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**
**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

237

1  day, no.
2      Q.  Well, did you learn anything that you
3  didn't know from Jeremy in those door-to-doors?
4      A.  I don't believe so.
5      Q.  Okay.  Was he opposed to the decision-
6  making that day?
7      A.  Yes, he was.
8      Q.  Did he give you any specific reasons?
9      A.  Kind of in the same general as everybody
10  else had, it shouldn't have gone down that way, that
11  it was an eviction.  We handled it more above and
12  beyond what it should have been handled.
13      Q.  How about D.J. Hannigan?  Any contact
14  with D.J. since February 24, 2016, specifically about
15  what had transpired?
16      A.  No.
17      Q.  Have you had any contact with him?
18      A.  Just text message and just seeing how I
19  was doing and stuff like that.
20      Q.  Okay.  How about with Dave Leffler?
21      A.  I saw him I think once or twice when I
22  was in the rehab place.  I don't remember getting any
23  phone calls or text messages, no.
24      Q.  How about any conversation specific to
25  the events and his view?

---

238

1      A.  I don't recall having a conversation with
2  him about it.
3      Q.  Have you ever sat down with the sheriff
4  and shared with him your view of what transpired?
5      A.  No.
6      Q.  How about with Welles Tonjes?
7      A.  Not in depth, no.
8      Q.  When was the last time you saw Tonjes?
9      A.  Basically, you know, at a table or
10  anything, it's been a while.  And I bumped into him --
11  myself and Travis bumped into him at an IHOP
12  restaurant where he was having breakfast and me and
13  Travis was also having breakfast.
14      Q.  Okay.  Any conversation about your
15  thoughts, ideas, emotions related to the decision-
16  making of February 24?
17      A.  Just like I've said before, just that day
18  was handled inappropriately and it shouldn't have been
19  handled that way.
20      Q.  You actually said this with Tonjes?
21      A.  Yes.
22      Q.  At that breakfast?
23      A.  Yes.
24      Q.  Okay.  Do you recall anything that Tonjes
25  said?

---

239

1      A.  I can't remember specifically.  I believe
2  he -- I want to say he did say he talked with Nate
3  that morning about the eviction and why -- I want to
4  say why -- I don't know.  I think I might be confused
5  with things I had prior or before.  I can't remember.
6      Q.  Has Welles Tonjes supplied you with any
7  information that was new or different from how you
8  experienced it; in other words, did he share with you
9  any specifics about conversations he had had prior to
10  the eviction with any of the guys involved?
11      A.  No.
12      Q.  Okay.  Have you had any contact or
13  communication with Monte Gore specifically related to
14  your thoughts regarding decision-making on
15  February 24, 2016?
16      A.  No, I have not.
17      Q.  Do you remember Tonjes and Gore visiting
18  you at St. A's the next day or a couple of days after
19  you had been shot?
20      A.  I can't remember.
21      Q.  Okay.  Have you had any conversation with
22  Burgette or Devin about your thoughts about the
23  decision-making on February 24, 2016?
24      A.  No, I haven't.
25      Q.  I'm getting tired and I bet you are too.

---

240

1  Did you tell me you have had some with Ernie?
2      A.  Yes.
3      Q.  More than one?
4      A.  Yes.
5      Q.  Okay.  And generally, what's Ernie's
6  thoughts?
7      A.  Very, very pissed off about how it was
8  handled.
9      Q.  Anything specific about what he's pissed
10  off about?
11      A.  It was supposed to have been just a civil
12  eviction, you know, something easy, and it got blown
13  up to -- it should have been pretty much a SWAT
14  callout, should have been a full SWAT.
15      Q.  Anyone else at Park County Sheriff's
16  Office that you have sort of shared with your views
17  about the decision-making on that day?
18      A.  Nobody specific, no.
19      Q.  Okay.  Have you been vocal around the
20  office about your thoughts regarding decision-making
21  that day?
22      A.  No.
23      Q.  Martin Wirth killed Nate Carrigan, didn't
24  he?
25      A.  To my knowledge, yes, he did.

---

60 (Pages 237 to 240)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

241

1      Q.  Is there any doubt, in your mind, Martin
2  Wirth shot and injured you?
3      A.  No doubt.
4      Q.  He ambushed you guys, didn't he?
5      A.  Yes, he did.
6      Q.  I have all of these neat little subfiles
7  and can't find something.  Have you ever met an
8  individual by the name of Dan Montgomery?
9      A.  Yes.
10     Q.  Tell me about when you met him.
11     A.  It's been a couple of months.  Myself and
12  Threlkel met him at breakfast one morning.
13         (At this time Mr. Phillips left the
14  room.)
15     Q.  And where was the breakfast?
16     A.  At the IHOP.  At IHOP.
17     Q.  Who all was there?
18     A.  Myself, Travis, and Dan.
19     Q.  What did you talk about?
20     A.  Briefly about what occurred that day.
21     Q.  Okay.  You say briefly.  How long do you
22  think you spoke with him?
23     A.  Maybe a good hour, hour and a half.
24     Q.  Where is this IHOP?
25     A.  It's off of Bowles and -- I don't

---

242

1  remember what the cross street is, but where that
2  movie theater is, it's just east of that.  Travis's
3  wife was working there on the weekends.
4      Q.  Okay.  Have you met with any other -- you
5  understand that Mr. Montgomery has been retained by
6  you to serve as an expert witness?
7      A.  Correct.  Yes.
8      Q.  Okay.  Have you met with any of the other
9  individuals who have been retained to serve as an
10  expert witness on your side of the case?
11     A.  As in who?
12     Q.  I was hoping you could help me out with
13  the names.  I'm going to screw up her name.  Mazone
14  ring a bell?
15         MR. SCHIMBERG:  How do I say her name?
16         MR. ELKUS:  Franny Mazone.
17         MR. SCHIMBERG:  Mazone.
18         THE DEPONENT:  Is that Fanny?
19         MR. ELKUS:  Franny.
20         THE DEPONENT:  Franny.
21     A.  Yeah.  I met with her, yes.
22     Q.  (BY MR. SCHIMBERG)  When did you meet
23  with her?
24     A.  It was this past summer.  Just talked
25  about injuries and future medical help down the road.

