1

1           IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 1:16-cv-03079-MSK-MJW
3   _____

4   ESTATE OF NATE CARRIGAN, JOHN CARRIGAN, MELISSA
    CARRIGAN and KOLBY MARTIN,
5
    Plaintiffs,
6
    v.
7
    PARK COUNTY SHERIFF'S OFFICE, SHERIFF FRED WEGENER, in
8   his official and individual capacity, and MARK
    HANCOCK, in his official and individual capacity,
9
    Defendants.
10  _____

11  DEPOSITION OF:  MARK HANCOCK - August 28, 2017
    _____
12
             PURSUANT TO NOTICE, the deposition of MARK
13  HANCOCK was taken on behalf of the Plaintiffs at 501
    South Cherry Street, Suite 920, Denver, Colorado
14  80246, on August 28, 2017, commencing at 10:00 a.m.,
    before Melanie L. Giamarco, Registered Professional
15  Reporter, Certified Realtime Reporter, and Notary
    Public within Colorado.
16

17

18

19

20

21

22      H+G

23

24      Hunter+Geist, Inc.

25   **303.832.5966**      1900 Grant Street, Suite 1025      ▪ www.huntergeist.com
     **800.525.8490**      Denver, CO 80203                   ▪ scheduling@huntergeist.com

                           Your Partner in Making the Record

**EXHIBIT G**

Court Reporting, Legal Videography, and Videoconferencing

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 2 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 17

1  A. A little over five years, yes, I believe
2  so.
3  Q. And then you became a lieutenant, right?
4  A. I tested for and was granted lieutenant,
5  yes.
6  Q. Now, what year did you become a lieutenant?
7  A. I would say 2006, early 2006, maybe, 2005.
8  Q. And was this --
9  A. Somewhere in there.
10  Q. -- with Sheriff Wegener? Was he the
11  sheriff at the time?
12  A. Yes, he was.
13  Q. Was Sheriff Wegener the sheriff the entire
14  time you worked at Park County?
15  A. No, he wasn't.
16  Q. Who was the sheriff?
17  A. Paul Ottmer was the sheriff and then Betty
18  Royce became interim sheriff.
19  Q. And then you tested and ultimately were
20  promoted to captain at the Park County Sheriff's
21  Office; is that correct?
22  A. I did not test for captain. The deal with
23  the sheriff was if you did the job correctly for
24  around a year, then he would promote us to captain,
25  and so Dan Muldoon and I both promoted at the same

### Page 18

1  time.
2  Q. And when you say did the job correctly,
3  what job did you have to do correctly in order to
4  become a captain at the sheriff's office?
5  A. Just because lieutenant was fairly new to
6  our organization, so I think he wanted to see if that
7  worked correctly as far as running -- for me, running
8  the patrol division.
9  Q. So when you became captain of the Sheriff's
10  Office -- and for purposes of the deposition, when I
11  say "Sheriff's Office," do you understand that to mean
12  the Park County Sheriff's Office?
13  A. Yes, I do.
14  Q. So when you became captain of the Sheriff's
15  Office, did Sheriff Wegener then eliminate the
16  lieutenant position?
17  A. Yes, he did.
18  Q. So just to understand, then, for purposes
19  of hierarchy within the Sheriff's Office, it would go
20  sergeant then captain?
21  A. Yes.
22  Q. And then after captain, would it be
23  commander?
24  A. Undersheriff.
25  Q. Undersheriff then sheriff?

### Page 19

1  A. Yes.
2  Q. Okay. Now -- I'm sorry. So what year did
3  you become captain?
4  A. I'm really not sure what year.
5  Q. Well, how long were you a lieutenant?
6  A. Approximately a year.
7  Q. All right. So if you became a lieutenant
8  about 2005-2006, that means you became a captain in
9  either 2007 --
10  A. I would say '7 or '8.
11  Q. Okay. And you held the position of captain
12  until what time?
13  A. Until I retired January of 2017.
14  Q. And why did you retire from the Sheriff's
15  Office?
16  A. Why did I retire?
17  Q. Yes.
18  A. I wanted to move to Wyoming, where I'm
19  from, and be closer to my daughters, who are in
20  Laramie, and my mother-in-law, who's getting older and
21  needed assistance. And my wife and I had been
22  planning to get back to Wyoming for a while.
23  Q. And what do you currently do for a living?
24  A. Ranch and farming.
25  Q. Not in law enforcement at all?

### Page 20

1  A. I am not in law enforcement currently.
2  Q. No reserves?
3  A. Pardon me?
4  Q. Are you in any reserve position with law
5  enforcement?
6  A. I am not.
7  Q. Now, during your tenure with the Park
8  County Sheriff's Office, did you receive any
9  disciplinary actions?
10  A. Disciplinary actions. I did not. I --
11  maybe younger, I got a warning, a written warning.
12  And I might have been written up for being late by a
13  sergeant when I was a deputy. And that's really all I
14  can remember. I mean, I got a talking to a few times.
15  Q. And I'm correct in saying that during your
16  tenure with Park County, you were a SWAT commander; is
17  that right?
18  A. No.
19  Q. You were never a SWAT commander at --
20  A. Yes, I was a SWAT commander, but for my
21  entire time, I believe I was a SWAT commander for
22  maybe eight, ten years.
23  Q. Okay. So what years were you SWAT
24  commander at Park County?
25  A. From approximately the time I was a

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 3 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

