1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     KOLBY MARTIN, and TRAVIS THRELKEL,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12   DEPOSITION OF:   TRAVIS JAMES THRELKEL
                      January 5, 2018
13   _____

14             PURSUANT TO NOTICE, the deposition of
     TRAVIS JAMES THRELKEL was taken on behalf of the
15   Defendants Park County Sheriff's Office and Sheriff
     Fred Wegener at 501 South Cherry Street, Suite 920,
16   Denver, Colorado 80246, on January 5, 2018, at
     9:36 a.m., before Darcy Curtis, Registered
17   Professional Reporter and Notary Public within
     Colorado.
18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966  
800.525.8490  

1900 Grant Street, Suite 1025  
Denver, CO 80203  

www.huntergeist.com  
scheduling@huntergeist.com  

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT H**

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 2 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

53

1  Fairplay, but I did go over to Bailey -- I was in
2  Bailey for quite a while as well.
3      Q. Okay. At the time of the eviction, you
4  were over on the Fairplay side?
5      A. Yes.
6      Q. Tell me a little bit about the training
7  you received initially as a patrol deputy with Park
8  County Sheriff's Office. For example, who was your
9  FTO?
10     A. Beginning FTO was with John Pender. And
11 I'm not sure if he was a deputy or a corporal.
12 Through that time with John Pender, sometimes I would
13 go with Corporal Nate Carrigan and I did that for
14 about four weeks. And I was then transferred over to
15 phase two with Field Training Officer Jacob
16 Lizakowski. Don't know how to spell that, so I'm
17 sorry.
18     Q. I don't either. What's the difference
19 generally between phase one and phase two of FTO?
20     A. Phase one is your introductory
21 understanding and learning geographical areas, what
22 the sheriff's office does as a whole for the county,
23 policy and procedure. You're getting your hands-on
24 experience with the FTO officer. You're usually in a
25 follow lead. You're not in a take control lead.

54

1      Phase two, you're expected to know the
2  majority of the geographical features, where you're
3  going, starting to take more control. You're the one
4  taking the calls now. You're the one trying to
5  formulate how you're going to work it out. If you had
6  a stump or become an issue, then you would talk to
7  your field training officer, help get an explanation
8  of why you do things, how you're doing.
9      Phase three, you're pretty much expected
10 to know what you're doing. There's going to be things
11 that are thrown out there that you probably haven't
12 experienced through field training that will come up.
13 And you're supposed to take charge, be the lead, and
14 you have your field training officer there to pass you
15 off, whether or not he or she believes you're able to
16 perform the functions as a solo officer.
17     Q. Okay. You passed all three levels?
18     A. Yes.
19     Q. The third level, was that somebody
20 different than Jacob?
21     A. I was fast tracked at the time.
22     Q. Okay.
23     A. So I was given the ability that
24 understanding because I knew what I was doing and the
25 officers believed that I knew what I was doing and

55

1  they felt comfortable with me, I was put on solo, I
2  believe, after nine or ten weeks of training.
3      Q. Okay. My question is, on level three,
4  was there somebody that was your FTO other than Jacob?
5      A. No. I believe at the time it was split
6  between the three of them.
7      Q. Okay.
8      A. But the majority -- it was phase two and
9  three with Deputy Lizakowski.
10     Q. All right. Pender is an experienced guy,
11 if I have the right guy in mind, isn't he?
12     A. Correct.
13     Q. He had like over 30 years with Denver, I
14 believe?
15     A. I believe so as well.
16     Q. All right. Was he a good trainer, in
17 your estimation?
18     A. Yes.
19     Q. He seems like a knowledgeable guy. Would
20 you agree with that?
21     A. I would.
22     Q. And was Nate, in your estimation, a good
23 trainer?
24     A. Yes.
25     Q. And how about Jacob?

56

1      A. I believe Jacob was a great trainer as
2  well.
3      Q. I'm trying to avoid his last name for our
4  court reporter. Do you think you deserved the
5  fast-track treatment?
6      MR. LORENZ: Object to form.
7      A. I believe I worked for it. I mean, I
8  earned it.
9      Q. (BY MR. SCHIMBERG) Yeah, that's all I
10 meant. Okay. So as far as your initial training, you
11 thought you had sufficient and thorough training to
12 become a patrol deputy?
13     A. Yes.
14     Q. Now, did you yourself become a field
15 training officer?
16     A. I did.
17     Q. Okay. Cleared that up for me. When?
18     A. I don't remember the dates. It was
19 probably -- I don't know. It was in 2016, I believe.
20 And I don't remember if that was -- it was before -- I
21 believe it was in January of 2016.
22     Q. Okay. And do you have to test for that,
23 to become an FTO?
24     A. No.
25     Q. Okay. Is it something you apply for?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 3 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 57

1   A. It was something I mentioned to the
2 corporals and the sergeant because they're looking for
3 other people.
4   Q. Okay. So let's be specific. Nate and
5 Tonjes?
6   A. Through Jen, Jen Plutt.
7   Q. Oh, Jen at that point?
8   A. Uh-huh.
9   Q. Okay. And how many deputies did you
10 serve as an FTO?
11   A. I had three, maybe five.
12   Q. And your job as an FTO with a new deputy
13 would include going through the policies and
14 procedures for familiarity?
15   A. Yes.
16   Q. Do you ride along together?
17   A. Yes.
18   Q. And I think you told me, as an FTO, you
19 kind of take the lead initially and they kind of
20 shadow you to observe, learn the ropes?
21   A. Yes.
22   Q. I'm just trying to get a feel for it.
23 Were you a good FTO?
24   A. I would like to believe I was.
25   Q. Yeah. Did anybody tell you you did a

### Page 58

1 good job as an FTO?
2   A. My partners did, the corporals and
3 sergeant, so I believe I was.
4   Q. Yeah. Did that assist you in your
5 pursuit of becoming a corporal?
6   A. I believe it did.
7   Q. In what way?
8   A. Becoming a field training officer, you
9 already have a higher standard of responsibility. So
10 you're in charge of training these guys, everything
11 else, so it already shows you have that responsibility
12 that you're able to take the next step of not only
13 training them, but as you're already overseeing them
14 through training, allows you to oversee other
15 people --
16   Q. I get it.
17   A. -- in the department.
18   Q. Makes sense. Would it be fair to say you
19 train in accordance or consistent with the policies
20 and procedures?
21   A. Yes.
22   Q. Okay. Did you ever find yourself
23 requesting that any policies and procedures be changed
24 based upon your initial experiences as a patrol deputy
25 and an FTO?

