1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     KOLBY MARTIN, and TRAVIS THRELKEL,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12   DEPOSITION OF:  MELISSA CARRIGAN - February 16, 2018
     _____
13
                     PURSUANT TO NOTICE, the deposition of
14   MELISSA CARRIGAN was taken on behalf of the Defendant
     Mark Hancock at 501 South Cherry Street, Suite 920,
15   Denver, Colorado 80246, on February 16, 2018, at
     9:08 a.m., before Darcy Curtis, Registered
16   Professional Reporter and Notary Public within
     Colorado.
17

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
800.525.8490   Denver, CO 80203                ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT L**

Case No. 1:16-cv-03079-MSK-NRN   Document 54-12   filed 03/23/18   USDC Colorado   pg 2 of 3

MELISSA CARRIGAN - 2/16/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

69

1 has a gun.
2 Q. And how long have you lived in Park
3 County? Was it 30 years?
4 A. Almost 30 years.
5 Q. Are there other people in your community
6 that you would put into this survivalist, survival-
7 guy-type category?
8 A. Oh, yes.
9 Q. In your opinion, is it known within the
10 community that these types of people exist in Park
11 County?
12 A. Yes.
13 Q. And in discussing Corporal Carrigan's
14 work with him, did he ever express to you that he
15 would come into contact with other people like who we
16 now know to be Martin Wirth --
17 A. Yes.
18 Q. -- during his line of work? Yes?
19 A. Yes.
20 Q. And that's what makes being a law
21 enforcement officer a dangerous job, right?
22 A. Yes.
23     MR. MANDELARIS: Object to form.
24 Q. (BY MR. GOLDFARB) Do you agree with that
25 statement, that there are inherent dangers present in

70

1 working in law enforcement?
2 A. Yes.
3 Q. And can we agree that there are certain
4 people that officers come into contact with that you
5 simply cannot predict what they're going to do?
6 A. Yes.
7 Q. Because sometimes people are irrational?
8 A. Yeah.
9     MR. MANDELARIS: Object to form.
10 Q. (BY MR. GOLDFARB) And sometimes those
11 people can be dangerous?
12     MR. MANDELARIS: Same objection.
13 Q. (BY MR. GOLDFARB) Is that a sentiment
14 that you share with me?
15 A. Yes.
16 Q. As Corporal Carrigan's mother, did you
17 have any concerns when he went into the law
18 enforcement business to begin with?
19 A. Not with Nathan.
20 Q. Did you ever think there's the potential
21 that he doesn't come home that evening?
22 A. Not with Nathan.
23 Q. Are you saying that from your perspective
24 as -- well, you understand that, especially within the
25 last few years, there have been a number of officers

71

1 who have been shot and shot and killed in the line of
2 duty?
3 A. What is the question?
4 Q. Are you aware of these incidents that
5 have occurred over the last call it five years where
6 officers have been shot and killed in the line of
7 duty?
8 A. Yes. I've known two of them.
9 Q. And even within the last few months here,
10 locally there have been several incidents of officers
11 who have been shot and killed in the line of duty,
12 correct?
13 A. Yes.
14 Q. And did you just think that something
15 like that would never happen to your son?
16 A. Not Nathan.
17 Q. Okay. But do you recognize that there
18 was a possibility that it could happen to your son?
19 A. Yes.
20 Q. And that is, in part, what makes being a
21 law enforcement officer such a dangerous job, right?
22 A. Yes.
23 Q. Had Corporal Carrigan ever been involved
24 in a physical altercation as a result of his line of
25 work?

72

1 A. Yes.
2 Q. Did he describe any of those incidents to
3 you?
4 A. Yes.
5 Q. What sorts of altercations was he
6 involved in?
7 A. We had a female trooper that pulled over
8 a car and the man in the car took her gun and her car
9 and called for assistance from the department. And a
10 female deputy -- he wrecked the car and a female
11 deputy wrestled with him and he ended up with both of
12 their guns and Nathan responded and had to tackle the
13 guy to the ground. They didn't tell him that he had
14 both of their guns, but he managed to get the guy.
15 Q. What you're telling me right now, is this
16 the story that Corporal Carrigan told to you?
17 A. Yes.
18 Q. The basic story of how this happened?
19 A. Yes. He was mad. He wrote them up.
20 Q. There are just a couple of details I want
21 to get straight. So he was not informed that this
22 individual had forcibly taken both of the other
23 deputies' guns from them prior to responding to the
24 scene?
25 A. Right.

