1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     KOLBY MARTIN, and TRAVIS THRELKEL,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12   DEPOSITION OF:  DAN MONTGOMERY  - March 6, 2018
     _____
13
                  PURSUANT TO NOTICE, the deposition of
14   DAN MONTGOMERY was taken on behalf of the Defendant
     Park County Sheriff's Office and Sheriff Fred Wegener
15   at 501 South Cherry Street, Suite 920, Denver,
     Colorado 80246, on March 6, 2018, at 9:36 a.m., before
16   Darcy Curtis, Registered Professional Reporter and
     Notary Public within Colorado.
17

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

**EXHIBIT M**

Case No. 1:16-cv-03079-MSK-NRN   Document 54-13   filed 03/23/18   USDC Colorado   pg 2 of 4

DAN MONTGOMERY - 3/6/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

41

1  Springs. I have not been deposed in that case. It's
2  actually scheduled for trial later this year.
3        Q. Who is representing Mr. Brown?
4        A. If the name pops up -- I'm sure it will
5  during this session.
6        Q. Where is that filed?
7        A. U.S. District Court right here in Denver.
8        Q. You've issued a report?
9        A. Yes. The Davies case, which we've talked
10 about, involving a semi-barricaded kind of a
11 situation. There's been a couple of other SWAT cases
12 I've been involved in as an expert witness talking
13 about tactics, degree of force, and that kind of
14 thing.
15       Q. Can you tell us the case names or any --
16       A. I can't. One was in Colorado Springs,
17 and I'm sorry I can't remember the case name. It's
18 been beyond the four years. Another one in New Mexico
19 involving a SWAT entry into a premises. But in both
20 of those cases, they did not involve a barricaded
21 gunman. They were dynamic entries where citizens
22 reportedly were injured. And there may be a couple of
23 others. I just can't recall offhand.
24       Q. Okay. Have you worked on a case
25 factually similar to the one that brings us together

42

1  that informs your opinions that you have set forth in
2  your report?
3        A. I don't understand that question.
4        Q. Have you ever worked on a case with
5  similar fact patterns as we have in our case, an
6  eviction with a fella that doesn't want to come out
7  resulting in shots fired?
8        A. Well, the Davies case. Of course, that's
9  a little different.
10       Q. Yeah.
11       A. This case obviously. Again, I've handled
12 many cases involving SWAT operations, use of force,
13 use of lethal force.
14       Q. I'm not questioning that, Dan.
15       A. Not similar to this case.
16       Q. Okay. It's a pretty unique set of
17 circumstances?
18       A. Yeah. Obviously, whether it's an
19 eviction and they don't want to come out or it's a
20 suspect that doesn't want to come out, the common
21 threat there is you've got people in there that don't
22 want to come out.
23       Q. In terms of the totality of the
24 circumstances, this one is unique, in your experience?
25       A. Unique in what way?

43

1        Q. You haven't provided testimony or
2  consultation in a case factually similar to this one?
3        A. Well, no case would be factually similar
4  to this one. This is highly unusual. A deputy got
5  killed in this case.
6        Q. Yeah. We're well aware of that, Dan.
7  You don't have to worry. There's a lot of sympathy on
8  this side of the case for the Carrigans.
9        A. Yeah. It's a complicated case. Now, as
10 a police chief, my members of my SWAT team handled
11 incidents where sometimes they had to end up killing
12 people. We would review those incidents, but as an
13 expert consultant --
14       Q. Law enforcement work is inherently
15 dangerous, is it not?
16       A. Oh, of course.
17       Q. Going both ways, for citizens and law
18 enforcement officers?
19       A. Yes, it can be.
20       Q. Yeah. The most well-planned, thought-out
21 tactical plan can still end up in tragic results?
22       A. It can, but if your plan is good and your
23 tactics are good and your judgment is good and your
24 emotional control is good, you're increasing the odds
25 of a successful outcome.

44

1        Q. Minimizing the chances of a tragedy but
2  still doesn't prevent it in all cases?
3        A. It can help prevent it, but, no, the
4  bottom line, take ambushes, for example, your tactics
5  and judgment can be perfect, but if you've got a
6  hidden assailant and you don't even know they are
7  there and you're ambushed, not much you can do.
8        Q. Let me catch up. Here is one for you.
9  In your opinion, sir, is a use-of-force matter
10 involving an officer shooting or being shot different
11 or the same as other use-of-force circumstances?
12            MR. LORENZ: Object to form.
13       A. Tim, could you repeat that one more time?
14            MR. SCHIMBERG: Yes, sure.
15            (The last question was read back as
16 follows: "In your opinion, sir, is a use-of-force
17 matter involving an officer shooting or being shot
18 different or the same as other use-of-force
19 circumstances?")
20            MR. LORENZ: Same objection.
21       A. Yes. And I say yes, because we're
22 talking about lethal force and the use of lethal
23 force. And you've got -- down the force spectrum,
24 you've got other types of force that come into play,
25 most often involving less lethal force, but they still

