IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN, MELISSA CARRIGAN,
KOLBY MARTIN, and TRAVIS THRELKEL,

Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his
official and individual capacity,
and MARK HANCOCK, in his official
and individual capacity,

Defendants.

_____

DEPOSITION OF:   KOLBY MARTIN - October 11, 2017
                 (Confidential Designations Pending)

_____

          PURSUANT TO NOTICE, the deposition of
KOLBY MARTIN was taken on behalf of the Defendants
Park County Sheriff's Office and Sheriff Fred Wegener
at 501 South Cherry Street, Suite 920, Denver,
Colorado 80246, on October 11, 2017, at 9:58 a.m.,
before Darcy Curtis, Registered Professional Reporter
and Notary Public within Colorado.

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 65

20    Q.   When were you accepted on the SWAT team?

21    A.   2006.

22    Q.   Who was the commander then?

23    A.   Captain Hancock.

Wegener and PCSO, Exhibit A

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 71

22          Q.    Okay.   I took your answer to mean that

23    you didn't stop with your training just by going to

24    the school and becoming certified in 2007?

25          A.    No.

**KOLBY MARTIN - 10/11/2017**

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 72

1          Q.     You continued to be educated and trained

2     in SWAT ops?

3          A.     Yes, I did.

4          Q.     Okay.  Some of which occurred at Park

5     County Sheriff's Office?

6          A.     Yes.

7          Q.     Okay.  Chronologically from 2007 walk me

8     through who has been the SWAT instructors that you've

9     taken classes from or training sessions with at Park

10    County Sheriff's Office.

11         A.     Well, different members.  One was Captain

12    Hancock.  The others were -- I'm trying to think of

13    anybody else.  Glen Hardy, that's not currently

14    working with Park County right now.  And a lot of

15    aspects -- it was a training that we just went over

16    repetitively or repeatedly to make sure we're all

17    dialed in or doing the same thing and know what our

18    jobs are.

Wegener and PCSO, Exhibit A

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 128

6        Q.     Were any names given to you?

7        A.     To my knowledge, the one running it was

8    going to be Mark Hancock, the captain.

9        Q.     Where did you get that info?

10       A.     From Tonjes.

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 131

16          Q.    All right.   And you said the what was

17    wrapping up?

18          A.    The briefing of the eviction.

19          Q.    Okay.   And what made you think that?

20          A.    Because people started getting up and

21    starting to grab their stuff and about to walk out the

22    door.

23          Q.    Okay.   And who do you recall being there?

24          A.    Corporal Nate Carrigan, Investigation

25    Corporal D.J. Hannigan, Captain Mark Hancock, Deputy

Wegener and PCSO, Exhibit A

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 132

1     Jeremy Lowrance.

Wegener and PCSO, Exhibit A

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 132

```
 9          Q.    At any time while you were there, did you

10    see the sheriff?

11          A.    Yes, he did come in briefly.

12          Q.    Okay.  After you guys?

13          A.    Yes, he was -- I think it was after us.

14    I can't remember, but I remember seeing him there for

15    a brief moment.

16          Q.    Okay.  So by your observation, he wasn't

17    a participant in this briefing that had been going on?

18          A.    No.
```

Wegener and PCSO, Exhibit A

Page 135

1          Q.    Okay.   Again, I'm trying to get a flavor

2    for when you and Travis walked in.   Did Hancock then

3    take you two guys over to this board and describe what

4    was going to take place?

5          A.    Yes.

6          Q.    Okay.   Tell me about that.   What were you

7    told?

8          A.    He just pointed out who is going what and

9    what's on the board, what channel we're going to be

10   on, what location I was going to go and who I was

11   going to go with, and did the same thing for Travis.

19          **Q.    Okay.   Was there any information shared**

20     **with you about Martin Wirth or the person being**

21     **evicted?**

22          A.    All I remember is something to the effect

23     of if he gets removed, it's going to be some type of

24     shootout and O.K. Corral.

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 145

```
 9          Q.    Okay.  Were there any other SWAT team

10    members other than yourself and Hancock?

11          A.    Travis Threlkel and Jeremy Lowrance.

12          Q.    Okay.  I didn't know about Jeremy.

13          A.    He was, I believe, just about to come on

14    or just came on to the SWAT team.

15          Q.    Okay.  So we have some experienced dudes

16    here, do we not?  We've got a commander in Hancock,

17    correct?

18          A.    Yes.

19          Q.    And he's the commander of SWAT, even

20    though this was just an eviction, right?

21          A.    Yes.

22          Q.    And we had you as a team leader SWAT

23    trained?

24          A.    Uh-huh.

25          Q.    Is that yes?  I'm sorry.
```

Wegener and PCSO, Exhibit A

1          A.    Yes.   I'm sorry.

2              Q.    No, that's fine.   Travis and Jeremy.   And

3     Nate has spent several years with the sheriff's

4     office, correct?

