IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

_____

ESTATE OF NATE CARRIGAN, JOHN CARRIGAN, MELISSA
CARRIGAN and KOLBY MARTIN,

Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE, SHERIFF FRED WEGENER, in
his official and individual capacity, and MARK
HANCOCK, in his official and individual capacity,

Defendants.

_____

DEPOSITION OF:  MARK HANCOCK - August 28, 2017

_____

        PURSUANT TO NOTICE, the deposition of MARK
HANCOCK was taken on behalf of the Plaintiffs at 501
South Cherry Street, Suite 920, Denver, Colorado
80246, on August 28, 2017, commencing at 10:00 a.m.,
before Melanie L. Giamarco, Registered Professional
Reporter, Certified Realtime Reporter, and Notary
Public within Colorado.

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 20

15          Q.    And I'm correct in saying that during your

16    tenure with Park County, you were a SWAT commander; is

17    that right?

18          A.    No.

19          Q.    You were never a SWAT commander at --

20          A.    Yes, I was a SWAT commander, but for my

21    entire time, I believe I was a SWAT commander for

22    maybe eight, ten years.

23          Q.    Okay.  So what years were you SWAT

24    commander at Park County?

25          A.    From approximately the time I was a

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 21

1   lieutenant until I -- just before I retired.

2        Q.   So during that approximately 11- or 12-year

3   period of time, did you go to any type of schooling or

4   training to become SWAT commander?

5        A.   Yes, I did.

6        Q.   All right.  So let's walk through that.

7        A.   Okay.

8        Q.   What schooling or training did you receive

9   to become SWAT commander?

10       A.   For SWAT commander, I went to a high-risk

11  tactical-planning school.  I went to team leader and

12  commander, more like a seminar, in Cripple Creek.  And

13  I believe there was one other, but it came later, and

14  that was a high-risk briefing and tactical-planning

15  school in Lakewood.

16       Q.   Now, that was the schooling you received as

17  SWAT commander; is that correct?

18       A.   Yes.

19       Q.   Did you receive any training or schooling

20  to be on SWAT?

21       A.   Yes, I did.

22       Q.   And when did you receive that?

23       A.   Ninety -- I believe it was 1999.  And that

24  was from the FBI.  Mr. Saxton and another associate

25  came down and did a two-week course in Park County for

Wegener and PCSO, Exhibit C

Page 22

1    us.

2         Q.    So have you been on SWAT starting in 1999

3    until you left Park County around 2017?

4         A.    Just prior to leaving, yes.

8      Q.   So you would do training on breaching once

9   a month?

10      A.   No, not always breaching, but we would set

11   up a schedule for a year, and in that year, there

12   would be breaching training.

13      Q.   And how would you get the information to

14   provide to your staff on SWAT training?

15      A.   On SWAT -- how would I get the --

16   basically, on experience and training that I had had,

17   and drawing from their experience, we would all sit

18   down and make the schedule a year in advance.  And so

19   we'd figure out who had the experience and what types

20   of training, and they would put that on throughout the

21   year.  So if it was medical, those guys would put it

22   on.  If it was breaching or shooting, I would do it.

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 29

14          Q.    Now, Mr. Hancock, please walk through for

15     me your job duties while you were a captain for Park

16     County.

17          A.    My job duties were to command and control

18     the patrol division and victim's-advocate division

19     and, you know, organize the day-to-day operations of

20     the patrol and victim's-advocate divisions, supervise

21     them.

16          A.   When you say "training," what that means to

17     me is, you know, by doing it.  We've done it several

18     times.  We trained on how to do that.  And when you

19     say entering into a dwelling after a breach, that's

20     also a standard patrol tactic that you use on patrol.

21     So just about every officer that I had was trained on

22     entering a residence after breaching a door.

```
 9        Q.    Who was the officer in charge in regards to

10    the operation of evicting Martin Wirth?

11        A.    Me.

12        Q.    And for purposes of the record, what does

13    it mean to be an officer in charge for a tactical

14    operation?

15        A.    To oversee the operation and lend a plan

16    and designate where officers are going to be and

17    assignments to officers in regard to the action that

18    we're going to take.
```

23        Q.    And you were the person who was in charge

24    of the tactical operations, right?

25        A.    Yes.

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 100

```
 8        A.    I know that Sergeant Tonjes had prior

 9   knowledge of the eviction and was working with

10   Corporal Carrigan on when that was going to occur.

11        Q.    When what was going to occur?

12        A.    The eviction.

13        Q.    Did they communicate that to you?

14        A.    When it was going to occur?

15        Q.    Yeah.

16        A..   No, Corporal Carrigan did.   Sergeant Tonjes

17   didn't.

18        Q.    And how did Corporal Carrigan communicate

19   when the eviction would occur?

20        A.    I believe it was -- it might have been the

21   Friday before or the Monday or Tuesday -- I believe

22   Monday, maybe, where he said, you know, that's the

23   date that they're doing the eviction, and he could use

24   some help with it.   And I said, "I'll certainly help

25   with it."
```

Wegener and PCSO, Exhibit C

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 137

h, right?

```
13        Q.    Now, Mr. Hancock, you attended the
14   February 24th briefing regarding the eviction of
15   Martin Wirth; is that right?
16        A.    Yes.
```

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 138

20      Q.   And who was the person leading the briefing

21   regarding the eviction of Mr. Wirth?

