IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN, MELISSA CARRIGAN,
KOLBY MARTIN, and TRAVIS THRELKEL,

Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his
official and individual capacity,
and MARK HANCOCK, in his official
and individual capacity,

Defendants.

_____

DEPOSITION OF:   TRAVIS JAMES THRELKEL
                 January 5, 2018

_____

        PURSUANT TO NOTICE, the deposition of
TRAVIS JAMES THRELKEL was taken on behalf of the
Defendants Park County Sheriff's Office and Sheriff
Fred Wegener at 501 South Cherry Street, Suite 920,
Denver, Colorado 80246, on January 5, 2018, at
9:36 a.m., before Darcy Curtis, Registered
Professional Reporter and Notary Public within
Colorado.

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

19          Q.    You became a member of the SWAT team as

20     well, didn't you, Travis?

21          A.    Yes.

22          Q.    And I understand that occurred -- well,

23     I'll just ask you -- late 2015, December of '15?  Do

24     you know?

25          A.    I was training for and I think I was part

Wegener and PCSO, Exhibit E

Page 61

1    of the team in January, because it was over a hundred

2    hours of basic training.  That was usually one

3    Wednesday a month for eight hours, eight to ten hours.

4            Q.    Now, to get on the SWAT team -- not

5    everybody gets on the SWAT team, right?

6            A.    Correct.

7            Q.    Okay.  Is it something you apply for or

8    are you asked if you want to?  What was your

9    experience?

10           A.    It was both.

11           Q.    Okay.  Something you wanted to do?

12           A.    Yes.  I wanted the training, because I

13   believed it could help me over my overall everyday

14   practice as a law enforcement officer.

15           Q.    Do you think it did?

16           A.    I think it did.

17           Q.    All right.  Did someone walk up to you

18   and say, Travis, we like your work, we would like to

19   have you on the team, something like that?

20           A.    I can't recall.

21           Q.    Okay.  Do you have to test to get in?

22           A.    No.

23           Q.    But you do have to go through, at a

24   minimum, a hundred hours of training?

25           A.    Yes.

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 64

```
21          Q.   Okay.  Did anybody else -- after you got

22   on to the SWAT team, did anyone else in the agency

23   apply and get on the SWAT team?

24          A.   I believe later on.

25          Q.   Who was that?
```

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 65

```
1          A.    I know Jeremy Lowrance joined the team

2     along with Deputy Maloney.   I don't remember his first
```

21          Q.    Explain that to me.   First of all, who

22    raised the idea at the briefing?

23          A.    Captain Hancock.   He asked if we should

24    have the SWAT team there or if we should call SWAT out

25    for that.

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 68

1      Q.   So he brought it up?

2      A.   Yes.

3      Q.   And he was the SWAT commander at the

4  time?

5      A.   Yes.

6      Q.   As well as being a captain of the patrol

7  division?

8      A.   Yes.

9      Q.   Okay.  So I need to have you flesh that

10 out.  So he asked those that were in attendance at the

11 briefing whether or not it should be a SWAT operation?

12     A.   Yes.

13     Q.   What do you recall specifically Mark

14 saying or asking?

15     A.   What do you guys think?  There was D.J.

16 Hannigan, myself, Kolby Martin, Deputy Lowrance, and

17 Corporal Carrigan in the room.  And it was just kind

18 of -- he threw it out there as the idea.  I think the

19 majority ruled that they would rather not call out

20 SWAT.

21     Q.   Do you recall anybody -- you say majority

22 ruled, which I infer there was somebody that thought

23 there should be a SWAT callout; is that right?  Did

24 anybody speak up?

25     A.   I think it was Kolby.

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 69

1      Q.    Kolby.  Do you have a specific

2   recollection of anything Kolby specifically said?

3      A.    Of what?  I guess I don't understand.

4      Q.    Well, it sounds like there was a vote or

5   Mark looked for consensus amongst you, D.J., Kolby,

6   Jeremy, and Nate, and you said Kolby Martin said it

7   should be.  Do you remember what he said specifically?

