Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 1 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 131

```
12             Q.    Okay.  So if I understand you right, you
13    went left to the -- I'll call it patrol room.  Does
14    that work?
15             A.    That will work, yes.
16             Q.    All right.  And you said the what was
17    wrapping up?
18             A.    The briefing of the eviction.
19             Q.    Okay.  And what made you think that?
20             A.    Because people started getting up and
21    starting to grab their stuff and about to walk out the
22    door.
23             Q.    Okay.  And who do you recall being there?
24             A.    Corporal Nate Carrigan, Investigation
25    Corporal D.J. Hannigan, Captain Mark Hancock, Deputy
```

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 2 of 20
KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 132

1  Jeremy Lowrance.
2            MR. ELKUS: Tim.
3            MR. SCHIMBERG: Thanks, Reid.
4            (Interruption in the proceedings.)
5       Q.   (BY MR. SCHIMBERG) All right. Jeremy
6  Lowrance.
7       A.   And I believe that was everybody in the
8  patrol room when me and Travis walked in.
9       Q.   At any time while you were there, did you
10 see the sheriff?
11      A.   Yes, he did come in briefly.
12      Q.   Okay. After you guys?
13      A.   Yes, he was -- I think it was after us.
14 I can't remember, but I remember seeing him there for
15 a brief moment.
16      Q.   Okay. So by your observation, he wasn't
17 a participant in this briefing that had been going on?
18      A.   No.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 3 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 143

8          Q.     (BY MR. SCHIMBERG)  Did that raise any
9   question by you as to, wait a minute, there seems to
10  be kind of a discrepancy here between breach and your
11  comment to whomever it was that asked that question?
12         A.     I never made a comment to anybody in
13  reference to that question.  I just remember the
14  question being asked and the captain stating, no,
15  we're not going inside the residence.
16         Q.     Fair enough.  Thank you.  Do you recall
17  that generating any conversation by anyone else?
18         A.     I believe it did, but I couldn't tell you
19  what the conversation was about.  I just remember that
20  pretty much the short briefing that myself and Travis
21  were involved in was brief with -- no more than a
22  regular briefing would be and then we're all kind of
23  rustling out the door to get equipment and get ourself
24  set up with equipment out of our vehicles.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 4 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 146

1  A. Yes. I'm sorry.

2  Q. No, that's fine. Travis and Jeremy. And
3  Nate has spent several years with the sheriff's
4  office, correct?

5  A. Yes.

6  Q. Okay. So in terms of Sheriff Wegener, do
7  you think it was reasonable for he to rely upon this
8  experienced group of guys to develop a proper plan?

9  A. I believe so, yes.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 5 of 20
KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 150

```
 2       Q.   Did you have any direct conversation with
 3  any of the three Platt Canyon guys there at the scene
 4  or at their facility?
 5       A.   I believe I had a conversation with
 6  Ernie, because he expressed his concerns of the reason
 7  why they're being requested to stand by and why there
 8  were so many officers being involved in an eviction.
 9  And he said that this just does not sound right.
10       Q.   Okay.  This was just you two guys off to
11  the side?
12       A.   Yeah.  I want to say briefly before we
13  all started hopping into our vehicles.
14       Q.   You and Ernie are pretty good friends --
15       A.   Yeah.
16       Q.   -- from SWAT trainings?
17       A.   Yes.
18       Q.   Did he say that he was upset about it
19  because they weren't given much notice?
20       A.   Yes.
21       Q.   Okay.  Did he expand on that?
22       A.   I can't remember exactly what me and him
23  talked about.  And I want to say that he also
24  expressed his concerns to Captain Hancock.
25       Q.   You say you want to say that, but did you
```

1  hear him?

2      A.   No, I did not hear him.

```
18        Q.   When it was announced that you were going
19   to be first, did you ask any question like are we
20   really breaching or anything like that or I didn't
21   think we were going in, anything like that?
22        A.   I had thoughts of it, but, no, I did not
23   state it verbally.
24        Q.   Okay.  Did anybody else say anything?
25        A.   Not that I can remember.
```

```
21        Q.    Okay.   Who was the officer in command in
22   this mission?
23        A.    Hancock.
24        Q.    Okay.   I think you answered this earlier,
25   but my understanding is from the time you were called
```

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 9 of 20
KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 206

1  to the door to the time you entered the residence, you

2  never once questioned Mark Hancock as to what we are

3  doing or why are we doing this?

