**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. : 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN,
MELISSA CARRIGAN, and
KOLBY MARTIN
TRAVIS THRELKEL

        Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual capacity, and
MARK HANCOCK, in his official and individual capacity,

        Defendant.

_____

**PLAINTIFFS' RESPONSE TO DEFENDANT MARK HANCOCK'S MOTION FOR
SUMMARY JUDGMENT (DOC. NO. 54)**
_____

        Plaintiffs, by and through their undersigned counsel, respond in opposition to Defendant

Mark Hancock's Motion for Summary Judgment (Doc. No. 54) (the "Hancock Motion" or

"Hancock's Motion") as follows:

## INTRODUCTION

        Law enforcement officers are often faced with dynamic emergency situations that require

split-second decisions.  This, however, is not such a case.

        On February 24, 2016, Defendant Mark Hancock was a Captain with the Park County

Sheriff's Office ("PCSO").  On that day Hancock and several other officers, including Nate

Carrigan, Kolby Martin, and Travis Threlkel, went to the residence of Martin Wirth to carry out an eviction.  After a confrontation between Wirth and the officers, Wirth went back into his residence and did not answer the officers' knocks on the door.  At this point, Hancock was faced with a decision of what to do next.  Hancock himself admits that there was no emergency at this point, and no one was in danger.  The officers were there to conduct an eviction, which is not a criminal matter.  Wirth was not suspected of any crime, nor was he fleeing from a crime scene.  In spite of this, Hancock ordered the other officers to breach the residence with guns, including rifles, drawn.  At that point Wirth shot at the officers, injuring Martin and Threlkel,[1] and killing Carrigan.  Wirth was also killed in the shootout.

One of the questions before the Court is whether Hancock's conduct, which directly led to the Plaintiffs' injuries, shocks the conscience.  Before answering that question, there is more to the story that must be considered.

Prior to the Wirth eviction, Hancock met with Undersheriff Monte Gore, Hancock's superior officer, regarding the specifics of the eviction.  Gore warned Hancock of the danger posed by Wirth, and Hancock agreed after conducting his own threat assessment of Wirth.  Hancock knew that Wirth, barely a month before the eviction, had threatened to shoot law enforcement officers.  Gore's warning to Hancock was not of a generalized danger.  Rather, Gore specifically warned that Wirth was homicidal and suicidal, and would try to shoot law enforcement officers in the process of committing "suicide by cop."  One of the subjects discussed was the likelihood that Wirth would retreat back into the residence and refuse to come out.  Gore gave Hancock a direct order: do not enter the Wirth residence under any circumstance.

---

[1] Threlkel did not receive any physical injuries during the Wirth eviction.

The plan for the eviction was that if Wirth went back into his residence, the officers would withdraw to the perimeter of the property and Hancock was to call Gore to assess what would be done next.  On the morning of the eviction, Hancock assured the officers that they would not be breaching the residence.  Later that day, the very situation they had planned for arose: Wirth retreated into his residence.  With no emergency, no danger to anyone's life, and a violent individual waiting inside the house, Hancock needed to do no more than follow the plan for this foreseeable circumstance.  Instead, he disregarded the safety of everyone involved and inexplicably ordered the other officers to breach the residence.  Hancock violated a direct order, PCSO policy, the tactical plan previously devised, his own training and experience, and the most fundamental tenets of law enforcement.  This led directly to the outcome he was warned about: serious injury and loss of life.  Such egregiously reckless conduct is truly conscience-shocking.

### CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT[2]

**A.    Affirmative Defense of Qualified Immunity by Hancock in his Individual Capacity**

1.    Burden of proof

Plaintiffs do not dispute that they bear the burden after Hancock raises the qualified immunity defense.

2.    Elements of qualified immunity

Plaintiffs do not dispute that, to overcome the qualified immunity defense, they must show: "'(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct.'"

---

[2] Plaintiffs will address the factual allegations made in Hancock's "Chronological Summary of Facts" as they apply to the specific claims and defenses below.

*Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (*quoting Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014)).

3.   <u>Both elements are satisfied and, therefore, Hancock is not entitled to qualified immunity</u>

    i.    *Hancock's actions violated a federal constitutional or statutory right*

        a.    ***Collins* does not bar all Due Process claims related to employment**

Hancock's argument that *Collins v. City of Harker Heights* "does not extend to guarantee employees a safe work environment" (Hancock Motion at 10) is irrelevant to the issues before this Court because Plaintiffs' claims in this action are not the same as the claim at issue in *Collins*.  The *Collins* court held that

the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace and the city's alleged failure to train or to warn its sanitation department employees was not arbitrary in a constitutional sense.

*Collins v. City of Harker Heights*, 503 U.S. 115, 130 (1992).  Here, Plaintiffs do not allege liability solely based on a failure to provide a safe workplace.  Because Plaintiffs' claims go beyond the generality of the claims at issue in *Collins*, and Plaintiffs' claims go to affirmative conduct by state actors, *Collins* does not apply.

Hancock contends that *Collins* stands for a broad prohibition against constitutional claims if they arise from an employment context.  (*See* Hancock Motion at 11.)  The *Collins* court did not make any ruling that could be read so broadly, and instead articulated the limited scope of its ruling, as quoted above.  *See Collins*, 503 U.S. at 130.  If anything, the *Collins* opinion explicitly leaves the door open for constitutional claims arising in an employment context.  In its criticism of the petitioner's claims, the *Collins* court stated:

> In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured.  Instead, she makes the more general allegation that the city deprived him of life and liberty by failing to provide a reasonably safe work environment.

*Id.* at 125-26.  This is not a case involving the type of "more general allegation" disapproved by the *Collins* court.  Rather, in this case the Plaintiffs show that Hancock, the supervisor, ordered the officers to go into the Wirth residence when Hancock knew there was a significant risk that the officers would be injured.  (*See* Dep. of Hancock, relevant portions of which are attached as Ex. 1, at 95:15-24, 126:19-24, 187:23-188:15, 206:21-207:1; Dep. of Gore, relevant portions of which are attached as Ex. 2, at 80:23-25, 81:1-19, 83:1-11, 93:2-12, 95:17-23.)  If *Collins* has any application to this case, it is to show that the Plaintiffs' claims are within the purview of constitutional protection.

The 10th Circuit discussed *Collins* in *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995).  The *Uhlrig* court entertained a danger creation claim by the estate of an employee against the employer.  In its discussion of *Collins*, the 10th Circuit made no mention of the type of broad prohibition against such claims as argued by Hancock.  Ultimately the *Uhlrig* court affirmed summary judgment for the employer, but based on the specific substantive elements of a danger creation claim.  If *Collins* stood for the broad proposition advocated by Hancock, there would be no need for the *Uhlrig* court to address the elements of the danger creation claim.  This further illustrates that Hancock's reading of *Collins* is incorrect.

