```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     and KOLBY MARTIN,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12         DEPOSITION OF:  MONTE GORE - June 20, 2017
                 (NONCONFIDENTIAL ONLY TRANSCRIPT)
13   _____

14             PURSUANT TO NOTICE, the deposition of
     MONTE GORE was taken on behalf of the Plaintiffs at
15   501 South Cherry Street, Suite 920, Denver, Colorado
     80246, on June 20, 2017, at 9:08 a.m., before Darcy
16   Curtis, Registered Professional Reporter and Notary
     Public within Colorado.
17

18

19

20

21

22

23

24

25
```

H+G

Hunter+Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 2

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 2 of 17

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

57

1  really have a civil division, but it was handled by
2  support services, working with support services on any
3  evictions or civil process.
4      Q.  (BY MR. SISSON)  So I guess I'm just
5  trying to understand your answer a little bit.
6      A.  Okay.
7      Q.  Because there's like two or three "I
8  thinks."  Are you aware of a time where there was
9  actual training given to Park County members on here
10 is the A, B, Cs of the eviction process?
11     A.  I'm not aware of any specific training on
12 evictions or the process.  I do believe that would
13 have been discussed at the sergeant level to officers
14 that were doing those.
15     Q.  Sure.  So Park County needs to evict me
16 from my house.  Hey, we have to go evict Don.  And the
17 sergeant may have some discussion with a deputy prior
18 to going on that eviction?
19     A.  Correct.
20     Q.  A typical eviction would be a two-man
21 team; is that correct?
22         MR. SCHIMBERG:  Form.
23     Q.  (BY MR. SISSON)  Two-man or woman team?
24     A.  With as limited as staff were at Park
25 County, not necessarily.  I think that would be

58

1  preferable, but not always the case.
2      Q.  Now, in terms of the high-risk
3  eviction -- risk, high risk, being the operative
4  terms -- to your knowledge, was there some type of
5  threat assessment done by the Park County Sheriff's
6  Department prior to any given eviction?
7          MR. SCHIMBERG:  Object to the form.
8      A.  On a basic eviction, there would not be a
9  threat assessment done.  On what you're calling a
10 high-risk eviction or any situation where we would
11 expect violence or we perceived a threat, there would
12 be a risk assessment done.  Typically that was done by
13 Captain Hancock.
14     Q.  (BY MR. SISSON)  Are you aware how
15 many -- well, and you said I used the term high-risk
16 eviction.  Is high-risk eviction not a term used by
17 the Park County Sheriff's Department?
18     A.  Not until recently.
19     Q.  Okay.  Let me ask a better question then.
20 Prior to the Wirth incident, okay, how did the Park
21 County Sheriff's Department term your run of the mill
22 eviction with no known threat versus an eviction where
23 you felt there may be some credible threat?  What was
24 the terminology that was used by the Park County
25 Sheriff's Department?

59

1          MR. SCHIMBERG:  Foundation.
2      A.  On a basic eviction, it was an eviction
3  and that's the term that we used to describe that.  On
4  the Wirth eviction, my term is it was a SWAT operation
5  right from the very get-go.
6      Q.  (BY MR. SISSON)  Okay.  So believe me,
7  we're going to get to the Wirth incident.  Okay?
8          MR. SCHIMBERG:  Would you allow me just a
9  second here, Don.  Excuse me.  Mr. Gore, every once in
10 a while your voice drops off.  I'm sorry for the
11 delay, but I want to see what your last little phrase
12 was.  Thanks for that.  I just missed that last little
13 phrase.
14         MR. SISSON:  That's okay.  Let me know
15 when you're ready, Tim.  Ready?
16         MR. SCHIMBERG:  Sure.
17     Q.  (BY MR. SISSON)  So, Undersheriff, in
18 your mind, the terminology or the terms of art being
19 used at the Park County Sheriff's Department prior to
20 the Wirth eviction, were you had an eviction, which it
21 could be a one or a two-person sort of procedure, or
22 it was essentially a SWAT operation?
23     A.  Yes.
24     Q.  Okay.  So you didn't really have high-
25 risk evictions; it was essentially a SWAT operation?

60

1      A.  Yes.
2      Q.  Now, when you say a SWAT operation, what
3  does that mean?
4      A.  That's where your threat assessment comes
5  in, that's where we plan the operation, that's where
6  we would have medical respond, that's where we would
7  have ambulances available, that's where we would have
8  a team and equipment staged, that's where a briefing
9  would take place with the SWAT commander and the
10 operators as far as what the issue was, information
11 would be conveyed on the threat evaluation,
12 information would be very specific as far as the plan
13 of action that was going to take place, and emergency
14 services would be notified and placed at a staging
15 area in case of injury.  So it's a lot more detailed,
16 and it is an operation.
17     Q.  And does the SWAT operation consist of
18 SWAT operators as opposed to Park County Sheriff's
19 Deputies that are not SWAT trained or SWAT operators?
20     A.  It should be tactical officers.
21     Q.  Okay.  Do you know if Nathan Carrigan was
22 a tactical officer?
23     A.  I believe the officers would have
24 received some tactical training.  I don't believe Nate
25 was a tactical officer.

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 3 of 17

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

**Page 77**

1  page, I think this sort of mirrors what you testified
2  to earlier. Under "The Structure of the Training
3  Section," specifically subsection C 2, "The division
4  commanders are responsible for the training,
5  supervision and budgeting of their respective
6  division." Is that accurate?
7      A. Yes.
8      Q. So the division commander in charge of
9  patrol at the time of the Wirth incident, would that
10 be Captain Hancock?
11     A. Yes.
12     Q. Okay. So I want to go to the specific
13 event. Okay. So February 24, 2016, what we're
14 calling the Wirth incident. Okay?
15     A. Okay.
16     Q. Did you have any prior interactions with
17 Martin Wirth prior to the date of the incident?
18     A. I did not have personal interaction with
19 Martin Wirth.
20     Q. Okay. Did you have any personal
21 knowledge of Martin Wirth or any of his threats?
22     A. Yes.
23         MR. SCHIMBERG: Form.
24     Q. (BY MR. SISSON) Okay. And what was your
25 personal knowledge?

**Page 78**

1      A. I was aware of Martin Wirth. I was aware
2  that he had made threats to law enforcement. I
3  believe there was an incident two weeks prior where he
4  had made threats -- I think it was someplace in
5  Jeffco -- and had to be contacted and had made threats
6  to officers. I had looked at information and
7  considered Wirth to be anti-government, anti-law
8  enforcement, and I felt he was extremely dangerous.
9      Q. Did you know him to be armed, dangerous,
10 and violent?
11         MR. SCHIMBERG: Form. Foundation.
12     A. Yes.
13     Q. (BY MR. SISSON) Based on -- and let me
14 back that up. Let me hone in on that a little bit
15 more. Did you know Mr. Wirth to be armed, dangerous,
16 and violent prior to February 24, 2016?
17     A. I felt he posed a significant threat.
18 Based on the threats made, I felt there was a high
19 probability he would be armed. And I felt he was
20 extremely volatile and dangerous, especially to law
21 enforcement and the government and the mortgage
22 company that he was dealing with.
23     Q. Okay. So what I want to do -- and we're
24 just going to continue with the numbering, so this is
25 going to be Exhibit 13.

**Page 79**

1         (Deposition Exhibit 13 was marked.)
2      Q. Undersheriff, this is the Welles Tonjes
3  lawsuit that was filed exactly a year after the
4  incident on February 24, 2017. And I believe it was
5  one of the documents you said you read prior to the
6  deposition?
7      A. Yes.
8      Q. Okay. Now, I want you to turn to --
9  well, looking at Exhibit 13, have you reviewed this
10 document prior to the deposition?
11     A. I have.
12     Q. Okay. I want to go to page 5 of this
13 complaint and specifically paragraph 22. Now, why
14 don't you read that paragraph to yourself and let me
15 know when you're ready.
16     A. Okay. I am finished reading 22.
17     Q. Now, you just testified to your knowledge
18 of Mr. Wirth, right?
19     A. Correct.
20     Q. And you said you reviewed some materials
21 that led you to the belief he was anti-government,
22 anti-cop, armed, dangerous, and was a significant
23 threat, right?
24         MR. SCHIMBERG: Form.
25     A. That's correct.

