```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 1:16-cv-03079-MSK-MJW
 3
    ESTATE OF NATE CARRIGAN,
 4  JOHN CARRIGAN, MELISSA CARRIGAN,
    and KOLBY MARTIN,
 5
    Plaintiffs,
 6
    v.
 7
    PARK COUNTY SHERIFF'S OFFICE,
 8  SHERIFF FRED WEGENER, in his
    official and individual capacity,
 9  and MARK HANCOCK, in his official
    and individual capacity
10
    Defendants.
11  _____

12  DEPOSITION OF:   FREDRICK WILLIAM WEGENER, III
                         June 8, 2017
13  _____

14              PURSUANT TO NOTICE, the deposition of
    FREDRICK WILLIAM WEGENER, III was taken on behalf of the
15  Plaintiffs at 1640 Grant Street, Suite 150, Denver,
    Colorado 80203, on June 8, 2017, at 9:15 a.m., before
16  Shauna T. Dietel, Registered Professional Reporter and
    Notary Public within Colorado.
17

18

19

20

21

22

23

24

25
```

H+G

Hunter+Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT 4

Case No. 1:16-cv-03079-MSK-NRN   Document 59-4   filed 05/04/18   USDC Colorado   pg 2 of 7

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### 37

1     Q  (BY MR. ELKUS) Okay. Is that it, in your
2 opinion, the only high risk to officer safety would be an
3 individual that poses -- that -- that you knew had a
4 weapon in the residence?
5     A  No. You could also look at criminal history.
6 Something in his background.
7     Q  Okay. So with that understanding, was there a
8 separate process -- again, during your tenure as Sheriff,
9 was there a separate process in evicting a person that
10 posed a high risk to officer safety in doing evictions?
11     MR. SCHIMBERG: Form.
12     Go ahead.
13     A  Well, yeah. I mean, you try to -- just as we'd
14 done with Mr. Wirth, you try to contact him, try and see
15 what -- you know, why he wouldn't get out. I know in 2014
16 they -- there was going to be a protest, so we wanted to
17 make sure that if we could, we can get ahold and find out
18 is there a way we can kind of get everybody to settle down
19 and -- and not create a scene, but they can have their
20 protest or whatnot, but we still need to have him leave
21 the residence.
22     In 2014, he agreed and left the residence.
23     Q  (BY MR. ELKUS) Okay. So in 2014, Mr. Wirth
24 left his residence -- residence peacefully, is that fair
25 to say?

### 38

1     A  He did.
2     Q  And what was the process by which the Sheriff's
3 Department utilized in getting Mr. Wirth to leave his
4 residence peacefully in 2014?
5     A  They talked with both him and the -- another
6 gentleman who was leading the "Foreclosure Resistance," or
7 I don't know what it's called. I think that's what it was
8 called, Colorado Foreclosure Resistance, and talking to
9 them about their protest.
10     Q  And -- and who from the Sheriff's Department
11 was able to communicate with Mr. Wirth at that period of
12 time, in 2014, again, to leave the residence peacefully?
13     A  Wells Tonjas I think was the sergeant at that
14 time.
15     Q  So correct me if I'm wrong, Sheriff, but it
16 sounds like communication with Mr. Wirth was able to
17 resolve the situation with him to allow him to leave the
18 residence; is that fair to say?
19     A  Correct.
20     MR. SCHIMBERG: Object to the form.
21     Q  (BY MR. ELKUS) And at that point in time,
22 there was no need to breach the residence or to use force
23 to remove, is that fair to say?
24     A  Yeah. He left. I mean, he was already gone.
25     Q  Okay. Now, what training -- and, again, during

