```
 1               IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:16-cv-03079-MSK-MJW
 3
      ESTATE OF NATE CARRIGAN,
 4    JOHN CARRIGAN, MELISSA CARRIGAN,
      and KOLBY MARTIN,
 5
      Plaintiffs,
 6
      v.
 7
      PARK COUNTY SHERIFF'S OFFICE,
 8    SHERIFF FRED WEGENER, in his
      official and individual capacity,
 9    and MARK HANCOCK, in his official
      and individual capacity,
10
      Defendants.
11    _____

12    DEPOSITION OF:   WELLES E. TONJES - September 13, 2017
      _____
13
                      PURSUANT TO NOTICE, the deposition of
14    WELLES E. TONJES was taken on behalf of the Plaintiffs
      at 501 South Cherry Street, Suite 920, Denver,
15    Colorado 80246, on September 13, 2017, at 9:09 a.m.,
      before Darcy Curtis, Registered Professional Reporter
16    and Notary Public within Colorado.

17

18

19

20

21

22

23

24

25
```

H+G

Hunter + Geist, Inc.

303.832.5966   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
800.525.8490   Denver, CO 80203               ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT 6

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 2 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### 73

1  right or wrong.  And I would always respond back,
2  Captain, that you know if it's unethical, immoral,
3  illegal, I'm going to say something.  This was the
4  kind of stuff that -- that's why it didn't surprise
5  me.
6      Q.  What do you mean, it didn't surprise you?
7      A.  What they did when they kicked the door.
8      Q.  Okay.  So based on the information that
9  you have, do you have any information that Gore --
10 that would suggest to you that Gore did not give the
11 order to Hancock not to enter the structure?
12     A.  No, because Monte Gore told me that he
13 had told Hancock not to enter the structure.
14     Q.  Is it possible Monte Gore was being
15 untruthful with you?
16     A.  I don't believe so, only because of the
17 fact that the way it came up was that I had also
18 instructed Corporal Carrigan and I also advised the
19 sheriff and Captain Hancock that all we were going to
20 do is knock on the door, and when Wirth told us, you
21 know, go fly a kite, we were going to say goodbye and
22 leave.
23     Q.  So let me back that up a little bit here.
24 You're saying that you instructed Captain Hancock and
25 the sheriff that all you were going to do is knock on

### 74

1  the door and leave?
2      A.  I advised them that that's what I had
3  advised the deputies to do.
4      Q.  When did you advise Captain Hancock and
5  the sheriff of that?
6      A.  Okay.  I advised the sheriff of that on
7  February 16.
8      Q.  Okay.
9      A.  And I advised -- Hancock and I talked
10 about it prior.  I don't know what date, but I had
11 also refreshed his memory the morning of the incident,
12 February 24.
13     Q.  Before we go any further here,
14 February 16, so about eight days before the event,
15 you're saying you briefed the sheriff?
16     A.  I did.
17     Q.  On what, on the plan?
18     A.  Yes, as well as --
19        MR. SCHIMBERG:  Object to form.
20        THE DEPONENT:  Sorry.
21        MR. SCHIMBERG:  No, you're all right.
22     Q.  (BY MR. SISSON)  Let me be more specific.
23 Did you brief the sheriff on the eviction plan for
24 Martin Wirth?
25     A.  I did.

### 75

1      Q.  What did you tell the sheriff on
2  February 16 with respect to the eviction plan for
3  Martin Wirth?
4      A.  The sheriff had sent out an e-mail asking
5  myself or at that time Sergeant Wohlers if we had any
6  information on the upcoming eviction of Martin Wirth.
7  I responded back and informed the sheriff.  I went up
8  to his office on February 16 and I was there probably
9  for a half hour, maybe 45 minutes.  I don't think it
10 was 45 minutes, but I'm not real sure.
11     Q.  But in the 30-minute range, you met with
12 the sheriff?
13     A.  Yeah, in his office.
14     Q.  What did you articulate or talk about
15 with the sheriff on February 16 with respect to the
16 Wirth eviction?
17     A.  He had questions as to if the eviction
18 was going to occur.  We had found out on that date
19 that the eviction had not been posted on the 16th yet.
20 The eviction company, the law firm and the eviction
21 company, were wanting to get the eviction dealt with
22 and handled.  When we found out it hadn't been posted,
23 I had contacted a deputy to go to the administrative
24 assistant and get a copy of the eviction and go post
25 it at Martin Wirth's house.  I had told the sheriff

