1

 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 1:16-cv-03079-MSK-MJW
 3
     ESTATE OF NATE CARRIGAN,
 4   JOHN CARRIGAN, MELISSA CARRIGAN,
     KOLBY MARTIN, and TRAVIS THRELKEL,
 5
     Plaintiffs,
 6
     v.
 7
     PARK COUNTY SHERIFF'S OFFICE,
 8   SHERIFF FRED WEGENER, in his
     official and individual capacity,
 9   and MARK HANCOCK, in his official
     and individual capacity,
10
     Defendants.
11   _____

12   DEPOSITION OF:   TRAVIS JAMES THRELKEL
                        January 5, 2018
13   _____

14             PURSUANT TO NOTICE, the deposition of
     TRAVIS JAMES THRELKEL was taken on behalf of the
15   Defendants Park County Sheriff's Office and Sheriff
     Fred Wegener at 501 South Cherry Street, Suite 920,
16   Denver, Colorado 80246, on January 5, 2018, at
     9:36 a.m., before Darcy Curtis, Registered
17   Professional Reporter and Notary Public within
     Colorado.
18

19

20

21

22

23       H+G

24

25   Hunter + Geist, Inc.

**303.832.5966**   1900 Grant Street, Suite 1025   ■ www.huntergeist.com
**800.525.8490**   Denver, CO 80203                ■ scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 9

Court Reporting, Legal Videography, and Videoconferencing

Case No. 1:16-cv-03079-MSK-NRN  Document 59-9  filed 05/04/18  USDC Colorado  pg 2 of 4

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

177

1  to get in, then we'll breach the door immediately
2  behind him if he tries to -- if he goes inside, shuts
3  the door, we'll be right there, we'll kick the door
4  and restrain him right there as soon as possible
5  inside the house.
6      Q.  If you have access to him?
7      A.  If we have access to him and we have eyes
8  on him.
9      Q.  Let me stop you, Travis.  I can't tell,
10  when you're giving me that information, whether this
11  is what you were thinking or whether this was part of
12  the conversation there in the squad room.
13      A.  That was the conversation, that if we saw
14  him through the glass or if he was outside, we would
15  do -- you know, it's a fresh pursuit.  If he goes back
16  inside immediately, we would follow and restrain him
17  inside the house.  If he was visible to us when we're
18  outside the door and he's refusing our commands to
19  come outside, if he was standing right there, we would
20  breach, go in.  If he was not within eyesight, if we
21  couldn't see him, then we weren't going to breach the
22  door and we were going to pull perimeter.  That's what
23  was discussed.
24      Q.  You anticipated or contemplated a fluid
25  situation when you got there?

178

1      A.  Yes.
2      Q.  Okay.  And what I mean by that is you can
3  plan up the wazoo, right, and things change when
4  you're actually putting them into the process,
5  correct?
6      A.  Yes.
7        MR. LORENZ:  Object to form and
8  foundation.
9      Q.  (BY MR. SCHIMBERG)  Okay.  There's a
10  certain amount of flexibility, I guess, of thought,
11  things can change when you get to the location?
12      A.  Yes.
13      Q.  You're trained on that?
14      A.  Yes.
15      Q.  Okay.  So in terms of -- well, that was
16  going to be a bad question.  Let's see if I can put it
17  in my own words, Travis, and you tell me if it's
18  wrong.  You planned and contemplated a potential of a
19  breach into the residence.  The circumstances would
20  have been, one, if you had eyesight of Mr. Wirth and
21  he wasn't obeying commands, right?
22      A.  Yes.
23      Q.  And what was the other circumstance where
24  you -- oh, if you were in his presence and he went in
25  immediately and shut the door on you type of thing and

179

1  you could get access to him?
2      A.  Yes.
3      Q.  Speed would be a positive factor for you
4  guys?
5      A.  Yes.
6      Q.  All right.  Were there any other
7  circumstances that were discussed where it would
8  result in a breach and enter into this residence on
9  Iris?
10      A.  Not that I remember.
11      Q.  Was there any discussion about who would
12  make that decision?
13      A.  Make the decision to breach?
14      Q.  Yes.
15      A.  I believe that would still come down from
16  his chain of command.  It would be either the
17  undersheriff or the sheriff himself.
18      Q.  Okay.  Where was the undersheriff?
19      A.  At the time I figured he would be in
20  Fairplay.  That's his office.  He --
21      Q.  Do you know?
22      A.  No, I don't know.
23      Q.  Where was the sheriff?  Do you know?
24      A.  The sheriff was supposed to be heading
25  out of town.  Because by that time, he left the

