## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
JOHN CARRIGAN,
MELISSA CARRIGAN, and
KOLBY MARTIN
TRAVIS THRELKEL

        Plaintiffs,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual capacity, and
MARK HANCOCK, in his official and individual capacity,

        Defendant.

_____

## PLAINTIFFS' RESPONSE TO DEFENDANTS PARK COUNTY SHERIFF'S OFFICE AND SHERIFF FRED WEGENER'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (DOC. NO. 55)
_____

        Plaintiffs, by and through their undersigned counsel, respond in opposition to Defendants

Park County Sheriff's Office and Sheriff Fred Wegener's Motion for Summary Judgment

Pursuant to Fed. R. Civ. P. 56 (Doc. No. 55) as follows:

### INTRODUCTION

        The Park County Sheriff's Office ("PCSO") selected Defendant Mark Hancock to lead

the eviction of Martin Wirth.  Having done so, PCSO is liable for the egregious conduct of

Hancock that led to serious injuries and deaths, all of which were preventable had Hancock

simply followed a plan intended to avoid the exact outcome Hancock caused, and had Hancock

followed the direct order of a superior officer.

The plan for the eviction was that if Wirth went back into his residence, the officers would withdraw to the perimeter of the property and Hancock was to call Gore to assess what would be done next.  On the morning of the eviction, Hancock assured the officers that they would not be breaching the residence.  Later that day, the very situation they had planned for arose: Wirth retreated into his residence.  With no emergency, no danger to anyone's life, and a violent individual waiting inside the house, Hancock needed to do no more than follow the plan for this foreseeable circumstance.  Instead, he disregarded the safety of everyone involved and inexplicably ordered the other officers to breach the residence.  Hancock violated a direct order, PCSO policy, the tactical plan previously devised, his own training and experience, and the most fundamental tenets of law enforcement.  This led directly to the outcome he was warned about: serious injury and loss of life.  Such egregiously reckless conduct is truly conscience-shocking.

## CLAIMS AND DEFENSES UPON WHICH JUDGMENT IS SOUGHT

**A.  Wegener in his individual capacity: Qualified Immunity**

1.  Burden of Proof

Plaintiffs do not dispute that they bear the burden after Wegener raises the qualified immunity defense.

2.  Elements of Qualified Immunity

Plaintiffs do not dispute that, in order to overcome the qualified immunity defense, they must show: "'(1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct.'"  *Albright v. Rodriguez*, 51 F.3d 1531, 1534 (10th Cir. 1995)

3.      <u>Elements that Wegener is entitled to qualified immunity</u>

Plaintiffs concede that Wegener, in his individual capacity, is entitled to qualified immunity.

**B.      Wegener is entitled to summary judgment Fourteenth Amendment Due Process**

1.      <u>Burden of Proof</u>

Plaintiffs do not dispute that they bear the burden of proving by a preponderance of the evidence each of the elements of danger creation.

2.      <u>Elements that Wegener is entitled to summary judgment regarding danger creation</u>

Plaintiffs concede that Wegener, in his individual capacity, is entitled to summary judgment regarding danger creation.

**C.      The PCSO and Wegener in his official capacity are not entitled to summary judgment based on danger creation**

1.      <u>Burden of Proof</u>

Plaintiffs do not dispute that they bear the burden in establishing municipal liability under 42 U.S.C. §1983.  The Supreme Court has "consistently refused to hold municipalities liable under a theory of *respondeat superior"* but nonetheless has imposed liability upon municipalities when the enforcement of their policies or customs by their employees causes a deprivation of a person's federally protected rights. Therefore, the Court requires a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights.  <u>*Monell*</u> and its progeny clearly stand for the proposition that the very language of § 1983 provides for the imposition of liability where there exists an "affirmative" or

"direct causal" link between a municipal person's adoption or implementation of a policy and a deprivation of federally protected rights, and that imposing liability upon such a basis does not implicate *respondeat superior.  Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010).

      2.    <u>Elements that Plaintiff can prove</u>

      a.    There is a violation of Plaintiffs rights under the constitution[1]

      **I.**    ***Collins* does not bar all Due Process claims related to employment**

PCSO's argument that *Collins v. City of Harker Heights* "does not provide a guarantee of safe outcomes" (Motion at 24) is irrelevant to the issues before this Court because Plaintiffs' claims in this action are not the same as the claim at issue in *Collins*.  The *Collins* court held that

> the Due Process Clause does not impose an independent federal obligation upon municipalities to provide certain minimal levels of safety and security in the workplace and the city's alleged failure to train or to warn its sanitation department employees was not arbitrary in a constitutional sense.

*Collins v. City of Harker Heights*, 503 U.S. 115, 130 (1992).  Here, Plaintiffs do not allege liability solely based on a failure to provide a safe workplace.  Because Plaintiffs' claims go beyond the generality of the claims at issue in *Collins*, and Plaintiffs' claims go to affirmative conduct by state actors, *Collins* does not apply.

The *Collins* court did not make any ruling that could be read so broadly as to prohibit all constitutional claims that arise from an employment context, and instead articulated the limited scope of its ruling, as quoted above.  *See Collins*, 503 U.S. at 130.  If anything, the *Collins* opinion explicitly leaves the door open for constitutional claims arising in an employment context.  In its criticism of the petitioner's claims, the *Collins* court stated:

---

[1] The constitutional violations at issue here are the state-created danger and failure to train.  The latter is discussed below, and incorporated herein by reference.

> In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured.  Instead, she makes the more general allegation that the city deprived him of life and liberty by failing to provide a reasonably safe work environment.

*Id.* at 125-26.  This is not a case involving the type of "more general allegation" disapproved by the *Collins* court.  Rather, in this case the Plaintiffs show that Hancock, the supervisor, ordered the officers to go into the Wirth residence when Hancock knew there was a significant risk that the officers would be injured.  (*See* Dep. of Hancock, relevant portions of which are attached as Ex. 1, at 95:15-24, 126:19-24, 187:23-188:15, 206:21-207:1; Dep. of Gore, relevant portions of which are attached as Ex. 2, at 80:23-25, 81:1-19, 83:1-11, 93:2-12, 95:17-23.)  If *Collins* has any application to this case, it is to show that the Plaintiffs' claims are within the purview of constitutional protection.

The 10th Circuit discussed *Collins* in *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir. 1995).  The *Uhlrig* court entertained a danger creation claim by the estate of an employee against the employer.  In its discussion of *Collins*, the 10th Circuit made no mention of the type of broad prohibition against such claims as argued by PCSO and Wegener.  Ultimately the *Uhlrig* court affirmed summary judgment for the employer, but based on the specific substantive elements of a danger creation claim.  If *Collins* stood for the broad proposition advocated by PCSO and Wegener, there would be no need for the *Uhlrig* court to address the elements of the danger creation claim.  This further illustrates that PCSO and Wegener's reading of *Collins* is incorrect.

The 10th Circuit's opinion in *Moore v. Guthrie*, 438 F.3d 1036 (10th Cir. 2006), does not support PCSO and Wegener's argument.  Most notably, the plaintiff in *Moore* argued "that he has a cognizable claim for a violation of bodily integrity, based on his alleged *right to work in a*

*safe environment.*" *Id.* at 1039-40 (emphasis added). Like *Collins*, the *Moore* opinion is distinguishable because the Plaintiffs in this action make claims that are more specific and particularized than a general claim to a right to work in a safe environment. Those claims, and the facts supporting them, will be discussed in greater detail elsewhere in this Response. A plain reading of *Collins* and *Moore*, however, shows that they do not stand for the broad prohibition argued by PCSO and Wegener. Properly construed, neither *Collins* nor *Moore* are a barrier to Plaintiffs' claims, and PCSO and Wegener's argument on this ground should be rejected.

