```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:16-cv-03079-MSK-MJW
 3    _____
 4    ESTATE OF NATE CARRIGAN, JOHN CARRIGAN, MELISSA
      CARRIGAN and KOLBY MARTIN,
 5
      Plaintiffs,
 6
      v.
 7
      PARK COUNTY SHERIFF'S OFFICE, SHERIFF FRED WEGENER, in
 8    his official and individual capacity, and MARK
      HANCOCK, in his official and individual capacity,
 9
      Defendants.
10    _____
11    DEPOSITION OF:  MARK HANCOCK - August 28, 2017
      _____
12
               PURSUANT TO NOTICE, the deposition of MARK
13    HANCOCK was taken on behalf of the Plaintiffs at 501
      South Cherry Street, Suite 920, Denver, Colorado
14    80246, on August 28, 2017, commencing at 10:00 a.m.,
      before Melanie L. Giamarco, Registered Professional
15    Reporter, Certified Realtime Reporter, and Notary
      Public within Colorado.
16
17
18
19
20
21
22
23
24
25
```

**H+G**

**Hunter + Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 1

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

37

Q.  And for purposes of this deposition, what is an entry team in regards to your experience as SWAT commander?

A.  What is a SWAT entry team?

Q.  Yep.

A.  It's a team of people that will do a tactical either dynamic or slow entry into a residence or a place that you're breaching.

Q.  And in the -- and I apologize if you may have answered this, but in regards to the 40 percent of the times that you had to breach a residence, how often would you utilize an entry team in breaching a dwelling?

MR MARKS:  Hold on.
Object to the form of the question.
Go ahead.
MR. SCHIMBERG:  Join.

A.  You would have personnel to go into the house each time.  If you label that as a team, yes, it's a team, what we refer to as a conga line of officers that would go in, a line of officers that would go in, once you breached.

Q.  So every entry that you've been involved in as SWAT commander, it was always a conga line to get into the dwelling?

38

A.  Yes.

Q.  Okay.  And is that something you were trained on?

A.  Yes.

Q.  Who trained you to do this, quote-unquote, conga line?

A.  FBI.

Q.  Okay.  So the FBI Academy, that was taught back in around 1999?

A.  Mm-hmm.

Q.  Is that a yes?

A.  Yes, it is.

Q.  And that's the last time that you received training in regards to an entry team -- excuse me, a SWAT entry team in breaching a dwelling?

A.  When you say "training," what that means to me is, you know, by doing it.  We've done it several times.  We trained on how to do that.  And when you say entering into a dwelling after a breach, that's also a standard patrol tactic that you use on patrol. So just about every officer that I had was trained on entering a residence after breaching a door.

Q.  But through a, quote-unquote, using your version of -- excuse me, using your language of a conga line?

39

A.  If it's a SWAT mission, there would be a conga line or a line of officers that would go in after a breach, yes.

Q.  Well, let me ask you specifically.
Who taught you to use a, quote-unquote, conga line to enter into a dwelling as a SWAT entry team?

A.  The FBI.  The FBI SWAT, basic school.

Q.  So switch gears a little bit here, Mr. Hancock.
In regard to your career at Park County, is it important to follow orders from superior officers?

MR MARKS:  Object to the form of the question.
MR. SCHIMBERG:  Join.

Q.  Go ahead?

A.  Is it important to --

Q.  Follow orders from superior officers.

A.  Yes.

Q.  Why?

A.  Well, the only way that you wouldn't follow an order, in my opinion, would be if it was unethical, illegal or immoral, but I think it's important to -- a paramilitary organization, that people follow orders from a superior officer.

40

Q.  And you would agree that a subordinate officer, where they may disagree with an order from a superior officer, as long as it's not unethical, immoral or illegal, that subordinate officer has to follow that superior officer's order; is that correct?

A.  That is not --

MR. SCHIMBERG:  Objection to form.
MR. ELKUS:  Hold on.  Give us a chance to jump in.

Same.

Q.  Go ahead.

A.  That is not correct.

Q.  Why do you say that that's not correct?

A.  Every officer, especially on SWAT, is -- was trained in our agency to be a safety officer.  And especially in SWAT, rank kind of goes out the door when you're actually doing a mission.  Anyone could state that they don't feel right about something, and it'd be discussed, or they could change -- possibly change the way you're doing something.
So as to your question, they would have to absolutely follow an order, I would disagree with that.

Q.  Have you ever heard of an officer in charge for purposes of SWAT or a tactical operation?  Have

10 (Pages 37 to 40)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

53

1    A.  I've known Undersheriff Gore since he
2  started with the organization at the Sheriff's Office.
3    Q.  And when was that?
4    A.  I'm not sure exactly when he started.
5    Q.  Were you working at the Sheriff's Office
6  before Undersheriff Gore was working at the office?
7    A.  Yes, I was.
8    Q.  And did you know Undersheriff Gore's
9  law-enforcement background before coming to Park
10  County?
11    A.  Not really.  I know a little bit about it.
12  I think he worked at the Summit County Sheriff's
13  Office.
14    Q.  And you may have answered this, but I want
15  to make sure I've, again, closed the loop on this.
16    Prior to the Martin Wirth incident, how
17  would you describe your relationship with
18  Undersheriff Gore?
19    A.  Professional.
20    Q.  And after the Martin Wirth incident, how
21  would you characterize your relationship with
22  Undersheriff Gore?
23    MR MARKS:  Object to the form of the
24  question.
25    Go ahead.

---

54

1    A.  Yeah.  There really was no relationship
2  with him.
3    Q.  And what do you mean by that?
4    A.  Well, he left the agency shortly after.
5    Q.  Well, let me ask it differently.
6    I mean, do you regularly speak to
7  Undersheriff Gore now?
8    A.  I never speak to him.
9    Q.  Would you categorize -- "categorize."
10    Would you characterize your relationship
11  with Undersheriff Gore as friendly?  As a friendship?
12    A.  Now?
13    Q.  Yeah.
14    A.  No.
15    Q.  Did you ever have a friendship with
16  Undersheriff Gore?
17    A.  Not a personal friendship.  I had a working
18  friendship.  We were friendly with each other, if
19  that's what you mean.
20    Q.  And when was the last time that you
21  interacted with Undersheriff Gore?
22    A.  Undersheriff Gore and Sergeant Tonjes came
23  to my house right after the shooting for a short time,
24  and I believe it was a day or two after.  And then I
25  made one phone call to Undersheriff Gore after I had

---

55

1  heard on the news that he had been let go from the
2  Sheriff's Office to ask if he was okay.  And that's
3  the only contact I've had with him.
4    Q.  So this phone call that you had, was that
5  with Undersheriff Gore?
6    A.  Yes.
7    Q.  And do you recall when that phone call took
8  place?
9    A.  I don't.  I would say a few days after he
10  had been let go from the Sheriff's Office.
11    Q.  Were you surprised that he was let go from
12  the Sheriff's Office?
13    A.  I wasn't surprised.
14    Q.  Why do you say that?
15    MR. SCHIMBERG:  Object to form.
16    A.  I just wasn't surprised.
17    Q.  I know, but why weren't you surprised?  I
18  mean, what was it that didn't surprise you?
19    A.  Well, I knew that the sheriff and him
20  didn't get along.
21    Q.  Well, did they not get along because of the
22  philosophic issues that you talked about earlier --
23    A.  Right.
24    Q.  -- or were there new issues that popped up
25  that created animosity between the Sheriff and

---

56

1  Undersheriff Gore?
2    MR MARKS:  Hold on.
3    Object to the form of the question;
4  foundation.
5    Go ahead.
6    MR. SCHIMBERG:  Join.
7    A.  There were no issues that I knew of other
8  than the -- what I mentioned before.
9    Q.  So you say you weren't surprised.
10    So did the Sheriff talk to you about why he
11  was terminating Undersheriff Gore's position with the
12  agency?
13    A.  No.
14    Q.  And in your phone call with
15  Undersheriff Gore, please walk through for me the
16  specific conversations you had with him.
17    A.  I asked him how he's doing, and he said
18  he's doing okay.  And I asked him how his family was
19  and everything.  He said they're doing okay.  And then
20  he stated to me, "We shouldn't be talking.  You could
21  get in trouble."  And I said, "Okay.  I understand."
22  And he said good-bye, and that was the extent of the
23  conversation.
24    Q.  Now, at the time that you were a captain at
25  Park County, were you a subordinate to

---

14 (Pages 53 to 56)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

57

1  Undersheriff Gore?
2      A.  Yes.
3      Q.  And as a subordinate officer to
4  Undersheriff Gore, if the Undersheriff gave you a
5  lawful command, were you required to follow that
6  command?
7          MR MARKS:  Object to the form of the
8  question.
9          Go ahead.
10     A.  Yes.  I mean, I could -- there's times
11 where he'd give me orders and commands and we would
12 talk about it.  But when we left his office, we were
13 in agreement, yes.
14     Q.  Okay.  Well, even if you were in a
15 disagreement with Undersheriff Gore, if he gave you a
16 direct order to do something, you were required to
17 follow it, correct?
18     A.  Yes, that's true.
19     Q.  And if you failed to follow a direct order
20 of Undersheriff Gore, you may be insubordinate; is
21 that fair to say?
22         MR MARKS:  Object to the form of the
23 question.
24         MR. SCHIMBERG:  Join.
25     A.  I would have been insubordinate, yes.

---

58

1      Q.  And for purposes of a tactical operation
2  within Park County, if Undersheriff Gore is giving you
3  a lawful command in regards to a tactical operation,
4  you are required to follow that order; is that fair to
5  say?
6          MR MARKS:  Object to the form of the
7  question.
8          MR. SCHIMBERG:  Join.
9      A.  That's not the relationship I had with
10 Undersheriff Gore.  He -- I can't remember him ever
11 giving me a tactical order on anything.  That really
12 wasn't his area of expertise.  Now, he would review my
13 plans and would listen to what I would suggest.  And
14 99 percent of the time, he would agree and allow that
15 to occur.  But my relationship with him wasn't -- he
16 would give me administrative-type orders on schedule,
17 scheduling and disciplinary things, but not on tactic.
18 That just wasn't his -- that's not something we did.
19         MR. ELKUS:  Okay.  Let's look at that,
20 then.
21         (A document was marked as Exhibit 15.)
22     Q.  I've just handed you what's been marked as
23 Deposition Exhibit 15, okay, Mr. Hancock?
24     A.  Yes, sir.
25     Q.  Now, these are excerpts of -- I'm sorry.

---

59

1  If I could have that back.  I apologize.  I gave you
2  the wrong one.  This is not the right one.  I
3  apologize.
4          (Discussion held off the record.)
5          (Exhibit 15 was marked for identification.)
6      Q.  Sorry.  Now you've been handed a correct
7  Exhibit 15.  These are excerpts of Monte Gore's
8  deposition dated June 20th, 2017, okay, Mr. Hancock?
9      A.  Yes, sir.
10     Q.  It's my understanding that you reviewed the
11 entire deposition transcript of Undersheriff Gore; is
12 that correct?
13     A.  I did not.
14     Q.  Okay.  Did you review any excerpts of
15 Undersheriff Gore's deposition?
16     A.  A few.  I skimmed over it.
17     Q.  Well, I want to go through some of these
18 pages with you.
19     A.  Yes, sir.
20     Q.  So let's turn to the first page.  It's page
21 81.
22     A.  Yes, sir.
23     Q.  And I'm going to read for you lines 7
24 to 19.  So these were questions:
25         "What was your specific conversation with

---

60

1  Captain Hancock?"
2          "Approximately two weeks, two and a half
3  weeks, prior to this operation being conducted, I had
4  called Captain Hancock into my office and advised him
5  that I felt Wirth was a significant threat.  Told him
6  that during the operation, I wanted to be very clear
7  that I considered Wirth extremely dangerous.  I felt
8  he was homicidal and suicidal.  I felt he wanted to
9  commit suicide by cop and take as many officers with
10 him as he could.  I directed Captain Hancock that
11 under no circumstances whatsoever were they to enter
12 Wirth's residence."
13         Do you see that?
14     A.  Yes, I do.
15     Q.  Do you recall the conversation
16 Undersheriff Gore had with you that Martin Wirth was a
17 significant threat?
18         MR MARKS:  Object to the form of the
19 question.
20     A.  I never had a conversation with him to this
21 extent.
22     Q.  So to what extent did you have a
23 conversation with Undersheriff Gore in regards to
24 Martin Wirth?
25     A.  A couple of days prior to the eviction,

