1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:16-cv-03079-MSK-MJW
 3
      ESTATE OF NATE CARRIGAN,
 4    JOHN CARRIGAN, MELISSA CARRIGAN,
      KOLBY MARTIN, and TRAVIS THRELKEL,
 5
      Plaintiffs,
 6
      v.
 7
      PARK COUNTY SHERIFF'S OFFICE,
 8    SHERIFF FRED WEGENER, in his
      official and individual capacity,
 9    and MARK HANCOCK, in his official
      and individual capacity,
10
      Defendants.
11    _____

12    DEPOSITION OF:  KOLBY MARTIN - October 11, 2017
                         (Confidential Designations Pending)
13    _____

14                 PURSUANT TO NOTICE, the deposition of
      KOLBY MARTIN was taken on behalf of the Defendants
15    Park County Sheriff's Office and Sheriff Fred Wegener
      at 501 South Cherry Street, Suite 920, Denver,
16    Colorado 80246, on October 11, 2017, at 9:58 a.m.,
      before Darcy Curtis, Registered Professional Reporter
17    and Notary Public within Colorado.

18

19

20

21

22

23

24

25
```

**H+G**

**Hunter+Geist, Inc.**

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 3

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 2 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

141

1  A. I cannot remember.
2  Q. Any information about any prior history
3  with Martin Wirth and your department that you recall
4  being shared at that time?
5  A. No. No, I can't.
6  Q. You'll see some asterisks behind some
7  names, such as yourself, Travis, Nate, and
8  Mr. Lowrance. Any recollection of why those asterisks
9  are there?
10  A. No, I can't remember exactly the reason
11  why those asterisks were there.
12  Q. You were the fellas that eventually
13  stacked up at the front door, isn't it?
14  A. Yes, it is.
15  Q. Okay. Was there any conversation about
16  you were -- the people with asterisks behind their
17  name were going to be a part of a stack at the front
18  door?
19  A. I can't recall if we had that
20  conversation or not.
21  Q. And then next to Nate's name and the
22  asterisk is breach. Do you have any recollection of a
23  conversation with Hancock or anybody else that morning
24  about why that word "breach" is behind Nate's name?
25  A. No, I do not.

142

1  Q. Would it indicate to you that at least
2  there was some anticipation of breaching the
3  residence?
4  A. Yes.
5  Q. Were you part of any such conversation?
6  A. I can't remember. I can't recall on that
7  day.
8  Q. Any other conversations, exchange of
9  information, that you can recall at the substation at
10  that time?
11  A. No, not any more than I've already
12  stated.
13  Q. Let's go back to whomever it was that
14  said -- I forget. So clear it up for me if I don't
15  get it. I think you said that if he stays in, are we
16  going to go in after him, something to that effect?
17  A. Yes.
18  Q. All right. Did I not listen very well?
19  Do you know who said that?
20  A. No, I can't recall who asked it. The
21  room was full of us deputies and stuff like that, and
22  I cannot remember who asked that.
23  Q. And your testimony is that Captain
24  Hancock said, no, we aren't?
25  A. Yes.

143

1  Q. Would you agree with me that seems to be
2  inconsistent recollection with the word "breach"
3  behind Nate Carrigan's name?
4  MR. ELKUS: Objection. Form and
5  foundation of the question.
6  A. Yeah. It would be a conflict basically,
7  yeah.
8  Q. (BY MR. SCHIMBERG) Did that raise any
9  question by you as to, wait a minute, there seems to
10  be kind of a discrepancy here between breach and your
11  comment to whomever it was that asked that question?
12  A. I never made a comment to anybody in
13  reference to that question. I just remember the
14  question being asked and the captain stating, no,
15  we're not going inside the residence.
16  Q. Fair enough. Thank you. Do you recall
17  that generating any conversation by anyone else?
18  A. I believe it did, but I couldn't tell you
19  what the conversation was about. I just remember that
20  pretty much the short briefing that myself and Travis
21  were involved in was brief with -- no more than a
22  regular briefing would be and then we're all kind of
23  rustling out the door to get equipment and get ourself
24  set up with equipment out of our vehicles.
25  Q. Okay. And you are a SWAT team leader,

144

1  right?
2  A. Yes.
3  Q. If you had any concern or had questions,
4  you would have felt free to raise your hand or voice
5  and say, wait, I need some more information, something
6  like that?
