```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
    Civil Action No. 1:16-cv-03079-MSK-MJW
 3
    ESTATE OF NATE CARRIGAN,
 4  JOHN CARRIGAN, MELISSA CARRIGAN,
    and KOLBY MARTIN,
 5
    Plaintiffs,
 6
    v.
 7
    PARK COUNTY SHERIFF'S OFFICE,
 8  SHERIFF FRED WEGENER, in his
    official and individual capacity,
 9  and MARK HANCOCK, in his official
    and individual capacity
10
    Defendants.
11  _____

12  DEPOSITION OF:   FREDRICK WILLIAM WEGENER, III
                     June 8, 2017
13  _____

14              PURSUANT TO NOTICE, the deposition of
    FREDRICK WILLIAM WEGENER, III was taken on behalf of the
15  Plaintiffs at 1640 Grant Street, Suite 150, Denver,
    Colorado 80203, on June 8, 2017, at 9:15 a.m., before
16  Shauna T. Dietel, Registered Professional Reporter and
    Notary Public within Colorado.
17

18

19

20

21

22

23

24

25
```

H+G

Hunter+Geist, Inc.

**303.832.5966**
**800.525.8490**

1900 Grant Street, Suite 1025
Denver, CO 80203

■ www.huntergeist.com
■ scheduling@huntergeist.com

Your Partner in Making the Record

EXHIBIT 4

Court Reporting, Legal Videography, and Videoconferencing

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 2 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## 37

1  Q   (BY MR. ELKUS)  Okay.  Is that it, in your
2  opinion, the only high risk to officer safety would be an
3  individual that poses -- that -- that you knew had a
4  weapon in the residence?
5      A   No.  You could also look at criminal history.
6  Something in his background.
7      Q   Okay.  So with that understanding, was there a
8  separate process -- again, during your tenure as Sheriff,
9  was there a separate process in evicting a person that
10  posed a high risk to officer safety in doing evictions?
11         MR. SCHIMBERG:  Form.
12         Go ahead.
13      A   Well, yeah.  I mean, you try to -- just as we'd
14  done with Mr. Wirth, you try to contact him, try and see
15  what -- you know, why he wouldn't get out.  I know in 2014
16  they -- there was going to be a protest, so we wanted to
17  make sure that if we could, we can get ahold and find out
18  is there a way we can kind of get everybody to settle down
19  and -- and not create a scene, but they can have their
20  protest or whatnot, but we still need to have him leave
21  the residence.
22         In 2014, he agreed and left the residence.
23      Q   (BY MR. ELKUS)  Okay.  So in 2014, Mr. Wirth
24  left his residence -- residence peacefully, is that fair
25  to say?

## 38

1      A   He did.
2      Q   And what was the process by which the Sheriff's
3  Department utilized in getting Mr. Wirth to leave his
4  residence peacefully in 2014?
5      A   They talked with both him and the -- another
6  gentleman who was leading the "Foreclosure Resistance," or
7  I don't know what it's called.  I think that's what it was
8  called, Colorado Foreclosure Resistance, and talking to
9  them about their protest.
10      Q   And -- and who from the Sheriff's Department
11  was able to communicate with Mr. Wirth at that period of
12  time, in 2014, again, to leave the residence peacefully?
13      A   Wells Tonjas I think was the sergeant at that
14  time.
15      Q   So correct me if I'm wrong, Sheriff, but it
16  sounds like communication with Mr. Wirth was able to
17  resolve the situation with him to allow him to leave the
18  residence; is that fair to say?
19      A   Correct.
20         MR. SCHIMBERG:  Object to the form.
21      Q   (BY MR. ELKUS)  And at that point in time,
22  there was no need to breach the residence or to use force
23  to remove, is that fair to say?
24      A   Yeah.  He left.  I mean, he was already gone.
25      Q   Okay.  Now, what training -- and, again, during

## 39

1  your tenure with the Sheriff's Department, and
2  specifically while you were Sheriff, what training did the
3  Park County Sheriff's Office provide to its sheriff
4  deputies in evicting someone that poses a high risk to
5  officer safety and/or the public?
6         MR. SCHIMBERG:  I'm sorry.  Could you read
7  that, please.  Sorry.
8         (The court reporter read the question as
9  follows: "Now, what training -- and, again, during your
10  tenure with the Sheriff's Department, and specifically
11  while you were Sheriff, what training did the Park County
12  Sheriff's Office provide to its sheriff deputies in
13  evicting someone that poses a high risk to officer safety
14  and/or the public?")
15      A   You know, other than -- you mean officer
16  safety --
17      Q   (BY MR. ELKUS)  Well, I'm asking --
18      A   -- patrol?
19      Q   -- was there a -- did you provide -- while you
20  were the sheriff, did you provide specific training to
21  your sheriff deputies on how to evict someone that posed a
22  high risk to officer safety and/or the public?
23      A   Specifically to that, no.
24      Q   Okay.
25         MR. ELKUS:  Let's go off the record here.

## 40

1         (A recess was taken from 9:59 a.m. until
2  10:19 a.m.)
3      Q   (BY MR. ELKUS)  Now, based on your tenure with
4  the Park County Sheriff's Office, other than Mr. Wirth,
5  have you had to deal with evicting a person that posed a
6  high risk to officer safety and/or the public?
7      A   On an eviction?
8      Q   Yes.
9      A   We had a gentleman who -- I want to say
10  probably two thousand -- I may get this wrong.
11         We had a gentleman earlier that was getting --
12  that the IRS was coming to him because of tax evasion.  So
13  he started his house on fire and was shooting at the
14  deputies.  He eventually killed himself.
15      Q   And you don't recall what year that was?
16      A   That's what I was trying to think.
17      Q   Was that while you were sheriff?
18      A   Yes.  Yes.
19      Q   And who was the deputy that was being shot at?
20      A   Deputies.  One of them was -- I think -- well,
21  one of them was Hancock.  I know Cam Hancock was one of
22  them.  I'm trying to remember the other deputies that were
23  there.  I'm going to guess this was probably '05, '06.
24         MR. SCHIMBERG:  Aren't we glad we tell your
25  clients don't guess?  I'm teasing, Sheriff.

Case No. 1:16-cv-03079-MSK-NRN  Document 60-4  filed 05/04/18  USDC Colorado  pg 3 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

41

1   A   I -- I just -- I just -- I can't remember
2   exactly.
3         MR. SCHIMBERG: I'm teasing you.
4   Q   (BY MR. ELKUS) Now, I think you stated that
5   the IRS was coming to his home on a -- because there was a
6   tax evasion issue?
7   A   Yeah.
8   Q   So was he being evicted?
9   A   Yes.
10  Q   Okay. And was Park County the agency that was
11  charged with getting him evicted?
12  A   No.
13  Q   Okay. So why was Park County involved?
14  A   Actually, he -- like I say, this was dealing
15  just with the IRS. We came out on a welfare check, I
16  think, during the process, and that's when it transpired.
17  Q   And why were you doing a welfare check?
18  A   Somebody called. I don't remember all the
19  specifics.
20  Q   And was this individual known to be armed and
21  dangerous?
22  A   I -- I don't recall.
23  Q   Okay. And how many deputies came out to this
24  individual's residence?
25  A   Boy, I -- I don't recall exact numbers.

42

1   Q   Was it the same number that came out for Martin
2   Wirth's residence, seven deputies and Fire and Rescue?
3   A   I don't think it was -- no. I'm guessing, so I
4   don't -- I don't know.
5   Q   Do you know whether or not SWAT was deployed
6   for this individual?
7   A   It was not.
8   Q   Okay. Do you know SWAT was not deployed?
9   A   The supervisor at the time for the shift must
10  not have thought it was warranted.
11  Q   And who was the supervisor? Do you recall?
12  A   I don't recall.
13  Q   But shots were fired at the deputies?
14  A   Yes. That's correct.
15  Q   And when shots were fired at the deputies, were
16  other deputy sheriffs in Park County then deployed to that
17  agency -- that residence?
18  A   Yes.
19  Q   Okay. And was there a shootout at that
20  residence?
21  A   No.
22  Q   And -- and so when he was shooting at the
23  deputies, what was your understanding how the deputies
24  responded?
25  A   Well, they got behind cover and the house was

43

1   -- then all of a sudden he torched the house, so then
2   there were other issues that had to be dealt with.
3   So . . .
4   Q   Do you know whether or not, when the deputies
5   arrived, that's when the suspect began firing at the
6   sheriff's deputies?
7   A   Yes.
8   Q   So right upon the arrival, he started shooting
9   at the sheriff's deputies?
10  A   That's correct.
11  Q   Okay. And shortly thereafter the house caught
12  on fire?
13  A   That's correct.
14  Q   And then the suspect died; is that right?
15  A   Yes. That's correct.
16  Q   Now, Sheriff, on average, and, again, during
17  your tenure as the Sheriff of Park County, how many
18  evictions per year, if you know, does the Park County
19  Sheriff's Office do?
20  A   I -- I don't -- I don't know.
21  Q   More than 100?
22  A   Less than 100, oh, yeah.
23  Q   I mean, I know we may not know the specific
24  number but --
25  A   Less than 50 a year, I would guess.

