# Professional Police & Public Safety Consulting, LLC

P.O. Box 745039
Arvada, Colorado, 80006-5039
303-888-7922



**Dan Montgomery, Chief of Police (Retired) AS, BS, MS, CLS**
Police, Security & Public Safety Expert
55 Years of Experience and Court-Qualified
dancommand@msn.com
www.professionalpoliceconsulting.com

### REBUTTAL REPORT
*Carrigan et al., vs. Park County, Colorado, et al.* United States District Court, District of Colorado, Case No. 1:16-cv-03079-MSC-MJW
December 14, 2017

I was asked by the Law Firm of Elkus and Sisson to review the December 4, 2017 report prepared by the defendants' expert witness in this case, Jonathyn Priest, and to prepare a rebuttal report if necessary. I have had the opportunity to review Mr. Priest's report, and do find it necessary to rebut several aspects of Mr. Priest's report. My report is structured as follows:

A. My opinions, the bases for my opinions, and my synopsis as reflected in my original report of September 24, 2017. <u>I would like to point out that I stand by the opinions I expressed in my original report, and these opinions should also be considered rebuttal to Mr. Priest's opinions where applicable</u>.

B. Mr. Priest's rebuttable statements and opinions reflected in his report of December 4, 2017, and my response(s) to each.

**A.  Montgomery Opinions, Bases for Opinions and Synopsis from the Original Report Prepared on September 24, 2017.**

**WERE THE ACTIONS OF THE DEFENDANTS IN THIS CASE IN CONCERT WITH WELL-ESTABLISHED AND MODERN POLICE PRACTICES AND STANDARDS?  WOULD REASONABLY TRAINED AND PRUDENT POLICE OFFICERS HAVE TAKEN THE SAME ACTIONS GIVEN THE SAME CIRCUMSTANCES? THE ANSWER TO BOTH OF THESE QUESTIONS IS NO.**

1.  Earlier in this report I discussed good policing and bad policing.  I emphasized the fact that when bad policing occurs, it is because the of the fact that the police officer(s) involved

EXHIBIT 9

did not have adequate training; did not receive and/or exercise good supervision; and/or did not use good judgment. In this case, all three of these factors came into play, and because they came into play, Deputy Nate Carrigan was murdered, Deputy Kolby Martin was shot several times; Deputy Travis Threlkel was struck by gunfire but not wounded, Captain Hancock was wounded, and Martin Wirth was killed by defensive gunfire. If the defendants in this case, Sheriff Fred Wegener and Captain Mark Hancock, had the proper training, had and/or exercised good supervision, and used good judgment, this tragedy could have been avoided. The entry into Mr. Wirth's residence was poorly planned, premature, and tactically incorrect. This poor planning, premature and untimely entry into Mr. Wirth's residence, and the numerous tactical deficiencies in this case, led to the death of Deputy Nate Carrigan and the serious injuries to Deputy Kolby Martin.

2. It was <u>reasonably foreseeable</u> in my opinion, given the totality of circumstances in this case, including the knowledge of Mr. Wirth's threats to kill police officers; the assumption that all residents in the county had firearms in their houses; the knowledge that no threat assessment had been conducted; the knowledge that no interior diagram of the Wirth residence had been completed prior to the entry; the knowledge that the entry team was not wearing adequate protective equipment; and the knowledge that medical had been staged in the area at the recommendation of the Park County sheriff's Department, that these deficiencies would lead to injuries and/or the death of sheriff's deputies.

3. The International Association of Chiefs of Police (IACP) Model Policy concerning "Barricaded subjects" was implemented in September of 2007. The situation we are dealing with here involving Martin Wirth fits the definition of what IACP defines as "Barricaded Subjects." The definition provides, "A person who is not suspected of committing a crime but is the focus of a legitimate police intervention effort---most often involving threats of suicide or mental illness---who has taken a position in a physical location most often a structure or a vehicle, that does not allow immediate police access---whether fortified or not---and who is refusing police orders to exit. A barricaded subject may be known to be armed, thought to be armed, have access to weapons in the location, or be in an unknown weapons status." Clearly, Mr. Wirth fits this description. There were no criminal charges pending against him and there were no warrants for his arrest. He was a barricaded subject who was thought to be armed, did not want to be evicted from his home, and the Park County Deputies present were there to invoke a civil process that had been authorized by the courts.

4. In their model policy concerning barricaded subjects, the IACP also identifies two different resolution strategies, primary resolution and secondary resolution.

- <u>Primary resolution</u> strategies include police actions, "Geared toward resolving a barricaded suspect or subject situation and involving the use of minimally intrusive techniques such as negotiations, time, electronic surveillance, and high energy illumination."

