# Estate of Ceballos v. Husk

United States District Court for the District of Colorado

June 1, 2017, Decided; June 1, 2017, Filed

Civil Action No. 15-cv-01783-RPM

**Reporter**
2017 U.S. Dist. LEXIS 84309 *; 2017 WL 2377118

ESTATE OF JAIME CEBALLOS; QUIANNA VIGIL; NAVEYAH CEBALLOS, through next friend; and JAYDEN CEBALLOS, through next friend; Plaintiffs, v. WILLIAM HUSK, individually; CITY OF THORNTON; Defendants.

**Counsel:** [*1] For Estate of Jaime Ceballos, Quianna Vigil, Naveyah Ceballos, through next friend, Jayden Ceballos, through next friend, Plaintiffs: by Anna C. Holland-Edwards, John R. Holland, Erica Tick Grossman, Holland Holland Edwards & Grossman, P.C., Denver, CO.

For William Husk, individually, City of Thornton, Defendants: Courtney B. Kramer, Eric Michael Ziporin, Senter Goldfarb & Rice, LLC, Denver, CO.

**Judges:** Richard P. Matsch, Senior District Judge.

**Opinion by:** Richard P. Matsch

# Opinion

ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 40)

The Estate of Jaime Ceballos brings claims under 42 U.S.C. § 1983 against Thornton Police Officer William Husk individually, alleging the use of excessive force in violation of the Fourth Amendment (First Claim); and against the City of Thornton for having deliberately indifferent policies, practices, procedures, and/or customs for Thornton police officers who are likely to encounter citizens with mental illness (Third Claim). The Estate also asserts a claim against Thornton under the Americans with Disabilities Act, alleging failure to make reasonable accommodations in its emergency medical response and law enforcement services (Fourth Claim). The individual plaintiffs, Ceballos' widow and children, assert a Colorado [*2] state law wrongful death claim against Officer Husk (Fifth Claim).[1]

On August 30, 2013, at approximately 7:30 p.m., Thornton police dispatch received a 911 call from Plaintiff Quianna Vigil. Vigil reported that her husband, Jaime Ceballos, was standing in the driveway of their home with two bats and acting crazy; that she was afraid and had her 17-month old daughter with her; that Ceballos was drunk and probably on drugs; and that two of Ceballos' friends were with him. Several City of Thornton police officers responded to the dispatch call. Within one minute of their arrival Officer Husk shot and killed Ceballos.

---

[1] Plaintiffs' Second Claim was previously dismissed by stipulation.

EXHIBIT 10

2017 U.S. Dist. LEXIS 84309, *2

Thornton police dispatch aired the request for service as a high priority disturbance involving a party armed with one or more bats, describing it as a "DK [drunk] unwanted party" and a "disturbance." There was no report that Ceballos had injured anyone that day. Vigil told dispatch that Ceballos had threatened her with a knife a few months earlier. That information was placed only on the Computer-Aided-Dispatch (CAD) system. Officer Husk's affidavit says he did not read the CAD information before the shooting.

Radio traffic and the CAD system also provided information that that [*3] Ceballos had been a "walkaway" from the North Suburban Medical Center in Thornton the previous night. One of the responding officers on August 30, Michael Snook, had contacted Ceballos in connection with the walkaway and had given him a ride home, but did not know why he had been at the hospital.

Officer Husk and Officer Eric Ward arrived in separate vehicles at about the same time. Both parked near the vehicle in which Vigil had parked with her daughter, several houses down the street from the driveway where Ceballos was located. The officers spoke to Vigil and identified her as the reporting caller, and then began to walk toward Ceballos. As Officers Ward and Husk walked toward the residence, two men who had been with Ceballos, Andrew Castillo and Sergio Martinez, approached and told officers that Ceballos was not acting right and might be on drugs. Castillo and Martinez say that the officers refused to take additional information from them and continued to advance toward Ceballos. Castillo says he was told to "shut the fuck up" and "get back."