---

243

1      Q.  Face to face?
2      A.  Yes.  She actually came to my mom's
3  house.
4      Q.  And there's been an economist hired to
5  talk about income loss, things like that.
6      A.  I think that was that phone call I had.
7  What was his name?
8         MR. SCHIMBERG:  Help me out guys.  What's
9  his name?
10         MR. ELKUS:  It's Jeff Nehls.
11         MR. GOLDFARB:  Nehls.
12         MR. SCHIMBERG:  Yes, Nehls.
13     A.  I had a conversation with him on the
14  phone.
15     Q.  (BY MR. SCHIMBERG)  Okay.  What did you
16  talk about with him?
17     A.  How much I've made basically through my
18  lifetime and moneys and stuff like that.  Future
19  medical issues I'm going to have down the road and
20  cost factor and stuff like that.  I believe that's
21  exactly to an extent what it was.
22     Q.  If I understand your answers to
23  interrogatories and even testimony, do you believe
24  that the decision-making that day was contrary or in
25  violation of any policies and procedures of the Park

---

244

1  County Sheriff's Office?
2      A.  I believe so, yes.
3      Q.  I think you have identified 509 and 510.
4  Does that ring a bell?
5      A.  Yes.
6      Q.  What are those, if you know off the top
7  of your head?
8      A.  I can't remember exactly which one is
9  which.  One is for barricaded subjects.  And I'm not
10  sure exactly the other one I referred to offhand.
11     Q.  It's the execution of a high-risk warrant
12  or service.
13     A.  Yeah.  I know I made sure, you know, I
14  researched on that stuff.
15     Q.  How did you go about researching on that
16  stuff?
17     A.  I have the policy and procedure for the
18  sheriff's department.  Everybody gets a copy of that.
19     Q.  Okay.  So let me see if I understand.  Do
20  you think there's something faulty or inadequate about
21  the procedure -- I mean the policy or procedure
22  itself, or is your beef with the decision-making that
23  should have followed those procedures and policies?
24         MR. ELKUS:  Object to the form of the
25  question, but go ahead, if you understand it.

---

61 (Pages 241 to 244)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

253

1    A.  Yes.
2    Q.  Okay.  At any point on that day or even
3  leading up to that day, had you ever heard anyone
4  characterize this eviction as a high-risk eviction?
5    A.  I can't recall if I heard that or not,
6  no.
7    Q.  Okay.  A little cleanup here.  At PCSO is
8  there someone held out to be the SWAT -- head of SWAT
9  training?
10    A.  No.  Due to our lack of resources and
11  moneys, a lot of us have actually done training or
12  headed up the training.
13    Q.  So you kind of take it upon yourself to
14  take on the responsibility of educating yourself and
15  thinking about what we're going to do at this
16  training?
17    A.  Yes.
18    Q.  But you don't carry the title of official
19  trainer?
20    A.  Correct.
21    Q.  Okay.  When we talked about Conner and
22  Abrams, were they also trainers in SWAT as well as
23  with patrol officers?
24    A.  Yes.
25    Q.  And you think they're well versed and

---

254

1  experienced and do a good job?
2    A.  I believe so, yes.
3    Q.  Okay.  So you personally assist in the
4  development of training for the PCSO SWAT or at least
5  you did when you're on SWAT?
6    A.  I have done a couple of trainings and
7  I've led a couple of trainings, yes.
8    Q.  Okay.  Can you think of any?
9    A.  One was bus assaults.
10    Q.  Bus?
11    A.  Bus, like a school bus or a regular
12  commercial, like RTD bus assaults.  And also, you
13  know, basically entries into a residence or an
14  occupied structure or anything to that effect.
15    Q.  In your training of entries into a
16  residence or a structure, would there be certain
17  criteria that have to exist for you to enter?
18    A.  As in?
19    Q.  Well, factors, circumstances.
20    MR. WAGNER:  Object to form.  You can
21  answer.
22    A.  As in warrants and stuff like that?
23    Q.  (BY MR. SCHIMBERG)  Yes, sure.
24    A.  Yes.
25    Q.  Okay.  Give me an example.

---

255

1    A.  Well, we would set up scenarios from, you
2  know, an everyday just warrant all of the way up to a
3  homicide suspect.
4    Q.  Okay.  So in serving a warrant instance,
5  would that be some follow-up to, say, 509?
6    A.  Correct.
7    Q.  Okay.  Did you put together a syllabus or
8  anything, education material, when you trained?
9    A.  Yes.
10    Q.  Okay.  Who would I ask to track that
11  down?
12    A.  It would be in probably the training
13  files.  And I'm assuming now probably Captain
14  Bonnelycke would probably have it now, to my
15  knowledge, because he's --
16    Q.  Or Rose?
17    A.  Or Rose.  Because I know one of those two
18  would have copies of those.
19    Q.  Do you have any feel, Kolby, of when you
20  did the bus assault and entries into residence
21  trainings?
22    A.  What do you mean by that?
23    Q.  When?
24    A.  Oh.
25    Q.  When did they occur?

---

256

1    A.  Bus assaults, it's been a while.  It was
2  probably within a year or so after I went to the
3  Colorado Springs SWAT school.
4    Q.  Which would be '08 or '09, is where you
5  did the training?  No.  You did training in '07?
6    A.  Correct.
7    Q.  I'm getting confused.  The bus assault
8  training you did would have been about a year after
9  that?
10    A.  Correct.
11    Q.  And how about the other one?
12    A.  I couldn't tell you exactly.  I know it
13  was down at that range, that place we called M Lazy C,
14  that ranch.  And it was basically when we were
15  rebuilding our SWAT team.  And the majority of the
16  new -- we had a majority of new members on the team.
17    Q.  Okay.  And when was that?  What's your
18  best estimate?
19    A.  Maybe two, three years ago.
20    Q.  What do you mean by "rebuilding our SWAT
21  team"?
22    A.  Most of the people that were originally
23  on SWAT with me, to include the person I already
24  mentioned, Glen Hardy, mostly everybody that was on
25  SWAT has left the agency.