137

1  MR. SCHIMBERG: Object to form.
2  A. It's two different things you're talking
3  about, so I got to be clear on what you're asking.
4  Q. Go ahead. Sure.
5  A. The eviction that day --
6  Q. Yeah. Prior to the eviction of Mr. Wirth,
7  did you have the time to do the topographical photos
8  of the residence and to gain more knowledge of the
9  layout of the Wirth property?
10  A. Certainly we did have time.
11  Q. Okay. That didn't happen, though, right?
12  A. We didn't do it that way, no.
13  Q. Now, Mr. Hancock, you attended the
14  February 24th briefing regarding the eviction of
15  Martin Wirth; is that right?
16  A. Yes.
17  Q. Who else was in attendance for that
18  briefing?
19  A. Nate Carrigan, D.J. Hannigan, Deputy
20  Lowrance, Travis Threlkel, Kolby Martin. Dave Leffler
21  was there for the start of it, and Sheriff Wegener was
22  there for some of it.
23  Q. Do you know why Sheriff Wegener was there?
24  A. I think he was stopping by the substation
25  on his way out of town to make sure that, you know, I

138

1  had enough personnel to do what I wanted to do that
2  day.
3  Q. And why did the Sheriff want to make sure
4  you had enough personnel?
5  MR. SCHIMBERG: Form and foundation.
6  A. He's a very active sheriff, very involved
7  with patrol and patrol operations, and there's many
8  times that he would insert himself into situations
9  with patrol where he'd want to participate personally.
10  Q. Did Sheriff Wegener ever express to you any
11  concerns he had about Martin Wirth prior to you being
12  involved in the eviction of Mr. Wirth?
13  A. No.
14  Q. And what role did you have in that
15  briefing?
16  A. It was an informal briefing, as I've
17  stated, and just kind of leading along with the guys.
18  There was input on, you know, who should go where and
19  how we should go about it.
20  Q. And who was the person leading the briefing
21  regarding the eviction of Mr. Wirth?
22  A. Leading the briefing?
23  Q. Yeah.
24  A. Me.
25  Q. And why were you leading the briefing?

139

1  A. Just a senior officer and kind of where I
2  was standing and Nate was sitting, D.J. was sitting,
3  so it just -- it just happened that way. It doesn't
4  necessarily -- it didn't necessarily always happen
5  that way. Sometimes I would show up late and insert
6  myself in their plan, and they would lead the
7  briefing, but that day, it just happened to be me.
8  Q. And am I correct in saying that you were
9  the officer in charge for the eviction of Mr. Wirth?
10  A. Yes.
11  Q. And who appointed you the officer in charge
12  of the eviction of Mr. Wirth?
13  A. I think I appointed myself as being the
14  captain, the patrol captain, and the senior officer,
15  but it wasn't -- it's not an appointed thing. It's
16  just, you know, when you show up and you're the
17  captain, you're in charge.
18  Q. And what was discussed during that
19  briefing?
20  A. That we had to serve an eviction and have
21  him removed from the property in relation with the
22  bank and their people ready to move in. And it was
23  scheduled to take place right around 10:00, 10:30 so
24  that they could move their people in and clean the
25  place and move him out.

140

1  Q. And during this briefing with the other
2  officers, was there ever any discussion about what
3  would happen if Mr. Wirth went back inside the
4  residence?
5  A. No, I -- I keep asserting that because we
6  didn't know where he would be.
7  Q. No, I understand that. I'm just asking for
8  purposes of contingency.
9  There was no discussion about contingencies
10  if Mr. Wirth went back in the residence, "This is what
11  we would do"?
12  A. Not go back in the residence. I think my
13  exact language was, "If it goes bad, we will retreat
14  and call in more resources."
15  Q. When you say "If it goes bad," did you
16  explain to the officers what that meant?
17  A. You know, I don't remember if I explained,
18  but my assertion and assumption was, you know, if he's
19  out on the deck brandishing a weapon, if we get up to
20  the door and he challenges us, if he's at the gate
21  with a weapon and he challenges us, or if we can see
22  that the property's been fortified, barricaded or
23  booby-trapped or anything like that going in, that
24  that would be a situation we would pull back.
25  Q. Well, you said two things here. You said

35 (Pages 137 to 140)

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 4 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

**Page 141**

1  it was your assertion or assumption.
2  A. Yeah.
3  Q. So do you think those two have different
4  meanings, assertions and assumptions?
5  A. Yeah, I think they have different meanings.
6  Q. Okay. So did you make an assumption as to
7  what "going bad," "the situation going bad" meant, or
8  did you actually assert to your officers, "This is
9  what I view as a situation going bad"?
10 A. I did --
11 Q. So which one was it?
12 A. I did not assert to them what the situation
13 meant if it went bad, because that could be a million
14 things. I simply said a broad statement, "If it goes
15 bad, we're going to pull back and call in more
16 resources."
17 Q. Well, being the officer in charge and going
18 over this, would you call this an operational plan or
19 a tactical plan in the eviction of Mr. Wirth?
20 A. I don't know. I don't know.
21 Q. What's the difference between -- is there a
22 difference between a tactical plan and an operational
23 plan for purposes of Park County?
24 A. Not really.
25 Q. Okay. Well, we'll just call it a plan.

**Page 142**

1  A. Okay.
2  Q. Okay. Was this a plan that you were
3  putting in place?
4  A. Yes.
5  Q. So being a SWAT commander, being an officer
6  in charge, don't you think the plan should have at
7  least been clear and unambiguous as communicated to
8  your fellow officers?
9  A. Yeah.
10 Q. Okay. And in regards to tell your fellow
11 officers "We will retreat if it goes bad," but you
12 didn't tell them what that meant, "if it goes bad,"
13 don't you think you should have been a little bit more
14 clear and unambiguous what your thoughts were as to
15 what "if it goes bad" meant?
16    MR. SCHIMBERG: Form.
17 A. Not necessarily.
18 Q. Why do you say "Not necessarily"?
19 A. Because they're in a perimeter. Nate and I
20 are the ones coming up and viewing the place. And
21 I've got Dave Leffler looking at the place. We would
22 be the ones to make the call that it's clear this is a
23 time to pull back. He's got a weapon on the deck, or
24 Nate and I are up at the door and he's telling you,
25 you know, "I'm going to shoot it out," or he