### Page 59

1   A. Not that I recall. I do remember asking
2 to change the way the FTO program was written.
3   Q. Okay. Who did you ask?
4   A. I believe I was with Andrew McGeorge and
5 we kind of collectively asked Sergeant Tonjes. It was
6 either Sergeant Tonjes at the time or it was
7 Undersheriff -- actually, it might have been
8 Undersheriff Dave Wohlers, which would put the time
9 afterwards when we started to change things. We
10 wanted to change the system on how we graded people
11 and how we effectively used that training manual to
12 help them.
13   Q. All right. So it was the actual training
14 component, not the policy or procedure itself, or I'm
15 trying to --
16   A. Correct.
17   Q. Okay. And were you successful, you and
18 McGeorge?
19   A. Yes.
20   Q. Okay. So Wohlers listened to you and got
21 some changes made, modifications?
22   A. Yes.
23   Q. Before you left, do you think those
24 changes were better for the officers?
25   A. I believe they were -- it was better for

### Page 60

1 them.
2   Q. In what way?
3   A. Understanding the FTO process itself.
4   Q. And you know what that means, but I
5 don't.
6   A. The field training process of what the
7 officers are expected to do, what's expected of them.
8 Say, as a training officer, what I expect from them
9 and, you know, it's outlined, it's layed out, and it
10 also goes through the merit system instead of using a
11 system one through ten, you can't objectively define
12 what number one means or what ten means. It was
13 easier to say did you pass, did you need training, or
14 are we going to revisit the phase and redo the phase
15 over again.
16   Q. Okay.
17   A. So it was acceptable, unacceptable, or
18 needs to improve on training.
19   Q. You became a member of the SWAT team as
20 well, didn't you, Travis?
21   A. Yes.
22   Q. And I understand that occurred -- well,
23 I'll just ask you -- late 2015, December of '15? Do
24 you know?
25   A. I was training for and I think I was part

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 4 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

61

1  of the team in January, because it was over a hundred
2  hours of basic training.  That was usually one
3  Wednesday a month for eight hours, eight to ten hours.
4       Q.  Now, to get on the SWAT team -- not
5  everybody gets on the SWAT team, right?
6       A.  Correct.
7       Q.  Okay.  Is it something you apply for or
8  are you asked if you want to?  What was your
9  experience?
10      A.  It was both.
11      Q.  Okay.  Something you wanted to do?
12      A.  Yes.  I wanted the training, because I
13 believed it could help me over my overall everyday
14 practice as a law enforcement officer.
15      Q.  Do you think it did?
16      A.  I think it did.
17      Q.  All right.  Did someone walk up to you
18 and say, Travis, we like your work, we would like to
19 have you on the team, something like that?
20      A.  I can't recall.
21      Q.  Okay.  Do you have to test to get in?
22      A.  No.
23      Q.  But you do have to go through, at a
24 minimum, a hundred hours of training?
25      A.  Yes.

62

1       Q.  Okay.  And were you trained through PCSO
2  or another organization or both?
3       A.  Through Park County Sheriff's Office.
4       Q.  Okay.  Who did the training that you
5  received?
6       A.  Most of the training was through Captain
7  Hancock and at the time would have been Sergeant Frank
8  Connor.
9       Q.  And why don't you give those guys a grade
10 as to how they were as trainers, in your estimation,
11 Hancock and Connor.  Were they good and thorough?
12          MR. LORENZ:  Object to form.
13      A.  I believe Connor was very valuable for
14 training.
15      Q.  (BY MR. SCHIMBERG)  He had over three
16 decades of experience with Denver as well, correct?
17      A.  Correct, as a SWAT commander as well.
18      Q.  Yeah.  He knew his stuff, I take it?
19      A.  Yes.
20      Q.  Okay.  And this is something you did
21 every Wednesday for eight to ten hours?
22      A.  About one Wednesday every month.
23      Q.  Oh, every month.  I'm sorry.
24      A.  Yes.
25      Q.  And the training included, you know,

63

1  hands-on going out in the countryside and trying to
2  re-enact potential circumstances you might run into?
3       A.  Yes, some of the trainings did.
4       Q.  Okay.  And they were done in accordance
5  with or consistent with policies and procedures of the
6  office?
7       A.  That I'm aware of.
8       Q.  Okay.  Did you have more training from
9  Frank or more from Mark, or do you recall one way or
10 another?
11      A.  I can't recall.  I would say, maybe,
12 50/50.
13      Q.  Did they ever do it jointly?
14      A.  I can't recall on that.
15      Q.  In becoming a member of the SWAT team,
16 are you assigned to a sub category, another team, or a
17 sub team, anything like that, or are you all just one
18 group?
19      A.  So it was two teams, A and B, and that
20 was usually for front half of the week or back half of
21 the week, is what it was.
22      Q.  And which team were you on, B, I take it?
23      A.  I think it was B.
24      Q.  Okay.  Who were your teammates?
25      A.  I believe Ed Goodman.  I don't know the

64

1  other ones.  We never used the teams.  If it came up
2  to SWAT call, everybody was called out.
3       Q.  But for training purposes, would it be
4  fair to say you trained with the B team?
5       A.  No.  We trained with everybody.
6       Q.  Okay.  Looking back on it, Travis, in
7  your SWAT training, who stands out to you as this
8  person really knows what they were doing and talking
9  about?
10      A.  Frank Connor.
11      Q.  Strikes me that way too.  How about
12 Abrams?  Did he teach?
13      A.  Yes.  He worked with us with the firearms
14 and more of the overall and legal practices.
15      Q.  Why don't you give me a grade on Dave
16 Abrams as a trainer.
17      A.  I would say highly respected.
18      Q.  Yeah.  I understand you have to be voted
19 on to the SWAT team; is that correct?
20      A.  Yes.
21      Q.  Okay.  Did anybody else -- after you got
22 on to the SWAT team, did anyone else in the agency
23 apply and get on the SWAT team?
24      A.  I believe later on.
25      Q.  Who was that?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 5 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

65

1  A. I know Jeremy Lowrance joined the team
2  along with Deputy Maloney. I don't remember his first
3  name. I believe Travis Darrington came on to the SWAT
4  team at the end.
5  Q. End of your tenure?
6  A. Yes.
7  Q. Well, for those guys, did you and your
8  fellow SWAT team members vote on them or discuss
9  whether or not they were skilled and trained enough to
10 be on the team?
11 A. I didn't vote for it.
12 Q. Who does?
13 A. I think they were just accepted because
14 at the time they had the experience, especially
15 Lowrance had military background and Maloney was just
16 a very well-rounded judge of character, excellent
17 work, he was thorough, he was smart, you know,
18 education-wise on that. So it seemed -- it only
19 seemed right to have them on the team.
20 Q. Yeah. Perhaps I was being too specific.
21 You didn't have to have a motion and a vote. It was
22 given their experience, skill, and training, yeah, of
23 course, come on board, that kind of thing?
24 A. Yes.
25 Q. Okay.

66

1  A. Maybe prior, before I was on the SWAT
2  team, it sounded that's how it used to be.
3  Q. Okay. But your experience is as we just
4  discussed?
5  A. Yes.
6  Q. Now, is that a certification that you
7  received, to be a SWAT team member?
8  A. I received a hundred-hour basic SWAT from
9  the county, from Park County Sheriff's Office, but I
10 would imagine, any other agency, there's quite a bit
11 more training for what they do.
12 Q. I don't know if it was Kolby or somebody
13 else in this case testified that in January of 2016
14 there was a little ceremony announcing your arrival on
15 the SWAT team?
16 A. Yes.
17 Q. Was there anybody else along with you?
18 A. Andrew McGeorge.
19 Q. Okay.
20 A. And I believe that was it.
21 Q. So there's a little bit of pomp and
22 circumstance; I mean it's a big deal becoming a SWAT
23 member?
24 A. I believe so.
25 Q. Something you could be proud of?

67

1  A. Yes.
2  Q. You work hard for?
3  A. Yes.
4  Q. The eviction on February 24, 2016,
5  Travis, what's your opinion, was that a SWAT operation
6  or not?
7      MR. LORENZ: Object to the form.
8  A. It should have been, but it was not.
9  Q. (BY MR. SCHIMBERG) Did you ever
10 articulate to Mr. Hancock that you thought it should
11 be a SWAT operation that day?
12 A. Yes.
13 Q. When?
14 A. The morning of the briefing it was
15 collectively asked from Captain Hancock if it should
16 be SWAT or civil just with deputies. I think it was
17 majority vote it should be with the deputies and not
18 calling out the SWAT team because there was issues
19 between it being an exigent circumstance versus a
20 civil.
21 Q. Explain that to me. First of all, who
22 raised the idea at the briefing?
23 A. Captain Hancock. He asked if we should
24 have the SWAT team there or if we should call SWAT out
25 for that.