18 (Pages 69 to 72)

Case No. 1:16-cv-03079-MSK-NRN   Document 54-12   filed 03/23/18   USDC Colorado   pg 3 of 3

MELISSA CARRIGAN - 2/16/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

109

1   their testimony that it was contemplated that Corporal
2   Carrigan would be the breacher.  Do you remember that?
3       A.  Yes.
4       Q.  And then you'll also remember -- you'll
5   see those stars next to certain names there, right?
6       A.  (Deponent nodded head up and down.)
7       Q.  Yes?
8       A.  Yes.
9       Q.  You'll also remember all of the
10  deposition testimony that equated the stars being next
11  to the names to those who ultimately played a role in
12  entering into Martin Wirth's home.  Do you remember
13  seeing that testimony?
14      A.  I don't remember seeing any testimony
15  except Hancock saying that he entered the house.  He
16  was not in the stack according to all of the other
17  testimonies.  That is one of my main questions, where
18  was he.
19      Q.  Did you read the portion of Kolby
20  Martin's deposition transcript where the team is
21  stacked up waiting to go into the house and he didn't
22  speak up and say this is a bad idea?
23          MR. MANDELARIS:  Foundation.
24      A.  Yes.
25      Q.  (BY MR. GOLDFARB)  That was an

110

1   opportunity for somebody to say something, right?
2       A.  Yes.
3       Q.  And did you read the portion of Travis
4   Threlkel's deposition transcript where he testified to
5   the same thing, he had an opportunity to say something
6   and never did?
7           MR. MANDELARIS:  Form.
8       A.  Yes.
9       Q.  (BY MR. GOLDFARB)  So that's at least
10  three people who could have said something but they
11  didn't, right?
12      A.  Yes.
13      Q.  Does that trouble you, that no one
14  stepped up to say I don't feel comfortable with this?
15      A.  No.
16      Q.  Okay.  What was Corporal Carrigan's
17  relationship with Mark Hancock like as far as you're
18  aware?
19      A.  It wasn't a good one.  He didn't trust
20  the man.  He had a saying, never turn your back on
21  Hancock.
22      Q.  So if others have characterized their
23  relationship as being like a mentor/mentee
24  relationship, those would just be lies?
25      A.  Yes.  Nathan would also say the man would

111

1   make a plan and would not deviate from that plan.  He
2   was frustrated when they coached football because
3   Hancock had made his plan, and if he would have
4   changed it just a little bit, they would have won the
5   game.  But to quote Nate, he said the man could not
6   take a dump if it wasn't in his plan.
7       Q.  On February 24, 2016, do you believe it
8   was Mark Hancock's intent to emotionally harm Corporal
9   Carrigan?
10          MR. MANDELARIS:  Form and foundation.
11      A.  Not his intent, no.
12      Q.  (BY MR. GOLDFARB)  Do you believe it was
13  Mark Hancock's intent to terrorize Corporal Carrigan?
14          MR. MANDELARIS:  Same objection.
15      A.  No.
16      Q.  (BY MR. GOLDFARB)  Do you believe it was
17  Mark Hancock's intent to physically harm Corporal
18  Carrigan?
19          MR. MANDELARIS:  Same objection.
20      A.  No, not his intent.
21      Q.  (BY MR. GOLDFARB)  Do you believe that it
22  was Mark Hancock's intent to have your son be killed
23  as a result of entering into Martin Wirth's home?
24          MR. MANDELARIS:  Same objection.
25      A.  No.

112

1       Q.  (BY MR. GOLDFARB)  Have you had any
2   conversations with Welles Tonjes since you gave your
3   TV interviews about this incident?
4       A.  Once.
5       Q.  When did that occur?
6       A.  Gosh.  I don't know.  Maybe a year later.
7       Q.  What did you all talk about?
8       A.  He wanted to apologize.
9       Q.  For what?
10      A.  For the loss of my son.
11      Q.  So what did he say to you about that?
12      A.  That he loved Nate like a son.  And I
13  know that's true, because Nate talked fondly of
14  Tonjes.  Nate used to babysit for Tonjes.  So that's
15  basically it.
16      Q.  Since those TV interviews, have you had
17  any conversations with Monte Gore about this incident?
18      A.  No.  I've never had a conversation with
19  Monte Gore.
20      Q.  Any reason why?
21      A.  Previous history.
22      Q.  Like what?
23      A.  There was a case prior regarding some
24  horses and my husband was involved in that.
25      Q.  And was this a criminal case?  Why was

**EXHIBIT L**