**EXHIBIT M**

Case No. 1:16-cv-03079-MSK-NRN   Document 54-13   filed 03/23/18   USDC Colorado   pg 3 of 4

DAN MONTGOMERY - 3/6/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

241

1  go in and pull him out. We've got a lawful order to
2  evict him, right?
3       A.  Right.
4            MR. LORENZ:  Object to form.
5       A.  You do have a lawful order to evict him.
6       Q.  (BY MR. GOLDFARB)  Sure.  So at that
7  point, let's say that they decide to make an entry
8  into the home.
9       A.  Okay.
10      Q.  Okay.  Does the added two hours,
11 negotiator, an addition of a full SWAT team prevent
12 Martin Wirth from shooting the first person who breaks
13 through the door?
14      A.  No.
15           MR. LORENZ:  Object to form.
16      A.  No.  You're trying to get to a specific
17 calculus here in terms of numbers and actions and you
18 can't.  It's situation specific.  It depends on the
19 circumstances.  Like I said, they could be there for
20 two more days.  But, again, you've got to factor in
21 the fact -- factor in the fact, excuse me -- consider
22 the fact this is a civil eviction.  This is not John
23 Dillinger or Ted Bundy that's wanted.  It's a guy that
24 won't leave the house.  It's a civil situation.
25      Q.  (BY MR. GOLDFARB)  But there is a court

242

1  order allowing them to handle the situation, right?
2            MR. LORENZ:  Object to form.
3       A.  It doesn't supercede officer safety.
4       Q.  (BY MR. GOLDFARB)  But that's --
5       A.  No court order does.
6       Q.  But I thought that's why it was important
7  to use a negotiator and a SWAT team potentially.
8            MR. LORENZ:  Object to form.
9       A.  You try to do that.  That's part of the
10 stage one that I'm talking about, time, talk, and
11 tactics.
12      Q.  (BY MR. GOLDFARB)  Sure.  And I'm saying,
13 in my scenario, we've spent time, we've tried talking,
14 it's now time for tactics.
15      A.  That's a very dangerous and critical
16 decision that you've got to make.  Is it really worth
17 it for a civil eviction?  You've already classified
18 this as a high-risk eviction, a guy who has threatened
19 to kill police officers, it could be the shootout at
20 the O.K. Corral, you've got tactical rifles involved,
21 you're looking at a very dangerous situation.  But so
22 far, you haven't had a crime.
23      Q.  Sure.
24      A.  You've got a civil issue.
25      Q.  So then, in your opinion, would it be

243

1  safe to allow a civilian from, say, the mortgage
2  company to try and effect the eviction?
3       A.  No, not at that point.
4            MR. LORENZ:  Object to form and
5  foundation.
6       A.  Not given the facts the cops knew at that
7  time, no.
8       Q.  (BY MR. GOLDFARB)  When you say given the
9  facts the cops knew at that time, we're talking about
10 the actual facts, the actual incident, correct?
11      A.  That he had threatened to kill a police
12 officer, shootout at the O.K. Corral, and this was
13 going to be a high-risk eviction.
14      Q.  Sure.  We can agree it would not have
15 been safe to allow a lay individual to go up to that
16 door and try and get Mr. Wirth to leave?
17      A.  I don't think so.
18           MR. LORENZ:  Object to form.
19      A.  I think at that point it's a police
20 situation.  SO's handle civil evictions, municipal
21 PD's do not.
22      Q.  (BY MR. GOLDFARB)  If we've got an
23 individual who you wouldn't let a lay individual try
24 and evict out of the home, the only people that can do
25 the job would be the sheriff's office, right?