5              A.    Yes.

5          Q.    **Reading through there as we did, would**

6    **you agree with me there's no order or directive by**

7    **Sheriff Wegener to breach and enter the residence?**

8               MR. ELKUS:  Objection.  Lack of

9    foundation or foundation and form of the question.  Go

10   ahead.

11              MR. SCHIMBERG:  He's got the information

12   right in front of him.

13              MR. ELKUS:  Well, asked and answered,

14   too, but go ahead.

15        A.    No, I don't consider it a direct order,

16   but it is basically an order or a copying of an order

17   that we're going to go inside the residence, correct.

18   Yes.

19        Q.    **(BY MR. SCHIMBERG)  But you agree with me**

20   **that's not an order, breach?**

21              MR. ELKUS:  Objection.  The document

22   speaks for itself, but go ahead.

23        A.    You know, like it says, Copy, breach the

24   door or breaching the door, as in he's confirming that

25   the order has been given.

Wegener and PCSO, Exhibit A

Page 217

1    Q.   (BY MR. SCHIMBERG)   And the order has

2  been given by someone other than the sheriff, correct?

3        A.   Yes.

4        Q.   In fact, it's in response to "We're going

5  to go through the door," correct?

6        A.   Correct.

7        Q.   You have no thought or fact to suggest

8  that Sheriff Wegener had a purpose in mind to have you

9  get injured, do you?

10            MR. ELKUS:   Objection.   Lack of

11 foundation.  Go ahead.

12       A.   No, I don't believe so.

13       Q.   (BY MR. SCHIMBERG)   You believe he's

14 committed to safety concerns for his officers?

15       A.   I would hope so.

16       Q.   Yeah.   No information or thought that he

17 intentionally wanted any of you guys to be injured?

18            MR. ELKUS:   Objection to the form of the

19 question.

20       A.   I don't think he had an intention of

21 anything to happen that day.

Wegener and PCSO, Exhibit A

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 244

19        Q.    Okay.  So let me see if I understand.  Do

20    you think there's something faulty or inadequate about

21    the procedure -- I mean the policy or procedure

22    itself, or is your beef with the decision-making that

23    should have followed those procedures and policies?

24            MR. ELKUS:  Object to the form of the

25    question, but go ahead, if you understand it.

Wegener and PCSO, Exhibit A

Page 245

1          A.   I understand.   I'm just --

2    decision-making on how it was handled that day that

3    conflicted to policy.

4          Q.   (BY MR. SCHIMBERG)   Okay.   So is it your

5    opinion that had the policies been followed, this

6    would not have happened?

7          A.   Yes.

8          Q.   So you're not critical of the policy and

9    its contents; you're critical of how this eviction was

10   effectuated?

11         A.   Correct.

Wegener and PCSO, Exhibit A

3        **Q.   Okay.  So you personally assist in the**

4  **development of training for the PCSO SWAT or at least**

5  **you did when you're on SWAT?**

6        A.   I have done a couple of trainings and

7  I've led a couple of trainings, yes.

8        **Q.   Okay.  Can you think of any?**

9        A.   One was bus assaults.

10       **Q.   Bus?**

11       A.   Bus, like a school bus or a regular

12  commercial, like RTD bus assaults.  And also, you

13  know, basically entries into a residence or an

14  occupied structure or anything to that effect.

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 258

19        Q.    It goes without saying, I guess, police

20    work is high risk, isn't it?

21        A.    Yes.

22        Q.    It's inherently risky, isn't it?

23        A.    Yes, it is.

24        Q.    Even a mundane traffic stop, you're not

25    sure what's going to happen?

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 259

1      A.   Correct.

2      Q.   Again, we hope for the best, prepare for

3   the worst?

4      A.   Yep.

Wegener and PCSO, Exhibit A

25        Q.    I was a bit unclear.    You talked about

Wegener and PCSO, Exhibit A

KOLBY MARTIN - 10/11/2017

Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 280

1    your attending the SWAT school with Colorado Springs.

2    Did you receive a specific certification as a result

3    of that training?

4              A.   Yeah.   It was -- I'm not sure exactly

5    what the certificate said, but it stated 40 hours of

6    SWAT training via the Colorado Springs Police

7    Department.

Wegener and PCSO, Exhibit A

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 304

22          Q.    (BY MR. GOLDFARB)  When you entered into

23    that home, you were acting in the course and scope of

24    your employment as a sheriff's deputy with the Park

25    County Sheriff's Office, correct?

Wegener and PCSO, Exhibit A

**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

1          A.    Yes, I was.

Wegener and PCSO, Exhibit A