22      A.   Leading the briefing?

23      Q.   Yeah.

24      A.   Me.

25      Q.   And why were you leading the briefing?

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Wegener and PCSO, Exhibit C

Page 139

```
 1        A.    Just a senior officer and kind of where I

 2   was standing and Nate was sitting, D.J. was sitting,

 3   so it just -- it just happened that way.  It doesn't

 4   necessarily -- it didn't necessarily always happen

 5   that way.  Sometimes I would show up late and insert

 6   myself in their plan, and they would lead the

 7   briefing, but that day, it just happened to be me.

 8        Q.    And am I correct in saying that you were

 9   the officer in charge for the eviction of Mr. Wirth?

10        A.    Yes.

11        Q.    And who appointed you the officer in charge

12   of the eviction of Mr. Wirth?

13        A.    I think I appointed myself as being the

14   captain, the patrol captain, and the senior officer,

15   but it wasn't -- it's not an appointed thing.  It's

16   just, you know, when you show up and you're the

17   captain, you're in charge.
```

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 143

11        A.    Not really.   I mean, they have experience.

12   Kolby Martin's a team leader.   They certainly

13   understood what their mission was that day.   And as

14   they have done on other calls, they would be able to

15   make those -- make those calls on their own.

Wegener and PCSO, Exhibit C

16    Q.    Okay.  And who were those officers?

17        A.    Nate Carrigan was to breach the door and

18    move out of the way.  The entry officers were going to

19    be Travis, Kolby Martin and myself.

20        Q.    And was that decided at the briefing who

21    would be the breaching officers?

22        A.    Yes.

23        Q.    And why were those officers specifically

24    selected to be the breaching officers?

25        A.    We were all SWAT officers, so more training

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 145

1  on entry.  And they're more experienced officers.  And

2  we felt more comfortable with that being the people

3  that were going to do that if we needed --

4      Q.   Was there a plan -- I'm sorry.  Go ahead.

5      A.   If we needed to.

Page 215

```
10          Q.   -- briefly, because looking at Exhibit 6,
11   you've identified Kolby Martin, Travis Threlkel, Nate
12   Carrigan and Jay Lowrance.
13          A.   Lowrance, yeah.
14          Q.   It was the understanding that those four
15   were going to be breach entry team; is that right?
16          A.   With me.
```

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 216

16        A.    Okay.   To come to the front of the

17    residence, it had already been dictated who would do

18    that.   And so when Nate and I started toward the front

19    of the residence up the hill, you know, those people

20    would come to the door.

21        Q.    So was the plan put in place that as you

22    and Nate Carrigan were walking to the door to talk to

23    Mr. Wirth, that the other officers that were

24    identified as the breaching officers, they knew to

25    walk up to the front door with you?

Wegener and PCSO, Exhibit C

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 217

1        A.    Yes.

2        **Q.    That was the plan --**

3        A.    To get up there, yes.

4        **Q.    That was the plan?**

5        A.    Yes.

6        **Q.    And that was a plan that you created during**

7    **the briefing; is that correct?**

8        A.    Yes.

Wegener and PCSO, Exhibit C

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 221

6          Did you understand on February 24th, 2016,

7     that as this operation was going down to evict Martin

8     Wirth, there's Sheriff Wegener who was going to be

9     leaving the county?

10        A.    Yes.

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 224

20          Q.   Now, starting on line 10, staying on

21   page 12, you said, "Talked to him on the deck.  He was

22   leaning over the rail talking to Nate and then Nate

23   said, Mr. Wirth, you know, we're here to serve the

24   eviction and I was still struggling to get up to Nate

25   and then I heard him say something as he turned to the

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 225

1    effect of, you know, you're not even going to give me

2    time to move my stuff out and, you know, I wanted to

3    say at the time of course we'll give you time to move

4    your stuff out, you know."

5              So I want to talk about that.  So when Wirth

6    stated, "You know, you're not even going to give me

7    time to move my stuff out," what was his demeanor like

8    when he said that?

9         A.   Leaning over the rail, looking down on us

10   from the deck, and calm.  Seemed calm.

11        Q.   And then -- okay.  So he wasn't -- in your

12   mind, he wasn't agitated?

13        A.   No.

14        Q.   Wasn't threatening?

15        A.   Not at all.

16        Q.   Okay.  And then he went back into the house

17   at that point in time?

18        A.   He walked back into the house, yes.

19        Q.   Didn't slam the door?

20        A.   No.

21        Q.   Did you think he was threatening at that

22   point in time?

23        A.   No, I didn't.  I thought he was coming to

24   the front door, actually.

25        Q.   Well, okay.  So let me understand.  So he's

Wegener and PCSO, Exhibit C

1    on the -- when you -- when Nate was talking to him,

2    was Nate at the front door?

3         A.    No, we were down, outside in front of our

4    vehicles looking up at the deck at him.

5         Q.    So that's when Mr. Wirth was out there on

6    his deck?

7         A.    Yes.

8         Q.    And Nate was -- Nate was speaking to him

9    from the car?

10        A.    In front of the cars, yes.

11        Q.    In front of the car?

12        A.    Yes.

13        Q.    Was he yelling up at him, talking to him?

14        A.    No, it was -- you could hear the

15    conversation.  It wasn't loud.

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 245

```
 7        Q.    Right.   But did you understand that by the

 8   Sheriff pulling up on scene that he was relieving you

 9   as being the OIC?

10        A.    No, I just stated that I saw or heard him

11   pull up on scene.
```

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Wegener and PCSO, Exhibit C

Page 260

```
 7        Q.    And I think you may have testified to this,

 8   Mr. Hancock, so I apologize, but who specifically gave

 9   the order to breach the residence?

10        A.    Well, I told Nate to take the door.

11        Q.    So it's -- you are the individual that gave

12   the order for Mr. Carrigan to enter the residence,

13   correct?

14        A.    Yes.
```

Wegener and PCSO, Exhibit C