8      A.    No.

9      Q.    Okay.  Did you speak up at the time?

10      A.    I felt that it should have been SWAT.

11      Q.    That's not my question, though.  Did you

12   speak up?

13      A.    Yes.  I said yes.

14      Q.    What did you specifically say?

15      A.    I said yes.

16      Q.    That's it, just yes?  Did you give any

17   reasons why or why not?

18      A.    I didn't give a reason.

19      Q.    All right.  So that tells me that D.J.,

20   Nate, and Jeremy didn't think it was necessary?

21          MR. LORENZ:  Object to foundation.

22      A.    I can't speak for them, so I don't know.

23      Q.    (BY MR. SCHIMBERG)  Well, what did they

24   say?  What do you recall?

25      A.    I know Lowrance was on the fence about

Wegener and PCSO, Exhibit E

Page 70

1    it.

2             Q.    **And what gives you that knowledge?**

3             A.    Because of his body language and his yes,

4    no, no, I don't think so type of attitude.

5             Q.    **All right.  What do you recall about**

6    **D.J., anything that he offered?**

7             A.    He was borderline on the fence with it as

8    well.  He was unsure.

9             Q.    **Okay.  And Nate?**

10            A.    Nate was against the idea.

11            Q.    **Did he give any reasons that you recall**

12   **for why he was against it?**

13            A.    Just his experience and time.

14            Q.    **Okay.  And how about Mark?  Did he make**

15   **any statements about how he felt one way or another?**

16            A.    No.  I think I recall him saying I don't

17   think we need them, referring to the SWAT team.

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 138

14          Q.    These were your first critical incidents

15    that you participated in?

16          A.    Yes.

17          Q.    Did it drive home the idea that your

18    career is inherently dangerous?

19                MR. LORENZ:   Object to the form.

20          A.    I already understood my job was

21    inherently dangerous.

22          Q.    (BY MR. SCHIMBERG)   I guess we found that

23    out yet again this weekend, didn't we?

24          A.    Unfortunately.

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 140

22          Q.    Okay.    Because in February you at least

23     had a briefing before the eviction was attempted,

24     right?

25          A.    As in the briefing the morning of?

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 141

1        **Q.**   **Yes.**

2        A.    Correct.

**Hunter + Geist, Inc.**
**scheduling@huntergeist.com * 303-832-5966 * 800-525-8490**

Wegener and PCSO, Exhibit E

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 154

```
24    it happened.  I knew Nate knew what the outside of the

25    house looked like because they were driving by before
```

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 155

1    and Nate had originally posted the first 30-day

2    eviction notice on the front gate.   That's where they

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 156

24          Q.    Okay.   Well, who did have command of this

25     eviction?

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 157

1          A.     From what I was told, it was Captain

2     Hancock.

3          **Q.     Okay.   So it made sense he was having the**

4     **conversation?**

5          A.     He was the one putting together,

6     assigning everything to everybody.   He's coming up

7     with the idea, he's coming up with the plan, so he's

8     in control of it.

Wegener and PCSO, Exhibit E

```
 7              And the sheriff walked in.  It was hard

 8   to explain writing it down.  The sheriff was there.

 9   However, he was only there for maybe the last -- I

10   don't know -- five minutes, three minutes at tops he

11   was in that building.  He came in, basically, hey,

12   guys, what's going on?  Hancock is like, hey, this is

13   what we're doing.  This is our plan.  The sheriff is

14   like, okay, so it sounds like you've got a plan.  He

15   goes, I've got a meeting down in Denver.  He goes,

16   I'll see you guys later.
```

Wegener and PCSO, Exhibit E

Page 174

```
 7              And the sheriff walked in.  It was hard
 8    to explain writing it down.  The sheriff was there.
 9    However, he was only there for maybe the last -- I
10    don't know -- five minutes, three minutes at tops he
11    was in that building.  He came in, basically, hey,
12    guys, what's going on?  Hancock is like, hey, this is
13    what we're doing.  This is our plan.  The sheriff is
14    like, okay, so it sounds like you've got a plan.  He
15    goes, I've got a meeting down in Denver.  He goes,
16    I'll see you guys later.
17              Q.    Okay.
```

Page 175

```
15              Q.   -- thoughts?  Okay.  And the sheriff

16    satisfied himself that you guys had a plan and he

17    left?

18              A.   Yes.

19              Q.   Okay.  He didn't participate in the plan

20    itself?

21              A.   No.
```

Wegener and PCSO, Exhibit E

23          **Q.    Where was the sheriff?  Do you know?**

24          A.    The sheriff was supposed to be heading

25    out of town.  Because by that time, he left the

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 180

1   office.  He was gone.