4        A.   No, I did not.

13         **Q.    Looking back on it, do you wish there was**
14   **something else you had done?**
15         A.    Yeah.
16         **Q.    What?**
17         A.    Speak out, speak up and say that --
18   basically saying we shouldn't be here doing this.  It
19   shouldn't go down like this.
20         **Q.    Anything else that you would have, could**
21   **have, should have?**
22         A.    Yeah, just like I said, speak up, speak
23   my mind and not be -- and not have the mindset that
24   I'm going to get in trouble if I do speak my mind.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 11 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 276

1    Q.   (BY MR. GOLDFARB)  In your mind?

2    A.   Sovereign citizens can be dangerous, yes.

3    Q.   Do you know, prior to the February 24,
4    2016, eviction, if there was any sort of notation
5    in -- let me take a step back.

6         If you make contact with a Park County
7    resident who let's say you have to go hands on with
8    them, that they attack you, you have to do a takedown,
9    ultimately take them into custody, and you then go and
10   write up a report.  Is there a way for you to put a
11   notation in your internal system to warn other
12   deputies about that individual that you just had
13   contact with?

14   A.   If I believe it's warranted, yes.

15   Q.   Okay.  Have you ever done that before?

16   A.   Yes, I have.

17   Q.   Do you know of other deputes who have
18   done that?

19   A.   Yes.

20   Q.   Is it -- I hate to use the word "common,"
21   but is it a common practice among deputies to utilize
22   that warning system to help each other out?

23   A.   Yes.

24   Q.   So if you run into someone -- let's say
25   you're doing a traffic stop and you run their

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 12 of 20
KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 277

1    information.  Does the warning pop up on your screen

2    for you, or how do you learn that warning is in the

3    system?

4         A.   If I run somebody on the streets,

5    90 percent of the time I'm running it through my

6    dispatch.  If my dispatch has that information, yeah,

7    then she'll inform me of it.

8         Q.   Can anyone input that warning information

9    into the system?

10        A.   We can put what we call a red flag, red

11   flagging a residence, and also our dispatch, we can

12   have our dispatch red flag that address.

13        Q.   Undersheriff Gore, could he put that

14   information into the system?

15        A.   Yes, he could.

16        Q.   Could Welles Tonjes put information like

17   that into the system?

18        A.   Yes.

19        Q.   Okay.  Do you know if, prior to this

20   eviction, there was anything in the system regarding a

21   warning for deputies who might come into contact with

22   Martin Wirth?

23        A.   I don't believe so.

24        Q.   Prior to February 24, 2016, did you

25   receive any sort of memo, e-mail, text message, any

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 13 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 278

1  sort of written communication from Undersheriff Gore
2  stating that no deputy, by any means, should enter the
3  Wirth home?
4          A.   No, I did not.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 14 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 280

1   your attending the SWAT school with Colorado Springs.

2   Did you receive a specific certification as a result

3   of that training?

4           A.   Yeah.  It was -- I'm not sure exactly

5   what the certificate said, but it stated 40 hours of

6   SWAT training via the Colorado Springs Police

7   Department.

8           Q.   Have you done any SWAT-specific

9   certificate training after that in 2007?

10          A.   No, I have not.

11          Q.   You don't receive certificates when you

12  do Park County SWAT trainings?

13          A.   I take that back.  Like I said before,

14  when we were basically rebuilding our SWAT team and

15  Sergeant Conner and Abrams, Sergeant Abrams, headed up

16  the training aspects, he did basically, if you want to

17  call it, an academy, if you will, but it took a whole

18  entire year to get through that.  And at the end of

19  it, we did get a certificate from Conner and Abrams.

```
22          Q.    You testified earlier you thought it was
23   odd to have medical on standby?
24          A.    Correct.
25          Q.    And you learned that when you got to the
```

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 16 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 291

1  briefing room?