Hancock also relies on *Moore v. Guthrie*, 438 F.3d 1036 (10th Cir. 2006), but again his reliance is misplaced.  Most notably, the plaintiff in *Moore* argued "that he has a cognizable claim for a violation of bodily integrity, based on his alleged *right to work in a safe*

*environment.*"  *Id.* at 1039-40 (emphasis added).  Like *Collins*, the *Moore* opinion is distinguishable because the Plaintiffs in this action make claims that are more specific and particularized than a general claim to a right to work in a safe environment.  Those claims, and the facts supporting them, will be discussed in greater detail below.  A plain reading of *Collins* and *Moore*, however, shows that they do not stand for the broad prohibition argued by Hancock.  Properly construed, neither *Collins* nor *Moore* are a barrier to Plaintiffs' claims, and Hancock's argument on this ground should be rejected.

### b.    State-created danger elements

Hancock apparently does not dispute that the two "preconditions" to state-created danger liability are present here.  (*See* Hancock Motion at 13-20.)  Those preconditions are: "first, the state actor took an affirmative action, and, second, that action led to private violence injuring the plaintiff."  *Estate of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016).  The affirmative action taken by Hancock, a state actor in his role as employee and captain of the PCSO, was to order officers to enter the Wirth residence, despite Gore's previous order that this not be done specifically because Wirth would shoot at the officers.  (*See* Ex. 2 at 81:9-19, 81:24-25, 82:1-4, 83:16-84:9, 87:10-14, 87:20-88:1.)  Hancock's action led to private violence injuring the Plaintiffs because Wirth shot at the officers once they entered the residence, injuring Martin and Threlkel, and killing Carrigan.  (*See* Dep. of Martin, relevant portions of which are attached as Ex. 3, at 209:2-212:6.)

Having established the "preconditions" for state-created danger, the analysis turns to the elements of state-created danger liability.  Those elements are:

> (1) the charged state . . . actor[] created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited

and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Estate of Reat*, 824 F.3d at 965 (*quoting Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th

Cir. 2014)).  Hancock does not argue the first and second elements above.  (*See* Hancock Motion

at 14-20.)  Plaintiffs will address each of the remaining four elements in turn.

> *Hancock's conduct put Plaintiffs at substantial risk of serious,*
> *immediate, and proximate harm*

Hancock ordered Carrigan, Martin, and Threlkel to breach and enter the front door of the

Wirth residence, with Wirth waiting inside.  Once they entered the residence, Wirth shot at them,

injuring Martin and Threlkel, and killing Carrigan.  Hancock's conduct put the officers in the

line of fire, and the facts show that this element of state-created danger liability is satisfied.

According to Hancock, he was the officer in charge of the Wirth eviction.  In that

capacity, he was to oversee the operation and develop a plan for, among other things: where the

officers would be; what the officers were assigned to do; and the course of action the officers

would take.  (Ex. 1 at 90:8-18.)  Wegener acknowledged that the ranking officer on scene during

the eviction of Wirth was Hancock.  (Dep. of Wegener, relevant portions of which are attached

as Ex. 4, at 239:17-21.)  When Wirth went back inside the residence Hancock directed four

officers to come up to the house.  (Ex. 1 at 233:24-234:5.)  The facts show that it was Hancock

who led the officers during the crucial moments of the eviction, and it was Hancock who ordered

them to breach the door.  (*Id.* at 151:6-12.)

As explained in greater detail below, before the Wirth eviction Hancock was given a

direct order by Undersheriff Gore not to breach the Wirth residence.  The reason for that order

was the danger of entering the residence after Wirth retreated inside.  Gore testified that by not following Gore's direct order Hancock exposed the members of the team to great danger.  (Ex. 2 at 140:21-25.)  By breaching the door instead of withdrawing to a safe location Hancock brought the officers into the "lion's lair."  (*Id.* at 141:1-5.)  Gore testified that Hancock was aware of the risks of breaching the Wirth residence and recklessly disregarded those risks.  (*Id.* at 145:10-19.)  Gore testified that Hancock's reckless disregard of the known risks led to Martin and Threlkel being injured, and Carrigan and Wirth being killed.  (*Id.* at 145:20-146:10.)

Hancock's own testimony shows that he was fully aware of the danger Wirth posed.  When Wirth went back into the home Hancock began to feel "real uncomfortable" because he could not see Wirth.  (Ex. 1 at 231:12-21.)  At the time of the eviction, Hancock assumed that Wirth was armed.  (*Id.* at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  The threat posed by Wirth was known to Hancock, as discussed below with regard to the "obvious or known" element.  That discussion is incorporated herein by reference.

In his Motion, Hancock argues that risks are inherent in law enforcement.  (Hancock Motion at 15-16.)  That argument, however, is a red herring.  Whether there are some generalized risks inherent in law enforcement has nothing to do with whether Hancock put the Plaintiffs at substantial risk of serious, immediate, and proximate harm.  As discussed above, it is apparent that Hancock's order quite literally put the Plaintiffs in the line of fire.  It was Hancock's conduct that directly and proximately exposed the Plaintiffs to the specific risk at issue here, *i.e.*, being sent directly into Wirth's ambush, which was thoroughly foreseeable to Hancock.  Taken to its logical conclusion, Hancock's argument would eliminate danger-creation

liability from the law enforcement context altogether. Hancock fails to provide any legal authority that endorses such a wide-reaching result.

The only reason Carrigan, Martin, and Threlkel were put in the virtually-assured risk of harm was Hancock's order that they breach the residence and go inside. Having satisfied this element of state-created danger liability, Plaintiffs turn to the next element, whether the risk was obvious or known.

*The risk was obvious or known*

The facts before this Court show that Hancock was well aware of the risk posed by Wirth. As recently as approximately one month before the Wirth eviction, Hancock had actual knowledge of Wirth threatening to shoot law enforcement officers. On January 20, 2016, Wirth was involved in an incident with PCSO officers in which Wirth "stated he was going to get a gun and 'shoot the first cop he sees.'" (PCSO Offense Report 2016000052, attached as Ex. 5, at PCSO 001003.) Hancock was a PCSO Captain on duty during the January 20, 2016 incident with Wirth. (Ex. 1 at 186:1-187:5.) In fact, Hancock heard the incident unfold on the radio. (*Id.* at 187:1-8.) Prior to the eviction of February 24, 2016, Hancock was aware that Wirth made a threat that he was going to shoot the first cop he sees. (*Id.* at 187:23-188:15.)