**Page 80**

1      Q. (BY MR. SISSON) Okay. Now, did you keep
2  that information to yourself or was that
3  information -- as it says in paragraph 22, "Mr. Wirth
4  was well-known within the Park County Sheriff's
5  Office." Do you see that first sentence?
6      A. I do.
7      Q. So your feelings or your beliefs about
8  the threat Mr. Wirth posed, do you believe that that
9  threat was well-known within the Park County Sheriff's
10 Office?
11         MR. SCHIMBERG: Form. Foundation.
12     A. This situation was very well-known
13 throughout the entire agency, yes.
14     Q. (BY MR. SISSON) Well, prior to the
15 February 24 events, okay, were the threats, the threat
16 assessment, if you will, your knowledge of Mr. Wirth,
17 was that well-known within the department?
18         MR. SCHIMBERG: Foundation and form.
19     A. Yes.
20     Q. (BY MR. SISSON) How do you know that?
21 Did you have specific conversations with people?
22     A. I did.
23     Q. Did you ever have a specific conversation
24 with Sheriff Wegener prior to February 24, 2016, about
25 the threat that Martin Wirth posed?

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 4 of 17

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

81

1  A. I never had a conversation specifically
2  with Sheriff Wegener.
3  Q. What about with Captain Hancock?
4  A. Yes.
5  Q. A specific conversation?
6  A. I did.
7  Q. What was your specific conversation with
8  Captain Hancock?
9  A. Approximately two weeks, two and a half
10 weeks, prior to this operation being conducted, I had
11 called Captain Hancock into my office and advised him
12 that I felt Wirth was a significant threat. Told him
13 that during the operation, I wanted to be very clear
14 that I considered Wirth extremely dangerous. I felt
15 he was homicidal and suicidal. I felt he wanted to
16 commit suicide by cop and take as many officers with
17 him as he could. I directed Captain Hancock that
18 under no circumstances whatsoever were they to enter
19 Wirth's residence.
20 Q. Okay. I mean, that sounds pretty
21 serious, Undersheriff. Are you saying you gave him a
22 direct order to --
23 A. I did.
24 Q. Let me finish my question. Are you
25 saying that you gave Captain Hancock a direct order

82

1  not to enter the Wirth structure approximately two
2  weeks before the incident?
3  MR. SCHIMBERG: Form.
4  A. Yes.
5  Q. (BY MR. SISSON) At any point did you
6  rescind that order?
7  A. No.
8  Q. Okay. In your specific conversation with
9  Hancock, did he acknowledge your order?
10 A. Yes.
11 Q. Did he have anything more than I
12 understand or did he say -- did he elaborate, I agree
13 with you, Undersheriff? I mean, tell me what was his
14 response. I mean, you just gave this direct order not
15 to breach the structure. Did he respond in a
16 substantive way?
17 A. He indicated that he understood the order
18 and that he would follow the directive and that I
19 could trust him that no one would be hurt in this
20 operation.
21 Q. Why did you give that order to Hancock?
22 A. I felt this situation and I felt
23 Mr. Wirth was extremely dangerous. And I was
24 concerned for the welfare of our officers and I was
25 concerned for the welfare of the residence and I had a

83

1  bad feeling about this entire operation.
2  Q. So let me back up a little bit. Now,
3  your view of Mr. Wirth based on what you reviewed and
4  the knowledge that you possessed at the time that you
5  communicated to Captain Hancock, did you consider that
6  to be a threat -- a, quote, unquote, threat
7  assessment?
8  A. That was my assessment. Hancock, I
9  believe, did a threat assessment and arrived at the
10 same conclusion, feeling that and having the
11 understanding that Mr. Wirth was extremely dangerous.
12 Q. Why do you believe -- you said you
13 believe Mr. Hancock did a threat assessment. Why do
14 you hold the belief that Captain Hancock did a threat
15 assessment?
16 A. This was a tactical operation from the
17 very get-go. The operation had two phases. We knew
18 that Mr. Wirth was extremely volatile and dangerous
19 and most likely armed. The first phase of the
20 operation was officers were supposed to, under the
21 tactical plan, make an attempt to get Mr. Wirth out of
22 the house in a peaceable manner.
23     I had anticipated that Mr. Wirth may come
24 out of the residence and go back in. And typically in
25 my experience as a peace officer, they will come out

84

1  of the residence to assess how many officers you have
2  and assess the situation themselves. When they go
3  back in the residence or if they go back in the
4  residence, at that point the operation should be
5  considered a barricade suspect operation. And the
6  officers, under the plan that Hancock and I discussed,
7  were supposed to withdraw to the perimeter, at which
8  time I was supposed to be given a phone call to assess
9  what we were going to do at that point.
10 Q. Okay. Now, we'll look at the policy in a
11 few minutes, but are you saying that -- what you just
12 articulated was essentially a two-phase tactical plan;
13 is that fair? I don't want to put words in your
14 mouth, so tell me if I'm wrong on that.
15 A. That's exactly what this was.
16 Q. And it sounds like it was a tactical plan
17 that was more or less an order by you to the captain;
18 is that fair or not fair?
19 A. That's accurate.
20 Q. Okay. So this really wasn't up for
21 discussion. It was more of an undersheriff telling a
22 captain here is the tactical plan, phase one, we'll
23 approach, we'll try to talk him out peacefully?
24 A. (Deponent nodded head up and down.)
25 Q. Did you specifically communicate to

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 5 of 17

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

85
1  Hancock that you felt it was likely or you anticipated
2  Wirth would come out and then retreat back in?
3      A.  That's correct.
4      Q.  And you told that to Hancock -- is this
5  the same communication approximately two weeks prior?
6      A.  Yes.
7      Q.  Okay.  How long did this meeting last?
8      A.  The meeting was conducted in my office,
9  about 30 minutes, and we actually left my office and
10 continued the discussion down at the patrol room,
11 probably another 15 minutes or half hour, so about an
12 hour discussion, I would estimate.
13     Q.  Any witnesses to that communication?
14     A.  Not that I'm aware of.  There could have
15 been people in the patrol room that overheard the
16 operation --
17     Q.  How much --
18     A.  -- or the discussion.
19     Q.  Sorry.  I didn't mean to talk over you.
20 I apologize.  How much thought -- let's back up a
21 little bit.  Okay.  So specifically we can go to
22 Exhibit 13 and the paragraph before.  Do you see that,
23 21?  "The Park County Sheriff's Office decided that it
24 would approach Mr. Wirth at his residence on
25 February 24, 2016, regarding his eviction."  Do you

86
1  see that sentence?
2      A.  I do.  21?
3      Q.  Yes, paragraph 21 in Exhibit 13 on page
4  5.
5      A.  Gotcha.
6      Q.  When was that decided?
7          MR. SCHIMBERG:  Object to form.  When was
8  what decided?
9          MR. SISSON:  Oh.
10     Q.  (BY MR. SISSON)  The allegation in
11 paragraph 21 is that "The Park County Sheriff's Office
12 decided that it would approach Mr. Wirth at his
13 residence on February 24, 2016, regarding his
14 eviction."  Do you see that sentence?
15     A.  (Deponent nodded head up and down.)
16     Q.  Is that an accurate sentence?
17     A.  It is.
18     Q.  Okay.  Who decided that and when?
19     A.  I believe that would have been decided in
20 the meeting I had with Hancock approximately two weeks
21 prior to the operation.
22     Q.  Okay.  So you decided that?
23     A.  Yes.
24     Q.  Did you pick the date?
25     A.  I did not pick the date.