### 39

1 your tenure with the Sheriff's Department, and
2 specifically while you were Sheriff, what training did the
3 Park County Sheriff's Office provide to its sheriff
4 deputies in evicting someone that poses a high risk to
5 officer safety and/or the public?
6     MR. SCHIMBERG: I'm sorry. Could you read
7 that, please. Sorry.
8     (The court reporter read the question as
9 follows: "Now, what training -- and, again, during your
10 tenure with the Sheriff's Department, and specifically
11 while you were Sheriff, what training did the Park County
12 Sheriff's Office provide to its sheriff deputies in
13 evicting someone that poses a high risk to officer safety
14 and/or the public?")
15     A  You know, other than -- you mean officer
16 safety --
17     Q  (BY MR. ELKUS) Well, I'm asking --
18     A  -- patrol?
19     Q  -- was there a -- did you provide -- while you
20 were the sheriff, did you provide specific training to
21 your sheriff deputies on how to evict someone that posed a
22 high risk to officer safety and/or the public?
23     A  Specifically to that, no.
24     Q  Okay.
25     MR. ELKUS: Let's go off the record here.

### 40

1     (A recess was taken from 9:59 a.m. until
2 10:19 a.m.)
3     Q  (BY MR. ELKUS) Now, based on your tenure with
4 the Park County Sheriff's Office, other than Mr. Wirth,
5 have you had to deal with evicting a person that posed a
6 high risk to officer safety and/or the public?
7     A  On an eviction?
8     Q  Yes.
9     A  We had a gentleman who -- I want to say
10 probably two thousand -- I may get this wrong.
11     We had a gentleman earlier that was getting --
12 that the IRS was coming to him because of tax evasion. So
13 he started his house on fire and was shooting at the
14 deputies. He eventually killed himself.
15     Q  And you don't recall what year that was?
16     A  That's what I was trying to think.
17     Q  Was that while you were sheriff?
18     A  Yes. Yes.
19     Q  And who was the deputy that was being shot at?
20     A  Deputies. One of them was -- I think -- well,
21 one of them was Hancock. I know Cam Hancock was one of
22 them. I'm trying to remember the other deputies that were
23 there. I'm going to guess this was probably '05, '06.
24     MR. SCHIMBERG: Aren't we glad we tell your
25 clients don't guess? I'm teasing, Sheriff.

Case No. 1:16-cv-03079-MSK-NRN   Document 59-4   filed 05/04/18   USDC Colorado   pg 3 of 7

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## Page 41

1  A   I -- I just -- I just -- I can't remember
2  exactly.
3        MR. SCHIMBERG:  I'm teasing you.
4  Q   (BY MR. ELKUS)  Now, I think you stated that
5  the IRS was coming to his home on a -- because there was a
6  tax evasion issue?
7  A   Yeah.
8  Q   So was he being evicted?
9  A   Yes.
10 Q   Okay.  And was Park County the agency that was
11 charged with getting him evicted?
12 A   No.
13 Q   Okay.  So why was Park County involved?
14 A   Actually, he -- like I say, this was dealing
15 just with the IRS.  We came out on a welfare check, I
16 think, during the process, and that's when it transpired.
17 Q   And why were you doing a welfare check?
18 A   Somebody called.  I don't remember all the
19 specifics.
20 Q   And was this individual known to be armed and
21 dangerous?
22 A   I -- I don't recall.
23 Q   Okay.  And how many deputies came out to this
24 individual's residence?
25 A   Boy, I -- I don't recall exact numbers.

## Page 42

1  Q   Was it the same number that came out for Martin
2  Wirth's residence, seven deputies and Fire and Rescue?
3  A   I don't think it was -- no.  I'm guessing, so I
4  don't -- I don't know.
5  Q   Do you know whether or not SWAT was deployed
6  for this individual?
7  A   It was not.
8  Q   Okay.  Do you know SWAT was not deployed?
9  A   The supervisor at the time for the shift must
10 not have thought it was warranted.
11 Q   And who was the supervisor?  Do you recall?
12 A   I don't recall.
13 Q   But shots were fired at the deputies?
14 A   Yes.  That's correct.
15 Q   And when shots were fired at the deputies, were
16 other deputy sheriffs in Park County then deployed to that
17 agency -- that residence?
18 A   Yes.
19 Q   Okay.  And was there a shootout at that
20 residence?
21 A   No.
22 Q   And -- and so when he was shooting at the
23 deputies, what was your understanding how the deputies
24 responded?
25 A   Well, they got behind cover and the house was