### 76

1  that -- because we had been working on when we were
2  going to get this done.  It seemed to me there was
3  like one or two other dates prior to that where we
4  couldn't get a date in line with the lockout company
5  and the moving company when they would have time and
6  we would have deputies.  Okay.  Big thing being
7  manpower, because Wednesdays was when we did it.  And
8  to pull deputies off during the week on like Sunday,
9  Monday, or Tuesday or Thursday, Friday, or Saturday,
10 would deplete our manpower, so we had the overlap day
11 on Wednesday.
12        So we posted it on the 16th.  The sheriff
13 knew we were posting it.  I had told the sheriff that
14 I kind of had talked to the -- I think she's a legal
15 assistant.  I don't remember her name.  I did give my
16 attorney her name, and I think I gave the name of the
17 guy that was handling the eviction, the lockout
18 company.  But I had told the sheriff that I had the
19 plan for four deputies to respond and that they were
20 going to go up and knock on the door -- and not all
21 four at once, obviously.  You would strategically put
22 them someplace so they could keep eyes on the place --
23 and that if Wirth told them, hey, I'm not leaving,
24 that they were going to leave and then they were going
25 to go let the law firm or the mortgage company know

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 3 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

77

1  that they needed to get the failure to comply. It was
2  during that conversation that the sheriff reminded
3  me -- because I had completely forgot -- that I had
4  this situation with Wirth back in 2014.
5       It was also in that conversation that the
6  sheriff and I talked about the Magnini situation and
7  how we waited for Magnini to be accessible, or
8  whatever you want to call it, and we could effect an
9  arrest. It was also in that conversation that I gave
10 the sheriff the phone number to the law firm and the
11 name and he called the lady and he asked the legal
12 assistant, you know, the questions as far as . . .
13      Q.  So on February 16, eight days before the
14 eviction, did the sheriff ask anything with respect to
15 why four deputies?
16      A.  Well, we knew that Wirth was an agitator.
17 Okay. So four deputies would -- you know, let's just
18 say anticipating that he did get aggressive, four
19 deputies would have allowed them to withdraw and cover
20 each other. And if it came to the point where it
21 became an aggressive altercation, we would have been
22 able to call in for backup.
23      Q.  Okay. Your prior testimony was --
24 because this is the -- correct me if I'm wrong here --
25 second step. February 16 you post the three-day

78

1  notice, right?
2       A.  Yes.
3       Q.  But you're telling the sheriff on
4  February 16 with respect to the second step, we're
5  going to have four deputies because Wirth is a danger?
6       A.  Yeah, because we don't know what to
7  anticipate from him. I used the term volatile and I
8  used the term loose like a cannon or something like
9  that. I can't remember exactly.
10      Q.  Okay. Would you say that, I mean, Wirth
11 was dangerous?
12      A.  So --
13          MR. SCHIMBERG: Form.
14          THE DEPONENT: Sorry.
15          MR. SCHIMBERG: It's all right.
16      A.  -- I didn't know about the homicide. I
17 did not know how dangerous he was. I figured he was
18 dangerous as to the kind that would, you know, kick,
19 bite, and scratch and stuff like that.
20      Q.  (BY MR. SISSON)  You articulated this
21 plan to the sheriff on February 16?
22      A.  I did.
23      Q.  And did the sheriff say, no, we're
24 actually going to go and breach the structure?
25      A.  No, because that's when the discussion