180

1  office.  He was gone.
2      Q.  He told you guys he had a meeting down in
3  town, right?
4      A.  Correct.
5      Q.  All right.  You had no prior personal
6  contact with this guy, Martin Wirth, correct?
7      A.  Correct.
8      Q.  Martin Wirth ambushed, shot and killed
9  Nate Carrigan, didn't he?
10      A.  Yes.
11      Q.  And he ambushed and injured seriously
12  your friend, Kolby Martin?
13      A.  Yes.
14      Q.  Okay.  And he shot and injured
15  Mr. Hancock?
16      A.  Yes.
17      Q.  Okay.  And based upon your earlier
18  testimony, he caused you at least some anxiety and
19  super sensitivity?
20        MR. LORENZ:  Object to form.
21      A.  Afterwards, yes.
22      Q.  (BY MR. SCHIMBERG)  Okay.  He could have
23  responded to the knocks on the door and come out
24  peacefully?
25        MR. LORENZ:  Object to form and

Case No. 1:16-cv-03079-MSK-NRN   Document 59-9   filed 05/04/18   USDC Colorado   pg 3 of 4

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

225

1  Q. Do you remember who said that?
2  A. No.
3  Q. Do you know who it was directed to?
4  A. No.
5  Q. Line 11, "We're going to go through the
6  door." Do you see that?
7  A. Yes.
8  Q. Next line, "Copy, breaching the door,"
9  correct?
10  A. Correct. And that probably would have
11  been dispatch understanding or reaffirming.
12  Q. I'll share with you that copy, breaching
13  the door was by Sheriff Wegener.
14  A. Or it could have been the sheriff, yeah.
15  Q. And that just reconfirms, as your word
16  was, someone saying we're going to go through the
17  door. Do you remember who said that?
18  A. Hancock.
19  Q. Okay. So there's not an order by Sheriff
20  Wegener to breach and go into the door; he says copy,
21  correct?
22  A. Correct.
23  Q. And then unfortunately we see within
24  seconds the report, "Shots fired, shots fired,"
25  correct?

226

1  A. Correct.
2      (Deposition Exhibit 38 was marked.)
3  Q. Same thing, this comes from your side of
4  the case, Travis, and it's out of the CBI
5  investigation. All right?
6  A. Okay.
7  Q. And it is a drawing of the interior of
8  the residence. Are you with me?
9  A. Okay.
10  Q. All right. You've got your bearings?
11  A. Yes.
12  Q. You've turned yours sideways. Is that to
13  do --
14  A. That's to help me understand where I'm
15  at.
16  Q. Well, I'm going to come over here so you
17  can help me understand. I'm interested, how does that
18  help you orientate yourself if you put your door to
19  the top? I'm just curious as to how that assists you.
20  A. It's either way, but I know the only
21  thing I saw --
22  Q. Don't mark anything yet.
23  A. I know, but it's just how I came in the
24  house, where I was, because I know exactly where that
25  wall was where I stopped.

227

1  Q. It's fine. I'm just more curious than
2  anything.
3  A. And that's how I feel the house sits on
4  the property.
5  Q. That part I get. And originally you were
6  down here?
7  A. I was supposed to be back here, yep.
8  Q. So there's knocks at the door, he
9  doesn't -- Wirth doesn't respond, Nate breaks the
10  door?
11  A. Yes.
12  Q. Okay. And as we talked about, Nate is a
13  good-sized man?
14  A. Uh-huh.
15  Q. Did it open on the first kick?
16  A. I think he kicked it two or three times.
17  Q. Okay. Up to that point, did any of you
18  say anything, should we pull back, should we wait a
19  while, anything like that?
20  A. No.
21  Q. Okay. So the door is breached?
22  A. The door is breached.
23  Q. And as Mark said, you guys are going
24  in --
25  A. Uh-huh.

228

1  Q. -- right?
2  A. Yes.
3  Q. Walk me through what you recall. Kolby
4  first?
5  A. So Kolby first, I was second, and
6  Lowrance was supposed to be behind me. I know he made
7  it into the mud room. I was stacked literally right
8  on top of Kolby, so we're no more than a breath away
9  from each other. So he's got his rifle pointed to the
10  right. I have my rifle on the left.
11  Q. So that's proper training --
12  A. That's training for us, yes. Kolby and I
13  make it to this corner of this house right here. I
14  remember this because the stove was there and the wall
15  stuck out maybe a foot.
16  Q. Which wall are we talking about?
17  A. This little partition wall right here, so
18  it stuck out a foot farther --
19  Q. Than the oven?
20  A. -- than the oven. Or it felt like it.
21  It was maybe 6 inches or something.
22  Q. I've gotcha. We're not going to hold you
23  to it. All right. So we're --
24  A. I know this, because we stopped exactly
25  right here.

TRAVIS JAMES THRELKEL

333

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

       I, Darcy Curtis, Registered Professional Reporter and Notary Public ID 20064016972, State of Colorado, do hereby certify that previous to the commencement of the examination, the said TRAVIS JAMES THRELKEL was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 18th day of January, 2018.

       My commission expires May 2, 2018.

__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.

_____
Darcy Curtis
Registered Professional Reporter
Certified Shorthand Reporter

EXHIBIT 9