## II. State-created danger elements

PCSO and Wegener apparently do not dispute that the two "preconditions" to state-created danger liability are present here. (*See* Motion at 17-23, 24.) Those preconditions are: "first, the state actor took an affirmative action, and, second, that action led to private violence injuring the plaintiff." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 965 (10th Cir. 2016). The affirmative action taken by Hancock, a state actor in his role as employee and captain of the PCSO, was to order officers to enter the Wirth residence, despite Gore's previous order that this not be done specifically because Wirth would shoot at the officers. (*See* Ex. 2 at 81:9-19, 81:24-25, 82:1-4, 83:16-84:9, 87:10-14, 87:20-88:1.) Hancock's action led to private violence injuring the Plaintiffs because Wirth shot at the officers once they entered the residence, injuring Martin and Threlkel, and killing Carrigan. (*See* Dep. of Martin, relevant portions of which are attached as Ex. 3, at 209:2-212:6.)

Having established the "preconditions" for state-created danger, the analysis turns to the elements of state-created danger liability. Those elements are:

(1) the charged state . . . actor[] created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited

and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Estate of Reat*, 824 F.3d at 965 (*quoting Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014)).  PCSO and Wegener do not argue the first and second elements above.  (*See* Motion at 17-23.)  Plaintiffs will address each of the remaining four elements in turn.

> ### *Hancock's conduct put Plaintiffs at substantial risk of serious, immediate, and proximate harm*

Hancock ordered Carrigan, Martin, and Threlkel to breach and enter the front door of the Wirth residence, with Wirth waiting inside.  Once they entered the residence, Wirth shot at them, injuring Martin and Threlkel, and killing Carrigan.  Hancock's conduct put the officers in the line of fire, and the facts show that this element of state-created danger liability is satisfied.

According to Hancock, he was the officer in charge of the Wirth eviction.  In that capacity, he was to oversee the operation and develop a plan for, among other things: where the officers would be; what the officers were assigned to do; and the course of action the officers would take.  (Ex. 1 at 90:8-18.)  Wegener acknowledged that the ranking officer on scene during the eviction of Wirth was Hancock.  (Dep. of Wegener, relevant portions of which are attached as Ex. 4, at 239:17-21.)  When Wirth went back inside the residence Hancock directed four officers to come up to the house.  (Ex. 1 at 233:24-234:5.)  The facts show that it was Hancock who led the officers during the crucial moments of the eviction, and it was Hancock who ordered them to breach the door.  (*Id.* at 151:6-12.)

As explained in greater detail below, before the Wirth eviction Hancock was given a direct order by Undersheriff Gore not to breach the Wirth residence.  The reason for that order

was the danger of entering the residence after Wirth retreated inside.  Gore testified that by not following Gore's direct order Hancock exposed the members of the team to great danger.  (Ex. 2 at 140:21-25.)  By breaching the door instead of withdrawing to a safe location Hancock brought the officers into the "lion's lair."  (*Id.* at 141:1-5.)  Gore testified that Hancock was aware of the risks of breaching the Wirth residence and recklessly disregarded those risks.  (*Id.* at 145:10-19.)  Gore testified that Hancock's reckless disregard of the known risks led to Martin and Threlkel being shot, and Carrigan and Wirth being killed.  (*Id.* at 145:20-146:10.)

Hancock's own testimony shows that he was fully aware of the danger Wirth posed.  When Wirth went back into the home Hancock began to feel "real uncomfortable" because he could not see Wirth.  (Ex. 1 at 231:12-21.)  At the time of evicting Wirth, Hancock assumed that Wirth was armed.  (*Id.* at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  The threat posed by Wirth was known by Hancock, as discussed below with regard to the "obvious or known" element.  That discussion is incorporated herein by reference.

Defendants argue that risks are inherent in law enforcement.  (PCSO and Wegener Motion at 15-16; Hancock Motion at 15-16.)  That argument, however, is a red herring.  Whether there are some generalized risks inherent in law enforcement has nothing to do with whether Hancock put the Plaintiffs at substantial risk of serious, immediate, and proximate harm.  As discussed above, it is apparent that Hancock's order quite literally put the Plaintiffs in the line of fire.  It was Hancock's conduct that directly and proximately exposed the Plaintiffs to the specific risk at issue here, *i.e.*, being sent directly into Wirth's ambush, which was thoroughly foreseeable to Hancock.

The only reason Carrigan, Martin, and Threlkel were put in the virtually-assured risk of harm was Hancock's order that they breach the residence and go inside.  Having satisfied this element of state-created danger liability, Plaintiffs turn to the next element, whether the risk was obvious or known.

<u>*The risk was obvious or known*</u>

The facts before this Court show that Hancock was well aware of the risk posed by Wirth.  As recently as approximately one month before the Wirth eviction, Hancock had actual knowledge of Wirth threatening to shoot law enforcement officers.  On January 20, 2016, Wirth was involved in an incident with PCSO officers in which Wirth "stated he was going to get a gun and 'shoot the first cop he sees.'"  (PCSO Offense Report 2016000052, attached as Ex. 5, at PCSO 001003.)  Hancock was a PCSO Captain on duty during the January 20, 2016 incident with Wirth.  (Ex. 1 at 186:1-187:5.)  In fact, Hancock heard the incident unfold on the radio.  (*Id.* at 187:1-8.)  Prior to the eviction of February 24, 2016, Hancock was aware that Wirth made a threat that he was going to shoot the first cop he sees.  (*Id.* at 187:23-188:15.)

After the January 20, 2016 event with Wirth, Tonjes had a conversation with Hancock regarding the threats Wirth made.  (Dep. of Tonjes, relevant portions of which are attached as Ex. 6, at 129:71-25.)  On or about February 22, 2016, only two days before the eviction, Tonjes had a conversation with Hancock wherein Tonjes articulated to Hancock that Wirth is highly volatile and potentially dangerous.  (*Id.* at 130:10-16.)  On the morning of the eviction, Tonjes had another conversation with Hancock telling him that Wirth was dangerous.  (*Id.* at 132:21-133:1.)

Gore also communicated to Hancock in no uncertain terms the threat posed by Wirth.

Prior to the February 24, 2016, events, Gore had a conversation with Hancock advising Hancock that Wirth posed a specific threat.  (Ex. 2 at 80:23-25; 81:1-19.)  Approximately two-and-a-half weeks before the eviction Gore called Hancock into his office and told Hancock that he felt Wirth was a "significant threat."  (*Id.* at 81:1-19.)  He told Hancock that: "I wanted to be very clear that I considered Wirth extremely dangerous."  (*Id.*)  Gore felt that Wirth was homicidal and suicidal.  (*Id.*)  He also told Hancock that Wirth wanted to commit "suicide by cop."  (*Id.*)

Gore tasked Hancock with doing a risk assessment as well as doing a tactical plan for the Wirth eviction.  (*Id.* at 92:17-21.)  Gore testified that he got a verbal threat assessment by Hancock concerning Wirth.  Hancock was aware of the threats that Wirth had made and Hancock was aware of the significant threat that Wirth posed.  (*Id.* at 95:17-23.)  Based on Gore's direction, Hancock did a threat assessment and arrived at the same conclusion that Gore did: that Wirth was extremely dangerous.  (*Id.* at 83:1-11.)  As Gore testified:

> [o]nce again, I had significant concerns for the safety of our staff, the safety of the citizens and the neighbors in that neighborhood.  And I just wanted to make it very clear to Captain Hancock that I considered Wirth a significant threat.  And as I have previously stated, I felt he wanted to commit suicide by cop.  And based on statements that [Wirth] had made and incidents two weeks prior to that, that [Wirth] wanted to have a shootout with law enforcement and take as many of us out as he could.  And that was my feeling and concern at the time.