---

15 (Pages 57 to 60)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

89

1  Q.  Yeah.
2     A.  Yeah.  Well, I did contact him that morning
3  by phone.  And he also had the radio and access to me
4  at any -- any point.  If he had a plan in mind and I
5  wasn't following it, he could have contacted me at any
6  time and asked what I was doing or ask me to give him
7  a call, and I would have done that.  And I never
8  disobeyed a direct order from him.
9     Q.  So let me back up a little bit.
10       You said that you did contact
11  Undersheriff Gore by phone?
12     A.  Yes, briefly that morning to make sure he
13  was going over to Communications.
14     Q.  So what was the specific conversation you
15  had with Undersheriff Gore?
16     A.  Just the time that we were going to do the
17  eviction.
18     Q.  And that the Undersheriff was going to go
19  to where?
20     A.  Communications.
21     Q.  Why -- what was your understanding as to
22  why Undersheriff Gore was going to Communications,
23  then?
24     A.  Well, I told you, they were short-staffed,
25  and I was going to be on a tactical channel separate

90

1  from the initial channel, and I wanted someone
2  listening and paying attention to that.
3     Q.  And that channel was op 5; is that right?
4     A.  Ops 5, yes.
5     Q.  Do you understand that Undersheriff Gore
6  was going to be on Ops 5?
7     A.  Well, I understood that he was going to be
8  at Communications where you can hear all the channels.
9     Q.  Who was the officer in charge in regards to
10  the operation of evicting Martin Wirth?
11     A.  Me.
12     Q.  And for purposes of the record, what does
13  it mean to be an officer in charge for a tactical
14  operation?
15     A.  To oversee the operation and lend a plan
16  and designate where officers are going to be and
17  assignments to officers in regard to the action that
18  we're going to take.
19     Q.  Let's turn to page 92.
20     A.  Can I back up a little?
21     Q.  Sure.
22     A.  If you're saying officer in charge, you're
23  saying of a SWAT operation or just a standard
24  operation?  Because this was not a SWAT operation.
25     Q.  All right.  So let's back up a little bit

91

1  then, okay?
2       What's the difference between having an
3  officer in charge on a SWAT operation versus having an
4  officer in charge in a non-SWAT operation?
5     A.  Well, a SWAT operation includes different
6  planning, different briefing, different intel and
7  different stuff we do.  Generally, if you're a senior
8  officer and you're showing up to a domestic-violence
9  call, you would be in charge by being the senior
10  officer and you would -- so it's different in the
11  amount of planning and stuff that you do.
12     Q.  All right.  But in this case, there was
13  planning involved in the operation of evicting
14  Mr. Wirth, right?
15     A.  Yes, there was.
16     Q.  More so than dealing with some type of
17  domestic-violence case; would you agree with that?
18     A.  More so, yes.
19     Q.  I mean, in this particular case, I mean,
20  this is a person you felt was not that dangerous; is
21  that right?
22       MR. SCHIMBERG:  Object to form.
23     Q.  My -- well, tell me, at the time that you
24  were evicting Mr. Wirth, did you think that he posed a
25  threat to law-enforcement officers or to the public at

92

1  large?
2     A.  As much as anyone that we would be evicting
3  would pose a threat.
4     Q.  Okay.  So typically, you know, based on
5  your tenure with Park County, how many officers are
6  needed to evict a person from their residence?
7     A.  One or two.
8     Q.  Okay.  But that didn't happen in this case,
9  right?
10     A.  It didn't.
11     Q.  I mean, you had seven officers evicting
12  Mr. Wirth, right?
13     A.  I did.
14     Q.  And you had -- was it the Platte County
15  fire department on call?
16     A.  Platte Canyon, yes.
17     Q.  Platte Canyon.
18     A.  On standby.
19     Q.  So when you evict -- based on your tenure,
20  when you evict somebody from their home, do you
21  typically have Platte Canyon Fire and Rescue on call?
22     A.  I don't.
23     Q.  And you were the person who was in charge
24  of the tactical operations, right?
25     A.  Yes.

23 (Pages 89 to 92)

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

---

93

1    Q.  You made the decision to bring seven
2  sheriff's deputies and have Platte Canyon on call,
3  right?
4    A.  I did.
5    Q.  So a guy that you didn't think really posed
6  a danger at all, you sort of beefed up the amount of
7  people you were going to be using to evict him, right?
8        MR MARKS:  Hold on.
9        Object to the form of the question.
10       Go ahead and answer.
11   A.  And I never said that I didn't view him as
12 dangerous at all.  He was potentially dangerous, as
13 everyone that you would evict would be, but that day I
14 had resources, and Carrigan, Nate Carrigan, was
15 worried about doing this eviction and had asked for my
16 help, and so I was lending him help.
17   Q.  Well, let's talk about that.  Nate Carrigan
18 asked for your help.  Did Nate Carrigan say, "Hey,
19 Captain, we need seven deputies on this.  We need fire
20 and rescue"?
21   A.  No, he didn't say that.
22   Q.  Who made that decision?
23   A.  I did.
24   Q.  So what assessment did you undergo to
25 determine, "I need seven sheriff's deputies and fire

---

94

1  and rescue on a call to evict someone that," in your
2  opinion, didn't think was that dangerous?
3    A.  There's two parts to that.  One is the
4  availability of those officers, which we rarely had,
5  but this fell on a Wednesday when I happened to have
6  those people readily available.  And the other is he
7  was worried about this eviction.
8    Q.  But I guess I'm missing the point -- I
9  guess I'm missing this a little bit, Mr. Hancock,
10 because -- so you have these people that are
11 available?
12   A.  Mm-hmm.
13   Q.  Typically, you only need one to two people
14 to do an eviction, so whether you had one to two
15 people available or seven to eight people available,
16 why did you make the decision to bring seven officers
17 to an eviction and fire and rescue to evict Martin
18 Wirth?  Why did you ask specifically for that type of
19 manpower?
20       MR MARKS:  Object to the form of the
21 question.
22       Go ahead.
23   A.  If you can, then you should.  If you have
24 the ability to do that, then you certainly should.
25 And as I stated, Nate was worried about the eviction.

---

95

1  And he had asked for help.  And I had it available, so
2  I utilized it.
3    Q.  Did he ask for fire and rescue?
4    A.  No.
5    Q.  Did he ask for seven sheriff's deputies?
6    A.  No, he didn't.
7    Q.  Okay.  So you made the decision to bring
8  seven sheriff's deputies to this eviction, correct?
9    A.  Yes.
10   Q.  You made the decision to bring fire and
11 rescue, correct?
12   A.  Mm-hmm.
13   Q.  Is that a yes?
14   A.  Yes, it is.
15   Q.  Did Nate Carrigan say, "Hey, this guy's
16 armed.  We need to have fire and rescue"?
17   A.  No.
18   Q.  Okay.
19   A.  But you assume that everybody is armed.
20   Q.  Okay.  So at this point, you were assuming,
21 when you were evicting Wirth, that Martin Wirth is
22 armed?
23   A.  You assume that everybody in Park County is
24 armed, yes.
25   Q.  Why do you make that assumption?

---

96

1    A.  Just general knowledge and my experience of
2  21 years there.  I don't know of anybody living there
3  that isn't armed.
4    Q.  And let me back this up a little bit,
5  because I think you testified that you had the
6  manpower available, so with Park County, does the
7  Platte Canyon Fire Department -- do they work under
8  the sheriff's department?
9    A.  They don't.
10   Q.  Okay.  That's a separate entity.  A
11 separate agency, correct?
12   A.  It is, yes.
13   Q.  Okay.  So every eviction that you've been
14 involved in, does Platte Canyon Fire and Rescue -- are
15 they staged at an eviction?
16   A.  No.
17   Q.  How many -- during your 21 years with Park
18 County, how many times have you personally brought in
19 or asked to be brought in a fire-and-rescue team to
20 evict a person from their residence?
21   A.  Well, never, because they wouldn't evict
22 anyone.
23   Q.  Coming to --
24   A.  Being on standby?
25   Q.  Be on standby.

24 (Pages 93 to 96)

MARK HANCOCK - 8/28/2017

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

97

1     A. To evict someone?
2     **Q. Yeah.**
3     A. Never.
4     **Q. Except for the Wirth situation, right?**
5     A. Yes.
6     **Q. And so when Nate Carrigan says, "I don't**
7 **think this should be a SWAT operation," is that the**
8 **only thing -- and he just says, "I have some concerns**
9 **with Martin Wirth," is that the only thing he told you**
10 **about Martin Wirth?**
11     A. No. He mentioned, and I knew of, a case
12 where he had threatened people in Jeffco and had come
13 across, and Jeffco had asked for our assistance with
14 locating him. He drove by, and our deputies followed
15 him to the residence. And there was a short
16 foot-chase, to my understanding. And he made some
17 pretty bizarre statements, I was told. And so -- and
18 Nathan had posted the notice, so I trusted in Nathan
19 when he had concern about this eviction and asked for
20 my help, that I'd give him resources that we had
21 available at the time.
22     **Q. So based on -- and we'll go through that in**
23 **a minute. I think the issue was the -- was it like a**
24 **month earlier or several weeks earlier of the**
25 **eviction, Martin Wirth allegedly threatened some State**

---

98

1 **Farm insurance agent saying that he would go and shoot**
2 **the first cop he sees, or something to that effect?**
3 **Is that right?**
4     A. Yes.
5     MR MARKS: Object to the form of the
6 question.
7     **Q. You weren't involved in that specific**
8 **operation?**
9     A. No.
10     **Q. But that was information you received from**
11 **other sheriff's deputies within your organization?**
12     MR MARKS: Object to the form of the
13 question, foundation.
14     A. Well, I was on duty when it happened, and I
15 didn't respond to the scene, but yeah, I had heard
16 from officers what had happened up there.
17     **Q. So based on that incident, did that raise**
18 **concern for you about the eviction of Martin Wirth?**
19     A. Yes.
20     **Q. Okay. Why?**
21     A. I thought that what he wanted was to make a
22 scene at his eviction as far as having maybe a
23 neighbor record it as we're taking him off the
24 property and add to his claims of, you know,
25 government corruption and getting him out of the --

---

99

1 and getting him out of the residence.
2     **Q. I'm going to go back to Exhibit 15, the**
3 **transcript. I'm looking at --**
4     A. Page 92.
5     **Q. -- page 92.**
6     A. Okay.
7     **Q. Let's start with line 5, question: "Okay.**
8 **During that six to eight weeks, are you having any**
9 **other communication with Captain Hancock or Sheriff**
10 **Wegener about this Wirth event as you are formulating**
11 **your tactical plan?"**
12     **Answer: "I know Captain Hancock was tasked**
13 **with the assignment to do a risk assessment and**
14 **tactical plan for the operation during the course of**
15 **time. I wasn't sure -- once again, the date was**
16 **somewhat up in the air prior to this. And the date**
17 **February 24 was eventually arrived at by, I believe,**
18 **Captain Hancock and I think Sergeant Tonjes had input**
19 **into that, as well as others may have had input into**
20 **that."**
21     **Question: "To your knowledge, if you know,**
22 **who tasked Hancock with a risk assessment?"**
23     **Answer: "I did."**
24     **Question: "Who tasked Hancock with a**
25 **tactical plan?"**

---

100

1     **Answer: "I did."**
2     **So based on what I just read, is there**
3 **anything that I read that you disagree with?**
4     A. Well, he didn't task me with the risk
5 assessment or the tactical plan.
6     **Q. Is there anything else that I just read**
7 **that you disagree, or that's it?**
8     A. I know that Sergeant Tonjes had prior
9 knowledge of the eviction and was working with
10 Corporal Carrigan on when that was going to occur.
11     **Q. When what was going to occur?**
12     A. The eviction.
13     **Q. Did they communicate that to you?**
14     A. When it was going to occur?
15     **Q. Yeah.**
16     A. No, Corporal Carrigan did. Sergeant Tonjes
17 didn't.
18     **Q. And how did Corporal Carrigan communicate**
19 **when the eviction would occur?**
20     A. I believe it was -- it might have been the
21 Friday before or the Monday or Tuesday -- I believe
22 Monday, maybe, where he said, you know, that's the
23 date that they're doing the eviction, and he could use
24 some help with it. And I said, "I'll certainly help
25 with it."

---

25 (Pages 97 to 100)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

101

Q.  Let's turn to page 93 of this exhibit, line 13, Question:  "So it was such a risk that you didn't just let Hancock do his own assessment and his own tactical plan, you took it upon yourself to do essentially those same two steps; is that fair?"

Answer:  "That would be fair.  I wanted Captain Hancock to have the understanding that this was extremely volatile, extremely dangerous, and extremely high risk."