7  A. Yes, but this wasn't a SWAT mission.
8  Q. Right. Well, even so, it's a mission,
9  right?
10  MR. ELKUS: Object to the form and
11  foundation of the question.
12  A. It was an eviction.
13  Q. (BY MR. SCHIMBERG) Fair enough. But
14  because it was an eviction, we had several of you guys
15  getting ready to go effectuate the eviction. If you
16  had any questions about the process or the plan, you
17  could have asked?
18  A. Yes.
19  Q. Okay. But as we sit here today, you
20  don't recall asking any questions?
21  A. No, I did not.
22  Q. Other than where am I to go?
23  A. Yes.
24  Q. Okay. Did you have any sense,
25  Mr. Martin, as to how long everybody had been there

36 (Pages 141 to 144)

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 3 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

145

1 talking about this before you and Travis entered?
2     A.  Maybe 10, 15 minutes, maybe more.
3     Q.  Okay.  What gave you that impression?
4     A.  Just because the chalkboard or --
5 correction -- the white dry-erase board was already
6 documented and posted with people on it, who was
7 involved, plus where they're going to go, a diagram of
8 the property, and the picture.
9     Q.  Okay.  Were there any other SWAT team
10 members other than yourself and Hancock?
11    A.  Travis Threlkel and Jeremy Lowrance.
12    Q.  Okay.  I didn't know about Jeremy.
13    A.  He was, I believe, just about to come on
14 or just came on to the SWAT team.
15    Q.  Okay.  So we have some experienced dudes
16 here, do we not?  We've got a commander in Hancock,
17 correct?
18    A.  Yes.
19    Q.  And he's the commander of SWAT, even
20 though this was just an eviction, right?
21    A.  Yes.
22    Q.  And we had you as a team leader SWAT
23 trained?
24    A.  Uh-huh.
25    Q.  Is that yes?  I'm sorry.

146

1     A.  Yes.  I'm sorry.
2     Q.  No, that's fine.  Travis and Jeremy.  And
3 Nate has spent several years with the sheriff's
4 office, correct?
5     A.  Yes.
6     Q.  Okay.  So in terms of Sheriff Wegener, do
7 you think it was reasonable for he to rely upon this
8 experienced group of guys to develop a proper plan?
9     A.  I believe so, yes.
10    Q.  Do you remember him, in the brief time he
11 was there, making any comments or input to this board?
12    A.  No, I do not.
13    Q.  Okay.  Did you and Travis walk in
14 together or was it staggered?
15    A.  We walked in together.
16    Q.  Okay.  So you leave the patrol room, as I
17 called it, and what did you do?  Where did you go?
18    A.  All of us basically followed each other
19 up to the fire station that's basically on top of what
20 we call -- it's called Crow Hill, just up the mountain
21 basically.  And we went to the fire station that's up
22 at the top of the hill.
23    Q.  The Platt Canyon group?
24    A.  Yeah.  Platt Canyon Fire Station 2.
25    Q.  Before you went there, did you kit up?

147

1     A.  We got whatever equipment we were going
2 to use out of our vehicles, yes.
3     Q.  As a SWAT member, do you carry your SWAT
4 gear in your vehicle all of the time?
5     A.  Yes, I do.
6     Q.  Okay.  Do you remember what you put on?
7     A.  It was not my SWAT vest, no.  It was just
8 basically a load-bearing vest, is what we call it,
9 that's not ballistic panels.  It's just something I
10 can carry equipment on.
11    Q.  Was there any reason for that equipment
12 versus putting on your SWAT gear?
13    A.  I gathered that this was just an
14 eviction, it's not a SWAT incident, and we didn't need
15 to go in full bore on something that's an eviction.
16    Q.  Was that something discussed, or are you
17 sharing with me what your mental processes were
18 thinking?
19    A.  Mental and the way the conversation was
20 pretty much going from everybody in the patrol room.
21    Q.  Okay.  Anything specifically?
22    A.  No, I could not tell you that.
23    Q.  All right.  Do you recall anybody raising
24 the specter of a SWAT callout in the substation when
25 you were there?

148

1     A.  There may have, but I don't remember it.
2     Q.  Okay.  What is Ops 5?
3     A.  It's a radio channel that we can switch
4 to other than the normal primary channel that
5 everybody talks across.