44

1   Q   Okay. So anywhere -- more than 10?
2   A   Oh, yes.
3   Q   More than 25?
4   A   Yes.
5   Q   Okay. So anywhere between 25 to 50 evictions
6   per year?
7   A   Yeah. I'm going to say that's probably
8   average.
9   Q   And would I be correct in saying that evictions
10  in Park County, that Park County Sheriff's Office is -- is
11  involved in, are sort of a reoccurring event for your
12  office.
13        MR. SCHIMBERG: Object to form.
14  A   Uneventful.
15  Q   (BY MR. ELKUS) Uneventful, but they are
16  reoccurring events, is that fair to say?
17  A   Oh, yes.
18  Q   Now, and, again, this is during your tenure as
19  the Sheriff, on average, to the best of your knowledge,
20  how many of those evictions, you know, again, per year,
21  does the Sheriff's Department deal with angry folks that
22  are being removed from the premises?
23        MR. SCHIMBERG: Form.
24        Go ahead.
25  A   Probably -- there's probably a few, yes.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 4 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

45

1  Q (BY MR. ELKUS) Okay. I mean, you would agree
2  that someone's being evicted from their home, and, I mean,
3  you may not recall specifics, but fair to say that based
4  upon your experience doing evictions in Park County, when
5  a person's being removed from their home and law
6  enforcement is present, you've personally observed those
7  tenants being upset that they have to leave the residence;
8  is that fair?
9      MR. SCHIMBERG: Foundation. Objection. Form.
10 A Yes.
11 Q (BY MR. ELKUS) Okay. And based upon your
12 experience with the Park County Sheriff's Office and the
13 number of evictions that are done per year, based on your
14 understanding, and -- is there a potential that the
15 Sheriff's Office will have to evict a person that poses a
16 high risk to officer safety and/or the public?
17     MR. SCHIMBERG: Object to form.
18     Go ahead.
19 A Yes.
20 Q (BY MR. ELKUS) Okay. And why do you say yes?
21 A Well, I mean, if you have to -- if you have an
22 eviction order or a writ of restitution that has to be
23 served then you will have to make contact with that
24 individual.
25 Q And it's certainly foreseeable that, you know,

46

1  those individuals that are now being removed from their
2  home, that those people could lash out at the sheriff's
3  deputies that are involved in that eviction. Is that fair
4  to say?
5      MR. SCHIMBERG: Object to form and foundation.
6      Go ahead.
7  A Sure. Or they could leave.
8  Q (BY MR. ELKUS) Ideally it would just be them
9  leaving --
10 A Correct.
11 Q -- right?
12     But like we know with Mr. Wirth, that was not
13 the ideal situation; is that right?
14     MR. SCHIMBERG: Object to form.
15 Q (BY MR. ELKUS) And I'm talking about the 2016
16 incident.
17 A Yes.
18     MR. SCHIMBERG: Same objection.
19 Q (BY MR. ELKUS) What was that, sir?
20 A Yes. You're right.
21 Q Now, with the potential threat that may be
22 posed to the public and/or officer safety, I'm correct
23 that Park County has not provided specific training on how
24 to handle evictions of high-risk persons; is that right?
25 A Well, we -- we've provided training on

47

1  high-risk stops, high risk -- I mean, other things that
2  are high risk.
3  Q But not high-risk evictions?
4  A Specifically high-risk evictions, no.
5  Q And, Sheriff, again, this is during your tenure
6  as the Sheriff of Park County, what research, if any, have
7  you done to determine what is the standard process or
8  procedure for evicting persons that pose a high risk to
9  officer safety and/or the public?
10     MR. SCHIMBERG: I'm sorry. Could you read
11 that.
12     (The court reporter read the question as
13 follows: "And, Sheriff, again, this is during your tenure
14 as the Sheriff of Park County, what research, if any, have
15 you done to determine what is the standard process or
16 procedure for evicting persons that posed a high risk to
17 officer safety and/or the public?")
18     MR. SCHIMBERG: Object to form.
19     But go ahead.
20 A I would not know how -- so do we know how to
21 deal with people that are high risk, yes.
22 Q (BY MR. ELKUS) That's not my question, though.
23     So my question is, you know, during your tenure
24 as the Sheriff of Park County, okay, have you done any
25 research to determine what is the standard process or

48

1  procedure, and I'm talking whether state, or nationwide,
2  for how other agencies evict persons -- law enforcement
3  agencies that evict persons that pose a high risk to
4  officer safety and/or the public? Have you done any
5  research on that?
6  A No.
7  Q Okay. And why not?
8  A Well, I deal with people who are a high risk or
9  who are -- have problems with the law enforcement every
10 day.
11 Q Okay. So in your mind, that was a reason not
12 to do any research nationally or statewide on how other
13 agencies do evictions for high risk personnel?
14     MR. SCHIMBERG: Object to form.
15 A So -- well, I guess I'm having a hard time with
16 the question. So I deal -- we -- we go through training.
17 We go through arrest control. We go through how to talk
18 to people. That's our job.
19 Q (BY MR. ELKUS) Okay. Well, other agencies
20 that you worked for, okay, and it sounds like you worked
21 for Aurora -- I mean, it wasn't in Aurora, but I've got to
22 ask it anyways for Aurora and Idaho Springs: For those
23 agencies, were there policies -- well, did those agencies
24 evict personnel from their homes?
25 A I don't think municipalities do. I think it's

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 5 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

49

1  usually just the Sheriff's Office that do.
2     Q    And that's where I'm going with this because I
3  don't -- because you worked for a city.  You didn't work
4  for a Sheriff's Department other than Park County; is that
5  right?
6     A    Correct.
7     Q    Okay.  So to the best of your knowledge, those
8  other agencies you worked for, they didn't have any
9  policies that you're aware of regarding evictions of
10 people, is that fair to say?
11    A    That's probably fair.
12    Q    So your sole knowledge on how evictions are
13 done was based on your work tenure with the Park County
14 Sheriff's Office?
15    A    Correct.
16    Q    Okay.  Now -- and, Sheriff, again, you know,
17 while you've been the Sheriff of Park County, how often
18 does the Park County Sheriff's Office encounter a member
19 of the public that is mentally ill?
20         MR. SCHIMBERG:  Object to form.
21    A    Once a week.
22    Q    (BY MR. ELKUS)  Okay.  And so do you agree
23 that, you know, based on your position with Park County,
24 the years that you've been there and while you were the
25 Sheriff, your interaction or your deputy's interactions

50

1  with mentally ill people is a reoccurring event within
2  your agency?
3     A    Sure.
4     Q    Okay.  And do you agree that mentally ill
5  people that Park County Sheriff's Office comes into
6  contact with may pose a safety risk to law enforcement
7  officers?
8     A    Yes.
9     Q    Okay.  And why do you say yes?
10    A    Well, it's been proven time and time again,
11 so . . .
12    Q    Well, why -- I get it, but your belief?  I
13 mean, why do you -- what is your understanding and behalf
14 as to why -- let me ask it differently.
15         Why do you believe that mentally ill people
16 pose a safety risk to Park County Sheriff's Office
17 deputies?
18    A    Well, I wouldn't phrase it like that.  Mentally
19 ill folks can -- can cause problems.
20    Q    Not every single one of them?
21    A    Yes.
22    Q    I understand that.
23         But why do you believe that mentally ill people
24 may pose, not all of them, but may pose a safety concern
25 for Park County Sheriff's Office deputies?

51

1     A    You know, if they're off their meds for a
2  while.  If they -- you know, their behavior could be such
3  that it could pose a -- a risk.  I mean --
4     Q    Because of the unpredictability of their
5  behavior, right?
6         MR. SCHIMBERG:  Object to form.
7     A    That can be unpredictable, yes.
8     Q    (BY MR. ELKUS)  Right.
9     A    Or they can be predictable.
10    Q    Okay.  And -- and based on your experience with
11 the Park County Sheriff's Office, have you personally
12 encountered a mentally ill person that posed a safety risk
13 to sheriff deputies?
14    A    Yes.
15    Q    And can you give some examples of that
16 occurring based on your personal interactions?
17    A    Yes.  I've had, I mean, individuals that
18 suffered from PTSD that had issues where they wanted to
19 fight with the officers on -- you know, I know they
20 fought.
21         Had an individual with me that didn't think he
22 needed a driver's license and registration or insurance,
23 walked around like he had a guns -- like he had a gun, and
24 -- and just created a hazard for everybody.
25    Q    And in the situation where you had that

52

1  mentally ill person that was walking around like he had a
2  gun, was that your personal experience or was that another
3  sheriff deputy that had that --
4     A    No.  That was mine.
5     Q    And how did you resolve that situation?
6     A    Took him to a public state hospital.
7     Q    And did you immediately use force, or were you
8  -- did you -- how did you get him into custody?
9     A    Well, that individual at the time had a -- a
10 staff with him.  That he started swinging at me, so
11 unfortunately I did have to tackle him, but, yeah.
12    Q    And based on your experience with the Park
13 County Sheriff's Office, how often would you encounter a
14 mentally ill person that posed a safety risk to sheriff
15 deputies.
16         MR. SCHIMBERG:  Form.  Foundation.
17         Go ahead.
18    A    I mean, how often?
19    Q    (BY MR. ELKUS)  Yeah.
20    A    Probably every once -- every once in awhile.  I
21 mean, I don't know exactly how often.
22    Q    Once a week?  Once a month?
23    A    That posed a threat?
24    Q    Yeah.
25    A    Yeah, you know, probably -- I don't want to