- <u>Secondary resolution</u> strategies include police action, "Geared toward resolving a barricaded suspect or subject situation and involving the use of intrusive tactics

EXHIBIT 9

such as window clearing, mechanized ram, chemical agents, and related munitions, breach and hold, robot entry and search, off-leash K-9search, and long-leash K-9 or entry team search."

5. The defendants in this case did not at all adhere to the above principles established by the International Association of Chiefs of Police concerning barricaded situations.

6. The defendants in this case simply did not at all adhere to this well-established principle of time, talk, and tactics. The defendants abandoned any idea of time and talk, and instead, resorted to tactics from the very beginning. Clearly in this situation involving Mr. Wirth, he fit the definition of a barricaded subject after he retreated back into his house and would not speak with the deputies present. Instead of establishing a perimeter however, and then working on making contact with Mr. Wirth for purposes of verbal de-escalation and resolution, the defendants resorted immediately to a dynamic entry. Captain Hancock, with the permission of Sheriff Wegener, and the entry team escalated to a secondary resolution using a dynamic and tactical entry and the threatened use of lethal force three minutes and five seconds after seeing Mr. Wirth re-enter his residence. In my opinion, this was outrageous, especially considering the fact that Captain Hancock stated on his police radio, "I'm going through the doors," at one minute and 37 seconds after Mr. Wirth re-entered his residence, and then did in fact make forced entry one minute and 28 seconds later.

7. Captain Hancock and Sheriff Wegener should have resorted to a primary resolution strategy involving negotiations and time. Clearly, this was not an active shooter scenario, no shots had been fired, and a dynamic tactical entry given the circumstances in this situation, which was a civil eviction, was clearly uncalled for. Sheriff Wegener and Captain Hancock had time on their side. When Mr. Wirth refused to come to the door of his residence as requested by the deputies, all they would have had to do is establish a command post, establish an inner perimeter and an outer perimeter for control purposes, and then attempt to make contact with Mr. Wirth either through the use of a landline, a cell phone, the police vehicle public address system, or a drop phone, and then de-escalate and negotiate. For many, many years, certainly back to the seventies, these kinds of situations have demanded the appropriate use of <u>time, talk, and tactics</u>. Time and talk are the equivalent of the <u>primary resolution strategy</u> identified by the IACP, where time is on the side of law enforcement authorities to manage and resort to negotiations, and tactics come into play in the <u>secondary resolution strategy</u> where forceful alternatives are typically used.

8. In reviewing the CBI investigation interview statements made by the involved deputies in this situation, as well as the deposition transcripts of Sheriff Fred Wegener, former Undersheriff Monte Gore, and former Captain Mark Hancock, it is clear that there was a fear that Mr. Wirth was dangerous by virtue of the threats he made shortly before this incident to get a gun and shoot the first police officer he saw, and by the threats he made to a neighbor (Mr. Garish) to shoot police officers and to create a "Shootout at the OK Corral." The deputies were aware of these threats as was Captain Hancock, and that was precisely why seven deputies were sent to implement the eviction of Mr. Wirth from his residence, along with Undersheriff Gore manning the rear command post position at the

EXHIBIT 9

Park County communications facility. Moreover, the Platte Canyon Fire Department was staged for medical purposes. Never, had this magnitude of resources been used on any prior eviction process. Essentially, even knowing that the eviction process involving Mr. Wirth was a "high risk eviction," (See Captain Hancock's telephone conversation with "Karen" in communications @ 2-24-16, 9:26:58 am where he refers to it as a "high risk eviction), the deputies under Captain Hancock's direct command, and under the indirect command of Sheriff Wegener, were sent into a lethal ambush in which Deputy Nate Carrigan was killed, Deputy Kolby Martin was shot several times and seriously wounded, and Captain Mark Hancock was wounded in the ear. All of this occurred in a mere 22 seconds approximately from the time the deputies entered the residence to the time that the "shots fired, officer down" requests for help were made @ 2-24-16, 9:49:04 am. This situation was mishandled, and in my opinion it was mishandled in part because of the perceived need on the part of Captain Hancock to rush in without first doing an effective situation assessment. This is a common problem among many police officers today, and in my opinion, Captain Hancock fell prey to and displayed, an inability to accomplish this fundamental pre-requisite task of situation assessment. He was simply rushing in, in too much of a hurry, and acting over-aggressively, <u>traits certainly that are not in concert with well-established and modern police practices and standards.</u>

9. During his interview with CBI, Captain Hancock stated, "….and I really regret that I'm a Marine sometimes because I am super aggressive and I don't like to give people the opportunity to plan, fortify, and take us out so I asked a second time I believe, and I don't know if I even got permission or not. I can't remember. But I told Nate to take the door." (@ CARRIGAN 17984-17985). This statement to CBI illustrates Captain Hancock's tendency to compress time and rush prematurely into situations, as he did in the Wirth incident. In contemporary policing, effecting planning, situation assessment, and tactical thinking are a must, and Captain Hancock simply did not live up to these well established and modern police practices and standards.