Shortly after Officers Husk and Ward arrived, Officer Michael Snook and Commander Dante Carbone also arrived at the scene in separate cars. [*4] Carbone parked in the same vicinity as Officers Husk and Ward and observed them as they proceeded toward Ceballos. Snook parked one to two houses away in the other direction and approached from the opposite side of Ceballos. Thus there were officers in the street approaching Ceballos from both directions.

When Officers Husk and Ward were approximately 100 yards from the residence, they saw Ceballos pacing in the driveway, swinging a baseball bat, yelling and throwing his arms in the air. By this time, the officers knew that Vigil and her daughter were parked down the street from Ceballos and that Ceballos' two friends had also left his immediate vicinity. They did not see any neighbors or other members of the public.

Officers Husk and Ward walked in the middle of the street toward Ceballos to keep a clear line of sight. They both repeatedly shouted commands for Ceballos to drop the bat. Instead of doing so, he went into his garage. Either before or after Ceballos went into the garage, Officer Husk drew his firearm and Officer Ward drew his less lethal taser. Ceballos emerged from the garage with the bat in his hand and began walking toward the officers, who had their weapons drawn and [*5] continued shouting commands. The evidence is conflicting as to whether Ceballos was walking quickly or slowly toward the officers and whether Officers Husk and Ward continued to advance toward Ceballos or stopped their approach to give him an opportunity to comply with their commands. It is undisputed that he did not comply with their commands, instead responding with comments such as "Fuck you!" and "Or what, Motherfucker?" Officer Husk says he replied, "Or you will be shot," and continued to order him to stop and drop the bat. Officers Husk and Ward have testified that they did not retreat from Ceballos because, in accordance with their training, they wanted to try to contain him and to prevent him from running away and endangering the public. They also say they were in fear for their lives.

At some point Officer Ward fired his taser, but again the evidence is conflicting. Officer Husk says in his affidavit that he heard Officer Ward "indicate" he was going to deploy his taser, but does not say that Officer Ward actually did so, or when. Officer Ward says in his affidavit that he fired his taser when Ceballos was approximately 12 to 15 feet away from him, but it was ineffective. Officer **[*6]** Ward says he has been trained to shout "taser" three times before deploying it, but does not recall whether he did on this occasion. He states that Officer Husk fired his gun after the taser had no effect. Officer Husk states that he fired his gun when he was approximately 15 to 20 feet from Ceballos. Officer Snook says he did not hear any "taser" warnings. According to Castillo, who was watching from down the street, the sound of the taser followed the gunshots. From this conflicting evidence a jury could infer that Officer Husk fired his gun at virtually the same time that Officer Ward deployed his taser, if not sooner.

Meanwhile, Officer Snook at first began approaching Ceballos from the opposite direction. After he had walked part of the way to Ceballos and observed him in the driveway, he sprinted back to his car to get his less lethal weapon, a beanbag shotgun, which he says could be used effectively at a greater distance than the taser. He testified that he recognized Ceballos from the walkaway incident the night before, and thought from observing him in the driveway that something in his face "didn't seem right." When Snook turned to get his shotgun, he did not think that either **[*7]** his own life or the lives of the other officers were in danger given their respective distances from Ceballos and that he was armed with a baseball bat.

Officer Husk reported, after the incident, that he saw a knife in Ceballos' other hand as the distance narrowed between the officers and Ceballos. Castillo and Martinez say Ceballos was not carrying a knife. Officer Husk admits he never reported seeing this knife to any other officer until after he shot Ceballos, and that his commands to Ceballos were to drop the bat. Officers Ward and Snook and Commander Carbone did not see a knife until after Ceballos had been shot. A responding fire fighter reported seeing a closed pocketknife fall out of Ceballos' pocket after he had been shot, as responders rolled him over.

Every Thornton police officer receives training on proper use of force, including deadly force. It is disputed to what extent Thornton has policies or provides training regarding the use of force against mentally ill, emotionally disturbed, or disabled individuals.