---

64 (Pages 253 to 256)

**EXHIBIT F**

Case No. 1:16-cv-03079-MSK-NRN   Document 54-6   filed 03/23/18   USDC Colorado   pg 18 of 26

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## 257

Q. Better pay, other agencies?

A. Yeah, pretty much. I'm pretty sure of it. Not totally sure of their circumstances or reasons why they left.

Q. Okay. How many SWAT callouts have you participated in at the Park County Sheriff's Office?

A. I'm just going to kind of voice it out, because I'm trying to think.

Q. Sure.

A. Webber Park, the one . . .

Q. You can rattle off the location or circumstance, if that helps.

A. One was Webber Park. And that's way down in the middle of nowhere in Park County. A party was being looked at and trying to be picked up by the U.S. Marshals -- and we had one of them on with us at the time -- also was involved in Teller County SWAT, Clear Creek County SWAT, and that was just the only two.

I was involved in basically a SWAT thing prior to me coming to SWAT and that's what I call the Talbert incident. Mr. Talbert had an issue about not getting his license plates paid for and he had to pay an extra $10 for the fee. Long story short, we found out where he lived. The following days him and

## 258

another officer got in a wrestling match for a rifle. The other officer that was also on scene -- because we had two scouts or snipers, if you want to call it, watching the property while we were coming. As the two officers were -- while one officer was wrestling with Mr. Talbert, the other officer shot him and got him in the back and resulting in his death that day. And that was 2006.

Q. Were you involved in that mission?

A. Yes, because it started out on my shift as a disturbance at DMV. He ran from us up towards another town that's in the county. We basically drove the same direction, pursued to a certain extent, found him parked off to the side of the road, came to make contact with him. He came out of his Jeep that he was in with a shotgun, gave him commands to put it down, stuff like that. He walked away from us into the trees and we pursued him and lost him in the forest.

Q. It goes without saying, I guess, police work is high risk, isn't it?

A. Yes.

Q. It's inherently risky, isn't it?

A. Yes, it is.

Q. Even a mundane traffic stop, you're not sure what's going to happen?

## 259

A. Correct.

Q. Again, we hope for the best, prepare for the worst?

A. Yep.

Q. Okay. How many evictions are you aware of that resulted in a SWAT callout at Park County, if any?

A. Zero.

Q. Okay. I'm just clearing up some things here. Have you been successful in quitting your tobacco habit?

A. No, not really.

Q. Oh, shoot. It helps your recovery.

A. Yeah. I quit for a while while I was rehabbing, but it came back.

Q. I'm sure your doctors have shared that with you?

A. Yes, they have.

Q. Okay. Why did you file a lawsuit, Kolby?

MR. WAGNER: I'm going to object to form. Foundation.

A. I don't see why that's relevant for me to say.

Q. (BY MR. SCHIMBERG) Well, what's your motivation? What's your goal?

## 260

A. Change with that agency.

Q. In what way?

A. A whole new command staff needs to be in that sheriff's department.

Q. Do you have anybody in particular?

MR. WAGNER: Objection. Form. Foundation.

A. Yeah.

Q. (BY MR. SCHIMBERG) Who?

A. Mike Brown.

Q. Oh. You want Brown in a position of command?

A. Yes. I want him as sheriff.

Q. Is he running, do you know?

A. He hasn't announced, but he has expressed that he's willing to do it.

Q. Okay. The sheriff is done. Sheriff Wegener, he's done, right?

A. In my opinion --

Q. He's not running again, right?

A. I don't know. I'm not pertinent to that information. I only hear scuttlebutt or speculation of what might occur.

Q. Okay. And what's the scuttlebutt you hear?

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

273

1   star next to his name, right?
2        A.  Yep.
3        Q.  Nate Carrigan has a star next to his
4   name, correct?
5        A.  Correct.
6        Q.  Travis Threlkel has a star next to his
7   name, correct?
8        A.  Correct.
9        Q.  You have a star next to your name,
10  correct?
11       A.  Yes.
12       Q.  And Mark Hancock has a star next to his
13  name, correct?
14       A.  I believe that's a star, yes.
15       Q.  So those who had stars next to their name
16  ultimately found themselves at the front door of the
17  Wirth home prior to the breach, correct?
18       A.  Yes.
19       Q.  Now, you said you had not had any
20  personal contact with Martin Wirth before this
21  incident?
22       A.  No, I have not.
23       Q.  Did you know anything about his contact
24  with Jefferson County and Park County Sheriff's
25  deputies on January 20, 2016?

274

1        A.  Prior to the eviction, I heard about the
2   pursuit, that Jefferson County came into our county,
3   and then our officers got involved or other deputies
4   from Park County, but I did not know that was Martin
5   Wirth.
6        Q.  So you knew that there was an incident
7   involving a Park County resident but didn't connect
8   that to Martin Wirth?
9        A.  No, I did not.
10       Q.  Did you have any information, prior to
11  making your way to Mr. Wirth's home on February 24,
12  2016, that would lead you to believe that he was a
13  dangerous individual?
14       A.  Just a little bit of possibly scuttlebutt
15  of the sovereign citizen comment that I made and that
16  he was evicted from that residence prior.
17       Q.  So if someone is evicted, does that mean
18  that they are per se dangerous?
19            MR. WAGNER:  Object to form.  Foundation.
20  Answer.
21       A.  How do you define dangerous?
22       Q.  (BY MR. GOLDFARB)  Well, I'm trying to
23  find out from you how you may have thought of Martin
24  Wirth as you were approaching his home on February 24,
25  2016.