**Page 143**

1  brandishes a weapon, or we observe a fortified,
2  barricaded home as we're approaching. So your
3  question is, should I have made every scenario clear
4  to them? I don't think so.
5  Q. Well, don't you think you should have
6  communicated to even the perimeter officers what facts
7  you were going to rely upon to pull back and retreat?
8  Don't you think you should have told them what
9  those -- at least in your mind what you thought those
10 facts would require?
11 A. Not really. I mean, they have experience.
12 Kolby Martin's a team leader. They certainly
13 understood what their mission was that day. And as
14 they have done on other calls, they would be able to
15 make those -- make those calls on their own.
16 Q. So please articulate for me the plan that
17 was in place on the eviction of Mr. Wirth.
18 A. What part -- from the start?
19 Q. Yeah. What was the plan?
20 A. The overall mission was to go get Martin
21 Wirth off the property and get the bank in with their
22 people. The idea of how to do that -- and it was a
23 group idea, not just mine -- was to have Nate and I --
24 Nate because he had a relationship with Mr. Wirth and
25 me because I'm good with community relations as

**Page 144**

1  well -- going up in marked uniforms, Nate had a marked
2  car in front of me, and peaceably serving the papers
3  and getting him off the property. And in case he was
4  in the property and wasn't going to come out, I had
5  arranged a breach and officers that were going to go
6  in if that were needed, and I had other officers that
7  were going to be on the perimeter.
8  Q. So you were going to arrange -- maybe -- I
9  want to make sure I state this correctly.
10    You arranged for a breach, or at least
11 breaching officers to come in and get Mr. Wirth if he
12 refused --
13 A. If we needed to.
14 Q. -- to comply; is that correct?
15 A. If we needed to, yes.
16 Q. Okay. And who were those officers?
17 A. Nate Carrigan was to breach the door and
18 move out of the way. The entry officers were going to
19 be Travis, Kolby Martin and myself.
20 Q. And was that decided at the briefing who
21 would be the breaching officers?
22 A. Yes.
23 Q. And why were those officers specifically
24 selected to be the breaching officers?
25 A. We were all SWAT officers, so more training

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 5 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

**Page 157**

1  Park County Sheriff's Office during your tenure there
2  to take topographical pictures of one's residence
3  before doing the eviction?
4     A.  Of an eviction?  No.
5     Q.  Why was one done in this particular case?
6     A.  I think we just had guys around during the
7  briefing, and they had decided that's something they
8  could do, partially because I had never been to the
9  property and, you know, I -- that's something that one
10 of the computer-savvy kids would have done so that we
11 would have had a picture of the property.
12    Q.  And in regards to the individuals at least
13 identified in this document, did any of them
14 express -- other than Nate Carrigan, express concerns
15 that they had in regards to the volatility or the
16 potential violence actions Mr. Wirth would do to the
17 officers involved in the eviction?
18    A.  I want to say, did any of the officers
19 point out that he was going to be volatile and
20 dangerous?  Is that what you're asking?
21    Q.  Yeah.  Did any of them express concerns
22 about Mr. Wirth and what he may do in regards to this
23 eviction other than Mr. Carrigan?  Because I think you
24 talked about that.
25    A.  Yeah.  No, not really.

**Page 158**

1     Q.  Well, not really or --
2     A.  Not -- no.
3     Q.  So here, there's D.J., Kolby, Travis, Nate,
4  J-Low and PCFD.
5     A.  Yes.
6     Q.  Were these -- and yourself, Hancock.
7         Were these all the individuals, including
8  PCFD, that were involved in this operation?
9     A.  Yes.
10    Q.  Now, here someone wrote "Back of
11 home [sic]."  Whose handwriting is that?
12    A.  Mine.  "Back of house."
13    Q.  I'm sorry?
14    A.  "Back of house."
15    Q.  I'm sorry.  "Back of house."
16    A.  Yeah.
17    Q.  So what was D.J. supposed to do with back
18 of house?
19    A.  Perimeter.
20    Q.  Okay.  And why was -- is his last name
21 Hannigan?
22    A.  Yes.
23    Q.  Why was Mr. Hannigan supposed to be on the
24 perimeter in regards to the eviction of Mr. Wirth?
25    A.  It had been decided in the briefing, he

**Page 159**

1  wore plainclothes.  He had dress shoes on.  And, you
2  know, he's not a real entry-type officer, not
3  comfortable with him doing a ton of entries, but he's
4  real good on staying put and observing, so perimeter
5  was absolutely the best place for D.J. to be.
6     Q.  And then you have Kolby, Travis, Nate and
7  J-Low, and there's asterisks by them?
8     A.  Yes.
9     Q.  Why are there asterisks by those names?
10    A.  Possible entry folks to go in.
11    Q.  When you say "Possible entry," I thought my
12 understanding of your testimony, sir, was that you
13 selected individuals that would be part of the entry
14 team; is that correct?
15    A.  If needed, yes.
16    Q.  Okay.  So these were the individuals that
17 you selected to be part of the entry, if needed, if
18 the -- excuse me.  Strike that.
19        Were these the individuals that were
20 selected to be part of the entry team if there was
21 going to be a breach of the Wirth residence?
22    A.  Yes, if needed.  Now, Jeremy Lowrance was
23 to be -- he was the most inexperienced officer
24 SWAT-wise -- was going to be at the back of the house
25 unless needed, and we would pull him up to the front.