68

1  Q. So he brought it up?
2  A. Yes.
3  Q. And he was the SWAT commander at the
4  time?
5  A. Yes.
6  Q. As well as being a captain of the patrol
7  division?
8  A. Yes.
9  Q. Okay. So I need to have you flesh that
10 out. So he asked those that were in attendance at the
11 briefing whether or not it should be a SWAT operation?
12 A. Yes.
13 Q. What do you recall specifically Mark
14 saying or asking?
15 A. What do you guys think? There was D.J.
16 Hannigan, myself, Kolby Martin, Deputy Lowrance, and
17 Corporal Carrigan in the room. And it was just kind
18 of -- he threw it out there as the idea. I think the
19 majority ruled that they would rather not call out
20 SWAT.
21 Q. Do you recall anybody -- you say majority
22 ruled, which I infer there was somebody that thought
23 there should be a SWAT callout; is that right? Did
24 anybody speak up?
25 A. I think it was Kolby.

17 (Pages 65 to 68)

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 6 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

69

1  Q. Kolby. Do you have a specific
2  recollection of anything Kolby specifically said?
3  A. Of what? I guess I don't understand.
4  Q. Well, it sounds like there was a vote or
5  Mark looked for consensus amongst you, D.J., Kolby,
6  Jeremy, and Nate, and you said Kolby Martin said it
7  should be. Do you remember what he said specifically?
8  A. No.
9  Q. Okay. Did you speak up at the time?
10 A. I felt that it should have been SWAT.
11 Q. That's not my question, though. Did you
12 speak up?
13 A. Yes. I said yes.
14 Q. What did you specifically say?
15 A. I said yes.
16 Q. That's it, just yes? Did you give any
17 reasons why or why not?
18 A. I didn't give a reason.
19 Q. All right. So that tells me that D.J.,
20 Nate, and Jeremy didn't think it was necessary?
21     MR. LORENZ: Object to foundation.
22 A. I can't speak for them, so I don't know.
23 Q. (BY MR. SCHIMBERG) Well, what did they
24 say? What do you recall?
25 A. I know Lowrance was on the fence about

70

1  it.
2  Q. And what gives you that knowledge?
3  A. Because of his body language and his yes,
4  no, no, I don't think so type of attitude.
5  Q. All right. What do you recall about
6  D.J., anything that he offered?
7  A. He was borderline on the fence with it as
8  well. He was unsure.
9  Q. Okay. And Nate?
10 A. Nate was against the idea.
11 Q. Did he give any reasons that you recall
12 for why he was against it?
13 A. Just his experience and time.
14 Q. Okay. And how about Mark? Did he make
15 any statements about how he felt one way or another?
16 A. No. I think I recall him saying I don't
17 think we need them, referring to the SWAT team.
18 Q. All right. I need to know if that is a
19 specific recollection you have or just sort of --
20 A. No. That's specific, because he was
21 standing at the whiteboard when he said it.
22 Q. There was a whiteboard that he was making
23 notations on, correct?
24 A. Yes.
25 Q. We'll take a look at that later. Have

71

1  you seen the photograph, the exhibit, that we've
2  marked and used in prior depositions of the
3  whiteboard?
4  A. No.
5  Q. Okay. Ever?
6  A. Pictures of it?
7  Q. Yes.
8  A. No.
9  Q. Okay. So when we talk about the
10 whiteboard here initially, it's just your recollection
11 of what you saw on February 24, 2016?
12 A. Yes.
13 Q. Okay. I go through that with you because
14 over time it's hard to differentiate what we might
15 have known at that very time, and with the passage of
16 time, we learn other information. Okay?
17 A. Okay.
18 Q. So there might be times where I really
19 define what did you know at the specific time as
20 opposed to sitting here today after a couple of years
21 have passed. All right?
22 A. Okay.
23 Q. Let me catch up here. Have you made
24 application to work at any private security business?
25 A. Not that I'm aware of.

72

1  Q. Well, you ought to know if you did. How
2  did you find out that the position might be available
3  with the Park County Sheriff's Office when you
4  applied?
5  A. Frank Connor was an instructor at our
6  academy.
7  Q. Do you remember what Frank taught or what
8  class you took from Frank?
9  A. He taught civil issues and -- I believe
10 that was it. He might have taught something else. I
11 don't recall.
12 Q. This was at Red Rocks?
13 A. Correct.
14 Q. Give me a flavor for that. Did Frank and
15 you talk together, or is this something that he
16 announced to the class, that there's some positions
17 open or might be a position open at Park County?
18 A. He didn't really necessarily -- he didn't
19 announce it, but I know one of my classmates, Joshua
20 Body, was already working for the sheriff's office.
21 And I believe Andrew, Andrew McGeorge -- he and I went
22 to the academy together -- I think he was already
23 talking to Frank Connor and that's where it just kind
24 of came out that they were still open and looking for
25 deputies, so I put my application in.

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 7 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 137

1  to make sure that he wasn't -- if he was still alive
2  or something.  They cleared the residence and CBI was
3  called and we just held it until they arrived.
4      Q.  Okay.  So I can never think of his last
5  name.  Tristan V. was dead on the scene?
6      A.  Yes.
7      Q.  Okay.  In terms of Park County Sheriff's
8  Office, who was the incident commander, if it fits?
9      A.  That one is hard.  I guess the first
10 initial would have been Connor.  He was the senior --
11     Q.  Senior.
12     A.  -- officer on scene.  I just relayed the
13 radio traffic.  When Captain Bonnelycke arrived on
14 scene, he then took over as he was the captain.  I
15 know the sheriff did show up that night and he was
16 probably not even maybe an hour after Captain
17 Bonnelycke.  Once he showed up on scene, he assumed
18 control of the scene and what was going on.  He was
19 making arrangements with CBI to come up to do the
20 investigation.  So it switches.
21     Q.  Yeah.  By the time Bonnelycke and the
22 sheriff get there, the event itself is over and done
23 with?
24     A.  Yes.  Correct.
25     Q.  Did you sustain any injuries of any type

### Page 138

1  as a result of that event?
2      A.  No.
3      Q.  Did it change your view of the nature of
4  your job in any way?
5      A.  I believe that one kind of compounded off
6  of the first shooting.
7      Q.  So how did that change your view?
8      A.  It didn't necessarily change my view, but
9  it gave me a lot more anxiety, start to panic and get
10 cold sweats.  It felt like my heart raised another
11 hundred beats when a call would come out when it was
12 something serious, especially when it involved a
13 firearm or barricaded suspect.
14     Q.  These were your first critical incidents
15 that you participated in?
16     A.  Yes.
17     Q.  Did it drive home the idea that your
18 career is inherently dangerous?
19         MR. LORENZ:  Object to the form.
20     A.  I already understood my job was
21 inherently dangerous.
22     Q.  (BY MR. SCHIMBERG)  I guess we found that
23 out yet again this weekend, didn't we?
24     A.  Unfortunately.
25         MR. LORENZ:  Object to the form.