244

1       A.  Right.
2            MR. LORENZ:  Object to form.
3       Q.  (BY MR. GOLDFARB)  Is it your position
4  then that they should never have gone into that house,
5  that Mr. Wirth could have sat in that home for a year
6  and no one should have gone in to get him?
7            MR. LORENZ:  Object to form.
8       A.  What do you mean, for a year?
9       Q.  (BY MR. GOLDFARB)  Sure.  If they went to
10 the front door and knocked on the front door and
11 Mr. Wirth said I'm not coming out of the house --
12      A.  Okay.
13      Q.  -- you wouldn't allow a lay member of the
14 public to go up and try and get Mr. Wirth to come out;
15 that would be too dangerous, right?
16           MR. LORENZ:  Object to form.
17      A.  Not at that point, no.
18      Q.  (BY MR. GOLDFARB)  That would fall to the
19 sheriff's office to perform that task, correct?
20      A.  That's their job.
21      Q.  So is it your opinion that they should
22 have just left him in the house?
23      A.  They should have what?
24      Q.  Just left Mr. Wirth in the house.
25      A.  They could have.  That was an

Case No. 1:16-cv-03079-MSK-NRN   Document 54-13   filed 03/23/18   USDC Colorado   pg 4 of 4

DAN MONTGOMERY - 3/6/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

245

1 alternative. They could have, yes.
2     Q. For a year?
3     A. Oh, there you go again. You're looking
4 for a specific calculus. I can't give you that.
5     Q. No. I'm just trying to find out --
6     A. It depends. It depends on the
7 circumstances.
8     Q. Sure. I'm just trying to find out what
9 your opinion is, because you have a lawful court order
10 that allows -- so when you're saying time and tactics,
11 I'm trying to find out what you mean by "time."
12     A. It's variable. You're a typical
13 attorney. You're looking for a specific calculus.
14 It's not there. It depends on the circumstances. How
15 many times do I have to say that today?
16     Q. Sure. So what would change in the
17 circumstances to where --
18     A. He decides to go to the grocery store.
19 If you left, you vacated, then take him when he's off
20 of the property. Don't go in.
21     Q. So it's your position then that no matter
22 what, no one should have gone into that home?
23         MR. LORENZ: Object to form.
24     A. At that point in time, no, and I said
25 that how many times today. It was too darn dangerous.

246

1 And you know what, it didn't work out very well, did
2 it, a cop died because they went in.
3     Q. (BY MR. GOLDFARB) And they could have
4 brought the entire Jefferson County SWAT team and
5 someone still could have been shot, right?
6         MR. LORENZ: Object to form.
7     A. You could have brought in the U.S. Marine
8 Corps and somebody could have gotten shot. No
9 question about it. That's a pretty callous way to
10 perceive this. They made -- he made a bad decision to
11 send those guys in given the facts and a deputy died.
12     Q. (BY MR. GOLDFARB) There was nothing that
13 was going to prevent Mr. Wirth from killing someone,
14 correct?
15         MR. LORENZ: Object to form.
16     A. I don't know. I don't know what was
17 going through his mind. At that point in time,
18 something happened because he fired numerous rounds
19 and hit three deputies, killed one, almost killed a
20 second, wounded one, and actually hit four different
21 deputies. There could have been four fatalities at
22 that scene.
23     Q. (BY MR. GOLDFARB) Because the only
24 person that had control over Mr. Wirth was Mr. Wirth
25 himself?

247

1     A. Correct.
2     Q. If you would take a look at Deposition
3 Exhibit 49 for me, please.
4     A. Deposition Exhibit 49. Okay.
5     Q. This is your rebuttal report.
6     A. Okay.
7     Q. If you would take a look at paragraph 9
8 on page 4 --
9     A. Okay.
10     Q. -- here you quote from the CBI interview
11 of Mark Hancock?
12     A. Yes.
13     Q. It's his discussion about, "I really
14 regret that I'm a marine sometimes because I am super
15 aggressive and I don't like to give people the
16 opportunity to plan, fortify, and take us out so I
17 asked a second time I believe," and you go on with the
18 rest of the quote.
19     A. I'm sorry. What paragraph are you in?
20     Q. No. 9.
21     A. I'm sorry. "and I really regret that I'm
22 a marine sometimes because I am super aggressive"?
23     Q. Yes.
24     A. Okay.
25     Q. Are you there with me?

248

1     A. Yes.
2     Q. When did Mark Hancock give this
3 interview?
4     A. Oh, boy. It's in the interview and I've
5 got the Bates numbers there.
6     Q. If I told you he gave that interview the
7 day after the shooting, would you have any reason to
8 dispute that?
9     A. It could have been. As I sit here
10 independently, I can't recall.
11     Q. Sure. Have you ever been shot at?
12     A. No.
13     Q. I'm going to make an assumption, so
14 correct me if I'm wrong, do you know other officers
15 who have been shot at?
16     A. Of course.
17     Q. Can we agree that that's a traumatic
18 experience?
19     A. Would I what?
20     Q. Can we agree being shot at is a traumatic
21 experience?
22     A. Oh, of course. And some people will
23 handle it in a very traumatic way, others may not. It
24 just depends on the individual.
25     Q. In reviewing the various depositions and