2          Q.   He told you guys he had a meeting down in

3   town, right?

4          A.   Correct.

**Hunter + Geist, Inc.**
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

Wegener and PCSO, Exhibit E

```
14          A.   As soon as we stacked -- once we found

15     out, because Kolby had the light, he stacked first in

16     line and then myself and Lowrance behind me, I could

17     tell -- I couldn't see him.  I couldn't see Martin

18     Wirth in the house.  That's when he's already knocking

19     at the door.  Hancock at this time was knocking,

20     sheriff's office.  And he did it like three times and

21     he told Nate to breach and then he's on the radio with

22     the sheriff.  And I don't know why he called the

23     sheriff, because he's supposed to be going out of

24     town.  But he gets on the radio and asks, do we have

25     permission?  Which I don't understand.  And I know it
```

Page 225

8          Q.    Next line, "Copy, breaching the door,"

9    correct?

10         A.    Correct.  And that probably would have

11   been dispatch understanding or reaffirming.

12         Q.    I'll share with you that copy, breaching

13   the door was by Sheriff Wegener.

14         A.    Or it could have been the sheriff, yeah.

15         Q.    And that just reconfirms, as your word

16   was, someone saying we're going to go through the

17   door.  Do you remember who said that?

18         A.    Hancock.

19         Q.    Okay.  So there's not an order by Sheriff

20   Wegener to breach and go into the door; he says copy,

21   correct?

22         A.    Correct.

Wegener and PCSO, Exhibit E

**TRAVIS JAMES THRELKEL - 1/5/2018**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 248

```
12          Q.    I take it that you don't suggest or have

13    any inkling at all that Fred doesn't care about the

14    safety of his officers?

15          A.    Say that again.

16          Q.    Yeah.  You don't question Fred's

17    allegiance to the safety of his officers?

18          A.    No.  I believe he's doing what he can to

19    protect the people that work for him and protect his

20    community that he serves.

21          Q.    He wouldn't put you in a position that

22    was unreasonably unsafe to you or your colleagues?

23          A.    No.  I don't --
```

Wegener and PCSO, Exhibit E

Page 249

```
1          Q.    (BY MR. SCHIMBERG)   He wouldn't

2   intentionally do that?

3          A.    I don't think he would intentionally do

4   it.
```

Wegener and PCSO, Exhibit E

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 326

12          Q.    Now, do I understand that you don't

13    quibble with the policy itself but rather the

14    execution of the policy?

15              MR. LORENZ:  Object to form.

16          A.    No.  You follow policy, but it's also

17    training on how you interact with -- there is no

18    policy on how -- like dynamic entry, there's no policy

19    written this is how you're going to do it.  It's

20    training on how it happens.  That training then

21    applies to, say, the barricaded suspect.

22          Q.    (BY MR. SCHIMBERG)  Okay.  Let's stop

23    right there.  With barricaded suspect, are you

24    critical of that policy?

25              MR. LORENZ:  Object to the form.

Wegener and PCSO, Exhibit E

Page 327

1        Q.    (BY MR. SCHIMBERG)   Or are you critical

2   of how it applied in this situation?

3             MR. LORENZ:   Object to the form.

4        A.   I am.  We had nothing but time and

5   tactics and none of that was used.

6        Q.    (BY MR. SCHIMBERG)   But the policy

7   itself, you can't sit here today and have a point of

8   criticism with it?

9        A.    Not that I know of.  Even if I looked at

10  it, I . . .

Wegener and PCSO, Exhibit E