2         A.   Yes.

3         Q.   And if medical is on standby, does that

4  mean that there's the potential for injuries?

5         A.   Yes.

6         Q.   And at that time, you did not voice any

7  concern to Mark Hancock, correct?

8         A.   No, I did not.

9         Q.   All right.  Knowing that there's medical,

10 does that tip you off as to what you maybe should

11 prepare for when you're kitting up?

12        A.   Yes.

13        Q.   And you said that you wore a load-bearing

14 vest?

15        A.   Yes, I did.

16        Q.   Is that something you wear outside of

17 your uniform --

18        A.   Yes.

19        Q.   -- or underneath?

20        A.   It would be over the top of my normal

21 uniform.

22        Q.   Okay.

23             (Deposition Exhibit 33 was marked.)

24        Q.   Do you have 33 there in front of you,

25 sir?

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 17 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 292

1      A.    I'm sorry.  Yes, I do.

2      Q.    Do you recognize the uniform that's

3  depicted on page 1 of Exhibit 33?

4      A.    Yes, I do.

5      Q.    Is that your uniform?

6      A.    That it is.

7      Q.    I should say it's your shirt, right?

8      A.    Yes.  It's my uniform shirt, yes.

9      Q.    You can identify that because there's a

10 CIT badge on there?

11     A.    And the other --

12     Q.    The FTO badge?

13     A.    Correct.

14     Q.    Presumably that's your name plate

15 underneath there?

16     A.    Yeah.  The very bottom one is a name

17 plate, then the gold one is CIT, and the small one

18 next to that is the FTO.  Above that in the silver,

19 that's a Taser instructor badge or pin -- it looks

20 like an actual Taser -- and above that is the SWAT

21 pin.

22     Q.    I'll represent to you these photos in

23 Exhibit 33 were a part of the CBI file.  It's what was

18        Q.   Okay.  And then I think you said that
19   when you saw Mr. Wirth go back inside, that caused you
20   some concern as well?
21        A.   Just a concern as what is he doing, is he
22   actually coming to the front door, or is he coming
23   out, or is he not coming out, what is he going to do.
24        Q.   At that point did you get on the radio
25   and say, Captain, what's he doing, let's fall back?

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 19 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 300

1    A.   No, I did not.

2    Q.   So that's at least the third time that

3 you had an opportunity to say something that you

4 didn't, right?

5         MR. WAGNER:  Object to form.  Foundation.

6    A.   I was following orders and doing my job

7 and being the perimeter.

8    Q.   (BY MR. GOLDFARB)  Again, that's at least

9 the third time now since you and I have been talking

10 that you had an opportunity to say something and

11 didn't, correct?

12   A.   And be insubordinate, no, I wasn't going

13 to say something on the radio.

14   Q.   Let me put it a different way.  At what

15 point leading up to the moment that Martin Wirth went

16 back into his home did you tell Captain Hancock, I'm

17 concerned about my safety?

18   A.   I did not say that.

19   Q.   At what point prior to the moment when

20 Mr. Wirth went back into his home did you tell Captain

21 Hancock, I feel concerned for my fellow deputies'

22 safety?

23   A.   I did not say anything like that.

Case No. 1:16-cv-03079-MSK-NRN   Document 56-1   filed 03/29/18   USDC Colorado   pg 20 of 20

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 306

```
 4         Q.   When you were standing at the front door,
 5   did you radio Sergeant Tonjes and say, this doesn't
 6   feel right, I don't want to go into this house?
 7         A.   That would be jumping chain of command.
 8         Q.   Did you radio anyone when you were
 9   standing at the front door?
10         A.   Dave Leffler.
11         Q.   That was asking him to come up from his
12   position, right?
13         A.   Correct.
14         Q.   Did you tell Dave Leffler that you didn't
15   want to go in the house?
16         A.   No, I did not.
17         Q.   You didn't tell anyone that you didn't
18   want to go in the house?
19         A.   No, I did not.
```