After the January 20, 2016 event with Wirth, Sergeant Welles Tonjes had a conversation with Hancock regarding the threats Wirth made. (Dep. of Tonjes, relevant portions of which are attached as Ex. 6, at 129:71-25.) On or about February 22, 2016, only two days before the eviction, Tonjes had a conversation with Hancock wherein Tonjes articulated to Hancock that Wirth is highly volatile and potentially dangerous. (*Id.* at 130:10-16.) On the morning of the eviction, Tonjes had another conversation with Hancock telling him that Wirth was dangerous.

(*Id.* at 132:21-133:1.)

Gore also communicated to Hancock in no uncertain terms the threat posed by Wirth. Prior to the February 24, 2016, events, Gore had a conversation with Hancock advising Hancock that Wirth posed a specific threat. (Ex. 2 at 80:23-25; 81:1-19.) Approximately two-and-a-half weeks before the eviction Gore called Hancock into his office and told Hancock that he felt Wirth was a "significant threat." (*Id.* at 81:1-19.) He told Hancock that: "I wanted to be very clear that I considered Wirth extremely dangerous." (*Id.*) Gore felt that Wirth was homicidal and suicidal. (*Id.*) He also told Hancock that Wirth wanted to commit "suicide by cop." (*Id.*)

Gore tasked Hancock with doing a risk assessment as well as doing a tactical plan for the Wirth eviction. (Ex. 2 at 92:17-21.) Gore testified that he got a verbal threat assessment by Hancock concerning Wirth. Hancock was aware of the threats that Wirth had made and Hancock was aware of the significant threat that Wirth posed. (*Id.* at 95:17-23.) Based on Gore's direction, Hancock did a threat assessment and arrived at the same conclusion that Gore did: that Wirth was extremely dangerous. (*Id.* at 83:1-11.) As Gore testified:

> [o]nce again, I had significant concerns for the safety of our staff, the safety of the citizens and the neighbors in that neighborhood. And I just wanted to make it very clear to Captain Hancock that I considered Wirth a significant threat. And as I have previously stated, I felt he wanted to commit suicide by cop. And based on statements that [Wirth] had made and incidents two weeks prior to that, that [Wirth] wanted to have a shootout with law enforcement and take as many of us out as he could. And that was my feeling and concern at the time.

(*Id.* at 93:2-12.) As to why he gave the order to Hancock: "I felt this situation and I felt Mr. Wirth was extremely dangerous. And I was concerned for the welfare of our officers and I was concerned for the welfare of the residence and I had a bad feeling about this entire operation." (*Id.* at 82:21-25, 83:1.)

Knowledge of the plan was not confined to just Gore and Hancock.  Tonjes met with Wegener and advised him of the plan to evict Wirth.  In that discussion, Tonjes advised Wegener that because Wirth was volatile the officers were going to withdraw and get an arrest warrant if Wirth did not come out of the residence or refused to leave.  (Ex. 6 at 75:14-79:7.)  Wegener understood and agreed with the plan that officers were not to enter the Wirth residence should Wirth refuse to come out or leave the residence.  (*Id.* at 79:2-10.)  On the morning of February 24, 2016, Tonjes articulated to Hancock the "plan" regarding how to handle Wirth should he go back into the residence.  (*Id.* at 80:3-12.)

At the time of the Wirth eviction, Hancock assumed that Wirth was armed.  (Ex. 1 at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  According to Hancock's CBI statement he believed, based on the information he had, that Wirth would become barricaded.  (*Id.* at 206:21-207:1.)  Hancock testified that when the officers told Wirth that he was being evicted Wirth stated, "you're not even going to give me time to move my stuff out" and then went back into his home.  (*Id.* at 224:21-225:18.)  Wirth then refused to come out and became a barricaded subject.  (Ex. 3 at 249:5-8.)

Based on Hancock's experience and tenure with PSCO, typically only one to two officers were used to evict a person from their residence.  (Ex. 1 at 92:4-7.)  For the Wirth eviction, Hancock had seven officers involved, as well as the Platte Canyon Fire and Rescue on call.  (*Id.* at 92:8-93:4.)  The Wirth eviction was the first time in Hancock's 21 years with PSCO that he had the Platte Valley Fire Department on standby for an eviction.  (*Id.* at 96:3-97:5.)  This alone shows that Hancock knew of the risk posed by Wirth.

Even assuming for the sake of argument that Hancock did not have actual knowledge of the risk posed by Wirth, that risk was abundantly obvious.  Before the eviction, Gore believed that Wirth posed the highest threat level.  (Ex. 2 at 103:17-25; 104:1.)  Before the eviction, Gore stated that he had previous awareness that Wirth wanted to commit suicide by cop.  (*Id.* at 105:8-20.)  This, in Gore's mind, reinforced the threat that Wirth posed.  (*Id.*)  Wegner testified that since he has been with PCSO, PCSO officers interact with mentally ill people on a recurring basis within Park County.  (Ex. 4 at 40:22-50:3.)  Wegner testified that it has been proven time and time again that mentally ill people in Park County have proven a safety risk to law enforcement officers.  (*Id.* at 50:4-11.)  Before the Wirth eviction, and while Wegener was the Sheriff, the PCSO was involved with a Park County resident that was getting evicted from his home and proceeded to shoot at Park County Sheriff Deputies.  (*Id.* at 40:3-41:9.)  On average, and during Wegner's tenure, PCSO dealt with 25-50 evictions per year.  (*Id.* at 43:16-44:8.)  The risk posed by Wirth, because of his specific behavior in the past and because of the well-known behavior of others like him in the county, was obvious to Hancock.

Hancock argues that Wirth's behavior "would have led a reasonable officer to believe that Mr. Wirth intended to grab a few of his belongings and leave the house."  (Hancock Motion at 17.)  This only serves to underscore the egregiousness of Hancock's conduct.  If Hancock thought Wirth was just going to "grab a few of his belongings and leave the house," the order to kick down the door and invade the house with guns drawn is particularly shocking.

### *Hancock acted recklessly in conscious disregard of that risk*

Despite his knowledge of the risk posed by Wirth, Hancock recklessly exposed the other officers to that risk, in complete disregard of the consequences he had been directly warned

about.  The facts before the Court show that the "reckless" element of state-created danger liability is satisfied.

> [R]eckless intent does not require that the actor intended to harm a particular individual; reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.  Thus, reckless intent involves disregard of a particular risk rather than intent to cause a particularized harm.

*Medina v. City & County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992) (citation omitted).