87
1      Q.  Who picked the date?
2      A.  As I recall, I think the date was
3  decided -- I think Sergeant Tonjes had input along
4  with Captain Hancock as far as when they would have
5  manpower available.
6      Q.  Okay.  So you have this meeting with the
7  captain about your assessment of the threat and your
8  communication to him of the tactical plan?
9      A.  Correct.
10     Q.  That accompanied a specific order not to
11 breach the structure under any circumstances?
12     A.  That's what I ordered Captain Hancock to
13 do, that under no circumstances was he to enter the
14 Wirth residence.
15     Q.  Okay.  Was there any ambiguity in your
16 order?  I mean, is there any way that he may have
17 thought, well, he doesn't really mean that or, you
18 know, if Wirth retreats in and I start to feel like
19 it's dangerous, maybe I can then breach the structure?
20     A.  There would have been no ambiguity.  I
21 gave the order and made it crystal clear that under no
22 circumstances was he to enter the residence.  I made
23 it clear that I felt Wirth was highly volatile and
24 dangerous and that I felt Mr. Wirth wanted to commit
25 suicide by cop and take as many officers with him as

88
1  he could.
2      Q.  So let me ask you this.  I mean, you have
3  a boss, the sheriff?
4      A.  I do.
5      Q.  And the sheriff can overrule your orders,
6  right?
7      A.  That is correct.
8      Q.  Okay.  So two weeks prior to the event,
9  the Wirth event, so I'm assuming it's around
10 February 12, give or take, right, you communicate this
11 to the captain.  And was it fair to say this was a
12 pretty big deal in your agency at that time?
13         MR. SCHIMBERG:  Form.  Foundation.
14     A.  This was a huge issue.  It was well-known
15 within the organization.  And I felt it was extremely
16 dangerous.
17     Q.  (BY MR. SISSON)  Okay.  So my question
18 is: Why didn't you go to the sheriff and say, hey,
19 Sheriff Wegener, I want to let you know this is a huge
20 deal in our organization, this is a huge threat to the
21 officers of our organization, I feel this guy is going
22 to take suicide by cop situation, he may take some of
23 us with him, I want to let you know I specifically, as
24 the undersheriff, implemented this tactical plan and
25 gave this order to Captain Hancock?  Why didn't you do

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 6 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

89

1 that, or did you do that?
2     MR. SCHIMBERG: Form.
3     A. The organization from the top down was
4 aware of the issue with Mr. Wirth. Sergeant Tonjes
5 was aware and had advised me he had briefed the
6 sheriff on this issue. The sheriff was supposed to be
7 out of town. He had a meeting in Denver --
8     Q. (BY MR. SISSON) Okay.
9     A. -- the day of this operation.
10    Q. Were you done?
11    A. No.
12    Q. Okay. Sorry. Go ahead.
13    A. With everybody having knowledge of this
14 situation, I did not feel it was necessary for me to
15 brief the sheriff again on what was well-known within
16 the organization.
17    Q. So are you saying that while you yourself
18 did not sit down across the desk from the sheriff and
19 articulate what you just articulated to me, you
20 believe that Sergeant Tonjes essentially did that?
21    A. Yes.
22        MR. SCHIMBERG: Form.
23    Q. (BY MR. SISSON) And based on your
24 knowledge, the sheriff was aware of your assessment of
25 Wirth, your tactical plan, and your direct order to

90

1 Hancock that under no circumstances that he should be
2 breaching the structure?
3     A. Yes.
4     Q. Okay. So you mentioned that on these big
5 operations, oftentimes, if not all of the time, you
6 would be the incident commander; is that true?
7     A. That is correct.
8     Q. Okay. This was such a threat, such a big
9 deal, why didn't you participate in the actual events
10 of February 24, 2016, from the very first phase?
11    A. The sheriff had scheduled a meeting and
12 was going to be out of the county that day. A lot of
13 times when the sheriff is gone, I step into that
14 position as acting sheriff. We were going to have
15 most of our resources in the Bailey area on this
16 operation. I felt my responsibility was to stay at
17 the office. We can't -- Park County is a huge county
18 and we needed a few people on the Fairplay side of the
19 county.
20        As I have stated earlier, I made it
21 crystal clear to Captain Hancock that if Mr. Wirth did
22 not answer the door or that if Mr. Wirth -- and I
23 anticipated he would come outside to assess us -- if
24 he went back inside, that at that time there was
25 supposed to be a withdrawal to the perimeter, at which

91

1 time Hancock would have contacted me by phone and we
2 would have assessed what we needed to continue the
3 operation, or I had considered withdrawing from the
4 operation.
5     Q. Now, you had this meeting with Hancock
6 approximately two weeks prior to the event. How much
7 time and thought did you put into either your threat
8 assessment or your tactical plan prior to
9 communicating it to Hancock approximately two weeks
10 before the event?
11    A. I had been made aware of this issue and
12 had had time to digest it and was very concerned, once
13 again, for the safety of our officers involved and for
14 the safety of the community, and I had given
15 considerable thought to this operation.
16    Q. And, I guess, what I'm looking for is --
17 if you can't answer it, it's fine, but when you say
18 you gave considerable thought in advance of your
19 meeting with Hancock, a day, two days, two weeks,
20 three weeks, three months? I mean, what period of
21 time are you digesting this information and
22 formulating your plan?
23    A. Six to eight weeks.
24    Q. Six to eight weeks. Okay. Now, during
25 that six to eight weeks, so we're talking, really,

92

1 about the first of the year and maybe even a little
2 bit before Christmas, you're giving thought to this
3 whole Wirth eviction; is that fair?
4     A. That is fair.
5     Q. Okay. During that six to eight weeks,
6 are you having any other communications with Captain
7 Hancock or Sheriff Wegener about this Wirth event as
8 you're formulating your tactical plan?
9     A. I know Captain Hancock was tasked with
10 the assignment to do a risk assessment and tactical
11 plan for the operation during the course of time. I
12 wasn't sure -- once again, the date was somewhat up in
13 the air prior to this. And the date February 24 was
14 eventually arrived at by, I believe, Captain Hancock
15 and I think Sergeant Tonjes had input into that, as
16 well as others may have had input into that.
17    Q. To your knowledge, if you know, who
18 tasked Hancock with a risk assessment?
19    A. I did.
20    Q. Who tasked Hancock with a tactical plan?
21    A. I did.
22    Q. Why, if you tasked Hancock with a risk
23 assessment and tactical plan, did you yourself
24 formulate your own risk assessment and your own
25 tactical plan?

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 7 of 17

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

93

1  MR. SCHIMBERG:  Form.
2  A.  Once again, I had significant concerns
3  for the safety of our staff, the safety of the
4  citizens and the neighbors in that neighborhood.  And
5  I just wanted to make it very clear to Captain Hancock
6  that I considered Wirth a significant threat.  And as
7  I have previously stated, I felt he wanted to commit
8  suicide by cop.  And based on statements that he had
9  made and incidents two weeks prior to that, that he
10 wanted to have a shootout with law enforcement and
11 take as many of us out as he could.  And that was my
12 feeling and concern at the time.
13     Q.  (BY MR. SISSON)  So it was such a risk
14 that you didn't just let Hancock do his own assessment
15 and own tactical plan, you took it upon yourself to do
16 essentially those same two steps; is that fair?
17     MR. SCHIMBERG:  Form.
18     A.  That would be fair.  And I wanted Captain
19 Hancock to have the understanding that this was
20 extremely volatile, extremely dangerous, and extremely
21 high risk.
22     Q.  (BY MR. SISSON)  So you mentioned -- you
23 already testified earlier -- that you believe Hancock
24 arrived at your same risk assessment?
25     A.  He did.