## Page 43

1  -- then all of a sudden he torched the house, so then
2  there were other issues that had to be dealt with.
3  So . . .
4  Q   Do you know whether or not, when the deputies
5  arrived, that's when the suspect began firing at the
6  sheriff's deputies?
7  A   Yes.
8  Q   So right upon the arrival, he started shooting
9  at the sheriff's deputies?
10 A   That's correct.
11 Q   Okay.  And shortly thereafter the house caught
12 on fire?
13 A   That's correct.
14 Q   And then the suspect died; is that right?
15 A   Yes.  That's correct.
16 Q   Now, Sheriff, on average, and, again, during
17 your tenure as the Sheriff of Park County, how many
18 evictions per year, if you know, does the Park County
19 Sheriff's Office do?
20 A   I -- I don't -- I don't know.
21 Q   More than 100?
22 A   Less than 100, oh, yeah.
23 Q   I mean, I know we may not know the specific
24 number but --
25 A   Less than 50 a year, I would guess.

## Page 44

1  Q   Okay.  So anywhere -- more than 10?
2  A   Oh, yes.
3  Q   More than 25?
4  A   Yes.
5  Q   Okay.  So anywhere between 25 to 50 evictions
6  per year?
7  A   Yeah.  I'm going to say that's probably
8  average.
9  Q   And would I be correct in saying that evictions
10 in Park County, that Park County Sheriff's Office is -- is
11 involved in, are sort of a reoccurring event for your
12 office.
13       MR. SCHIMBERG:  Object to form.
14 A   Uneventful.
15 Q   (BY MR. ELKUS)  Uneventful, but they are
16 reoccurring events, is that fair to say?
17 A   Oh, yes.
18 Q   Now, and, again, this is during your tenure as
19 the Sheriff, on average, to the best of your knowledge,
20 how many of those evictions, you know, again, per year,
21 does the Sheriff's Department deal with angry folks that
22 are being removed from the premises?
23       MR. SCHIMBERG:  Form.
24       Go ahead.
25 A   Probably -- there's probably a few, yes.

Case No. 1:16-cv-03079-MSK-NRN   Document 59-4   filed 05/04/18   USDC Colorado   pg 4 of 7

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

45

1 Q (BY MR. ELKUS) Okay. I mean, you would agree
2 that someone's being evicted from their home, and, I mean,
3 you may not recall specifics, but fair to say that based
4 upon your experience doing evictions in Park County, when
5 a person's being removed from their home and law
6 enforcement is present, you've personally observed those
7 tenants being upset that they have to leave the residence;
8 is that fair?
9     MR. SCHIMBERG: Foundation. Objection. Form.
10 A Yes.
11 Q (BY MR. ELKUS) Okay. And based upon your
12 experience with the Park County Sheriff's Office and the
13 number of evictions that are done per year, based on your
14 understanding, and -- is there a potential that the
15 Sheriff's Office will have to evict a person that poses a
16 high risk to officer safety and/or the public?
17     MR. SCHIMBERG: Object to form.
18     Go ahead.
19 A Yes.
20 Q (BY MR. ELKUS) Okay. And why do you say yes?
21 A Well, I mean, if you have to -- if you have an
22 eviction order or a writ of restitution that has to be
23 served then you will have to make contact with that
24 individual.
25 Q And it's certainly foreseeable that, you know,