79

1  came up about Magnini and how that had gotten handled.
2       Q.  Okay. Basically you're saying that you
3  told the sheriff point-blank, if Wirth doesn't come to
4  the door or he refuses to leave, you're going to
5  withdraw and then you're going to fall into step
6  three, which is the arrest warrant?
7       A.  Yes.
8       Q.  Did the sheriff agree or disagree with
9  the plan?
10      A.  He agreed with it.
11      Q.  Did he say anything about, you know, the
12 plan? Did he say it was a good plan, bad plan? Did
13 he make any comments whatsoever?
14          MR. SCHIMBERG: Form.
15      A.  Only that it was going to fall along the
16 same lines as what happened with Magnini.
17      Q.  (BY MR. SISSON)  Okay. Let me give you
18 a -- I guess here is where I'm confused a little bit.
19 Let me give you a transcript.
20          (Deposition Exhibit 18 was marked.)
21      Q.  This is a transcript of the deposition of
22 Fred Wegener on June 8, 2017. Okay?
23      A.  Okay.
24      Q.  And I'll just tell you it's not the
25 entire transcript. I just printed out the relevant

80

1  pages.
2       A.  Okay.
3       Q.  Okay. So let's look at -- you talked
4  about you reminded the sheriff of the plan again on
5  February 24?
6       A.  I don't think I did.
7       Q.  Or did you say you articulated it to
8  Hancock?
9       A.  I did to Hancock, because Hancock called
10 me that morning and that's when he told me that I did
11 not need to respond on the eviction. He was going to
12 handle it.
13      Q.  So was Hancock in the meeting with the
14 sheriff on February 16?
15      A.  No.
16      Q.  Just you and the sheriff?
17      A.  Yes.
18      Q.  Anybody else?
19      A.  Don't believe so other than the lady that
20 was on the phone from the law firm.
21      Q.  Okay. So let's go to page 124 of this
22 deposition.
23      A.  Okay.
24      Q.  I want to read a few lines to you to kind
25 of give you some context.

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 4 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

**Page 89**

1  I say, path of least resistance.
2      Q.  (BY MR. SISSON)  I'm just trying to
3  understand why he would disobey a direct order in this
4  situation.
5          MR. GOLDFARB:  Objection.  Foundation.
6      Q.  (BY MR. SISSON)  Do you have any
7  thoughts?
8      A.  I have no idea.  I don't know if he got
9  permission from the sheriff to change the plan or not.
10 I don't know.  Once he told me I was out of the loop,
11 the only other contact I had after that was when I
12 heard the deputies calling out at the Bailey
13 substation and I called the Bailey substation wanting
14 to know what the heck was going on.
15     Q.  What did they say?
16     A.  Well, it was a short conversation and it
17 was with Nate.  And Nate said that he was scared and
18 that I should come over there.  And I said, okay.  I
19 see where this is going, because I had my ideas.  And
20 that was the last conversation I had with Nate.
21     Q.  How soon was that or where was that in
22 terms of proximity to the actual shooting?
23     A.  It was probably -- I don't know exactly,
24 but probably 20 minutes prior, maybe more.
25     Q.  Okay.  So based on your knowledge of the

**Page 90**

1  event, was there any hostage situation?
2      A.  No.
3      Q.  Was there any reason at all that you can
4  think of to go and enter that structure?
5          MR. GOLDFARB:  Objection.  Form.
6  Foundation.
7          MR. SCHIMBERG:  Join.
8      A.  Absolutely not.
9      Q.  (BY MR. SISSON)  To your knowledge, was
10 there any shooting by Mr. Wirth prior to them entering
11 the structure?
12     A.  To my knowledge, no.
13     Q.  Okay.
14     A.  When I showed up at the scene, okay, I
15 engaged two people at the scene.  Well, I take that
16 back.  I engaged four people at the scene.  The first
17 one was Sheriff Wegener.  And he told me to keep the
18 one neighbor away from him, because the neighbor
19 across the road was being very vocal about what had
20 occurred.
21     Q.  Is that Rick Gabrisch?
22     A.  I have no idea what the guy's name was.
23 As soon as he told me that, then those individuals --
24 they must have heard him or something, because they
25 stepped back.  But then I had three deputies meet me