(*Id.* at 93:2-12.)  As to why he gave the order to Hancock: "I felt this situation and I felt Mr. Wirth was extremely dangerous.  And I was concerned for the welfare of our officers and I was concerned for the welfare of the residence and I had a bad feeling about this entire operation." (*Id.* at 82:21-25, 83:1.)

Knowledge of the plan was not confined to just Gore and Hancock.  Tonjes met with Wegener and advised him of the plan to evict Wirth.  In that discussion, Tonjes advised Wegener

that because Wirth was volatile that if Wirth does not come out of the residence or he refuses to leave that the officers were going to withdraw and get an arrest warrant.  (Ex. 6 at 75:14-79:7.)  Wegener understood and agreed with the plan that officers were not to enter the Wirth residence should Wirth refuse to come out or leave the residence.  (*Id.* at 79:2-10.)  On the morning of February 24, 2016, Tonjes articulated to Hancock the "plan" regarding how to handle Wirth should he go back into the residence.  (*Id.* at 80:3-12.)

At the time of evicting Wirth, Hancock assumed that Wirth was armed.  (Ex. 1 at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  According to Hancock's CBI statement he believed, based on the information he had, that Wirth would become barricaded.  (*Id.* at 206:21-207:1.)  Hancock testified that when the officers told Wirth that he was being evicted Wirth stated, "you're not even going to give me time to move my stuff out" and then went back into his home.  (*Id.* at 224:21-225:18.)  Wirth then refused to come out and became a barricaded subject.  (Ex. 3 at 249:5-8.)

Based on Hancock's experience and tenure with PSCO, typically only one to two officers were used to evict a person from their residence.  (Ex. 1 at 92:4-7.)  For the Wirth eviction, Hancock had seven officers involved, as well as the Platte Canyon Fire and Rescue on call.  (*Id.* at 92:8-93:4.)  The eviction of Wirth was the first time in Hancock's 21 years with PSCO that he had the Platte Valley Fire Department on standby for an eviction.  (*Id.* at 96:3-97:5.)  This alone shows that Hancock knew of the risk posed by Wirth.

Even if Hancock did not have actual knowledge of the risk posed by Wirth, that risk was abundantly obvious.  Before the eviction, Gore believed that Wirth posed the highest threat level.

(Ex. 2 at 103:17-25; 104:1.)  Before the eviction, Gore stated that he had previous awareness that Wirth wanted to commit suicide by cop.  (*Id.* at 105:8-20.)  This, in Gore's mind, reinforced the threat that Wirth posed.  (*Id.*)  Wegner testified that since he has been with PCSO the PCSO officers interact with mentally ill people on a recurring basis within Park County.  (Ex. 4 at 40:22-50:3.)  Wegner testified that it has been proven time and time again that mentally ill people in Park County have proven a safety risk to law enforcement officers.  (*Id.* at 50:4-11.) Before the Wirth eviction, and while Wegener was the Sheriff, the PCSO was involved with a Park County resident that was getting evicted from his home and proceeded to shoot at Park County Sheriff Deputies.  (*Id.* at 40:3-41:9.)  On average, and during Wegner's tenure, PCSO dealt with 25-50 evictions per year.  (*Id.* at 43:16-44:8.)  The risk posed by Wirth, because of his specific behavior in the past and because of the well-known behavior of others like him in the county, was obvious to Hancock.

Hancock argues that Wirth's behavior "would have led a reasonable officer to believe that Mr. Wirth intended to grab a few of his belongings and leave the house."  (Hancock Motion at 17.)  This only serves to underscore the egregiousness of Hancock's conduct.  If Hancock thought Wirth was just going to "grab a few of his belongings and leave the house," the order to kick down the door and invade the house with guns drawn is particularly shocking.

### *Hancock acted recklessly in conscious disregard of that risk*

Despite his knowledge of the risk posed by Wirth, Hancock recklessly exposed the other officers to that risk, in complete disregard of the consequences he had been directly warned about.  The facts before the Court show that the "reckless" element of state-created danger liability is satisfied.

> [R]eckless intent does not require that the actor intended to harm a particular individual; reckless intent is established if the actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.  Thus, reckless intent involves disregard of a particular risk rather than intent to cause a particularized harm.

*Medina v. City & County of Denver*, 960 F.2d 1493, 1496 (10th Cir. 1992) (citation omitted).

There can be little debate that Hancock had actual knowledge of the serious risk posed by entering the Wirth residence.  As discussed elsewhere in this Response, Gore ordered Hancock that under no circumstances were they to enter the Wirth residence.  (Ex. 2 at 81:17-19, 87:10-14.)  Gore testified:

> Approximately two weeks, two and a half weeks, prior to this operation being conducted, I had called Captain Hancock into my office and advised him that I felt Wirth was a significant threat.  Told him that during the operation, I wanted to be very clear that I considered Wirth extremely dangerous.  I felt he was homicidal and suicidal.  I felt he wanted to commit suicide by cop and take as many officers with him as he could.  I directed Captain Hancock that under no circumstances whatsoever were they to enter Wirth's residence.

(*Id.* at 81:9-19.)

> There would have been no ambiguity.  I gave the order and made it crystal clear that under no circumstances was he to enter the residence.  I made it clear that I felt Wirth was highly volatile and dangerous and that I felt Mr. Wirth wanted to commit suicide by cop and take as many officers with him as he could.

(*Id.* at 87:20-88:1.)

Gore's orders to Hancock went beyond merely prohibiting entering the Wirth residence.  Gore also outlined the plan for the eviction with Hancock.  On February 12, 2016, Gore communicated the tactical plan to Hancock, as well as the direct order not to breach the Wirth residence.  (*Id.* at 109:13-17.)  Gore testified to the details of the plan as follows:

> This was a tactical operation from the very get-go.  The operation had two phases. We knew that Mr. Wirth was extremely volatile and dangerous and most likely

armed.  The first phase of the operation was officers were supposed to, under the tactical plan, make an attempt to get Mr. Wirth out of the house in a peaceable manner.

I had anticipated that Mr. Wirth may come out of the residence and go back in.  And typically in my experience as a peace officer, they will come out of the residence to assess how many officers you have and assess the situation themselves.  When they go back in the residence or if they go back in the residence, at that point the operation should be considered a barricade suspect operation.  And the officers, under the plan that Hancock and I discussed, were supposed to withdraw to the perimeter, at which time I was supposed to be given a phone call to assess what we were going to do at that point.

(*Id.* at 83:16-84:9.)  Hancock responded to Gore that he understood the order and that he would follow the directive and that "I could trust [Hancock] that no one would be hurt in this operation."  (*Id.* at 82:8-20.)  The tactical plan as discussed with Hancock was an order by Gore to Hancock.  (*Id.* at 84:16-19.)  Gore further explained the plan put in place for the foreseeable scenario of Wirth retreating into the residence:

Q.   Okay.  So based on your tactical plan if Mr. Wirth chose not to come to the door, was it your belief that they should have retreated?

A.  Yes.

Q.  And that was essentially a direct order from you to Hancock?

A.  Yes.

Q.  Okay.  Let's keep going on this thing.  "I became concerned.  I was concerned as to where Mr. Wirth was, to include the possibility that he was exiting the house to a vacated perimeter spot or simply hiding in the house."  Do you see that?