Question:  "So you mentioned -- you already testified earlier -- that you believe Hancock arrived at your same risk assessment?"

Answer:  "He did."

Is there anything that I just read that you disagree with?

A.  Yes, all of that.  It's just not something he did.  And as I told you, it's not a conversation that we had.

Q.  Did you ever have a conversation with Undersheriff Gore in regards to any risk assessment of Martin Wirth concerning the eviction of Mr. Wirth?

A.  I did not.

Q.  Let's turn to page 110, please.  And looking at line 21, question:  "Okay.  So let me back up a little bit.  Did you have an expectation -- you

---

102

said in the very beginning of the deposition this was going to be a SWAT operation; is that right?"

Answer:  "That is correct."

Question:  "Did you have any role in selecting the members of the team or was that sort of up to Captain Hancock?"

Answer:  "That was going to be up to Captain Hancock, but because this was a two-phase operation where we're going to try to contact Mr. Wirth, get him to leave the premises, with understanding that if he didn't, they were supposed to fall back to perimeter, and then it became a full-fledged SWAT operation.  And at that point, tactical officers would be utilized.  And a tactical operation would be executed.

"But I was not convinced that that was the proper course.  I wanted to brief with Captain Hancock and have some time -- we have all of the time in the world while we're on the perimeter -- to discuss options.  And some of the options that I discussed with Captain Hancock were using gas at that time to have Mr. Wirth leave the preparations.  I wanted to assess what equipment and officers we had to ensure that we had trained officers if we decided to take a tactical approach.  A tactical approach, once again, would have been under no circumstances to use

---

103

personnel to go in.  It would have been to use gas to force Mr. Wirth to come out."

Do you see that?

A.  Yes, I do.

(Eden Rolland left the room.)

Q.  Now, is there anything that I just read that you disagree with?

A.  I do not disagree with that course of action because that was more or less my MO with dealing with barricaded-type people, Constitutionalists.  And I had discussed on some occasions that that was my philosophy with Undersheriff Gore of dealing with these kinds of things, but as I stated, this conversation didn't occur with him on the Martin Wirth eviction at all.

Q.  All right.  So let's back that up a little bit.

A.  Okay.

Q.  So I get it that you didn't have this conversation, so . . .

A.  I didn't.

Q.  But what was -- the part that you did agree with --

A.  In this?

Q.  -- is that if Mr. Wirth -- and I understand

---

104

that you didn't have this conversation with the undersheriff.  Let's just start off with that, okay?

So in regards to at least the operation, at least what was going through your mind that you did agree with, is that if Mr. Wirth did not leave the premises, you then, at least from a tactical-plan perspective, would have agreed with going back to perimeter; is that right?

MR. SCHIMBERG:  Form.

Q.  Go ahead.

A.  That depends on how that went, how he acted or his actions.  You know, if he'd have been standing on the deck with a rifle, yes, to a perimeter and calling in SWAT and gassing him out of there would have been what I would have done.

Q.  Because I think you said that -- and I guess, when we went over this, I said, what did you disagree with?  You said you disagreed with the conversation you had with Undersheriff Gore, but you didn't agree with -- you didn't disagree with the course of action being taken, particularly when you're dealing with a Constitutionalist.

Did I state that correctly?

A.  Yes.

Q.  Okay.  What is a Constitutionalist, in your

---

26 (Pages 101 to 104)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

125

1  appropriate than me objecting to the question.
2      A.  No.
3      Q.  I'm sorry.  What was your answer?
4      A.  No.
5      Q.  And did you have any intel on what the
6  elevation was at the Wirth residence before going out
7  to the property itself?
8      A.  I didn't.
9      Q.  Let's turn to page 140, please.  Let's
10  start at line 12 of page 140.
11      A.  Yes, sir.
12      Q.  Question:  "Let's assume he has these
13  concerns he's articulating here.  Was the order from
14  you to him to tactically retreat?
15          Answer:  "Tactically withdraw."
16          Question:  "Tactically withdraw?"
17          Answer:  "Yes."
18          "And was Hancock insubordinate by not
19  following that order?"
20          Answer:  "Yes."
21          Question:  "Okay.  Do you believe by not
22  following that order, essentially Hancock exposed the
23  members of the team to great danger?"
24          Answer:  "Yes."
25          Question:  "And what was that danger?"

126

1          Answer:  "By not withdrawing to a safe
2  location and breaching the door, you're going into the
3  lion's lair and you exposed everybody to danger."
4          Question:  "Were those dangers known to
5  Hancock and articulated to you by Hancock?"
6          Answer:  "Yes."
7      So I want to talk about that very briefly.
8  Is there anything there that you disagree with?
9      A.  Yes.
10      Q.  What do you disagree with?
11      A.  The exposing everybody to danger and
12  leading them into the lion's lair part.
13      Q.  Why do you disagree with that statement?
14      A.  I had no knowledge that, you know, we would
15  be in danger or we would be going into the lion's
16  lair.  I didn't know that Martin Wirth was going to
17  ambush us.
18      Q.  Well, let's talk about that.
19      I think you testified earlier that you
20  assumed everybody's armed, correct?
21      A.  Yes.
22      Q.  Did you assume that Martin Wirth was armed
23  before you breached the residence?
24      A.  I assumed that he had weapons, most likely.
25      Q.  Okay.  And with that assumption, did you

127

1  think at that point in time, before kicking down the
2  door and breaching the residence, that he could have
3  used those weapons on you and the other officers?
4      A.  I didn't think that, no.
5      Q.  Looking back on this today, is that
6  something you think you should have been more
7  precautious about?
8      A.  No, not necessarily.
9      Q.  Is it your testimony today that you would
10  have done anything different here today -- I'm sorry.
11  Let me ask it differently.
12      A.  Knowing all the things I know now?
13      Q.  Hold on.  Let me ask it differently.
14          Knowing everything you know today --
15      A.  Yes.
16      Q.  -- would you have done things differently?
17      A.  Absolutely.
18      Q.  What would you have done differently?
19          MR MARKS:  Object to the form of the
20  question.
21      A.  It's --
22          MR. SCHIMBERG:  Join.
23      A.  What part?
24      Q.  What part would you have done differently,
25  looking back on this entire operation that you were

128

1  involved in?
2      A.  Knowing everything I know today?
3      Q.  Absolutely.
4          MR. SCHIMBERG:  Object to the form.
5          MR MARKS:  Same.
6      A.  There's so much to it.
7      Q.  Why don't you tell me.
8      A.  Knowing what I know today.  That's a real
9  hard question to answer because I didn't have that
10  information.  I'd have to run it through scenarios
11  and, you know, I'd have to see what your --
12      Q.  Would you have breached the residence,
13  knowing what you know today?
14      A.  I don't know.  I don't know how it would
15  have turned out to that point.
16      Q.  Well, let me ask you this:  You have Martin
17  Wirth, right?  You came up to the property -- we're
18  going to go into the whole breach here in a minute,
19  but you came up to the property with Mr. Carrigan.
20  Mr. Carrigan talked to Mr. Wirth; he went back inside
21  the residence, correct?
22      A.  Yes, sir.
23      Q.  Okay.  Now, at that point in time, you
24  didn't know for sure whether he was armed, correct?
25      A.  I know that he was not armed.

32 (Pages 125 to 128)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

129

1  Q.  You knew he wasn't armed?
2  A.  Yeah.
3  Q.  I thought you said you assumed he was
4  armed.
5  A.  No, I assume that people have firearms.
6  Are you talking about armed like on their person?
7  Q.  So you didn't know whether he specifically
8  had weapons on his person at that point in time?
9  A.  I didn't see any weapons.
10  Q.  Okay.  So before breaching a residence,
11  right, and we're talking about Mr. Wirth's property,
12  okay?
13  A.  Yes.
14  Q.  Wouldn't the prudent course of action at
15  that point in time, instead of kicking down the door,
16  is to get more information in regards to the interior
17  of the house?  Would you agree with that?
18  A.  No, not necessarily.
19  Q.  All right.  So did you know the specific
20  layout of the Wirth residence before you breached the
21  property?
22  A.  I didn't.
23  Q.  Well, you're SWAT commander, right?
24  A.  I am.
25  Q.  At least you were.

130

1  A.  Mm-hmm.
2  Q.  And part of training in SWAT command before
3  you do an entry is that, to the best you can, figure
4  out the interior of the home.  Do you understand that?
5  A.  I understand what you're saying, and if
6  that's possible, yes, you would have that information.
7  You don't always have that information.
8  Q.  Right, because sometimes you don't have the
9  time to get the information, right?
10  A.  Yes.  And many -- and you talk of training
11  with SWAT.  They set up different kinds of scenarios
12  based on your entry not knowing what's inside --
13  Q.  That's right.
14  A.  -- because -- and so just because a plan
15  says what's inside, it doesn't prevent one from
16  changing that plan and not notifying building and
17  zoning, or if they built the house themselves.  You
18  just don't know on that, so the practice of training
19  is to make an entry a dynamic entry on whatever
20  interior you may face.  Is that --
21  Q.  Well, let's back up a little bit.
22  What research did you do to try to determine
23  the interior of Mr. Wirth's residence before evicting
24  Mr. Wirth?
25  A.  I didn't do any research.  I did ask any of

131

1  our deputies if they've been inside the house.
2  Q.  Okay.  Is that the only thing you asked?
3  A.  Yes.
4  Q.  Did you say, "Hey, what does the interior
5  look like," or you said, "Has anybody been inside the
6  house"?
7  A.  "Has anybody been inside the house?"
8  Q.  That's it?
9  A.  Yes.  Well, they said no, so . . .
10  Q.  Okay.  So at that point, you have no
11  information of what the interior of that home looked
12  like; is that fair to say?
13  A.  That's fair to say.
14  Q.  So when you kicked down the door, you had
15  no idea of the layout of the interior of the house,
16  correct?
17  MR MARKS:  Object to --
18  A.  That is --
19  MR MARKS:  Hold on.
20  Object to the form of the question.
21  Go ahead.
22  A.  That is incorrect.
23  Q.  So you knew the interior of the home as
24  soon as you kicked down the door?
25  A.  I didn't say that.  I said it's incorrect

132

1  that -- what you're saying.  What I said is you could
2  look through the window and I could see inside the
3  home.
4  Q.  Oh, so you saw the full view of everything,
5  of every place Mr. Wirth could be inside the home
6  by just looking through the window?
7  A.  No, not everything, but --
8  Q.  Is that part of your tactical training,
9  just to look inside the window?
10  MR. ELKUS:  Before -- let me ask my
11  question.  You can object.
12  Q.  Let me ask you --
13  MR MARKS:  No, no, you interrupted his
14  prior answer.
15  Q.  Oh, I'm sorry.  Finish -- is there anything
16  else you want to finish with that?
17  MR MARKS:  He said "but," and then --
18  Q.  Go ahead.
19  MR. MARKS:  -- you hopped on the end.
20  Q.  I'm sorry.  Didn't mean to interrupt you.
21  Go ahead, please.
22  A.  You're stating that I looked through the
23  window, and I didn't see the entire interior, but I
24  saw some of it through the window.  And then you said
25  I didn't know at all.  Well, we could see.

33 (Pages 129 to 132)

MARK HANCOCK - 8/28/2017
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

133

1  Q. Okay. So based on your SWAT training, is
2  the best way to understand the full layout of the
3  entire house you're about to breach is just to look
4  inside a window? Is that your training?
5  A. No. You know that's not --
6  Q. Well, I don't. I'm asking you.
7  A. No, that's not part of the --
8  Q. I'm asking you. That's not your training,
9  is it?
10  A. No, but your training is to adapt and
11  overcome.
12  Q. Okay. But let me back it up a little bit.
13  What is your training on the best way to
14  gain information of the interior of one's home before
15  you do an entry as SWAT to get into the residence?
16  A. The absolute best information --
17  Q. Yep.
18  A. -- would be if I had a deputy that had been
19  inside that home.
20  Q. Okay. Did you have that?
21  A. No, not there.
22  Q. I'm talking about the Wirth residence.
23  That's the one we're talking about.
24  A. No deputies at that -- that I had there had
25  been inside the home.

134

1  Q. Could have utilized a robot to get a better
2  sense of what's inside the home, right?
3  A. I couldn't have utilized a robot because I
4  didn't have one.
5  Q. So your department doesn't have a robot to
6  utilize?
7  A. No.
8  Q. Okay. So does Jefferson County?
9  A. I don't know.
10  Q. Did you make any inquiry to the
11  Undersheriff or the Sheriff or any sheriff's deputy in
12  Park County in regard to the eviction of Mr. Wirth as
13  to whether or not you could have obtained a robot to
14  determine the interior of Mr. Wirth's residence?
15  A. I did not.
16  Q. Okay. So prior to doing the eviction
17  itself, could you have inquired with Jeffco if you
18  could borrow their robot, if need be, for the purposes
19  of evicting Mr. Wirth? Could you have done that?
20  MR MARKS: Object to foundation and form.
21  A. I wouldn't have done that because it's an
22  eviction.
23  Q. Well, it's an eviction where you have seven
24  deputies and fire and rescue staged, right?
25  A. It is, yes.