6     Q.  Let me put it in my own layperson's
7 terms.  It would be dedicated to this eviction?
8     A.  Yes.
9     Q.  If I'm somewhere else on the Fairplay
10 side and pulled somebody over, I would use a different
11 channel than Ops 5?
12    A.  Yes.
13    Q.  Okay.  What do you recall -- here is one
14 for you.  Did you go up to Platt Canyon in your own
15 vehicle?
16    A.  Yes.  I went in my own patrol vehicle,
17 yes.
18    Q.  With anybody?
19    A.  No.  By myself.
20    Q.  And tell me what you recall, with as much
21 detail as possible, the conversations or what you
22 observed there.
23    A.  We got to the fire station.  Everybody
24 parked pretty much out in front.  Most of us got out
25 of our cars.  We met with the paramedics that were

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 4 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

149

1  going to go with us.
2      Q.  Who was that, if you recall?
3      A.  The one was Ernie Walker, the other one
4  was Devin and I can't think of his last name, and then
5  Joe Burgette who is the assistant chief.  And I don't
6  know how to spell Burgette.  And I remember standing
7  in the middle of two vehicles.  One was Jeremy
8  Lowrance and the other one was Captain Mark Hancock's.
9  Jeremy to my left, also standing with me, Captain
10 Hancock standing to my right.
11     Q.  What's your proximity, like you and Reid
12 here today?
13     A.  Pretty much as close as I am with Reid
14 right now.  Again, Jeremy asks the captain, so if he
15 doesn't come out of the residence, we're not going
16 inside, correct?  And the captain said, you're
17 correct, we're not going inside.  And we did, I
18 believe, a couple other things.  The paramedics --
19     Q.  Like what?
20     A.  I can't remember.  Probably just
21 waiting -- just sitting there waiting for the
22 paramedics to pull out one of their ambulances and had
23 probably quick final little conversations.  Like I
24 said, I can't remember exactly what.  And then we all
25 got in line and started following each other towards

150

1  the residence.
2      **Q.  Did you have any direct conversation with**
3  **any of the three Platt Canyon guys there at the scene**
4  **or at their facility?**
5      A.  I believe I had a conversation with
6  Ernie, because he expressed his concerns of the reason
7  why they're being requested to stand by and why there
8  were so many officers being involved in an eviction.
9  And he said that this just does not sound right.
10     **Q.  Okay.  This was just you two guys off to**
11 **the side?**
12     A.  Yeah.  I want to say briefly before we
13 all started hopping into our vehicles.
14     **Q.  You and Ernie are pretty good friends --**
15     A.  Yeah.
16     **Q.  -- from SWAT trainings?**
17     A.  Yes.
18     **Q.  Did he say that he was upset about it**
19 **because they weren't given much notice?**
20     A.  Yes.
21     **Q.  Okay.  Did he expand on that?**
22     A.  I can't remember exactly what me and him
23 talked about.  And I want to say that he also
24 expressed his concerns to Captain Hancock.
25     **Q.  You say you want to say that, but did you**

151

1  **hear him?**
2      A.  No, I did not hear him.
3      **Q.  Okay.  Has Ernie told you subsequently**
4  **that he did talk to Hancock about it?**
5      A.  Yes.
6      **Q.  What has he told you?**
7      A.  Just pretty much the same thing he's kind
8  of told me, is that this feels more of a SWAT mission,
9  this feels more of a SWAT action.  Paramedics or us,
10 as in medics, should have been advised of this days
11 ago, if you want to say.  There should have been more
12 of a plan set up than let's hurry up and go type
13 situation.
14     **Q.  When did you and Ernie have this**
15 **conversation?**
16     A.  It was the summer of 2016 when I finally
17 got out of the hospital and out of rehab.
18     **Q.  Okay.  Were you back at the office, or**
19 **did he come visit you?**
20     A.  I was actually staying at my mom's house,
21 because I was still out of work and I still couldn't
22 walk on my leg.