13 (Pages 49 to 52)

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 6 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 53

1   seem like we have a whole bunch of mentally ill people
2   walking around.  So, yeah, let's go maybe once, twice a
3   week, maybe.  Something like that.
4       Q    And essentially you may not know the specific
5   numbers, but it's fair to say, Sheriff, is that your
6   sheriff deputies at Park County would encounter a mentally
7   ill person that posed a safety risk to your deputies, is
8   that fair to say?  At least once or twice a week, is that
9   fair to say?
10      A    Sure.  Sure.
11      Q    Now, prior to the Martin Wirth incident that
12  we're here for, the February 24th incident, what specific
13  training did the Park County Sheriff Office provide to its
14  employees -- to its deputies regarding identifying,
15  preventing, and deescalating persons who were experiencing
16  a mental health problem?
17          MR. SCHIMBERG:  Form.
18      A    Well, there's Mental Health First Aid.  There's
19  Dealing with the Mentally Ill.  I mean, there's various
20  courses that we have provided.
21      Q    (BY MR. ELKUS)  Do you recall what those
22  courses were?
23      A    Just what I just said.  That's the name of the
24  course.
25      Q    The name of the course is -- what is it then?

### Page 54

1       A    Mental Health First Aid.  That's with a first
2   responder.  And there's also -- or Dealing with the
3   Mentally Ill is also another one of those.  Some of those
4   they get online.  My victim's advocate director has also
5   had classes dealing with mentally ill?
6       Q    And what year was that training provided?
7       A    Boy, I think we provide classes.  That's --
8   every year there's classes in dealing with the mentally
9   ill.
10      Q    And to the best of your knowledge, were those
11  classes -- did they deal with how to deescalate persons
12  that were experiencing mental health issues?
13      A    There's -- there is a deescalation course that
14  POST provides.  That's one of the mandated trainings.
15      Q    Okay.  But that mandated training didn't happen
16  until January 1st of 2016, right?
17      A    Yeah, that mandating.  But that course, I can't
18  remember when that deescalation -- deescalation training,
19  I can't remember when they started with that, because that
20  may have been actually before that.
21      Q    Do you have a specific recollection of having
22  that course offered for your sheriff deputies?
23      A    No, I don't.
24      Q    Did you take that course specifically?
25      A    I haven't taken the deescalation one.  I have

### Page 55

1   taken the mental health one.
2       Q    Okay.  And regarding the Mental Health First
3   Aid -- is that the one you're talking about?
4       A    Yes.
5       Q    And what year did you take that one?
6       A    I want to say -- and I think, in my mind,
7   actually it might have been dealing with the mental ill,
8   but it was probably back in 2004, 2003.
9       Q    Okay.  So approximately 12 to 14 years -- 13 to
10  14 years ago is when you took that course, right?
11      A    Correct.
12      Q    And did you take -- or have you taken updated
13  courses since that point in time, in 2003 or 2004, on how
14  law enforcement is to respond to mentally ill individuals?
15      A    I don't recall.
16      Q    Okay.  And if you would have, that would be
17  contained in the training records that were provided to
18  our firm; is that fair to say?
19      A    Or there could be something that we picked up.
20  I know the County Sheriffs of Colorado, when we go to
21  conference, we also have these little classes too.  I'm
22  trying to remember if one of those was also a topic of the
23  mentally ill.
24      Q    Okay.  Would there be any certifications as
25  contained in your personnel file that would indicate that

### Page 56

1   you went to that?
2       A    No.  There would be training in the training
3   records for the County Sheriffs of Colorado.
4       Q    Okay.  And have you provided those documents to
5   Mr. Schimberg?
6       A    No.  I don't know if we have on those.
7       Q    All right.  Do you believe that you have those
8   documents?  Because if you do, I do need you to provide
9   that to Mr. Schimberg, if you have them.
10      A    No, I don't.  And I don't know that we got a
11  certificate.
12      Q    Okay.  So as you sit here today, you have no
13  specific recollection of taking any updated courses from
14  2003 to 2004, since that point in time, about whether or
15  not you specifically took updated courses on how law
16  enforcement is to interact with mentally ill individuals;
17  is that fair to say?
18      A    You mean other than the one I just told you?
19      Q    Yeah.  The Mental Health First Aid one.
20      A    No.  No.  But I said I may have taken -- we may
21  have had a course with the County Sheriffs of Colorado.
22      Q    Okay.  But I'm asking you, do you have any
23  specific recollection that you actually took that course?
24      A    Other than what I just said?
25          MR. ELKUS:  Can you read the answer back.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 7 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

57

1  (The court reporter read the answer as follows:
2  "Or there could be something that we picked up.  I know
3  the County Sheriffs of Colorado, when we go to conference,
4  we also have these little classes too.  I'm trying to
5  remember if one of those was also a topic of the mentally
6  ill.")
7     Q   (BY MR. ELKUS)  The reason I'm asking this
8  question, Sheriff, is because it indicates to me that you
9  don't really have a specific recollection of going through
10  a course.
11     So I'm asking, do you specifically recall
12  taking a course on mental health individuals at that
13  conference or not?
14     A   Specifically, no.
15     Q   And to the best of your knowledge, what is the
16  Park County Sheriff's Office policy -- actually, let me
17  back that up.
18     As of February 24th, 2016, what was the Park
19  County Sheriff Office policy on how deputies are to
20  interact with people who are experiencing mental health
21  problems?
22     A   I have a policy that deals with handling the
23  mentally ill.
24     Q   And was that policy -- in regards to mentally
25  ill individuals, did that policy address on how your

58

1  deputies are to identify, prevent, and deescalate persons
2  that are experiencing mental health problems?
3     A   I think it -- it was more along the lines of
4  when you -- probably when -- when dealing with individuals
5  with mental illness how to go about finding resources to
6  get them help or who to call to help facilitate screening
7  of those individuals, various things like that.
8          MR. ELKUS:  Let me mark as Exhibit 1 . . .
9          (Deposition Exhibit 1 was marked.)
10     Q   (BY MR. ELKUS)  Have you seen this document
11  before, sir?
12     A   Yes.
13     Q   Okay.  And is this the policy -- the Park
14  County Sheriff Office policy that was in place in dealing
15  with the mentally ill as of February 24, 2016?
16     A   Yes.
17     Q   And this policy addresses the procedure by
18  which persons that are experiencing a mental health event
19  can be placed into custody; is that right?
20     A   Correct.
21     Q   Okay.  And you would agree this policy does not
22  address on how Park County Sheriff Office deputies are to
23  identify and then deescalate a person that is experiencing
24  a mental health issue; is that right?
25          Please take the time to review it.

59

1     Q   So ask the question again.
2          MR. ELKUS:  Can you please read the question
3  back to the sheriff.
4          (The court reporter read the question as
5  follows: "And you would agree this policy does not address
6  on how Park County Sheriff Office deputies are to identify
7  and then deescalate a person that is experiencing a mental
8  health issue; is that right?")
9          MR. SCHIMBERG:  Object to form.
10     A   Yeah.  It -- well, it says that when any person
11  appears to have a mental illness and as a result of such
12  mental illness appears to be an imminent danger to himself
13  or others, appears to be gravely disabled, then the person
14  specified in the paragraphs A with whom is referred to in
15  the section as the intervening professional upon probable
16  cause and with such assistance, may be required and may
17  take the person into custody and cause the person to be
18  taken into custody and placed in a facility designated or
19  approved by the executive director for a 72-hour treatment
20  and evaluation.
21     Q   (BY MR. ELKUS)  Right.  It doesn't -- this
22  policy doesn't address, or at least inform deputies, on
23  how to deescalate a person that is experiencing a mental
24  health issue?  It doesn't say that, does it?
25     A   How to -- how to deescalate, no.  I mean, the

60

1  policy doesn't say how to deescalate.
2     Q   Right.  Right.  In fact, this policy gives you
3  the procedure on -- on how to take -- essentially, place a
4  mentally ill person into custody on, like, a 72-hour
5  cycle, is pretty much what this is, right?
6          MR. SCHIMBERG:  Object to the form.
7     A   Yeah.  That's what this policy does.
8     Q   (BY MR. ELKUS)  Okay.  All right.  Now, are you
9  aware of any other Park County Sheriff Office policy that
10  addresses how sheriff deputies are to identify and
11  deescalate a person that's experiencing a mental health
12  issue?
13     A   I'm trying to remember.  2016.
14     So if they have somebody who's in a mental
15  health crisis, they can call the Colorado Crisis Hotline,
16  put that individual in touch with it to find out if --
17  because if the individual doesn't rise to an M-1 status,
18  that individual then may just have to go to a therapist
19  and/or talk to somebody over the phone, and that would
20  deescalate it.
21     So I'm guessing as far as written policy, no,
22  but they have been trained.
23     Q   Okay.  So the -- the -- okay.  So who provided
24  that training?
25     A   The -- as far as the training, it's more of a

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 8 of 19
FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 61

-- right now we have a -- we've had it -- like I say, it's probably a couple of years now. We have had the process in place when dealing with the mentally ill, being able to contact the Colorado Crisis Hotline to be able to do that.