10. In 1997, Charles Remsberg, author of "The Tactical Edge," and one of the world's most respected law enforcement tactical trainers, stresses the importance of <u>tactical thinking</u> for law enforcement officers, and breathes life into the popular lexicon developed in 1709 by Alexander Pope, "Fools rush in where angels fear to tread." In his chapter concerning tactical thinking, Remsberg states:

11. "By thinking self-protectively, you still can resolve volatile situations favorably, not only with less risk to yourself, but to citizens you may be trying to defend. Good self-protective thinking means good tactical thinking: not just rushing in, flaunting your machismo and hoping for the best, but analyzing the situation you're up against …anticipating what problems you might encounter…and deciding what you say and do as part of a plan for controlling the action. Failing to understand that all this can be done is what leads some officers to react emotionally with ill-advised heroics. Failing to understand how it should be done leads to other tactical failures. They may talk a good show about survival, but they're not able to actually apply survival principles in a meaningful way on the street. Some for example, rigidly compartmentalize their thinking. They memorize and try to apply one set of prescribed procedures for responding to all

EXHIBIT 9

silent alarms….another for conducting all building searches…and another for making all traffic stops.  Tactical thinking that works involves a simple formula:  you match options for defense and control to the type of threat you're facing.  Obviously, that's easier said than done.  But it is easier done than a lot of officers imagine.  The key is the way you think. Good tactical thinking begins with assessing your potential danger." ("The Tactical Edge, Surviving High-Risk Patrol," Charles Remsberg, author of "Street Survival: Tactics for Armed Encounters, Calibre Press, 1997).  Again, Captain Hancock's rush to judgment cost Deputy Carrigan his life and nearly cost Deputy Martin his life.

12.  Another example that effectively describes the tactical deficiencies in this case can be found in the 2011 discussion by Dr. Ron Martinelli concerning "pre-contact threat assessment."  Dr. Martinelli, a former San Jose, California Police Officer and today a nationally known expert in policing strategies Dr. Ron Martinelli identified what he termed *Pre-Contact Threat Assessment,* Pre-contact threat assessment is an absolutely critical component of well-established and modern police practices and standards. Poor pre-contact threat assessment is quite common among law enforcement officers, especially when functioning under stress. There are five fundamental components of pre-contact threat assessment (Lethal and Nonlethal Uses of Force: The Five Considerations of Graham, Dr. Ron Martinelli and Associates, 2011).

13. "Rule #1:  Avoid emotional capture. You cannot seek to control others unless you are first in control of yourself emotionally. Untrained officers and/or those lacking in confidence in officer safety and use of force skills tend to easily become emotionally captured by a subject's resistance and allow their own survival chemicals to take over and impair their critical decision-making and performance under pressure."

14. Rule #2:  Manipulate the environment, don't be manipulated by it.  Officers are often challenged in the field by unique and rapidly evolving circumstances that they lack the proper equipment for.  However, this does not mean that you lack situational awareness or that you cannot immediately adapt and modify your tactics to ultimately overcome a resistive or potentially violent subject.  Improvise, adapt and overcome.  If you allow your environment to control you when you have a clear opportunity to control it, you will fail."

15. "Rule #3:  Remember the five components of arrest (verbalization, approaching the subject, going hands on with the subject, arrest and control tactics, handcuffing and searching).  In assessing the subject and your situation, you must determine whether you and/or your partners can successfully accomplish all five of the arrest components.  This is the most important component of any pre-contact threat assessment.  If you believe that you cannot accomplish all five components, do not make contact at that time.  Rather, whenever the situation allows, follow Rules 1 and 2, keep calm, stay focused, maintain situational awareness, manipulate the environment, and wait for additional resources and equipment to allow you to re-engage to make the arrest."

16. "Rule #4:  If at all possible avoid time compression.  Officers have a bad habit of wanting to take immediate action when it is neither safe nor prudent to do so.  Again, this speaks to emotional capture and a lack of situational awareness. Remember that there is a

EXHIBIT 9

distinction between potential and imminent jeopardy. While all contacts with resistant subjects are potentially dangerous, far fewer contacts actually place officers or others in imminent danger. Follow Rule #1 and do not become so emotionally captured by a resistant subject that you become unreasonably phobic and adrenalized to the point where you rush into a situation that you do not have to. Examples of unnecessary time compression include:

- Moving too close to the subject
- Posturing by screaming/yelling complex/confusing orders and commands
- Rapidly engaging an already agitated, angry, delusional or psychotic person who does not present any imminent threat, from a distance."