Thornton offers a 40-hour Crisis Intervention Training (CIT) course that specifically deals with using force and interacting with the mentally ill, emotionally disturbed, **[*8]** or individuals in crisis. CIT is specifically designed to train officers to deal with people in crisis by using techniques such as maintaining safety by using time and distance; taking steps to calm the situation by using quiet voices; avoiding getting too close, too fast; not rushing into the situation; assessing the need for backup; making a plan with fellow officers for the best course of action; gathering information from those on the scene; avoiding escalating the situation; communicating in a calm, non-threatening manner; not having multiple people giving commands at the same time; and containing the subject by establishing a perimeter.

CIT training is not mandatory in Thornton, and only some 50% of its officers are CIT-trained. Written City policy states that it is "recommended" that "[w]henever possible" a CIT-trained officer will respond to calls involving persons who are mentally ill or experiencing a crisis (such as persons "exhibiting unusual behavior"), but there is no policy or mechanism to ensure that a CIT-trained officer responds to calls that involve such situations. Plaintiffs have provided expert opinion that Thornton is not in compliance with industry standards in this regard. **[*9]**

Although CIT training is not mandatory, Thornton asserts that it provides other training that incorporates similar tactics for dealing with persons suffering from a mental health problem or thought to be on drugs or alcohol. This assertion is put in dispute by Thornton's own Rule 30(b)(6) witness, Commander Vitgenos, who testified that no training is provided by Thornton, other than CIT training, with respect to how to deal with an individual who is mentally ill, experiencing a chaotic or highly-agitated event, or thought to be on drugs or alcohol. He also testified that Thornton officers are not specifically trained to call for backup from CIT-trained personnel when dealing with a person in crisis, and that whether a CIT-trained person responds to such a call may be a matter of "catch-as-catch-can" or "luck."

Officer Husk states that he encounters a member of the public in crisis or mentally ill "on a daily basis." Officer Ward agrees it is at least weekly, if not daily. At the time of this incident, Officer Ward had been trained in CIT techniques, but Officer Husk had not. Nevertheless, Officer Husk took charge of the call because the incident occurred in his district, a practice Officer Husk described **[*10]** as "an old school police thing." Officer Ward and Commander Carbone testified that officers in this case did not use CIT tactics such as keeping a safe distance and giving the individual personal space, assuming a calm and non-threatening demeanor, gathering information from people at the scene, and learning and understanding the person's history. The officers assert that this failure was justified by the exigencies of the situation and their concern for public safety. Plaintiffs' expert opines that the failure to use de-escalation techniques, the department's action in not training Officer Husk in CIT, and Officer Husk's action in assuming responsibility for mental health crisis situation simply because the call was in his district, were not consistent with well-established modern police standards.

Thornton awarded Officers Husk and Ward "medals of valor" for their handling of the Ceballos incident. Thornton did not interview Snook in its administrative investigation before concluding the shooting was justified, even though Snook was an eyewitness to the events as they unfolded and had moved to use less lethal force at the scene. Thornton Police Chief Nelson testified that he would **[*11]** have the officers handle the situation the same way if faced with it again.

**Qualified Immunity**

A police officer violates an arrestee's clearly established Fourth Amendment right to be free of excessive force during an arrest if the officer's actions were not "objectively reasonable" in light of the facts and circumstances confronting him. *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* Because the reasonableness inquiry overlaps with the qualified immunity analysis, "a qualified immunity defense [is] of less value when raised in defense of an excessive force claim." *Maresca v. Bernalillo County*, 804 F.3d 1301, 1313 (10th Cir. 2015) (quoting *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002)).

The reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment they used force but also on whether the officers' own conduct during the seizure unreasonably created the need to use such force. *Hastings v. Barnes*, 252 Fed. Appx. 197, 203 (10th Cir. 2007) (unpublished)); *see also Medina v. Cram*, 252 F.3d 1124, 1132 (10th Cir. 2001); *Allen v. Muskogee*,

*Okl.*, 119 F.3d 837, 840 (10th Cir. 1997); *Sevier v. City of Lawrence, Kan.*, 60 F.3d 695, 699 (10th Cir. 1995). However, **[*12]** only reckless and deliberate conduct that is "immediately connected to the seizure will be considered." *Hastings*, 252 Fed. Appx. at 203 (citing *Medina*, 252 F.3d at 1132). Mere negligence or conduct attenuated by time or intervening events is not to be considered. *Id.*, citing *Sevier*, 60 F.3d at 699 n.8. The mentally ill or disturbed condition of the suspect is a relevant factor in determining reasonableness of an officer's response to a situation. *See Giannetti v. City of Stillwater*, 216 Fed. Appx. 756, 764 (10th Cir. 2007) (unpublished); *Allen*, 119 F.3d at 840, 842; *Sevier*, 60 F.3d at 699, 701 and n.10.

Here, there is conflicting evidence on many of the relevant factors that determine whether Officer Husk acted reasonably in using deadly force within a minute of when officers arrived on the scene. Officer Husk and his fellow officers knew that Ceballos was acting "crazy," was yelling and pacing in his driveway carrying a baseball bat, and had been reported to have knives in the past; but in her 911 call Vigil did not say he had said or done anything specifically threatening violence to her. Evidence supports an inference that officers had an opportunity, at a safe distance from Ceballos, to talk with his wife and friends to find out more information, but they did not avail themselves of that and instead quickly approached him, both yelling commands. There is no evidence of any attempt to **[*13]** de-escalate the situation. There were no visible members of the public. Officer Ward was trained in CIT, but Officer Husk took charge of the call based on an "old school" practice and CIT techniques were not employed. There is no evidence the officers even talked about their tactics, much less made a specific plan. One officer went back to his car for a less lethal beanbag shotgun, but the others proceeded without him. The evidence of when Officer Ward attempted to use his less-lethal taser—either immediately before or maybe even after Officer Husk fired his gun—is conflicting. The evidence of how the officers and Ceballos approached each other is conflicting. Officer Husk says he saw a knife in Ceballos' hand, but that material fact is disputed. All of this creates questions for the jury as to whether Officer Husk acted reasonably and whether the officers recklessly and deliberately acted to create the need for deadly force through their own actions. Where the entire encounter lasted less than a minute, everything the officers did was "immediately connected" to the decision to use force.

In light of the disputed evidence and the conflicting inferences that could be drawn from it, summary **[*14]** judgment on the reasonableness of Officer Husk's use of deadly force, and therefore whether there was a Fourth Amendment violation, is not warranted.

The applicable law was clearly established by the time of this event. The Tenth Circuit has held that *Allen* and *Sevier* "clearly establish that an officer acts unreasonably when he aggressively confronts an armed and suicidal/emotionally disturbed individual without gaining additional information or by approaching him in a threatening manner (*i.e.*, running and screaming at him)." *Hastings*, 252 Fed. Appx. at 204-06. These cases provided Officer Husk with the requisite fair warning that his conduct in this case, assuming Plaintiffs' version of the facts, was unlawful.

Officer Husk is therefore not entitled to summary judgment based on qualified immunity.

**Municipal Liability**

"[T]he inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."

*Allen*, 119 F.3d at 841 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)). To establish a city's liability under § 1983 for inadequate training of police officers in the use of force, a plaintiff must show (1) the officers exceeded constitutional limitations on the use of force; (2) the use **[*15]** of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training. *Id.* at 841-42. Regarding the second and third elements, "evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Id.* at 842.

The first element is discussed above. The second is established by the officers' testimony that they deal with mentally ill persons, substance abusers, and people in crisis on a daily or weekly basis.