275

1        A.  I assume that someone, if they're not
2   willing to leave a residence, they could be
3   potentially dangerous, yeah.
4        Q.  Are you aware of any efforts to contact
5   Mr. Wirth prior to your going to his home to ask him
6   to leave?
7        A.  Not to my knowledge, no.
8        Q.  And at what point, when Mr. Wirth was out
9   on the deck, did you hear him say I'm not leaving my
10  property?
11       A.  I don't remember hearing him say that.
12       Q.  That's because you really couldn't hear
13  anything that he was saying?
14       A.  No.
15       Q.  Okay.  So, again, the fact that Martin
16  Wirth was going to be evicted, does that make him per
17  se dangerous?
18            MR. WAGNER:  I'm going to object to form.
19  Foundation.
20       A.  No.
21       Q.  (BY MR. GOLDFARB)  And the fact that
22  Martin Wirth was a sovereign citizen, does that make
23  him per se dangerous to law enforcement officers?
24            MR. WAGNER:  Same objection.  Form.
25  Foundation.

276

1        Q.  (BY MR. GOLDFARB)  In your mind?
2        A.  Sovereign citizens can be dangerous, yes.
3        Q.  Do you know, prior to the February 24,
4   2016, eviction, if there was any sort of notation
5   in -- let me take a step back.
6            If you make contact with a Park County
7   resident who let's say you have to go hands on with
8   them, that they attack you, you have to do a takedown,
9   ultimately take them into custody, and you then go and
10  write up a report.  Is there a way for you to put a
11  notation in your internal system to warn other
12  deputies about that individual that you just had
13  contact with?
14       A.  If I believe it's warranted, yes.
15       Q.  Okay.  Have you ever done that before?
16       A.  Yes, I have.
17       Q.  Do you know of other deputes who have
18  done that?
19       A.  Yes.
20       Q.  Is it -- I hate to use the word "common,"
21  but is it a common practice among deputies to utilize
22  that warning system to help each other out?
23       A.  Yes.
24       Q.  So if you run into someone -- let's say
25  you're doing a traffic stop and you run their

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

277

1  information.  Does the warning pop up on your screen
2  for you, or how do you learn that warning is in the
3  system?
4       A.  If I run somebody on the streets,
5  90 percent of the time I'm running it through my
6  dispatch.  If my dispatch has that information, yeah,
7  then she'll inform me of it.
8       Q.  Can anyone input that warning information
9  into the system?
10      A.  We can put what we call a red flag, red
11 flagging a residence, and also our dispatch, we can
12 have our dispatch red flag that address.
13      Q.  Undersheriff Gore, could he put that
14 information in the system?
15      A.  Yes, he could.
16      Q.  Could Welles Tonjes put information like
17 that into the system?
18      A.  Yes.
19      Q.  Okay.  Do you know if, prior to this
20 eviction, there was anything in the system regarding a
21 warning for deputies who might come into contact with
22 Martin Wirth?
23      A.  I don't believe so.
24      Q.  Prior to February 24, 2016, did you
25 receive any sort of memo, e-mail, text message, any

---

278

1  sort of written communication from Undersheriff Gore
2  stating that no deputy, by any means, should enter the
3  Wirth home?
4       A.  No, I did not.
5       Q.  Did you at any time, prior to
6  February 24, 2016, receive a memo, e-mail, any other
7  sort of written document from Sergeant Tonjes stating
8  that, by no means, for no reason should no deputy
9  enter into Martin Wirth's home?
10      A.  No, I haven't.
11      Q.  Have you received memos or e-mails from
12 either of those two individuals in the past saying
13 here is a new policy or here is something to be aware
14 of when you're out on patrol?
15      A.  I wouldn't get them straight from the
16 undersheriff, no.  I would get them from Sergeant
17 Tonjes.
18      Q.  Is that part of his job duties, to
19 circulate that sort of information?
20      A.  It's like the same thing as what I said
21 before, is the chain of command.
22      Q.  With respect to your SWAT training while
23 at Park County, did you find that your SWAT training
24 translated over into your day-to-day patrol
25 activities?

---

279

1       A.  Only if it warranted.
2       Q.  Okay.  Can it make you, being SWAT
3  trained, a better patrol deputy?
4       A.  On the tactical sense, yes.
5       Q.  How so?  Just explain that for me.
6       A.  Oh, just approaching, observing a little
7  bit more details when you go to a residence.  When you
8  go to a call at a residence and the term that we've
9  used in law enforcement is hinky, you know, that term
10 would be if the house feels like there could be --
11 down the road we could get some more issues, or if we
12 had an issue at that residence, this type of stuff we
13 can have problems with, as in layout of the residence,
14 approaching or leaving and stuff like that, you learn
15 to start getting more detail oriented when it comes to
16 that type of stuff.
17      Q.  So it's fair to say then that you're
18 receiving more specialized training through being a
19 SWAT team member and that translates over into your
20 day-to-day patrol tactical abilities?
21      A.  Correct.
22      Q.  My only point is they're not mutually
23 exclusive?
24      A.  No.
25      Q.  I was a bit unclear.  You talked about

---

280

1  your attending the SWAT school with Colorado Springs.
2  Did you receive a specific certification as a result
3  of that training?
4       A.  Yeah.  It was -- I'm not sure exactly
5  what the certificate said, but it stated 40 hours of
6  SWAT training via the Colorado Springs Police
7  Department.
8       Q.  Have you done any SWAT-specific
9  certificate training after that in 2007?
10      A.  No, I have not.
11      Q.  You don't receive certificates when you
12 do Park County SWAT trainings?
13      A.  I take that back.  Like I said before,
14 when we were basically rebuilding our SWAT team and
15 Sergeant Conner and Abrams, Sergeant Abrams, headed up
16 the training aspects, he did basically, if you want to
17 call it, an academy, if you will, but it took a whole
18 entire year to get through that.  And at the end of
19 it, we did get a certificate from Conner and Abrams.
20      Q.  When you were going through with
21 Mr. Schimberg talking about your recovery from your
22 injuries and then rejoining the department -- do you
23 remember generally that testimony?
24      A.  Yes.
25      Q.  -- in my notes Mr. Schimberg asked you a