**Page 160**

1     Q.  And who selected these four individuals as
2  the breaching team?
3     A.  I think it was a unanimous selection, but I
4  put the asterisks by their name.
5     Q.  When you say it was a unanimous decision or
6  selection, can you please explain how the selection
7  occurred in regards to these individuals being part of
8  the entry team?
9     A.  Well, when I mentioned the possibility of a
10 breach and entering the home, it was just agreed that
11 Kolby and Travis with the most experience, me with the
12 most experience, should definitely be on there.  And
13 since I didn't know how big of an area we're talking
14 with perimeter, I didn't know if Jeremy Lowrance would
15 possibly get in on an entry or have to stay at his
16 perimeter.
17    Q.  And in your mind at the time that this was
18 being -- that this plan was being created, what would
19 be -- what facts would have to unfold in your mind for
20 there to be a breach of the residence, of the Wirth
21 residence?
22    A.  Him being inside and not coming to the door
23 and, you know, if I thought that -- well, I did think
24 that I could get in on him quickly and get him out of
25 there.

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 6 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

161

1  Q. And why would a breach be the option to get
2  him out of the residence as opposed to sort of pulling
3  back and seeing if you can coax him out through
4  conversation?
5  A. Well, I don't like to give people a ton of
6  time to think over their options on a thing like that.
7  And, you know, maybe he continues to talk with Nate
8  and we could go in the door and get him. Maybe he
9  comes to the door and starts arguing with us at the
10 door where we can see him, and we can get in quickly
11 and get him, you know -- and it's worked in my
12 experience to go quickly and get after people before
13 they have a chance to plan, kind of interrupting their
14 OODA loop on their planning and how they're going to
15 resist. I like the speed in getting in on them before
16 they have a chance to do that.
17 Q. And is that based on specific training you
18 received through the FBI and other high-risk tactical
19 planning that you did as a SWAT commander? That's how
20 you got to that knowledge? Or is this just based on
21 practice that you sort of dealt with while working at
22 Park County?
23 A. I think it's a combination of all of it,
24 but it definitely is what I've been most successful at
25 over the years up there.

162

1  Q. And in regards to the ones where you wanted
2  to do this, I don't want to use the word "shock and
3  awe," but just kicking down the door and getting the
4  guy before he fortifies, what type of cases were those
5  that you did that in?
6  A. Many.
7  Q. Well, are we talking about armed suspects?
8  A. Yes. There's been some that we've done it
9  with armed suspects, yes.
10 Q. So was there a full-on tactical-plan
11 SWAT-entry team that you would take down the door and
12 grab the guy immediately? Is that the one we're
13 talking --
14 A. Seldom, seldom was there a tactical plan.
15 A lot of times it's just window of opportunity. You
16 know, you're at the door and you get in there quick
17 and you get them. It's been very successful for me.
18 Q. But there's not a lot of room for error for
19 that, right? I mean, you know, you just happened to
20 be lucky in that circumstance if you're dealing with
21 an armed suspect, that you just happened to kick down
22 the door and didn't get shot at, right? Is that
23 right?
24        MR MARKS: Object to the form.
25        MR. SCHIMBERG: Form.

163

1  Q. Go ahead.
2  A. Well, I don't see it as luck. I see it as
3  being more determined to take them into custody
4  quickly than it is for them to determine that they're
5  going to fire on officers or fight with officers.
6  Q. Well, how many times have you done this
7  operation where you had an armed suspect, other than
8  Wirth, where you guys kicked down the door, grabbed
9  them without having a shot being fired back at the
10 officers by a suspect?
11 A. I don't know how many. I know that there's
12 been a couple where that's occurred. And when you
13 say -- are you saying brandishing a weapon?
14 Q. No, I'm talking where you've actually been
15 shot at by the suspect when you guys just kicked down
16 the door and you'd been shot at. How many times --
17 other than Wirth, how many times has that happened?
18 A. Well, I mean, I've been shot at several
19 times. As to --
20 Q. No, when you're talking about --
21 A. -- kicking the door down --
22 Q. Kicking the door down, breaching the entry,
23 grabbing the guy before he fortifies, how many times
24 have you -- has that -- have you done that without --
25 where you've been shot at?

164

1  A. Not counting Platte Canyon, I would say
2  maybe once. And I'm not sure that they shot at us. I
3  think that the gun went off, but -- and Platte Canyon,
4  I -- it's unclear as to if there's shooting -- there
5  was shooting going on when we made entry, but being
6  shot at directly, this is the one case I can
7  absolutely say for sure that we were being shot at.
8  Q. Is it your testimony that the training
9  you've received is SWAT -- as a SWAT officer as well
10 as a SWAT commander, that if you see an armed suspect
11 that the best course of action just to breach, grab
12 the guy before he fortifies? Is that your testimony?
13 A. That that's the best course of action?
14 Q. Yeah. Is that your training? Is that how
15 you've been trained?
16 A. No. It depends on the -- on what you're
17 talking about. If the window of opportunity is there,
18 I think it would certainly behoove the officers to
19 take advantage of that. If it's not, then you can't
20 do it.
21 Q. With respect to this drawing here on
22 Exhibit 6, this diagram, do you know what that diagram
23 depicts?
24 A. I believe it's the property, but I don't
25 know who drew it.

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 7 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

221

1  do you see that?
2      A.  Yes.
3      Q.  So the fact that the sheriff was leaving
4  the county -- actually, let me back up just a little
5  bit.
6          Did you understand on February 24th, 2016,
7  that as this operation was going down to evict Martin
8  Wirth, there's Sheriff Wegener who was going to be
9  leaving the county?
10     A.  Yes.
11     Q.  Because the Sheriff was leaving the county,
12 do you understand at that point that the person in
13 charge, at least at the Sheriff's Office, was
14 Undersheriff Gore?
15     A.  Yes.
16     Q.  Now, so for all intents and purposes, I
17 understand that Wegener's the sheriff, but when
18 Wegener's out of the office, the acting sheriff really
19 was, at this time, Undersheriff Gore; is that right?
20     A.  That's correct.
21     Q.  Now, you stated, "I advised the
22 Undersheriff that I needed help to go to
23 Communications and monitor it."
24         Why did you want the Undersheriff to go to
25 Communications and monitor?  What?