### Page 139

1      Q.  (BY MR. SCHIMBERG)  Yeah, it's really
2  sad.  Can you differentiate, in your own mind, Travis,
3  effect of these two critical incidents in your view of
4  your career or your job?
5      A.  What do you mean by that?
6      Q.  Well, you said it increased your anxiety
7  level, right?
8      A.  Correct.
9      Q.  Okay.  Can you differentiate between the
10 two, or is it all compounded by the two events?
11         MR. LORENZ:  Object to the form and
12 foundation.
13     A.  I know the first event caused most of it
14 and the second one -- the difference is the first
15 event I was a hundred percent uncomfortable going to
16 the situation.  Something about the second event,
17 going with Frank Connor, there was a comfortability
18 level on the trust that I had and it didn't --
19 whatever he was involved with and he told me to do
20 something, I knew it was going to be okay.
21     Q.  (BY MR. SCHIMBERG)  And that was lacking
22 in February?
23     A.  Yes.
24     Q.  Okay.  Explain that to me.  Because you
25 had SWAT trained and certified guys with you, whether

### Page 140

1  it was a SWAT operation or not, right?
2      A.  Correct.
3      Q.  Okay.  So explain what you feel or
4  believe.
5      A.  So you can be trained, 100-percent
6  aspect, you can be the best at your job.  If you don't
7  trust your partners or your leadership, it can be --
8  you know, it's the weakest link.  It takes one link to
9  fail the whole thing.  And that's how I felt about the
10 command at the time, of the SWAT command.  And Captain
11 Hancock being our leader that day, it didn't feel
12 right.  I wasn't comfortable with it.
13     Q.  Well, let me keep picking at you.  And
14 I'm sorry, because I'm trying to just understand your
15 concept here.  Is it that you didn't have the same
16 confidence in Captain Mark Hancock that you developed
17 with Sergeant Frank Connor?
18     A.  I would say yes.
19     Q.  Okay.  Is there more to it than that?
20     A.  No.  I didn't have the confidence with
21 Hancock as I did with the confidence with Connor.
22     Q.  Okay.  Because in February you at least
23 had a briefing before the eviction was attempted,
24 right?
25     A.  As in the briefing the morning of?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 8 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

153

1  whiteboard came from.  I think it was on the back
2  desk.  I think they actually picked it up and started
3  using it.  They put it on the front wall.
4      Q.  Was it up when you arrived?
5      A.  It was.
6      Q.  Was there anything on it when you
7  arrived?
8      A.  Not yet.  It was blank.
9      Q.  Okay.
10     A.  And that's when they started talking
11 about the layout of the house.
12     Q.  When you say "they," you were part of
13 this "they," weren't you?
14     A.  The conversation between the whole team.
15     Q.  Okay.  And Kolby is there with you?
16     A.  Yes.
17     Q.  You arrived at the same time?
18     A.  Yes.
19     Q.  I'm just going to walk you through it in
20 detail.  Okay?
21     A.  Okay.
22     Q.  Just do your best at recalling.
23     A.  Okay.
24     Q.  The whiteboard goes up.  The Google Earth
25 photo has been passed around and that is attached to

154

1  the grease board?
2      A.  It's sitting next to it.  It's not taped
3  to it.
4      Q.  I've gotcha.  And then what do you recall
5  happening next?
6      A.  The team started talking about the layout
7  of the house.  That's the first thing.  Because I
8  don't know what the house looks like, where it's at,
9  how are we going to go into it, where is he going to
10 come out if he comes out, does he have another
11 driveway where he can leave out of.  So that's where
12 it came into -- Captain Hancock grabbed the marker and
13 started drawing the house the way it looked on Google
14 Map and from some of the other deputies' experiences
15 from being at the house.
16     Q.  What other deputies said they had been to
17 the house previously?
18     A.  I think Captain Hancock said he was there
19 before.  I know Leffler stated he was there.  Well,
20 hold on, because Leffler is not in this conversation
21 at the time.  And Nate, because I think he was part of
22 the first eviction.  And I didn't know the guy was
23 evicted until that day, that that is the second time
24 it happened.  I knew Nate knew what the outside of the
25 house looked like because they were driving by before

155

1  and Nate had originally posted the first 30-day
2  eviction notice on the front gate.  That's where they
3  were going over the layout of the house and saying
4  this is the house, corresponding with the Google
5  Earth, and then this is what the house looks like.
6  Because you couldn't really tell the size of the roof
7  line on the picture.
8      Q.  What happens after that?
9      A.  Captain Hancock started assigning
10 positions to people.
11     Q.  Let's go through it.  However it's
12 easiest for you, who is assigned where?
13     A.  So I know he assigned Nate as the
14 breacher, because I know he said Nate is a big guy and
15 he joked about that and we just kind of all agreed
16 because . . .
17     Q.  He was a big guy.
18     A.  Yeah.  We knew he could kick the door
19 down.  We knew he would be able to do it without a
20 problem.  And then it's like if you guys have to go
21 in, this is the team I want.  So, of course, Kolby is
22 the SWAT team leader and he also had the most
23 seniority out of us there.  So it was Kolby, myself,
24 and then Lowrance was put on to go in the house if we
25 had to, if he was immediately available.

156

1      Q.  It's decided Kolby's first, you're next.
2  Those are the two SWAT guys?
3      A.  Correct.
4      Q.  Thanks.  And Jeremy behind you?
5      A.  Well, it wasn't that order.  Those were
6  just the people on the board if we had to make
7  entrance.  We didn't have assigned of who was going in
8  first, second, third, but we were assigned those
9  positions that if we had to go in the house and grab
10 the guy, he was going to be there.
11     Q.  And where was Hancock going to be in
12 relation to the rest of you guys?
13     A.  He was going to -- I think basically
14 right on the outside.  He said he was going to take, I
15 think, incident command or command of the call.
16     Q.  So if you needed to go in, was he going
17 to go in?
18     A.  Yes.  He said if he needed to go in, he
19 would go in.
20     Q.  Was there any discussion he would go in
21 after you guys or before you guys or with you, or how
22 did that -- what do you recall?
23     A.  I don't recall anything on that one.
24     Q.  Okay.  Well, who did have command of this
25 eviction?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 9 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 177

1  to get in, then we'll breach the door immediately
2  behind him if he tries to -- if he goes inside, shuts
3  the door, we'll be right there, we'll kick the door
4  and restrain him right there as soon as possible
5  inside the house.
6  　　Q.　If you have access to him?
7  　　A.　If we have access to him and we have eyes
8  on him.
9  　　Q.　Let me stop you, Travis.  I can't tell,
10  when you're giving me that information, whether this
11  is what you were thinking or whether this was part of
12  the conversation there in the squad room.
13  　　A.　That was the conversation, that if we saw
14  him through the glass or if he was outside, we would
15  do -- you know, it's a fresh pursuit.  If he goes back
16  inside immediately, we would follow and restrain him
17  inside the house.  If he was visible to us when we're
18  outside the door and he's refusing our commands to
19  come outside, if he was standing right there, we would
20  breach, go in.  If he was not within eyesight, if we
21  couldn't see him, then we weren't going to breach the
22  door and we were going to pull perimeter.  That's what
23  was discussed.
24  　　Q.　You anticipated or contemplated a fluid
25  situation when you got there?