There can be little debate that Hancock had actual knowledge of the serious risk posed by entering the Wirth residence.  As discussed elsewhere in this Response, Gore ordered Hancock that under no circumstances were they to enter the Wirth residence.  (Ex. 2 at 81:17-19, 87:10-14.)  Gore testified:

> Approximately two weeks, two and a half weeks, prior to this operation being conducted, I had called Captain Hancock into my office and advised him that I felt Wirth was a significant threat.  Told him that during the operation, I wanted to be very clear that I considered Wirth extremely dangerous.  I felt he was homicidal and suicidal.  I felt he wanted to commit suicide by cop and take as many officers with him as he could.  I directed Captain Hancock that under no circumstances whatsoever were they to enter Wirth's residence.

(*Id.* at 81:9-19.)

> There would have been no ambiguity.  I gave the order and made it crystal clear that under no circumstances was he to enter the residence.  I made it clear that I felt Wirth was highly volatile and dangerous and that I felt Mr. Wirth wanted to commit suicide by cop and take as many officers with him as he could.

(*Id.* at 87:20-88:1.)

Gore's orders to Hancock went beyond merely prohibiting entering the Wirth residence.  Gore also outlined the plan for the eviction with Hancock.  On February 12, 2016, Gore communicated the tactical plan to Hancock, as well as the direct order not to breach the Wirth

residence.  (Ex. 2 at 109:13-17.)  Gore testified to the details of the plan as follows:

> This was a tactical operation from the very get-go.  The operation had two phases.  We knew that Mr. Wirth was extremely volatile and dangerous and most likely armed.  The first phase of the operation was officers were supposed to, under the tactical plan, make an attempt to get Mr. Wirth out of the house in a peaceable manner.
>
> I had anticipated that Mr. Wirth may come out of the residence and go back in.  And typically in my experience as a peace officer, they will come out of the residence to assess how many officers you have and assess the situation themselves.  When they go back in the residence or if they go back in the residence, at that point the operation should be considered a barricade suspect operation.  And the officers, under the plan that Hancock and I discussed, were supposed to withdraw to the perimeter, at which time I was supposed to be given a phone call to assess what we were going to do at that point.

(*Id.* at 83:16-84:9.)  Hancock responded to Gore that he understood the order and that he would follow the directive and that "I could trust [Hancock] that no one would be hurt in this operation."  (*Id.* at 82:8-20.)  The tactical plan as discussed with Hancock was an order by Gore to Hancock.  (*Id.* at 84:16-19.)  Gore further explained the plan put in place for the foreseeable scenario of Wirth retreating into the residence:

> Q.   Okay.  So based on your tactical plan if Mr. Wirth chose not to come to the door, was it your belief that they should have retreated?
>
> A.   Yes.
>
> Q.   And that was essentially a direct order from you to Hancock?
>
> A.   Yes.
>
> Q.   Okay.  Let's keep going on this thing.  "I became concerned.  I was concerned as to where Mr. Wirth was, to include the possibility that he was exiting the house to a vacated perimeter spot or simply hiding in the house."  Do you see that?
>
> A.   Yes.
>
> Q.   Do you think that is a valid concern based on phase one of your tactical plan?
>
> A.   No.

Q.  Why not?

A.   According to phase one, the officers should have been put in a position in a perimeter around the house to begin with, so that if Mr. Wirth exited from any side of the house, it could be reported to the officers.  Additionally, topography and trailers or whatever the tactical issues at the residence are, whatever they were at the time, should have already been addressed.  And how they were going to withdraw should have already been addressed as well.

(*Id.* at 139:1-140:2.)  Hancock did not request to change the tactical plan after it was discussed between him and Gore on February 12, 2016.  (*Id.* at 114:15-21.)

Hancock's conduct was particularly reckless because it ran contrary to his own prior training and experience.  Based on Hancock's SWAT training, he understood that looking inside a home window is not the best way to understand the full layout of the entire house before breaching the residence.  (Ex. 1 at 133:1-5.)  Before evicting Wirth, Hancock did not conduct any research of the interior of the Wirth home (*Id.* at 130:22-131:1), nor did he know the specific layout of Wirth's home (*Id.* at 129:19-22).  Hancock's limited knowledge of the interior of the Wirth home before breaching was from merely looking inside a window.  (*Id.* at 131:23-132:3.) The window Hancock looked into was a small window portion in the door.  The door window did not give Hancock a clear view of the entire inside of the Wirth home.  (*Id.* at 228:16-229:16.) In fact, when looking into the window Hancock could not see Wirth.  (*Id.* at 228:16-19.) Hancock admits that he did not know Wirth's location within the residence.  (Hancock Motion at 17.)  Hancock never looked into any other window in the Wirth residence nor did he direct any officers to do so either.  (Ex. 1 at 229:20-230:3.)  Despite his own knowledge about the importance of knowing the layout of a home before breaching that home, and his failure to take any steps to gain such knowledge, Hancock ordered the officers to breach the residence. Notably, when Wirth went back into the residence Hancock acknowledged that there was no

immediate emergency occurring based on Wirth's actions.  (*Id.* at 238:13-239:1, 239:25-240:6.) This makes his order to breach the residence all the more egregious.

This is not a situation in which there could be any doubt about who Hancock was putting in danger.  Carrigan, Martin, and Threlkel were "stacked" at the front door and Hancock ordered them to force entry into the residence.  Knowing the risk posed by Wirth, Hancock sent a limited and specifically definable group of officers into the substantial risk of serious, immediate, and proximate harm.  While Plaintiffs do not argue that Hancock had the intent to harm these officers, Hancock did act recklessly in conscious disregard of the risk of serious harm.  The facts show that Hancock had actual knowledge of that risk, and the severity of the risk.

When Hancock did not retreat when Wirth went back into the residence, and instead began to knock numerous times on the door, Hancock was in violation of Gore's order and Hancock was insubordinate.  (Ex. 2 at 140:12-20.)  Hancock acknowledged that within PCSO it is important to follow orders from superior officers.  (Ex. 1 at 39:11-19.)  When Hancock was a Captain at PCSO he was a subordinate officer to Gore.  (*Id.* at 56:24-57:2.)  As admitted by Hancock, when Gore was undersheriff and Gore gave Hancock a direct order Hancock was required to follow it.  If he failed to follow a direct order then Hancock would have been insubordinate.  (*Id.* at 57:13-25.)

Gore testified that Hancock was aware of the risks of breaching the Wirth residence and recklessly disregarded those risks.  (Ex. 2 at 145:10-19.)  Gore also testified that by recklessly disregarding, and outright ignoring, the known risks, Hancock's conduct led to the serious injuries to Martin and Threlkel, and the deaths of Carrigan and Wirth.  (*Id.* at 145:20-146:10.)

Hancock knew of the specific and serious risk posed by forcing entry into the Wirth

residence, yet Hancock recklessly disregarded that risk and ordered the officers to breach the residence, leading to the grim outcome explicitly predicted by Gore.