94

1     Q.  Do you think -- I'm just asking your
2  opinion.  Based on your communications with Hancock
3  and your experience with Hancock, do you think he
4  understood the threat that Martin Wirth posed?
5     MR. SCHIMBERG:  Form.  Foundation.
6     Q.  (BY MR. SISSON)  And when I say that, the
7  same way that you did?
8     MR. SCHIMBERG:  Same objections.
9     A.  I feel Captain Hancock was an experienced
10 SWAT commander.  He had experience in putting together
11 tactical plans and threat assessments and he was good
12 at that.  He had a clear understanding of the threat.
13 I reiterated that I had significant concerns about
14 Mr. Wirth and the threat that he posed, so much so
15 that I directed him and ordered him that he was under
16 no circumstances to go into that residence.  And he
17 had a clear, concise understanding on his own, and he
18 had a clear, concise understanding of the directive
19 that I had given him.
20     Q.  (BY MR. SISSON)  Did he in any way argue
21 or debate the merits of, well, what if he goes back
22 into the structure, you know, could there possibly be,
23 Undersheriff, a situation where he retreats back into
24 the structure and maybe we should breach the
25 structure?  Did he in any way articulate that to you?

95

1     A.  No.
2     Q.  Did he take any issue with your tactical
3  plan?
4     A.  No.
5     Q.  Did you ever see on a piece of paper an
6  actual risk assessment by Captain Hancock?
7     A.  I think he briefed me on the risk
8  assessment.  I don't remember seeing or recall seeing
9  a specific written risk assessment, but typically on
10 any operation, the captain was assigned to do a risk
11 assessment and provide a tactical plan which would be
12 submitted to me for approval.  And I would review
13 those plans, and if I had questions, I would ask those
14 questions, or if I had concerns, I would address those
15 concerns, if I wanted changes made, I would go over
16 those with the captains.
17     Q.  So did you ever get a written tactical
18 plan or a threat assessment from Captain Hancock?
19     A.  I think I got a verbal assessment.  And
20 the captain was aware of the threats that Wirth had
21 made and the captain was aware of the significant
22 threat that Wirth posed and the captain acknowledged
23 that he would follow my directive.
24     Q.  Okay.  So let me -- and I don't think we
25 need to belabor this too much, but let's look at

96

1  Exhibit 4 in the binder.
2     MR. RAY:  Are you doing all right?
3     THE DEPONENT:  I'm doing good.
4     MR. SCHIMBERG:  I'm having my old man
5  bout again.
6     MR. SISSON:  Oh, let's take five minutes,
7  Tim?
8     MR. SCHIMBERG:  Yes.
9     MR. SISSON:  Let's take a five-minute
10 break.
11    (Recess taken, 11:32 a.m. to 11:42 a.m.)
12     Q.  (BY MR. SISSON)  I want to go to
13 Exhibit 4.  And it looks like Exhibit 4 is an offense
14 report related to Martin Wirth.  Is that your
15 understanding?
16     A.  That's what it looks like, yes.
17     Q.  Relating to certain crimes that were
18 allegedly committed by Martin Wirth; is that fair?
19     A.  That is fair.
20     Q.  Did you have knowledge of -- my
21 understanding of this document is that the date of the
22 offense was on January 20, 2016.  Do you see the
23 incident date and time?
24     A.  Let me go back.
25     Q.  First page.

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

101

1  A. I do.
2  Q. Is that a significant threat to an
3  officer?
4  MR. SCHIMBERG: Form. Foundation.
5  A. It would be.
6  Q. (BY MR. SISSON) "I sprinted toward
7  Wirth, wrapped both of my arms around his body and
8  free arm, and tackled him to the ground. The force of
9  the impact broke my sunglasses and caused a scrape on
10  my forehead and right cheek. Wirth landed on his
11  back."
12  So did you understand that in the context
13  of this incident on January 20, Wirth was actively
14  aggressive towards officers and there was a physical
15  struggle?
16  A. Yes.
17  Q. Did you know that prior to the date of
18  the Wirth eviction event?
19  A. Yes.
20  MR. SCHIMBERG: Form.
21  Q. (BY MR. SISSON) Okay. Flipping the
22  page, I'm going to kind of cherry pick here through
23  this thing, because it's too long to read the entire
24  thing. First paragraph, third sentence, "Wirth was
25  still screaming at us and resisting." Do you see

102

1  that?
2  A. I do.
3  Q. Was that known to you prior to the Wirth
4  incident?
5  A. I know that he had resisted.
6  Q. Okay. "Wirth kept relaxing and clenching
7  his fist as I was trying to manipulate his hand and
8  arm. I also noticed a pocketknife in a pocket on
9  Wirth's right leg." Were you aware of not only the
10  resistance but also the weapon in this event, i.e.,
11  the pocketknife?
12  A. I was not aware of the pocketknife.
13  Q. Okay. Second paragraph, so I'm on Bates
14  1,003, two-thirds of the way down, "Wirth yelled back
15  by saying, 'No. They're illegally arresting me. Call
16  the ACLU.'" Were you aware of that comment?
17  A. No.
18  Q. Third paragraph, Bates 1,003, "Wirth
19  still refused to place his legs in the vehicle. Wirth
20  then yelled at us by saying you motherfuckers broke my
21  teeth. You fucking broke my teeth. Wirth had three
22  missing teeth on his bottom jaw. I did not see any
23  blood." Were you aware that in the context of this
24  event, Wirth was basically yelling he was being
25  illegally arrested and that he believed he was

103

1  assaulted by the officers?
2  A. I know he had made -- he was resisting
3  and I know that there was a confrontation, but I did
4  not read the report, so I was unaware of the detail or
5  the specifics.
6  Q. Were you aware of his -- what he believed
7  to be his injury?
8  A. No.
9  Q. Okay. Do you believe that if he felt he
10  was assaulted by officers that he would pose a
11  greater, potentially an even greater, threat on the
12  date of the Wirth eviction?
13  MR. SCHIMBERG: Form and foundation.
14  A. I was aware prior to this that he posed a
15  significant threat. When I was made aware of this, it
16  reinforced what I already knew.
17  Q. (BY MR. SISSON) Let me ask it a
18  different way. You're finding this out for the first
19  time, I mean, or at least the broken teeth part of it.
20  In your mind, the threat assessment, could it have
21  gone any higher than you already had it, or was he
22  basically at the highest level of threat, in your
23  mind?
24  MR. SCHIMBERG: Form and foundation.
25  A. In my mind, he was at the highest threat

104

1  level.
2  Q. (BY MR. SISSON) Okay. Let's go back to
3  the same exhibit, fourth paragraph. And this is the
4  event with the insurance agent.
5  A. Yes.
6  Q. "As Wirth was walking out, he stated he
7  was going to get a gun and 'shoot the first cop he
8  sees.'" Do you see that?
9  A. Yes.
10  Q. Were you aware that Martin Wirth
11  allegedly made that comment to an insurance agent?
12  A. I was aware that he had talked about
13  having a firearm, but I wasn't aware that it was an
14  insurance agent.
15  Q. Okay. But you were aware that he talked
16  about having a firearm. Were you aware that he was
17  talking about using the firearm to shoot the first cop
18  he sees?
19  A. I believe I was -- as I recall, I
20  believe -- as I recall, I was made aware of the
21  incident and that he had threatened law enforcement
22  with firearms.
23  Q. Okay. So it sounds like you weren't
24  maybe necessarily aware of the specific verbatim
25  quote, but the general I have a firearm, I'm going to

26 (Pages 101 to 104)

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 9 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