46

1 those individuals that are now being removed from their
2 home, that those people could lash out at the sheriff's
3 deputies that are involved in that eviction. Is that fair
4 to say?
5     MR. SCHIMBERG: Object to form and foundation.
6     Go ahead.
7 A Sure. Or they could leave.
8 Q (BY MR. ELKUS) Ideally it would just be them
9 leaving --
10 A Correct.
11 Q -- right?
12     But like we know with Mr. Wirth, that was not
13 the ideal situation; is that right?
14     MR. SCHIMBERG: Object to form.
15 Q (BY MR. ELKUS) And I'm talking about the 2016
16 incident.
17 A Yes.
18     MR. SCHIMBERG: Same objection.
19 Q (BY MR. ELKUS) What was that, sir?
20 A Yes. You're right.
21 Q Now, with the potential threat that may be
22 posed to the public and/or officer safety, I'm correct
23 that Park County has not provided specific training on how
24 to handle evictions of high-risk persons; is that right?
25 A Well, we -- we've provided training on

47

1 high-risk stops, high risk -- I mean, other things that
2 are high risk.
3 Q But not high-risk evictions?
4 A Specifically high-risk evictions, no.
5 Q And, Sheriff, again, this is during your tenure
6 as the Sheriff of Park County, what research, if any, have
7 you done to determine what is the standard process or
8 procedure for evicting persons that pose a high risk to
9 officer safety and/or the public?
10    MR. SCHIMBERG: I'm sorry. Could you read
11 that.
12    (The court reporter read the question as
13 follows: "And, Sheriff, again, this is during your tenure
14 as the Sheriff of Park County, what research, if any, have
15 you done to determine what is the standard process or
16 procedure for evicting persons that posed a high risk to
17 officer safety and/or the public?")
18    MR. SCHIMBERG: Object to form.
19    But go ahead.
20 A I would not know how -- so do we know how to
21 deal with people that are high risk, yes.
22 Q (BY MR. ELKUS) That's not my question, though.
23    So my question is, you know, during your tenure
24 as the Sheriff of Park County, okay, have you done any
25 research to determine what is the standard process or

48

1 procedure, and I'm talking whether state, or nationwide,
2 for how other agencies evict persons -- law enforcement
3 agencies that evict persons that pose a high risk to
4 officer safety and/or the public? Have you done any
5 research on that?
6 A No.
7 Q Okay. And why not?
8 A Well, I deal with people who are a high risk or
9 who are -- have problems with the law enforcement every
10 day.
11 Q Okay. So in your mind, that was a reason not
12 to do any research nationally or statewide on how other
13 agencies do evictions for high risk personnel?
14    MR. SCHIMBERG: Object to form.
15 A So -- well, I guess I'm having a hard time with
16 the question. So I deal -- we -- we go through training.
17 We go through arrest control. We go through how to talk
18 to people. That's our job.
19 Q (BY MR. ELKUS) Okay. Well, other agencies
20 that you worked for, okay, and it sounds like you worked
21 for Aurora -- I mean, it wasn't in Aurora, but I've got to
22 ask it anyways for Aurora and Idaho Springs: For those
23 agencies, were there policies -- well, did those agencies
24 evict personnel from their homes?
25 A I don't think municipalities do. I think it's

12 (Pages 45 to 48)

Case No. 1:16-cv-03079-MSK-NRN   Document 59-4   filed 05/04/18   USDC Colorado   pg 5 of 7

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

49

1  usually just the Sheriff's Office that do.
2  Q   And that's where I'm going with this because I
3  don't -- because you worked for a city. You didn't work
4  for a Sheriff's Department other than Park County; is that
5  right?
6  A   Correct.
7  Q   Okay. So to the best of your knowledge, those
8  other agencies you worked for, they didn't have any
9  policies that you're aware of regarding evictions of
10 people, is that fair to say?
11 A   That's probably fair.
12 Q   So your sole knowledge on how evictions are
13 done was based on your work tenure with the Park County
14 Sheriff's Office?
15 A   Correct.
16 Q   Okay. Now -- and, Sheriff, again, you know,
17 while you've been the Sheriff of Park County, how often
18 does the Park County Sheriff's Office encounter a member
19 of the public that is mentally ill?
20     MR. SCHIMBERG: Object to form.
21 A   Once a week.
22 Q   (BY MR. ELKUS) Okay. And so do you agree
23 that, you know, based on your position with Park County,
24 the years that you've been there and while you were the
25 Sheriff, your interaction or your deputy's interactions