**Page 91**

1  at the bottom of the driveway there and the thing that
2  came out of their mouth was, Sarg, we weren't supposed
3  to make entry, and that came from all three of them.
4  And these guys were scared.  They just saw their
5  corporal get killed.
6      Q.  Who are these three deputies?
7      A.  It was Jeremy Lowrance, Travis Threlkel,
8  and Dave Leffler.
9      Q.  Did you ever have any conversation with
10 any of these three deputies before the eviction, the
11 Wirth eviction on February 24, about the plan?
12     A.  I don't believe so, because all of my
13 communication went through Corporal Carrigan.
14     Q.  So you show up on scene how soon after
15 the actual shooting?  Do you know?
16     A.  The way I was --
17         MR. SCHIMBERG:  I'm sorry.  Hold the
18 phone.  Could you read that back?  I'm sorry.
19         (The last question was read back as
20 follows:  "So you show up on scene how soon after the
21 actual shooting?  Do you know?")
22         MR. SCHIMBERG:  I'm sorry, sir.
23         THE DEPONENT:  That's fine.
24     A.  I have no idea.  I know that once I heard
25 things turned to crap over there, I stopped what I was

**Page 92**

1  doing and headed out the door.  And I would imagine I
2  probably was there within a half an hour.
3      Q.  (BY MR. SISSON)  Okay.  And unsolicited
4  all three of these people told you that they shouldn't
5  have entered the structure?
6      A.  Right.  That's what they were told they
7  were not going to do by Captain Hancock.
8      Q.  Captain Hancock told them that they were
9  not to enter the structure?
10     A.  That they were not going to enter the --
11 he didn't tell them not to.  He told them they were
12 not going to.  This was going to be go over there and
13 they were not going to enter the structure.
14     Q.  Did you ask him then why did you enter
15 the structure?
16     A.  Yeah, because they got an order to enter
17 the structure, to breach the door from Captain
18 Hancock.
19     Q.  Okay.
20     A.  And Nate went first.
21     Q.  Did they tell you why they got that order
22 from Captain Hancock?
23     A.  No.
24     Q.  Okay.
25     A.  I know that they had said that all Wirth

23 (Pages 89 to 92)

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 5 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

93

1  did was he had come out -- the way the house was set
2  up was when you walked up to the house, the entry
3  door, as you face the house, would have been on the
4  left-hand side that goes into the primary residence.
5  And then there was like -- I don't know if it's a
6  garage or part of the built-out basement and then on
7  top of that was like a deck area and that that was
8  where he had come out and told him he wasn't going to
9  cooperate and he went back inside.
10      Q.  Okay.
11      A.  But I don't know the exact words that
12  were said.
13      Q.  Okay.  Did you have any other
14  conversation with Sheriff Wegener on the date of the
15  incident?
16      A.  No, because he directed me to -- we had
17  Colorado Bureau of Investigations show up and we had I
18  want to say it's the 11th or 13th Judicial District
19  investigators show up from the district attorneys.
20  They had called me.  They had showed up, and I
21  basically at that time took on the role of what was
22  going on at the church up there, which was our command
23  post, what was going on at the scene of the shooting,
24  and what was going on down at the Bailey substation,
25  which I didn't spend much time down there.  But I

94

1  can't remember if it was CBI, Colorado Bureau of
2  Investigations, the investigators there, or if it was
3  the DA's office, they wanted the deputies that were on
4  scene or involved to respond down to the Bailey
5  substation to be interviewed.
6      Q.  Okay.  Let me back up a little bit.  Did
7  you ever know anything about the comments Rick
8  Gabrisch made to the Park County Sheriff's Office with
9  respect to Martin Wirth prior to the eviction?
10     A.  No.
11     Q.  Did you hear any of the radio traffic
12  between any kind of conversation between Hancock and
13  Sheriff Wegener on the date of the eviction?
14     A.  Not that I remember.  And here is why.
15     Q.  Okay.
16     A.  The eviction was handled on two different
17  channels, our primary channel and then I want to say
18  they went to PEC 4.  And that's P-E-C 4.  And I think
19  that's where they had taken the radio traffic, and
20  then once the shooting started, it started going over
21  to the main channel, which is the one I was on.  I was
22  not on PEC 4.  I think it's PEC.  It might be TAC.
23     Q.  TAC of PEC 4?
24     A.  Yeah.  PEC or TAC, yeah.  I don't
25  remember.