A.  Yes.

Q.  Do you think that is a valid concern based on phase one of your tactical plan?

A.  No.

Q.  Why not?

A.   According to phase one, the officers should have been put in a position in a

perimeter around the house to begin with, so that if Mr. Wirth exited from any side of the house, it could be reported to the officers. Additionally, topography and trailers or whatever the tactical issues at the residence are, whatever they were at the time, should have already been addressed. And how they were going to withdraw should have already been addressed as well.

(*Id.* at 139:1-140:2.) Hancock did not request to change the tactical plan after it was discussed between him and Gore on February 12, 2016. (*Id.* at 114:15-21.)

Hancock's conduct was particularly reckless because it ran contrary to his own prior training and experience. Based on Hancock's SWAT training, he understood that looking inside a home window is not the best way to understand the full layout of the entire house before breaching the residence. (Ex. 1 at 133:1-5.) Before evicting Wirth, Hancock did not conduct any research of the interior of the Wirth home (*Id.* at 130:22-131:1), nor did he know the specific layout of Wirth's home (*Id.* at 129:19-22). Hancock's limited knowledge of the interior of the Wirth home before breaching was from merely looking inside a window. (*Id.* at 131:23-132:3.) The window Hancock looked into was a small window portion in the door. The door window did not give Hancock a clear view of the entire inside of the Wirth home. (*Id.* at 228:16-229:16.) In fact, when looking into the window Hancock could not see Wirth. (*Id.* at 228:16-19.) Hancock never looked into any other window in the Wirth residence nor did he direct any officers to do so either. (*Id.* at 229:20-230:3.) Despite his own knowledge about the importance of knowing the layout of a home before breaching that home, and his failure to take any steps to gain such knowledge, Hancock ordered the officers to breach the residence. Notably, when Wirth went back into the residence Hancock acknowledged that there was no immediate emergency occurring based on Wirth's actions. (*Id.* at 238:13-239:1, 239:25-240:6.) This makes his order to breach the residence all the more egregious.

This is not a situation in which there could be any doubt about who Hancock was putting in danger.  Carrigan, Martin, and Threlkel were "stacked" at the front door and Hancock ordered them to force entry into the residence.  Knowing the risk posed by Wirth, Hancock sent a limited and specifically definable group of officers into the substantial risk of serious, immediate, and proximate harm.  While Plaintiffs do not argue that Hancock had the intent to harm these officers, Hancock did act recklessly in conscious disregard of the risk of serious harm.  The facts show that Hancock had actual knowledge of that risk, and the severity of the risk.

When Hancock did not retreat when Wirth went back into the residence, and instead began to knock numerous times on the door, Hancock was in violation of Gore's order and Hancock was insubordinate.  (Ex. 2 at 140:12-20.)  Hancock acknowledged that within PCSO it is important to follow orders from superior officers.  (Ex. 1 at 39:11-19.)  When Hancock was a Captain at PCSO he was a subordinate officer to Gore.  (*Id.* at 56:24-57:2.)  As admitted by Hancock, when Gore was undersheriff and Gore gave Hancock a direct order Hancock was required to follow it.  If he failed to follow a direct order then Hancock would have been insubordinate.  (*Id.* at 57:13-25.)

Gore testified that Hancock was aware of the risks of breaching the Wirth residence and recklessly disregarded those risks.  (Ex. 2 at 145:10-19.)  Gore also testified that by recklessly disregarding, and outright ignoring, the known risks, Hancock's conduct led to the serious injuries to Martin and Threlkel, and the deaths of Carrigan and Wirth.  (*Id.* at 145:20-146:10.)

Hancock knew of the specific and serious risk posed by forcing entry into the Wirth residence, yet Hancock recklessly disregarded that risk and ordered the officers to breach the residence, leading to the grim outcome explicitly predicted by Gore.

*Hancock's conduct, when viewed in total, is conscience shocking*

When Hancock ordered the officers to breach the Wirth residence, Hancock violated a direct order from a superior, ignored his own knowledge and the warnings of others about the risk posed by Wirth, ignored a plan that had been previously devised for precisely the situation that arose, and disregarded the fact that there was no exigency or emergency requiring forced entry into the residence.  "[T]he shocks-the-conscience part of such a claim concerns the defendant's conduct as a whole.  This includes both action and inaction."  *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) (quotation marks and citation omitted).  When viewed as a whole Hancock's actions and inactions are not merely negligent, but amount to the rare case that truly shocks the conscience.

Prior to the eviction, Hancock was given a direct order not to enter the residence if Wirth retreated back inside because of the substantial risk that Wirth would shoot at the officers.  As discussed above, Gore spoke to Hancock approximately two or two-and-a-half weeks prior to the eviction and told Hancock that Wirth was a significant threat.  (Ex. 2 at 81:9-19.)  Gore ordered Hancock "that under no circumstances whatsoever were they to enter Wirth's residence."  (*Id.*)  Hancock told Gore that Hancock understood, and would follow, the order.  (*Id.* at 82:8-20.)  Gore also made clear to Hancock that Wirth was homicidal and suicidal, and Wirth wanted to commit suicide by cop and would take as many officers with him as he could.  (*Id.* at 81:9-19.)  Only two days before the eviction, Tonjes also articulated to Hancock that Wirth is highly volatile and potentially dangerous.  (Ex. 6 at 130:10-16.)  Hancock even did his own threat assessment of Wirth and arrived at the same conclusion that Gore did: that Wirth was extremely dangerous.  (*Id.* at 83:1-11.)  At the time of evicting Wirth, Hancock assumed that Wirth was

armed.  (Ex. 1 at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  According to Hancock's CBI statement he believed, based on the information he had, that Wirth would become barricaded.  (*Id.* at 206:21-207:1.)  Hancock went so far as to use more than three times as many officers for the Wirth eviction as he normally would, and took the unprecedented step of having Platte Valley Fire Department on standby.  (*Id.* at 92:4-93:4, 96:3-97:5.)  Despite all this, and despite Hancock's awareness of the importance of following orders (*Id.* at 39:11-25), Hancock disobeyed the direct order given by Gore (Ex. 2 at 140:12-20; Ex. 1 at 57:13-25).  Hancock's insubordination, which led directly to the grievous outcome that the order was intended to prevent, is part of Hancock's conscience-shocking conduct.

Another important aspect of Hancock's "conduct as a whole" is that prior to the eviction Hancock knew that Wirth was dangerous, likely to be armed, and threatened to shoot law enforcement officers.  Prior to the eviction of February 24, 2016, Hancock was aware that Wirth made a threat that he was going to shoot the first cop he sees.  (Ex. 1 at 187:23-188:15.)  Hancock was aware of the threats that Wirth had made and that Wirth posed a significant threat.  (Ex. 2 at 95:17-23.)  On or about February 22, 2016, only two days before the eviction, Tonjes had a conversation with Hancock wherein Tonjes articulated to Hancock that Wirth was highly volatile and potentially dangerous.  (Ex. 6 at 130:10-16.)  On the morning of the eviction, Tonjes had another conversation with Hancock telling him that Wirth was dangerous.  (*Id.* at 132:21-133:1.)  Approximately two-and-a-half weeks before the eviction Gore called Hancock into his office and told Hancock that he felt Wirth was a "significant threat."  (Ex. 2 at 81:1-19.)  He told Hancock that: "I wanted to be very clear that I considered Wirth extremely dangerous."  (*Id.*)  At

the time of evicting Wirth, Hancock assumed that Wirth was armed.  (Ex. 1 at 95:15-24.)  In fact, Hancock testified that before breaching the Wirth residence Hancock believed it was "most likely" that Wirth had weapons.  (*Id.* at 126:19-24.)  This is not a situation in which there was any doubt about what lay in wait behind the front door of the Wirth residence.  Hancock was warned about the risk posed by Wirth, and Hancock had actual knowledge of the danger, yet Hancock ordered the officers to breach the residence anyway, needlessly putting lives in jeopardy.