135

1  Q. And this was an eviction where at least
2  during your tenure you never had to use fire and
3  rescue before, right, up until Mr. Wirth?
4  A. Right. Well, there was fire and rescue on
5  one incidence, but it wasn't our eviction.
6  Q. A what eviction?
7  A. It wasn't our eviction.
8  Q. Oh, it wasn't your eviction.
9  A. No. But, yeah, they've been to one other.
10  But as to your answer, no -- or answer -- I think I'm
11  understanding, had I ever used fire and rescue before?
12  No.
13  Q. Do you know whether or not Jefferson County
14  Sheriff's Department has a robot they utilize for
15  SWAT?
16  A. I don't.
17  Q. Did you make any inquiries with anybody
18  within your agency as to whether or not Jefferson
19  County uses robots for entry teams?
20  A. I don't.
21  Q. Please turn to page 143, line 6. "And in
22  terms of the topography and the downhill tactical
23  withdrawal, is it your testimony that was well-known
24  to Hancock in advance of this incident on
25  February 24th?"

136

1  Answer: "This is the first that I became
2  aware of any tactical uphill or downhill issues. Part
3  of the responsibility of the SWAT commander would have
4  been to not only do topographical photos of the
5  residence, do photos around the sides of the
6  residence, and to identify any of those issues prior
7  to ever deploying or prior to ever taking a team up to
8  the residence."
9  Do you agree with that statement?
10  A. If you are dealing with a SWAT team and a
11  SWAT-team entry, I agree that you would get as much
12  information as you could on it.
13  Q. Why do you need it for a SWAT-team entry?
14  A. If it's a more formal -- formal thing, you
15  have time and tactics and you have the time to gather
16  this information and have a briefing and practice what
17  you're getting into, and you can do those sorts of
18  things on a SWAT mission.
19  Q. And when you say there when you have time,
20  what do you mean by that?
21  A. If you have time, time and tactics. If you
22  have time to do all this, then it is available to do
23  that.
24  Q. Was there enough time to do that for
25  Mr. Wirth, the eviction of Mr. Wirth?

34 (Pages 133 to 136)

EXHIBIT 1

MARK HANCOCK - 8/28/2017
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

149

1    Q.  Well, what about a dwelling into a home,
2  whether it's in City and County of Denver or in Park
3  County when you do an entry?  I'm not talking 2,300
4  square feet of mileage.  I'm talking into a dwelling,
5  into a home, whether that home is in Denver or that
6  home is in Park County, what is the standard uniform,
7  if you will, the protective gear a SWAT officer is to
8  wear when they do an entry?
9         MR. SCHIMBERG:  Form.
10        MR MARKS:  Object to the form of the
11  question.
12     A.  I'm trying to explain that, first of all, I
13  don't know what the standard operating procedures
14  anywhere else are.  I can tell you that sometimes we
15  wore the heavy vest on entries and sometimes we
16  didn't.
17     Q.  So the ones where you did, what were the
18  facts that were occurring at that instance that
19  required, you know, more of the tactical wear, if you
20  will, or gear of a SWAT team?
21     A.  I would say a high level of danger of a
22  shootout occurring, a high possibility of that and,
23  again, how much -- how close I could get the team to
24  the residence where, you know -- because it's
25  dangerous crossing large distances with all that gear.

---

150

1    Q.  Well, in this particular case, was there a
2  great deal of distance you had to cover in regards to
3  where your officers were and the entry of Mr. Wirth's
4  residence?
5     A.  There was some distance, yes.
6     Q.  What was the distance?
7     A.  I don't know for sure.  Just distance
8  through trees and snow.
9     Q.  Are we talking -- go ahead.
10     A.  I don't know the exact distance.
11     Q.  Okay.  So let's talk about the officers
12  that were present, okay?
13     A.  Yes.
14     Q.  In regards to your location, Mr. Carrigan's
15  location, Mr. Martin's location, Mr. Threlkel's
16  location, what was the distance of those personnel in
17  regards to where they originally were when they first
18  got there on scene to where they ended up being
19  actually at the residence?
20        MR MARKS:  Object to the form of the
21  question.
22        MR. SCHIMBERG:  Join.
23     A.  Shorter for me because I was in the
24  driveway.  For them, they parked up on a corner of the
25  property up above and they had to cover some distance

---

151

1  through some trees.  I don't know how far, but they
2  had to cover some distance, but I don't know how far.
3     Q.  And at some point, was it a hundred yards?
4  200 yards?  Do you know?
5     A.  I couldn't say.
6     Q.  But at the time, they were asked to breach
7  the residence, right?
8     A.  Uh-huh.
9     Q.  They were pretty much there at the --
10     A.  Door.
11     Q.  -- at the front of the house, or the door?
12     A.  Mm-hmm.
13     Q.  And backing up a little bit, talking about
14  this sort of standard equipment that entry teams or
15  SWAT wears, when you do an entry, is it your
16  understanding that a sort of ballistic shield is
17  utilized to enter a residence?
18     A.  On some cases, yes.
19     Q.  Okay.  Not in every case?
20     A.  No.
21     Q.  Okay.  So what cases -- at least based on
22  your training, based on your understanding, when is
23  this ballistic shield utilized?
24     A.  Again, it's, can you get the -- is it a
25  high probability of a shooting occurred?  Are you

---

152

1  going to use explosive devices to breach the door,
2  flash-bangs, things of that sort?  And distance to the
3  door from the vehicles on bringing all that gear up.
4  We've done it both ways.  We've had many times where
5  we've taken the gear with us, and then we've had other
6  times where it's decided that slows us down and it's
7  just too much and we make entry without any of that.
8     Q.  Was there a decision made not to bring this
9  equipment to the Wirth eviction?
10     A.  There was as far as Kolby and Travis asked
11  me what type of gear should they wear, and I said,
12  "You can go soft cover or you can go however you feel
13  comfortable."  And they chose soft covers and their
14  standard vest, I believe.  Kolby might have had more
15  stuff on.  I'm not sure.  But it was their decision as
16  to what they wore.
17     Q.  Did you make any recommendations that they
18  should bring the ballistic shield with them?
19     A.  I didn't.
20     Q.  Was there any conversations about bringing
21  a ballistic shield to the Wirth eviction?
22     A.  There were questions as to should we bring
23  a shield?  And the decision was made that the shield
24  we had at the substation at the time was a training
25  shield and had been busted up from all the training,

---

38 (Pages 149 to 152)

MARK HANCOCK - 8/28/2017

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

173

Q.  Well, I'm sure like an armed suspect who has a gun pointed at ya, even in those instances, yelling commands to put your weapon down is preferred to just shooting someone, right?

A.  If you have time to do that, but if someone's pointing a gun at you, any circumstances I've seen, you're not going to have time to do that. And if you took time to do that, you'd probably get shot.

Q.  Sure, okay.  But in circumstances like with Martin Wirth, he wasn't pointing a gun at you guys initially when you first came to the property, right?

A.  No.

Q.  And the first time, at least that you're aware of, that he pointed a gun at your officer is when you guys breached the residence, correct?

A.  We were inside the house, yes.

Q.  Inside the house, right.

And so with that respect in regards to trying to resolve this peacefully, was -- I mean -- and we looked at the plan, which was, you know, this Exhibit 6 where you had detailed where perimeters would be.  You put asterisks around, you know, who may be breaching.

Was there anyone that was identified that

174

would be the focal point of trying to resolve this peacefully and try to get them out of the home?

A.  Yes.  Nate.  Nate and myself.

Q.  So was there a plan put in place that if Mr. Wirth went back into the residence, that continually talking and trying to resolve this peacefully was the preferred tactic?  Was that discussed?

A.  There was no plan as to as if he went back in the house.  The plan was, wherever he was, that we could talk to him and get him to do it peacefully, and the best avenue to do that would be Nate Carrigan and myself.

Q.  So when you say going back into the house and try to resolve it peacefully and talk to him, was there a period of time that you would give him to sort of talk it through to try to get him out, to try to see if you could resolve this peacefully?  Was there like a timetable that you would allow that to happen before you would enter the residence?

MR MARKS:  Object to the form of the question.

A.  Not a specific time, no.

Q.  And based on your tenure with Park County, other than with Mr. Wirth, have you had to deal with

175

evicting a person that posed a high risk to officer safety and/or the public?

A.  Yes.

Q.  Okay.  Who?

A.  Who?

Q.  Yeah.  Who was that?

A.  I can't remember for sure.  I know the lady that lived across from Martin Wirth who had heartache with the Sheriff's Office posed a risk, a risk to officers and public safety.

Q.  How did she pose a risk to officers and the public?

A.  She made threats and stuff.

Q.  What were the threats that she was making?

A.  She wasn't going to go peacefully and she was going to make a big deal out of it.

Q.  And were you involved in that eviction?

A.  I did it, yes, by myself, actually.

Q.  Okay.  And did she -- why did you go by yourself as opposed to deploying seven officers and having a Platte Canyon Fire and Rescue staged?

A.  This was after the Martin Wirth event.

Q.  Okay.  But --

A.  And I chose to do the evictions by myself in the Bailey -- actually, I did them in Fairplay as

176

well -- by myself just as a point of -- you know, I felt comfortable that I could handle those situations by myself.

Q.  Well, why did that circumstance with this lady who was -- was she making any overt threats to law-enforcement officers?

A.  Yes, mm-hmm.

Q.  And why didn't you elect to bring seven sheriff's deputies -- or multiple deputies out there, not necessarily seven, and stage fire and rescue in that circumstance?

A.  This was after --

Q.  No, I got -- I understand that.

A.  -- the event.  And, you know, I didn't want to subject my guys to the possibility of this happening again.

Q.  So your thought -- I'm sorry.  Go ahead.

A.  So I felt that I had the skills and the public knowledge of the public and be able to set up communications with them and figure out those things and work those problems out before we got on scene.

Q.  And when you said "set up communications," what do you mean by that?

A.  Calling them on the phone, stopping by prior to, talking to them, saying that this is coming,

Hunter + Geist, Inc.
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490
EXHIBIT 1

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

177

1  getting a feel for how the thing was going to go.
2      Q.  And to help de-escalate the person that was
3  going to be the subject to the eviction?
4      A.  Yes.
5      Q.  And did that work peacefully for you?
6      A.  Yes, it did.
7      Q.  And in regards to that tactic that you used
8  with this individual that you evicted by yourself, do
9  you feel that you learned from the Wirth residence --
10  the Wirth eviction on how to handle this other
11  eviction that happened subsequent to the Wirth
12  situation?
13      A.  Was there things that I learned from the
14  Wirth eviction?  There absolutely was.
15      Q.  What did you learn?
16      A.  Again, to have more information about the
17  party, to run them through NCIC and to, you know,
18  try -- I know there were some arguments with the banks
19  as far as they would want things to happen a certain
20  day, and I would assert myself in saying that, you
21  know, "We'll make this happen when it's -- when it's
22  time for us."
23          And one individual, in particular, a veteran
24  with PTSD, who I knew, I gave him an extra week to get
25  his stuff out.  And he was appreciative.  And it went

178

1  peaceful as far as the eviction.  But that's just how
2  I chose to deal with it from that point on.
3          And after this event, a lot of things were
4  happening and being said about how you should do
5  evictions, and should you SWAT on evictions, and how
6  the stuff was going to go.  So I felt that I could,
7  with the most experience with the public, could work
8  these out in a better way by myself.
9      Q.  And the one with the PTSD, did that happen
10  subsequent to the Wirth situation?
11      A.  After.
12      Q.  After?
13      A.  Yes.
14      Q.  When did that happen?  Do you recall?
15      A.  I don't.
16      Q.  Do you know the name of the individual that
17  you were evicting?
18      A.  I don't remember.  He was in Berlin, Berlin
19  subdivision, but . . .
20      Q.  What about the female?  Do you remember her
21  name?
22      A.  I don't.
23      Q.  And again, during your tenure, I'm not
24  going to ask you to give me the specific numbers, but
25  approximately how many evictions did Park County