23     **Q.  So he came and visited you?**
24     A.  Yes.
25     **Q.  How about any of the other guys from**

152

1  **Platt Canyon?  Have you had any follow-up discussion**
2  **with Burgette or Devin?**
3      A.  Devin I've talked briefly with also
4  during the summer.  And I want to say that was for a
5  holiday.  I can't remember which holiday it was.  It
6  might have been the 4th, 4th of July, 2016.  Me and
7  Ernie both went to his residence for a barbecue.
8      **Q.  Oh.  What did Devin have to say?**
9      A.  Not a lot.  Unfortunately at that time
10 when I talked with Devin, he was highly intoxicated
11 already, so we didn't really get into a lot of
12 conversation about it.  He was doing his thing,
13 referenced the barbecue.
14     **Q.  More of a social get-together?**
15     A.  Yes.
16     **Q.  All right.  You and Travis walk in late.**
17 **What was your impression of who was organizing and**
18 **officer in command?**
19     A.  Captain Hancock.
20     **Q.  Was that by seniority or experience or**
21 **just how it fell in his lap or do you know?**
22     A.  I think just because of his rank.
23     **Q.  Okay.  In your experience with Captain**
24 **Hancock -- tell me if this is right or wrong -- he**
25 **would have entertained questions and ideas from the**

38 (Pages 149 to 152)

---

173

1  A. Yes.
2  Q. In what way?
3  A. Like I said, he never responded, he never
4  looked towards my direction or to the direction of my
5  voice. His demeanor of walking was not slowed that he
6  recognized that someone was saying something to him.
7  Q. Did it raise your level of sensitivity,
8  or how would I say it? Yeah, that's as good as any.
9  A. As in?
10  Q. Well, did it make you tense? Did it make
11  you anticipate anything?
12  A. Just to my wondering is why he was, you
13  know, going back inside the residence.
14  Q. Okay. Did you satisfy yourself that
15  there was a court order to evict him?
16  A. Yes.
17  Q. Okay. Was that discussed back at the
18  substation?
19  A. No. Not at that time, no.
20  Q. Okay. When did you kind of satisfy
21  yourself that you had a proper court order?
22  A. I can't remember exactly when, but I had
23  seen the actual documents prior to that day.
24  Q. Oh, okay. So he goes back inside?
25  A. Yes.

---

174

1  Q. Did you communicate with Mark or Nate
2  about what that meant to you or anything like that?
3  A. No.
4  Q. What's your next recollection?
5  A. I actually approached the residence to
6  kind of get a look and see what was going on. There's
7  actually -- on this diagram, it's not shown. I don't
8  know why. There's a small jetty of some type of a
9  wall that kind of sticks out right here where I've put
10  the black mark. It's just a wall that sticks out.
11  And right on the inside of this there's another
12  sliding glass door that goes into the basement.
13  Q. Would you just put door or basement door?
14  A. On that gray part, my pen doesn't want to
15  write.
16  Q. I don't know if the ballpoints are
17  better.
18  A. Yeah. For some reason, that doesn't want
19  to write on the gray part from where it's printed.
20  Q. All right. So you're giving us some
21  detail there now leading up to where you went to?
22  A. Yes.
23  Q. Which was where?
24  A. I just went up to the sliding glass door.
25  It was extremely tinted, mirror tinted, if you will,

---

175

1  where I couldn't even see, going up like this, to look
2  inside the residence.
3  Q. Did you actually do that, cup your hands
4  over your eyes and try to peer in?
5  A. Yes, I did. And then from -- I'm not
6  sure exactly what point, when I was here, the radio
7  traffic from Mark Hancock calling us, myself, Travis
8  Threlkel, and Jeremy Lowrance, to the front door.
9  Q. Okay. So when you're peering in, did you
10  see any evidence of Mr. Wirth?
11  A. I didn't see anything. It was so dark
12  and tinted. Like I said, it was extremely dark and
13  tinted that I couldn't even see anything.
14  Q. Okay.
15  A. He could have been standing right on the
16  other side of the glass and I wouldn't have seen him.
17  Q. So you were pretty exposed?
18  A. Yes.
19  Q. Okay. If he had weapons?
20  A. Yes.
21  Q. So you're called up to the front door?
22  A. Yes.
23  Q. Share with us your mental impression, if
24  any, hearing that request.
25  A. Why are we getting called up to the door?

---

176

1  There shouldn't be any reason. He's not coming out.
2  Q. Did you ask?
3  A. No, I did not.
4  Q. Okay. And I think we know this. You
5  went up to the front door?