Q   Okay. So let's walk through that a little bit.
A   Sure.
Q   When you say contact the -- what was the name of that?
A   Colorado Crisis Hotline.
Q   Okay. So what is that?
A   That's a statewide program for dealing with mentally ill individuals.
Q   And what's the specific training you -- your agency provides to deputies on how to utilize the Colorado Crisis Hotline?
A   So the specific training would be that those individuals, when they run across somebody whose in a mental health crisis, i.e., they're suicidal, but they're not ambulatory, so they don't need to go to an ER, then those individuals then are put in contact with somebody from whatever catchman area you're in -- ours is Aspen Point -- puts them in contact with somebody from Aspen Point who will then talk to them.
Q   And what was that training provided to your deputies?

Page 62

A   I'm going to say last year, but I don't remember exactly when.
Q   Was that before the Martin Wirth incident or after?
A   I don't recall. I don't know the exact date when they rolled that out.
Q   Okay. But the first time that was provided as training to your sheriff's deputy was 2016?
A   '16, yeah.
Q   Because -- and I think the -- that you identified, Sheriff, was that it is when someone's having a mental health crisis, specifically either suicidal ideations, then you would call the mental health crisis hotline.
    Did I state that correctly?
A   Well, yeah. And that was one example, yes.
Q   Okay. Because what other mental health crisis that you were trained on -- let me ask it differently. That was poorly worded.
    What other mental health issues would require sheriff deputies to contact the Colorado Crisis Hotline?
A   Oh, somebody suffering from PTSD, postpartum depression. I mean, all sorts of mental health issues.
Q   Okay. And did you take that course?
A   Yes.

Page 63

Q   Did you know if Mike -- is it Mike? Mark Hancock?
A   Mark Hancock.
Q   Did Mark Hancock take that course? Do you know?
A   Like I said, it was a -- it was -- I don't want to say it was a course. It was just a -- they came in. I think Mary Pat and Patty Lucy, we all got together and put on a, I guess, little session where we just tried to get folks to start using the Colorado Crisis Hotline.
Q   And -- and what prompted your department to want to provide that training to your sheriff deputies?
A   Well, rural Colorado has often suffered with folks moving up into the mountains that have mental illness, and the unavailability of services causes our folks to have to deal with those individuals quite frequently, whether that's through -- and that can be through, you know, the jail. It could be, you know, through various calls.
    And so we recognized that one of the problems is trying to get individuals to mental health services is hard, so we're trying to work with our provider, Aspen Point, to try to provide more service to rural -- rural areas.
Q   And so the -- the 36 sworn officers within the

Page 64

Park County Sheriff's Office, were they all required to take that course?
A   No. The jailers get it. They get a different method. We have an in-house psychiatrist.
Q   So did all 18 sworn law enforcement officers take this Colorado Crisis Hotline course?
A   I don't know if they took it or if they got -- it was -- they did inservice training and got it when they were at one of their meetings.
Q   Okay. So all 18 sworn patrol officers in some fashion were required to take that?
A   Sure. Should have gotten it, yeah.
Q   And what did you ensure that all 18 sworn law enforcement officers, specifically the patrol division, took the Colorado Crisis Hotline course?
A   I just put it out to the supervisors to make sure that they got it.
Q   Okay. Was that mandatory, or was it sort of suggested?
A   No. Suggested.
Q   Okay.
A   I mean, they're going to get it.
Q   What do you mean, they're going to get it?
A   Well, I mean, that's the procedure. The procedure's set up. The way they deal with the mentally

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 9 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

65

1  ill, they're going to get -- they're going to get it.
2  Either they're going to -- you know, voluntarily they go
3  out and take the course -- or, you know, go out and get
4  the information, or when they have a call, they're going
5  to get that information presented to them.
6      Q   All right.  So to understand what you're saying
7  is, the way that your 18 sworn officers, patrol division,
8  are going to get this training on Colorado Crisis Hotline
9  is either -- they're going to get it either voluntarily
10 through some course, right?
11     A   (The witness nodded.)
12     Q   Is that a yes?
13     A   Yes.
14     Q   Or they'll get it through, actually, on-the-job
15 training when they're actually going through the --
16 through a situation where they need to get a crisis
17 hotline call; is that fair to say?
18     A   That's correct.
19     Q   Okay.  Now . . .
20         (Deposition Exhibit 2 was marked.)
21     Q   (BY MR. ELKUS)  Have you seen this document
22 before, Sheriff?
23     A   Yes.
24     Q   Okay.  What is this document?
25     A   It's the table of contents.

66

1      Q   Is that for the policy and procedure manual of
2  the Park County Sheriff's Office that was at least in
3  effect as of February 24th, 2016?
4      A   Correct.
5      Q   In looking through this table of contents,
6  other than Policy 741 that was dealing with the mentally
7  ill, what other policy here, if you could identify,
8  addresses or deals with mentally ill or how to -- how to
9  -- let me ask it differently.
10         Other than Policy 741, looking at this table of
11 contents, is there any other policy that specifically
12 addresses how sheriff deputies are to deal with people
13 suffering from mental illness?
14     A   I believe 741 is it.
15     Q   Okay.  So to the best of your recollection
16 looking at this table of contents, only 741 is the only
17 policy dealing with the mentally ill; is that fair to say?
18         MR. SCHIMBERG:  Form.
19     A   Yes.  I -- I don't think there's any other
20 policy.
21     Q   (BY MR. ELKUS)  Okay.  Thank you, sir.
22         Now, Sheriff, have you ever heard of crisis
23 intervention teams or CIT?
24     A   Yes.  We have a couple folks trained in that.
25     Q   Okay.  And I'm going to get into that.

67

1      And so what is CIT?
2      A   Crisis Intervention.  Individuals who have been
3  trained to deal with situations, high-stress situations.
4      Q   And do you believe that CIT provides a benefit
5  for law enforcement agencies?
6      A   Oh, yes.
7      Q   And why do you say yes?
8      A   So it helps you with critical incidents.
9      Q   Okay.  And -- and during your tenure as
10 Sheriff, and prior to February 24th, 2016, did you require
11 all of your officers to undergo CIT training?
12     A   No.
13     Q   Okay.  Why not?
14     A   Didn't have the -- didn't have the officers to
15 do it.
16     Q   What do you mean you didn't have the officers
17 to do it?
18     A   That requires sending individuals off shift
19 that aren't covering the county to go to the training.  So
20 if the training had come up to us, then we would have been
21 able to get more people through it, but I didn't have the
22 backfill to be able to send the individuals to training.
23     Q   So to understand what you're saying, then,
24 Sheriff, is you just didn't have enough personnel to -- to
25 send off to go to CIT training because that would,

68

1  essentially, not give you enough officers to assist the
2  community?
3      A   To cover the shifts, yes.
4      Q   Okay.  And as of February 24, 2016, what
5  percentage of your sheriff deputies were CIT trained?
6      A   A very small percentage.
7      Q   If you had to guess, do you know?
8          MR. SCHIMBERG:  Form.
9          Go ahead.
10     A   I -- I don't -- I think -- at that time, I
11 think only one that I had that was a CIT officer.
12     Q   (BY MR. ELKUS)  Okay.  And are you CIT trained?
13     A   I am not.
14     Q   Did you ever have an opportunity to take CIT
15 training?
16     A   No, I did not.
17     Q   No.  I know that you're not, but did you ever
18 have an opportunity to go and get CIT training?
19     A   Oh, I'm sure, yes.
20     Q   Okay.  And why -- do you recall why you didn't
21 go out and get the CIT training that was at least
22 available at the time for you to take?
23     A   Duties and responsibilities.
24     Q   Okay.  So similar to your other deputies, that
25 you couldn't really miss on their shifts because your

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 10 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 69

1   department --
2       A   Is small.
3       Q   -- is small that you really couldn't afford to
4   leave the Park County Sheriff Office vacant, if you will,
5   to go take CIT training?  Is that what you're saying?
6       A   Yes.  That's correct.
7       Q   But you do have an Undersheriff, right?
8       A   I do.
9       Q   And so if your Under -- and so when you're gone
10  from the office, essentially, the Undersheriff, for all
11  intents and purposes, takes the position as Sheriff; is
12  that right?
13      A   No.
14      Q   Or assumes some of the responsibilities of your
15  day-to-day operations, other than what are statutorily to
16  you?
17      A   Sure.
18      Q   Is that right?
19      A   Yes.
20      Q   Okay.  So, I mean, I understand that he cannot
21  -- I mean, I know there's certain statutes that only the
22  Sheriff can technically hire and fire sheriff deputies by
23  law; is that right?
24      A   Yes.
25      Q   Okay.