17. "Rule #5: <u>Distance and cover are your friends</u>. Whenever possible, utilize and maintain distance and cover from any resistant and potentially violent subject you intend to arrest. Distance allows you to observe more and prevents visual distortions such as perceptual narrowing or tunnel vision. Maintaining distance enhances hearing, situational awareness and lengthens reactionary gap. These benefits allow the involved officer(s) to maintain center and balance, and lessen the potential for emotional capture. Maintaining distance from resistant subjects ultimately allows officer(s) an enhanced opportunity to observe and assess what is happening more accurately, and respond to potential and imminent threats in a safer and more effective manner."

18. I have identified Sheriff Fred Wegener as the incident commander in this situation because he did in fact come to the scene of this event just prior to it commencing, and did in fact suggest tactical alternatives for Captain Hancock to utilize, which were rejected by Captain Hancock. For example, when Sheriff Wegener asked Captain Hancock if he was going up to the door, Captain Hancock advised, "I'm going through the door." Sheriff Wegener failed to ask any further questions of Captain Hancock to my knowledge or call a time out to discuss further. Then, when Captain Hancock stated to Sheriff Wegener that they were giving Mr. Wirth too much time and he needed to "go," Sheriff Wegener responded, "OK, see if you can get his attention at the door." Captain Hancock replied, "We tried that, he's not coming." At this point, Sheriff Wegener should again have called a time out, had the deputies stand down, establish an inner perimeter, and enact a primary resolution strategy. Instead, approximately 37 seconds later, Captain Hancock stated, "We're gonna go through the door." Sheriff Wegener replied, "Copy-breaching the door." Sheriff Wegener clearly had the authority and the power to stop this nonsense, but he failed to do so. In his interview with CBI, he indicated, "I was just letting them do their thing." (@ CARRIGAN 18061-18063). As a result of "letting them do their thing," Deputy Nate Carrigan was murdered and Deputy Martin suffered severe physical injuries after being shot several times.

19. Sheriff Wegener also admitted in deposition that he saw the officers on the entry team make entry without wearing protective helmets. He also stated that there is only one deputy on his department that is formally trained in crisis intervention training (CIT), and that individual, identified as Deputy Jones, came to Park County from the Denver Police Department. Sheriff Wegener further indicated in his deposition that no back-up assistance

EXHIBIT 9

from the Jefferson County SWAT Team was requested, nor was their tactical robot requested so that it could have been used to make initial entry into the residence.

20. In his interview by CBI, Sheriff Wegener indicated, "Now the fact that we had some folks who were SWAT trained that were going on this, yes that is correct. But this was, because I didn't want this to seem like that. I didn't want to make it seem like we were this overpowering force was going up there on an eviction. No. We were going up there but we knew what he was capable of." (@ CARRIGAN 18058-18059). From this statement to CBI, it would certainly appear that the decision to downgrade this situation from a SWAT action to a non-SWAT action was attributable to Sheriff Wegener, and was perhaps politically-motivated by a desire to look non-militaristic. If this is true, and it was in fact as he stated his decision to downgrade the response, that downgrade cost Deputy Carrigan his life. And, if the statement made by Sheriff Wegener is not true, then why didn't he confer with Captain Hancock before, during, or after the pre-action briefing and learn more about the nature of Mr. Wirth and the threat he posed. It was common knowledge throughout the department that Mr. Wirth had threatened to kill police officers. Why didn't Sheriff Wegener know that? Why didn't Sheriff Wegener do more to ensure that this situation would be handled in a manner consistent with well-established and modern police practices and standards? He was there on scene.

21. I am concerned about the decision Sheriff Wegener made to not allow this high risk eviction to become a full blown SWAT activation. It was indeed a high risk situation involving an individual who was considered dangerous and who had threatened to kill police officers on at least two different occasions, and a SWAT activation should have been implemented by the Park County Sheriff's Department with perhaps the assistance of the combined Jefferson County Sheriff's Department SWAT Team. SWAT personnel are typically trained to start with, where appropriate, a primary resolution strategy using time and talk to negotiate peaceful surrenders, and then, where appropriate and necessary to enact a secondary resolution strategy utilizing forceful tactics, including such devices as gas projectiles, flash-bang projectiles, robots, etc. etc. Sheriff Wegener's decision to not allow this situation to become a SWAT operation, and not to use the services of the Jefferson County SWAT Team or a negotiator from the outside, proved fatal.