Genuine issues of fact as to the third and fourth elements are established by evidence that Thornton has no specific policies or training beyond CIT with respect to dealing with people in crisis; that the only specific direction officers receive on de-escalating situations with people in crisis comes in CIT training; **[*16]** that most of the department was not trained in CIT tactics at the time of this incident; and that it was "catch-as-catch-can" as to whether a CIT-trained officer would respond. Officers Husk and Ward both testified that based on their training they thought retreating or waiting to approach Ceballos was not appropriate. Officer Husk testified specifically that his training was not to "give ground" in this type of situation until the threat to public safety has been contained, but there are disputed issues regarding the extent of any public safety threat. Chief Nelson testified that in hindsight he would not have the officers do anything differently, and awarded them medals of valor for their conduct. At oral argument Defendants' counsel said that Husk was following the policy that the officers' duty was to contain and control the violent actor for the protection of the public and the officers.

This evidence supports a reasonable inference that Thornton's policy and training fail to adequately consider and emphasize the use of techniques to de-escalate the situation presented when the actor is obviously out of control and acting in a bizarre manner suggesting intoxication or mental illness. **[*17]** It also supports a finding that Thornton's official response after the incident demonstrated deliberate indifference to persons in such circumstances, and to any inadequacies in officer training, by affirming that Officer Husk had appropriately carried out what he had been trained to do.

**Americans with Disabilities Act**

To prove a violation of the ADA, Plaintiff must establish: (1) Ceballos was a qualified individual with a disability; (2) he was either excluded from participating in or denied the benefits of some public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).

Assuming Ceballos was suffering from a disability qualifying him for accommodation under the ADA[2] and that there is a legal basis for a claim,[3] Plaintiffs have failed to present evidence providing a reasonable basis to find that Husk was aware of any such disability or that he failed to accommodate Ceballos because of it.

**Wrongful Death—Willful and Wanton Conduct**

Ceballos' widow and children separately seek damages for wrongful death under Colorado law.[4] Officer Husk is immune **[*18]** from liability for torts committed unless the act or omission causing the injury was willful and wanton. C.R.S. § 24-10-118(2). Willful and wanton conduct is that which is purposefully committed and which the actor must have realized as dangerous, done heedlessly and recklessly and without regard to the consequences, or of the rights and safety of the plaintiff. *See* C.R.S. § 13-21-102(1)(b); *see also Martinez v. Estate of Bleck*, 379 P.3d 315, 318, 323, 2016 CO 58 (Colo. 2016) (to be willful and wanton, conduct must exhibit "conscious disregard" for the safety of others) . The disputed evidence here—including the combination of haste, failure to gather information, failure to use de-escalation techniques, lack of apparent immediate danger to the public, failure to wait for Officer Snook to retrieve his less lethal shotgun, and the creation of exigent circumstances by the officers' own actions—could support a reasonable inference of willful and wanton disregard of Ceballos' rights and safety.

**Order**

Based on the foregoing, it is

ORDERED that Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' First, Third, and Fifth Claims for Relief; and it is

FURTHER ORDERED that the motion for summary judgment is GRANTED with respect to Plaintiffs' Fourth Claim for Relief.

DATED: June 1, 2017 **[*19]**

BY THE COURT:

/s/ Richard P. Matsch

Richard P. Matsch, Senior District Judge

---

[2] Plaintiffs do not specifically identify Ceballos' alleged disability. The Complaint alleges only generally that he suffered from a mental illness or substance abuse problem.

[3] The law is not settled in the Tenth Circuit as to whether Plaintiffs' theory would be recognized. *See Gohier*, 186 F.3d at 1220-21 (observing that other circuits have recognized claims for disability discrimination where a plaintiff alleges that police failed to reasonably accommodate his disability in the process of arresting him, but it remained an "open question in this circuit").

[4] The federal remedy under § 1983 for cases ending in the death of the victim is a survival action brought by the decedent's estate. *See Berry v. City of Muskogee, Okl.*, 900 F.2d 1489, 1506-07 (10th Cir. 1990). State wrongful death actions are not foreclosed by this remedy provided there is no duplication of recovery. *Id.* at 1507.

2017 U.S. Dist. LEXIS 84309, *19

End of Document