---

70 (Pages 277 to 280)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

289

1  deputies involved, you were thinking to yourself
2  that's a bit odd, because typically this is a one-man
3  job, why are there so many people involved in this
4  eviction?
5      A.  Yes, I did.
6      Q.  Again, you didn't say anything at that
7  time?
8      A.  No.
9      Q.  You didn't ask Sergeant Tonjes what is
10  going on here?
11      A.  I don't recall if I did or not.
12      Q.  You didn't go to Undersheriff Gore and
13  say, hey, why are we having so many deputies involved
14  in a simple eviction?
15      A.  I wouldn't go to the undersheriff for
16  that.
17      Q.  Okay.  Did you reach out to any fellow
18  deputies and say, guys, do you have any idea what is
19  going on here, why are there so many people involved
20  in this?
21      A.  I believe that conversation did happen
22  between me and Travis before we left the sheriff's
23  office.
24      Q.  Do you know if Travis went to Sergeant
25  Tonjes and asked him any questions about why so many

---

290

1  deputies were being involved in this eviction?
2          MR. WAGNER:  Objection.  Foundation.
3      A.  I don't believe so, because we were both
4  in Sergeant Tonjes's office at the time.
5      Q.  (BY MR. GOLDFARB)  Okay.  Did you say,
6  Sergeant, this doesn't feel right?
7      A.  I may have.
8      Q.  And Travis was there with you?
9      A.  Yes.  I'm not sure if he was there before
10  me or I got there before him.
11      Q.  What did Sergeant Tonjes -- how did he
12  respond to that?
13      A.  I believe he responded that this is
14  getting blown out of proportion.
15      Q.  So was it your impression then that
16  Sergeant Tonjes was more in line with what your
17  thinking was, these are typically one-man jobs to
18  carry out an eviction?
19      A.  Correct.
20      Q.  We don't need this many people?
21      A.  Correct.
22      Q.  You testified earlier you thought it was
23  odd to have medical on standby?
24      A.  Correct.
25      Q.  And you learned that when you got to the

---

291

1  briefing room?
2      A.  Yes.
3      Q.  And if medical is on standby, does that
4  mean that there's the potential for injuries?
5      A.  Yes.
6      Q.  And at that time, you did not voice any
7  concern to Mark Hancock, correct?
8      A.  No, I did not.
9      Q.  All right.  Knowing that there's medical,
10  does that tip you off as to what you maybe should
11  prepare for when you're kitting up?
12      A.  Yes.
13      Q.  And you said that you wore a load-bearing
14  vest?
15      A.  Yes, I did.
16      Q.  Is that something you wear outside of
17  your uniform --
18      A.  Yes.
19      Q.  -- or underneath?
20      A.  It would be over the top of my normal
21  uniform.
22      Q.  Okay.
23          (Deposition Exhibit 33 was marked.)
24      Q.  Do you have 33 there in front of you,
25  sir?

---

292

1      A.  I'm sorry.  Yes, I do.
2      Q.  Do you recognize the uniform that's
3  depicted on page 1 of Exhibit 33?
4      A.  Yes, I do.
5      Q.  Is that your uniform?
6      A.  That it is.
7      Q.  I should say it's your shirt, right?
8      A.  Yes.  It's my uniform shirt, yes.
9      Q.  You can identify that because there's a
10  CIT badge on there?
11      A.  And the other --
12      Q.  The FTO badge?
13      A.  Correct.
14      Q.  Presumably that's your name plate
15  underneath there?
16      A.  Yeah.  The very bottom one is a name
17  plate, then the gold one is CIT, and the small one
18  next to that is the FTO.  Above that in the silver,
19  that's a Taser instructor badge or pin -- it looks
20  like an actual Taser -- and above that is the SWAT
21  pin.
22      Q.  I'll represent to you these photos in
23  Exhibit 33 were a part of the CBI file.  It's what was
24  pulled off of you either in the ambulance or at the
25  hospital.  I don't know where it was pulled off of

---

73 (Pages 289 to 292)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

293

1   you.
2       A.  It was actually pulled off of me when I
3   was still at the residence.
4       Q.  Okay.  Would you turn to the second page
5   of Exhibit 33?  Do you recognize what's depicted here?
6       A.  Yes, I do.
7       Q.  It says "Survival Armor"?
8       A.  Yes.
9       Q.  Is this a bullet-proof vest?
10      A.  That it is.
11      Q.  And were you wearing that underneath your
12  uniform?
13      A.  Yes, I was.
14      Q.  Okay.  Is that something that you were
15  wearing during the briefing?
16      A.  Yes, I was.
17      Q.  So you left that on?
18      A.  Yes.
19      Q.  So you had a load-bearing vest on on the
20  outside of your uniform, but you did have a ballistic
21  vest on underneath, correct?
22      A.  Correct.
23      Q.  You took a handgun and a rifle with you
24  to Mr. Wirth's home, right?
25      A.  Yes, I did.

---

294

1       Q.  At any time -- well, let's take a step
2   back.  How much time past between the conclusion of
3   the briefing and when you actually left to go out to
4   do the eviction?  Do you have any sense?
5       A.  Maybe up to 20 minutes.
6       Q.  What were you all doing at the substation
7   for that 20-minute period?
8       A.  Like I said, after the briefing, we
9   gathered our stuff inside the building and went
10  outside to our patrol vehicles and started gathering
11  our items that we were going to take with us.
12      Q.  Were you nervous?
13      A.  No.
14      Q.  Were you scared?
15      A.  Concerned.
16      Q.  Again, you did not raise those concerns
17  with Mark Hancock, correct?
18      A.  No, I did not.
19      Q.  Did you have a radio with you?
20      A.  Yes, I did.
21      Q.  Did you at any point radio Sergeant
22  Tonjes to raise concerns with him?
23      A.  No, because that would be jumping chain
24  of command.
25      Q.  Okay.  Did you feel like your life could

---

295

1   be in danger?
2       A.  Yes.
3       Q.  So is chain of command more important
4   than your life?
5           MR. WAGNER:  Object to form.
6       A.  No.
7       Q.  (BY MR. GOLDFARB)  Despite some knowledge
8   of the potential danger, you've got a medical crew on
9   standby for this operation, you didn't ask off of the
10  eviction, right?
11      A.  No, I did not.
12          (Deposition Exhibit 34 was marked.)
13      Q.  Would you take a moment and look through
14  Deposition Exhibit 34 for me, please.
15      A.  Okay.
16      Q.  Can you tell me what -- well, is this
17  Martin Wirth's home or what you know to be Martin
18  Wirth's home depicted in the photos that make up
19  Exhibit 34?
20      A.  That it is.
21      Q.  This is the house that you went to?
22      A.  Correct.
23      Q.  And would you turn to the third-to-last
24  page?  It's a photo that has some red garage doors.
25      A.  Third-to-last page?