222

1      A.  The radio.  The radio traffic.
2      Q.  Which radio traffic specifically?
3      A.  Ops 5.  I've stated they were short of
4  personnel, and so a communications officer would be
5  monitoring the regular channel and the Undersheriff
6  would be listening on Ops 5.
7      Q.  Why did you want the Undersheriff to be the
8  one monitoring Ops 5?
9      A.  Well, I wanted him to be aware of what was
10 going on and to have control over the situation if he
11 needed it.
12     Q.  Let's turn to page 12.  So here, starting
13 on line 5, "...where I saw him talking to the guy on
14 the deck and I think he called him Mr. Wirth but I
15 didn't know this guy from Adam.  I've never seen him
16 before.  I've heard a lot about him but I've never
17 seen him."
18         So in your interview with CBI, you said you
19 heard a lot about Mr. Wirth.  So tell me everything
20 you heard about Mr. Wirth.
21     A.  I've already told you what I had heard
22 about him, the incident in Jefferson County and the --
23 I don't know if I told you, the prior eviction, that
24 he had been evicted in 2014, I believe.
25     Q.  So you didn't tell me that.  So what did

223

1  you know about the prior eviction of Mr. Wirth?
2      A.  That he had been evicted in 2014,
3  peacefully.  And again, this is after the event, so,
4  you know, I'm listening to the news and I'm hearing
5  things about Wirth.
6      Q.  Well, did you think that your statement --
7      A.  After.
8      Q.  -- where you say, "I heard a lot about him
9  but I've never seen him before" -- was that based on
10 things that you heard after the fact, or did you
11 understand that you were -- the questions asked of you
12 was what you heard about Mr. Wirth prior to the
13 eviction?
14         MR MARKS:  Object to the form of the
15 question.
16     A.  I think it was a combination of both at
17 that time.
18     Q.  Well, you talked about the January 20th,
19 2016, incident, right?
20     A.  Yes.
21     Q.  And you said you -- at least here you're
22 saying that you heard about his prior eviction.
23     A.  Mm-hmm.
24     Q.  Did you hear that from the news or did you
25 know about Mr. Wirth's prior eviction based upon your

224

1  employment at Park County?
2      A.  Based on my employment at Park County,
3  yeah.
4      Q.  Okay.  And who told you about the prior
5  eviction regarding Martin Wirth?
6      A.  Who told me?
7      Q.  Yeah.
8      A.  I'm not certain.
9      Q.  Do you know why that came up?
10     A.  Because we were doing an eviction on him.
11 I believe it was Dave Leffler, but I can't be certain
12 on that.
13     Q.  And do you recall what Mr. Leffler told you
14 about the prior eviction of Mr. Wirth?
15     A.  Just that -- I think my -- they told me
16 that, and my question was "Why is he there now?"  And
17 somebody, and I don't know who, said that there had
18 been a mistake made or a glitch with the bank process
19 and he had been allowed back in.
20     Q.  Now, starting on line 10, staying on
21 page 12, you said, "Talked to him on the deck.  He was
22 leaning over the rail talking to Nate and then Nate
23 said, Mr. Wirth, you know, we're here to serve the
24 eviction and I was still struggling to get up to Nate
25 and then I heard him say something as he turned to the

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 8 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

225

1 effect of, you know, you're not even going to give me
2 time to move my stuff out and, you know, I wanted to
3 say at the time of course we'll give you time to move
4 your stuff out, you know."
5     So I want to talk about that.  So when Wirth
6 stated, "You know, you're not even going to give me
7 time to move my stuff out," what was his demeanor like
8 when he said that?
9     A.  Leaning over the rail, looking down on us
10 from the deck, and calm.  Seemed calm.
11     Q.  And then -- okay.  So he wasn't -- in your
12 mind, he wasn't agitated?
13     A.  No.
14     Q.  Wasn't threatening?
15     A.  Not at all.
16     Q.  Okay.  And then he went back into the house
17 at that point in time?
18     A.  He walked back into the house, yes.
19     Q.  Didn't slam the door?
20     A.  No.
21     Q.  Did you think he was threatening at that
22 point in time?
23     A.  No, I didn't.  I thought he was coming to
24 the front door, actually.
25     Q.  Well, okay.  So let me understand.  So he's

226

1 on the -- when you -- when Nate was talking to him,
2 was Nate at the front door?
3     A.  No, we were down, outside in front of our
4 vehicles looking up at the deck at him.
5     Q.  So that's when Mr. Wirth was out there on
6 his deck?
7     A.  Yes.
8     Q.  And Nate was -- Nate was speaking to him
9 from the car?
10     A.  In front of the cars, yes.
11     Q.  In front of the car?
12     A.  Yes.
13     Q.  Was he yelling up at him, talking to him?
14     A.  No, it was -- you could hear the
15 conversation.  It wasn't loud.
16     Q.  Okay.  So Nate's talking to him.  And
17 that's when Wirth says, You know, I can't believe
18 you're not going to give me time to move my stuff out?
19     A.  Something to that --
20     Q.  And then he walks back into his home,
21 right?
22     A.  Yes.
23     Q.  And I think you testified, he wasn't
24 threatening at that point, right?
25     A.  No.  No.