### Page 178

1  　　A.　Yes.
2  　　Q.　Okay.  And what I mean by that is you can
3  plan up the wazoo, right, and things change when
4  you're actually putting them into the process,
5  correct?
6  　　A.　Yes.
7  　　　　MR. LORENZ:  Object to form and
8  foundation.
9  　　Q.　(BY MR. SCHIMBERG)  Okay.  There's a
10  certain amount of flexibility, I guess, of thought,
11  things can change when you get to the location?
12  　　A.　Yes.
13  　　Q.　You're trained on that?
14  　　A.　Yes.
15  　　Q.　Okay.  So in terms of -- well, that was
16  going to be a bad question.  Let's see if I can put it
17  in my own words, Travis, and you tell me if it's
18  wrong.  You planned and contemplated a potential of a
19  breach into the residence.  The circumstances would
20  have been, one, if you had eyesight of Mr. Wirth and
21  he wasn't obeying commands, right?
22  　　A.　Yes.
23  　　Q.　And what was the other circumstance where
24  you -- oh, if you were in his presence and he went in
25  immediately and shut the door on you type of thing and

### Page 179

1  you could get access to him?
2  　　A.　Yes.
3  　　Q.　Speed would be a positive factor for you
4  guys?
5  　　A.　Yes.
6  　　Q.　All right.  Were there any other
7  circumstances that were discussed where it would
8  result in a breach and enter into this residence on
9  Iris?
10  　　A.　Not that I remember.
11  　　Q.　Was there any discussion about who would
12  make that decision?
13  　　A.　Make the decision to breach?
14  　　Q.　Yes.
15  　　A.　I believe that would still come down from
16  his chain of command.  It would be either the
17  undersheriff or the sheriff himself.
18  　　Q.　Okay.  Where was the undersheriff?
19  　　A.　At the time I figured he would be in
20  Fairplay.  That's his office.  He --
21  　　Q.　Do you know?
22  　　A.　No, I don't know.
23  　　Q.　Where was the sheriff?  Do you know?
24  　　A.　The sheriff was supposed to be heading
25  out of town.  Because by that time, he left the

### Page 180

1  office.  He was gone.
2  　　Q.　He told you guys he had a meeting down in
3  town, right?
4  　　A.　Correct.
5  　　Q.　All right.  You had no prior personal
6  contact with this guy, Martin Wirth, correct?
7  　　A.　Correct.
8  　　Q.　Martin Wirth ambushed, shot and killed
9  Nate Carrigan, didn't he?
10  　　A.　Yes.
11  　　Q.　And he ambushed and injured seriously
12  your friend, Kolby Martin?
13  　　A.　Yes.
14  　　Q.　Okay.  And he shot and injured
15  Mr. Hancock?
16  　　A.　Yes.
17  　　Q.　Okay.  And based upon your earlier
18  testimony, he caused you at least some anxiety and
19  super sensitivity?
20  　　　　MR. LORENZ:  Object to form.
21  　　A.　Afterwards, yes.
22  　　Q.　(BY MR. SCHIMBERG)  Okay.  He could have
23  responded to the knocks on the door and come out
24  peacefully?
25  　　　　MR. LORENZ:  Object to form and

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 10 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

**189**

1 dramatically or just more conversational?
2    A.  No. It was a conversation to him. It
3 was a question directed to him. Like I said before,
4 why don't we wait for him to go to the gas station or
5 go to the store?
6    Q.  And you said this to --
7    A.  To Captain Hancock. He says, no, I have
8 a plan. This is what we're doing.
9    Q.  So there's two statements you made and
10 both times Hancock's response was, no, I have a plan?
11    A.  Yes.
12    Q.  Okay. Just trying to figure this out,
13 Travis. So this conversation about time was as you
14 were leaving. The conversation about why can't we
15 just wait for him to go to the gas station or
16 something was when?
17    A.  Was when we were leaving the substation.
18 Okay. We're supposed to be leaving the substation to
19 go to the fire station to meet up with the paramedics.
20    Q.  Are you still inside or outside at this
21 point?
22    A.  We are inside.
23    Q.  And you don't recall any other input or
24 questions raised by any of the other fellas?
25    A.  No.

**190**

1    Q.  Okay. Then any discussion about how
2 you're going to suit up, or was it up to each of you
3 to decide how to do that?
4    A.  That was brought up and that was brought
5 up at the fire station.
6    Q.  Okay. Walk me through that.
7    A.  Okay. So we left the substation.
8    Q.  Let me stop you, Travis, and really
9 frustrate you. Is there anything else you recall
10 being said by anyone at the substation at the briefing
11 or as you're walking out that we haven't talked about?
12    A.  Somebody brought up why we can't get the
13 shield, the chemicals, and the ram.
14    Q.  Got that.
15    A.  No, we don't have time. That's exactly
16 what it was. And then I brought up why can't we wait
17 for him. And as soon as that was done, we walked out
18 the door.
19    Q.  Okay. You've shared that with me. I'm
20 asking is there anything else now that occurs to you.
21    A.  No. I said no. I don't know and I don't
22 know if there was, so, no.
23    Q.  All right. I don't want you 48 hours
24 from now saying, oh, now I remember that. Any
25 communication by or between you guys as you're leaving

**191**

1 the substation to go up to the fire department?
2    A.  I did not have a conversation with
3 anybody.
4    Q.  Okay. Now, we're talking about the
5 Platte Canyon Fire Department that's basically at the
6 top of Crow Hill?
7    A.  Yes, that is the fire department we went
8 to.
9    Q.  I'm visualizing. Okay. What happens
10 there? What do you recall?
11    A.  So we pulled up in our individual cars.
12 We got out. And I know one of the bay doors was
13 coming up. Obviously, they were expecting us. The
14 conversation at the beginning was -- I don't know who
15 asked it -- somebody asked, well, what do you want us
16 wearing? And he said, you guys can dress how you
17 want. You can go soft or hard. By that meaning for
18 us is our soft armor that we wear everyday anyways, we
19 can just wear that, or put on our Level IV carriers,
20 which they've got the full broad shoulder Level IV
21 ceramic plates in the center of them, full wraparound
22 kit for upper body.
23    Q.  Which did you choose to go with?
24    A.  I went with -- I had my own personal
25 plate carrier at the time. Because I had a county-

**192**

1 issued plate carrier, however, it didn't have the
2 equipment to carry magazines, handcuffs, tourniquets,
3 a first aid kit, or anything. My personal vest, which
4 is considered a Level IV, I had all of that equipment
5 on there and they were steel plates. They weren't
6 ceramic. So they're designed to take quite a bit more
7 brunt, if that's what happened. So I put that on. I
8 put my own personal plate carrier on.
9    Q.  I don't know. To a layperson like me,
10 let me try it. You were well protected; you were
11 armored up?
12    A.  For chest-wise, yes, I was.
13    Q.  Okay. And it was up to each individual
14 to decide what they were most comfortable with?
15    A.  Yes.
16    Q.  Anything else that you recall at the
17 Platte Canyon Fire Department?
18    A.  So while we're at the fire department, I
19 was next to Kolby and Lowrance's car. I think I was
20 parked in the middle. And the question was brought up
21 by Lowrance, so we're not going in the house? And the
22 response came back from Hancock, no, we're not going
23 in the house, and he gets pretty irritated about it.
24 And that's because this conversation --
25    Q.  Who was irritated?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 11 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### 205

1  Q. Yeah. All right. And did you go up
2  there?
3  A. I did.
4  Q. Did Jeremy go with you?
5  A. Jeremy did.
6  Q. And did D.J. go up there?
7  A. No.
8  Q. And did Kolby?
9  A. Kolby came to the front door.
10 Q. Okay. And you didn't observe him, but he
11 came on the side with the mobile home?
12 A. Yes.
13 Q. Now, before you had left -- well, during
14 the time you left your car and got to the position
15 that you've circled, did you ever observe Mr. Wirth
16 coming out of the house?
17 A. I think it was approximately when I
18 was -- when Lowrance and I were right about here.
19 Q. Okay.
20 A. I saw him. He was standing -- it was
21 just enough where I could see through the side of the
22 house, you know, to the deck. He came out and he was
23 waving his hands and he was yelling at Captain Hancock
24 and Nate Carrigan.
25 Q. Could you see Nate and Hancock?