*Hancock's conduct, when viewed in total, is conscience shocking*

When Hancock ordered the officers to breach the Wirth residence, Hancock violated a direct order from a superior, ignored his own knowledge and the warnings of others about the risk posed by Wirth, ignored a plan that had been previously devised for precisely the situation that arose, and disregarded the fact that there was no exigency or emergency requiring forced entry into the residence.  "[T]he shocks-the-conscience part of such a claim concerns the defendant's conduct as a whole.  This includes both action and inaction."  *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) (quotation marks and citation omitted).  When viewed as a whole Hancock's actions and inactions are not merely negligent, but amount to the rare case that truly shocks the conscience.

Prior to the eviction, Hancock was given a direct order not to enter the residence if Wirth retreated back inside because of the substantial risk that Wirth would shoot at the officers.  As discussed above, Gore spoke to Hancock approximately two or two-and-a-half weeks prior to the eviction and told Hancock that Wirth was a significant threat.  (Ex. 2 at 81:9-19.)  Gore ordered Hancock "that under no circumstances whatsoever were they to enter Wirth's residence."  (*Id.*)  Hancock told Gore that Hancock understood, and would follow, the order.  (*Id.* at 82:8-20.)  Gore also made clear to Hancock that Wirth was homicidal and suicidal, and Wirth wanted to commit suicide by cop and would take as many officers with him as he could.  (*Id.* at 81:9-19.)  Only two days before the eviction, Tonjes also articulated to Hancock that Wirth was highly volatile and potentially dangerous.  (Ex. 6 at 130:10-16.)  Hancock even did his own threat

assessment of Wirth and arrived at the same conclusion that Gore did: that Wirth was extremely dangerous.  (Ex. 2 at 83:1-11.)  At the time of the eviction, Hancock assumed that Wirth was armed.  (Ex. 1 at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  According to Hancock's CBI statement he believed, based on the information he had, that Wirth would become barricaded.  (*Id.* at 206:21-207:1.)  Hancock went so far as to use more than three times as many officers for the Wirth eviction as he normally would, and took the unprecedented step of having Platte Valley Fire Department on standby.  (*Id.* at 92:4-93:4, 96:3-97:5.)  Despite all this, and despite Hancock's awareness of the importance of following orders (*Id.* at 39:11-25), Hancock disobeyed the direct order given by Gore (Ex. 2 at 140:12-20; Ex. 1 at 57:13-25).  Hancock's insubordination, which led directly to the grievous outcome that the order was intended to prevent, is part of Hancock's conscience-shocking conduct.

Another important aspect of Hancock's "conduct as a whole" is that prior to the eviction Hancock knew that Wirth was dangerous, likely to be armed, and threatened to shoot law enforcement officers.  Prior to the eviction of February 24, 2016, Hancock was aware that Wirth made a threat that he was going to shoot the first cop he sees.  (Ex. 1 at 187:23-188:15.)  Hancock was aware of the threats that Wirth had made and that Wirth posed a significant threat. (Ex. 2 at 95:17-23.)  On or about February 22, 2016, only two days before the eviction, Tonjes had a conversation with Hancock wherein Tonjes articulated to Hancock that Wirth was highly volatile and potentially dangerous.  (Ex. 6 at 130:10-16.)  On the morning of the eviction, Tonjes had another conversation with Hancock telling him that Wirth was dangerous.  (*Id.* at 132:21-133:1.)  Approximately two-and-a-half weeks before the eviction Gore called Hancock into his

office and told Hancock that he felt Wirth was a "significant threat." (Ex. 2 at 81:1-19.) He told Hancock that: "I wanted to be very clear that I considered Wirth extremely dangerous." (*Id.*) At the time of the eviction, Hancock assumed that Wirth was armed. (Ex. 1 at 95:15-24.) In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons. (*Id.* at 126:19-24.) This is not a situation in which there was any doubt about what lay in wait behind the front door of the Wirth residence. Hancock was warned about the risk posed by Wirth, and Hancock had actual knowledge of the danger, yet Hancock ordered the officers to breach the residence anyway, needlessly putting lives in jeopardy.

One of the most shocking aspects of this case is that there was a plan in place ahead of time for exactly the situation that confronted Hancock, yet Hancock inexplicably disregarded that plan and sent the officers into the line of fire. As discussed elsewhere in this Response, Gore discussed the plan with Hancock, including the eventuality of Wirth retreating into the residence. The plan as outlined by Gore, and Gore's direct order to Hancock, are discussed elsewhere and need not be repeated in full. The plan is also significant, however, because even in the hours leading up to the eviction, Hancock assured the officers that they would not be breaching the Wirth residence. At the substation for the briefing regarding the Wirth eviction, Martin recalls a deputy asking Hancock whether they would go in after Wirth if he stayed in the residence, and Hancock said they would not. (Ex. 3 at 142:13-25.) After the briefing, and while at the fire station, Martin heard Deputy Lowrance ask Hancock if they would not go inside should Wirth refuse to come out and Hancock responded: "you're correct, we're not going inside." (*Id.* at 148:20-149:17.) Even in the moments before breaching the residence, at least

one of the officers was still working under the impression that they would not be breaching. Hancock called Martin up to the front door and at that point, Martin was thinking to himself, "why are we getting called up to the door? There shouldn't be any reason.  He's not coming out." (*Id.* at 175:21-176:1.)  When Martin got to the front door he did not verbalize his concern because failure to follow orders would be insubordination.  (*Id.* at 178:5-23.)  The officers bravely followed Hancock's order, however, resulting in serious injuries and deaths.

Hancock's order that the officers breach the Wirth residence was all the more shocking because there was no need to breach the residence.  The Court need look no further than the testimony of Hancock himself: when Wirth went back into the residence Hancock acknowledged that there was no immediate emergency occurring based on Wirth's actions.  (Ex. 1 at 238:13-239:1, 239:25-240:6.)  In his Motion, Hancock argues that Wirth's behavior "would have led a reasonable officer to believe that Mr. Wirth intended to grab a few of his belongings and leave the house." (Hancock Motion at 16-17.)  This only serves to underscore the egregiousness of Hancock's conduct.  If there was no emergency, and a reasonable officer would believe that Wirth just intended to grab a few belongings and then leave the house, why defy a direct order and send armed officers into the "lion's lair?"  There is simply no reasonable explanation, and Hancock's conduct goes beyond being merely unreasonable.