### Page 105

1   shoot a cop, you were aware of?
2       A. Yes.
3       Q. Flipping the page, what about the last
4   full paragraph? "Deputy MacDonald came over to me and
5   Wirth. Wirth began asking us to 'shoot him in the
6   head.'" Do you see that?
7       A. Yes.
8       Q. Were you aware that Wirth had a desire to
9   have essentially a suicide by cop situation?
10          MR. SCHIMBERG: Form. Foundation.
11      A. I had a previous awareness that he was
12  going to -- that he wanted to commit suicide by cop,
13  but I didn't know that was part of this incident or
14  that statement was made as part of this incident.
15      Q. (BY MR. SISSON) These kind of
16  statements, are they concerning to you?
17      A. Yes.
18      Q. Does it reinforce your threat assessment
19  of Martin Wirth?
20      A. Yes.
21      Q. Okay. Now, what about Rick Gabrisch? Do
22  you know who that person is?
23      A. I believe he was a neighbor of Mr. Wirth.
24      Q. Are you aware of any communications from
25  Mr. Gabrisch to the Park County Sheriff's Department

### Page 106

1   as it concerns Mr. Wirth?
2       A. I was not aware of any communication when
3   I worked at Park County. I believe I watched Channel
4   4 News in which this individual had alleged that he
5   had specifically contacted the sheriff and later
6   another employee of the sheriff's office. But at the
7   time, I was not made aware or was aware of any of this
8   communication.
9       Q. So if hypothetically Rick Gabrisch
10  contacted Park County Sheriff's Department, one to
11  two -- I'm sorry -- two to three months prior to the
12  Wirth incident and made a statement along the lines of
13  he has reason to believe that Wirth will shoot it out
14  with the cops and he communicated that to the sheriff,
15  would it be your understanding that the sheriff would
16  communicate that to the department in some form or
17  fashion?
18      A. Yeah.
19          MR. SCHIMBERG: Form and foundation.
20      A. Yes.
21      Q. (BY MR. SISSON) If that statement was
22  made by a concerned citizen to the sheriff, why do you
23  think the sheriff would then disseminate that
24  information to the department?
25      A. In my opinion, that would be a

### Page 107

1   significant threat and add to the information we
2   already had about Mr. Wirth. And that should have
3   been conveyed to me and that should have been conveyed
4   to Captain Hancock.
5       Q. To your knowledge, did --
6       A. And disseminated through the
7   organization.
8       Q. To your knowledge, did that ever occur?
9   Did Sheriff Wegener communicate the information to
10  you?
11      A. No.
12      Q. Do you have any knowledge of the sheriff
13  communicating the information to Captain Hancock?
14      A. No.
15      Q. How about to the department?
16      A. No.
17      Q. Okay. So I want to get back and drill
18  down a little bit more on -- you talked a little bit
19  about the tactical plan and what it was and your role
20  in devising the plan, but I want to back up a little
21  bit. Why are tactical plans made and utilized?
22      A. Tactical plans are devised so that
23  officers have a clear and concise understanding of
24  what their specific assignments are going to be, what
25  the plan is, and how it's going to be executed. When

### Page 108

1   you have a tactical plan, you don't want there to be
2   any question whatsoever come up during the plan.
3   That's why we develop plans.
4       Q. Okay. So I think we've talked pretty
5   extensively about the six to eight weeks you thought
6   about it. We talked quite a bit about your 45-minute
7   to an hour long meeting with Captain Hancock on or
8   about February 12 and your specific order to him. I
9   want to talk about between February 12 and the date of
10  the eviction proceeding on February 24. Okay. So you
11  communicated the tactical plan, you communicated your
12  risk assessment, you communicated your direct order to
13  Hancock that under no circumstances should the
14  structure be breached?
15      A. Yes.
16      Q. Okay. Between February 12 and
17  February 24, what is your understanding of whether
18  that tactical plan was communicated to the team, the
19  group of people that were going to implement the
20  tactical plan?
21      A. On a tactical plan, one of the important
22  phases is to have a briefing prior to the execution of
23  that plan. During the briefing, the officers are
24  advised of what positions they are going to hold, what
25  their duties and responsibilities as part of that

MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

---

109

1  operation are going to be, assignments are given, and
2  the plan is expressed to them, a lot of times even
3  through diagram, of what is going to take place. Once
4  again, we want that plan to be very clear and we want
5  everyone associated with that plan to have a clear,
6  concise understanding so that there are no questions.
7  Officers are also given the opportunity after the plan
8  is given to ask questions or express concerns. But
9  that plan is made so that, once again, just to
10 reiterate, everybody has a clear, concise
11 understanding of what their role is, what the mission
12 is, and what they're going to accomplish.
13      Q.  Okay.  So back to my question, you
14 communicated very clearly the tactical plan and the
15 accompanying order not to breach to Hancock on or
16 about February 12?
17      A.  Correct.
18      Q.  You've answered that multiple times.  Are
19 you aware of any briefing to the members of the
20 sheriff's department that we're going to implement the
21 tactical plan, carry out the tactical plan, prior to
22 February 24?
23      A.  Standard operating procedure would have
24 been to have a briefing prior to the operation being
25 executed where all team members would have been made

---

110

1  aware and briefed on the tactical plan, their
2  assignments, and what they were to do.
3      Q.  So are you aware of such a briefing
4  occurring prior to the date of the event?
5      A.  I wasn't aware or it wasn't reaffirmed to
6  me that a tactical briefing had taken place during
7  this time frame.  I assumed that standard operating
8  procedure, there would be a briefing prior to the
9  execution of the operation.  In reading material after
10 the fact, I'm aware that that briefing did take place.
11     Q.  Do you know when it took place?
12     A.  It would have taken place, I think, at
13 the -- or it would have taken place prior -- early on
14 the morning of the 24th prior to the execution of the
15 operation.
16     Q.  So my understanding in the CBI report is
17 that it occurred at approximately 8:30 hours.  Does
18 that sound -- is that your understanding as well, or
19 do you have a different understanding?
20     A.  That's my understanding.
21     Q.  Okay.  So let me back up a little bit.
22 Did you have an expectation -- you said in the very
23 beginning of the deposition this was going to be a
24 SWAT operation; is that right?
25     A.  That is correct.

---

111

1      Q.  Did you have any role in selecting the
2  members of the team or was that sort of up to Captain
3  Hancock?
4      A.  That was going to be up to Captain
5  Hancock, but because this was a two-phase operation
6  where we were going to try to contact Mr. Wirth and
7  get him to leave the premises, with the understanding
8  that if he didn't, they were supposed to fall back to
9  perimeter, and then it became a full-fledged SWAT
10 operation.  And at that point, tactical officers would
11 be utilized.  And a tactical operational plan would be
12 executed.
13          But I was not convinced that that was the
14 proper course.  I wanted to brief with Captain Hancock
15 and have some time -- we have all of the time in the
16 world when we're on the perimeter -- to discuss
17 options.  And some of the options that I had discussed
18 with Captain Hancock were using gas at that time to
19 have Mr. Wirth leave the premises.  I wanted to assess
20 what equipment and officers we had to ensure that we
21 had trained officers if we decided to take a tactical
22 approach.  The tactical approach, once again, would
23 have been under no circumstances to use personnel to
24 go in.  It would have been to use gas to force
25 Mr. Wirth to come out.

---

112

1      Q.  So have you ever heard the terminology
2  talk them out, smoke them out?
3      A.  Yeah.
4      Q.  So it sounds like -- I'm obviously being
5  very simplistic about it -- phase two would have been
6  the traditional approach of setting up a tactical
7  perimeter?
8      A.  Correct.
9      Q.  Establishing communications with
10 Mr. Wirth?
11     A.  Correct.
12     Q.  In an effort to talk him out peacefully?
13     A.  (Deponent nodded head up and down.)
14     Q.  And if there was going to be any tactical
15 measures beyond that, your view is it would have been
16 chemical in nature?
17     A.  That's correct.
18     Q.  Okay.  Was there any consideration to
19 using a robot?
20     A.  If Mr. Wirth didn't come out, the plan
21 called for the officers to fall back to a safe
22 location on perimeter and all of those issues were to
23 be discussed with me so that we could evaluate
24 options.
25     Q.  Okay.