50

1  with mentally ill people is a reoccurring event within
2  your agency?
3  A   Sure.
4  Q   Okay. And do you agree that mentally ill
5  people that Park County Sheriff's Office comes into
6  contact with may pose a safety risk to law enforcement
7  officers?
8  A   Yes.
9  Q   Okay. And why do you say yes?
10 A   Well, it's been proven time and time again,
11 so . . .
12 Q   Well, why -- I get it, but your belief? I
13 mean, why do you -- what is your understanding and behalf
14 as to why -- let me ask it differently.
15     Why do you believe that mentally ill people
16 pose a safety risk to Park County Sheriff's Office
17 deputies?
18 A   Well, I wouldn't phrase it like that. Mentally
19 ill folks can -- can cause problems.
20 Q   Not every single one of them?
21 A   Yes.
22 Q   I understand that.
23     But why do you believe that mentally ill people
24 may pose, not all of them, but may pose a safety concern
25 for Park County Sheriff's Office deputies?

51

1  A   You know, if they're off their meds for a
2  while. If they -- you know, their behavior could be such
3  that it could pose a -- a risk. I mean --
4  Q   Because of the unpredictability of their
5  behavior, right?
6      MR. SCHIMBERG: Object to form.
7  A   That can be unpredictable, yes.
8  Q   (BY MR. ELKUS) Right.
9  A   Or they can be predictable.
10 Q   Okay. And -- and based on your experience with
11 the Park County Sheriff's Office, have you personally
12 encountered a mentally ill person that posed a safety risk
13 to sheriff deputies?
14 A   Yes.
15 Q   And can you give some examples of that
16 occurring based on your personal interactions?
17 A   Yes. I've had, I mean, individuals that
18 suffered from PTSD that had issues where they wanted to
19 fight with the officers on -- you know, I know they
20 fought.
21     Had an individual with me that didn't think he
22 needed a driver's license and registration or insurance,
23 walked around like he had a guns -- like he had a gun, and
24 -- and just created a hazard for everybody.
25 Q   And in the situation where you had that

52

1  mentally ill person that was walking around like he had a
2  gun, was that your personal experience or was that another
3  sheriff deputy that had that --
4  A   No. That was mine.
5  Q   And how did you resolve that situation?
6  A   Took him to a public state hospital.
7  Q   And did you immediately use force, or were you
8  -- did you -- how did you get him into custody?
9  A   Well, that individual at the time had a -- a
10 staff with him. That he started swinging at me, so
11 unfortunately I did have to tackle him, but, yeah.
12 Q   And based on your experience with the Park
13 County Sheriff's Office, how often would you encounter a
14 mentally ill person that posed a safety risk to sheriff
15 deputies.
16     MR. SCHIMBERG: Form. Foundation.
17     Go ahead.
18 A   I mean, how often?
19 Q   (BY MR. ELKUS) Yeah.
20 A   Probably every once -- every once in awhile. I
21 mean, I don't know exactly how often.
22 Q   Once a week? Once a month?
23 A   That posed a threat?
24 Q   Yeah.
25 A   Yeah, you know, probably -- I don't want to

Case No. 1:16-cv-03079-MSK-NRN   Document 59-4   filed 05/04/18   USDC Colorado   pg 6 of 7

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 237

1  A  Correct.
2  Q  Okay. And do you know whether communicating
3  with Mr. Wirth would or would not work as deescalation?
4  Do you have any opinion one way or the other on that?
5  A  If he was communicating, yeah. Yes.
6  Q  So it stands to reason the fact that he wasn't
7  communicating, in your mind, then, it probably meant like,
8  yeah, communication would not deescalate the situation
9  with him?
10  A  Correct.
11  Q  All right. Now -- and you would agree with me,
12  Sheriff, maybe you don't, but would you agree that this
13  policy mandates that the Park County Sheriff's Office must
14  use peaceful resolution before using alternative
15  approaches?
16  A  Yeah, I think they're definitely going to try
17  and use peaceful resolution. Yes.
18  Q  But it's a mandate; you have to do that first?
19  A  You have to try, yes.
20  Q  Okay. Now, alternative approaches would
21  include breaching the residence with armed law enforcement
22  officers, correct?
23  A  Correct.
24  Q  Now, prior to the breach, Sheriff, were there
25  any facts known to you of an emergent situation, emergency