95

1      Q.  So Leffler, Lowrance, and Threlkel --
2      A.  Yes.
3      Q.  -- they all told you that they were not
4  supposed to make entry; they were all scared and shook
5  up, right?
6      A.  Yes.
7      Q.  Did they tell you anything else on the
8  date of the eviction?
9      A.  No.  Because my concern was to get them
10 calmed down and get them down to the Bailey substation
11 where the investigators would have been.  And also, I
12 was anticipating the victim advocates would be down
13 there and would help these guys get through this.
14     Q.  Now, my understanding is there was a
15 briefing the morning of the eviction with some of
16 these deputies and Captain Hancock.  Do you have any
17 knowledge of that briefing?
18     A.  Only after the fact.
19     Q.  What's your knowledge of that briefing?
20     A.  Well, after the shooting all went down
21 and stuff like that and I had gone to the command post
22 where other law enforcement agencies were responding
23 and I had gone to the scene and I went back down to
24 the Bailey substation, when I walked in -- okay.  The
25 Bailey substation has got two report-writing rooms for

96

1  the deputies, one that's up front and one that's in
2  the back.  And they primarily would use the one in the
3  back.  And I walked in and there was a dry-eraser
4  board with an exterior diagram of Wirth's house.  And
5  I saw the X's around the house where the deputies were
6  to be assigned.  That's when I realized that they had
7  actually did a -- I don't know -- incident diagram.
8      Q.  Look at Exhibit 8.
9      A.  Excuse me?
10     Q.  Exhibit 8 in the binder.
11     A.  Oh, 8.
12     Q.  Is this the --
13     A.  That's not the diagram I saw.
14     Q.  That's not the diagram?
15     A.  No.  It was of the actual house.
16     Q.  Okay.  Sort of like a picture of the
17 house or a handwritten thing of the house?
18     A.  It was just on a dry-eraser board.  It
19 was just drawn and it was basically just the outside
20 walls.  There were no interior walls drawn.
21     Q.  Okay.  Based on seeing that on the dry-
22 erase board, what did that mean to you?
23     A.  To me it didn't look like an eviction.
24 It looked like they were surrounding the place to
25 anticipate or to have an aggressive entry or an

24 (Pages 93 to 96)

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 6 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

129

1  deputies and tell them X, Y, and Z?
2      A.  I would have just told them the sheriff
3  had handled it.
4      Q.  Did he tell you how the sheriff handled
5  it?
6      A.  Nope.
7      Q.  To your knowledge, did something else
8  change in terms of the offenses or anything like that?
9      A.  Nope.  Everything was -- the guy was
10 issued a citation and was let go.
11     Q.  Okay.  So back to your complaint here, I
12 just want to make sure I understand this.  After the
13 January 20 events in Jeffco, you had a conversation
14 with Hancock wherein you raised the concerns about
15 Wirth's threats to Hancock?
16     A.  His threats to Hancock, you mean --
17     Q.  I'm sorry.  I'm sorry.  I stated that
18 very poorly.  After the January 20 Wirth event, the
19 deputies complained and then you had a conversation
20 one on one with Hancock where you said the deputies
21 are concerned about the --
22     A.  -- way it was handled with the summons
23 being issued.
24     Q.  And specifically the Wirth threats?
25     A.  Yes.