One of the most shocking aspects of this case is that there was a plan in place ahead of time for exactly the situation that confronted Hancock, yet Hancock inexplicably disregarded that plan and sent the officers into the line of fire.  As discussed elsewhere in this Response, Gore discussed the plan with Hancock, including the eventuality of Wirth retreating into the residence.  The plan as outlined by Gore, and Gore's direct order to Hancock, are discussed elsewhere and need not be repeated in full.  The plan is also significant, however, because even in the hours leading up to the eviction, Hancock assured the officers that they would not be breaching the Wirth residence.  At the substation for the briefing regarding the Wirth eviction, Martin recalls a deputy asking Hancock whether they would go in after Wirth if he stayed in the residence, and Hancock said they would not.  (Ex. 3 at 142:13-25.)  After the briefing and while at the fire station Martin heard Deputy Lowrance ask Hancock if Wirth does not come out of the residence we are not going inside, and Hancock responded: "you're correct, we're not going inside."  (*Id.* at 148:20-149:17.)  Even in the moments before breaching the residence, at least one of the officers was still working under the impression that they would not be breaching. Hancock called Martin up to the front door and at that point, Martin was thinking to himself

"why are we getting called up to the door? There shouldn't be any reason.  He's not coming out." (*Id.* at 175:21-176:1.)  When Martin got to the front door he did not verbalize his concern because failure to follow orders would be insubordination.  (*Id.* at 178:5-23.)  The officers bravely followed Hancock's order, however, resulting in serious injuries and deaths.

Hancock's order that the officers breach the Wirth residence was all the more shocking because there was no need to breach the residence.  The Court need look no further than the testimony of Hancock himself: when Wirth went back into the residence Hancock acknowledged that there was no immediate emergency occurring based on Wirth's actions.  (Ex. 1 at 238:13-239:1, 239:25-240:6.)  In his Motion, Hancock argues that Wirth's behavior "would have led a reasonable officer to believe that Mr. Wirth intended to grab a few of his belongings and leave the house."  (Hancock Motion at 16-17.)  This only serves to underscore the egregiousness of Hancock's conduct.  If there was no emergency, and a reasonable officer would believe that Wirth just intended to grab a few belongings and then leave the house, why defy a direct order and send armed officers into the "lion's lair?"  There is simply no reasonable explanation, and Hancock's conduct goes beyond being merely unreasonable.

Contrary to his own deposition testimony that there was no emergency when Wirth went back into the residence, in his Motion Hancock argues that "[i]t is reasonable for police to move quickly if 'delay would gravely endanger their lives or the lives of others.'"  (Hancock Motion at 19 (*quoting City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015)).)  After Wirth retreated into the residence, he was not a danger to anyone.  The officers were outside, where they could retreat to form a perimeter as previously planned.  Wirth was inside the residence alone.  The only thing at that point that could "gravely endanger their lives or the lives

of others" was to send the officers into the Wirth residence, which is exactly what Hancock did.

It is important to remember that after retreating into his residence, Wirth was not a threat to anyone. (Ex. 1 at 227:20-228:6.) Wirth had not committed a crime; the officers were there to conduct an eviction, which is not a criminal matter. *See* C.R.S. § 13-40-101 *et seq.* Wirth was not charged with any crime, not was Wirth fleeing from the commission of any crime. That Hancock would order the officers to breach the residence with guns drawn, in the face of the known risk involved in that course of action, is all the more egregious because there was no crime involved.

Though Defendants hope to paint the picture of a sudden emergency requiring a split-second decision, that is simply not the facts of this case. When Wirth went back into the residence, there was no emergency requiring immediate action. Also, if there was any question about what to do at that point, Hancock only needed to refer to the plan devised ahead of time. That plan envisioned the very scenario that confronted Hancock: Wirth retreating into the residence. (Ex. 2 at 83:16-84:9.) Hancock had time to reflect on the situation. This is not a case of an officer faced with an unexpected emergency requiring an immediate decision. This case is the opposite, which reinforces the conscience-shocking nature of Hancock's conduct.

Hancock's conduct was contrary to PCSO policy that governed the precise situation he was facing. At the time of the Wirth eviction, PCSO had a hostage/barricade policy in effect.[2] (Ex. 2 at 158:5-21.) All member of PCSO were required to follow the policy. (*Id.* at 158:22-159:2.) Under the policy, when Wirth went back into the residence he was considered a barricaded subject. (*Id.* at 159:6-17.) Under the barricade policy, when Wirth went back into the

---

[2] A copy of the "Hostage/Barricaded Subject Incidents" policy is attached as Ex. 7.

residence there was a reasonable belief that he would commit serious bodily injury or death to officers.  (*Id.* at 160:13-20.)  Under Section III of the barricaded policy, it is the policy (which is not discretionary) to place the lives of the hostage, civilians, and officers as the utmost importance and the officers are to peacefully resolve the incident through communication with the suspect.  (*Id.* at 161:13-162:7.)  Gore monitored the radio during the eviction and there were no attempts by Wegener or Hancock to communicate with Wirth.  (*Id.* at 162:19-24.)  Under the barricade policy, there was no basis or justification to tactically enter the residence.  (*Id.* at 163:22-164:17.)  In addition to being contrary to policy, Hancock's conduct was contrary to a direct order from his superior officer (as discussed above).

Hancock's conduct was also inconsistent with his own experience and training.  Based on Hancock's SWAT training, he understood that if possible it is best to know the layout of a building before entering the building.  (Ex. 1 at 130:2-7.)  Hancock also knew from his training and experience that looking inside a home window is not the best way to understand the full layout of the entire house before breaching the residence.  (*Id.* at 133:1-5.)  Yet, Hancock's knowledge of the interior of the Wirth home before breaching was from simply looking inside a window.  (*Id.* at 131:23-132:3.)  The window Hancock looked into was a small window portion in the door.  The door window did not give Hancock a clear view of the entire inside of the Wirth home.  (*Id.* at 228:16-229:16.)  In fact, when looking into the window Hancock could not see Wirth.  (*Id.* at 228:16-19.)  Hancock never looked into any other window in the Wirth residence nor did he direct any officers to do so.  (*Id.* at 229:20-230:3.)  Before breaching the residence, Hancock did not know the specific layout of Wirth's home.  (*Id.* at 129:19-22.)  Hancock did not conduct any research of the interior of the Wirth home.  (*Id.* at 130:22-131:1.)  At the time of the

breach Hancock believed he could just "grab" Wirth, however, he did not know where Wirth was in the residence.  (*Id.* at 261:5-14.)  In sum, Hancock knew that Wirth was likely to be armed, knew that Wirth had previously threatened to shoot law enforcement officers, did not know the layout of the house or where Wirth was in the house, yet Hancock ordered the officers to breach the residence so that Hancock could somehow "grab" Wirth.  This not only defies his training and PCSO policy, it defies common sense.

Finally, Hancock himself has acknowledged that he did not handle the Wirth eviction properly.  In his interview with CBI, Hancock stated: "I really feel like he's barricading or, you know, something bad's going to happen and I really regret that I'm a Marine sometimes because I am super aggressive…."  (Hancock CBI Interview, relevant portions of which are attached as Ex. 8, at CARRIGAN 019142; *see also* Ex. 1 at 197:10-17.)  Hancock also stated that he was "second guessing and worrying that I messed something up…."  (Ex. 8 at CARRIGAN 019155.) Even though the plan going into the eviction was to retreat and form a perimeter if Wirth went back into the residence, Hancock admits that he did not think about retreating before breaching the Wirth residence.  (Ex. 1 at 254:3-5.)