179

1  Sheriff's Office do per year, physical evictions of
2  removing the person from the residence?
3      A.  Per year --
4          MR. SCHIMBERG:  Form and foundation.
5      A.  Per year, I really couldn't say.  I would
6  say in the time when I was doing them by myself, it
7  could be two or three a week.
8      Q.  Okay.  So quite a bit?
9      A.  Depending on the time of year, it seemed to
10  come and go.  You know, some days you could have
11  three, other Wednesdays you'd have none.
12      Q.  And based on your experience with Park
13  County and the number of evictions at least that you
14  were doing personally, was there a potential that the
15  Sheriff's Office would have to evict a person that
16  posed a high risk to officer safety and/or the public?
17      A.  Yes.
18          MR. SCHIMBERG:  Form.
19      Q.  Have you done any research -- and, again,
20  this is while you were employed with Park County.
21          Did you do any research to determine what is
22  the standard process or procedure for evicting a
23  person that posed a high risk to officer safety and/or
24  the public?
25          MR MARKS:  Object to the form of the

180

1  question.
2          MR. SCHIMBERG:  Join.
3      A.  I didn't.
4      Q.  And Mr. Hancock, again, while you were
5  employed with Park County, how often did you encounter
6  individuals that you perceived to be mentally ill?  In
7  the public, I'm talking about.
8      A.  There were a few, yes.  How many?  I
9  don't -- I couldn't tell you.
10      Q.  Well, was it on a regular basis that you
11  would interact with people that were mentally ill, or
12  at least posed in your mind to have some form of
13  mental illness?
14      A.  Yeah, it's possible one a week.
15      Q.  And do you agree that mentally ill people
16  that at least you came into contact with as a
17  sheriff's deputy with Park County, they may pose a
18  risk to law-enforcement officers?
19          MR MARKS:  Object to the form of the
20  question.
21          MR. SCHIMBERG:  Join.
22      A.  They might.  It's potential for risk, yes.
23  Unpredictable.
24      Q.  And why do you say that mentally ill people
25  have the potential of inflicting some form of safety

45 (Pages 177 to 180)

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

181

1 concerns upon a law-enforcement officer?
2     MR MARKS: Object to the form of the
3 question.
4     A. Just my experience that mentally ill people
5 can be unpredictable at times.
6     Q. And have you encountered a mentally ill
7 person that, in fact, posed a safety risk to you as a
8 law-enforcement officer of Park County?
9     A. Yes.
10     Q. And prior to the Martin Wirth incident,
11 what specific training did the Park County Sheriff's
12 Office provide to its deputies regarding identifying,
13 preventing and de-escalating persons who are
14 experiencing mental health problems?
15     MR. SCHIMBERG: Form.
16     A. We had Mary Pat Bowen and the Victim's
17 Advocate Office would occasionally do mental health --
18 how to deal with the mentally ill courses, and usually
19 they would be at briefings and when we could fit the
20 training in.
21     Q. And did you specifically have training on
22 how to deal with mentally ill individuals and how
23 to --
24     A. The Sheriff's Office, do you mean?
25     Q. Yeah. Did you personally, while you were

182

1 employed with the Park County -- sorry, while you were
2 employed with Park County Sheriff's Office --
3     A. Yes. I've attended some of those, yes.
4     Q. I want to make sure I close the loop on
5 this. The question's out there.
6     Did you specifically have training on
7 identifying, preventing and de-escalating persons who
8 are experiencing mental health problems?
9     A. Yes.
10     Q. And when was the last time that you had
11 that training with Park County?
12     A. I couldn't tell you.
13     Q. Did you have that training prior to the
14 eviction of Martin Wirth?
15     A. Yes.
16     Q. And if you recall, what was the specific
17 training you received?
18     A. Just basically understanding mentally ill
19 people and, you know, utilizing some resources that
20 the state has, crisis line. And AspenPointe had
21 numbers that they give us. And we had cards, and you
22 could give those to people and get assistance with
23 dealing with those type of people.
24     Q. Now, have you ever heard of crisis
25 intervention teams or CIT?

183

1     A. Yes.
2     Q. Are you CIT trained?
3     A. I am not.
4     Q. And do you believe that CIT training
5 provides a benefit for law enforcement agencies?
6     MR. SCHIMBERG: Object to form and
7 foundation.
8     A. Do I believe it does?
9     Q. Yeah. Do you personally believe that it
10 does?
11     A. I have think it's an avenue, yes.
12     Q. What do you mean that "it's an avenue,
13 yes"?
14     A. It's something that can help with dealing
15 with mentally ill people.
16     Q. And during your tenure with the Park County
17 Sheriff's Office and prior to February 24th, 2016, did
18 the Sheriff require that all officers of the Park
19 County Sheriff's Office undergo CIT training?
20     A. No.
21     Q. As of February 24th, 2016, do you know what
22 percentage of the Park County Sheriff's Office
23 deputies were CIT trained?
24     A. Deputies?
25     Q. Yeah. Deputies.

184

1     A. I don't know of any. Maybe a detective
2 that was a retired Denver police officer, Greg Jones.
3 I believe he was CIT trained. Mary Pat and a couple
4 of the victim's advocate ladies were, but I think
5 that's the only person I know of.
6     Q. Well, let's be clear. Mary Pat, she's not
7 a sheriff's deputy, right?
8     A. No. No.
9     Q. And this other detective, what's his name?
10     A. Greg Jones.
11     Q. Was he a sheriff's deputy as of
12 February 24th, 2016?
13     A. Yes.
14     Q. Did you request that -- what was his last
15 name? Jones?
16     A. Jones, uh-huh.
17     Q. Did you request that Mr. Jones be utilized
18 in the eviction of Martin Wirth?
19     A. No.
20     Q. And why not?
21     A. He wasn't on -- I think he was on vacation.
22     Q. Was he in the state of Colorado, do you
23 know?
24     A. I don't know where he was.
25     Q. What efforts did you make, if any at all,

Hunter + Geist, Inc.
EXHIBIT 1
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

MARK HANCOCK - 8/28/2017

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

185

1  to staff a CIT-trained officer in the eviction of
2  Martin Wirth?
3      A.  I didn't make any efforts at all.
4      Q.  Now, prior to February 24th, 2016, did you
5  have any interactions with Martin Wirth?
6      A.  No.
7      Q.  Did you know of Martin Wirth prior to
8  February 24th, 2016?
9      A.  Did I know of him?
10     Q.  Yes.
11     A.  Yes.
12     Q.  And how did you know of him?
13     A.  Based on the call I had mentioned to you in
14  Jefferson County and that -- that incident.
15     Q.  Did Martin Wirth have a reputation within
16  the Park County Sheriff's Office prior to
17  February 24th, 2016?
18         MR. SCHIMBERG:  Form and foundation.
19         MR MARKS:  Object to foundation.
20     A.  What kind of --
21     Q.  Did he have a reputation?  I don't know
22  what that could be.  Did he have any reputation within
23  the Park County Sheriff's Office?
24     A.  Not to my knowledge.
25         MR. SCHIMBERG:  Foundation.

---

186

1      Q.  Please turn to Exhibit 4 in the notebook in
2  front of you, sir.  Have you ever seen this document
3  before?
4      A.  Yes.
5      Q.  What is this document?
6      A.  It's a police report, offense report, on
7  the incident I was talking to you about in Jefferson
8  County with Martin Wirth.
9      Q.  And when did you first see this document?
10     A.  In the binder that I -- or it was given to
11  me by attorneys, my attorneys.
12     Q.  All right.  I obviously don't want you to
13  go into any conversation you had with legal counsel,
14  but as of -- it looks like the date of this incident
15  was January 20th, 2016; is that correct?
16     A.  That's what the date says, yes.
17     Q.  And you were employed by the Park County
18  Sheriff's Office at this time?
19     A.  Yes.
20     Q.  And you were a captain with the Park County
21  Sheriff's Office as of the date of this incident?
22     A.  I was, yes.
23     Q.  And I think you may have testified to this,
24  so please correct me if I'm wrong, but you were on
25  shift at the time this incident took place; is that

---

187

1  correct?
2      A.  Yes, I was.
3      Q.  And you were the captain of patrol at that
4  point in time?
5      A.  I was, yes.
6      Q.  And you do recall the specific incident on
7  this date and time?
8      A.  I heard it over the radio, yes.
9      Q.  So let's go through this, okay?
10        You look at the bottom right-hand corner,
11  there's some numbers, we call those Bates numbers.  Do
12  you see that?
13     A.  Here?
14     Q.  Yep.
15     A.  Yes.
16     Q.  Where it says "PCSO" and then like a 00
17  then it goes 1003, if you could turn to 1003.  Are you
18  there?
19     A.  Yes.
20     Q.  Okay.  Now, looking under the fourth
21  paragraph --
22     A.  Yes.
23     Q.  -- and five lines down where it says, "As
24  Wirth was walking out," do you see that?  It says, "As
25  Wirth was walking out, he stated he was going to get a

---

188

1  gun and shoot the first cop he sees."
2      Do you see that?
3      A.  I'm looking.  Oh, yes.  Uh-huh.
4      Q.  And at the time of this incident on
5  January 20th, 2016, were you made aware that that was
6  the threat that Mr. Wirth was making towards
7  law-enforcement officers?
8      A.  No.
9      Q.  When did you first become aware of that
10  threat?
11     A.  I'm not really sure when I became aware of
12  that threat.
13     Q.  But you knew that prior to February 24th,
14  2016; did you not?
15     A.  Yes.  Yes, I had heard that prior.
16     Q.  And did you take this statement where
17  Mr. Wirth says shoot the first cop he sees -- would
18  you take that as a threat towards law enforcement?
19     A.  I would, yes.
20     Q.  Did it concern you, at the time you first
21  heard that, that Mr. Wirth was making such statements
22  about law-enforcement officers?
23     A.  Yes.  Yes.  It concerned me.
24     Q.  Why did that concern you?
25     A.  Well, as it would any police officer when

---

47 (Pages 185 to 188)

EXHIBIT 1

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

197

1    Q.  And are there any changes you wish to make
2 regarding what you told the critical incident issue
3 team?
4         MR MARKS:  Hold on.  Object to the form of
5 the question.  Go ahead.
6    A.  Yeah, it's my understanding that you can't
7 make --
8    Q.  I'm sorry.  Let me ask it -- let me say it
9 differently.
10       I'm not asking to change it, but is there
11 anything here in this, in your statement, that you
12 think was inaccurate of what you stated?
13    A.  Inaccurate?  No.  I will say that, you
14 know, I hadn't had any sleep.  I mentioned several
15 times that I'm fuzzy on stuff and can't remember
16 accurately, so just to summarize, it's not a very good
17 interview.
18    Q.  What part was not a very good interview?
19    A.  There are parts where I kind of rambled on.
20 My thoughts weren't clear.  You know, I was very
21 upset.  I was very tired.  I hadn't slept in several
22 days.  And hazy, I mention that.  I was hazy in my
23 mind about it, so, you know -- but I pushed through it
24 the best I could.  And it's just not the best
25 interview.

198

1    Q.  Well, you understand this was not an
2 internal affairs investigation, right?  I'm talking
3 this interview with CBI.  Did you understand that?
4    A.  Did I understand it wasn't --
5    Q.  An internal affairs investigation, did you
6 understand that?
7    A.  I'm not sure -- I know it was an
8 investigation, but could this information be used in
9 an internal investigation?  I think that it probably
10 could, yeah.
11    Q.  That wasn't my question.
12       My question is, did you understand that the
13 CBI interview was not an internal affairs
14 investigation interview?  Did you understand that?
15    A.  Probably not.  I -- well, I did.  Internal
16 investigation, I think, would be from my own internal
17 department, so no, I -- it was not an internal
18 affairs.
19    Q.  Did you understand that this was --
20    A.  Well, they said it's not.
21    Q.  Right.  Did you understand this was a
22 completely voluntary statement?
23    A.  Yes.
24    Q.  And did you understand that you did not
25 have to give this statement on the date of this

199

1 interview?  Did you understand that?
2    A.  I did.
3    Q.  Did you understand that you could have gone
4 home, grabbed some sleep, come back and do the
5 interview?  Did you understand that?
6    A.  I was at home.
7    Q.  Okay.  You were at home?  Okay.  So they
8 came to your home and interviewed you?
9    A.  Yes, they did.
10    Q.  Okay.  At that point, did you say, "Look,
11 guys, I don't feel comfortable doing the interview
12 right now.  Let me get some sleep and then I can do
13 this another time"?  Did you understand that you could
14 do that?
15    A.  As a police officer, no.  No, I didn't feel
16 I could do that.
17    Q.  Okay.  So they were compelling you to give
18 this statement?
19    A.  I wouldn't say that, but when you're
20 involved in an incident like this and CBI shows up,
21 you're entitled to give them an interview.  And I -- I
22 don't know.  You said do I -- do I think that I had a
23 chance to say, "No, I'll talk to you guys later?"  Not
24 necessarily, no, I don't.
25    Q.  Were you Mirandized?