6  A. Yes, I did.
7  Q. Do you remember how you got up there?
8  A. Pretty much from where that sliding glass
9  door -- I can't recall if there was a side window to
10  this area, because below the deck is the two-car
11  garage and there's literally two garage doors, not one
12  full-size one, there's two. I can't remember if I
13  peered into any of these windows, but I took a trek
14  between the front porch and the camper trailer that
15  was parked out, walked around over to the front porch
16  where Captain Hancock and Nate Carrigan were already
17  standing.
18  Q. All right.
19  A. I don't know if you need to see it, I
20  just drew black where I went here, up and around.
21  Q. Pretty much a semicircle around to the
22  front?
23  A. Yes.
24  Q. Thanks for doing that. Now, when you got
25  to the front door, any conversation?

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 6 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### 177

1   A.   I'm not sure on timeline what was
2   conversated before or after.  I do remember the radio
3   traffic from Captain Hancock to the sheriff on the
4   aspects that there's too much time going by.  We need
5   to get in there.  And I'm not sure exactly what else
6   was transpiring on the radio.  The question was asked
7   to myself, Travis, and Jeremy -- and I'm not sure when
8   Jeremy and Travis got to the front door.  I just know
9   all of a sudden they're standing around me.  The
10  question was who has a flashlight.  And the aspects
11  was who has a flashlight on their rifle.  I said I am,
12  because I was the only one who had a flashlight on the
13  rifle.
14      Q.   Who asked the question?
15      A.   Hancock.
16      Q.   Okay.
17      A.   He said, okay, you're first.
18      Q.   Okay.  Let me back up, because I didn't
19  ask you a very good question.  When you went up to the
20  front door, were Nate and Hancock announcing
21  themselves or knocking on the door?  Do you recall any
22  of that?
23      A.   If I remember, I remember seeing Nate
24  knocking on the door when I got up there.
25      Q.   Okay.  Do you remember either one of them

### 178

1   verbalizing that they're with the sheriff's office?
2       A.   I can't recall, no.
3       Q.   Okay.  Did you?
4       A.   No, I did not.
5       Q.   Okay.  Did you call Travis and Jeremy to
6   come down to the front door?
7       A.   No, I did not.
8       Q.   Who do you think did?
9       A.   Hancock.
10      Q.   Okay.  Was it the one directive to come
11  to the front door to all of you, or was there
12  subsequent ones to call Travis and Jeremy down there?
13      A.   I can't remember if it was one or a
14  couple.  I just know that, hey, guys -- to the avenue,
15  hey, guys, I need you at the front door and I need you
16  here now.
17      Q.   Okay.  When you get there and you've
18  thought to yourself why are we going there, did you
19  verbalize that question?
20      A.   No, I did not.
21      Q.   Is there any reason why not?
22      A.   Not following orders, being
23  insubordinate.
24      Q.   Well, there's no order that you couldn't
25  ask a question, was there?

### 179

1           MR. ELKUS:  Object to the form of the
2   question.
3       A.   What do you mean?
4       Q.   (BY MR. SCHIMBERG)  Well, there was an
5   opportunity for you when you got there, even before
6   Travis and Jeremy showed up, to say, Captain, what are
7   we doing up here?
8       A.   Yeah, there was an opportunity, but I
9   never asked.
10      Q.   Okay.  Did anybody before you entered?
11      A.   I don't recall.
12      Q.   Okay.  That's all we can go by, is what
13  you recall.  Your impression was, when you heard this
14  request, why are we being asked to go to the front
15  door?
16      A.   Yes.
17      Q.   Is that correct?
18      A.   Yes.
19      Q.   And you get there.  And do you have any
20  sense of the time before Travis and Jeremy got there?
21      A.   No, I do not.  Like I said, all I
22  remember is all of a sudden they're standing next to
23  me.
24      Q.   Okay.  Was there any conversation between
25  you, Jeremy, and Travis when they got up there?

### 180

1       A.   No, there wasn't.
2       Q.   Were you standing in sort of a cell
3   group, or were you already sort of lined up?
4       A.   Semi lined up.
5       Q.   Okay.  And tell me what order.  Who was
6   where?
7       A.   Well, I was --
8       Q.   Let's leave that one.  Let me see if I
9   have a better one for you.  I don't know if I do,
10  quite honestly.  Just so we can kind of keep things
11  separate, let me show you another diagram from the
12  CBI.
13          (Deposition Exhibit 28 was marked.)