Page 70

1       A   That's correct.
2       Q   Okay.  So in that respect, in regards to, you
3   know, your -- your day-to-day operations, I mean, couldn't
4   your Undersheriff have taken over some of the day-to-day
5   operations to give you the opportunity to go take CIT
6   training?  Did you ever think about that?
7       A   Yes.  He probably could have.
8       Q   Okay.  Did that ever occur to you to allow your
9   Undersheriff to do that, to take on some of your
10  responsibilities so you could take CIT training?  Did that
11  ever occur to you?
12      A   I guess I'm trying to figure out -- so CIT
13  training is the answer to everything?
14      Q   No, that's not what I'm asking.
15      A   Well, you're --
16      Q   My question to you, though --
17      A   I guess I don't understand.  Yeah, I mean,
18  there's a lot of things I'd love to be able to do, but I
19  just -- we don't have the ability to be able to -- or the
20  funds to be able to afford to be able to go to just -- go
21  to CIT training.
22      Q   Okay.  You -- I mean, being in law enforcement
23  as long as you have, I mean, you understand --
24      A   Sure.
25      Q   -- how nationally, and even the FBI, most

Page 71

1   agencies, how they look at the importance of CIT training?
2           Do you understand that?
3           MR. SCHIMBERG:  Object to form.  Argumentative.
4       A   Yeah.  I mean, yes.  I mean, we'd love for all
5   our officers to go to law school, but to be able to drop
6   everything you're doing and be able to just go to law
7   school would be tough.
8           So I think what we try and do is we try to
9   maximize the use of everybody's time.  We try and go
10  through the required training that we have from POST and
11  try and get those individuals to attend that training,
12  which deals pretty much with skills, which are high
13  liability, and those things that may deal with current
14  issues.
15          But we do get some mental health training.  We
16  just haven't gotten everybody to CIT training.
17      Q   (BY MR. ELKUS)  Now, those offices in your
18  agency that are CIT trained, okay, now, did you have a
19  mechanism in your department for ensuring that one of the
20  few officers that are, in fact, CIT trained, that they
21  would be responding to crisis calls?
22          Do you have any mechanism for that within your
23  agency?
24      A   The individual that was trained actually came
25  to us from Denver.  So he was trained while he was there,

Page 72

1   so . . .
2       Q   Who was that?
3       A   Craig Jones.
4       Q   Okay.  So, now, whenever there was a crisis
5   situation that Park County was dealing with, was there,
6   then, a mechanism that you implemented within your
7   department that would then require or have Deputy Jones
8   come and respond to that situation as a CIT trained
9   officer?
10      A   No.
11      Q   And since you've been Sheriff, what efforts
12  have you made to staff a certain number of CIT trained
13  officers on a given shift?
14      A   None.  We don't have enough to do it.
15      Q   And I would be correct in stating, Sheriff,
16  that, I mean, it's really a luck of the draw that in
17  dealing with, let's say, for instance, the February 24th,
18  2016 incident with Mr. Wirth, that someone on scene would
19  be CIT trained?  Is that fair to say?
20      A   Correct.
21      Q   Now, based upon your experience in law
22  enforcement, Sheriff, would you agree that the best person
23  to respond to a person in crisis, mental health crisis, is
24  someone that's trained in CIT?  Would you agree with that?
25      A   I would not.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 11 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## 73

1  Q  Why do you say you would not agree with that?
2  A  I -- I don't know what the -- I don't know that
3  CIT is going to be the best individual.  It may be
4  somebody that's not CIT trained that could be the best.
5  Q  And part of your -- at least to understand your
6  opinion on that, part of that is because you're just --
7  you're not CIT trained, so you don't know the full
8  benefits that CIT provides; is that fair to say?
9  A  Well, or if I had somebody that was a trained
10 mental health expert, they may be the individual that's
11 more qualified to go.
12 Q  Well, let me ask you this:  Was there anybody
13 on your staff, and specifically sheriff deputies, as of
14 February 24th, 2016, that had training -- a lot of
15 training as that, I think you said mental health expert,
16 in your department?
17    Was there anybody like that?
18 A  No.  Huh-uh.
19 Q  Okay.  And prior to -- and you maybe answered
20 this, so let me just close the loop on this, okay,
21 Sheriff.
22    Prior to February 24th, 2016, did you make any
23 efforts to see whether the Park County Sheriff Office was
24 within compliance with generally accepted policy practice
25 -- practices statewide or nationally with respect to CIT?

## 74

1  A  No.
2  Q  Okay.
3     (Deposition Exhibit 3 was marked.)
4  Q  (BY MR. ELKUS)  Now, Sheriff, have you seen
5  this document before?
6  A  Yes.
7  Q  And what is this document?
8  A  Policy 401.
9  Q  And was this the training function established
10 policy that was in effect as of February 24, 2016?
11 A  Yes.
12 Q  Okay.  And, Sheriff, you would agree that
13 training is one of the most important administrative
14 responsibilities for any law enforcement agency?  Would
15 you agree with that?
16 A  Yes.
17    MR. SCHIMBERG:  Object to form.
18 Q  (BY MR. ELKUS)  I'm sorry?
19 A  Yes.
20 Q  Okay.  Now, let's be more specific.  You would
21 agree that training is one of the most important
22 administrative responsibilities for your own agency?
23 A  That's correct.
24 Q  Okay.  And you would also agree, Sheriff, that
25 well-trained sheriff deputies are generally better

## 75

1  prepared to act decisively and correctly in a broad
2  spectrum of situations, right?
3     MR. SCHIMBERG:  Object to form.
4  A  Yes.
5  Q  (BY MR. ELKUS)  You seem unsure with your
6  answer.  Are you --
7  A  No.  I'm positive with my answer.  But go
8  ahead.
9  Q  Okay.  Now, to that end, an officer that is not
10 well trained in a crisis situation, Sheriff, will pose a
11 risk to officer safety and the public.  Would you agree
12 with that?
13    MR. SCHIMBERG:  Form.
14 A  Your definition of a "crisis."
15 Q  (BY MR. ELKUS)  Well, what is your definition
16 of "crisis" in regards to --
17 A  Individuals --
18 Q  -- in regards to, you know, law enforcement
19 deployment?
20 A  Well, I mean, is the crisis an accident?  Is it
21 a -- what -- what's the -- what's the crisis.
22 Q  That's fair.
23    So let's -- let's talk about when we're dealing
24 with a situation where you have an individual that is
25 threatening the public or officer safety in regards to

## 76

1  either a weapon -- or let's say with a weapon, okay, and
2  in that -- would you say that that's a crisis for law
3  enforcement officers?
4  A  Yes.
5  Q  Okay.  And with that knowledge, an officer that
6  is not well trained in that crisis situation that we were
7  just talking about, that will -- that may pose a risk to
8  officer safety and the public; fair to say?
9  A  Correct.  Correct.
10 Q  Okay.  Now, under this policy, this Policy 401,
11 the Sheriff's Department is taking responsibility to
12 develop, implement, and administer training to all of its
13 officers; is that right?
14 A  Yes.
15 Q  Now, let's look under Roman Numeral 4,
16 procedure, on the first page.  Do you see that, sir?
17 A  Yes.
18 Q  And it says, Training is to provide -- or is
19 provided as a means to accommodate the professional need
20 of the Park County Sheriff's Office and to actualize the
21 interests and concerns the agency has for job-related and
22 personal development needs of the sworn and non-sworn
23 personnel.
24    Then it goes, Section B, Activities of the
25 training session shall include, but not be limit ed to,

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 12 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## Page 93

1  A   Yes.
2  Q   Okay. And when was the first time you were
3  aware of that allegation?
4  A   After the shooting.
5  Q   Okay. And do you -- and looking at the
6  statement where it says Mr. Wirth was walking out and he
7  stated he was going to get a gun and shoot the first cop
8  he sees, I mean, do you take that statement to be a threat
9  towards law enforcement officers?
10      MR. SCHIMBERG: Form.
11  A   Yeah. I mean, in the -- in the heat of the
12  incident, yeah, I don't know. I wasn't there, so . . .
13  Q   (BY MR. ELKUS) Okay.
14  A   Was he just pissed off and that's something he
15  said, I -- I don't know.
16  Q   Okay. Now, you know, I know that you said you
17  looked at this after the fact. But having looked at it
18  after the fact, did it concern you that almost 30 days
19  before the eviction that we're here for, did it concern
20  you that Mr. Wirth was openly saying that he was going to
21  shoot the first cop he sees?
22      MR. SCHIMBERG: Form.
23      Go ahead.
24  A   Again, I mean, is that the only thing he said,
25  then, no, I probably wouldn't.