22. Administratively, there were three key factors that came into play in this incident involving the deaths of Deputy Carrigan and Mr. Wirth tht are extremely concerning. First of all, whenever there is an officer-involved shooting incident, especially so in a case like this involving the death of a citizen and of a police officer, there is a criminal investigation typically performed by the local district attorney's office, another law enforcement agency, or the Colorado Bureau of Investigation. These investigations are done to determine if there were any criminal improprieties on anyone's part. In this case, the investigation was completed by the Colorado Bureau of Investigation. There is also an administrative investigation that is completed to determine if there were any policy, procedure, or rules violations. Typically, that kind of an investigation would be completed by the involved law enforcement agency or an outside law enforcement agency in order to ensure a fair and objective investigation. <u>Surprising in this case is the fact that no internal investigation was completed. Sheriff Wegener indicated in his deposition that he personally determined that</u>

EXHIBIT 9

<u>there were no policy violations in the Carrigan/Wirth incident</u>. In my opinion, this was a major failure on the part of Sheriff Wegener and the Park County Sheriff's Department, and certainly a failure in terms of ensuring that the organizational approach to officer-involved shootings such as what we saw in this case, was in concert with well-established and modern police practices and standards. Sheriff Wegener was essentially clearing himself of any administrative improprieties. That is not the way the system is supposed to work and it raises concerning questions as to why Sheriff Wegener did not launch an internal investigation.

23. Undersheriff Monte Gore, who was the incident commander at the rear command post in the communications center during the Carrigan/Wirth incident, and who lost his job within days after the death of Deputy Carrigan and Mr. Wirth, indicated during his deposition the following:

24. "Approximately two weeks, two and a half weeks prior to this operation being conducted, I had called Captain Hancock into my office and advised him that I felt Wirth was a significant threat. Told him that during the operation, I wanted to be very clear that I considered Wirth to be extremely dangerous. I felt he was homicidal and suicidal. I felt he wanted to commit suicide by cop and take as many others with him as he could. I directed Captain Hancock (sic) that under no circumstances whatsoever were they to enter Wirth's residence." Furthermore, according to former Undersheriff Gore, Captain Hancock was ordered that if Mr. Wirth came out and then went back into his residence, Captain Hancock was to call Gore. Once that occurred, then options existed that needed to be pursued, e.g. cancel the eviction operation and leave the scene, or set up perimeter control and consider other tactical options. Again, the evidence suggests that Captain Hancock disobeyed a direct order, and furthermore, accepting as true some statements recently made by Deputy Kolby Martin, Captain Hancock was asked on two different occasions by two different deputies on the morning of the eviction whether or not deputies would be entering Mr. Wirth's residence, and on both occasions, Captain Hancock replied that they would not. This in my opinion, suggests an affirmation on the part of Captain Hancock that he was acknowledging the earlier direct order of former Undersheriff Monte Gore not to enter the residence, and then changed his mind when Sheriff Wegener arrived on scene and he started conversing over the radio with Sheriff Wegener but not Undersheriff Gore. It is noteworthy too that Captain Hancock did not initiate any communications over the tactical radio frequency being monitored by former Undersheriff Gore, a fact confirmed by both Captain Hancock and Gore. Also of importance is the fact that the order by Undersheriff Gore not to enter the Wirth residence was never rescinded by anyone.

25. Mr. Gore went on to say that Sheriff Wegener willfully disregarded a known risk, and was of the opinion too that the sheriff's actions rose to the level of gross negligence. He stated further, "…and his actions were unreasonable and I have no idea why anyone in any universe would have ordered those young men to go into that residence. They weren't prepared. They weren't equipped. It goes against barricaded----everybody's policy in a barricaded suspect. It should not have happened in any universe." During his deposition, former Undersheriff Gore stated, "This was an extremely dangerous situation.

EXHIBIT 9

Ad under no circumstances, even if I had all of the aforementioned equipment (shields), best trained officers, best trained team, you would not have made entry into this residence."

26. Accepting as true the statements of former Undersheriff Gore that Captain Hancock was given direct orders not to enter the Wirth residence, it is inconceivable to me why Captain Hancock would deliberately disobey such an order and make a forced entry into the Wirth residence under these circumstances. In the world of policing where life and death decisions are made routinely, and where police officers deal with mental health issues on almost a daily basis, it is critical that in tactical situations, especially where lives may be in danger, that orders from a superior officer be followed. This was a case of insubordination on the part of Captain Hancock <u>but most importantly, this insubordination was the cause of the tragedy that resulted</u>. If Captain Hancock had simply followed the orders he was given, this tragedy would have been averted.

27. Earlier in this report, I made reference to the fact that good training is an absolute essential ingredient to good policing. One of the concerning aspects of this case is the fact that there was only one deputy within the Park County Sheriff's Department that was trained and certified in crisis intervention tactics, commonly referred to as CIT, and that was Deputy Jones who received his training with the Denver Police Department prior to joining the PCSD. Sheriff Wegener indicated in his deposition that he had not had any of his deputies trained and certified in CIT, and that no mechanism was in place to have any of his deputies (Deputy Jones in this case), on standby should a critical incident occur where crisis intervention assistance was needed. In today's world of policing, CIT training is, as referenced above, an essential ingredient to good policing, and it is critical that police officers and sheriff's deputies be CIT trained and certified so that they can more effectively deal with critical incidents. Recognizing that there may well be situations where all field personnel assigned to a patrol function are not CIT trained and certified, the important thing is to have one or more CIT officers on duty so that they can be called upon to respond to a scene and takeover a call for purposes of effective verbal intervention, de-escalation, and resolution. Through a 40 hour course, that is what they are trained to do. <u>As a chief of police or a sheriff, it is not enough to hope that one or more of your field personnel is CIT trained and certified, and that on any given day or night you might benefit from the luck of the draw by having one of them on duty</u>. As a chief of police or sheriff, you have to first, insist on getting your field personnel CIT trained and certified, and second, make sure in your deployment scheme that you have CIT personnel on duty and available to take, and or assist in crisis calls where intervention is necessary. Surprisingly, this was not the case in the Park County Sheriff's Department, and this failure to have in place, or even to call for mutual aid CIT assistance in my opinion, was another reason this tragedy occurred.