---

296

1       Q.  Yes.
2       A.  Oh.
3       Q.  Yes.  Above the red garage doors, this is
4   that front deck?
5       A.  Yes, it is.
6       Q.  Mr. Wirth was standing on this front
7   deck?
8       A.  Correct.
9       Q.  Where were you positioned while he was
10  out on that front deck?  Can you tell from this photo?
11      A.  I'm not sure exactly where I was at in
12  this photo.  I really can't tell you.
13      Q.  Turn to the page marked as Carrigan 445.
14      A.  Okay.
15      Q.  That's another angle of that front deck,
16  right?
17      A.  Yes, that's . . .
18      Q.  It's got that sliding glass door that you
19  looked into at some point?
20      A.  Correct.
21      Q.  Here is my question:  Are there any
22  stairs leading to the front deck on the outside of
23  this home?
24      A.  No, there's not.
25      Q.  Mr. Wirth, when he went inside, if he was

---

**Hunter + Geist, Inc.**

**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

297

1　going to come out, there were only two possible points
2　where he could come out, right?
3　　　　A.　Correct.
4　　　　Q.　It's the door you ultimately went
5　through, the front door, right?
6　　　　A.　Correct.
7　　　　Q.　Or he could, I guess, go downstairs and
8　come out this sliding door?
9　　　　A.　Correct.
10　　　　Q.　So when Mark Hancock and Nate Carrigan
11　moved to the front door, are you critical of moving --
12　their movement up to that position?
13　　　　　MR. WAGNER:　Object to form.
14　　　　A.　What do you mean by "critical"?
15　　　　Q.　(BY MR. GOLDFARB)　Well, do you think
16　they should not have gone to the front door?
17　　　　　MR. WAGNER:　Foundation.
18　　　　A.　I believe that they were going to make
19　contact with him.
20　　　　Q.　(BY MR. GOLDFARB)　Because if someone is
21　going to come out of their house, they've got to come
22　out of an exit point, right?
23　　　　A.　Correct.
24　　　　Q.　And there's only two exit points that
25　you're aware of for this home?

298

1　　　　A.　Correct.
2　　　　Q.　And the front door is the logical place
3　for someone to meet a group of officers who would come
4　to their home, right?
5　　　　A.　Yes.
6　　　　Q.　If they're going to come outside to
7　interact with them?
8　　　　A.　Correct.
9　　　　Q.　So can we agree that it's logical to go
10　to the front door to make contact with a subject?
11　　　　A.　Yes.
12　　　　　MR. WAGNER:　Object to form.　You can
13　answer.
14　　　　A.　Yes.
15　　　　Q.　(BY MR. GOLDFARB)　If you turn to page 1
16　of Exhibit 34 -- actually, I think page 2 is probably
17　the better view.　You'll see there's a window which
18　takes up about half of that front door?
19　　　　A.　Yes.
20　　　　Q.　Is that the same size of window that was
21　there when you made your way to the front door?
22　　　　A.　I believe so, yes.
23　　　　Q.　It looks like there's been new glass put
24　in there, but the window itself, the door itself,
25　would have looked the same as this?

299

1　　　　A.　I don't believe it had glass on it at
2　that time.
3　　　　Q.　Okay.　And you can look into that window,
4　right?
5　　　　A.　Again, that day I don't believe there was
6　any type of window in that door.
7　　　　Q.　Oh, okay.　You think it was empty, no
8　glass in there?
9　　　　A.　I believe it was a solid door.
10　　　　Q.　Oh, so you don't believe that there was
11　any window in that door?
12　　　　A.　I don't believe there was any --
13　　　　Q.　All right.
14　　　　A.　-- window in that door.
15　　　　Q.　Do you know for sure whether or not there
16　was a window?
17　　　　A.　No, I cannot tell you that.
18　　　　Q.　Okay.　And then I think you said that
19　when you saw Mr. Wirth go back inside, that caused you
20　some concern as well?
21　　　　A.　Just a concern as what is he doing, is he
22　actually coming to the front door, or is he coming
23　out, or is he not coming out, what is he going to do.
24　　　　Q.　At that point did you get on the radio
25　and say, Captain, what's he doing, let's fall back?

300

1　　　　A.　No, I did not.
2　　　　Q.　So that's at least the third time that
3　you had an opportunity to say something that you
4　didn't, right?
5　　　　　MR. WAGNER:　Object to form.　Foundation.
6　　　　A.　I was following orders and doing my job
7　and being the perimeter.
8　　　　Q.　(BY MR. GOLDFARB)　Again, that's at least
9　the third time now since you and I have been talking
10　that you had an opportunity to say something and
11　didn't, correct?
12　　　　A.　And be insubordinate, no, I wasn't going
13　to say something on the radio.
14　　　　Q.　Let me put it a different way.　At what
15　point leading up to the moment that Martin Wirth went
16　back into his home did you tell Captain Hancock, I'm
17　concerned about my safety?
18　　　　A.　I did not say that.
19　　　　Q.　At what point prior to the moment when
20　Mr. Wirth went back into his home did you tell Captain
21　Hancock, I feel concerned for my fellow deputies'
22　safety?
23　　　　A.　I did not say anything like that.
24　　　　Q.　Again, if Mr. Wirth was going to meet
25　Captain Hancock and Corporal Carrigan to interact with

Hunter + Geist, Inc.