227

1     Q.  Did he give you any indication he was going
2 to shoot at you?
3     A.  No.
4     Q.  Right?  Didn't make any overt threats to
5 you at that point, right?
6     A.  No.
7     Q.  And so you then went up to the residence,
8 to the front door, with Mr. Carrigan; is that correct?
9     A.  Yes.
10     Q.  And did you have a conversation with
11 Mr. Wirth while he was inside the home?
12     A.  No.
13     Q.  So did Nate have any conversation with
14 Mr. Wirth while he was inside the home?
15     A.  No.  We made announcements, "Come to the
16 door."
17     Q.  Okay.  And were you making loud
18 announcements?
19     A.  Yes.
20     Q.  What did you specifically state?
21     A.  I said, "Come to the door.  Talk to us.
22 Sheriff's Office.  Eviction."  And Nate said some
23 things.  I think another officer said something as
24 well.
25     Q.  And when you went up to the door with Nate,

228

1 is that when the other officers came up to the door
2 next to you?
3     A.  Shortly after that, yeah.
4     Q.  Was he threatening you at that point in
5 time?
6     A.  No.
7     Q.  Did he say, "Get off my property"?
8     A.  No.
9     Q.  Did Mr. Wirth say anything to you?
10     A.  Nothing.
11     Q.  Did he say, "I have a gun"?
12     A.  No.
13     Q.  Did he say -- did you hear any movement in
14 the house, like he was getting a gun?
15     A.  No.
16     Q.  Did you look into the window to see what he
17 was doing?
18     A.  I looked into the window of the door and
19 couldn't see him.
20     Q.  When you say "looked into the window of the
21 door," so there was a door and there was a small
22 window?
23     A.  There were small windows, like kind of a
24 French window-type setup on the door.
25     Q.  And how big were these windows?  Do you

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 9 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

229

1  recall?
2      A.  They were square.
3      Q.  Why don't you give me an approximate size,
4  if you remember.  Was it like, 2-by-2?
5      A.  Not that big, no.
6      Q.  Okay.  And was the entire door glass or was
7  there just a small portion of the door that was glass?
8      A.  Small portion.
9      Q.  Okay.  So you were looking in the door?
10     A.  Mm-hmm.
11     Q.  Could you see anything?
12     A.  A kitchen, what looked to be a kitchen and
13 some appliances.
14     Q.  Did you have a clear view of the entire
15 inside of the home just looking through that door?
16     A.  No, I did not.
17     Q.  Just looking into that small glass portion
18 of the door?
19     A.  No.
20     Q.  Did you go around and look?  Was there,
21 like, other windows you could look into the house?
22     A.  There were other windows.
23     Q.  Did you look through those other windows?
24     A.  No.
25     Q.  Did you direct any other sheriff's deputies

230

1  to look into those windows to give you a sense of
2  where he was?
3      A.  No.
4      Q.  So your instinct, though, was when you --
5  according to you, after Mr. Wirth says, "You're not
6  even going to give me time to move my stuff,"
7  according to your statement, you stated, "You know, I
8  wanted to say at the time of course we'll give you
9  time to move your stuff out."
10     Did you actually say that to Mr. Wirth?
11     A.  No.
12     Q.  Did you have the opportunity to tell him
13 "Look, Mr. Wirth, you have the time to move your stuff
14 out"?  Did you have the opportunity to say that to him
15 before breaching the residence?
16     MR MARKS:  Object to the form of the
17 question.
18     Q.  Did you have the -- let me --
19     MR. ELKUS:  Can you read my question back,
20 please?
21     (The last question was read back.)
22     A.  Did I have the opportunity?  Yes.
23     Q.  And why didn't you say that to Mr. Wirth
24 before making the decision to breach the residence?
25     A.  Well, he wasn't coming to the door.

231

1      Q.  Did he have a telephone?
2      A.  I don't believe so.
3      Q.  Do you know for a fact whether he had a
4  phone or not?
5      A.  I don't.
6      Q.  Did he make any inquiries as to other forms
7  of communications you could have made with Mr. Wirth
8  during this exchange prior to breaching the residence?
9      A.  Other than yelling through the door?
10     Q.  Yep.
11     A.  No.
12     Q.  And then you stated here, at least looking
13 at line 17 on page 12, "You know, that's why we're
14 here and he went back in the house and I started
15 feeling real uncomfortable about that and I might have
16 radioed in that he went back in his house."
17     Do you see that?
18     A.  Yes.
19     Q.  Now, why did you feel uncomfortable when
20 Mr. Wirth went back into the house?
21     A.  Because I couldn't see him.
22     Q.  Well, he wasn't threatening you, right?
23     A.  Right.
24     Q.  He didn't seem angry with you when he went
25 back into the home, right?

232

1      A.  No.
2      Q.  So what did he do other than not respond to
3  you through the door that made you feel real
4  uncomfortable?
5      A.  It's not responding and I can't see him.  I
6  don't know what he's doing.
7      Q.  And you don't know where he is in the
8  residence, right?
9      A.  And I don't know where he is.
10     Q.  You don't know if he's armed or not, right?
11     A.  I don't.
12     Q.  You don't know whether he's getting a
13 firearm at that point in time, right?
14     A.  I don't know that.
15     Q.  When you say -- when you start feeling
16 uncomfortable, did you feel that your life may be
17 threatened at that point?
18     A.  No.
19     Q.  Did you think the other officers' lives
20 were being threatened at that point in time?
21     A.  No.
22     Q.  Or potentially in danger?  Did you think
23 their lives were potentially in danger at this point
24 in time?
25     A.  No.