### 206

1  A. Nate was standing outside the door of his
2  vehicle.
3  Q. Why don't you draw a vehicle with NC.
4  A. Here.
5  Q. Where was the vehicle that Hancock drove?
6  A. I believe they showed up in the same
7  vehicle. They parked one of the vehicles down below,
8  because they didn't want two vehicles in the driveway.
9  Q. Oh, okay.
10 A. They wanted to use Nate's marked vehicle.
11 That way they can say we visibly showed that we were
12 police driving up the driveway.
13 Q. So Mark's car would have been back down
14 at the Iris?
15 A. Yes.
16 Q. At the end of the driveway. All right.
17 Did you actually hear communication between Mr. Wirth
18 and Nate and Mark?
19 A. The only thing I heard from Wirth was
20 you're not going to let me get my shit and that's when
21 he got mad.
22 Q. How do you know he got mad?
23 A. Well, he threw his arms up and walked in
24 the house and slammed the door. I could hear that
25 part. And there was no more conversation after that.

### 207

1  Q. So your recollection or characterization
2  of him was that he was aggravated?
3  A. He was probably aggravated with us being
4  there.
5  Q. Okay. Well, I don't want probably. How
6  would you characterize what you saw out of Mr. Wirth
7  that day?
8  A. I believe he was upset. I know he was
9  upset that we were there.
10 Q. What makes you say that?
11 A. Throwing up your arms in a gesture like
12 that, that's not promoting happiness.
13 Q. It wasn't a hug, huh?
14 A. No.
15 Q. Did he use any obscenities that you
16 heard?
17 A. Well, when he said you guys aren't going
18 to let me get my shit, seemed to be pretty upset.
19 Q. Anything other than that?
20 A. That's the only thing I heard him say.
21 Q. As we sit here today, you have a specific
22 recollection of that language used by Wirth?
23 A. I do.
24 Q. Okay. Did you hear anything from Nate or
25 Mark Hancock?

### 208

1  A. I did not hear anything of what they
2  said.
3  Q. Did Wirth appear to be combative in any
4  way?
5     MR. LORENZ: Object to form.
6  A. I can't really explain that, because, I
7  mean, they were completely apart from -- they were
8  separated. He didn't have any weapons in his hands.
9  Q. (BY MR. SCHIMBERG) Okay. If you could,
10 Travis, if you could stand and just show me with your
11 body language what you recall, if you can mimic this
12 hand movement that you saw Wirth use.
13 A. So he's standing at the railing. He
14 throws his hands up like this. As soon as he throws
15 his hands up, he turns around and walks into his
16 house.
17 Q. Was it in the process of turning that you
18 hear him say that?
19 A. No. He says you're not going to let me
20 get my shit, turns around and goes into his house.
21 Q. Okay. Thanks for doing that. When you
22 observed that, did you and Jeremy say anything to each
23 other?
24 A. No. I think I was just focused on the
25 front. I was more worried about the house itself.

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 12 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 213

say, hurry up, guys, get to the door, so we walked to the front door.

Q. What do you mean by "pulling perimeter"?

A. We were supposed to be getting ready to get in our positions, but we were pulled off of that before that could even happen.

Q. That's the way I took it. I just wanted to make sure. When you guys are standing around here, what's sort of the distance between where you're standing and the door of the residence? Are you like right up here?

A. We're right on the door -- on the right side of the door. Assuming that door folds in like it did at Wirth's house, we were on the right side of that door. So the door could open, swing in, and we can go in without standing in front of the door.

Q. What I'm getting at, are you right --

A. We were right on top of it.

Q. Just like I am in the depo room?

A. Just like you are right there. And it's one guy after the other. We're not arm's length away. We're literally right next to each other.

Q. When you assembled at the front door, were you already basically in a stack?

A. I was originally the first one in the

### Page 214

stack and then it was Kolby and Lowrance. And then the question got brought up, wait, who has got a light on their gun? Kolby had a light on his gun, so Kolby stepped up to the front.

Q. When we say gun, was it a rifle?

A. A rifle.

Q. That's fine. Who asked that question, if you recall?

A. The light question?

Q. Yes.

A. Captain Hancock asked who had a light on their weapon.

Q. Okay. So up to that point, there was no plan on who would be first if you had to enter or anything like that?

A. No.

Q. Okay. Do you have an understanding, as a trained officer, what would prompt someone to ask who has a light on their rifle?

MR. LORENZ: Object to form.

A. The house is dark. You go in somewhere dark, you would have a light.

Q. (BY MR. SCHIMBERG) Yeah, that's the way I took it too, but you guys are outside and it was a nice day, right, sunlight, et cetera?

### Page 215

A. Yes.

Q. All right. And if you go into a house that may not have light on --

A. Yes.

Q. -- it can bother your vision, correct? All right. So that sounds reasonable to you to ask who is going to have a light on their rifle?

A. Yes.

MR. LORENZ: Object to form.

Q. (BY MR. SCHIMBERG) Are you carrying a rifle at this point or your handgun?

A. I had my rifle.

Q. How about Jeremy, if you recall?

A. Jeremy had his rifle with him.

Q. All right. And Kolby did?

A. Kolby had his rifle with him.

Q. All right. Do you know what Mark was carrying, one way or another?

A. I think he just had a radio in one hand and his pistol in his other.

Q. Okay. And Nate, do you remember him holding a weapon?

A. Nate was paper service in hand.

Q. What does that mean?

A. He had the actual --

### Page 216

Q. Eviction notice --

A. -- eviction notice.

Q. -- or restitution order?

A. Uh-huh.

Q. Okay. Anything else that you recall in terms of conversation or preparation outside the front door?

A. For preparation-wise --

Q. Yes.

A. -- or just altogether?

Q. Altogether. There's no mystery. I'm just trying to walk you through each step of what you recall.

A. As soon as we stacked -- once we found out, because Kolby had the light, he stacked first in line and then myself and Lowrance behind me, I could tell -- I couldn't see him. I couldn't see Martin Wirth in the house. That's when he's already knocking at the door. Hancock at this time was knocking, sheriff's office. And he did it like three times and he told Nate to breach and then he's on the radio with the sheriff. And I don't know why he called the sheriff, because he's supposed to be going out of town. But he gets on the radio and asks, do we have permission? Which I don't understand. And I know it

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 13 of 16

**TRAVIS JAMES THRELKEL - 1/5/2018**
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

281

1 the house. Gave them their hour. We left after the
2 hour is up that they're given.
3  Q. As an FTO, did you ever train other new
4 deputies on the eviction process?
5  A. Yes, from my understanding.
6  Q. Okay. So let's role play a little bit
7 here. I'm a new deputy. Teach me what the eviction
8 process is.
9  A. So I explain to them you first get your
10 first letter. And this is from what was told to me.
11 There's no policy on it. There's nothing in the
12 training manual on it. You'll get your first letter
13 and that's usually somebody pays through the courts,
14 they get the certified letter saying they now have 30
15 days. So you post that on the door. You try to
16 knock, try to verify they're home. That way you can
17 physically hand it to them, tell them you've got 30
18 days. And you try to verify that's even the person
19 that's on there, because you don't want to be giving
20 it to a housekeeper that has no idea who they even
21 are. She's a contract cleaner. You make sure it's
22 them, they understand. It's usually within 3 days of
23 the ending of that 30 days, so at like day 27, you
24 would get another notice, 3 days. You've got 3 days
25 to move out. You talk to the parties. And then,