Contrary to his own deposition testimony that there was no emergency when Wirth went back into the residence, in his Motion Hancock argues that "[i]t is reasonable for police to move quickly if 'delay would gravely endanger their lives or the lives of others.'"  (Hancock Motion at 19 (*quoting City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015)).)  After Wirth retreated into the residence, he was not a danger to anyone.  The officers were outside,

where they could retreat to form a perimeter as previously planned.  Wirth was inside the residence alone.  The only thing at that point that could "gravely endanger their lives or the lives of others" was to send the officers into the Wirth residence, which is exactly what Hancock did.

As discussed elsewhere in this Response, the officers were at the Wirth residence merely to affect a civil eviction order.  Wirth was not charged with any crime, not was Wirth fleeing from the commission of any crime.  That Hancock would order the officers to breach the residence with guns drawn, in the face of the known risk involved in that course of action, is all the more egregious because there was no crime involved.

Though Defendants hope to paint the picture of a sudden emergency requiring a split-second decision, that is simply not the facts of this case.  When Wirth went back into the residence, there was no emergency requiring immediate action.  Also, if there was any question about what to do at that point, Hancock only needed to refer to the plan devised ahead of time.  That plan envisioned the very scenario that confronted Hancock: Wirth retreating into the residence.  (Ex. 2 at 83:16-84:9.)  Hancock had time to reflect on the situation.  This is not a case of an officer faced with an unexpected emergency requiring an immediate decision.  This case is the opposite, which reinforces the conscience-shocking nature of Hancock's conduct.

Hancock's conduct was contrary to PCSO policy that governed the precise situation he was facing.  At the time of the Wirth eviction, PCSO had a hostage/barricade policy in effect.[3] (Ex. 2 at 158:5-21.)  All member of PCSO were required to follow the policy.  (*Id.* at 158:22-159:2.)  Under the policy, when Wirth went back into the residence he was considered a barricaded subject.  (*Id.* at 159:6-17.)  Under the barricade policy, when Wirth went back into the

---

[3] A copy of the "Hostage/Barricaded Subject Incidents" policy is attached as Ex. 7.

residence there was a reasonable belief that he would commit serious bodily injury or death to officers.  (*Id.* at 160:13-20.)  Under Section III of the barricaded policy, it is the policy (which is not discretionary) to place the lives of the hostage, civilians, and officers as the utmost importance and the officers are to peacefully resolve the incident through communication with the suspect.  (*Id.* at 161:13-162:7.)  Gore monitored the radio during the eviction and there were no attempts by Wegener or Hancock to communicate with Wirth.  (*Id.* at 162:19-24.)  Under the barricade policy, there was no basis or justification to tactically enter the residence.  (*Id.* at 163:22-164:17.)  In addition to being contrary to policy, Hancock's conduct was contrary to a direct order from his superior officer (as discussed above).

Hancock's conduct was also inconsistent with his own experience and training.  Based on Hancock's SWAT training, he understood that if possible it is best to know the layout of a building before entering the building.  (Ex. 1 at 130:2-7.)  Hancock also knew from his training and experience that looking inside a home window is not the best way to understand the full layout of the entire house before breaching the residence.  (*Id.* at 133:1-5.)  Yet, Hancock's knowledge of the interior of the Wirth home before breaching was from simply looking inside a window.  (*Id.* at 131:23-132:3.)  The window Hancock looked into was a small window portion in the door.  The door window did not give Hancock a clear view of the entire inside of the Wirth home.  (*Id.* at 228:16-229:16.)  In fact, when looking into the window Hancock could not see Wirth.  (*Id.* at 228:16-19.)  Hancock admits that he did not know Wirth's location within the residence.  (Hancock Motion at 17.)  Hancock never looked into any other window in the Wirth residence nor did he direct any officers to do so.  (Ex. 1 at 229:20-230:3.)  Before breaching the residence, Hancock did not know the specific layout of Wirth's home.  (*Id.* at 129:19-22.)

Hancock did not conduct any research of the interior of the Wirth home.  (*Id.* at 130:22-131:1.)

At the time of the breach Hancock believed he could just "grab" Wirth, however, he did not

know where Wirth was in the residence.  (*Id.* at 261:5-14.)  In sum, Hancock knew that Wirth

was likely to be armed, knew that Wirth had previously threatened to shoot law enforcement

officers, did not know the layout of the house or where Wirth was in the house, yet Hancock

ordered the officers to breach the residence so that Hancock could somehow "grab" Wirth.  This

not only defies his training and PCSO policy, it defies common sense.

Finally, Hancock himself has acknowledged that he did not handle the Wirth eviction

properly.  In his interview with CBI, Hancock stated: "I really feel like he's barricading or, you

know, something bad's going to happen and I really regret that I'm a Marine sometimes because

I am super aggressive…."  (Hancock CBI Interview, relevant portions of which are attached as

Ex. 8, at CARRIGAN 019142; *see also* Ex. 1 at 197:10-17.)  Hancock also stated that he was

"second guessing and worrying that I messed something up…."  (Ex. 8 at CARRIGAN 019155.)

Even though the plan going into the eviction was to retreat and form a perimeter if Wirth went

back into the residence, Hancock admits that he did not think about retreating before breaching

the Wirth residence.  (Ex. 1 at 254:3-5.)

Leading up to the Wirth eviction, Hancock knew that Wirth was a threat to law

enforcement officers and that Wirth may retreat into his residence when faced with eviction.  A

plan was put in place for that scenario, and Hancock was given a direct order not to enter the

residence.  Even in the hours leading up to the eviction, Hancock assured the other officers

involved that they would not be breaching the residence.  When the very situation that was

previously envisioned came to fruition, Hancock defied the plan, a direct order, his own training,

and common sense when he ordered other officers to breach the residence.  That conduct had the exact result that Hancock was warned about, *i.e.*, Wirth started shooting at the officers. Hancock's reckless conduct led directly to Martin and Threlkel being seriously injured, and Carrigan and Wirth dying.  Hancock's reckless disregard for the lives of others, including subordinate officers who looked to him for leadership and bravely followed his orders, is truly conscience-shocking.

> ii.  *The right was clearly established at the time of Hancock's unlawful conduct*

The fundamental defect in Hancock's argument regarding the "clearly established" element of qualified immunity is that Hancock takes too narrow a view of what "clearly established" means.  While the Supreme Court has cautioned against over-generalizing when analyzing the "clearly established" element, Hancock's narrow view that there must be a Supreme Court or 10th Circuit case involving "a third party who fires at deputies while they participate in a tactical operation" (Hancock Motion at 13) is far too restrictive and inconsistent with the applicable law.

For the "clearly established" element, the inquiry is not whether the facts of one case are "sufficiently similar to" the facts of the instant case, but whether the applicable case law "would make it clear to reasonable officials" that the conduct in question was a violation of Plaintiffs' rights.  *See Doe v. Hutchinson*, No. 17-3070, 2018 U.S. App. LEXIS 8069, *12 (10th Cir. Mar. 30, 3018).  "[T]he qualified immunity analysis involves more than a scavenger hunt for prior cases with precisely the same facts.  In certain circumstances, law can be clearly established even without a body of relevant case law, and even in novel factual circumstances."  *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) (citations and quotation marks omitted).