---

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 11 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

### Page 113

1  A. Gas would be one option, a robot, even
2  though it wasn't specifically discussed, from a nearby
3  jurisdiction would be an option, withdrawing would
4  have been an option.
5  Q. Completely vacating the operation
6  entirely?
7  A. Yes.
8  Q. Okay. So did you attend the 8:30
9  briefing that your understanding occurred on the date
10  of the incident?
11  A. No.
12  Q. Why not?
13  A. Once again, I was in Fairplay. Most of
14  our folks were in Fairplay. Sergeant Tonjes and I
15  stayed -- excuse me. Most of the folks were in Bailey
16  on this operation that we had that day. We needed to
17  have a presence on the Fairplay side. The sheriff was
18  going to be attending a meeting in Denver, so I felt
19  under the circumstances I needed to stay in Fairplay.
20  And Captain Hancock and I discussed the situation and
21  he assured me he would follow my directive to the
22  letter.
23  Q. Okay.
24  A. So I felt comfortable with that.
25  Q. I know he assured you of that. Well, I

### Page 114

1  think your testimony was on the day that you
2  communicated your threat assessment and tactical plan
3  about two weeks prior, that he said he understood the
4  plan, he understood your order, and he was going to
5  follow it?
6  A. Correct.
7  Q. Did he reaffirm his commitment and
8  understanding to your plan between February 12 and the
9  date of the incident?
10  A. I don't recall if he reaffirmed the plan
11  between those dates or that timeline, but he was very
12  much aware of what the plan was. And if there had
13  been any changes to the plan, he would have directed
14  those to me or should have.
15  Q. To your knowledge, were there any changes
16  to your plan, the one you imparted on him on
17  February 12, to the date of the incident?
18  A. No.
19  Q. Did he ever come to you with a request
20  for changes?
21  A. No.
22  Q. I want you to turn to Exhibit 6 in your
23  binder. Are you there?
24  A. I am.
25  Q. Okay. So do you have any -- and it's a

### Page 115

1  two-page document.
2  A. Okay.
3  Q. Okay. Do you have any knowledge of what
4  Exhibit 6 is?
5  A. It looks like the diagram that would have
6  been presented as part of the pre-briefing on the
7  morning of February 24.
8  Q. Okay. Now, am I correct in stating
9  that -- well, let me back up. Have you seen this
10  document prior to today?
11  A. No.
12  Q. Okay. Looking at the document -- I'm on
13  the first page -- it says, "Hancock, OPPS-5." Do you
14  see that?
15  A. I do.
16  Q. Do you know what that means?
17  A. Yes. When we have a tactical operation,
18  we go to a separate radio channel so that law
19  enforcement activities are still handled on the
20  regular channel, but we don't want any interruptions
21  or people coming in or talking, so we separate and
22  went to a special ops. It actually stands for
23  Operations 5.
24  Q. So that's a channel, radio channel?
25  A. That was our specific channel that was

### Page 116

1  designated for this specific operation.
2  Q. Okay. Let me back up a little bit. So
3  in terms of the tactical planning of this whole event,
4  was it known within the agency on February 24, 2016,
5  that the sheriff was going to be going out of town to
6  Denver and that you were going to be the acting
7  sheriff?
8  A. Yes.
9  Q. How does that work in terms of the acting
10  sheriff? Does the sheriff say -- pull out a magic
11  wand and say, You're the acting sheriff today, or is
12  there some kind of personnel order, e-mail? How do
13  people know that you're the acting sheriff?
14  MR. SCHIMBERG: Form. Foundation.
15  A. In the absence of the sheriff, the
16  undersheriff assumes that role. And anytime the
17  sheriff would leave the county, I was in that role as
18  the second in command.
19  Q. (BY MR. SISSON) Based on your knowledge,
20  do you believe that was understood by Captain Hancock
21  on February 24, 2016?
22  A. Yes.
23  Q. Okay. In terms of incident command, was
24  it your understanding that had this tactical plan made
25  it to step two, you would be the incident commander?

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

Page 137

1  Q. You're familiar with written discovery
2  responses?
3  A. Yes.
4  Q. In fact, you've probably worked with
5  Mr. Schimberg as your attorney on written discovery
6  responses; is that right?
7  A. Yes.
8  Q. Okay. So looking at this document here,
9  okay, this is -- and it looks like we don't have the
10 signed verification, but if you go to page 12, you'll
11 see a verification from Mark Hancock or what should
12 have been a signed verification. Page 12.
13 A. I'm getting there.
14 Q. Okay. Do you see that?
15 A. Yes, I do.
16 Q. But nevertheless you can see that these
17 are the responses of Mark Hancock and you see the
18 electronic signature of Timothy P. Schimberg, his
19 attorney?
20 A. I do.
21 Q. Okay. Let's go back to page 8, question
22 9.
23 A. Okay.
24 Q. The question is: "Please state with
25 specificity all facts to support the decision to

Page 138

1  breach the door of the Wirth residence on the date of
2  the incident." Then there's an objection and then
3  there is a one-paragraph answer. Do you see that?
4  A. Uh-huh, I do.
5  Q. I guess what I'm telling you is this is
6  the response to that question from Mark Hancock in the
7  form of a written discovery response. Okay?
8  A. Okay.
9  Q. I don't know if -- you probably haven't
10 seen this before; is that right?
11 A. I have not.
12 Q. Why don't you read that paragraph to
13 yourself. I want to ask you some questions about it.
14 A. Okay. I read it.
15 Q. Okay. So I'm looking -- I'm going to ask
16 you questions based on that response. Okay?
17 A. Okay.
18 Q. So Hancock says, "At that time, and after
19 announcing ourselves and knocking on the door numerous
20 times, it became clear that Mr. Wirth was not coming
21 to the door per our requests." Now let me back up a
22 little bit. Phase one of your tactical plan was if
23 Mr. Wirth does not come to the door, what was the
24 plan?
25 A. They were to withdraw to the perimeter.

Page 139

1  Q. Okay. So based on your tactical plan if
2  Mr. Wirth chose not to come to the door, was it your
3  belief that they should have retreated?
4  A. Yes.
5  Q. And that was essentially a direct order
6  from you to Hancock?
7  A. Yes.
8  Q. Okay. Let's keep going on this thing.
9  "I became concerned. I was concerned as to where
10 Mr. Wirth was, to include the possibility that he was
11 exiting the house to a vacated perimeter spot or
12 simply hiding in the house." Do you see that?
13 A. Yes.
14 Q. Do you think that is a valid concern
15 based on phase one of your tactical plan?
16 A. No.
17 Q. Why not?
18 A. According to phase one, the officers
19 should have been put in a position in a perimeter
20 around the house to begin with, so that if Mr. Wirth
21 exited from any side of the house, it could be
22 reported to the officers. Additionally, topography
23 and trailers or whatever the tactical issues at the
24 residence are, whatever they were at the time, should
25 have already been addressed. And how they were going

Page 140

1  to withdraw should have already been addressed as
2  well.
3  Q. Okay. And did you believe that was
4  addressed in the form of your tactical plan?
5  A. I left those details up to the captain.
6  In any of our discussions, none of those details were
7  broached by the captain that there were issues.
8  Q. Okay. Stopping at that point. And this
9  is Hancock's answer, right? Knocking numerous times,
10 he doesn't come to the door, right?
11 A. (Deponent nodded head up and down.)
12 Q. Let's assume he has these concerns he's
13 articulating here. Was the order from you to him to
14 tactically retreat?
15 A. Tactically withdraw.
16 Q. Tactically withdraw?
17 A. Yes.
18 Q. And was Hancock insubordinate by not
19 following that order?
20 A. Yes.
21 Q. Okay. Do you believe by not following
22 that order, essentially Hancock exposed the members of
23 the team to great danger?
24 MR. SCHIMBERG: Form and foundation.
25 A. Yes.