Page 238

1  situation, that required immediate action, or did you have
2  time to look at other options in resolving this issue?
3  A  Me? No.
4  Q  Meaning you, that they were -- you were not
5  aware --
6  A  Nobody -- nobody told anything to me.
7  Q  Okay.
8  A  There was something to the effect of he was
9  gaining a tactical advantage that -- I do -- Mark said
10  over the radio. I do remember hearing that.
11  Q  So what was the tactical advantage that Mark
12  was telling you?
13  A  Because he was on higher ground.
14  Q  All right. So why -- did that pose a concern
15  for you, that the -- that Mr. Wirth was at a tactical
16  advantage, being at higher ground?
17  A  It did for them, apparently. That's why they
18  said it, yeah.
19  Q  Well, in that circumstance, would it make more
20  sense to move out of the way and sort of create a
21  perimeter and potentially get SWAT involved if he was at a
22  tactical advantage?
23  A  If they thought it would be, yes.
24  Q  Right. And what his concern was when he was at
25  higher ground, at a tactical advantage, where he may not

Page 239

1  have said it, the impression that Mr. Hancock was giving
2  to you, what you understood it to mean, was he may have a
3  weapon and fire on us; is that right?
4  A  Yeah, I -- I don't know what he thought.
5  Q  I'm asking what you took it to mean.
6  A  Yeah, so -- that he considered it to be
7  dangerous.
8  Q  Okay. Now, let's turn to the second page of
9  this policy, sir.
10  A  Okay.
11  Q  And it says, "B.  Officer in Command (OIC)."
12  A  Okay.
13  Q  "The ranking officer at the scene shall be in
14  command until specifically relieved by a superior."
15  Do you see that?
16  A  Correct.
17  Q  So in this particular case, I guess the ranking
18  officer was Captain Hancock, right?
19  A  Correct.
20  Q  And he was the officer in command?
21  A  Correct.
22  Q  And you did not relieve him of that position,
23  correct?
24  A  Correct.
25  Q  All right. Now -- but under this policy,

Page 240

1  presuming that the policy would apply, and I understand
2  that it's your position today that it did not apply in
3  regards to Mr. Wirth because you didn't think he was a
4  barricaded subject.
5  A  Correct.
6  Q  But you don't know whether or not Captain
7  Hancock thought he was a barricaded subject, correct?
8  A  I don't.
9  Q  Okay. Now -- but if it is a barricaded
10  situation, let's look at what -- these things you have to
11  follow. It says, "The OIC shall inform the watch
12  commander about the nature and circumstances surrounding
13  the incident."
14  Do you see that?
15  A  Yes.
16  Q  And that's not discretionary. That's something
17  that the OIC has to do; is that correct?
18  A  Correct.
19  Q  And why is that? Why do they have to do that?
20  A  Well, if the commander is not there, they want
21  to make sure he was brought up to speed upon what was
22  going on.
23  Q  All right. So the fact that the commander at
24  this point actually was the patrol commander, that's
25  something that Hancock didn't have to do; is that right?

FREDRICK WILLIAM WEGENER, III

323

REPORTER'S CERTIFICATE

STATE OF COLORADO      )
                       ) ss.
COUNTY OF ADAMS        )

       I, SHAUNA T. DIETEL, Registered Professional Reporter, and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said FREDRICK WILLIAM WEGENER, III was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 19th day of June, 2017.

       My commission expires October 5, 2017.

_XXX_   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.



                                      Shauna T. Dietel
                                      Registered Professional Reporter

EXHIBIT 4