130

1      Q.  He says he's going to look into it.  He
2  doesn't come back to you.
3      A.  No.  I go to him.
4      Q.  You go to him.  And then he says the
5  sheriff handled it?
6      A.  Yeah.
7      Q.  But you don't get any --
8      A.  I have no idea what the sheriff did.  He
9  might have talked to Wohlers or whatever.
10     Q.  Then sometime after February 16, but
11 before the eviction, you had another conversation with
12 Hancock where you articulated Wirth is highly volatile
13 and potentially dangerous?
14     A.  Yes, which probably, I'm assuming -- not
15 assuming, but I would say that probably would have
16 happened on the 22nd.
17     Q.  Why do you think it was the 22nd?
18     A.  Because Monday was kind of a day to catch
19 up where he would come to work and I would let him
20 know the stuff that had happened over the weekend,
21 kept him apprised of everything that was going on.
22         MR. SCHIMBERG:  Excuse me.  Are we
23 talking February?
24         THE DEPONENT:  Yes.  I'm sorry.  Yes,
25 February 22.

131

1          MR. SCHIMBERG:  No, that's okay.  Just
2  want to make the record clear.
3      Q.  (BY MR. SISSON) So February 22 you have
4  this conversation with Hancock?
5      A.  Yeah, I think it would have been then.
6      Q.  Right.  I know you're not exactly a
7  hundred percent sure on what day.  Are you positive
8  that you had another conversation with Hancock prior
9  to February 24 about Wirth being dangerous?
10     A.  Yeah, because we talked about the
11 eviction.  Because the reason we talked about the
12 eviction was because we were going to try to do it on
13 the 17th, but we found out on the 16th it hadn't been
14 posted.  So then the sheriff wanted to know if we
15 could do it on the 18th, which would have been the
16 Thursday, but we didn't have enough deputies and the
17 bank had a conflict, I think, the move-out company and
18 stuff.
19     Q.  Okay.
20     A.  Which would have been the day that we
21 only had four -- we only have four deputies that work
22 the shift, two on one side of Kenosha, two on the
23 other side of Kenosha.
24     Q.  Anything else about the meeting, the
25 conversation, you had with Hancock about Wirth being

132

1  dangerous prior to February 24?
2      A.  No.  It was just like updating him.
3      Q.  Did you ever hear Hancock articulate to
4  anyone else about Wirth being dangerous?
5      A.  No.
6      Q.  Did you have another -- you said you
7  refreshed Hancock on February 24, the morning of?
8      A.  When he called me.
9      Q.  Okay.  So we have the complaint about the
10 way the January 20 event was handled with Hancock?
11     A.  Right.
12     Q.  You have the February 22 conversation
13 about Wirth being dangerous with Hancock?
14     A.  I'm guessing it was the 22nd, but that
15 would make sense.
16     Q.  We don't know the date --
17     A.  Right.
18     Q.  -- but we know it was before February --
19     A.  We know it was before the 24th, yes.
20     Q.  And then the morning of the 24th before
21 the eviction, you have another conversation with
22 Hancock about Wirth being dangerous?
23     A.  Right.  When he called me and I told him
24 that because of the way the situation was with Wirth
25 and we didn't want to have a confrontation, it was

Case No. 1:16-cv-03079-MSK-NRN   Document 59-6   filed 05/04/18   USDC Colorado   pg 7 of 8

WELLES E. TONJES - 9/13/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

133

1  knock on the door and see you later.
2     **Q.  What did Hancock say to you?**
3     A.  He would handle it.  That was it.
4     **Q.  Did he say, well, that's not -- Sergeant,**
5  **with all due respect, that's not the plan, I'm the**
6  **captain, and we're going to do something different?**
7     A.  Nope.
8     **Q.  Did he acknowledge that that was the**
9  **plan?**
10    A.  Did he acknowledge that what was the
11 plan, knock on the door?
12    **Q.  Yes.  Knock on the door and then we're**
13 **going to leave if he doesn't just come out**
14 **voluntarily.**
15    A.  He said, yeah, he understood what we had
16 planned.
17    **Q.  Okay.**
18    A.  Whether he was going to do it or not, and
19 he's the captain.  I'm the sergeant, you know.
20    **Q.  Okay.  During that conversation --**
21    A.  It was real brief.
22    **Q.  Do you know if that conversation was**
23 **before or after their, quote, unquote, briefing at the**
24 **Bailey substation?**
25    A.  No.  That would have been before, because