Leading up to the Wirth eviction, Hancock knew that Wirth was a threat to law enforcement officers and that Wirth may retreat into his residence when faced with eviction.  A plan was put in place for that scenario, and Hancock was given a direct order not to enter the residence.  Even in the hours leading up to the eviction, Hancock assured the other officers involved that they would not be breaching the residence.  When the very situation that was previously envisioned came to fruition, Hancock defied the plan, a direct order, his own training, and common sense when he ordered other officers to breach the residence.  That conduct had the exact result that Hancock was

warned about, *i.e.*, Wirth started shooting at the officers.  Hancock's reckless conduct led directly to Martin and Threlkel being seriously injured, and Carrigan and Wirth dying.  Hancock's reckless disregard for the lives of others, including subordinate officers who looked to him for leadership and bravely followed his orders, is truly conscience-shocking.

>    b.    The Sheriff's Office delegated authority to Hancock

The Supreme Court has recognized that lawfully empowered decision makers cannot insulate themselves from liability under section 1983 by *knowingly* allowing a subordinate to exercise final policymaking authority vested by law in the decision makers. *See Ware v. Unified Sch. Dist. No.* 492, 902 F.2d 815, 818 (10th Cir. 1990).  A municipal policy is a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipality's] officers."   An act committed by an official who has been delegated the power of "establishing final policy" will also constitute a municipal policy. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1259 (10th Cir. 2007) *citing to Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986).  In determining whether an individual is a "final policymaker" the Court looks at three elements: (1) whether the official is meaningfully constrained "by policies not of that official's own making;" (2) whether the official's decision are final--i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.   *See Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).  As will be discussed below, Hancock was a final policymaker as it pertains to the eviction of Martin Wirth.

At all times relevant, on February 24, 2016, Park County Sheriff's Office Policy 510 was in effect.  *See* **Exhibit 7;** see also, Ex. 2 at 158:5-21.  Under Policy 510 it identifies when a PCSO

member is to be an Officer in Command (OIC) and what duties the OIC has as the ranking officer at the scene.  Pursuant to Policy 501, the OIC as the ranking officer, "**shall** be in command until specifically relieved by a superior."  *See* Ex. 7, p.2. [Emphasis added] Said another way, unless relieved by a superior, the OIC is in command of the operation at the scene.  In regard to the eviction of Wirth, Hancock was the OIC.  In fact, Wegener testified to the following salient points: (1) Wegener gave Hancock the authority to make the tactical plan to evict Martin Wirth (Ex. 4 at 146:7-147:2); (2) under Policy 510, Hancock was the OIC (Ex. 4 at 239:11-21); (3) even though Wegener was the most senior officer that appeared on scene for the Wirth eviction that Wegener did not assume command (Ex. 4 at 199:23-200:1); and (4) Wegener admits that he never took command from Hancock and, as such, Hancock was still in charge of the entire operation regarding the eviction of Wirth (Ex. 4 at 199:23-200:1).[3]  With Policy 510 being in effect at the time of the eviction, and Hancock being the OIC, the decisions Hancock made on scene were not restrained by the at-issue policy nor were his decisions subject to any "meaningful review" by the Sheriff, who was the authorized policymaker.[4]  *See* **Exhibit 7**.[5]  In fact, where Hancock sought permission to breach the residence by Wegener, Wegener himself did not know why Hancock asked permission to breach by virtue of Hancock's position as the OIC.  (*See* Ex. 4 at 199:10-200:9). This latter fact reveals that Hancock had the final authority to breach the residence without a meaningful avenue for review from the Sheriff himself.  *Starrett v. Wadley*, 876 F.2d 808, 818-19 (10th Cir. 1989) (Wadley had final authority to set employment policy as to the hiring and firing

---

[3] Wegener testified that under Policy 510, the OIC would need to inform the watch commander about the nature and circumstances surrounding the incident; however, because Hancock was the patrol commander (along with the fact that PSCO does not have watch command) Hancock was not required to do this regarding Martin Wirth. See Ex. 4 at 240:9-241:3).

[4] Reviewing Policy 510, it does not identify any constraints that are placed upon the OIC.  *See Ex. 7.*

[5] Gore testified that all PCSO personnel, including the Sheriff, are to follow Policy 510.  (Ex. 2 at 158:22 – 159:2).

of his staff because City did not offer any meaningful avenues of review).  Based on the foregoing, Hancock was the final policymaker concerning the February 24, 2016 eviction of Martin Wirth. The causal link between the conduct of Hancock, the final policymaker, and the state-created danger constitutional violation is discussed above.

Assuming *arguendo* that the Court does not find that Hancock was a final policymaker, Wegner as the Sheriff certainly was.  There is evidence that Hancock sought permission from Wegner to breach the residence.  (Ex. 1 at 256:1-5).  According to Hancock, he asked Wegner permission to breach the Wirth home and Wegner said "go".  *Id*.  Based on the conversation Hancock had with Wegener, Hancock then ordered the breach.  (Ex. 3 at 188:2-7).  Thus, Wegener's actions were as a final policymaker.

The Defense will likely argue that if Wegner then ordered the breach that such order then nullifies and/or overrides any order previously given by Gore.  First, if such argument is in fact made by the Defense that is an argument that the Defendants bear the burden to prove, not the Plaintiffs, because it is a defense rather than an element of one of Plaintiffs' claims for relief. Second, there are conflicting facts as to whether Hancock would in fact have to follow the "order" to breach by Wegener or not.  As set forth previously herein, Gore testified that he gave Hancock a direct order not to breach the residence and the fact that Hancock failed to follow that direct order he was insubordinate.  (Ex. 2 at 138:18-140:20).  Based on the foregoing, at a minimum there are unresolved questions of fact as to who the final policymaker was on February 24, 2016.  As such, this Court should not dismiss this case on summary judgment.

**D.      Wegner is entitled to summary judgment on deliberate indifferent training and supervision**

      1.      <u>Burden of Proof</u>

Plaintiffs do not dispute that they bear the burden of proving by a preponderance of the evidence each of the elements of danger creation.

      2.      <u>Elements that Wegener is entitled to summary judgment regarding danger creation</u>

Plaintiffs concede that Wegener, in his individual capacity, is entitled to summary judgment regarding being deliberately indifferent to training and supervision

**E.      The PCSO and Wegener in his official capacity are not entitled to summary judgment based on deliberate indifferent training and supervision**

      1.      <u>Burden of Proof</u>

Plaintiffs do not dispute that they bear the burden of proving by a preponderance of the evidence each of the elements of deliberate indifferent training and supervision.

      2.      <u>Elements that Plaintiffs can prove</u>

In evaluating and researching cases concerning failure to train and supervise in a law enforcement context, the cases for municipal liability appear to only address failure to train as applied in a use of force setting under the Fourth Amendment and/or Fourteenth Amendment.  If there is a separate and distinct standard as applied to Fourteenth Amendment violations for failure to train when there is no allegation of use of force, the undersigned has not been able to locate those specific cases.  To that end, the standard as applied by the Tenth Circuit for failure to train is as follows: (1) the officers exceeded constitutional limitations; (2) conduct arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward

persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Allen v. Muskogee,* 119 F.3d 837, 841-42 (10th Cir. 1997)[6] ; *see also*, *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1240 (10th Cir. 1999)(The same standard of deliberate indifference applies to both inadequate training and inadequate supervision).