200

1    A.  I don't believe I was, no.  I may have
2 been.
3    Q.  Well, we've gone through this.  We didn't
4 see any type of Miranda advisement, so do you believe
5 you were Mirandized prior to giving this statement on
6 the record?
7    A.  I would think that I would have been
8 because it's concerning a criminal matter, yeah.
9    Q.  But you have no recollection of that; is
10 that correct?
11    A.  Well, I'm just assuming that it happened,
12 but I don't have a recollection of not only this, but
13 most of the interview.
14    Q.  All right.  Well, let's go through this
15 interview, then, Mr. Hancock.  Let's start with
16 page 5.  It's the top right-hand corner.
17    A.  Yes, sir.
18    Q.  So starting at line 4, it says, "Captain
19 Hancock.  I've had attended the basic SWAT school put
20 on by the FBI in '99 and I have attended team leader
21 schools, a couple of those, commander school, one of
22 those, and a couple of high-risk planning courses over
23 my career, and there's probably tons of other training
24 I've been doing"; do you see that?
25    A.  Yes.

50 (Pages 197 to 200)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

205

1  that you created after the incident?
2      A.  Yes.
3      Q.  Did you provide those notes to your legal
4  counsel?
5      A.  No, I didn't have legal counsel.
6      Q.  All right.  But I'm asking in regards to
7  this litigation, did you provide those notes to legal
8  counsel?
9      A.  No.  I didn't have them.
10     Q.  Do you still have those notes?
11     A.  No, I gave them to CBI.
12     Q.  All right.  So CBI, that's what -- the
13 notes were given to CBI; is that correct?
14     A.  They took the notes, yes.
15     Q.  Do you have any other notes that you've
16 taken in regard to this incident?
17     A.  No.
18     Q.  Do you have a diary?
19     A.  No.
20     Q.  Did you ever have any type of journal
21 entries or notes that you've created in regards to
22 this litigation?
23     A.  No.
24     Q.  Let's turn to page 9, please.  Are you
25 there, sir?  Page 9?

---

206

1      A.  Yes.  Yes, sir.
2      Q.  Starting on line 1, "I had either DJ or
3  Nate make a phone call to Platte Canyon Fire to have
4  them staged"; do you see that?
5      A.  Yes, sir.
6      Q.  So according to this statement, you were
7  the one that told D.J. or Nate Carrigan to call Platte
8  Canyon Fire; do you see that?
9      A.  Yes, sir.
10     Q.  So they didn't do that on their own.
11 According to your statement, you told them to contact
12 Platte Canyon Fire?
13     A.  According to this statement.
14     Q.  Is this statement correct or incorrect?
15     A.  The way I remember -- I remember it better
16 now, it's incorrect.
17     Q.  Okay.  And when you say they were staged,
18 where was Platte Canyon Fire Department staged at
19 least in regards to the eviction of Martin Wirth?
20     A.  I don't know.
21     Q.  Let's look on line 11.  You said here,
22 "Based on the intel that I had, I figured he may be
23 physically combative because that's all I'd had so
24 far.  You know, there's a possibility I thought he
25 could become barricaded"; do you see that?

---

207

1      A.  Yes, I do.
2      Q.  Why did you think that Mr. Wirth would
3  become barricaded?
4      A.  I just thought in terms of being a squatter
5  and being in a place that he's not supposed to be and
6  knowing that an eviction would come that he could
7  possibly barricade himself in there.
8      Q.  Did you think all -- let me back it up a
9  little bit.
10         Why did you say he was a squatter?  Why did
11 you say that?
12     A.  He -- well, he wasn't a renter, and he
13 wasn't -- he had no ownership to the house, so just a
14 squatter, a trespasser.  We have a lot of those up in
15 Park County.  They just come to a residence and start
16 living, so . . .
17     Q.  So do you think that -- and it sounds like
18 you said there's a lot of squatters that you have in
19 Park County.
20     A.  Yes.
21     Q.  Do you think all the squatters in
22 lake [sic] county would barricaded?
23     A.  Park County.
24     Q.  I'm sorry.  Park County.
25     A.  Would they be barricaded?

---

208

1          MR. SCHIMBERG:  Foundation.
2      A.  If they thought that we were coming to get
3  them, it's a possibility, but I have no idea.
4      Q.  And was there any information that you had
5  that led you to believe that Martin Wirth would be
6  barricaded, or at least the possibility of being
7  barricaded?
8      A.  No information that I had, no.
9      Q.  And you said, "Based on the intel that I
10 had, I figured he may be physically combative."
11         So what intel did you have that made you
12 feel that Mr. Wirth would be physically combative?
13     A.  The guys talking about -- or our deputy
14 having to tackle him.  And I think he claimed that one
15 of his teeth -- tooth were knocked out and that he had
16 been -- had a physical altercation with officers
17 before, so it's a possibility that he'd do that again.
18     Q.  Did it concern you when you were going to
19 be doing this eviction that Mr. Wirth would be
20 physically combative to your officers?
21     A.  It didn't concern me, no.
22     Q.  Why not?
23     A.  Because we're trained and equipped to
24 handle that.  We do that all the time.
25     Q.  And then you said, starting on line 19,

---

52 (Pages 205 to 208)

MARK HANCOCK - 8/28/2017
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

221

1  do you see that?
2      A.  Yes.
3      Q.  So the fact that the sheriff was leaving
4  the county -- actually, let me back up just a little
5  bit.
6          Did you understand on February 24th, 2016,
7  that as this operation was going down to evict Martin
8  Wirth, there's Sheriff Wegener who was going to be
9  leaving the county?
10     A.  Yes.
11     Q.  Because the Sheriff was leaving the county,
12 do you understand at that point that the person in
13 charge, at least at the Sheriff's Office, was
14 Undersheriff Gore?
15     A.  Yes.
16     Q.  Now, so for all intents and purposes, I
17 understand that Wegener's the sheriff, but when
18 Wegener's out of the office, the acting sheriff really
19 was, at this time, Undersheriff Gore; is that right?
20     A.  That's correct.
21     Q.  Now, you stated, "I advised the
22 Undersheriff that I needed help to go to
23 Communications and monitor it."
24         Why did you want the Undersheriff to go to
25 Communications and monitor?  What?

222

1      A.  The radio.  The radio traffic.
2      Q.  Which radio traffic specifically?
3      A.  Ops 5.  I've stated they were short of
4  personnel, and so a communications officer would be
5  monitoring the regular channel and the Undersheriff
6  would be listening on Ops 5.
7      Q.  Why did you want the Undersheriff to be the
8  one monitoring Ops 5?
9      A.  Well, I wanted him to be aware of what was
10 going on and to have control over the situation if he
11 needed it.
12     Q.  Let's turn to page 12.  So here, starting
13 on line 5, "...where I saw him talking to the guy on
14 the deck and I think he called him Mr. Wirth but I
15 didn't know this guy from Adam.  I've never seen him
16 before.  I've heard a lot about him but I've never
17 seen him."
18         So in your interview with CBI, you said you
19 heard a lot about Mr. Wirth.  So tell me everything
20 you heard about Mr. Wirth.
21     A.  I've already told you what I had heard
22 about him, the incident in Jefferson County and the --
23 I don't know if I told you, the prior eviction, that
24 he had been evicted in 2014, I believe.
25     Q.  So you didn't tell me that.  So what did

223

1  you know about the prior eviction of Mr. Wirth?
2      A.  That he had been evicted in 2014,
3  peacefully.  And again, this is after the event, so,
4  you know, I'm listening to the news and I'm hearing
5  things about Wirth.
6      Q.  Well, did you think that your statement --
7      A.  After.
8      Q.  -- where you say, "I heard a lot about him
9  but I've never seen him before" -- was that based on
10 things that you heard after the fact, or did you
11 understand that you were -- the questions asked of you
12 was what you heard about Mr. Wirth prior to the
13 eviction?
14         MR MARKS:  Object to the form of the
15 question.
16     A.  I think it was a combination of both at
17 that time.
18     Q.  Well, you talked about the January 20th,
19 2016, incident, right?
20     A.  Yes.
21     Q.  And you said you -- at least here you're
22 saying that you heard about his prior eviction.
23     A.  Mm-hmm.
24     Q.  Did you hear that from the news or did you
25 know about Mr. Wirth's prior eviction based upon your

224

1  employment at Park County?
2      A.  Based on my employment at Park County,
3  yeah.
4      Q.  Okay.  And who told you about the prior
5  eviction regarding Martin Wirth?
6      A.  Who told me?
7      Q.  Yeah.
8      A.  I'm not certain.
9      Q.  Do you know why that came up?
10     A.  Because we were doing an eviction on him.
11 I believe it was Dave Leffler, but I can't be certain
12 on that.
13     Q.  And do you recall what Mr. Leffler told you
14 about the prior eviction of Mr. Wirth?
15     A.  Just that -- I think my -- they told me
16 that, and my question was "Why is he there now?"  And
17 somebody, and I don't know who, said that there had
18 been a mistake made or a glitch with the bank process
19 and he had been allowed back in.
20     Q.  Now, starting on line 10, staying on
21 page 12, you said, "Talked to him on the deck.  He was
22 leaning over the rail talking to Nate and then Nate
23 said, Mr. Wirth, you know, we're here to serve the
24 eviction and I was still struggling to get up to Nate
25 and then I heard him say something as he turned to the

56 (Pages 221 to 224)

225

1 effect of, you know, you're not even going to give me
2 time to move my stuff out and you, you know, I wanted to
3 say at the time of course we'll give you time to move
4 your stuff out, you know."
5      So I want to talk about that.  So when Wirth
6 stated, "You know, you're not even going to give me
7 time to move my stuff out," what was his demeanor like
8 when he said that?
9      A.  Leaning over the rail, looking down on us
10 from the deck, and calm.  Seemed calm.
11      Q.  And then -- okay.  So he wasn't -- in your
12 mind, he wasn't agitated?
13      A.  No.
14      Q.  Wasn't threatening?
15      A.  Not at all.
16      Q.  Okay.  And then he went back into the house
17 at that point in time?
18      A.  He walked back into the house, yes.
19      Q.  Didn't slam the door?
20      A.  No.
21      Q.  Did you think he was threatening at that
22 point in time?
23      A.  No, I didn't.  I thought he was coming to
24 the front door, actually.
25      Q.  Well, okay.  So let me understand.  So he's

226

1 on the -- when you -- when Nate was talking to him,
2 was Nate at the front door?
3      A.  No, we were down, outside in front of our
4 vehicles looking up at the deck at him.
5      Q.  So that's when Mr. Wirth was out there on
6 his deck?
7      A.  Yes.
8      Q.  And Nate was -- Nate was speaking to him
9 from the car?
10      A.  In front of the cars, yes.
11      Q.  In front of the car?
12      A.  Yes.
13      Q.  Was he yelling up at him, talking to him?
14      A.  No, it was -- you could hear the
15 conversation.  It wasn't loud.
16      Q.  Okay.  So Nate's talking to him.  And
17 that's when Wirth says, You know, I can't believe
18 you're not going to give me time to move my stuff out?
19      A.  Something to that --
20      Q.  And then he walks back into his home,
21 right?
22      A.  Yes.
23      Q.  And I think you testified, he wasn't
24 threatening at that point, right?
25      A.  No.  No.