14      Q.   I've marked Exhibit 28, which is another
15  diagram of the 36 Iris Drive location.  It's a little
16  larger photograph of the residence there showing some
17  of the locations here.  Now, there's a rectangle
18  called mud room.  Do you see that on your exhibit?
19      A.   Yes, I do.
20      Q.   All right.  Is that what you've been
21  referring to as the front door?
22      A.   Yes.
23      Q.   Now, outside the mud room on the outside
24  of it, are there steps?
25      A.   There was one step in like -- I think it

185

1  Q. So you are some 10 to 15 feet away from
2  Nate and Hancock when he asked that question?
3  A. Yes.
4  Q. Okay. So he says to you, you're first?
5  A. Yes.
6  Q. Any explanation needed?
7  A. No, just because I had a flashlight on my
8  rifle.
9  Q. What's the connection between -- I think
10 I know, but the connection between a flashlight and
11 you being first?
12 A. Just in case the interior was dark and we
13 can illuminate it.
14 Q. Did you turn your flashlight on?
15 A. No, I did not.
16 Q. Ever?
17 A. No, I did not.
18 Q. All right. Walk me through this. What
19 happens next, to your recollection?
20 A. I can explain a little bit more, if you
21 have a diagram, of the actual interior of the
22 residence.
23 Q. I do.
24 A. That will work right there.
25 Q. Let's mark it.

186

1  (Deposition Exhibit 29 was marked.)
2  Q. Did you have any intel on the layout of
3  the interior of the residence?
4  A. No, I did not.
5  Q. Again, this comes out of the CBI report,
6  the investigation. You'll see in the lower right-hand
7  corner is some Bates stamp numbering, Carrigan 018835.
8  Do you see that?
9  A. Yes.
10 Q. I got it from your attorneys, but also
11 the CBI. Does this work for you to explain what
12 happens next from the outside?
13 A. Yes. This one and this one will be
14 perfect for explaining.
15 Q. Just for our record, when you said this
16 one and this one --
17 A. I'm sorry.
18 Q. That's all right.
19 A. Exhibit 28 will work on the starting of
20 it and then continuing on it will be Exhibit 29, when
21 we actually enter the residence.
22 Q. All right. Before you enter, do you get
23 into a conga line?
24 A. I don't believe so.
25 Q. Do you know who went where? If you were

187

1  going to be first, do you know who followed?
2  A. I knew I was going to be first. I just
3  gathered Travis was going to be second and Jeremy
4  Lowrance would be third.
5  Q. And why did you think that, just because
6  of your positioning outside?
7  A. Yes.
8  Q. Okay. And where was Mark Hancock going
9  to be?
10 A. He was still behind Nate Carrigan right
11 there next to the door.
12 Q. Was there any discussion as to who was
13 going to go in when?
14 A. No. Just that I was going to be first.
15 And I assume that's why Travis and Jeremy were right
16 next to me, that they were going to be second and
17 third.
18 Q. When it was announced that you were going
19 to be first, did you ask any question like are we
20 really breaching or anything like that or I didn't
21 think we were going in, anything like that?
22 A. I had thoughts of it, but, no, I did not
23 state it verbally.
24 Q. Okay. Did anybody else say anything?
25 A. Not that I can remember.

188

1  Q. Okay. What do you recall happening next?
2  A. Like I said, with the conversation across
3  the radio between Hancock and the sheriff, I heard,
4  okay, go ahead and breach. And that's when Hancock
5  looked at Nate Carrigan and said go ahead and breach
6  or breach, and Nate started kicking the door with his
7  foot.
8  Q. Okay. Was there any doubt, in your mind,
9  you were going to breach when it was pointed out to
10 you you're first?
11 A. There was no doubt that we're going in.
12 Q. Okay. And that had occurred prior to
13 communication with the sheriff?
14 A. I think it was kind of intertwined with
15 everything, of us walking up there, Travis and Jeremy
16 walking up there, and them knocking and announcing.
17 It was like all wrapped up in the same timeline.
18 Q. Okay.
19 A. All kind of occurring in the same time.
20 Q. Okay. Did you see the sheriff on the
21 site?
22 A. No, I did not.
23 Q. Okay. You didn't see him at the time you
24 observed the conversation out on the deck --
25 A. No, I didn't.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 8 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

209

1  the room is laid out, obstacles, and stuff like that.