## Page 94

1  Q   (BY MR. ELKUS) It wouldn't have risen to --
2  A   No.
3  Q   After the situation and looking back on this,
4  you know, this statement alone didn't give you concern --
5  A   No.
6  Q   -- that this man may have actually posed a real
7  threat to law enforcement?
8  A   No.
9  Q   Okay. Why do you say no?
10  A   If that's all he said, and that's all he'd
11  done.
12  Q   Okay. Let's turn to the next page, 1004.
13  Third paragraph where it says, Deputy McDonald came over
14  to me.
15      Do you see that? It's this paragraph right
16  here, sir.
17  A   Yes.
18  Q   Deputy McDonald came over to me and Wirth.
19  Wirth began asking us to shoot him in the head. Deputy
20  McDonald told Wirth that wasn't going the happen. Once
21  the paramedics arrived on scene, I left to go inform
22  Sergeant Woolers about Wirth's suicidal statements.
23      Do you see that?
24  A   Yes.
25  Q   And first of all, do you know who Sergeant

## Page 95

1  Woolers is?
2  A   Yes.
3  Q   Who's Sergeant Woolers?
4  A   He's my Undersheriff.
5  Q   Okay. And -- and is it -- did Sergeant Woolers
6  not have a conversation with you about this interaction
7  with Martin Wirth on February -- on January 20, 2016?
8  A   No.
9  Q   Do you know whether or not Sergeant Woolers has
10  ever had any conversation with then Captain Hancock or
11  your Undersheriff at the time regarding this incident?
12  A   No, I don't know.
13  Q   Okay. Now, Sheriff, do you know Richard
14  Gabrish?
15  A   Yes.
16  Q   Did I pronounce his last name correctly?
17  A   I think so, yeah.
18  Q   How do you --
19  A   Gabrish.
20  Q   Gabrish. Okay.
21      And how do you know Mr. Gabrish?
22  A   From the CBI investigation.
23  Q   And when you say you know him from the CBI
24  investigation, what do you mean by that?
25  A   That he told me they talked to Mr. Gabrish in

## Page 96

1  the CBI investigation.
2  Q   They told you to talk to Mr. Gabrish?
3  A   No. No. They said they talked to him.
4  Q   Oh, Okay. So prior to the CBI investigation --
5  and the CBI investigation you're referring to was the
6  investigation of the February 24th, 2016, incident; is
7  that correct?
8  A   Correct.
9  Q   And is it your position that prior to that date
10  you've had no interaction with Mr. Gabrish?
11  A   None that I recall.
12  Q   Okay.
13  A   He says he talked to me two years prior, but I
14  -- I don't recall.
15  Q   All right. And that -- let's -- that's --
16  that's why I want to go into this.
17  A   Okay.
18      (Deposition Exhibit 5 was marked.)
19  Q   (BY MR. ELKUS) First of all, Sheriff, I've
20  handed you Deposition Exhibit 5. And this was the
21  interview of Richard Gabrish from the CBI investigation
22  into the February 24th incident. Okay?
23  A   Okay.
24  Q   I'll just represent that to you.
25      Now, have you ever reviewed this document

24 (Pages 93 to 96)

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 13 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

145

1  with what they were doing?
2       A   Correct.
3       Q   Now, was the Facebook page that you were
4  apprised of by your other fellow officers of Park County,
5  was it the phrase by Mr. Wirth, If there's a war on cops,
6  where's the recruitment center?  Did you understand that
7  that's what he was posting on social media, or was there
8  something else he was posting on there?
9       A   I think that's the one I remember somebody
10 talking about.
11      Q   Okay.  And do you recall what concerns those
12 officers -- well, let me state it differently.
13          Did you have a conversation with any sheriff
14 deputy within your organization specifically in regards to
15 that Facebook posting by Mr. Wirth?
16      A   No.
17      Q   Okay.  Well, it sounds like you became aware of
18 it.  So how did you become aware of it?
19      A   It was in the investigation CBI did.
20      Q   Okay.  So that's how you became aware of some
21 of the officers' concerns about this Facebook posting; is
22 that right?
23      A   Correct.
24      Q   But you specifically had no conversations with
25 any sheriff's deputy within your organization about their

146

1  concerns with that Facebook posting by Mr. Wirth?
2       A   Correct.
3       Q   Okay.  And that's including Captain Hancock as
4  well?  You had no conversations with Captain Hancock in
5  regards to that Facebook post?
6       A   Correct.
7       Q   So then who ultimately made the decision to
8  bring seven sheriff deputies and at least have fire and
9  rescue on standby for the eviction of Mr. Wirth?
10      A   Captain Hancock.
11      Q   Okay.  And -- and I apologize, again, Sheriff,
12 if this is redundant, but, you know, by -- did you give
13 Captain Hancock the authority to make sort of this
14 tactical plan in the eviction plan of Mr. Wirth?
15          MR. SCHIMBERG:  Object to form.
16      A   Yeah.  I mean, I guess I'm trying to -- what do
17 -- what do you mean by that, I guess.
18      Q   (BY MR. ELKUS)  Well, I mean, who gave Captain
19 Hancock the authority to make this tactical plan to go and
20 evict Martin Wirth?
21          MR. SCHIMBERG:  Same objection.
22      A   Well, I guess it would be -- it would be me.  I
23 mean, you're --
24          MR. SCHIMBERG:  Don't guess.
25      A   And I shouldn't say "I guess."  You're giving

147

1  the authority as the deputy sheriff when I swear you in,
2  so that gives you the authority.
3          MR. ELKUS:  All right.  Well, the problem --
4          MR. SCHIMBERG:  Sorry.
5          MR. ELKUS:  Yeah, just object to it.
6          MR. SCHIMBERG:  Yeah, my fault.
7          MR. ELKUS:  We can't -- we can't have you
8  directing in how he should respond to it.
9          MR. SCHIMBERG:  It's just that I can tell he's
10 confused, and he feels like he can't question you, and I'm
11 frustrated.
12      Q   (BY MR. ELKUS)  So let's -- let's -- do you
13 have any specific recollection of giving Captain Hancock
14 authority to -- well, actually, let me ask it differently.
15 I'll back up a little bit and not make this confusing.
16          I think you said that there were two division
17 commanders as of -- that were -- sorry.
18          There were two division commanders at the Park
19 County Sheriff's Office as of February 24th, 2016; is that
20 correct?
21      A   Yes.
22      Q   Okay.  And one of the division commanders is
23 Captain Hancock?
24      A   Correct.
25      Q   And by virtue of his position as a division

148

1  commander -- and I think -- and -- he would have the
2  authority to -- to go and devise a tactical plan to evict
3  someone like Mr. Wirth; is that fair to say?
4       A   Yes, I'll say that.
5       Q   Okay.  Now -- now, based on your experience in
6  law enforcement, is it important to have a mission plan in
7  place for operations that require proactive law
8  enforcement action?
9           Do you understand the question?
10      A   No, not at all.
11      Q   So when I say "proactive," meaning that
12 officers are going to have to do something.  Okay.  Do you
13 understand when I say the word "proactive" they're going
14 to have to take a course of action?
15      A   Okay.
16      Q   Okay.  Whether that's entry into a residence,
17 SWAT action, whatever you want -- however you define that.
18          So is it important to have a mission plan in
19 place for operations that require proactive -- meaning we
20 have to take a course of action -- for law enforcement
21 officers?
22          Do you understand?
23      A   Yes.
24      Q   Okay.
25      A   I understand the question.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 14 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## Page 197

1 before your sheriff's deputies breached the home?")
2  A  A minute.
3  Q  (BY MR. ELKUS) Okay. So not a long period of
4 time went by from when Wirth went into the residence from
5 when the officers then breached the -- breached the home;
6 is that right?
7  A  Correct.
8  Q  Seemed to you pretty quick?
9  A  Yes.
10  Q  Okay. Now, in your statement here, you said --
11 and this is on Page 7.
12  A  Okay.
13  Q  You said, So I said, Well, all right, you know.
14 We listened a little bit.
15      Well, when you said, So I said, Well, all
16 right. You know, we listened a little bit, who were you
17 talking to?
18  A  I have no idea what that means.
19  Q  When you say, We listened a little bit, who is
20 "we"?
21  A  That's what I said. I don't know what that
22 means.
23  Q  Okay. It says, I thought may be about
24 announcing, but I thought, You know what, he's already
25 seen us.

## Page 198

1      What do you mean by that?
2  A  Oh, I believe what I'm thinking he's -- as far
3 as not knowing we're there. I mean, obviously he knows
4 we're there, and he came out and talked to us. So he
5 knows the sheriff's office is there.
6  Q  Okay. So at this point, he went back into the
7 residence. Was there a conversation that you had with
8 Hancock where Hancock was discussing with you the options
9 of breach or don't breach?
10  A  No.
11  Q  Okay. So you had no conversation.
12      Do you recall whether Hancock asked your
13 permission to breach the residence?
14  A  He -- yes, he did ask me to go in, if he could
15 go in.
16  Q  Okay. So there was some conversation that you
17 had with Captain Hancock about breaching the residence?
18      MR. SCHIMBERG: Object to form.
19  A  He asked me over the radio if he could go in,
20 and I said yes.
21  Q  (BY MR. ELKUS) Okay. If you want to call that
22 a conversation or some exchange -- all right. Let's use
23 the word exchange.
24      Okay?
25  A  Okay.

## Page 199

1      MR. SCHIMBERG: That sits better with me too.
2 Thank you.
3      MR. ELKUS: What's that?
4      MR. SCHIMBERG: That sits better with me too.
5 Thank you.
6  Q  (BY MR. ELKUS) So you had some exchange with
7 Captain Hancock where he asked permission to breach the
8 residence; is that correct?
9  A  He asked if he could go in, and I said yes.
10  Q  Okay. And did you understand at that point in
11 time that, even though you were present -- who had
12 tactical command of this operation?
13  A  He did.
14  Q  Hancock did?
15  A  Hancock did, yes.
16  Q  So if you know, why would Hancock ask your
17 permission to enter the residence if Hancock had tactical
18 command?
19  A  I don't know.
20  Q  Okay. Do you think he had to ask for
21 permission to breach the residence if he had tactical
22 command?
23  A  Yeah, I don't know.
24  Q  Did you assume tactical command by being the
25 most senior officer that appeared on scene?