28. For purposes of background and clarification, CIT is nothing new. It has been around for years after being implemented in the Memphis, Tennessee Police Department in 1988. CIT became quite valuable in law enforcement circles and in the early 2000's, the United States Department of Justice, through its Office of Community-Oriented Policing started funding grants for local law enforcement agencies throughout the United States. The grants were coordinated as I recall by the State of Colorado Department of Public Safety, Division of Criminal Justice.

EXHIBIT 9

29. Scott Glaser, the Executive Director of the National Alliance on Mental Illness Colorado, recently authored a guest commentary for the Denver Post discussing the subject of mental illness and Crisis Intervention Training programs. The commentary was titled, "Guest Commentary: When Mental Illness and Police Collide." *(Denver Post Editorial Section, August 21, 2015, Scott Glaser, NAMI Colorado).*

Mr. Glaser offered the following thoughts, which I totally agree with, that offer some insight into the need for quality police training in CIT. He said:

"Mental illness affects one in five people in Colorado and affects people of all races, genders, and ages. Police will find themselves in frequent contact with people who may be in the throes of a psychosis, deep depression or other affliction that may affect their ability to interact with others, including uniformed officers. When this occurs, death need not be the outcome.

Crisis Intervention Team training is vital to helping equip officers with the tools they need to ensure the safety of people who may be struggling with the effects of their illness. The goal of CIT is to train law enforcement officers in the recognition of mental illness, to enhance their verbal crisis de-escalation skills, and to provide more streamlined access to community-based mental health services.

This training can save the lives of citizens and officers alike. It should be available to all officers and local communities should hold their police forces to this standard of training. I ask the police to make this training a priority; these tragedies affect not just the public, but the lives of uniformed officers who are involved in these incidents."

30. In my professional opinion, Sheriff Wegener could have availed himself and his officers of the crisis intervention tactics training that had been in place in law enforcement throughout the United States and in Colorado for many years. He failed to do so however, and this failure, coupled with his reliance on the "luck of the draw" to have a CIT trained deputy on duty (with only one pre-trained deputy on his staff), contributed to the death of Deputy Nate Carrigan and the wounding of several other deputies.

Synopsis

The outcome in this case would very likely have been much different if the Park County Sheriff's Department had employed primary resolution strategies initially, using time and talk for negotiation and resolution purposes rather than immediately jumping to a secondary resolution strategy where forceful and dynamic tactics were used. The net result was that deputies were inappropriately sent into a lethal ambush where one deputy died as a result of his wounds and three other deputies were wounded, one very seriously with multiple gunshot wounds. Given the totality of circumstances in this case, it was very foreseeable that the directed entry into the residence of Martin Wirth was dangerous and that personnel might be wounded or even killed, as did in fact happen. This case was more than a simple eviction, as evidenced by the fact that seven on-scene personnel were

EXHIBIT 9

handling this eviction, more than ever before for an eviction, and that three of the four deputies entering the residence were armed with assault rifles, as well as the fact that for the first time ever, medical personnel were staged in the event there were injuries.

Moreover, the outcome would have been much different if Captain Hancock had followed the direct orders given to him by former Undersheriff Monte Gore to refrain from entering the Wirth residence, and the outcome would have been different as well if Sheriff Wegener had placed an emphasis on training his personnel in crisis intervention techniques (CIT), and had effectively deployed such trained deputies in the field, rather than relying on the, "luck of the draw." In my 55 years in the law enforcement arena, I frankly have never seen any police incident where there was a more egregious disregard for the safety of law enforcement personnel.

### B.   Priest's Rebuttable Statements and Opinions of December 4, 2017 and Montgomery Responses to Each.

The theme of Mr. Priest's report revolves around several basic premises, all covered under the opinions he expressed in I through IV, on pages 21-30 of his report. I will address each individual opinion, and rather than bringing into question the credibility of any witnesses, citing legal authority, conducting a constitutional analysis, or making factual determinations, I will attempt to focus, as I did in my original report, on whether or not the actions of Captain Hancock and Sheriff Wegener were in concert with well-established and modern police practices and standards. In other words, would reasonably trained police officers, given the same set of facts and circumstances, acted in the same or similar manner?