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

301

1  them in person, he would have to come out of the house
2  in some way, right?
3       A.  Correct.
4       Q.  And so he would have to go into the home
5  to eventually come out of the home, right?
6       A.  Correct.
7       Q.  When you ultimately made your way up to
8  that front door, how did you learn you were going to
9  go into the home?
10       A.  Because I was called up to that front
11  door.
12       Q.  Did Captain Hancock tell you over the
13  radio that you were going to breach the home at that
14  point?
15       A.  Not on the radio, no.
16       Q.  How did you know you were going to end up
17  going into the home?
18       A.  Because he called us off of our original
19  positions and original jobs and called us to be up to
20  the front door.
21       Q.  Well, but you previously said that breach
22  was not part of the plan, I thought.  So how did you
23  know that you were going to go into the house when you
24  got called off of your spot?
25       A.  Because I'm getting called up to the

---

302

1  front door.
2       Q.  And that's because of the positioning
3  that's -- the notations on the whiteboard talking
4  about breach?
5       A.  No, because he said get up here to the
6  front door on the radio.
7       Q.  But just because you're going to the
8  front door, does that mean that you're going to enter
9  the home?
10       A.  If I was getting called up to the front
11  door, there wouldn't be any other reasons why.
12       Q.  Could you be acting as a cover officer if
13  Mr. Wirth came out of the house?
14       A.  Nate was with him.
15       Q.  Is there a policy that you can only have
16  one cover officer?
17       A.  No, there's no policy.
18       Q.  Okay.  So is it possible that Mark
19  Hancock could have been calling others up to the front
20  door for cover?
21       MR. WAGNER:  Objection.  Form.
22  Foundation.
23       A.  Yeah, I guess he could.
24       Q.  (BY MR. GOLDFARB)  When you got to that
25  front door, you never said, Captain Hancock, I have

---

303

1  concern for my safety?
2       A.  No, I did not.
3       Q.  You never said, Captain Hancock, I have
4  concern for my fellow deputies' safety?
5       A.  No, I did not.
6       Q.  When he ultimately gave the order to
7  breach the residence, did you say, no, this is not a
8  safe situation?
9       A.  No, I did not.
10       Q.  Do you think that Captain Hancock
11  intended to kill you that day?
12       A.  I believe he had an agenda.
13       Q.  Do you think his intent was to cause you
14  grievous bodily injury?
15       MR. WAGNER:  Object to form.
16       A.  I don't believe that.
17       Q.  (BY MR. GOLDFARB)  Do you believe that it
18  was his intent to have you killed by entering into
19  that home?
20       A.  No.
21       Q.  All right.  Do you believe it was his
22  intent to terrorize you?
23       MR. WAGNER:  Object to form.
24       A.  I don't know.  I can't speculate on that.
25       Q.  (BY MR. GOLDFARB)  Well, I'm asking you

---

304

1  to speculate.
2       A.  I don't believe so.
3       Q.  Okay.  Do you believe it was his intent
4  to cause you any sort of emotional harm?
5       MR. WAGNER:  Same objection.
6       A.  These questions sound like the same exact
7  thing you've just been asking.  No.
8       Q.  (BY MR. GOLDFARB)  Do you know what
9  Captain Hancock's relationship was with Nate Carrigan?
10       A.  I believe it was pretty professional and
11  personal.
12       Q.  Would you have reason to dispute if I
13  told you that he thought of Corporal Carrigan as his
14  son?
15       MR. WAGNER:  Object to foundation.
16       A.  I couldn't tell you on that.
17       Q.  (BY MR. GOLDFARB)  But would you dispute
18  it?
19       MR. WAGNER:  Object to foundation.
20       A.  I couldn't dispute it because I don't
21  have information on it.
22       Q.  (BY MR. GOLDFARB)  When you entered into
23  that home, you were acting in the course and scope of
24  your employment as a sheriff's deputy with the Park
25  County Sheriff's Office, correct?

---

76 (Pages 301 to 304)

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

305

1　　　A.  Yes, I was.

2　　　Q.  Taking a step back, you were offered a

3　position with Park County Sheriff's Office, right?

4　　　A.  What do you mean?

5　　　Q.  Well, between the time -- take a step

6　back.  When you left Elbert County, you were made a

7　job offer by Park County to join their sheriff's

8　office?

9　　　A.  Correct.

10　　　Q.  Okay.  And you accepted that offer?

11　　　A.  Yes, I did.

12　　　Q.  You didn't have to accept that offer?

13　　　A.  No, I didn't.

14　　　Q.  So is it fair to say that you were

15　voluntarily a member of the Park County Sheriff's

16　Office?

17　　　A.  Well, I accepted the job.

18　　　Q.  My point being is you weren't drafted

19　into being a sheriff's deputy for Park County, were

20　you?

21　　　A.  No, I was not.

22　　　Q.  This was an at-will position?

23　　　A.  Yes.

24　　　Q.  Okay.  And you chose to put your name in

25　to join the SWAT team at Park County?

306

1　　　A.  Correct.

2　　　Q.  So you volunteered for SWAT?

3　　　A.  Correct.

4　　　Q.  When you were standing at the front door,

5　did you radio Sergeant Tonjes and say, this doesn't

6　feel right, I don't want to go into this house?

7　　　A.  That would be jumping chain of command.

8　　　Q.  Did you radio anyone when you were

9　standing at the front door?

10　　　A.  Dave Leffler.

11　　　Q.  That was asking him to come up from his

12　position, right?

13　　　A.  Correct.

14　　　Q.  Did you tell Dave Leffler that you didn't

15　want to go in the house?

16　　　A.  No, I did not.

17　　　Q.  You didn't tell anyone that you didn't

18　want to go in the house?

19　　　A.  No, I did not.

20　　　Q.  That's yet another instance of your not

21　voicing any concerns, right?

22　　　A.  Correct.

23　　　Q.  We talked a little bit about Policy 509

24　earlier today.  That's Deposition Exhibit 30 -- oh,

25　I'm sorry.  510.  That's the barricaded subject

307

1　policy.

2　　　　　MR. SCHIMBERG:  It's in here, I think,

3　Kolby.

4　　　　　THE DEPONENT:  I thought I got a copy of

5　it as well.