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

233

1  MR MARKS: Object to the form of the
2  question.
3  A. I didn't.
4  Q. Now, when Mr. Wirth went back into the
5  residence, you did not call Undersheriff Gore; is that
6  correct?
7  A. Not directly, no.
8  Q. Did you contact him indirectly?
9  A. Well, I think I said it on the radio.
10  Q. So what did you say? "Hey, he went into
11  the house"?
12  A. Yes.
13  Q. And was that on Ops 5?
14  A. That's the channel I was on, yes.
15  Q. Okay. So did you -- do you recall
16  specifically going on the radio and saying he went
17  back into the home?
18  A. Yes.
19  Q. Now, starting on line 19, you stated, "I
20  might have radioed in that he went back in his house."
21  So here, you don't definitively state that
22  you did that, but today you do?
23  A. Yes.
24  Q. Then you say, "I can't remember but I did
25  tell the four to get up next to the house as close as

---

234

1  we could to the house."
2  So according to this statement, you directed
3  officers to come to the house. They did not just come
4  at their own volition. Do you see that?
5  A. Yes --
6  MR MARKS: Object to the form of the
7  question.
8  A. -- I see it.
9  Q. So which one is it? Did you order them --
10  or excuse me.
11  Did you tell these officers to come up to
12  the house or did they just come up at their own
13  volition when they saw you walk into the house?
14  A. Yeah. And you're asking me to be
15  absolutely clear on this, and I'm just not.
16  Q. Well, you know, this interview took place,
17  what is it, a day after the incident, right?
18  A. Mm-hmm.
19  Q. Is that a yes?
20  A. That's a yes.
21  Q. Now, I understand that you've had time to
22  think about this, but do you think your memory was
23  better the day after you did the interview or over a
24  year and a half after the interview? Which is better,
25  your memory then or now?

---

235

1  A. Well, on some parts of it, my memory is
2  better now.
3  Q. Okay. Well, let's talk about this
4  particular issue, okay? Where you say, "I did tell
5  the four to get up next to the house," is that an
6  accurate statement or not?
7  A. It's possible that I said that, but I -- I
8  told you, I don't remember.
9  Q. At least as you sit here today, you don't
10  remember that?
11  A. Right. Are we to a point where I can take
12  a break?
13  Q. Do you need a break right now? We can take
14  a break. Sure. That's fine. Take a break.
15  (Recess taken from 4:08 p.m. until
16  4:21 p.m.)
17  Q. (By Mr. Elkus) Now, when you were at -- I
18  think -- let me back this up a little bit,
19  Mr. Hancock, because I think you testified that, you
20  know, when you were doing -- when you did an eviction,
21  you assume that the person being evicted is armed.
22  Do you recall testifying something to that
23  effect today?
24  MR MARKS: Object to the form of the
25  question.

---

236

1  MR. SCHIMBERG: Join.
2  A. Not on an eviction. I think what I said
3  was in Park County, every resident should be assumed
4  that they're armed.
5  Q. Okay. I'm sorry. So you -- at least
6  during your tenure with the Park County Sheriff's
7  Office, you assumed that every resident within the
8  county is armed; is that right?
9  A. Possessed a firearm.
10  Q. Possessed a firearm?
11  A. Yeah.
12  Q. So when you were evicting Martin Wirth, did
13  you take the assumption that he was armed as you were
14  evicting him?
15  A. Just like anyone else in Park County, I
16  would think that he had a weapon, owned a weapon,
17  firearm.
18  Q. Now, you testified that you were feeling
19  really uncomfortable when Mr. Wirth went back into the
20  residence. Do you recall that?
21  A. Yes.
22  Q. So feeling uncomfortable, why not retreat
23  and regroup on a -- regroup to a more tactically safe
24  place, such as behind your patrol vehicles, when
25  Mr. Wirth went back into the residence? Why not do

---

59 (Pages 233 to 236)

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 11 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

245

1  A. That's correct.
2  Q. So why did you make a call into the Sheriff
3  as opposed to making a call into Undersheriff Gore?
4  A. So I -- I don't know if I heard it or that
5  if I saw out of the corner of my eye the Sheriff
6  pulling up on scene.
7  Q. Right. But did you understand that by the
8  Sheriff pulling up on scene that he was relieving you
9  as being the OIC?
10  A. No, I just stated that I saw or heard him
11  pull up on scene.
12  Q. Well, you said you made a couple of calls
13  to the Sheriff, "who was, for some reason, on his way
14  there"; do you see that?
15  A. Yes, I do.
16  Q. So why were you calling the Sheriff as
17  opposed to the Undersheriff?
18  A. Because I either saw or I heard him call on
19  scene.
20  Q. So correct me -- let me understand what
21  you're saying.
22      The reason you didn't call
23  Undersheriff Gore, who at least at the time was sort
24  of the acting sheriff -- the reason you didn't call
25  Undersheriff Gore is because you saw the Sheriff pull

246

1  up onto the scene?
2  A. I either saw him or heard him, that he
3  pulled up. I don't know which.
4  Q. And then you said, "I think he just had a
5  bad feeling and I might have saw Fred pull up or knew
6  he was near. I said, sheriff, you know, there's too
7  much of a delay from this to here and I really feel
8  like he's barricading or, you, know something bad's
9  going to happen."
10      So here you're communicating to the Sheriff
11  that you felt that Martin Wirth was now barricading;
12  do you see that?
13  A. Yeah, but I didn't say that to the Sheriff.
14  Q. Okay. So you didn't tell the Sheriff that
15  you felt like he was barricading?
16  A. No.
17  Q. But that was a feeling that you had at that
18  point in time?
19  A. It felt like it's a possibility, yes.
20  Q. Well, you didn't say a possibility. You
21  said, "I really feel like he is barricading." Those
22  are your words, right?
23  A. They are.
24  Q. Okay. Now -- "or, you know, something
25  bad's going to happen. And I really regret that I'm a

247

1  Marine sometimes because I'm super aggressive and I
2  don't like to give people the opportunity to plan,
3  fortify and take us out, so I asked a second time, I
4  believe, and I don't know if I had gotten permission
5  or not. I can't remember. But I told Nate to take
6  the door"; do you see that?
7  A. Yes, I see it.
8  Q. Now, when you had a feeling like Mr. Wirth
9  was barricading, did you believe at that point in time
10  that he had the possibility of being armed?
11  A. No, I wasn't thinking about that.
12  Q. Did you know the full layout of the
13  interior of the Wirth residence before breaching the
14  dwelling?
15  A. I didn't.
16  Q. As a SWAT commander, or at least as a
17  former SWAT commander -- let me ask it differently.
18  And I'm talking about at the time.
19      As a SWAT commander at the time, don't you
20  think it was relevant before breaching the Wirth home
21  to know the layout of the interior of that dwelling?
22  A. No, I didn't think that at the time.
23  Q. Do you think it was important to know that?
24  A. Not at the time, no.
25  Q. Why is that?