282

1 obviously, get your final eviction day, whether it's a
2 Wednesday, Tuesday, Friday, you go serve the actual
3 eviction. Martin Wirth was the only physical eviction
4 I've had.
5  Q. Now, you individually, in terms of your
6 understanding of the eviction process, you understood,
7 prior to the Wirth eviction, that a lawful eviction
8 order allowed you to remove, even if forcefully, an
9 individual from their property, correct?
10  A. Correct.
11  MR. LORENZ: Object to foundation.
12  Q. (BY MR. GOLDFARB) And on February 24 of
13 2016, you did have a lawful order to dispossess Wirth
14 from 36 Iris Drive in Bailey, Colorado, correct?
15  MR. LORENZ: Object to foundation.
16  A. Correct.
17  Q. (BY MR. GOLDFARB) Well, you talked to
18 Mr. Schimberg about -- did you look at the order for a
19 moment?
20  A. I believe I did look at it. It went
21 around the room.
22  Q. Did you question the validity of the
23 order for any reason?
24  A. No.
25  Q. Do you know what a trauma intervention

283

1 session is?
2  A. No.
3  Q. If I represent to you that you
4 participated in a trauma intervention session with
5 Sean -- is it Nadler from Nicoletti?
6  A. That could be.
7  Q. Does that ring any bells for you?
8  A. Yes.
9  Q. If I told you you participated in one of
10 these sessions after the Guffey shooting, does that
11 jog your memory?
12  A. Well, it should have been, because I
13 would have to talk to him if I was cleared fit for
14 duty anyways. He was the one designated for our
15 district, I guess.
16  Q. And Sean cleared you as being fit for
17 duty after that Guffey incident, right?
18  A. Correct.
19  Q. Were you cleared fit for duty after the
20 Wirth eviction?
21  A. Yes.
22  Q. Between the Wirth eviction and your
23 leaving Park County Sheriff's Office, did anyone
24 direct you to participate in some sort of fitness-for-
25 duty evaluation?

284

1  MR. LORENZ: Object to the form.
2  A. What do you mean by directing me to?
3  Q. (BY MR. GOLDFARB) Did Sheriff Wegener,
4 Undersheriff Gore, or any superior deputies to you
5 come to you and say we think you need to go see
6 someone and undergo a fitness-for-duty evaluation?
7  A. To be honest with you, I always thought
8 you had to see somebody after a shooting anyways to be
9 cleared fit for duty, so I don't know if he ever
10 commanded me or anything like that. I was told by the
11 sheriff to go talk to this guy who met us at our
12 office.
13  Q. And we know that you were cleared after
14 the Wirth eviction, right?
15  A. Yes.
16  Q. We know that you were cleared after the
17 Guffey incident, right?
18  A. Yes.
19  Q. Between being cleared for the Guffey
20 incident and your leaving Park County, did you undergo
21 any other mental health evaluations while you were a
22 deputy at Park County Sheriff's Office?
23  A. There was no other time where I was told
24 I need to go see somebody.
25  Q. Did you have to undergo any sort of

297

1  Hancock asks the group whether or not there should be
2  a SWAT callout.  Do you remember talking about that?
3       A.   Yes.
4       Q.   And you thought that it should be a SWAT
5  callout, right?
6       A.   Yes.
7       Q.   Did you vocalize that?
8       A.   Yes.
9       Q.   And the others in the room ultimately
10 decided this doesn't need to be a SWAT callout; it can
11 be a patrol response, correct?
12           MR. LORENZ:  Object to the foundation.
13      A.   Yes.
14      Q.   (BY MR. GOLDFARB)  So the majority of the
15 people in the room thought we don't need to make this
16 a SWAT callout, correct?
17           MR. LORENZ:  Object to foundation.
18      A.   Yes.
19      Q.   (BY MR. GOLDFARB)  And Mark Hancock put
20 that to the group to help make that decision, correct?
21           MR. LORENZ:  Object to foundation.
22      Q.   (BY MR. GOLDFARB)  He asked for
23 everybody's input, right?
24      A.   Yes.
25      Q.   And he listened to the majority?

298

1       A.   Yes, but it was also told --
2            MR. LORENZ:  Object to foundation.
3       A.   -- told because it was a civil issue and
4  when is SWAT going to get involved in a civil issue.
5  SWAT is not going to show up because two neighbors are
6  arguing what color a fence is, because one is painting
7  it white and one is painting it purple.  That's kind
8  of what a civil issue was coming down to on this.
9       Q.   (BY MR. GOLDFARB)  Who raised the issue
10 of this being a civil issue, so, therefore, SWAT
11 doesn't need to be involved?
12      A.   Because an eviction is a civil issue.
13      Q.   I know, but who raised that during the
14 briefing?
15      A.   I know D.J. brought it up once.
16      Q.   Okay.  When did he bring it up?
17      A.   Sometime in the conversation.
18      Q.   Okay.
19      A.   Just said --
20      Q.   At what point?
21      A.   I don't know.  In the beginning of our
22 conversation about planning.  I don't know.
23      Q.   Okay.  Did you raise that this was a
24 civil issue, so why are we doing all of this?
25      A.   No.

299

1       Q.   Is it fair to say that during the
2  briefing -- well, we can agree that a breach was
3  planned, correct?
4            MR. LORENZ:  Object to form and
5  foundation.
6       A.   Yes.
7       Q.   (BY MR. GOLDFARB)  All right.  At what
8  point during the briefing when you're in the briefing
9  room did you tell Mark Hancock I don't feel
10 comfortable entering Martin Wirth's home?
11      A.   I never said that.
12      Q.   At what point in that briefing room did
13 you tell Mark Hancock I don't feel comfortable with
14 our plan for breaching Martin Wirth's home?
15      A.   I didn't.
16      Q.   Did you ever raise with Mark Hancock,
17 during the briefing, tactically I think we should do
18 something different when it comes to if we have to
19 breach the house?
20      A.   No.
21      Q.   Was the stack planned?
22           MR. LORENZ:  Object to form and
23 foundation.
24      A.   We hadn't -- we planned members for the
25 stack.  We didn't plan how the stack was going to work

300

1  out or who was going to be one, two, three, four.
2       Q.   (BY MR. GOLDFARB)  You didn't plan the
3  order of how people were going to line up, but you
4  knew there was going to be a stack?
5            MR. LORENZ:  Object to the form.
6       A.   Yes.
7       Q.   (BY MR. GOLDFARB)  As you were leaving
8  the briefing room and kitting up, did you go to Mark
9  Hancock and say I don't feel comfortable with our plan
10 for interacting with Martin Wirth?
11      A.   No.
12      Q.   Did you tell him I don't feel comfortable
13 with the plan to breach the residence?
14      A.   No.
15      Q.   En route to the Platte Canyon Fire
16 Department, did you radio any member of the command
17 staff saying Mark Hancock has this plan to breach the
18 residence, I don't feel comfortable with that?
19      A.   No.
20      Q.   Did you radio any fellow deputies in
21 their cars saying what is going on here, we need to
22 put an end to this, we cannot enter this house?
23      A.   No.
24      Q.   When you arrived at Platte Canyon, do you
25 go up to Mark Hancock and say I don't want to enter

75 (Pages 297 to 300)