"[O]fficials committing outrageous, yet sui generis, constitutional violations ought not to shield their behavior behind qualified immunity simply because another official has not previously had the audacity to commit a similar transgression." *Jones v. Hunt*, 410 F.3d 1221, 1230 (10th Cir. 2005). It is important to note that the "clearly established" analysis does not rest on finding a single similar case, but instead looks to the body of existing precedent. *See Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015); *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (10th Circuit found "clearly established" element satisfied based on multiple cases, each of which fit different aspects of the facts before the court).

There is another facet to the "clearly established" analysis not addressed by Hancock, *i.e.*, that the degree of similarity required of prior case law is lower when the conduct in question is obviously improper. "'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1173 (10th Cir. 2017) (*quoting Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Existing precedent under factually similar circumstances is unnecessary in an "obvious case" in which "the unlawfulness of the officer's conduct is sufficiently clear." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Hancock relies on certain statements from the *Wesby* opinion, yet *Wesby* was a Fourth Amendment case and the *Wesby* court stated that more specificity is required in the Fourth Amendment context. *Id.* This action does not involve the Fourth Amendment. Plaintiffs will show not only that it was clearly established that Hancock's conduct violated constitutional rights, but also that the egregiousness of Hancock's

conduct was obvious and the unlawfulness of that conduct was readily apparent to any reasonable officer.

As discussed in greater detail above, and incorporated herein by reference, Hancock was given a prior direct order from a superior (Gore) not to enter the Wirth residence based on the threat Wirth posed and, with no crime having been committed or similar emergency need, Hancock ordered the officers to force entry into the residence.  This had the result that Gore previously communicated to Hancock: a shootout occurred resulting in loss of life and serious injury.

At the time of the Wirth eviction, the unlawfulness of aggressively pursuing a dangerous and suicidal person was clearly established.  In 1992, nearly 14 years before the Wirth eviction, the 10th Circuit held: "an officer might be found liable if a fleeing suspect's conduct is sufficiently predictable and is directly and immediately linked to the officer's conduct and if the officer's decision to pursue or continue to pursue the suspect was unreasonable under the circumstances."  *Medina*, 960 F.2d at 1499.  Here, when Wirth (who was not a suspect of any crime at the time) fled back into the residence it was predictable that the officers would be harmed if they pursued him into the house.  That is precisely what Gore warned Hancock of when discussing the eviction.  (Ex. 2 at 80:23-25, 81:1-19, 83:1-11, 95:17-23.)  Gore also warned that Wirth was suicidal and may attempt "suicide by cop."  (*Id.* at 81:1-19.)  Five years after *Medina*, the 10th Circuit again found a constitutional violation by officers approaching an armed and suicidal person in *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997).

Even more recently, the 10th Circuit again analyzed a case involving an officer aggressively confronting an armed and suicidal individual in *Hastings v. Barnes*, 252 Fed. Appx.

197 (10th Cir. 2007) (unpublished).  In *Hastings* the 10th Circuit clearly explained the impact of its earlier decisions on this subject:

> *Allen* and *Sevier* [*v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995)] provided [defendants] the requisite fair warning that their conduct in this case was unlawful. They clearly establish that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him).

*Hastings*, 252 Fed. Appx. at 206.  The circumstances described by the *Hastings* court as having been clearly established are nearly identical to the facts of this case.  Hancock ordered the officers to breach the door of the Wirth residence after Wirth had retreated inside, an aggressive confrontation to say the least.  Hancock knew that Wirth had access to firearms (*see* Ex. 1 at 95:20-24, 187:23-188:15), and had been warned by Gore about the danger Wirth posed to not only the officers but also himself (Ex. 2 at 80:23-25, 81:1-19, 83:1-11, 95:17-23).  Hancock ordered the breach of the door without gaining additional information such as where Wirth was located within the residence.  (Ex. 1 at 228:16-229:16.)  In addition, Hancock ordered the officers to breach the residence while they had their guns drawn (*see* Dep. of Threlkel, relevant portions of which are attached as Ex. 9, at 228:5-10), which was certainly a threatening manner of approaching Wirth.  As of the time of the Wirth eviction the unconstitutionality and wrongfulness of Hancock's conduct in ordering an aggressive and threatening pursuit of Wirth, who was dangerous and suicidal, was clearly established.

Another aspect of Hancock's conduct that was clearly established to be in violation of the rights protected by § 1983 was misleading the officers into thinking they would not be breaching the Wirth residence.

The Ninth Circuit, in *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), imposed

liability for danger creation when the state as employer misrepresented to a nurse employed in a state correctional facility that she would not work with violent sex offenders.  We too have supposed, in dicta, that if the state 'affirmatively misleads an employee of the substantial risks in the workplace, that action may give rise to § 1983 liability.'

*Robbins v. Okla. Ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1252 (10th Cir. 2008) (*quoting Uhlrig v. Harder*, 64 F.3d 567, 575 (10th Cir. 1995)).  The facts of this case indicate that, before arriving at the Wirth residence, Hancock affirmatively assured officers that if Wirth retreated into the residence, they would not be breaching the door.  (*See* Ex. 6 at 92:14-13, 95:1-6.)  At the substation for the briefing regarding the Wirth eviction, Martin recalled a deputy asking Hancock what would happen if Wirth stayed in the residence, and whether they would go after Wirth, at which point Hancock said they would not.  (Ex. 3 at 142:13-25.)  After the briefing, and while at the fire station, Martin heard Lowrance ask Hancock if they would not go inside should Wirth retreat into the residence.  (*Id.* at 148:20-149:17.)  Hancock responded: "you're correct, we're not going inside." (*Id.*)  Threlkel's understanding of the plan was that if Wirth went back inside the residence and was not visible then the officers were not going to breach the residence and were going to pull perimeter.  (Ex. 9 at 177:9-23.)  Having mislead the officers into thinking that they would not breach the residence if Wirth retreated inside, once at the residence Hancock took the opposite course of action and ordered the officers into the virtually-guaranteed shootout that he was warned about by Gore.  The 10th Circuit clearly established in *Robbins* and *Uhlrig* that such conduct could give rise to § 1983 liability.