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 13 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

141

1  Q. (BY MR. SISSON) And what was that
2  danger?
3  A. By not withdrawing to a safe location and
4  by breaching the door, you're going into the lion's
5  lair and you exposed everybody to danger.
6  Q. Were those dangers known to Hancock and
7  articulated to you by Hancock?
8  MR. SCHIMBERG: Form and foundation.
9  A. Yes.
10  Q. (BY MR. SISSON) And did you actually
11  articulate that you felt that this could be a
12  situation where he shoots cops and wants to die by
13  suicide by cop?
14  MR. SCHIMBERG: Form.
15  A. That was my feeling, yes.
16  Q. (BY MR. SISSON) But did you articulate
17  that to Hancock?
18  A. I did.
19  Q. Okay. Now, I'm going to continue with
20  Hancock's answer here.
21  A. Okay.
22  Q. Okay. I'm in the middle of that
23  paragraph. "I believed, based upon my experience,
24  that our position near the house was thus compromised.
25  I knew that retreating across open ground, to include

142

1  downhill from the residence, would unnecessarily
2  expose all of the officers. Because we were up
3  against the house, and unable to safely retreat across
4  open ground, I asked permission to make entry which
5  was granted by the sheriff." Did you read that?
6  A. I did.
7  Q. Okay. I want to take that in steps. "I
8  knew that retreating across open ground, to include
9  downhill from the residence, would unnecessarily
10  expose all of the officers." Do you see that
11  sentence?
12  A. Yes.
13  Q. What is your reaction to that sentence or
14  that explanation?
15  A. I absolutely disagree with that.
16  Q. Why?
17  A. As the SWAT commander, all of those
18  considerations should have been taken into account as
19  far as and as part of the risk assessment. There
20  should have been the correct perimeter set up around
21  the residence. Officers should have been given
22  directives on perimeter, that if these officers
23  contact Wirth and he goes back inside the house or
24  Wirth doesn't come to the door, that they are to take
25  up defensive positions on perimeter and cover the

143

1  withdrawal of the officers as they get out of the
2  danger zone.
3  Q. So essentially there would have been
4  cover officers during the tactical withdraw?
5  A. Yes.
6  Q. And in terms of the topography and the
7  downhill tactical withdraw, is it your testimony that
8  was well-known to Hancock in advance of this incident
9  on February 24?
10  A. This is the first that I became aware of
11  any tactical uphill or downhill issues. Part of the
12  responsibility of the SWAT commander would have been
13  to not only do topographical photos of the residence,
14  do photos around the sides of the residence, and to
15  identify any of those issues prior to ever deploying
16  or prior to ever taking a team up to the residence.
17  Q. So do you believe if Hancock had a
18  concern, you know, Hey, Undersheriff, you're giving me
19  a tactical plan that this guy doesn't answer the door
20  and I have to -- we have to do a tactical withdraw, it
21  is downhill to some degree, that may unnecessarily
22  expose the officers, would you expect the captain to
23  have articulated those concerns to you?
24  A. Yes.
25  Q. At any point did he?

144

1  A. No.
2  Q. Do you believe those to be valid
3  concerns?
4  MR. SCHIMBERG: Form.
5  A. If they were concerns that the captain
6  had, those concerns should have been dealt with prior
7  to any execution of this operation.
8  Q. (BY MR. SISSON) Do you believe these
9  concerns, whether valid or not, justified a departure
10  from your tactical plan?
11  A. Absolutely not.
12  Q. Hancock says that he did it because had
13  he not, he would have unnecessarily exposed all of the
14  officers. That was the language he used in this
15  discovery response. Do you believe that breaching the
16  residence unnecessarily exposed all of the officers?
17  A. Breaching the residence, in my opinion,
18  was gross negligence on the part of Hancock and the
19  sheriff.
20  Q. You used a term of legal art. I want to
21  know -- you're not a lawyer, right?
22  A. No.
23  Q. Okay. Do you know what the difference
24  between negligence and gross negligence is?
25  MR. SCHIMBERG: Form.

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

145

A. I think gross negligence would be doing something that you absolutely have an understanding and knowledge of and it goes against the conscious of any reasonable act. It's an extremely high level of negligence. And it's with knowledge and understanding that what you're doing is unduly putting people at risk versus making a decision that you can reflect back on and go, you know, I could have probably done a better job of managing this situation.

Q. (BY MR. SISSON) Do you believe Hancock was aware of the risks of breaching that structure?

A. Yes.

MR. SCHIMBERG: Form and foundation. Legal conclusion.

Q. (BY MR. SISSON) Do you believe he recklessly disregarded those risks?

A. Yeah.

MR. SCHIMBERG: Form. Foundation. Legal conclusion.

Q. (BY MR. SISSON) Do you believe by him recklessly disregarding those risks and ignoring those risks, that that led to Nathan Carrigan being shot and killed by Mr. Wirth?

MR. SCHIMBERG: Form and foundation.

A. Yes.

146

Q. (BY MR. SISSON) Do you believe that Hancock recklessly disregarding those risks led to Kolby Martin being shot seven times by Mr. Wirth?

MR. SCHIMBERG: Form and foundation.

A. Yes.

Q. (BY MR. SISSON) And same question: Do you believe that by Captain Hancock recklessly disregarding those risks, that led to Travis Threlkel being shot in the chest one time?

A. Yes.

MR. SCHIMBERG: Same objection.

Q. (BY MR. SISSON) Do you believe that had Captain Hancock not willfully and recklessly disregarded those risks, that none of this would have happened?

MR. SCHIMBERG: Form. Foundation.

A. Yes.

Q. (BY MR. SISSON) Now, do you say that lightly?

A. No, sir.

Q. I mean, you told me earlier today that you considered Hancock a work friend; is that right?

A. That is correct.

Q. Okay. Other than this incident, is there something -- did you have some kind of falling out

147

with Hancock that would cause you to be in any way seeking revenge against Hancock or do you have an ax to grind with Hancock or anything of that nature?

A. No.

Q. I mean, let me ask you this, your opinions. You've been in law enforcement for a very long time, right?

A. Yes.

Q. Do you believe your opinions are to a reasonable degree of certainty in the area of law enforcement?

MR. SCHIMBERG: Form. Foundation.

A. Restate your question.

Q. (BY MR. SISSON) I mean, you were the undersheriff. You devised the tactical plan. You've articulated great knowledge of law enforcement, thousands of hours of training, FBI Academy, so on and so forth. Do you believe that to some degree you have a certain expertise in law enforcement and tactics?

A. Yes.

Q. So do you believe that in that regard that you have the necessary background to give an opinion on the merits of a law enforcement officer's actions in a law enforcement action such as this?

A. Yes.

148

MR. SCHIMBERG: Object to form and foundation.

Q. (BY MR. SISSON) So when you say that you believe Hancock recklessly disregarded these policies -- and let me ask you this -- was it not just policies but also your order?

A. It was my order that this not occur, that no breach or entry be attempted. Our policy as far as barricaded suspect and how to handle those kinds of situations, although I haven't referred to that policy in some time, but I'm confident that the sheriff and Hancock violated their own policy.

Q. Is your opinion in that regard to a reasonable degree of certainty as sort of an expert in the field of law enforcement?

MR. SCHIMBERG: Form and foundation. Thank you.

A. Yes.

Q. (BY MR. SISSON) And is it to a reasonable degree of certainty as a sort of subject matter expert on your own policies and procedures in Park County?

MR. SCHIMBERG: Same objections.