134

1  if I remember correctly, he called me not too long
2  after 6 a.m.  Because I talked to Nate probably about
3  10 till 6:00, somewhere in there.  And then he would
4  have called me, because I think -- I'm not sure, but I
5  think he called me from the Bailey substation, because
6  he was not at the office, Hancock.
7     **Q.  So you said you talked to Nate and Nate**
8  **said he was scared, but was that a different**
9  **conversation?**
10    A.  That was a conversation after --
11    **Q.  The briefing?**
12    A.  -- the briefing or when the -- I don't
13 know when the briefing was.  Okay.  But it was after I
14 called Nate about why other deputies were showing up.
15    **Q.  So your conversation with Hancock is**
16 **before you have any knowledge of other deputies**
17 **starting to go to the scene?**
18    A.  Yes.
19    **Q.  So in this conversation, you reaffirm the**
20 **plan, which was to knock on the door and then leave?**
21    A.  Right.
22    **Q.  And Hancock seemed to --**
23    A.  Seemed like he was on board with it.
24    **Q.  Seemed like he was on board with it.  And**
25 **then you, again, articulated the threat of Martin**

135

1  **Wirth?**
2     A.  Yeah.  We just talked, because of the
3  situation, it was like we didn't want to have an
4  aggressive action.  We just wanted to get in there,
5  get out of there, and leave if he was there.
6        During the course -- and I don't know if
7  this means anything.  During the course of when we
8  first started realizing that we were going to have to
9  evict Martin Wirth again, I would have the deputies go
10 by and see if Martin Wirth was living there.  I had
11 asked the law firm to check to see if there was any
12 power or phone there.  And from what I remember, the
13 young lady told me she couldn't find anything.  So the
14 only thing we had on it was that he was living there
15 and using firewood to keep him warm in February.
16    **Q.  Okay.  So any other conversations -- so**
17 **it sounds like your conversation with Hancock was**
18 **approximately 6 a.m. or a little bit before 6 a.m. on**
19 **February 24?**
20    A.  It would have been a little after.
21    **Q.  A little after?**
22    A.  Yeah, maybe five, ten minutes.
23    **Q.  Did you have any other conversations with**
24 **Hancock on February 24?**
25    A.  Not that day.

136

1     **Q.  Not that day?**
2     A.  Right.
3     **Q.  Not before or after the briefing other**
4  **than the one you just described?**
5     A.  Right, because after the incident
6  occurred, he was transported to the hospital.
7     **Q.  Hancock was?**
8     A.  Yes.
9     **Q.  So you didn't see him on scene?**
10    A.  I did not.
11       MR. SISSON:  Okay.  So it's 12:02.  Why
12 don't we take a one-hour lunch break and we'll see you
13 back a little after 1:00.
14       (Recess taken, 12:02 p.m. to 1:02 p.m.)
15    **Q.  (BY MR. SISSON)  So still under oath.**
16    A.  Yes.
17    **Q.  So I'm getting near the end of my stuff**
18 **and then these guys will probably take a bite at the**
19 **apple.  Okay.  Let's move forward here.  I think we**
20 **talked about the three conversations you had with**
21 **Captain Hancock prior to the eviction, prior to our**
22 **lunch break.  Do you recall those?**
23    A.  I recall two of them.  I recall the one
24 on like the 25th, the morning of the 24th.  When was
25 the other one?

WELLES E. TONJES

348

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

    I, Darcy Curtis, Registered Professional Reporter and Notary Public ID 20064016972, State of Colorado, do hereby certify that previous to the commencement of the examination, the said WELLES TONJES was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

    I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

    IN WITNESS WHEREOF, I have affixed my signature this 27th day of September, 2017.

    My commission expires May 2, 2018.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

_____
Darcy Curtis
Registered Professional Reporter
Certified Shorthand Reporter

EXHIBIT 6