In regard to the first element, as to whether the Sheriff's Office violated Plaintiffs' constitutional rights, please refer to the arguments set forth herein as it pertains to state creation danger. In addition, where a superior's failure to train amounts to deliberate indifference to the rights of persons with whom his subordinates come into contact, the inadequacy of training may serve as the basis for § 1983 liability. *Sutton*, 173 F.3d at 1240. As admitted by Wegner, the Sheriff Department is responsible to develop, implement and administer training to all of its officers. (Ex. 4 at 76:10-14). As will be discussed in turn below, the PCSO failed in its responsibility to provide required training to the subordinate officers (i.e. the Plaintiffs), which inaction now serves as a violation of the Plaintiffs' constitutional rights.

Under the second element under a failure to train (i.e. a usual and recurring situation with which police officers must deal) that has been established. To that end, the following facts have been testified to by Wegener: (1) the PCSO encounters a member of the public that is mentally ill once a week. (Ex. 4 at 49:16-21); (2) Wegner testified that since he has been with PCSO that PCSO deputies interact with mentally ill people as a reoccurring event within Park County(Ex. 4 at 40:22-50:3); (3) Wegner testified that based on his position with PCSO that it has been proven time and time again that mentally ill people in Park County have *proven a safety risk to law enforcement*

---

[6] The elements as set forth above addressed specifically "use of force".

*officers* (Ex. 4 at 50:4-11); Wegner's own personal experience at PCSO had him personally interact with a mentally ill person in Park County that *posed a safety risk to Sheriff Deputies was about twice a week*. (Ex. 4 at 52:12-53:3). Similar to Wegner's testimony is Hancock who likewise testified as follows: (1) based on his tenure with PCSO he would interact with at least one mentally ill person per week (Ex. 1 at 180:4-14) and (2) Hancock understood that mentally ill people that officers come into contact with may *pose a safety risk to the officer*. (*Id.* at 180:15 to 181:5). Finally, during Wegener's tenure as Sheriff, the PCSO on average would participate in twenty-five (25) to fifty (50) evictions per year. (Ex. 4 at 43:16-44:8). On that point, Hancock testified that he assumes everybody in Park County is armed. (Ex. 1 at 95:19-96:3). In sum, the above facts establish that the PCSO deals with mentally ill people that are likely armed on a daily basis which people pose a risk to officer safety.

With regard to the third factor, the Tenth Circuit has written as follows as to the showing a plaintiff must establish for a claim of deliberate indifference:

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998)

Viewing the record and drawing reasonable inference in favor of the Plaintiffs, there is sufficient evidence to raise a jury question as to the third factor. First, the Plaintiffs concede that based on the information received in discovery there is no evidence of any previous incident

involving a PCSO law enforcement officer being killed by a Park County resident which resident was in the throes of a mental episode that caused private violence.  However, as *Barney* sets forth, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is highly predictable.  As noted above, by Wegner's and Hancock's own admission, the PCSO deals with mentally ill people on a daily basis, which people pose a safety risk to law enforcement officers.   In addition, and accepting Hancock's testimony as true, based on his experience in Park County, he assumes every resident in the county is armed.  To that point, there was a prior incident to the Wirth eviction wherein the PCSO was dispatched to a Park County resident's home who was being evicted and the resident began to shoot at the Sheriff Deputies.  (Ex. 4 at 40:3-41:9).  Ultimately, that resident died by his own hands.  *Id.*  Where no PCSO deputy was killed in that prior incident Wegener did acknowledge that there is a potential that the Sheriff's Office will have to evict a person that poses a high risk to officer safety, as noted by the prior incident as well at the events regarding the Wirth eviction.  (*Id.* at 45:11-19).  Notably, at the time of the Wirth eviction, the PCSO had no policy in effect on how PCSO deputies are to deescalate a person that is experiencing a mental health issue.  (*Id.* at 57:18-60:7).  The policy that was in effect at the time of the Wirth eviction was a procedure on how deputies are to place a mentally ill person into custody on a 72-hour hold.  *Id.*

Absent a specific policy on how to deescalate a person that is experiencing a mental health issue, Wegener testified that the only training received by PSCO deputies is calling into a Colorado Crisis Hotline.  (*Id.* at 60:8-22).[7]   However, where Wegener cannot recall whether such training

---

[7] Wegener testified that the need for the hotline training occurred because of the number of mentally ill people moving into rural Colorado and the fact that PCSO has to deal with these people frequently.  (Ex. 4 at 63:11-24).

on the hotline occurred before or after the Wirth incident, he acknowledged that it was not mandatory training but only suggested training.  (*Id.* at 62:1-9; 64:13-20).  In fact, Wegener did not know whether all 18 sworn PCSO patrol deputies received training but believed the officers would get the training either voluntarily or when they are out on the field dealing with the issue. (*Id.* at 64:5-65:18).

With a question of fact as to whether the hotline training was provided either before the Wirth eviction or not, what is undisputed is that only one or two PCSO deputies were Crisis Intervention Trained (CIT) as of February 24, 2016.  (*Id.* at 68:4-11).  As Dan Montgomery, Plaintiffs' expert in the field of police tactics opined, crisis intervention training is vital to helping equip officers with the tools they need to ensure the safety of people who may be struggling with the effects of their illness.  The goal of CIT is to train law enforcement officers in the recognition of mental illness, to enhance their verbal crisis de-escalation skills, and to provide more streamlined access to community-based mental health services.  (See Dan Montgomery's rebuttal report, attached as Ex. 9).  Wegener even acknowledged that CIT trained officers provides a benefit for law enforcement agencies in dealing with critical incidents.  (Ex. 4 at 67:1-8).  Where CIT training has been around since 1988 (Ex. 9) Wegener did not require that his officers undergo CIT training at all. (Ex. 4 at 67:9-12).  In fact, there was not even a mechanism in place at the PCSO that would require a CIT trained PCSO deputy to respond to situations where a CIT officer is required.  (*Id.* at 72:4-10).

Why does a lack of training on dealing with mentally ill residents give rise to deliberate indifference in this case? Based on the mentally ill population that PSCO officers deal with on a day-to-day basis it was highly probable that a PCSO deputy would be subject to private violence

from a mentally ill resident which resident (according to Hancock) is likely armed. (Ex. 1 at 95:19-96:3).  By not providing the officers with the requisite skills in dealing with mentally ill persons in Park County, the PCSO exposes those officers to real private violence.  A case illustrative and instructive on the issues presently before this Court is the holding in *Estate of Jaime Ceballos v. City of Thornton*, et al, 2017 U.S. Dist. LEXIS 84309 (Dist. Colorado, June 1, 2017).[8]

In *Ceballos*, Thornton Officers responded to a call of a person that was holding two baseball bats and "acting crazy".  Based on the facts presented to the Court, within one minute of the officers arriving on scene the officer shot and killed Ceballos.  In evaluating aspects of the City of Thornton's training, the Court noted the following:

> Every Thornton police officer receives training on proper use of force, including deadly force. It is disputed to what extent Thornton has policies or provides training regarding the use of force against mentally ill, emotionally disturbed, or disabled individuals.
>
> Thornton offers a 40-hour Crisis Intervention Training (CIT) course that specifically deals with using force and interacting with the mentally ill, emotionally disturbed, or individuals in crisis. CIT is specifically designed to train officers to deal with people in crisis by using techniques such as maintaining safety by using time and distance; taking steps to calm the situation by using quiet voices; avoiding getting too close, too fast; not rushing into the situation; assessing the need for backup; making a plan with fellow officers for the best course of action; gathering information from those on the scene; avoiding escalating the situation; communicating in a calm, non-threatening manner; not having multiple people giving commands at the same time; and containing the subject by establishing a perimeter.
>
> CIT training is not mandatory in Thornton, and only some 50% of its officers are CIT-trained. Written City policy states that it is "recommended" that "[w]henever possible" a CIT-trained officer will respond to calls involving persons who are mentally ill or experiencing a crisis (such as persons "exhibiting unusual behavior"), but there is no policy or mechanism to ensure that a CIT-trained officer

_____

[8] A copy is attached for the Court's convenience as Ex. 10.

responds to calls that involve such situations. Plaintiffs have provided expert opinion that Thornton is not in compliance with industry standards in this regard.