227

1      Q.  Did he give you any indication he was going
2 to shoot at you?
3      A.  No.
4      Q.  Right?  Didn't make any overt threats to
5 you at that point, right?
6      A.  No.
7      Q.  And so you then went up to the residence,
8 to the front door, with Mr. Carrigan; is that correct?
9      A.  Yes.
10      Q.  And did you have a conversation with
11 Mr. Wirth while he was inside the home?
12      A.  No.
13      Q.  So did Nate have any conversation with
14 Mr. Wirth while he was inside the home?
15      A.  No.  We made announcements, "Come to the
16 door."
17      Q.  Okay.  And were you making loud
18 announcements?
19      A.  Yes.
20      Q.  What did you specifically state?
21      A.  I said, "Come to the door.  Talk to us.
22 Sheriff's Office.  Eviction."  And Nate said some
23 things.  I think another officer said something as
24 well.
25      Q.  And when you went up to the door with Nate,

228

1 is that when the other officers came up to the door
2 next to you?
3      A.  Shortly after that, yeah.
4      Q.  Was he threatening you at that point in
5 time?
6      A.  No.
7      Q.  Did he say, "Get off my property"?
8      A.  No.
9      Q.  Did Mr. Wirth say anything to you?
10      A.  Nothing.
11      Q.  Did he say, "I have a gun"?
12      A.  No.
13      Q.  Did he say -- did you hear any movement in
14 the house, like he was getting a gun?
15      A.  No.
16      Q.  Did you look into the window to see what he
17 was doing?
18      A.  I looked into the window of the door and
19 couldn't see him.
20      Q.  When you say "looked into the window of the
21 door," so there was a door and there was a small
22 window?
23      A.  There were small windows, like kind of a
24 French window-type setup on the door.
25      Q.  And how big were these windows?  Do you

57 (Pages 225 to 228)

EXHIBIT 1

MARK HANCOCK - 8/28/2017

**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

229

1  recall?
2      A.  They were square.
3      Q.  Why don't you give me an approximate size,
4  if you remember.  Was it like, 2-by-2?
5      A.  Not that big, no.
6      Q.  Okay.  And was the entire door glass or was
7  there just a small portion of the door that was glass?
8      A.  Small portion.
9      Q.  Okay.  So you were looking in the door?
10      A.  Mm-hmm.
11      Q.  Could you see anything?
12      A.  A kitchen, what looked to be a kitchen and
13  some appliances.
14      Q.  Did you have a clear view of the entire
15  inside of the home just looking through that door?
16      A.  No, I did not.
17      Q.  Just looking into that small glass portion
18  of the door?
19      A.  No.
20      Q.  Did you go around and look?  Was there,
21  like, other windows you could look into the house?
22      A.  There were other windows.
23      Q.  Did you look through those other windows?
24      A.  No.
25      Q.  Did you direct any other sheriff's deputies

---

230

1  to look into those windows to give you a sense of
2  where he was?
3      A.  No.
4      Q.  So your instinct, though, was when you --
5  according to you, after Mr. Wirth says, "You're not
6  even going to give me time to move my stuff,"
7  according to your statement, you stated, "You know, I
8  wanted to say at the time of course we'll give you
9  time to move your stuff out."
10      Did you actually say that to Mr. Wirth?
11      A.  No.
12      Q.  Did you have the opportunity to tell him
13  "Look, Mr. Wirth, you have the time to move your stuff
14  out"?  Did you have the opportunity to say that to him
15  before breaching the residence?
16      MR MARKS:  Object to the form of the
17  question.
18      Q.  Did you have the -- let me --
19      MR. ELKUS:  Can you read my question back,
20  please?
21      (The last question was read back.)
22      A.  Did I have the opportunity?  Yes.
23      Q.  And why didn't you say that to Mr. Wirth
24  before making the decision to breach the residence?
25      A.  Well, he wasn't coming to the door.

---

231

1      Q.  Did he have a telephone?
2      A.  I don't believe so.
3      Q.  Do you know for a fact whether he had a
4  phone or not?
5      A.  I don't.
6      Q.  Did he make any inquiries as to other forms
7  of communications you could have made with Mr. Wirth
8  during this exchange prior to breaching the residence?
9      A.  Other than yelling through the door?
10      Q.  Yep.
11      A.  No.
12      Q.  And then you stated here, at least looking
13  at line 17 on page 12, "You know, that's why we're
14  here and he went back in the house and I started
15  feeling real uncomfortable about that and I might have
16  radioed in that he went back in his house."
17      Do you see that?
18      A.  Yes.
19      Q.  Now, why did you feel uncomfortable when
20  Mr. Wirth went back into the house?
21      A.  Because I couldn't see him.
22      Q.  Well, he wasn't threatening you, right?
23      A.  Right.
24      Q.  He didn't seem angry with you when he went
25  back into the home, right?

---

232

1      A.  No.
2      Q.  So what did he do other than not respond to
3  you through the door that made you feel real
4  uncomfortable?
5      A.  It's not responding and I can't see him.  I
6  don't know what he's doing.
7      Q.  And you don't know where he is in the
8  residence, right?
9      A.  And I don't know where he is.
10      Q.  You don't know if he's armed or not, right?
11      A.  I don't.
12      Q.  You don't know whether he's getting a
13  firearm at that point in time, right?
14      A.  I don't know that.
15      Q.  When you say -- when you start feeling
16  uncomfortable, did you feel that your life may be
17  threatened at that point?
18      A.  No.
19      Q.  Did you think the other officers' lives
20  were being threatened at that point in time?
21      A.  No.
22      Q.  Or potentially in danger?  Did you think
23  their lives were potentially in danger at this point
24  in time?
25      A.  No.

---

Hunter + Geist, Inc.
EXHIBIT 1
scheduling@huntergeist.com * 303-832-5966 * 800-525-8490

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

233

1    MR MARKS:  Object to the form of the
2  question.
3    A.  I didn't.
4    Q.  Now, when Mr. Wirth went back into the
5  residence, you did not call Undersheriff Gore; is that
6  correct?
7    A.  Not directly, no.
8    Q.  Did you contact him indirectly?
9    A.  Well, I think I said it on the radio.
10    Q.  So what did you say?  "Hey, he went into
11  the house"?
12    A.  Yes.
13    Q.  And was that on Ops 5?
14    A.  That's the channel I was on, yes.
15    Q.  Okay.  So did you -- do you recall
16  specifically going on the radio and saying he went
17  back into the home?
18    A.  Yes.
19    Q.  Now, starting on line 19, you stated, "I
20  might have radioed in that he went back in his house."
21    So here, you don't definitively state that
22  you did that, but today you do?
23    A.  Yes.
24    Q.  Then you say, "I can't remember but I did
25  tell the four to get up next to the house as close as

234

1  we could to the house."
2    So according to this statement, you directed
3  officers to come to the house.  They did not just come
4  at their own volition.  Do you see that?
5    A.  Yes --
6    MR MARKS:  Object to the form of the
7  question.
8    A.  -- I see it.
9    Q.  So which one is it?  Did you order them --
10  or excuse me.
11    Did you tell these officers to come up to
12  the house or did they just come up at their own
13  volition when they saw you walk into the house?
14    A.  Yeah.  And you're asking me to be
15  absolutely clear on this, and I'm just not.
16    Q.  Well, you know, this interview took place,
17  what is it, a day after the incident, right?
18    A.  Mm-hmm.
19    Q.  Is that a yes?
20    A.  That's a yes.
21    Q.  Now, I understand that you've had time to
22  think about this, but do you think your memory was
23  better the day after you did the interview or over a
24  year and a half after the interview?  Which is better,
25  your memory then or now?

235

1    A.  Well, on some parts of it, my memory is
2  better now.
3    Q.  Okay.  Well, let's talk about this
4  particular issue, okay?  Where you say, "I did tell
5  the four to get up next to the house," is that an
6  accurate statement or not?
7    A.  It's possible that I said that, but I -- I
8  told you, I don't remember.
9    Q.  At least as you sit here today, you don't
10  remember that?
11    A.  Right.  Are we to a point where I can take
12  a break?
13    Q.  Do you need a break right now?  We can take
14  a break.  Sure.  That's fine.  Take a break.
15    (Recess taken from 4:08 p.m. until
16  4:21 p.m.)
17    Q.  (By Mr. Elkus)  Now, when you were at -- I
18  think -- let me back this up a little bit,
19  Mr. Hancock, because I think you testified that, you
20  know, when you were doing -- when you did an eviction,
21  you assume that the person being evicted is armed.
22    Do you recall testifying something to that
23  effect today?
24    MR MARKS:  Object to the form of the
25  question.

236

1    MR. SCHIMBERG:  Join.
2    A.  Not on an eviction.  I think what I said
3  was in Park County, every resident should be assumed
4  that they're armed.
5    Q.  Okay.  I'm sorry.  So you -- at least
6  during your tenure with the Park County Sheriff's
7  Office, you assumed that every resident within the
8  county is armed; is that right?
9    A.  Possessed a firearm.
10    Q.  Possessed a firearm?
11    A.  Yeah.
12    Q.  So when you were evicting Martin Wirth, did
13  you take the assumption that he was armed as you were
14  evicting him?
15    A.  Just like anyone else in Park County, I
16  would think that he had a weapon, owned a weapon,
17  firearm.
18    Q.  Now, you testified that you were feeling
19  really uncomfortable when Mr. Wirth went back into the
20  residence.  Do you recall that?
21    A.  Yes.
22    Q.  So feeling uncomfortable, why not retreat
23  and regroup on a -- regroup to a more tactically safe
24  place, such as behind your patrol vehicles, when
25  Mr. Wirth went back into the residence?  Why not do

59 (Pages 233 to 236)

EXHIBIT 1

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

---

237

1  that?
2      MR MARKS: Object to the form of the
3  question.
4      A. I thought he was coming to the door when he
5  went back in the residence.
6      Q. All right. And so --
7      A. So I wanted to meet him at the door.
8      Q. And so when you went up there, how long
9  were you up there when you were asking him to come to
10 the door before making the decision to breach?
11     A. I don't know the time.
12     Q. Was it, like, one minute? Two minutes?
13 Ten minutes?
14     A. I -- and I would get away from saying any
15 times, because if you asked me how long the whole
16 thing lasts, I'd tell you three hours, but I know it
17 only lasted a few minutes. So I -- I don't really
18 know the time, other than some time had passed when we
19 were asked -- yeah, making -- trying to get him at the
20 door.
21     Q. Now, were there sort of emergent
22 situation -- well, let me ask it differently.
23     I think you testified that he wasn't
24 threatening you when he went back into the residence;
25 is that right?

---

238

1      A. That's right.
2      Q. His demeanor was calm, right?
3      A. Yes.
4      Q. Even when he was -- even when you were
5  telling him to come out of the residence, he wasn't
6  saying anything to you at that point, right?
7      A. No.
8      Q. Assuming -- I think you were -- again,
9  like, most residents in Park County, I think you
10 testified that you assumed that he may have firearms
11 in the residence; is that correct?
12     A. That's correct.
13     Q. Now, with him not threatening you, there
14 potentially have an armed individual in there, there
15 was no exigent circumstances that were creating, at
16 that point in time, to require -- or let me ask you
17 differently -- there was no emergency situation
18 occurring at that point in time to forcibly enter the
19 residence, right?
20     MR. SCHIMBERG: Form.
21     MR MARKS: Yeah, join.
22     A. No immediate emergency, no, but in my mind,
23 and I've stated, time had passed, and I was worried
24 about what he's doing, where he's going. And I had
25 had great success with speed at that point, getting to

---

239

1  people and getting them in custody.
2      Q. No, I understand that. I understand that.
3      But, I mean, was your plan to take him into
4  custody?
5      A. If he was going to fight us, yes.
6      Q. Well, all those other circumstances that
7  you were dealing with where you were coming into the
8  home, were those evictions or were those individuals
9  that were either high risk or that were -- there was
10 warrants or suspects?
11     A. Different situations. A little of both.
12     Q. Were any of them evictions?
13     A. Where I went in --
14     Q. Where you just breached the door, go in and
15 grab the person and bring them out of the house, were
16 any of those evictions?
17     A. I suppose there's probably a couple where
18 we went in the house. Now, whether we breached the
19 door or not, I -- I'm uncertain, but there's several
20 occasions where I've seen people, I've went in, they've tried to
21 back in their house, I've went in, they've tried to
22 close doors on us, and I've just went in and not
23 necessarily take them into custody, but be close to
24 them to be able to control the situation.
25     Q. All right. So in regards to this case, I

---

240

1  think you testified that there was no emergency
2  situation unfolding that demanded that you breach the
3  residence; is that true?
4      A. That is true other than the time passing in
5  my mind of I don't know what he's doing or where he's
6  at.
7      Q. Okay. So other than time passing, you
8  would agree that -- I understand that preferred in
9  your mind is to breach the residence and take control
10 of the situation.
11     A. Yes.
12     Q. But did it occur to you, prior to breaching
13 the door, that maybe the best option was to retreat,
14 go back behind your vehicles and gather a different
15 plan? Did that occur to you?
16     A. Did not occur to me.
17     Q. Okay. Now, you do mention in your
18 interview on line 22, you said, "He had a height
19 advantage and we went up the hill to the front, front
20 of the thing so I'm kind of seeing Nate here parked
21 and me back down here, so up this was"; do you see
22 that?
23     A. Yes.
24     Q. So why did you mention that Mr. Wirth had a
25 height advantage?