2      Q.  Okay.  Let me take you back.  As I
3  understand it, you're in the mud room still before you
4  walk along the kitchen wall there.  You announce
5  sheriff's office, show me your fucking hands?
6      A.  Correct.
7      Q.  Let's go back to role-playing.  Could you
8  give me a flavor for what Kolby Martin sounds like at
9  that time?
10     A.  It would be in the same -- like I did
11 when I was outside trying to yell at Mr. Wirth not to
12 go back inside the residence.  I would have probably
13 not exactly yelled it, but my voice would have been a
14 lot higher and a lot more of a command.
15     Q.  Was there any doubt, in your mind, that
16 you could have been heard by Mr. Wirth?
17     A.  Doubt, as he couldn't hear me?
18     Q.  Yes.
19     A.  I don't believe so.  I believe he would
20 have heard me.
21     Q.  Yes.  Especially now that you have an
22 idea of where he was positioned?
23     A.  After the fact, yes.
24     Q.  Yes.  He would have heard you?
25     A.  Yes, he would have heard me.

210

1      Q.  Okay.  Now, thinking about it, when you
2  announced it in that way, if I'm behind you, would I
3  be reasonable in thinking that, oh, Deputy Martin sees
4  this guy?
5      A.  No.
6      Q.  Why not?
7      A.  Because I did not challenge.
8      Q.  Maybe that's what I'm missing.  What's
9  the difference between what you said and a challenge?
10     A.  I would have continued on saying show me
11 your hands, turn away from me, more detailed.  I would
12 have continued on giving more verbal commands.
13     Q.  Gotcha.  I am just freezing.  I'm sorry.
14     A.  I'm roasting.
15     Q.  Are you really?
16     A.  Yeah.
17     Q.  And then you get shot?
18     A.  Yes.
19     Q.  And the first one you take is beltline?
20     A.  Just below my beltline, yes.
21     Q.  And then you are shot again?
22     A.  I cannot recall when I got the two rounds
23 in my right leg.  And I cannot tell you when I got the
24 other round that was on my left leg kind of more like
25 to the surface through and through.  When I caught the

211

1  first round after taking my first step and was going
2  to go around the corner, that's when I caught the
3  first round.  To me it felt like -- if anybody has
4  ever been hit by a paintball, that's what it felt
5  like, or if somebody comes and flicks you real hard.
6      Q.  Really?
7      A.  That's what it felt like.  I knew I was
8  hit.  I took a step back and my back was actually up
9  against the stove that's on that diagram.  My back was
10 up against that stove, Travis directly to my left.  I
11 looked at Travis and said, Travis, I'm hit.  He
12 jokingly looked at me and said, no, you're not.  I
13 looked at him again and said, yes, I am, and that's
14 when I started running back out of the house.
15     Q.  That is when you started your retreat?
16     A.  Yes.
17     Q.  You did away with one of my assumptions.
18 I thought you went down immediately?
19     A.  No, I did not.
20     Q.  Okay.  Do you remember going down?
21     A.  Yes, I do.
22     Q.  All right.  Where were you located when
23 you went down?
24     A.  I probably just made one step into the
25 mud room, almost out the door.

212

1      Q.  Okay.  And you went down as a result of
2  the shot to your left femur?
3      A.  Correct.
4      Q.  Okay.  And that one did feel like a
5  bullet?
6      A.  Yeah.  It felt like my leg exploded.
7      Q.  At any time did you return fire?
8      A.  No, I did not.
9      Q.  Why not?
10     A.  I did not know where he was at.  I've
11 been trained and everything of not to spray and pray.
12     Q.  That's an acceptable training technique?
13     A.  As in?
14          MR. ELKUS:  Object to the form of the
15 question.
16     Q.  (BY MR. SCHIMBERG)  Where did you receive
17 that training?
18     A.  Through academy, through SWAT training,
19 just through my career in law enforcement.
20     Q.  Okay.  Do you have a feel for what the
21 rationale of that is?
22     A.  As in spray and pray?
23     Q.  Yes.
24     A.  Is that you're just shooting wildly and
25 trying to hit anything and everything that you can try

Case No. 1:16-cv-03079-MSK-NRN   Document 60-3   filed 05/04/18   USDC Colorado   pg 9 of 10

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

249

1  Q. (BY MR. SCHIMBERG) My question is: When
2  he went back inside, in your mind, he did not become a
3  barricaded subject just by going back inside?