## Page 200

1  A  No.
2  Q  Okay. Why do you say no?
3  A  I never took command from Captain Hancock.
4  Q  Okay. So the person still in charge of this
5 entire operation was Captain Hancock?
6  A  Correct.
7  Q  Even with you being present on scene, it was
8 still -- Captain Hancock was still tactical command?
9  A  Correct.
10  Q  Now, if you can, please discuss for me the full
11 exchange that you had with Captain Hancock about breaching
12 the residence.
13  A  Just what I said.
14  Q  Why don't you tell me what specifically -- no,
15 I don't want you to read it. Just your recollection.
16  A  He asked if he could go in; I said yes.
17  Q  Okay. Okay. And at that point in time, did
18 you actually -- it sounds like you observed the officers
19 going into the Wirth residence, correct?
20  A  I could hear them. It's uphill, so I could --
21 I mean, I could see that there was going on, but I --
22 yeah.
23  Q  Did you actually physically see them go into
24 the residence? Because your explanation here is we called
25 a conga line.

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 15 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

## 237

1  A   Correct.
2  Q   Okay.  And do you know whether communicating
3  with Mr. Wirth would or would not work as deescalation?
4  Do you have any opinion one way or the other on that?
5  A   If he was communicating, yeah.  Yes.
6  Q   So it stands to reason the fact that he wasn't
7  communicating, in your mind, then, it probably meant like,
8  yeah, communication would not deescalate the situation
9  with him?
10  A   Correct.
11  Q   All right.  Now -- and you would agree with me,
12  Sheriff, maybe you don't, but would you agree that this
13  policy mandates that the Park County Sheriff's Office must
14  use peaceful resolution before using alternative
15  approaches?
16  A   Yeah, I think they're definitely going to try
17  and use peaceful resolution.  Yes.
18  Q   But it's a mandate; you have to do that first?
19  A   You have to try, yes.
20  Q   Okay.  Now, alternative approaches would
21  include breaching the residence with armed law enforcement
22  officers, correct?
23  A   Correct.
24  Q   Now, prior to the breach, Sheriff, were there
25  any facts known to you of an emergent situation, emergency

## 238

1  situation, that required immediate action, or did you have
2  time to look at other options in resolving this issue?
3  A   Me?  No.
4  Q   Meaning you, that they were -- you were not
5  aware --
6  A   Nobody -- nobody told anything to me.
7  Q   Okay.
8  A   There was something to the effect of he was
9  gaining a tactical advantage that -- I do -- Mark said
10  over the radio.  I do remember hearing that.
11  Q   So what was the tactical advantage that Mark
12  was telling you?
13  A   Because he was on higher ground.
14  Q   All right.  So why -- did that pose a concern
15  for you, that the -- that Mr. Wirth was at a tactical
16  advantage, being at higher ground?
17  A   It did for them, apparently.  That's why they
18  said it, yeah.
19  Q   Well, in that circumstance, would it make more
20  sense to move out of the way and sort of create a
21  perimeter and potentially get SWAT involved if he was at a
22  tactical advantage?
23  A   If they thought it would be, yes.
24  Q   Right.  And what his concern was when he was at
25  higher ground, at a tactical advantage, where he may not

## 239

1  have said it, the impression that Mr. Hancock was giving
2  to you, what you understood it to mean, was he may have a
3  weapon and fire on us; is that right?
4  A   Yeah, I -- I don't know what he thought.
5  Q   I'm asking what you took it to mean.
6  A   Yeah, so -- that he considered it to be
7  dangerous.
8  Q   Okay.  Now, let's turn to the second page of
9  this policy, sir.
10  A   Okay.
11  Q   And it says, "B.  Officer in Command (OIC)."
12  A   Okay.
13  Q   "The ranking officer at the scene shall be in
14  command until specifically relieved by a superior."
15      Do you see that?
16  A   Correct.
17  Q   So in this particular case, I guess the ranking
18  officer was Captain Hancock, right?
19  A   Correct.
20  Q   And he was the officer in command?
21  A   Correct.
22  Q   And you did not relieve him of that position,
23  correct?
24  A   Correct.
25  Q   All right.  Now -- but under this policy,

## 240

1  presuming that the policy would apply, and I understand
2  that it's your position today that it did not apply in
3  regards to Mr. Wirth because you didn't think he was a
4  barricaded subject.
5  A   Correct.
6  Q   But you don't know whether or not Captain
7  Hancock thought he was a barricaded subject, correct?
8  A   I don't.
9  Q   Okay.  Now -- but if it is a barricaded
10  situation, let's look at what -- these things you have to
11  follow.  It says, "The OIC shall inform the watch
12  commander about the nature and circumstances surrounding
13  the incident."
14      Do you see that?
15  A   Yes.
16  Q   And that's not discretionary.  That's something
17  that the OIC has to do; is that correct?
18  A   Correct.
19  Q   And why is that?  Why do they have to do that?
20  A   Well, if the commander is not there, they want
21  to make sure he was brought up to speed upon what was
22  going on.
23  Q   All right.  So the fact that the commander at
24  this point actually was the patrol commander, that's
25  something that Hancock didn't have to do; is that right?

Case No. 1:16-cv-03079-MSK-NRN Document 60-4 filed 05/04/18 USDC Colorado pg 16 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

241

1    A  Correct. And also, you could tell to too this
2 was -- we don't have watch commanders, so that's -- was
3 probably taken from another agency.
4    Q  Okay. Did you -- do you recall what agency
5 this was taken from?
6    A  I think this was taken from El Paso County.
7    Q  Now, then it says, "Delegate the tactical
8 mission to the OIC of the tactical response team."
9       Well, the fact that, you know, the commander on
10 scene was -- the officer in command, that didn't have to
11 happen here; is that right?
12    A  Correct.
13    Q  Then it says, "Ensure development of a
14 communications negotiation process and emergency response
15 team reaction."
16       Do you see that?
17    A  Yes.
18    Q  Did that happen in this case?
19    A  No.
20    Q  Ensure -- number 4, "Ensure establishment of an
21 inner and outer perimeter command post, tactical
22 operations center, negotiations center and a staging area
23 for officers and others arriving for assignment."
24       Do you see that?
25    A  Correct.

242

1    Q  Was that done in this case?
2    A  No.
3    Q  Did Park County have the capabilities of doing
4 that at the time of the indent?
5    A  Yes, we could have probably done something. We
6 had -- well, of course, you had the inner and outer
7 perimeter, but, I mean, I guess they could have done more,
8 as far as the command post, if we had more officers.
9    Q  All right. Do you know how many officers were
10 part of the outer perimeter?
11    A  Three.
12    Q  All right. Well, let's be clear, because there
13 were -- how many officers were breaching the -- the
14 residence?
15    A  I think there were four, so that'd be three
16 left.
17    Q  Well, we know that Carrigan breached.
18    A  Uh-huh.
19    Q  Is that a yes?
20    A  Yes.
21    Q  Hancock breached?
22    A  Correct.
23    Q  We know that --
24    A  Kolby.
25    Q  Throkill breached.

243

1       And Martin breached, right?
2    A  That's right.
3    Q  And then there were three other than yourself
4 who was in a car. There were three other sheriff deputies
5 present, right?
6    A  Correct.
7    Q  Where was --
8       MR. SCHIMBERG: I need to get an objection here
9 because -- I just need to object to form. I'm just not
10 sure you guys are using -- well, I should shut up.
11
12       MR. ELKUS: That's fine.
13       MR. SCHIMBERG: Object to form.
14    Q  (BY MR. ELKUS) So then you had Lowrance.
15 Where was Deputy Lowrance before the breach? Do you know?
16    A  I -- I believe he was on perimeter.
17    Q  Do you know what part of the perimeter he was
18 on?
19    A  No. I don't recall.
20    Q  And I think -- was it Hannigan?
21    A  Hannigan? DJ.
22    Q  DJ Hannigan? And was he part of the perimeter
23 for the breach?
24    A  Correct, correct.
25    Q  Do you know where he was?