1. <u>Priest Opinion I</u>:  "The briefing held by Captain Hancock set forth a reasonable plan for contacting Mr. Wirth and if necessary, forcibly evicting him in accordance with the Writ of Restitution." (@ 21).

<u>Montgomery Response to Priest Opinion I</u>:  I respectfully disagree.

- ➢ First of all we must recognize the fact that from the onset, this civil eviction was deemed to be high risk and dangerous in nature. In a phone conversation at 7:22 am on the morning of this incident (four hours earlier), an unidentified Park County Sheriff's Deputy and a dispatcher named Karen, the deputy stated, "The other thing is, we're doing an eviction at 10:00 am at 36 Iris Drive, and this is the guy who threatened to kill policemen and we've been watching his house off and on for the last couple weeks you know, for a month or so., His name is Martin Wirth. They're going to go up there and take care of it that way.  Nobody will get hurt." (Audio File 2:24-16, 7:22:34 am).

- ➢ Furthermore, in another telephone conversation between Captain Hancock and Karen at 9:02 am on the morning of the incident, Captain Hancock stated, "Karen, this is Captain Hancock. I'm getting ready to do a high risk eviction and those civil guys will be on Ops 5 (tactical frequency) but I'll switch back and forth and tell

EXHIBIT 9

    you when we're on scene and that's all I'm gonna say."(Audio File 2-24-16, 9:02:26 am).

- The risk was evident, everyone knew it was a risky eviction and dangerous in nature. That is why seven deputies were assigned to this eviction, the most ever assigned to a civil eviction; that is why fire-rescue was staged; and that is why three of the officers making entry into the residence were armed with tactical rifles. I would submit further that nowhere in the "plan" that was developed was there any provision for having a CIT trained deputy (the one and only CIT trained deputy in the sheriff's department), involved in order to provide any necessary negotiation services, and nowhere in the plan was there any diagram made of the interior of Mr. Wirth's residence. Moreover, there was no provision for having a full SWAT Team staged, e.g. the Jefferson County Swat Team and the equipment they could provide, and there was no provision for the type of protective equipment the entering deputies should be wearing. They were essentially left alone to decide what time of protective gear to wear on this mission. Captain Hancock failed to develop a solid plan for this eviction, and failed to ensure that his officers were adequately equipped with the necessary tactical gear. These shortcomings ultimately proved fatal.

- No threat assessment was accomplished prior to the briefing and the tactical deployment in this situation. Captain Hancock indicated in his deposition no formal threat assessment was done in this case. He stated that it would have been Deputy Carrigan's job to do the threat assessment but he never instructed Deputy Carrigan to do a threat assessment involving a numerical methodology.

- The briefing was inadequate and not in concert with well-established and modern police practices and standards. Reasonably-trained and prudent police personnel would have ensured that the briefing would have resolved the above-noted deficiencies, especially so in a situation deemed from the beginning to be a high-risk eviction. The preparation was not at all qualitatively proportional to the potential severity of the incident.

2. Priest Opinion II: "Captain Hancock's Decision to Order a Breach of the Residence Was Reasonable." (@ 23).

Montgomery Response to Priest Opinion II: I disagree.

- Mr. Priest asserts in his report (@ 23) that there were just two options available for Captain Hancock to pursue at the scene. He identified the first option as the forcible removal of Mr. Wirth from his residence. His second option included negotiation, SWAT-type entry, leave the location. I disagree and see it differently. There were four legitimate options: Obtain voluntary compliance from Mr. Wirth to leave the residence; Set up a perimeter and enter into a de-escalation/negotiation with Mr. Wirth; Leave the location if negotiations proved unsuccessful and resolve the situation another time; Make a dynamic, tactical entry and forcibly remove Mr.

EXHIBIT 9

Wirth. The last option involving a dynamic and tactical entry and forcibly removing Mr. Wirth was not at all realistic under the circumstances of this case. It was dangerous, uncalled for, and it resulted in the loss of lives and bullet wounds. As I discussed extensively in my original report, making a dynamic, tactical entry in this case, given the circumstances where entry was made approximately three minutes after Mr. Wirth entered his residence, was not at all in concert with well-established and modern police practices and standards.  It was not at all what reasonably-trained and prudent police officers would have done under these circumstances.

➢ Mr. Priest asserts in his report, "Neither of the two choices conclusively supports a more reasonable option over the other."  Again, I disagree.  On page 2 and 3 of this report, I fully discuss the advantages where applicable of the tactical approach recommended by the International Association of Chiefs of Police (IACP) in their discussion regarding barricaded subjects (people who have taken up a position in a vehicle or structure, whether fortified or not).  Clearly, the superior tactical strategy in this matter, would have been a, "primary resolution" geared towards resolving a barricaded suspect or subject situation involving the use of minimally intrusive techniques such as negotiations, time, electronic surveillance, high-energy illumination, etc.), rather than a "secondary resolution" involving highly intrusive tactics.