6　　　　　MR. SCHIMBERG:  No.

7　　　　　THE DEPONENT:  I thought I did, because I

8　have . . .

9　　　　　MR. SCHIMBERG:  You have 509.  This is

10　510.

11　　　　　MR. GOLDFARB:  He gave you high risk.

12　　　　　THE DEPONENT:  Yeah, I've got 509.

13　　　　　MR. SCHIMBERG:  It's Exhibit 9.

14　　　　　THE DEPONENT:  Okay.

15　　　Q.  (BY MR. GOLDFARB)  You'll see on the

16　front page it says, "Purpose," Roman numeral I?

17　　　A.  Yes.

18　　　Q.  "The purpose of this policy is to provide

19　general guidelines for handling hostage/barricaded

20　subject situations."  Did I read that correctly?

21　　　A.  Correct.

22　　　Q.  So the purpose of this is not a mandate;

23　it's a general guideline, right?

24　　　　　MR. WAGNER:  Object to form.  Foundation.

25　　　A.  You're correct.

308

1　　　Q.  (BY MR. GOLDFARB)  It talks about the

2　procedures for complying with this guideline, this set

3　of guidelines, right, Roman numeral IV, "Procedures"?

4　　　A.  Correct.

5　　　Q.  You didn't have to evacuate any

6　occupants, right?

7　　　A.  No, I did not.

8　　　Q.  It talks about having an officer in

9　command, subsection B?

10　　　A.  Correct.

11　　　Q.  You had an officer in command at the

12　scene, right?

13　　　A.  Correct.

14　　　Q.  And then skip to D.  It talks about a

15　hostage communication team.  Did you need a hostage

16　communication team for this?

17　　　A.  We don't even have one.

18　　　Q.  Okay.  E talks about psychological

19　services.  Did you need psychological services for

20　dealing with Mr. Wirth?

21　　　A.  Not that I know of.  We didn't have any.

22　　　Q.  But F, you talked about tactical

23　considerations, right?

24　　　A.  Yes.

25　　　Q.  Before, that's what the briefing was,

Hunter + Geist, Inc.

scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**EXHIBIT F**

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

309

1   right?
2      A.  Correct.
3      Q.  People, what their roles and
4   responsibilities were?
5      A.  Yes.
6      Q.  Okay.  Captain Hancock told you where you
7   needed to go, right?
8      A.  Yes.
9      Q.  And to the extent there was going to be a
10  breach, he starred the names of the people who would
11  ultimately enter into the home, right?
12     A.  I don't remember him saying the aspects
13  of we're going to breach.
14     Q.  Again, that's what's on the whiteboard,
15  right?
16     A.  Correct.
17     Q.  And he assigned someone to actually be
18  the breacher.  That was Nate Carrigan, correct?
19     A.  Correct.
20     Q.  So what part of Policy 510 did Mark
21  Hancock not comply with?  What portion of these
22  guidelines did he not follow?
23        MR. WAGNER:  Object to form.  Foundation.
24     Q.  (BY MR. GOLDFARB)  It's my understanding
25  you've reviewed this policy in the past?

---

310

1      A.  Yes, I have.
2      Q.  In fact, you testified that you studied
3   it?
4      A.  Yes.
5      Q.  Okay.  So what portion of this guideline
6   did Mark Hancock not comply with?
7      A.  Well, he handled it like a hostage or
8   barricaded subject.  He didn't handle it as an
9   eviction, civil eviction.
10     Q.  Okay.  The civil eviction or the writ of
11  restitution, that provides a sheriff's deputy with the
12  authority to remove an occupant from their home,
13  correct?
14     A.  Correct.
15     Q.  And that does include physical removal of
16  the occupant from their home, correct?
17     A.  If need be, yes.
18     Q.  So part of the reason that you went into
19  the home, the objective, was to kick the door down and
20  go in and at least try to detain Mr. Wirth so that
21  they could get the eviction process done, right?
22     A.  Correct.
23     Q.  And the writ of restitution allows you to
24  enter into the residence, right?
25     A.  It doesn't specifically say that, but,

---

311

1   yes, we were supposed to take possession of the
2   residence.
3      Q.  Turn to page 20 of Deposition Exhibit 31
4   for me.
5      A.  What page was that again?  I'm sorry.
6      Q.  20 and we'll start at line 18.  Line 15
7   starts by talking about a lawful eviction order?
8      A.  Correct.
9      Q.  I just want to give you some context is
10  all.  And then Agent Nordgren, is that the CBI
11  investigator who interviewed you?
12     A.  Yes.
13     Q.  Says, "And are you aware what authority
14  something like that gives you," referring to the
15  eviction order?
16     A.  Yes.
17     Q.  You answered, "It's basically to remove
18  him physically"?
19     A.  Yes.
20     Q.  It goes on, the agent says, "Okay.  You
21  say, "from his residence."  Did I read that correctly?
22     A.  Yes.
23     Q.  And then the agent says, "It allowed you
24  to also enter the residence," right?
25     A.  Yes.

---

312

1      Q.  You continue on to page 21, "Yes."  The
2   agent says, "to effect that removal?"  And then you
3   answer, "Yes."  Did I read any of that incorrectly?
4      A.  No, you did not.
5      Q.  So as of the day after this incident,
6   what I just read to you was your understanding of your
7   authority during the eviction process when a lawful
8   eviction order was entered by a court?
9      A.  Yes.
10     Q.  So that includes to enter and physically
11  remove an occupant, correct?
12     A.  And it superseded what was discussed
13  prior to us going to the eviction.
14     Q.  Well, the order itself, your
15  understanding is you told the CBI investigator was
16  that under a lawful eviction order, under a lawful
17  writ of restitution, you could both enter the home and
18  physically remove the occupant, correct?
19     A.  Yes.
20        MR. WAGNER:  Objection.  Asked and
21  answered multiple times.
22     Q.  (BY MR. GOLDFARB)  During the course of
23  your CBI investigation, did you come to have any
24  understanding as to why they were speaking with you?
25     A.  Because of the shooting incident.

---

78 (Pages 309 to 312)