248

1  A. I didn't think that at the time.
2  Q. Were any of the officers that were present,
3  were they wearing any entry team helmets or anything
4  like that, SWAT entry team helmets?
5  A. No, I don't believe so.
6  Q. So in your statement, you stated,
7  "something bad's going to happen. I really regret
8  that I'm a Marine sometimes because I'm super
9  aggressive and I don't like to give people the
10  opportunity to plan, fortify and take us out."
11      So first, what do you mean that you really
12  regret that you're a Marine sometimes?
13  A. First of all, that statement at the time,
14  upset, no sleep, it's -- that's not what I meant.
15  What I mean is I've had a lot of success at very
16  quickly getting in on people and getting the situation
17  under control, interrupting their OODA loop before
18  they fortify and plan or do anything to us. And
19  obviously, this is after the fact. And this is the
20  one time in my career where -- that that got people
21  hurt.
22  Q. So let's back that up a little bit, okay?
23  A. Okay.
24  Q. So you did not mean to tell CBI that you
25  regret that you're a Marine sometimes. Is that your

Case No. 1:16-cv-03079-MSK-NRN   Document 54-7   filed 03/23/18   USDC Colorado   pg 12 of 12

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

253

1 question.
2      A.  If -- well, in this case, we didn't know
3 that he was in there waiting to ambush us.  I think if
4 you knew that he was going to ambush you, then, no,
5 you wouldn't be super aggressive in going after him.
6      Q.  And I guess that's part of the point,
7 Mr. Hancock, because at this point, other than talking
8 through the window and he's nonresponsive, okay, you
9 didn't have a whole lot of information about where
10 Mr. Carrigan -- or, excuse me, where Mr. Wirth was in
11 the residence before breaching, right?
12      A.  That's right.
13      Q.  You didn't have a whole lot of information
14 as to what type of weaponry he had before entering
15 that -- entering that dwelling; is that correct?
16      A.  I didn't.
17      Q.  And there were options at your disposal
18 that you could have utilized to find out more
19 information about Mr. Wirth while he was inside the
20 residence before breaching; isn't that true?
21          MR MARKS:  Object to the form of the
22 question, and foundation.
23          Go ahead.
24      A.  I didn't feel that way at the time, no.
25      Q.  Well, you didn't think about it at the

254

1 time, right?
2      A.  Right.
3      Q.  You didn't think about retreating.  You
4 didn't think about that, did you, before breaching?
5      A.  No.
6      Q.  You didn't think about trying to figure out
7 some form of communication to talk to Mr. Wirth other
8 than through that small little window, right?
9      A.  That's how we were trying to talk to him,
10 yes.
11      Q.  I know.  But you didn't try or think about
12 utilizing other -- some other form of communication to
13 talk to Mr. Wirth before breaching that home, right?
14      A.  I didn't at that time, no.
15      Q.  Did you think, "Do you know what?  Let me
16 go back.  We could utilize" -- and actually, let me
17 back this up a little bit.  Sorry.  Let me clarify
18 this.
19          Did your vehicles have like a speaker
20 system?
21      A.  Yes.
22      Q.  Okay.  Was that on your car?
23      A.  Yes.  It should have been on all the patrol
24 cars.
25      Q.  You certainly could have gone back to your

255

1 car at that point where at least there was some level
2 of protection.  You could have been in your car and
3 tried to talk Mr. Wirth out from your vehicle.  You
4 could have done that; could you not?
5          MR MARKS:  Object to the form of the
6 question.
7      A.  I could have done that, yes.
8      Q.  You didn't think about that at an option,
9 did you?
10      A.  I didn't do that, no.
11      Q.  No, I know you didn't do it.  Did you think
12 about it as an option?
13      A.  Not at the time, no.
14      Q.  Why didn't you think about that being the
15 option to take other than kicking the door down?
16      A.  Why didn't I?
17      Q.  Yeah.  Didn't it come to you -- why didn't
18 you think like, "Do you know what?  There may be other
19 options here other than breaching"?
20          MR MARKS:  Object to the form of the
21 question.
22          MR. SCHIMBERG:  Form.
23      A.  I thought about getting in quickly, because
24 I had had a lot of success with that, and getting him
25 under control and getting him out of there.

256

1      Q.  Now, with respect to kicking the door down
2 and doing the breach, did you get a direct order from
3 the Sheriff to do that?
4      A.  I asked -- no.  I asked permission, and he
5 said go.
6      Q.  Why were you asking permission from the
7 Sheriff to breach the residence?
8      A.  I had either seen or heard that he was on
9 scene, and I -- I don't know.  He could have been
10 looking at something else, you know.  And as with
11 other things that we had done, it's nice to have the
12 Sheriff okay what you're doing.
13      Q.  But you were the officer in charge, right?
14      A.  That's correct.
15      Q.  So why did you think you needed to get
16 permission from the Sheriff when you were the OIC?
17          MR. SCHIMBERG:  Object to form.
18      A.  Well, because he showed up on scene, or I
19 believe that he had shown up on scene.  I had seen him
20 or heard him.  And, you know, I wanted to check if he
21 had other information or other ideas of what to do.
22      Q.  Did he make any suggestions to you for
23 other ideas?
24      A.  No.
25      Q.  And when you -- let me back this up.

64 (Pages 253 to 256)