301

1  this house, I don't feel comfortable?
2      A.  No.
3      Q.  Did you say that you overheard that Ernie
4  was upset with Mark Hancock about SWAT versus patrol
5  and when he learned about the eviction process?
6      A.  Say that again.
7      Q.  Sure.  I wasn't clear what your testimony
8  was earlier today.  When Ernie gets involved in this
9  whole plan, he was upset.  That is what you viewed?
10     A.  He was upset because Captain Hancock knew
11 about it for a while.  And if you're planning
12 something this big -- obviously, he planned it.  There
13 was going to be multiple deputies.  He planned
14 paramedics were going to be there -- Ernie was upset
15 because he wasn't involved in the process of the
16 planning, because now Ernie has got to learn, fly on
17 the spot, what's happening or why we're doing it or
18 what we're doing when he could have been involved from
19 the beginning and been comfortable.
20     Q.  And my question is:  Did you overhear
21 Ernie express that to Mark?
22     A.  Yes.
23     Q.  At that point, after hearing Ernie make
24 that statement to Mark Hancock, did you say, Captain,
25 we need to take a step back, we don't need to do this

302

1  right this minute, I don't feel comfortable with this
2  plan?
3      A.  No.
4      Q.  So that was yet another opportunity you
5  could have stepped in to voice your concerns, correct?
6          MR. LORENZ:  Object to form.
7      A.  Could have been.
8      Q.  (BY MR. GOLDFARB)  Okay.  And then from
9  Platte Canyon, you make your way to the Wirth
10 property, right?
11     A.  Correct.
12     Q.  You went through in great detail with
13 Mr. Schimberg about everyone's movements around the
14 property prior to the breach.  Do you remember going
15 through that whole exercise?
16     A.  Yes.
17     Q.  It's fair to say you did not have any
18 personal interaction with Martin Wirth while he was
19 out on his front deck?
20     A.  Correct.
21     Q.  After the breach occurred, after Martin
22 Wirth was shot and died, did you have an opportunity
23 to actually walk around the property at all?
24     A.  No.  I stayed on that side to Kolby.  I
25 didn't walk around the property.

303

1      Q.  Do you know if there are -- well, you're
2  aware there's that deck area that he came out on,
3  right?
4      A.  Yes.
5      Q.  Do you know if there are stairs that lead
6  from that deck down to the ground level where Mark and
7  Nate were positioned?
8      A.  I was not aware of it at the time.  I
9  later learned there was no stairs.  It was just a
10 patio deck or something.
11     Q.  If Martin Wirth was going to come out of
12 the house to meet any collection of you deputies, is
13 it logical that he was going to go inside to come
14 outside?
15         MR. LORENZ:  Object to form and
16 foundation?
17     A.  Well, yes.
18     Q.  (BY MR. GOLDFARB)  I mean, there are two
19 ways he could come to ground level.  He could jump off
20 of the deck or he could go back in the house and come
21 out a door, right?
22     A.  Yes.
23         MR. LORENZ:  Object to --
24     Q.  (BY MR. GOLDFARB)  My point being is
25 there weren't stairs where he could just walk down to

304

1  where Mark and Nate were, right?
2      A.  At the time I did not know that.  After
3  the fact, that's correct, there was no stairs.
4      Q.  Sitting here today, there were no stairs
5  that you're aware of --
6      A.  Correct.  There was no stairs on that
7  house.
8          MR. LORENZ:  Object to form.
9      Q.  (BY MR. GOLDFARB)  So are you critical,
10 when Martin Wirth went inside, of Mark and Nate moving
11 from their position below the deck to that front door
12 area?  Are you critical of that movement?
13     A.  I didn't watch them.  I had my own thing
14 I had to deal with.
15     Q.  I know.  Sitting here today, are you
16 critical of Mark and Nate moving from below the deck
17 to that front door area?
18         MR. LORENZ:  Object to form and
19 foundation.
20     A.  I don't understand what you mean by
21 "critical."  I'm going to criticize why they did it
22 or . . .
23     Q.  (BY MR. GOLDFARB)  Do you think they
24 should not have moved from their position below the
25 deck to the front door?

Case No. 1:16-cv-03079-MSK-NRN   Document 54-8   filed 03/23/18   USDC Colorado   pg 16 of 16

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

305

1 A. Yeah. I believe they should have stayed
2 put. They should have backed the patrol car out of
3 the driveway and we should have pulled perimeter.
4 That's exactly what I think. There's my critical.
5 Q. Okay. So if it were you, you would not
6 have met the individual at their door if they
7 indicated they were going to come out?
8 MR. LORENZ: Object to form and
9 foundation.
10 A. If they indicated they were going to come
11 out, I would meet them.
12 Q. (BY MR. GOLDFARB) So now let's go back
13 to answering questions about what you knew in the
14 moment. You saw Martin Wirth out on the deck for a
15 moment, correct?
16 A. Yes.
17 Q. As you're making your way around the
18 backside of the home, correct?
19 A. Yes.
20 Q. And you saw him throw his hands up?
21 A. Yes.
22 Q. Okay. You were not present for the
23 interaction that Mark Hancock and Nate Carrigan had
24 with Martin Wirth, correct?
25 MR. LORENZ: Object to form.

306

1 A. I did not hear the conversation.
2 Q. (BY MR. GOLDFARB) Okay. In fact, you
3 were not standing directly next to them during that
4 conversation, correct?
5 A. I was not standing next to them.
6 Q. As you are moving around the back of the
7 house, you don't know what is said between Martin
8 Wirth, Mark Hancock, and Nate Carrigan, correct?
9 A. Correct.
10 Q. Did you see Martin Wirth with a weapon of
11 any kind as you were making your way around the back
12 of the house to your position?
13 A. No.
14 Q. Did you see Martin Wirth acting
15 aggressively in any way, shape, or form as you were
16 making your way around the back of the house?
17 MR. LORENZ: Object to form.
18 A. My belief was the split interaction they
19 had was aggressive. I did not see him throwing things
20 around inside of his house.
21 Q. (BY MR. GOLDFARB) Who, in your view, had
22 more information in the moment about Martin Wirth as
23 he was standing on that deck, yourself, who was making
24 your way around the back of the house, or Mark Hancock
25 and Nate Carrigan, who were actually interacting with

307

1 him?
2 MR. LORENZ: Object to the form and
3 foundation.
4 A. Who had more information that day?
5 Captain Hancock.
6 Q. (BY MR. GOLDFARB) Okay. That's because
7 he's the one actually interacting with Martin Wirth,
8 right?
9 A. He's the one that planned it. I figured
10 he would know a lot more than I would know about him.
11 Q. And you're not there interacting with
12 this individual, correct?
13 A. Correct.
14 Q. So ultimately you are called to that
15 front door, right?
16 A. Yes.
17 Q. So I know that you said back at the fire
18 department Jeremy Lowrance makes a statement about
19 we're not going into the house or something to that
20 effect, right?
21 A. Correct.
22 Q. And Mark says in the affirmative, no,
23 we're not going to go in?
24 A. Yes.
25 Q. But as you're making your way to the

308

1 front and when you get there, who do you see? Who is
2 at the front door?
3 A. Mark Hancock and Nate Carrigan.
4 Q. Okay. And then ultimately Kolby Martin
5 and Jeremy Lowrance joined you, right?
6 A. Correct.
7 Q. And those are all of the people who are
8 on the whiteboard with stars next to their name who
9 are included in the breach party, correct?
10 MR. LORENZ: Object to form.
11 A. I don't understand what a breach party
12 is.
13 Q. (BY MR. GOLDFARB) Okay. Let's go to
14 deposition Exhibit 6 in your binder there. Are you
15 with me?
16 A. Uh-huh.
17 Q. The word "breach" is next to Nate's name,
18 correct?
19 A. Correct.
20 Q. And did you watch as someone wrote the
21 word "breach" next to Nate's name during the briefing?
22 A. Yes.
23 Q. And then you'll see there are stars next
24 to Hancock, Kolby, Travis, Nate, and J Low. Do you
25 see those stars?