Not only did Gore warn Hancock about the danger posed by entering the Wirth residence, Gore gave Hancock a direct order not to enter the Wirth residence.  (Ex. 2 at 81:9-19, 81:24-25, 82:1-4, 84:16-19, 87:10-14, 87:20-88:1, 109:13-17.)  Hancock was required to follow Gore's

order, because Gore was above Hancock in the chain of command.  (*Id.* at 140:12-20; Ex. 1 at 39:11-19, 42:15-43:2, 44:11-22, 56:24-57:2, 57:13-25.)  The wrongfulness of violating Gore's direct order would have been apparent to any reasonable officer, even without any case law for guidance.  That said, as of the time of the eviction there was case law in the 10th Circuit illustrating that violating an order, or similar job requirements such as internal policy, would be a part of the determination of whether an officer's action was unconstitutional.  *See e.g.*, *Medina*, 960 F.2d at 1497 ("the officers involved in the chase deliberately disregarded supervisory orders to discontinue the chase; the dangerousness of such conduct to the people along the limited two mile chase route was known or obvious…."); *Herring v. Keenan*, 218 F.3d 1171, 1184 (10th Cir. 2000).  As discussed in greater detail above, PCSO had a "Hostage/Barricaded Subject Incidents" policy in place at the time of the Wirth eviction.  (*See* Ex. 7.)  Under the policy, when Wirth went back into the residence he was considered a barricaded subject.  (Ex. 2 at 159:6-17.)  Hancock's order to force entry into the residence was a violation of the policy.  (*See* Ex. 2 at 163:22-164:17.)  Law enforcement agencies have policies like this specifically to avoid needless danger to officers, suspects, and civilians.  One of Hancock's most basic duties as a law enforcement officer was to follow departmental policies.  Likewise, following orders through the chain of command is one of the most fundamental requirements of law enforcement, and any reasonable officer in Hancock's position would know that Gore's order not to enter the residence must be followed.  Hancock's violation of Gore's order and the barricaded subjects policy go directly to the constitutional claim at issue here.  Gore gave the order not to enter the Wirth residence specifically because of the danger involved and the foreseeable likelihood that Wirth would shoot at the officers.  (Ex. 2 at 80:23-25, 81:1-19, 83:1-11, 95:17-23.)  Hancock simply

disregarded Gore's order, and in doing so violated one of the most basic tenets of law enforcement, as well as the Plaintiffs' constitutional rights.

It is important to remember that after retreating into his residence, Wirth was not a threat to anyone. (Ex. 1 at 227:20-228:6.) Wirth had not committed a crime; the officers were there to conduct an eviction, which is not a criminal matter. *See* C.R.S. § 13-40-101 *et seq.* Under such circumstances Hancock's conduct is even more egregious. Wirth did not place any of the officers in any kind of dangerous situation, prior to Hancock's order. Wirth also was not fleeing from the commission of an inherently violent crime. Under prior 10th Circuit case law viewed against this factual backdrop, it was clearly established that Hancock's conduct was unconstitutional. *See Hicks v. Woodruff*, No. 99-6303, 2000 U.S. App. LEXIS 15091, at *7-8 (10th Cir. June 28, 2000). Hancock's order to breach the door, with guns drawn and ready to use deadly force, was a constitutional violation because Wirth (while barricaded inside the residence) did not place anyone in a dangerous and life-threatening situation and Wirth was not fleeing from the commission of any crime.

In light of the above, it was clearly established in the 10th Circuit that Hancock's conduct violated Plaintiffs' rights. Even assuming for the sake of argument that there was no applicable case law, Hancock would not be entitled to qualified immunity because existing precedent under factually similar circumstances is unnecessary in an "obvious case" in which "the unlawfulness of the officer's conduct is sufficiently clear." *Wesby*, 138 S. Ct. at 590. This is the "obvious case." No reasonable law enforcement officer would think it proper to defy a direct order and send subordinate officers into a known danger, particularly when there is no emergency or danger requiring endangering the lives of fellow officers and the evictee. This is particularly

egregious considering Hancock's prior assurances to the officers that they would not be breaching the residence.  Once at the Wirth residence, Carrigan, Martin, Threlkel, and the other officers bravely followed Hancock's orders.  Though law enforcement is an inherently dangerous profession, that does not absolve Hancock of his egregious conduct.  No guidance from the 10th Circuit or the Supreme Court is necessary here given the obviously egregious nature of Hancock's conduct.

Having established that Hancock's actions violated a federal constitutional or statutory right, and that the right was clearly established at the time of Hancock's unlawful conduct, Hancock's motion for summary judgment on his qualified immunity defense should be denied.

**B.      Plaintiffs' Second Claim for Relief: 42 U.S.C. § 1983 – Deliberately Indifferent Training and Supervision**

Plaintiffs concede that Hancock is entitled to qualified immunity in his individual capacity with respect to Plaintiffs' second claim for relief, "42 U.S.C. § 1983 – Deliberately Indifferent Training and Supervision."[4]  (*See* First Am. Compl. (Doc. No. 32) at 20-23.)

**C.      Plaintiffs' First and Second Claims for Relief against Hancock in his Official Capacity**

Plaintiffs concede to dismissal of their claims for relief against Hancock in his official capacity.

---

[4] Plaintiffs do not, however, concede Hancock's factual arguments in this portion of his motion.  (*See* Hancock Motion at 22.)  To the extent those factual arguments apply to other aspects of the Hancock Motion, they are addressed elsewhere in this Response.  To the extent those factual arguments apply only to the portion of the Hancock Motion regarding Plaintiffs' second claim for relief, it is unnecessary for Plaintiffs to address those facts in light of Plaintiffs' concession on this claim.

## **CONCLUSION**

For all the reasons set forth above, Plaintiffs respectfully request that Hancock's Motion be denied with respect to Hancock's affirmative defense of qualified immunity.  The facts, in light of applicable law, show that Hancock violated Plaintiffs' constitutional rights, and it was clearly established at the time of the Wirth eviction that Hancock's conduct was unconstitutional.

Dated: May 4, 2018.

ELKUS & SISSON, P.C.

*/s/Lucas Lorenz*
Reid J. Elkus
Donald C. Sisson
Lucas Lorenz
501 South Cherry Street, Suite 920
Denver, CO 80246
Telephone: (303) 567-7981
Fax: (303) 431-3753
relkus@elkusandsisson.com
dsisson@elkusandsisson.com
llorenz@elkusandsisson.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on May 4, 2018, I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO MARK HANCOCK'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 54)** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Timothy P. Schimberg
Fowler, Schimberg, Flanagan & McLetchie, P.C.
1640 Grant Street, Suite 300
Denver, CO 80203
*Attorneys for Defendants Park County Sheriff's Office and Sheriff Fred Wegener*

David J. Goldfarb
Josh Marks
Berg Hill Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO 80302
*Attorneys for Defendant Michael Hancock*

*/s/ Alissa Creenan*_____
Alissa Creenan