A. Yes.

Q. (BY MR. SISSON) Are you in any way

37 (Pages 145 to 148)

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 15 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

Page 157

1  5?
2    A. I do.
3    Q. Did you voice a concern? So you hear --
4  however you hear it, whether you heard the captain ask
5  permission, the sheriff say yes, or I think the way
6  you recollect is Hancock saying if we're going to do
7  something, we need to do it now, and the next thing
8  you hear is the sheriff saying breach, breach, breach?
9    A. Just twice, breach, breach.
10   Q. I'm sorry, just twice. If you heard that
11 communication on Ops 5, did you voice concern at that
12 moment?
13   A. I was absolutely taken aback by the
14 order, and there wasn't enough time to stop it at that
15 point. The next instant the door was breached, shots
16 were fired, and it was a very chaotic scene.
17   Q. So you didn't voice any concern on Ops 5
18 at that moment?
19   A. Excuse me?
20   Q. You didn't say anything on the radio at
21 that time?
22   A. I did not.
23   Q. And it unfolded so quickly, you didn't
24 have the time to do that?
25   A. I did not. And also, typically the

Page 158

1  commander on scene has the authority. And the reason
2  to do that is there may be something that changes that
3  they may need to readjust, but this happened in an
4  instant, this situation.
5    Q. Okay. I want to look at Exhibit 9 in the
6  binder in front of you.
7    A. Okay.
8    Q. Do you got it?
9    A. I do.
10   Q. You've made reference to this policy a
11 few times today; is that fair?
12   A. Yes.
13   Q. This is what you're talking about with
14 the hostage/barricaded subject incidents policy?
15   A. Correct.
16   Q. Is that correct?
17   A. Yes, it is.
18   Q. Is it your understanding that this policy
19 was effective and in force on the date of the Wirth
20 incident?
21   A. Yes.
22   Q. I want to go through this policy. Now
23 this policy -- is this a policy that it's your
24 understanding that the members of the Park County
25 Sheriff's Office, including the sheriff, are obligated

Page 159

1  to follow?
2    A. Yes.
3    Q. Is it something that members of the
4  sheriff's department train on?
5    A. Yes.
6    Q. Okay. I just want to go through a few
7  things on this. "Definitions: Barricaded Subject,"
8  do you see that, subsection II?
9    A. Yes, I do.
10   Q. Did you believe that Martin Wirth when
11 they're knocking on the door and he's not coming to
12 the door, at that point is he a barricaded subject?
13   A. The fact that he came out, looked around
14 and went back in the house, did not respond to knocks
15 on the door, I would have considered this and it
16 should have been treated as a barricaded suspect
17 situation.
18   Q. He became barricaded when he came out and
19 then went back in, or was he barricaded the second he
20 didn't respond to knocking on the door?
21   A. Even if he did not respond, I mean, you
22 couldn't be sure that he was in there and barricaded.
23 The house may be vacant, but I would have -- based on
24 the information we had, I would have made the
25 assumption that he was -- that this was a barricaded

Page 160

1  situation.
2    Q. Okay. Go ahead.
3    A. And that's why the instruction was to
4  withdraw, whether he -- if he didn't answer the door
5  or if he came out and looked around, withdraw.
6    Q. If he comes out, looks around and then
7  goes back in, you don't have to make any assumptions,
8  you know he's barricaded; is that true?
9    A. I think you would reasonably assume that
10 and especially based on the information and knowledge
11 we had about Mr. Wirth, that this was now a barricaded
12 situation.
13   Q. Okay. Let's just look at the definition.
14 "Any individual who's reasonably believed to be a
15 threat to commit serious bodily injury or death." Do
16 you think that was a reasonable belief, that he was a
17 threat?
18   A. I do.
19   Q. To officers in the community?
20   A. Yes.
21   Q. "and who is in a stronghold position," do
22 you see that?
23   A. Yes.
24   Q. What does that term, stronghold position,
25 mean? Does that mean it has to be a fox hole or a

Case No. 1:16-cv-03079-MSK-NRN   Document 59-2   filed 05/04/18   USDC Colorado   pg 16 of 17

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

### Page 161

1 bunker or some kind of a fortified position, or could
2 it be a mere house?
3          MR. SCHIMBERG: Form.
4     A. It could be any of those.
5     Q. (BY MR. SISSON) Okay.
6     A. Realistically it's going to be your
7 house.
8     Q. Okay. The hostage, that wouldn't have
9 applied to this particular event; is that fair?
10    A. That is fair.
11    Q. Okay. Now, look at the Policy, No. III.
12    A. Okay.
13    Q. Subsection III, "In hostage/barricaded
14 subject situations, it shall be the policy." Do you
15 see that?
16    A. I do.
17    Q. Does that mean it's optional?
18    A. No.
19    Q. Okay. "of the Park County Sheriff's
20 Office to consider the lives of the hostages,
21 civilians and officers involved to be of the utmost
22 importance." Do you see that?
23    A. I do.
24    Q. Is it your understanding that this policy
25 exists for the very purpose of putting lives first and

### Page 162

1 foremost?
2     A. Yes.
3     Q. And then "whenever possible, to enhance
4 the prospects of peacefully resolving the incident
5 through communication with the suspect." Do you see
6 that?
7     A. I do.
8     Q. Let's back up a little bit. You're
9 monitoring this thing on the radio?
10    A. Correct.
11    Q. And you hear somebody call out that Wirth
12 goes back into the structure, right?
13    A. Correct.
14    Q. At that moment in time you consider him
15 to be barricaded?
16    A. Yes.
17    Q. And this policy applies?
18    A. Yes.
19    Q. And I know you heard some communication
20 on the radio with Hancock and ultimately the sheriff,
21 but do you know if there was any attempts to
22 communicate with Wirth by Hancock or anybody else on
23 scene?
24    A. No.
25    Q. Okay. Should there have been an attempt

### Page 163

1 to communicate with Wirth at that point?
2          MR. SCHIMBERG: Form.
3     A. I think to prioritize the situation, they
4 should have withdrew and got those officers out of
5 that danger zone. At that time we could have
6 discussed -- and had all of the time in the world to
7 do so to discuss whether there was a mechanism to
8 communicate with him or what our options were and how
9 we were going to resolve the situation, including a
10 withdrawal.
11    Q. (BY MR. SISSON) In terms of priority,
12 withdraw and then attempt to communicate?
13    A. Yes.
14    Q. "whenever possible, to develop and
15 maintain the ability to use alternative approaches to
16 resolve the incident should communications fail." So
17 that would have been a consideration once there was a
18 tactical withdraw, once there was an attempt to
19 communicate with Wirth, then that step would have been
20 taken?
21    A. Yes.
22    Q. Now, looking at Procedures, subsection
23 IV, paragraph A, "Patrol deputies confronting hostage/
24 barricaded subject incidents shall not initiate
25 tactical actions other than those necessary to protect

### Page 164

1 the lives and safety of themselves or others
2 consistent with the Park County Sheriff's Office's use
3 of force policy." Do you see that?
4     A. I do.
5     Q. So backing up -- and you saw Hancock's
6 response -- they knock on the door, Wirth retreats,
7 he's then feeling like their position is compromised
8 and they can't withdraw down the hill, if you will, or
9 he may unnecessarily expose their lives or whatever
10 his language was. Does this policy actually indicate
11 that they can't breach at that point unless it's
12 necessary to protect their lives and the safety of
13 others?
14    A. Yes.
15    Q. And do you believe that those
16 justifications were present in this case?
17    A. No.
18    Q. Now, looking at the Procedures IV A and
19 then we have 1, 2, 3, do you see that?
20    A. I do.
21    Q. "Notify a supervisory officer of the
22 incident and circumstances. 2. Contain and isolate
23 the incident scene, establishing an inner containment
24 perimeter to provide a reasonable degree of safety."
25 Do you see that?

**MONTE GORE - 6/20/2017 - CONTAINS NON CONFIDENTIAL MATERIAL**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

222

```
                    REPORTER'S CERTIFICATE
STATE OF COLORADO         )
                          ) ss.
CITY AND COUNTY OF DENVER )
           I, Darcy Curtis, Registered Professional
Reporter and Notary Public ID 20064016972, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said MONTE GORE
was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place
aforesaid and was thereafter reduced to typewritten
form; that the foregoing is a true transcript of the
questions asked, testimony given, and proceedings had.
           I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of
this litigation.

           IN WITNESS WHEREOF, I have affixed my
signature this 30th day of June,
2017.

           My commission expires May 2, 2018.

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.
```