Although CIT training is not mandatory, Thornton asserts that it provides other training that incorporates similar tactics for dealing with persons suffering from a mental health problem or thought to be on drugs or alcohol. This assertion is put in dispute by Thornton's own Rule 30(b)(6) witness, Commander Vitgenos, who testified that no training is provided by Thornton, other than CIT training, with respect to how to deal with an individual who is mentally ill, experiencing a chaotic or highly-agitated event, or thought to be on drugs or alcohol. He also testified that Thornton officers are not specifically trained to call for backup from CIT-trained personnel when dealing with a person in crisis, and that whether a CIT-trained person responds to such a call may be a matter of "catch-as-catch-can" or "luck."

Officer Husk states that he encounters a member of the public in crisis or mentally ill "on a daily basis." Officer Ward agrees it is at least weekly, if not daily. At the time of this incident, Officer Ward had been trained in CIT techniques, but Officer Husk had not. Nevertheless, Officer Husk took charge of the call because the incident occurred in his district, a practice Officer Husk described as "an old school police thing." Officer Ward and Commander Carbone testified that officers in this case did not use CIT tactics such as keeping a safe distance and giving the individual personal space, assuming a calm and non-threatening demeanor, gathering information from people at the scene, and learning and understanding the person's history. The officers assert that this failure was justified by the exigencies of the situation and their concern for public safety. Plaintiffs' expert opines that the failure to use de-escalation techniques, the department's action in not training Officer Husk in CIT, and Officer Husk's action in assuming responsibility for mental health crisis situation simply because the call was in his district, were not consistent with well-established modern police standards.

*Estate of Ceballos v. Husk*, Civil Action No. 15-cv-01783-RPM, 2017 U.S. Dist. LEXIS 84309, at *7-9 (D. Colo. June 1, 2017)

In denying summary judgment for insufficient training, the Court determined that there were questions of fact as to the third and fourth elements under the failure to train claim. "This evidence supports a reasonable inference that Thornton's policy and training fail to adequately consider and emphasize the use of techniques to de-escalate the situation presented when the actor is obviously out of control and acting in a bizarre manner suggesting intoxication or mental

illness." *Estate of Ceballos v. Husk*, Civil Action No. 15-cv-01783-RPM, 2017 U.S. Dist. LEXIS 84309, at *16-17 (D. Colo. June 1, 2017).

Where there are differences in this case as compared to *Ceballos*[9] what is overlapping and similar is the frequency by which Thornton and PCSO dealt with mentally ill individuals and the lack of sufficient training both law enforcement agencies have in addressing those daily issues. Said another way, Thornton and PCSO were not dealing with isolated factual scenarios but were dealing with the usual and recurring situation of mentally ill individuals that posed a safety risk to officers.[10]   Certainly, a jury could conclude that with the frequency PCSO deals with armed/mentally ill residents, there is a high risk that a PCSO deputy will be shot by such a person. In this case, there is evidence that at a minimum creates a material issue of fact that Martin Wirth had mental illness or some form of mental health condition at the time of the incident.  (Ex. 2 at 93:2-13); *see also* (Gabrish CBI statement, attached as Ex. 11, at 3-7, 18, 21, 23).  In that regard, even though the holding in *Ceballos* is not mandatory authority for this Court, its holding is persuasive in that there are questions of fact that a jury can reasonably infer that PCSO's policy and training were so inadequate that it made the sheriff deputies ill equipped in dealing with Martin Wirth.  Thus, there is a direct causal link between the constitutional deprivation and the inadequate training.  For instance, Wegener testified that looking back at this situation he would have done things differently such as trying to talk to Wirth and convince him not to take it out on the PCSO. (Ex. 4 at 267:2-269:1).  If Wegener (or more than one of his officers) would have had at CIT training, which admittedly Wegener did not have (*Id.* at 68:12-13), he would have understood and

---

[9] Ceballos did not allege state creation danger as the constitutional violation.
[10] As noted previously, this was evident when a Park County resident began to shoot a law enforcement officers that tried to evict him from his residence.

known he could have used tactics to deescalate the Wirth incident through communication and not taking the extreme measure of breaching the residence to grab Wirth.  (Ex. 9); see also (Ex. 1 at 261:5-11).  By breaching the residence[11] instead of first using de-escalation techniques the PCSO unreasonably exposed the Plaintiffs to private violence.[12]  (Ex. 9)

Finally, the Defense argues that under the fourth element in proving deliberate indifference that Plaintiffs have to establish that the lack of training applies "toward the persons with whom Plaintiffs come into contact" and not the persons that are the recipient of the training. *See Def. Motion for Summary Judgmen*t, p.31.  The flaw in the Defense argument is the failure to recognize that the spirit behind the at-issue element is really addressing whether the recipient of the inadequate training had his/her rights violated.  Admittedly, there are not a lot cases where law enforcement has argued that a law enforcement officer's constitutional rights were violated based on the departments' failure to train the officer.  Most of the cases, including *Carr*, address a failure to train when the recipient is a criminal suspect.  In the United State District Court for the District of Colorado, there was a case where an officer was injured based, in part, on an alleged failure to train.  *See Davies v. City of Lakewood*, No. 14-cv-01285-RBJ, 2016 U.S. Dist. LEXIS 18355, at *34 (D. Colo. Feb. 16, 2016).[13]  Ultimately, the Court in *Davies* dismissed the failure to train claim but not on the grounds that the plaintiff as the recipient of the training did not have standing to make the claim.  *Id.* at *34-39.

---

[11] The first time Wirth pointed a gun at the PCSO deputies was when the officers breached the residence and entered the home. (Ex. 1 at 173:14-17).

[12] Dan Montgomery cites to Scott Glaser's article titled: "When Mental Illness and Police Collide".  In citing to Mr. Glaser's article, Mr. Montgomery summarized the following: "[t]his training can save the lives of citizens and officers alike.  It should be available to all officers and local communities should hold their police forces to this standard of training.  I ask the police to make this training a priority; these tragedies affect not just the public but the lives of uniformed officers who are involved in these incidents."  (See Ex. 9)

[13] A copy is attached for the Court's convenience as Ex. 12.

## **CONCLUSION**

For all the reasons set forth above, Plaintiffs respectfully request that the Motion be denied with respect to Plaintiffs' first and second claims for relief against PCSO and Wegener in his official capacity.

Dated: May 4, 2018.

ELKUS & SISSON, P.C.

*/s/Reid J. Elkus*
Reid J. Elkus
Donald C. Sisson
Lucas Lorenz
501 South Cherry Street, Suite 920
Denver, CO 80246
Telephone: (303) 567-7981
Fax: (303) 431-3753
relkus@elkusandsisson.com
dsisson@elkusandsisson.com
llorenz@elkusandsisson.com
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2018, I electronically filed the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANTS PARK COUNTY SHERIFF'S OFFICE AND SHERIFF FRED WEGENER'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 (DOC. NO. 55)** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Timothy P. Schimberg
Fowler, Schimberg, Flanagan & McLetchie, P.C.
1640 Grant Street, Suite 300
Denver, CO 80203
*Attorneys for Defendants Park County Sheriff's*
*Office and Sheriff Fred Wegener*

David J. Goldfarb
Josh Marks
Berg Hill Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO 80302
*Attorneys for Defendant Michael Hancock*

/s/ Alissa Creenan_____
Alissa Creenan