---

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

---

253

1  question.
2  A.  If -- well, in this case, we didn't know
3  that he was in there waiting to ambush us.  I think if
4  you knew that he was going to ambush you, then, no,
5  you wouldn't be super aggressive in going after him.
6  Q.  And I guess that's part of the point,
7  Mr. Hancock, because at this point, other than talking
8  through the window and he's nonresponsive, okay, you
9  didn't have a whole lot of information about where
10  Mr. Carrigan -- or, excuse me, where Mr. Wirth was in
11  the residence before breaching, right?
12  A.  That's right.
13  Q.  You didn't have a whole lot of information
14  as to what type of weaponry he had before entering
15  that -- entering that dwelling; is that correct?
16  A.  I didn't.
17  Q.  And there were options at your disposal
18  that you could have utilized to find out more
19  information about Mr. Wirth while he was inside the
20  residence before breaching; isn't that true?
21  MR MARKS:  Object to the form of the
22  question, and foundation.
23  Go ahead.
24  A.  I didn't feel that way at the time, no.
25  Q.  Well, you didn't think about it at the

---

254

1  time, right?
2  A.  Right.
3  Q.  You didn't think about retreating.  You
4  didn't think about that, did you, before breaching?
5  A.  No.
6  Q.  You didn't think about trying to figure out
7  some form of communication to talk to Mr. Wirth other
8  than through that small little window, right?
9  A.  That's how we were trying to talk to him,
10  yes.
11  Q.  I know.  But you didn't try or think about
12  utilizing other -- some other form of communication to
13  talk to Mr. Wirth before breaching that home, right?
14  A.  I didn't at that time, no.
15  Q.  Did you think, "Do you know what?  Let me
16  go back.  We could utilize" -- and actually, let me
17  back this up a little bit.  Sorry.  Let me clarify
18  this.
19  Did your vehicles have like a speaker
20  system?
21  A.  Yes.
22  Q.  Okay.  Was that on your car?
23  A.  Yes.  It should have been on all the patrol
24  cars.
25  Q.  You certainly could have gone back to your

---

255

1  car at that point where at least there was some level
2  of protection.  You could have been in your car and
3  tried to talk Mr. Wirth out from your vehicle.  You
4  could have done that; could you not?
5  MR MARKS:  Object to the form of the
6  question.
7  A.  I could have done that, yes.
8  Q.  You didn't think about that an option,
9  did you?
10  A.  I didn't do that, no.
11  Q.  No, I know you didn't do it.  Did you think
12  about it as an option?
13  A.  Not at the time, no.
14  Q.  Why didn't you think about that being the
15  option to take other than kicking the door down?
16  A.  Why didn't I?
17  Q.  Yeah.  Didn't it come to you -- why didn't
18  you think like, "Do you know what?  There may be other
19  options here other than breaching"?
20  MR MARKS:  Object to the form of the
21  question.
22  MR. SCHIMBERG:  Form.
23  A.  I thought about getting in quickly, because
24  I had had a lot of success with that, and getting him
25  under control and getting him out of there.

---

256

1  Q.  Now, with respect to kicking the door down
2  and doing the breach, did you get a direct order from
3  the Sheriff to do that?
4  A.  I asked -- no.  I asked permission, and he
5  said go.
6  Q.  Why were you asking permission from the
7  Sheriff to breach the residence?
8  A.  I had either seen or heard that he was on
9  scene, and I -- I don't know.  He could have been
10  looking at something else, you know.  And as with
11  other things that we had done, it's nice to have the
12  Sheriff okay what you're doing.
13  Q.  But you were the officer in charge, right?
14  A.  That's correct.
15  Q.  So why did you think you needed to get
16  permission from the Sheriff when you were the OIC?
17  MR. SCHIMBERG:  Object to form.
18  A.  Well, because he showed up on scene, or I
19  believe that he had shown up on scene.  I had seen him
20  or heard him.  And, you know, I wanted to check if he
21  had other information or other ideas of what to do.
22  Q.  Did he make any suggestions to you for
23  other ideas?
24  A.  No.
25  Q.  And when you -- let me back this up.

---

64 (Pages 253 to 256)

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

261

1    A. Do I think if they knew that he was armed
2  inside the residence, would that be important? Yes.
3    Q. Okay. Why do you say yes?
4    A. That'd be good knowledge to have.
5    Q. Did you believe that entering Mr. Wirth's
6  residence posed a hazardous environment for you and
7  your officers?
8    A. No, not at the time.
9    Q. Why do you say no?
10   A. Well, I didn't believe that at the time. I
11 thought we were going to go in and grab him quick.
12   Q. But at that point, you didn't even know
13 where he was in the residence, right?
14   A. That's right.
15   Q. So for all you know, he could have been
16 held in some type of room that you weren't even aware
17 of before breaching the residence, right?
18   A. That's possible.
19   Q. I mean, for all you know, where you may not
20 have seen him fortify, you know, outside, he may have
21 been fortifying inside the home before you breached,
22 right?
23   A. That's possible, yeah.
24   Q. Didn't think about that, though, did you?
25   A. No, I didn't encounter that.

262

1    Q. No, what you encountered was Mr. Wirth
2  opening fire on you and your fellow deputies, right?
3    A. That's right.
4    Q. So he put himself in a position where
5  tactically he was more at an advantage than you were
6  when you entered the residence; is that true?
7    A. I don't know where he was.
8    Q. All right. Well, I mean, you know, you
9  were -- you were a SWAT commander. You were on SWAT
10 for a long period of time.
11   A. That's right.
12   Q. So it sounds like, to me, when you wanted
13 to breach and get the suspect or the individual, you
14 want to do it quickly, grab the guy and get out.
15 That's your MO, right?
16   A. That's right.
17   Q. But how do you go in and grab someone and
18 get them out quickly if you have no idea where they
19 are in the home?
20   A. You dynamically flood the room with
21 officers, and you work through the house as quickly as
22 possible until you contact them.
23   Q. Well, let's take that to its logical
24 conclusion. I mean, if this -- if you have no idea
25 where this man is who is, to use your word, you think

263

1  most people in Park County are armed --
2    A. Well, that they have weapons.
3    Q. Or that they have weapons, which means that
4  they're armed, right?
5        MR MARKS: Object to the form of the
6  question.
7    A. See, I --
8    Q. You don't agree with that?
9    A. I don't agree with that. Armed -- and I
10 told you this before. Are you talking on you, a
11 holster, strapped with a strap holding it?
12 Brandishing? What are you -- what do you mean by
13 "armed"?
14   Q. Well, what we do know is Nate Carrigan was
15 armed.
16   A. Yes, he had a sidearm.
17   Q. And did you know that he had an open carry?
18   A. No.
19   Q. Well, you said you knew he had a sidearm.
20 So how do you know that?
21   A. Who? Nate?
22   Q. I'm sorry. Did I say Nate Carrigan? I
23 apologize. I apologize. I misspoke.
24       Martin Wirth, did you know -- you knew that
25 Martin Wirth was armed?

264

1    A. I didn't know that he was armed on him. I
2  suspected that, he's a Park County resident, he
3  probably owns firearms.
4    Q. Did you ever do a search as to whether or
5  not he had a concealed-weapon permit?
6    A. No.
7    Q. Did you ever -- subsequent to this event,
8  did you ever look to see if Mr. Wirth had a
9  concealed-weapons permit?
10   A. Didn't I just answer that? I said no.
11   Q. No, I thought -- did you know -- I'm sorry.
12 Did I say prior, prior, did you ever do a search? I'm
13 thinking prior to the eviction, did you ever do that?
14   A. No.
15   Q. And subsequent to the eviction, you didn't
16 do that either?
17   A. No.
18   Q. Okay. Now, I think what you testified is
19 that what you like doing is sort of just coming in and
20 flooding the home with law enforcement to get the
21 suspect. Did I state that correctly?
22   A. Quickly.
23   Q. How does that -- how does that not pose an
24 officer safety issue?
25   A. We've done it many, many times. Officers

**MARK HANCOCK - 8/28/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

265

1  are doing it right now.  They enter homes and they
2  quickly take control of the rooms and the people that
3  are in them.
4        Q.  Yeah, but do you know -- when you say
5  all -- there's officers that are doing it right now --
6        A.  Yes.
7        Q.  -- do you know whether those officers have
8  tactical plans in place that know where the individual
9  may be in the home before they do that?
10       A.  No, I don't -- I wouldn't think they would.
11       Q.  Do you -- other than Park County Sheriff's
12 Office, do you actively go out, currently, and teach
13 and train other officers on SWAT operations?
14       A.  Do I now?
15       Q.  Yeah.
16       A.  No.
17       Q.  And other than Park County, have you taught
18 other law-enforcement agencies within the state of
19 Colorado about SWAT training and SWAT tactics?  Have
20 you done that?
21       A.  I have, some in Colorado and some across
22 the country, yes.
23       Q.  And do you teach this technique where you,
24 without a full tactical plan in place, this kicking
25 down a door, flooding the area without knowing where

266

1  the individual may be or having any knowledge of the
2  interior of the home, do you teach that?
3        A.  I -- I don't, no.  If you're talking SWAT,
4  that's different than patrol operations.
5        Q.  All right.  So this was a patrol operation,
6  right?
7        A.  Yes.
8        Q.  So in your mind, this patrol operation
9  should be viewed differently than a SWAT operation; is
10 that fair to say?
11       A.  Yes.
12       Q.  So in your patrol operation, do you think
13 that it is prudent course of action to not know where
14 the individual may be in the residence, to breach a
15 residence and flood it and try to apprehend the
16 individual?
17       A.  You're making it sound like that's every
18 situation, and it's just not.
19       Q.  Okay.  So what situations dictate that you
20 should, in a patrol operation, kick down the door and
21 flood the home to try to find the suspect?
22       A.  I don't know.  It could be -- it could be
23 lots of different situations.
24       Q.  Can you give me some examples?
25       A.  An example of when you would -- you know,

267

1  you're at the door, maybe you see someone running in,
2  maybe someone's sitting there telling you "Go away.
3  Don't come in," and time -- time is a problem for you,
4  and you go through the door and you get on them to
5  control the situation quickly.  Or they come to the
6  door and say they're going to go get their gun, and
7  you follow them through the door and get them.
8        Q.  And that makes sense, because you now know
9  where the suspect is, right?
10       A.  Yes.
11       Q.  You have a visual observation of where the
12 suspect is, correct?
13       A.  That's correct.
14       Q.  But you don't have that in this situation
15 with Martin Wirth because you had no idea where he is
16 in the residence, right?
17       A.  I didn't.
18       Q.  And so for all you know, or for all you
19 knew at the time, he could have actually been
20 fortifying himself within the residence to take your
21 officers out, right?
22       A.  Or he could have been sitting in the chair
23 in the living room.
24       Q.  Did you see him?
25       A.  No.

268

1        Q.  Sitting in a chair in the living room?
2        A.  No, but you say he could have been
3  fortifying.  He could have been sitting there waiting
4  for us.
5        Q.  And the reality is you didn't even know
6  where the living room was in relation to the small
7  little window you were looking at, right?
8        A.  That's right.
9        Q.  Because what you saw was the kitchen?
10       A.  Mm-hmm.
11       Q.  Is that a yes?
12       A.  That's yes.
13       Q.  How much time elapsed between Mr. Wirth
14 going back into the residence and when you breached
15 the door?
16       A.  I told you before.  I don't have a sense of
17 the time.
18       Q.  Was it pretty quick?
19       A.  I don't know.  It seemed like a long time,
20 but I have no sense of time on that.
21       Q.  Please turn to Exhibit 9 in front of you,
22 sir.
23       A.  Yes, sir.
24       Q.  Have you ever seen this document before?
25       A.  Yes, sir.

67 (Pages 265 to 268)

```
 1                    REPORTER'S CERTIFICATE

 2    STATE OF COLORADO          )
                                 ) ss.
 3    COUNTY OF DENVER           )

 4              I, MELANIE L. GIAMARCO, do hereby certify

 5    that I am a Registered Professional Reporter and

 6    Notary Public within the State of Colorado; that

 7    previous to the commencement of the examination, the

 8    deponent was duly sworn by me.

 9              I further certify that this deposition was

10    taken in machine shorthand by me at the time and place

11    herein set forth, that it was thereafter reduced to

12    typewritten form, and that the foregoing constitutes a

13    true and correct transcript of the proceedings had.

14              I further certify that I am not employed by,

15    related to, nor of counsel for any of the parties

16    herein, nor otherwise interested in the result of the

17    within litigation.

18              In witness whereof, I have affixed my

19    signature this 7th day of September, 2017.

20

21

22

23              Melanie L. Giamarco
                Certified Realtime Reporter
24
      My commission expires:  August 21, 2021.
25    Notary ID:  20014025991
```

EXHIBIT 1