4  A. No.
5  Q. Okay. When, in your mind, did he become
6  a barricaded subject?
7  A. When he refused to come to the door after
8  the knocking and the announcing.
9  Q. By Nate and Hancock?
10  A. Correct.
11  Q. Okay. But you don't have a recollection
12  or a sense of how much time it was between the time he
13  was knocking or -- boy, bad question. You didn't come
14  to the conclusion at that front door whether or not
15  there was too much time that had transpired or not
16  enough time?
17  A. No, I did not.
18  Q. Okay. So by the mere fact he didn't,
19  what, promptly respond, he became a barricaded subject
20  in your mind?
21  A. Yes.
22  Q. And that's when, in your estimation,
23  Policy 510 would be triggered?
24  A. Correct.
25  Q. When you're outside, did you have a

250

1  belief that he was a threat to you or that he was just
2  held up in there?
3  A. On the aspects of threat, yes, because it
4  was unknown of what he's doing inside the residence.
5  To me, in my opinion, if I don't know what's going on
6  inside the residence, it's still a threat until I know
7  otherwise. He could have been doing anything inside
8  that residence prior to us going inside.
9  Q. This probably is totally unfair, but do
10  you have any recollection of a thought process, when
11  you were at the front door area, as to whether or not
12  he was posing a threat by not responding?
13  A. I had a lot of things go through my mind
14  in reference just before going in that door.
15  Q. Share those with us.
16  A. It's going back to the same thing, is
17  expect the worst, but hope for the best. I had the
18  same two thoughts. We're going inside that door and
19  he's standing there waiting for us. And also had I'm
20  going inside that door and I could get injured of some
21  sort, some way.
22  MR. ELKUS: Before we go into the next
23  subject here, can we take a five-minute break?
24  MR. SCHIMBERG: Of course.
25  MR. ELKUS: I have to bring my

251

1  counterpart in here to take over for me.
2  THE DEPONENT: Okay.
3  MR. SCHIMBERG: And I'm almost done,
4  you'll be glad to hear.
5  (Recess taken, 5:35 p.m. to 5:49 p.m.,
6  after which time Mr. Elkus was not present and
7  Mr. Wagner was.)
8  (Deposition Exhibit 32 was marked.)
9  Q. (BY MR. SCHIMBERG) Exhibit 32 is the
10  other policy and procedure that, if I understand your
11  testimony and your discovery responses, you think was
12  violated or decision-making was inconsistent with it,
13  correct?
14  A. Correct.
15  Q. This is the other policy and procedure
16  that you researched and came to that conclusion?
17  A. Yes.
18  Q. Let me ask you specifically about this
19  policy. You're not critical of the policy and its
20  contents; you're critical of how it was effectuated in
21  this instance?
22  A. That is correct.
23  Q. And you've been trained pursuant to
24  Policy 509?
25  A. Yes.

252

1  Q. And you think you're competent, as a
2  result of that training, to properly comply with this
3  when it applies?
4  A. Yes.
5  Q. By "this," I mean Exhibit 32.
6  A. Yes.
7  Q. All right. So here is my confusion.
8  Help me out. The event of February 24, 2016, was not
9  a high-risk warrant service?
10  A. No, it was not.
11  Q. So this policy would not apply, would it?
12  MR. WAGNER: Object to form. You can
13  answer.
14  A. Not at the time, no. Not at the starting
15  of it, no.
16  Q. (BY MR. SCHIMBERG) Okay. So by your
17  answer, do I infer that you think, as the day went on,
18  it was triggered?
19  A. Yes.
20  Q. At what point did you conclude that or
21  think it kicked in?
22  A. When we started putting things in line to
23  go inside the residence.
24  Q. Okay. At that point you think 509 should
25  have been followed?

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           ) ss.
CITY AND COUNTY OF DENVER  )

       I, Darcy Curtis, Registered Professional Reporter and Notary Public ID 20064016972, State of Colorado, do hereby certify that previous to the commencement of the examination, the said KOLBY MARTIN was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 23rd day of October, 2017.

       My commission expires May 2, 2018.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.


_____
Darcy Curtis
Registered Professional Reporter
Certified Shorthand Reporter


EXHIBIT 3