244

1    A  On the back side of the house.
2    Q  Do you know who the other officer was that was
3 -- oh, Leffler.
4    A  Yes.
5    Q  Where was -- do you know where Leffler was in
6 the perimeter?
7    A  Talking to me.
8    Q  But do you know where --
9    A  I think he had the bottom of the drive -- of
10 the -- what would be called the east -- southeast corner.
11    Q  Now, obviously, there was not a press center
12 involved here, right?
13    A  Correct.
14    Q  Now, then it says, "Ensure that responsibility
15 for traffic and crowd control is establish and that routes
16 for emergency vehicles have been designated."
17       Did that happen in this case?
18    A  No.
19    Q  "Make provisions for recording, personnel
20 assignments and developing a chronological record of
21 events of the command center and tactical operations
22 center."
23       Did that happen in this case that you're aware
24 of?
25    A  Yeah, I mean, they were recording the

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 17 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

265

1  Wirth, right?
2       MR. SCHIMBERG:  Form.
3    A   Well, I think you're trying to -- I mean, any
4  time you have a situation like this, you're trying to take
5  precautions just so that nothing happens.  I mean, you
6  hope nothing happens.  You plan for the worst and hope for
7  the best.
8    Q   (BY MR. ELKUS) Well, did you think that when
9  Mr. Wirth was refusing to leave the residence that that
10  was an indication to you that he may act out violently
11  towards the law enforcement officers that were present?
12  Did you think that?
13    A   I think you always -- like I say, you take
14  precautions.  You hope he doesn't.  But yeah, I mean, you
15  probably do think he's going to do something.
16    Q   I'm just asking your mindset at the time.
17  Okay?  I get this was in February of 2016 and we're
18  talking a year and a half ago.
19    A   Right.
20    Q   But, you know, I'm just asking what your
21  thoughts were at that point in time.
22    A   Right.
23    Q   Okay?  At that point in time, were you
24  thinking, Look, this guy's not coming out.  He is -- we
25  have a court order.  He's refusing that.  He's shut the

266

1  door, ran back into his home, locked the door, whatever,
2  shut the door, and now we have to breach.
3       So in your mind, were you thinking -- did you
4  have a thought that this individual is -- is giving an
5  indication, at least to me, that he's going to act out
6  violently towards my officers?  Did you think that?
7    A   I -- I thought he was going to act out or do
8  something, yes.  But not violent -- I don't know that he's
9  going to be violent.  I mean, all of a sudden, he make
10  come out and say, All right, I thought it over.  I'm going
11  to come out.
12    Q   Were you aware of the risk that he was going to
13  act out violently before the decision was made to breach?
14    A   Say that again.
15    Q   Yeah.  I'm sorry, that was a bad question.
16       Did you think that Martin Wirth posed a risk to
17  your sheriff deputies before breaching the residence, for
18  their officer safety?
19    A   No.
20    Q   So if the answer is no -- you said no, being
21  the answer is no -- why, then, have seven deputies and
22  fire and rescue present if you didn't think he posed a
23  risk to your officers for officer safety?
24    A   I think just precautionary, just to make sure
25  nothing happens.  Maybe by a show of force, he'd think

267

1  differently about doing anything.
2    Q   Well, I know everybody wants to do this Monday
3  morning quarterbacking --
4    A   Yep.
5    Q   -- but looking back on this, hindsight 20/20, I
6  mean, do you think you should have used other options
7  before breaching the residence?
8       MR. SCHIMBERG:  Let me object to the form.  Go
9  ahead.
10    A   Sure.
11    Q   (BY MR. ELKUS) What other options --
12    A   I mean, why wouldn't you?
13    Q   That's what I'm asking.  So, I mean, what other
14  options -- I know we all could look back and try to fix
15  the things that we could do, right?
16    A   Uh-huh.
17    Q   And, you know, looking back on this, what are
18  the things that you would do differently?
19    A   Worked harder on convincing Mr. Wirth that
20  taking it out on us isn't the right thing to do.
21    Q   What do you mean by that?
22    A   That's what the courts are for.  If he had a
23  complaint, if has a problem, he needs to go take it out
24  with the court.  We're just delivering the writ.  We're
25  not the ones you need to fight with.

268

1    Q   So do you mean, like, trying to talk ti him?
2    A   I'd love to have.
3    Q   So one of the things -- and I don't want to --
4  when you say we would have talked about fighting with the
5  court, you mean prior to the eviction?
6    A   Yes.
7    Q   Are you talking the day of the eviction, try to
8  talk to him?
9    A   Prior to the eviction.
10    Q   Okay.
11    A   Gotten him to go -- go to the courthouse.
12    Q   And what about the operation itself?  If there
13  would be, would you do anything different with the actual
14  operation itself, looking back on it now today?
15       MR. SCHIMBERG:  Same objection.
16    A   You know, I think -- we wanted a peaceful
17  resolution.  We wanted him to come out of the house.
18  Would I have wanted -- and I sure as heck didn't want
19  anybody to get hurt, including him.
20    Q   (BY MR. ELKUS) Of course not.
21    A   So would I have done anything different?  Yeah.
22  Probably would have yelled on the PA more, or should have
23  yelled on the PA.  I don't say "more."  I should have
24  yelled on it, to see if I could have drawn him out of the
25  house, announcing that I was there.  Maybe that would have

Case No. 1:16-cv-03079-MSK-NRN   Document 60-4   filed 05/04/18   USDC Colorado   pg 18 of 19

FREDRICK WILLIAM WEGENER, III - 6/8/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

269

1 helped.
2     Q   Anything else?
3     A   It was an eviction.  You know, I don't -- the
4 way my officers were ambushed inside, again, it was --
5 it's an eviction.
6     Q   So you still would have breached the residence?
7     A   Yeah.  I might have used different tactics, but
8 that's --
9     Q   What different tactics would you have used?
10    A   A shield, definitely would have had a shield,
11 which would have helped.  And I might have used a flash
12 bang, some sort of distractionary [sic] device.
13    Q   And was that equipment that was available to
14 your officers--
15    A   Yes.
16    Q   -- on February 24th, 2016?
17    A   Yes.
18    Q   And did anybody bring that equipment with them
19 to the scene?
20    A   I don't know.
21    Q   Let's go back to your interview statement,
22 Sheriff.  I think that was 7.  All right.  Let's go to
23 page 11 here, Sheriff.
24    A   Okay.
25    Q   Now, at some point SWAT was called out to the

270

1 residence; is that right?
2     A   Yes.
3     Q   They were?
4     A   They were.
5     Q   When were they called out?
6     A   Afterwards.
7     Q   Why is that?
8     A   Well, he left the residence, and he came out
9 that -- when he came out the door, I started worrying
10 about why did he create all that gunfire and then leave.
11 So I was concerned about maybe being some sort of and
12 explosive device maybe being left inside the house.
13    Q   And how many SWAT officers deployed?  Do you
14 know?
15    A   No, I don't.
16    Q   Okay.  Now, why didn't the Park County
17 Sheriff's Office deploy a SWAT team when Mr. Wirth went
18 into the residence?
19    A   When he went into the residence?
20    Q   Yeah.
21        MR. SCHIMBERG:  Object to form.  Foundation.
22        Go ahead.
23    A   Well, like I said earlier, because at that time
24 we didn't have any indication he was going to do anything.
25    Q   (BY MR. ELKUS)  Let's turn to page 13 of your

271

1 interview statement, sir.
2     A   Okay.
3     Q   So let's start at line 17 where it says,
4 "SHERIFF" -- this is your statement -- "There was nothing.
5 Now, the fact that we had some folks that were SWAT
6 trained that were going on this, yes, that's correct, we
7 did, but this was -- because I didn't want this to seem
8 like that.  I didn't want to make it seem like we're -- we
9 were this overpowering force was going up there on an
10 eviction.  No.  We were going to go up there, but we knew
11 what he was capable of."
12       Do you see that?
13    A   Yes.
14    Q   I just want to understand this.  So you didn't
15 want to deploy SWAT because you didn't want to do an
16 overpowering force?
17    A   Correct.
18    Q   But yet seven officers and fire and rescue, in
19 your opinion, was not an overpowering force?
20    A   No.
21    Q   Not for an eviction?
22    A   Correct, correct.
23    Q   Okay.  And then you said, "No.  We were going
24 up there, but we knew what he was capable of."  So what
25 did you know he was capable of?

272

1     A   We knew he would, you know, run.  We knew he'd
2 fight.
3     Q   When you say we knew he was going to fight, how
4 did you think he was going to fight you guys?  With hands?
5     A   Hands.
6     Q   Guns?  Bats?  What did you think he was going
7 to fight you with?
8     A   Yeah, whatever.
9     Q   Whatever.  So you knew that he was going to put
10 up a fight to some degree?
11    A   Yeah.  I mean, obviously, he did three weeks
12 prior.
13    Q   All right.  But you didn't know to what extent
14 he was going to do something?
15    A   Correct.
16    Q   Right.  But you know that he did pose a danger
17 to you and your officers?
18    A   We knew he was capable of doing something.
19    Q   Well, when you say "doing something," doing
20 something to your officers?
21    A   Correct.  Correct, yeah.
22    Q   And that could be dangerous to your officers,
23 right?
24    A   Everything is dangerous.  Walking across the
25 street is dangerous.

FREDRICK WILLIAM WEGENER, III

323

REPORTER'S CERTIFICATE

STATE OF COLORADO     )
                      ) ss.
COUNTY OF ADAMS       )

       I, SHAUNA T. DIETEL, Registered Professional Reporter, and Notary Public, State of Colorado, do hereby certify that previous to the commencement of the examination, the said FREDRICK WILLIAM WEGENER, III was duly sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

       I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature this 19th day of June, 2017.

       My commission expires October 5, 2017.

_XXX_   Reading and Signing was requested.

_____   Reading and Signing was waived.

_____   Reading and Signing is not required.



Shauna T. Dietel
Registered Professional Reporter

EXHIBIT 4