➢ I would submit as well that the strategy of the Commission on Accreditation for Law Enforcement Agencies (CALEA) regarding the use of force is relevant here. CALEA states, "Agencies should ensure training is conducted ranging from immediate action to de-escalation. De-escalation policy should also include a discussion of proportionality, using distance and cover, tactical re-positioning, "slowing down" situations that do not pose an immediate threat, calling for supervisory and other resources."  CALEA Mandatory Standard 4.1.1, Use of Reasonable Force).

➢ I would also cite the works of Remsberg and Martinelli concerning the dangers of officers rushing into situations without first effectively engaging in "situation assessment," as discussed on pages 4-6 of this report.

➢ Lastly, Mr. Priest overlooked in his analysis as to the propriety of the entry into Mr. Wirth's residence, the statement Captain Hancock made to the Colorado Bureau of Investigation:  "…and I really regret that I'm a Marine sometimes, because I am super aggressive and I don't like to give people the opportunity to plan, fortify, and take us out so I asked a second time I believe and I don't know if I even got permission or not.  I can't remember."  This statement in my opinion, illustrates my concern that Captain Hancock rushed into a situation prematurely without first conducting a quality situation assessment.

3. Priest Opinion III:  "Assuming an Order from Undersheriff Gore Existed Where Captain Hancock Would Hold, and Not Enter the Wirth Residence, Captain Hancock Had Discretion to Reasonably Act." (@ 25).

EXHIBIT 9

Montgomery Response to Priest Opinion III: I disagree. If in fact Captain Hancock was ordered by Undersheriff Gore to not enter the Wirth residence, Captain Hancock had no discretion to enter. That discretion was taken away by virtue of the reported direct order issued by the Undersheriff. Captain Hancock did in fact have the discretion to "reasonably act" as stated by Mr. Priest, but the entry in Mr. Wirth's residence was taken off the table of alternatives by the Undersheriff. Entry was no longer an option. And as I stated in my original report, if in fact a direct order had been issued to refrain from entering, that order should have been followed. Absent such an order, and given the circumstances of this matter, entry into the residence of Mr. Wirth was still was not in concert with well-established and modern police practices and standards. Entry in this situation was not what reasonably-trained police officers would have done given the same or similar circumstances. Police officers do not have unfettered discretion to do simply what they want. They have to play by the rules and these rules have been established over the years by organizations such as the International Association of Police, the Commission on Accreditation for Law Enforcement Agencies, the Police Executive Research Forum, and others professional police organizations, discussed in more depth in my original report.

4. Priest Opinion IV: The Sheriff Performed Reasonably and Operated Within His Authority." (@ 30)

Montgomery Response to Priest Opinion IV: I disagree.

- ➢ Mr. Priest asserts in his report that Sheriff Wegener, "Correctly and reasonably deferred to Captain Hancock's experience." (@ 31). Again, I disagree. As I have stated throughout my original report, and as reflected in this report at A6 and A7 on page 3; A18 and A19 on page 6; A21 and A22 on page 7; A27 and A28 on page 9 and A30 on page 10, there is much Sheriff Wegener could have done to turn this situation around. He could have ensured that his department had quality training in and policies on, how to handle high risk evictions, but he didn't; He could have mandated that an internal affairs investigation into this incident be initiated; but he didn't; He could have ensured that his personnel had and were utilizing the proper equipment at the scene of the eviction, but he didn't; He could have ensured that his department had a hostage negotiation team, but he didn't; He could have ensured that a CIT trained deputy (Deputy Jones) was at the scene in the event he was needed to verbally defuse and de-escalate the situation with Mr. Wirth, but he didn't; He could have ensured that the Jefferson County Sheriff's Department be notified to assist and/or be staged in this situation, but he didn't; He could have ensured that his department was well-trained and well-versed in crisis intervention training, but he didn't; He could have demanded that Captain Hancock make this situation a full-fledged SWAT operation, but he didn't, for political purposes; Instead, Sheriff Wegener stated, "I was just letting them do their thing." (@ CARRIGAN 18061-18069). Sheriff Wegener in my opinion, was not operating within his authority. Authority is defined basically as the "right" to take certain actions, and "power" is defined basically the "ability" to implement those actions. Clearly, Sheriff Wegener had the right and the power to effect change within his

EXHIBIT 9

department, and at the scene of the incident involving Mr. Wirth, and as noted earlier, he failed in many different regards. These failures contributed to the death of Deputy Carrigan.

Respectfully Submitted,

*Dan Montgomery*

Dan Montgomery, Chief of Police (Retired)

EXHIBIT 9