# Davies v. City of Lakewood

United States District Court for the District of Colorado

February 16, 2016, Decided; February 16, 2016, Filed

Civil Action No 14-cv-01285-RBJ

**Reporter**
2016 U.S. Dist. LEXIS 18355 *

TAMARA DAVIES, as personal representative of the Estate of James Davies, Plaintiff, v. THE CITY OF LAKEWOOD, COLORADO, and its Police Department; AGENT DELVANEY (D.J.) BRALEY, in his official and individual capacities; POLICE CHIEF KEVIN PALETTA, in his official and individual capacities; SERGEANT MICHELLE CURRENT, in her official and individual capacities; JOHN AND JANE DOES 1-5, current and former employees of the Lakewood Police Department, in their official and individual capacities, Defendants.

**Prior History:** Davies v. City of Lakewood, 2016 U.S. Dist. LEXIS 18348 (D. Colo., Feb. 16, 2016)

**Counsel: [*1]** For Tamara Davies, as personal representative of the Estate of James Davies, Plaintiff: Murray Ogborn, LEAD ATTORNEY, Clayton Earl Wire, Michael Jon Ogborn, Thomas Dean Neville, Ogborn Mihm, LLP, Denver, CO.

For Devaney (I) (D.J.) Braley, in his individual capacity, Defendant: Josh Adam Marks, LEAD ATTORNEY, Katherine M. L. Pratt, Berg Hill Greenleaf & Ruscitti, LLP, Boulder, CO.

**Judges:** R. Brooke Jackson, United States District Judge.

**Opinion by:** R. Brooke Jackson

## Opinion

ORDER

This matter is before the Court on defendants' Motions for Summary Judgment [ECF Nos. 114, 115, 116, and 119] and plaintiff's Motions for Partial Summary Judgment [ECF Nos. 122 and 123]. The motions have been fully briefed by the parties and are ripe for review.

### I. FACTS

This case arises from a tragic incident that occurred on November 9, 2012. ECF No. 43 at ¶ 1. Around 2:00 a.m., the Lakewood Police Department (LPD) responded to reports of gunshots near 20th Avenue and Eaton Street in Lakewood, Colorado. *Id.* at ¶ 26. The officers eventually pinpointed the location of the shooter, Joe Ruiz, at 1940 Eaton Street. *Id.* at ¶ 37. Defendant Sergeant Thomas Grady, a SWAT negotiator, called into the house and spoke with Rebecca Ruiz, who informed him that there were **[*2]** three people inside. *Id.* at ¶ 47. At the LPD's request, the three occupants exited through the front door

EXHIBIT 12

without any weapons and were taken into police custody. *Id.* at ¶¶ 48, 51; ECF No. 119 at 3. The parties dispute whether the officers on scene believed there to be an outstanding armed suspect on the premises.

Defendant Sergeant Michelle Current, the Incident Commander, instructed her officers to "clear the house." ECF No. 43 at ¶ 52. Meanwhile, Agent James Davies set up a perimeter on the backside of the house. *Id.* at ¶¶ 65-68. Agent Davies stood on an overturned ladder to peer over the wooden privacy fence in order to see into the backyard. *Id.* at ¶ 1. Sergeant Current instructed Agent Davies to maintain his position. *Id.* at ¶ 67.

While the officers were clearing the house they discovered three aggressive pit bulls inside the bedrooms. *Id.* at ¶ 55. Because the pit bulls sounded "extremely angry," they decided to clear the rest of the house from the exterior by breaking the windows and scanning each room with a mirror. *Id.* at ¶¶ 101, 207. Sergeant Current radioed a request for the necessary equipment, and Defendant Agent Devaney Braley offered to bring the equipment from the LPD **[*3]** station. *Id.* at ¶ 69.

Once Agent Braley arrived on scene, he joined Sergeant Grady and Agent Okamura inside the house. As the three officers prepared to go outside to break the windows, Sergeant Grady informed Agents Braley and Okamura that the backyard had not yet been cleared. *Id.* at ¶ 201. Now focused on clearing the backyard, the officers exited the north door of the house. *Id.* at ¶ 210; ECF No. 119 at 4-5.

Agent Braley stepped into the carport attached to the north side of the residence and moved several steps to his left to allow Sergeant Grady and Agent Okamura to follow. ECF No. 43 at ¶ 210-211. He maneuvered around a parked vehicle in order to observe and clear the north side of the residence. *Id.* at ¶ 212. As he scanned from left to right, he spotted a man peering over the privacy fence holding a black semi-automatic pistol and heard him say "hey" in a conversational tone. *Id.* at ¶ 215-16. Unbeknownst to Agent Braley, it was Agent Davies. Believing him to be an armed suspect, Agent Braley yelled "Drop the gun. Drop the gun." *Id.* at ¶ 221. Seconds later, Agent Braley fired six shots at Agent Davies. *Id.* at ¶ 222; ECF No. 119 at 6. One of Agent Braley's six shots struck and killed **[*4]** Agent Davies. ECF No. 43 at ¶ 224.

This suit is brought on behalf of Agent Davies' estate by its personal representative, Tamara Davies. ECF No. 43. She asserts constitutional claims against Agent Braley, Sergeant Current, Sergeant Grady, and the City of Lakewood (the City). *Id.* Agent Braley, Sergeant Current, and Sergeant Grady move for summary judgment asserting qualified immunity. ECF Nos. 114, 116, 119. The City moves for summary judgment, arguing that for each claim against it, plaintiff cannot put forth evidence proving one or more elements of the claim for which plaintiff bears the burden. ECF No. 115. Finally, plaintiff moves for partial summary judgment regarding the defendants' workers' compensation and comparative fault defenses and the City's deadly force policy. ECF Nos. 122, 123.

## II. SUMMARY JUDGMENT STANDARD

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (internal quotations and citations omitted). A material fact is genuine if "the evidence is such that a reasonable **[*5]** jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The

EXHIBIT 12

moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party must "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324.

## III. QUALIFIED IMMUNITY

The qualified immunity doctrine "shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 685 F.3d 903, 909 (10th Cir. 2012) (internal quotations and citations omitted). When the defendant asserts a qualified immunity defense, the summary judgment standard is subject to a "somewhat different analysis from other summary judgment rulings." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).

By asserting the defense of qualified immunity, a defendant "trigger[s] a well-settled twofold burden" that the plaintiff is "compelled to shoulder." *Cox v. Glanz*, 800 F.3d 1231, 1245 (10th Cir. 2015). The burden shifts to the plaintiff to show (1) "that the defendant's actions violated a specific statutory or constitutional right," and (2) that the right was "clearly established at the time of the conduct at issue." *Steffey*, 461 F.3d at 1221. Courts have discretion to address either prong of **[*6]** this standard first. *Cox*, 800 F.3d at 1246. "In determining whether a plaintiff has carried its two-part burden . . . ordinarily courts must 'adopt' plaintiff's 'version of the facts.'" *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1325 (10th Cir. 2009) (Holmes, J., concurring). However, "plaintiff's version of the facts must find support in the record[.]" *Id.*

"It is only *after* plaintiff crosses the legal hurdle comprised of his or her two-part burden of demonstrating the violation of a constitutional right that was clearly established, that courts should be concerned with the *true* factual landscape[.]" *Id.* (emphasis in original). Considering the true factual landscape, "courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law." *Id.* at 1326.

## IV. ANALYSIS

### A. <u>Agent Braley</u>

Agent Braley argues that he is entitled to summary judgment on qualified immunity grounds. ECF No. 114. He is entitled to qualified immunity unless his use of deadly force violated clearly established Fourth Amendment law. *Thomson*, 584 F.3d at 1313.

### 1. <u>Constitutional Violation</u>

The Court must first determine whether plaintiff's version of the facts demonstrates that Agent Braley violated **[*7]** Agent Davies' constitutional right. I find that it does.

EXHIBIT 12

Plaintiff claims that Agent Braley's use of deadly force constituted excessive force in violation of Agent Davies' Fourth Amendment right to be secure in his person against unreasonable seizures.[1] U.S. Const. amend. IV; ECF No. 43 at ¶ 286. The Supreme Court has held that "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (emphasis in original). When evaluating excessive force claims, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Courts assess "objective reasonableness" based on "whether the totality of the circumstances justified the use of force," and must "pay careful attention to the facts and circumstances of the particular case." *Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)) (internal quotation marks omitted). The "reasonableness" of the use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." [*8] *Graham*, 490 U.S. at 396. Further, "the reasonableness of an officer's actions must be assessed in light of the officer's training."[2] *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008).

Deadly force is justified under the Fourth Amendment "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Sevier*, 60 F.3d at 699 (citing *Graham*, 490 U.S. at 396 and *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). In discerning whether probable cause exists courts consider a non-exclusive list of factors: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) [*9] whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." *Estate of Larsen*, 511 F.3d at 1260.

In friendly-fire cases, the Fourth Amendment inquiry is whether the defendant's mistaken belief that his fellow officer was a suspect was objectively reasonable under the circumstances. *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 23 (1st Cir. 2005) ("We think that a jury could find that an objectively reasonable officer would have recognized [plaintiff] as an officer, and thus would have recognized that he was not a threat and would not have shot him."); *Duy Ngo v. Storlie*, No. 03-3376 (RHK/JJG), 2006 U.S. Dist. LEXIS 36474, 2006 WL 1579873, at *7 (D. Minn. June 2, 2006) *aff'd sub nom, Ngo v. Storlie*, 495 F.3d 597 (8th Cir. 2007) ("Genuine issues of material fact exist concerning whether [defendant's] failure to recognize [plaintiff] as someone other than the targeted suspect was reasonable[.]"); *Wilkins v. City of Oakland*, 350 F.3d 949, 955 (9th Cir. 2003) ("The crucial question, therefore, is whether their mistaken belief that Wilkins was a civilian was reasonable under the circumstances.").

In the present case, plaintiff claims that Agent Braley's use of deadly force was objectively unreasonable, and, alternatively, if there was a need for deadly force, Agent Braley's reckless conduct created that need.

---

[1] Plaintiff also alleged in her Second Amended Complaint that Agent Braley's use of deadly force violated Agent Davies' constitutional right to be free from excessive force under the Fourteenth Amendment. ECF No. 43 at ¶ 286. Plaintiff has not advanced that argument in subsequent briefings, and the Court considers the Fourteenth Amendment claim to be abandoned. *See e.g.*, ECF No. 144.

[2] As I stated in my Order addressing the defendants' motion to preclude, my view is that an officer's training is relevant to the reasonableness of his conduct, and admissible, but that failure to comply with training is not determinative of whether his conduct in a particular context was objectively unreasonable.

EXHIBIT 12

ECF No. 144 at 20-36. Accepting plaintiff's version of the facts, insofar as it is supported **[*10]** by the record, the Court finds that plaintiff has presented sufficient evidence to demonstrate that the degree of force used against Agent Davies was objectively unreasonable. As such, the Court need not discuss whether plaintiff's evidence demonstrates that Agent Braley's reckless conduct created the need for deadly force.

According to plaintiff, a reasonable officer would have been aware of Agent Davies' location on the perimeter due to Agent Davies' radio communications.[3] ECF No. 144 at 23. Around 3:08 a.m., Agent Braley radioed Sergeant Current as he was driving to the residence with the mirror and catch poles. ECF No. 144-6 at 13. He stated, "Hey sarge, what's the best way for me to come in with this equipment[?]" *Id.* Sergeant Current responded with directions. *Id.* Immediately thereafter, Sergeant Current asked Agent Davies, "[A]re you actually in the backyard, or are you on the outside of the fence?" *Id.* at 14. Agent Davies responded, "I'm on the outside of the fence ah kinda peeking over it's not a great spot but it's the best I got for the backyard." *Id.* Agent Davies' voice was recognizable over the radio due to his British accent. ECF No. 144-26 at 227:14-25. Sergeant Current then asked Agent **[*11]** Davies, "so the backyard's secure, I mean will we be able to throw the dogs back there[?]" ECF No. 144-6 at 14. Agent Davies answered, "as far as I can see it does appear to be secure." *Id.* Twenty seconds after that exchange, Agent Albrets, using Davies' last name, advised Davies over the radio that he was opening up the north door to the house, and Davies confirmed. *Id.*

Further, plaintiff claims that even if a reasonable officer would not have known that Agent Davies was on the perimeter, in light of his training, a reasonable officer would have expected to see at least one officer in Agent Davies' perimeter position. ECF No. 144 at 25. Agent Braley had received training on setting up a perimeter so that two officers take positions on opposite corners of a scene to minimize crossfire and maintain cover of all four sides. ECF No. 144-26 at 70:23-71:13; ECF No. 144-22 at 93:1-10. Upon arriving at the scene, Agent Braley stopped and talked to four police officers near the southwest side of the house. ECF No. 144-8 at 2-3. Plaintiff argues that a reasonable officer **[*12]** with Agent Braley's training would have concluded that the other perimeter officers were located on the northeast corner of the scene. ECF No. 144 at 25.

The perimeter officers advised Agent Braley that the equipment was needed inside. ECF No. 144-8 at 2-3. He took the equipment inside through the open front door and met up with the rest of the entry team—Sergeant Grady and Agent Okamura. *Id.* Of the three officers, Agent Braley was the most experienced in tactics. ECF No. 144-22 at 157:21-159:16. The entry team needed to clear the house from the backyard by breaking the windows and using mirrors to peer inside of the rooms due to the aggressive pit bulls inside. *Id.* at 131:1-25. However, just before going outside to break the windows Sergeant Grady mentioned to Agent Braley that the backyard had not yet been cleared. ECF No. 144-5 at 10. In some respects, at this point the plan changed—from a plan to clear the house to a plan to clear the backyard. ECF No. 144-26 at 310:1-311:23.

Agent Braley had been trained to communicate his plans over the radio under these circumstances. ECF No. 144-28. Agent Braley had received a Training Bulletin titled "Tactics in Use of Force Situations." *Id.* **[*13]** It instructed officers to "[c]oordinate and communicate with other officers arriving on scene," and "[k]now the location of these back-up officers and approach the call as a team." *Id.* at 1. It stated that officers were to (1) plan; (2) communicate, (3) maintain situational awareness; (4) listen to their radios;

---

[3] An inspection of Agent Braley's radio after the fact indicated that it had been functioning properly. ECF No. 144-45 at 74:7-16.

EXHIBIT 12

and (5) slow things down. *Id.* Finally, the bulletin warned officers: "Do not forget, several other agents will be involved. It is absolutely critical to communicate what your intentions are. Do not assume others on scene know what your plan is." *Id.* Despite this training, Agent Braley neglected to broadcast their new plan. *See* ECF No. 144-6.

The team exited the house through the north door. ECF No. 144-5 at 5-6. Agent Braley led the group, followed by Sergeant Grady and Agent Okamura. *Id.* Immediately outside the door there was a carport containing a classic car covered by a tarp. *Id.* Agent Braley stepped to the left to clear the deep-left corner of the yard. *Id.* After clearing the corner, he "collapse[d] his sector" by visually panning around from left to the right. ECF No. 114-1 at 332-333. As he did so, Agent Braley heard a voice say "hey" in a conversational manner. ECF No. 144-5 at 6. He activated his rifle **[\*14]** light and spotted a man peering over the privacy fence. *Id.* Unbeknownst to Agent Braley, the man peering over the fence was Agent Davies. *Id.* Agent Braley could see the man's face and both hands. *Id.* He was holding a semi-automatic pistol in his right hand and a flashlight in his left hand. *Id.*; ECF No. 144-3 at 309:17-24.

Plaintiff's expert, Dr. Ron Martinelli, believes that Agent Davies most likely was directly facing Agent Braley. ECF No. 144-20 at 66. He also concluded that Agent Braley's rifle mounted lighting system would have illuminated Agent Davies' face. *Id.* at 65. The two officers knew each other prior to November 9, 2012 because they worked together at the same station. ECF No. 144-26 at 225:23-226:19. Thus, Dr. Martinelli concluded that Agent Davies would have been identifiable. ECF No. 144-20 at 65-66. He also determined that in some positions the shoulder patches on Agent Davies' police jacket would have been visible and identifiable. *Id.* at 66. Additionally, Chief Paletta acknowledged that Agent Davies' carrying of a flashlight indicated that he was a police officer and not a suspect. ECF No. 144-3 at 309:25-310:6.

After spotting the man peering over the fence, Agent Braley yelled, "Police, **[\*15]** drop the gun, drop the gun." ECF No. 144-5 at 6. Within three seconds, Agent Braley fired six shots at Agent Davies. ECF No. 144-10 at 140:11. Plaintiff's expert, Dr. Richard Ziernicki, through a recreation of the incident, concluded that Agent Braley was between 23 and 28 feet away from Agent Davies when he fired his gun. ECF No. 144-16 at 34. One bullet struck Agent Davies just below his left eye and killed him. *Id.* at 14, 34. One bullet passed through the fence and into the wall of the apartment building behind him. *Id.* at 34. The remaining four bullets were shot above the fence line. *Id.* Dr. Ziernicki determined that Agent Davies' head and both hands were over the fence and were visible to Agent Braley when he fired the fatal shot. ECF No. 144-17 at 14. Furthermore, Dr. Ziernicki opined that Agent Davies had his gun pointed down throughout the entire encounter. *Id.*

Agent Braley urges the Court to focus on the reasonableness of his conduct at the moment he fired his weapon. However, Tenth Circuit precedent indicates that the "totality of the circumstances" embraces conduct "immediately connected with the seizure," such as conduct "arguably creating the need for force." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189 (10th Cir. 2001). Here, however, the Court need **[\*16]** not delineate at exactly what point Agent Braley's conduct becomes too attenuated to be "immediately connected with the seizure." Even if the Court limits its analysis to the mere seconds preceding the firing of the fatal shot, plaintiff's version of the facts describes circumstances under which a reasonable officer would have been able to identify the man peeking over the fence as a fellow officer rendering the use of deadly force objectively unreasonable. Agent Davies (1) was in a perimeter position; (2) held a flashlight in one hand and a gun in the other hand; (3) spoke in a conversational tone and volume; and (4) kept his gun pointed at the ground. Furthermore, the rifle light fully illuminated Agent Davies' face and in some positions the police patches on his jacket. Certainly if a reasonable officer

EXHIBIT 12

recognized Agent Davies as a fellow officer, he also would have recognized that Agent Davies was not a threat and would not have shot him. *Young*, 404 F.3d at 23; *see also Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998) (shooting a fellow police officer would be objectively unreasonable if the shooter "should have been able to recognize that the figure he was shooting was a fellow officer[.]"). Put another way, a reasonable officer would not have **[*17]** perceived a fellow officer as a threat of serious physical harm to himself or others, and thus he would not have had probable cause to use deadly force.

In *Duy Ngo* Judge Kyle commented, "In cases involving a police officer shooting another police officer, courts have generally concluded that the shooting officer is not entitled to qualified immunity because the court cannot say, as a matter of law, that the shooting officer made a reasonable mistake in shooting a fellow officer; courts allow a jury to decide whether the shooting officer's actions were objectively reasonable." 2006 U.S. Dist. LEXIS 36474, 2006 WL 1579873, at *7 (listing cases). I agree with that conclusion as to the application of the qualified immunity doctrine to the claims against Agent Braley in the present case.

In sum, plaintiff has carried the first part of the two-part burden. A reasonable jury could find that Agent Braley's use of deadly force violated Agent Davies' Fourth Amendment right to be free from excessive force.

## 2. Clearly Established

The next inquiry is whether the conduct alleged by plaintiff—if proven at trial and accepted by the jury—violated clearly established law. *Estate of Booker v. Gomez*, 745 F.3d 405, 434 (10th Cir. 2014). I conclude that it did.

"The doctrine of qualified immunity shields officials from civil liability **[*18]** so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255 (2015) (internal citations and quotation marks omitted). A clearly established right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2083, 179 L. Ed. 2d 1149 (2011) (internal citations and quotation marks omitted). Existing precedent must have placed the constitutional question "beyond debate." *Id.* "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

It is a longstanding principle of constitutional law that "policemen . . . are not relegated to a watered-down version of constitutional rights." *Garrity v. State of N.J.*, 385 U.S. 493, 500, 87 S. Ct. 616, 17 L. Ed. 2d 562 (1967). Thus, every reasonable officer would have understood that he and his fellow officers retained their Fourth Amendment protections. Additionally, it has been clearly established that an officer's use of deadly force is justified "under the Fourth Amendment if a reasonable officer in [the defendant's] position would have had probable cause to believe that there was a threat of serious physical harm to [himself] or to others." *Sevier*, 60 F.3d at 699 (citing **[*19]** *Graham*, 490 U.S. at 396). Relying on the *Sevier* and *Graham* holdings, I conclude that every reasonable officer would have known that it violates the Fourth Amendment to use deadly force against a person that poses absolutely no threat of serious harm to the officer or to others.

EXHIBIT 12

The Supreme Court recently reemphasized in *Mullenix* that "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" 136 S. Ct. at 308. In most cases, the general deadly-force standard elucidated in *Graham* is not sufficient to put an officer on notice of the "clearly established" law. *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004); *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987) ("the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense"). However, there exists a "narrow exception" which permits the plaintiff to show that "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Martinez v. New Mexico Dep't of Pub. Safety*, 47 F. App'x 513, 516 (10th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)). In such cases, the *Graham* standard can serve to put an officer on notice that his conduct was unlawful. *Brosseau*, 543 U.S. at 199 ("Of course, in an obvious case, [the *Graham* and *Garner*] standards can 'clearly establish' **[\*20]** the answer, even without a body of relevant case law.").

This is an obvious case where the *Graham* standard constitutes "clearly established" law. At this stage in the analysis, the Court must adopt plaintiff's version of the facts. *Thomson*, 584 F.3d at 1325 (Holmes, J., concurring). Under plaintiff's version of the facts a reasonable officer would have recognized the man on the fence as a fellow officer. It is obvious that a reasonable officer would have known that shooting and killing a fellow officer who posed absolutely no threat to the officer or others would violate the Constitution. It is "beyond debate" that the use deadly force constitutes excessive force under these circumstances. *al-Kidd*, 131 S. Ct. at 2083; *See Wilkins*, 350 F.3d at 955 (in a friendly-fire case the Ninth Circuit recognized that the officers "could not have been reasonably mistaken as to the legality of their actions had they realized that Wilkins was a police officer").

### 3. Genuine Disputes of Material Facts

Because plaintiff satisfied her two-part burden to overcome Agent Braley's qualified immunity defense, the Court turns from plaintiff's factual landscape to "the *true* factual landscape." *Thomson*, 584 F.3d at 1326 (Holmes, J., concurring) (emphasis in original). "Based upon that true factual landscape, **[\*21]** courts should determine whether defendant can carry the traditional summary judgment burden of establishing that there are no genuine issues of material fact for jury resolution and that defendant is entitled to judgment as a matter of law." *Id.* Clearly important issues of fact remain to be determined by the jury. The parties genuinely dispute many material facts that implicate the totality of the circumstances analysis including, but not limited to, whether (1) Agent Davies' face was visible; (2) the police patches on Agent Davies' jacket were visible; (3) Agent Davies was holding a police flashlight; and (4) Agent Davies pointed his gun up and towards Agents Braley. Therefore, these fact disputes render summary disposition inappropriate.

### B. Sergeants Current and Grady

Sergeants Current and Grady (the Sergeants) assert the defense of qualified immunity. ECF Nos. 116 and 119. Plaintiff argues that they are liable in a supervisory capacity because their conduct violated clearly established Fourth Amendment law. ECF No. 144. The Court has discretion to address either prong of the qualified immunity analysis first. *Cox*, 800 F.3d at 1246. For the reasons discussed below, I find that

EXHIBIT 12

plaintiff has failed to demonstrate that **[*22]** the Sergeants violated clearly established law. As such, the Court need not decide whether plaintiff has provided sufficient evidence for a reasonable jury to find that the Sergeants violated Agent Davies' Fourth Amendment rights.

Plaintiff first argues that if the Court finds that the law was clearly established for the purposes of Agent Braley's qualified immunity defense, then it must also find that the law was clearly established for the purposes of the Sergeants' qualified immunity defenses. ECF No. 144 at 58. Essentially, plaintiff asserts that the Court need not perform an independent "clearly established" analysis for the supervisory defendants. *Id.* In support of this argument plaintiff cites *Estate of Booker v. Gomez*, 745 F.3d 405, 436 (10th Cir. 2014). As I explain below, plaintiff misreads *Booker*, and the Court must perform an independent clearly established analysis for the Sergeants' qualified immunity defenses in this case.

In 2009 the Supreme Court changed the landscape of § 1983 supervisory liability in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868. The Court determined that government officials could not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*. *Id.* at 676. It reasoned that "[b]ecause vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff **[*23]** must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* The Court acknowledged that in a § 1983 action, the term "supervisory liability" is a misnomer. *Id.* at 677. "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

"Prior to the Supreme Court's decision in *Ashcroft v. Iqbal* . . . some courts adopted special principles for evaluating the application of qualified immunity to claims against supervisors." Martin A. Schwartz, *Section 1983 Litig. Claims & Defenses*, § 7.19[E] (2014). Instead of following the traditional qualified immunity inquiry, some courts created a distinct test for supervisory liability. *Id.* For example, the First Circuit held that when a supervisor seeks qualified immunity, the "clearly established" inquiry becomes whether "(1) the subordinate's actions violated a clearly established constitutional right, and (2) it was clearly established that a supervisor would be liable for constitutional violations perpetrated by his subordinates in that context." *Camilo-Robles v. Hoyos*, 151 F.3d 1, 6 (1st Cir. 1998). *See also Poe v. Leonard*, 282 F.3d 123, 134 (2d Cir. 2002).

In 2014 the Tenth Circuit decided *Estate of Booker v. Gomez*—the case upon which **[*24]** plaintiff relies. 745 F.3d 405; ECF No. 144 at 58. In *Booker*, the plaintiff was arrested and taken to a "cooperative seating area" where arrestees wait to finish the booking process. *Id.* at 412. Following a disputed series of events, a deputy tried to grab the plaintiff's arm and the plaintiff swung his left elbow at the deputy, nearly striking her in the head. *Id.* Several other deputies and one sergeant witnessed the plaintiff's actions, believed them to be aggressive, and quickly restrained the plaintiff in a prone position on the ground. *Id.* at 413. One deputy put the plaintiff in a "carotid restraint," another deputy handcuffed the plaintiff and put his knee on the plaintiff's back, and yet another deputy used a pain compliance technique on the plaintiff's ankle. *Id.* Further, the sergeant, who was the on-duty supervisor, applied a taser to the plaintiff for eight seconds. *Id.* The plaintiff subsequently died of cardiorespiratory arrest as a result of the restraint. *Id.* at 426.

The plaintiff brought suit against the sergeant in her supervisory capacity arguing that she used unconstitutional excessive force. *Id.* at 420. The sergeant asserted the defense of qualified immunity. *Id.* at 435. In its supervisory liability qualified immunity analysis, **[*25]** the court concluded that the plaintiff carried his two-part burden by showing that (1) a reasonable jury could find that the sergeant violated the

EXHIBIT 12

plaintiff's constitutional rights by actively participating in—and failing to intervene and prevent—the use of excessive force with the requisite state of mind; and (2) the law was clearly established. *Id.* at 436.

Regarding the "clearly established" prong, the *Booker* court stated, "our conclusion regarding clearly established law" in a preceding section of the opinion "also precludes summary judgment on this claim." *Id.* The court referenced Schwartz, § 7.19[E], which stated: "Under the holding in *Iqbal* that a supervisory official may be held liable under § 1983 only for his or her unconstitutional conduct, there is no longer any need to contemplate whether qualified immunity as applied to supervisory officials requires special or separate consideration." *Id.* The *Booker* court had already determined that the sergeant's actions violated clearly established law when it addressed the deputies' conduct. *Id.* at 427. It concluded that the sergeant was on notice that her use of force with the taser—and her failure to intervene and prevent the deputies' use of force with respect to **[*26]** the neck restraint and pressure on plaintiff's back—was excessive under the Fourteenth Amendment. *Id.* at 422-23, 428-29.

Plaintiff's argument that the Court need not perform a "separate" analysis of the "clearly established" prong for supervisory liability when the Court has already determined that the law was clearly established for the purposes of the subordinate's liability misunderstands *Booker*. The *Booker* court simply acknowledged that the "clearly established" analysis is not performed in a *separate manner* for the purpose of supervisory liability as it was pre-*Iqbal*—in cases such as *Hoyos*, 151 F.3d at 6 and *Leonard*, 282 F.3d at 134. After all, "[a]s with any other official sued under § 1983, the critical issue is whether the defendant supervisory official violated clearly established federal law." Schwartz, § 7.19[E]. Therefore, in light of *Iqbal*, this Court must perform the "clearly established" analysis for the purposes of the Sergeants' qualified immunity defense.[4]

Alternatively, plaintiff contends that if the Court must engage in the "clearly established" analysis for the supervisors, Supreme Court and Tenth Circuit precedent make clear that the Sergeants' conduct did violate clearly established law. ECF No. 144 at 59. As discussed above, the question is whether "every reasonable official would have understood that what he is doing violates that right," and the existing precedent must have placed the constitutional question "beyond debate." *al-Kidd*, 131 S. Ct. at 2083.

Unlike in *Booker*, plaintiff does not accuse the Sergeants of directly participating in the use of force or failing to intervene in another officer's use of force. Instead, plaintiff alleges that the Sergeants' actions caused Agent Braley to use excessive force. Specifically, plaintiff argues that Sergeant Current violated Agent Davies' Fourth Amendment rights by failing to (1) establish a command post; (2) initiate a SWAT callout; (3) communicate the location of the perimeter personnel; and **[*28]** (4) broadcast adequate information regarding the plan to clear the house from the backyard. ECF No. 144 at 3, 40-43, 51, 54. Additionally, she contends that Sergeant Grady violated Agent Davies' rights by (1) failing to initiate a SWAT callout; (2) failing to communicate over the radio and with Sergeant Current regarding the plans to clear the house and backyard; and (3) stating "we haven't cleared the backyard" to Agent Braley. *Id.* at 40, 44, 47.

---

[4] Where appropriate, the Court may aggregate officer conduct in its qualified immunity analysis. *Booker*, 745 F.3d at 421. In *Booker*, it was appropriate to do so because the sergeant, along with the deputies, actively participated, and failed to intervene, in the use of force. Here, plaintiff does not allege that the Sergeants actively participated **[*27]** or failed to intervene in Agent Braley's use of deadly force. The Sergeants' conduct is further removed from his use of force. As such, it is more appropriate to analyze the Sergeants' conduct separately from Agent Braley's conduct.

Exhibit 12

Plaintiff contends that Tenth Circuit precedent, *Sevier* and *Myers*, "clearly established that the reckless creation of the need to use deadly force provided sufficient grounds to find an objectively unreasonable state of mind." ECF No. 144 at 59. However, I conclude that these cases are distinguishable from the case at hand and would not have put the Sergeants on notice that their conduct was unlawful. First, neither case addresses supervisory liability when analyzing the reckless creation of the need to use deadly force. *Sevier*, 60 F.3d at 699 (individual liability); *Myers v. Oklahoma Cty. Bd. of Cty. Comm'rs*, 151 F.3d 1313, 1319-20 (10th Cir. 1998) (municipal liability). Second, neither case comes remotely close to addressing the conduct at issue here. *Sevier*, 60 F.3d at 699, 701 n.10 (two officers recklessly confronted an armed and distressed man without gathering additional information about **[*29]** the situation creating the need to use deadly force against him); *Myers*, 151 F.3d at 1319-20 (final policymaker's decision to enter a distraught man's apartment which led to the officers' use of deadly force was reasonable as a matter of law). *Sevier* and *Myers* do not place the constitutional question here—whether a reasonable officer would have known that the Sergeants' conduct violated Agent Davies' Fourth Amendment rights—"beyond debate."

Finally, plaintiff contends that the Sergeants' actions were "egregious enough where only a general statement of law is necessary to show that a right was 'clearly established.'" ECF No. 144 at 59. Thus, plaintiff concludes that the general statements of law in *Garner* and *Dodds* were more than sufficient to put the Sergeants on notice that their actions would violate Agent Davies' constitutional rights. *Id.* (citing *Garner*, 471 U.S. 1, 105 S. Ct. 1694, 85 L. Ed. 2d 1) (citing *Dodds v. Richardson*, 614 F.3d 1185, 1200-1201 (10th Cir. 2010), for the proposition that "[i]t was clearly established that a supervising officer's unreasonable or reckless implementation of a plan or policy could subject the supervisor to liability under Section 1983."). This argument is without merit.

Finding that the Sergeants did not violate clearly established law, the Court need not proceed to the rest of the qualified immunity analysis. For **[*30]** the reasons discussed above, Sergeants Current and Grady are entitled to qualified immunity from plaintiff's Fourth Amendment claim.

## C. Municipal Liability

As a threshold matter, it is well established that "a municipality cannot be held liable under section 1983 for the acts of an employee if a jury finds that the municipal employee committed no constitutional violation." *Myers*, 151 F.3d at 1316. Further, even where the municipal employee committed a constitutional violation, the municipality cannot be held liable under § 1983 for its employees' actions on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). In order to establish municipal liability, a plaintiff must show the existence of (1) a municipal policy or custom; (2) a direct causal link between the policy or custom and the injury alleged; and (3) deliberate indifference on the part of the municipality. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (a plaintiff must "show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury").

The "official policy or custom" requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." **[*31]** *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) (emphasis in original). A plaintiff may demonstrate the existence of a municipal policy or custom in the form of (1) an officially promulgated policy; (2) an

Exhibit 12

informal custom amounting to a widespread practice; (3) the decisions of employees with final policymaking authority; (4) the ratification by final policymakers of the decisions of their subordinates; or (5) the failure to adequately train or supervise employees. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010).

Plaintiff must also demonstrate a direct causal link between the municipal policy and the injury alleged. *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997). That is, the municipality must be the "direct cause" or "moving force" behind the constitutional violation. *Smedley v. Corr. Corp. of Am.*, 175 F. App'x 943, 946 (10th Cir. 2005); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) ("It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983."). Furthermore, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *City of Okla. City v. Tuttle*, 471 U.S. 808, 824, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

Finally, plaintiff must establish the requisite degree of culpability on the part of the municipality. **[*32]** *Schneider*, 717 F.3d at 769. "[T]he prevailing state-of-mind standard for a municipality is deliberate indifference regardless of the nature of the underlying constitutional violation." *Id.* at 771 n.5. Further,

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]

*Id.* at 771 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)).

Here, the City first argues that it is entitled to summary judgment because "[a] municipality may not be held liable where there was no underlying constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). However, as discussed above, genuine issues of material fact exist concerning whether Agent Braley violated Agent Davies' Fourth Amendment rights. Thus, plaintiff has satisfied this threshold inquiry **[*33]** for the purposes of surviving the City's summary judgment motion.

Plaintiff alleges that the City acted with deliberate indifference when it enacted or accepted seven different policies or customs that directly caused Agent Braley's use of deadly force.[5] ECF No. 43 at ¶ 308. Specifically, plaintiff claims the City (1) failed to adequately train its sergeants; (2) failed to adequately supervise its sergeants assigned to the night shifts; (3) maintained a custom to underutilize the

---

[5] In plaintiff's Second Amended Complaint she alleged eighteen *Monell* violations, some of which are consolidated within the seven here. *Id.* Several of those violations were addressed in the City's motion for summary judgment, but were not addressed in plaintiff's response. *Compare* ECF No. 115 *with* ECF No. 141. Specifically, plaintiff's response failed to address arguments relating to the following claims: (1) screening applicants for Sergeant; (2) training regarding officer-on-officer confrontations; (3) implementation of standard operating procedures regarding perimeters; (4) implementation of standard operating procedures regarding hours worked by officers; and (5) long shifts and overtime. *Id.* Therefore, these claims are considered abandoned.

Exhibit 12

SWAT team; (4) maintained a custom to underutilize the Incident Command System; (5) condoned and encouraged a culture of unnecessary risk taking; (6) failed to ensure that its officers were mentally fit for duty following involvement in traumatic shooting incidents; and (7) maintained a formal unconstitutional deadly force policy. ECF No. 141. The City moves for summary judgment as to all of these claims. ECF No. 115. Plaintiff moves for partial summary judgment asserting that the City's deadly force policy is unconstitutional as a matter of law. ECF No. 123. With respect to all seven claims, the Court finds that plaintiff fails to put forth evidence proving one or more elements for which plaintiff bears the **[\*34]** burden. Furthermore, the Court finds that the deadly force policy is not unconstitutional as a matter of law. Therefore, the City's motion for summary judgment is granted and plaintiff's motion for partial summary judgment is denied.

### 1. <u>Failure to Train</u>

Plaintiff argues that the LPD failed to adequately train its less experienced sergeants, including Sergeant Current, on how to safely and effectively supervise an incident, and this deficiency in **[\*35]** training increased the risk that an officer could be misidentified and thus hurt or killed. ECF No. 141 at 12. The City moves for summary judgment arguing that (1) the City maintained sufficient training policies; (2) there is no causal connection between Sergeant Current's training and Agent Davies' death; and (3) there is no evidence of the City's deliberate indifference. ECF No. 115 at 15; ECF No. 162 at 6. For the reasons discussed below, I find that no reasonable jury could conclude that the LPD's failure to adequately train its sergeants caused Agent Braley's use of deadly force and that the City was deliberately indifferent to that risk.

Assuming without deciding that a reasonable jury could find that the LPD failed to adequately train its sergeants on how to supervise a scene, plaintiff fails to prove causation and the requisite culpability on the part of the City. In *Carr v. Castle*, the Tenth Circuit addressed the requisite causal connection in failure to train cases:

> It is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983. Therefore, in order for liability to attach in a failure to train case, **[\*36]** the identified deficiency in a city's training program must be *closely related* to the ultimate injury, so that it *actually caused* the constitutional violation.

337 F.3d 1221, 1231 (10th Cir. 2003) (emphasis added) (quoting *Brown v. Gray*, 227 F.3d 1278, 1290 (10th Cir. 2000)). Generally, plaintiff contends that LPD's training of its sergeants was inadequate because most of the training programs for supervisors had to be self-initiated by the individual sergeant. ECF 141 at 14; ECF No. 141-2 at 243:17-20. With respect to Sergeant Current, plaintiff claims she "fell through the cracks." ECF No. 141 at 14. Specifically, she alleges that Sergeant Current's training was insufficient in relation to (1) the "buddy system"; (2) clearing houses; (3) diagramming an incident scene; (4) the Incident Command System (ICS); and (5) basic supervisory responsibilities. ECF No. 141-12 at 37. Plaintiff's strongest evidence of causation is Chief Montgomery's testimony that the inadequate training of Sergeant Current "contributed to" the death of Agent Davies. *Id.* This is insufficient. Plaintiff must show how the City's failures to train Sergeant Current "actually caused" Agent Braley's imposition of excessive force. *Carr*, 337 F.3d at 1231. The five allegations of Sergeant Current's inadequate training cannot be **[\*37]** said to have led directly to Agent Braley's use of deadly force. The alleged deficiencies in her supervisory training are not "closely related" to her subordinate's use of deadly force. *Id.*

Exhibit 12

Additionally, the record contains no evidence that the City acted with deliberate indifference. As stated above, plaintiff fails to identify a single incident, other than the incident at issue here, where an LPD sergeants' failure to safely and effectively supervise a scene caused a subordinate officer to use excessive force. As such, no pattern of constitutional violations existed that would have put the City on notice that its training of its sergeants was inadequate as to the safe and effective supervision of a scene.

Furthermore, this case is not within the "narrow range of circumstances" where notice can be found absent a pattern of tortious conduct. It is not "highly predictable" or "plainly obvious" that the LPD's self-initiated training program for its sergeants would lead to a subordinate's use of excessive force.

Plaintiff argues that LPD's training was not in line with normal police practices, which can be sufficient to establish deliberate indifference. ECF No. 141 at 14. In support of **[*38]** this argument she cites to *Allen v. Muskogee, Okl.*, 119 F.3d 837 (10th Cir. 1997) and *Moore v. Miller*, 10-CV-00651-JLK, 2014 U.S. Dist. LEXIS 72452, 2014 WL 2207346 (D. Colo. May 28, 2014). *Allen* and *Moore* are distinguishable from the present case. In these two cases, the training programs at issue differed from normal police practices with respect to the officers' conduct in situations closely connected to the use of force, thereby putting the respective police departments on notice that their training programs were substantially certain to result in constitutional violations. First, in *Allen* the city trained its officers to "act recklessly in a manner that created a high risk of death" when dealing with a mentally ill suspect with a firearm. 119 F.3d at 844-45 (officers were "trained to leave cover, approach, and attempt to disarm such persons" which will predictably "provoke a violent response"). In *Miller*, the city failed to train its officers properly on the use of force and probable cause. 2014 U.S. Dist. LEXIS 72452, 2014 WL 2207346, at *5. Thus, given how both cities' policies were out of line with normal police practices in a manner closely connected to the use of force, it can reasonably be said that the deficiencies in the training programs were highly likely to result in constitutional violations. The same cannot be said for the LPD's alleged failure to train its **[*39]** supervisors on the safe and effective supervision of an incident scene. I accept that the LPD's training differed from normal police practices, but the nature of the training at issue relates to supervisory conduct unrelated to the use of force.


## 2. Inadequate Supervision of Sergeants on the Graveyard Shift

Plaintiff argues that the LPD had a policy of not having a commander on duty or formally "on call" during the graveyard shift, this policy was a cause of Agent Davies' death, and the City had actual knowledge of the problem and associated risks and chose to ignore it. ECF No. 141 at 7. The City moves for summary judgment arguing that plaintiff cannot prove causation or that the City had the requisite culpability. ECF No. 115 at 20; ECF No. 162 at 3-5. Because a reasonable juror could not find that the LPD's staffing on the graveyard shift caused Agent Braley to use excessive force or that the City was deliberately indifferent to that risk, the City is entitled to summary judgment on this issue.

It is undisputed that the City did not have a commander "on duty" or formally "on call" during the graveyard shift. ECF No. 115 ¶¶ 13, 19. The parties do note that sergeants working the graveyard **[*40]** shift were permitted to call their commander at home and did so previously. ECF No. 115 at 21; ECF No. 141 at 8-9. However, plaintiff fails to put forth sufficient evidence from which a reasonable jury could conclude that this policy was the "moving force" behind Agent Braley's use of excessive force. First, plaintiff has presented no evidence that the policy itself is unconstitutional. In *Tuttle*, the Supreme Court stated:

EXHIBIT 12

> [S]ome limitation must be placed on establishing municipal liability through policies that are not themselves unconstitutional, or the test set out in *Monell* will become a dead letter. Obviously, if one retreats far enough from a constitutional violation some municipal "policy" can be identified behind almost any such harm inflicted by a municipal official[.]

471 U.S. at 823. The Court continued, "where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the policy and the constitutional deprivation." *Id.* at 824 (internal quotation marks omitted). Here, plaintiff has only pointed to a single incident of an alleged **[*41]** constitutional deprivation.

Additionally, "[t]o establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (internal quotation marks omitted). And here, the policy is wholly unrelated to the use of deadly force. There is simply too tenuous a connection between the policy—not having a commander on duty or on call during the graveyard shift—and the injuries sustained by Agent Davies—deadly force by friendly fire. Therefore, no reasonable jury could find that this policy was the "moving force" behind Agent Braley's use of deadly force.

Also, plaintiff's claim fails because the record contains no evidence of the City's deliberate indifference. Plaintiff argues that the City had actual notice that its inadequate supervision during the graveyard shift would increase the risk to officer safety and it deliberately disregarded that risk. ECF No. 141 at 8. Specifically, plaintiff asserts that LPD actually knew that its inadequate supervision could lead to an officer being hurt or killed. *Id.* at 7. Plaintiff also argues that the City had constructive notice of a risk to officer safety because it was "highly predictable" **[*42]** and "plainly obvious" that an officer would be hurt or killed as a result of "inadequate incident command by an inexperienced and unsupervised sergeant." *Id.* at 10 (emphasis added).

Plaintiff's evidence of deliberate indifference is deficient in two respects. First, the issue is not whether the City knew that its actions would increase the risk to "officer safety," but whether the City knew that its actions were substantially certain to result in a *constitutional violation. Schneider*, 717 F.3d at 771. This is important because an action that increases the risk to "officer safety" does not necessarily increase the risk of a Fourth Amendment violation. In the vast majority of cases where an officer is hurt or killed due to the violent acts of a third party, the lapse in officer safety does not result in an injury that could give rise to an excessive force claim. *See Armijo By & Through Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1260 (10th Cir. 1998) ("state actors are liable only for their own acts, and not the violent acts of third parties"). It is only in rare cases where an officer is hurt by a state actor that a lapse in officer safety results in an injury that could be the basis for an excessive force claim. Plaintiff puts forth no evidence that would suggest that the City knew that its policy would result in its **[*43]** own officer's use of excessive force.

This point is deeply intertwined with the issue of causation, and is illustrated by the Supreme Court's language in *Tuttle*:

> The fact that a municipal "policy" might lead to "police misconduct" is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the "moving force" behind a *constitutional*

Exhibit 12

violation. There must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue.

471 U.S. at 844 n.8 (emphasis in original). Similarly, the fact that the City knows that its policy might make officers less safe is hardly sufficient to satisfy *Monell's* requirement that the City know or have reason to know that its particular policy is substantially certain to result in its officers' use of excessive force.

Second, with respect to constructive notice, plaintiff claims that it was "highly predictable" and "plainly obvious" that an officer would be *hurt or killed* as a result of the LPD's inadequate supervision of sergeants on the graveyard shift. However, plaintiff must show that a *violation of federal rights* is a highly predictable or plainly obvious consequence of the LPD's actions. *Schneider*, 717 F.3d at 771. Thus, **[*44]** plaintiff must show that it was highly predictable or plainly obvious that LPD's custom would result in a friendly fire shooting in violation of the Fourth Amendment. *Compare with Young*, 404 F.3d at 29 ("the jury could find that the department knew that a friendly fire shooting in violation of the Fourth Amendment was a predictable consequence of the PPD's failure to train on on-duty/off-duty interactions" in light of its "always armed, always on-duty" policy). That she fails to do. As such, summary disposition as to this issue is appropriate.

### 3. <u>Underutilization of SWAT</u>

Plaintiff argues that LPD maintained a custom of not calling out the SWAT team for dangerous incidents in direct contravention to its LPD Policy PP-4920; that this custom created a risk that an officer would be killed; and that the City was deliberately indifferent to that risk. ECF No. 141 at 18. Put another way, plaintiff asserts that this custom of underutilizing SWAT was the "moving force" behind Agent Braley's use of deadly force. *Id.* For the same reasons discussed above in Section IV.C.2, the City is entitled to summary judgment on this issue.

Assuming that plaintiff could prove that the City had a custom of underutilizing SWAT in contravention to the LPD's official **[*45]** policy, plaintiff fails to put forth sufficient evidence from which a jury could find causation and the requisite culpability. Regarding causation, plaintiff relies on Chief Paletta's testimony that had SWAT been called on November 9, 2012, a roll call of the perimeter positions would have occurred and patrol officers in perimeter positions would have been replaced by SWAT officers. ECF No. 143-1 at 141:13-143:11. Therefore, plaintiff concludes that had SWAT been called Agent Davies' position would have been communicated to the other officers or Agent Davies would have been replaced by a SWAT officer. ECF No. 141 at 20. Once again the relationship between the alleged custom and Agent Braley's use of force is too tenuous. There is no evidence that the custom itself is unconstitutional, so plaintiff automatically bears a higher burden in proving causation. Plaintiff does not produce evidence of a single incident—let alone a pattern of incidents—where the City's underutilization of SWAT resulted in an officer using excessive force. Further, the underutilization of SWAT is not "closely related" to the use of excessive force.[6] The Court does not dispute that the underutilization of

---

[6] Axiomatically, a police department's decision to deploy SWAT under certain circumstances can constitute excessive force. *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1190-91 (10th Cir. 2001) ("The decision to deploy a SWAT team to execute a warrant necessarily involves the decision to make an overwhelming show of force . . ."). It is hard to imagine then, how Sergeant Current's decision to use a lesser degree of force by *not* deploying SWAT could be considered the "moving force" behind Agent Braley's use of deadly force.

Exhibit 12

SWAT **[\*46]** might have negative impacts on the policing of an incident. However, plaintiff does not offer any evidence that connects the dots between a decision not to use SWAT and Agent Braley's use of excessive force. Finding causation would require the Court to make a series of inferential leaps.

Additionally, in order to prove deliberate indifference plaintiff points to Chief Paletta's testimony that a "potential risk" of violating the mandatory SWAT policy, PP-4920, was that an officer could be hurt or killed. ECF No. 143-1 at 100:15-19. As discussed in depth in Section IV.C.2, this is insufficient to establish deliberate indifference. Plaintiff fails to identify a pattern of constitutional violations that would have put the City on notice that **[\*47]** its underutilization of SWAT was substantially certain to result in its officers' use of excessive force. Finally, plaintiff does not assert, nor would this Court conclude, that it was "plainly obvious" that a constitutional violation would occur as a result of this custom.


### 4. <u>Underutilization of ICS</u>

Plaintiff argues that even though LPD's formal policy stated that supervisors were supposed to implement ICS in "tactical incidents," the well-settled custom was that sergeants did not use ICS in such incidents. ECF No. 141 at 20. Further, plaintiff contends that this custom was the "moving force" behind Agent Braley's use of force and the City was deliberately indifferent to that risk. *Id.* at 20-21. Again, for the same reasons discussed above in Sections IV.C.2 and 3, plaintiff's claim cannot survive summary judgment.

To prove causation, plaintiff points to Chief Paletta's testimony that Sergeant Current failed to set up a command post at the Eaton Street incident. ECF No. 143-1 at 260:8. Plaintiff argues that the command post was essential to effective command of the scene and communication with other officers. This evidence is insufficient to establish that this custom was the "moving force" behind **[\*48]** Agent Braley's use of deadly force. Once again, plaintiff does not identify a single other incident where a sergeant's failure to set up a command post led to an officer's use of excessive force. Like with the underutilization of SWAT, the Court notes the possibility that using ICS could have positively impacted the overall incident, but even so, there is no evidence that the failure to use ICS "actually caused" Agent Braley to use deadly force. Further, this custom is not "closely related" to the constitutional violation at hand.

Additionally, to prove deliberate indifference, plaintiff only offers Chief Paletta's testimony that a "potential risk" of violating LPD ICS policy PP-4903 is that an officer could get hurt or killed. For the same reasons discussed above, this does not establish deliberate indifference.


### 5. <u>Culture of Unnecessary Risk Taking</u>

Plaintiff claims that LPD encouraged and allowed a culture and custom of unnecessary risk taking to exist in the department. ECF No. 141 at 23. The City argues in part that plaintiff cannot prove causation or deliberate indifference. ECF No. 164 at 10. I agree that the plaintiff fails to prove causation or deliberate indifference, and thus, **[\*49]** summary judgment is appropriate as to this claim.

Assuming that plaintiff could prove a culture of unnecessary risk taking at LPD, plaintiff cannot prove that the culture caused Agent Braley to use excessive force. Plaintiff offers evidence that individual LPD officers often risked their own safety. However, plaintiff does not allege that officers used or posed a risk of using excessive force during that "risk taking" conduct. In fact, plaintiff does not offer a single prior incident of unconstitutional conduct that occurred as a result of this "risk taking" culture. Additionally, the

Exhibit 12

only evidence that plaintiff puts forth regarding "unnecessary risk taking" on November 9, 2012 is that Agent Okamura and Sergeant Grady entered the house without putting on any tactical gear. ECF No. 141-16 at 176:6. This evidence is insufficient to prove that this culture was the "direct cause" of Agent Davies' death.

Furthermore, plaintiff puts forth no evidence of deliberate indifference. ECF No. 141 at 23-25. She points to evidence that LPD encouraged or congratulated officers who took unnecessary safety risks so long as they achieved a favorable outcome. ECF No. 141-7 at ¶ 29; ECF No. 141-16 at 240:1-16; [*50] ECF No. 141-15 at 172:5-175:11. However, plaintiff puts forth no evidence that the City was aware that this risk-taking behavior had led to, or was obviously going to lead to, an officer's use of excessive force.

### 6. Failure to Ensure Mental Fitness

Plaintiff alleges that the LPD failed to ensure that its agents were mentally and emotionally fit for duty following traumatic incidents which was the moving force behind Agent Braley's use of deadly force and that the City was deliberately indifferent to that risk. ECF No. 141 at 25-30. The City argues that plaintiff cannot meet her burden of proving causation. ECF No. 164 at 12. I agree with the City. I conclude that no reasonable jury could find that LPD's custom of not confirming that its officers were mentally fit for duty following a traumatic incident was the moving force behind Agent Braley's use of deadly force.

Plaintiff contends that the LPD should have had a policy in place to require its officers to submit to a mental health evaluation following involvement in a use of deadly force incident to ensure that such officers were mentally fit for duty. ECF No. 141-24 at 314:17. To prevail on this claim, plaintiff must prove that the [*51] City's custom—not ensuring that its officers were fit for duty following a traumatic incident—was the "direct cause" of the constitutional violation. To carry that burden, plaintiff tries to establish that Agent Braley was unfit for duty prior to November 9, 2012. Plaintiff offers evidence that Agent Braley was previously involved in a foot pursuit and an exchange in gunfire with a suspect but did not shoot the suspect. ECF No. 141-8 at ¶ 43. Agent Gillespie testified that after that incident, Agent Braley told her, "never again will that happen." *Id.* From Agent Gillespie's testimony plaintiff concludes, without any support from the record, that "[t]his attitude towards the use of deadly force is indicative of someone who was traumatized and may be unfit for duty." ECF No. 141 at 30.

Additionally, plaintiff tries to prove that Agent Braley's unfitness for duty caused him to shoot Agent Davies. Plaintiff offers evidence that in 2009 an armed suspect pointed a gun at Agent Braley. ECF No. 141-25. As a result, Agent Braley shot and killed the armed suspect, who happened to be a Hispanic male with a shaved head. *Id.* Plaintiff asserts that this 2009 event was significant because directly after [*52] Agent Braley shot Agent Davies, a balding Caucasian male, Agent Braley reported over the radio that the individual he shot was a Hispanic male with a shaved head. ECF No. 141-30 at 2. From those facts plaintiff concludes, again without any support from the record, that Agent Braley "transposed the trauma and threat associated with his prior shooting incidents onto this incident[.]" ECF No. 141 at 30.

Plaintiff's evidence is insufficient to establish the "direct causal link" between the LPD's custom and the violation of Davies' rights for two reasons. First, plaintiff simply offers her own assumptions rather than factual evidence that Agent Braley's involvement in other "intense" and "traumatic" incidents in the course of his employment rendered him unfit for duty prior to November 9, 2012 and that this psychological trauma caused him to shoot Agent Davies. Second, plaintiff puts forth no evidence that had

Exhibit 12

the LPD had a more rigorous policy in place to ensure that its officers were fit for duty, that a psychologist would have come to the same conclusion as plaintiff, that Agent Braley was unfit for duty, and would have prevented Agent Braley from working on November 9, 2012. Plaintiff **[*53]** fails to put forth evidence proving that this custom was a but-for cause, let alone the moving force, behind Agent Braley's use of force.

## 7. Deadly Force Policy

Plaintiff moves for partial summary judgment asserting that LPD's deadly force policy is unconstitutional as a matter of law. ECF No. 123. The City also moves for summary judgment arguing that plaintiff cannot prove that the LPD's deadly force policy was the moving force behind Agent Braley's use of deadly force or that the City was deliberately indifferent to that risk. ECF No. 115 at 24-27; ECF No. 137; ECF No. 164 at 9. First, I conclude that the LPD's policy is not facially unconstitutional. Second, I find that plaintiff fails to put forth sufficient evidence upon which a reasonable jury could find causation and deliberate indifference.

Plaintiff contends that LPD Policy PP-4503 (the Policy) is facially unconstitutional because Section (C)(1) authorizes the use of deadly force even when an agent's belief regarding probable cause is subjectively reasonable but objectively unreasonable. ECF No. 123 at 7. I disagree with plaintiff's interpretation of the Policy.

Policy PP-4503 is titled "Use of Deadly Force." ECF No. 123-1. It **[*54]** is divided into three sections titled "(A) Policy," "(B) Procedure," and "(C) Rule." *Id.* Section A is predominantly an introductory section explaining the need for police agents to be properly armed "for the protection of society and themselves." *Id.* Additionally, it states that the general policy of the LPD with respect to the use of firearms or deadly force "shall be that an agent will use deadly force only when the agent is legally justified and the use of deadly force is objectively reasonable." *Id.*

Section B, "Procedure," authorizes the use of force under certain circumstances, consistently adopting the constitutional standards elucidated in Supreme Court and Tenth Circuit case law. *Id.* For example, it states that "Lakewood police agents are permitted to fire their weapons . . . [w]hen the use of deadly force is objectively reasonable[.]" *Id.* at (B)(1)(a). This is fully consistent with the Supreme Court's decision in *Graham.* 490 U.S. at 398. In Subsection (B)(2) the policy specifically provides that deadly force may be used in defense of life when "a police agent has probable cause to believe that the agent or another person is in imminent danger of being killed or of receiving serious bodily injury." *Id.* This language echoes **[*55]** the Tenth Circuit's holding in *Sevier.* 60 F.3d at 699. Further, Subsection (B)(5) states that the "reasonableness of a police agent's decision to use deadly force under this policy must be viewed from the perspective of a reasonable agent on the scene who may often be forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving and without the calm advantage of 20/20 hindsight." *Id.* Again, this language is consistent Tenth Circuit's holding in *Thomson.* 584 F.3d at 1312-13.

Finally Section C, the "Rule" section, addresses deadly force, choke holds, warning shots, and firing shots at misdemeanants. *Id.* The specific provision at issue states as follows:

Justification for the use of deadly force shall be limited to what reasonably appears to be the facts known or perceived by an agent at the time he decides to use such force. Facts unknown to an agent,

Exhibit 12
Page 19 of 21

no matter how compelling, cannot be considered in later determining whether the shooting was justified.

*Id.* at (C)(1).

I conclude that LPD Policy PP-4503 is not unconstitutional as a matter of law. Sections (A) and (B) repeatedly state that an agent may only use deadly force when it is objectively reasonable. Reading the Policy as a whole, the Court interprets Subsection (C)(1) not **[*56]** as an authorization of the use of deadly force, but as the LPD's standard for evaluating an officer's justification for his use of deadly force after the fact. Subsection (C)(1) limits the facts upon which an officer may claim that his use of deadly force was justified. Under Subsection (C)(1), an officer cannot later claim that his use of force was justified based upon facts that he did not actually know at the time. Therefore, under LPD policy, an officer cannot use subjectively unreasonable—but objectively reasonable—deadly force and later claim that he had probable cause to do so based upon facts that he didn't actually know at the time he decided to use such force.

The City contends that plaintiff cannot prove two essential elements of her claim, causation and deliberate indifference. ECF No. 115 at 24. I agree. First, plaintiff fails to put forth sufficient evidence that the Policy was the moving force behind Agent Braley's use of force. Plaintiff claims that the Policy caused Davies' death because it encouraged LPD agents to "shoot first and ask questions later" by "authoriz[ing] agents to use deadly force in those situations in which they have unreasonably or recklessly failed to collect or gain necessary information that **[*57]** would have negated their belief that a threat existed." ECF No. 141 at 22. As discussed above, the Court disagrees with plaintiff's interpretation of the Policy. Further, plaintiff puts forth no evidence that Agent Braley interpreted the Policy in this manner or that the Policy caused Agent Braley to "shoot first and ask questions later" on November 9, 2012.

Second, plaintiff puts forth no evidence of the City's deliberate indifference, arguing instead that she need not prove deliberate indifference because the policy itself is facially unconstitutional. ECF No. 169. Here, however, because the Court has found that the policy is facially lawful, plaintiff must demonstrate that the City's actions were taken with "deliberate indifference" as to its known or obvious consequences. *Brown*, 520 U.S. at 407. That she fails to do.


## D. Plaintiff's Motion for Partial Summary Judgment Regarding Defendants' Defenses

Plaintiff moves for partial summary judgment arguing as a matter of law that (1) the Colorado Workers' Compensation Act does not limit, preclude, or provide an offset against plaintiff's claims which are based solely on 42 U.S.C. § 1983; and (2) comparative fault is inapplicable to plaintiff's claims. ECF No. 122. For the reasons **[*58]** discussed below, plaintiff's motion is moot.

First, the only remaining defendant in this case, Agent Braley, filed a motion [ECF No. 138] clarifying that he does not raise any defense relating to the payment of workers' compensation benefits to Mrs. Davies or her children. As such, this part of plaintiff's motion is moot.

Second, Agent Braley concedes, and his Answer shows, that he is not asserting a defense based on comparative fault or non-party at fault. ECF No. 136 at 15; ECF No. 138 at 3; ECF No. 53 at 37. Instead, he intends to put forth evidence disputing causation, an element of plaintiff's claim, and he cautiously pled

Exhibit 12
Page 20 of 21

his denial of plaintiff's claim as an "affirmative defense." Because Agent Braley has not asserted a comparative fault defense, plaintiff's motion is moot as to this issue.


**V. ORDER**

   1) Defendant Braley's Motion for Summary Judgment [ECF No. 114] is DENIED.
   2) Defendant Current's Motion for Summary Judgment [ECF No. 116] is GRANTED.
   3) Defendant Grady's Motion for Summary Judgment [ECF No. 119] is GRANTED.
   4) Defendant City of Lakewood's Motion for Summary Judgment [ECF No. 115] is GRANTED.

   5) Plaintiff's Motion for Partial Summary Judgment Regarding Defendant City of **[*59]** Lakewood's Use of Deadly Force Policy [ECF No. 123] is DENIED.
   6) Plaintiff's Motion for Partial Summary Judgment Regarding Defendants' Defenses Regarding Workers' Compensation and Comparative Fault [ECF No. 122] is DENIED AS MOOT.

DATED this 16th day of February, 2016.

BY THE COURT:

/s/ R. Brooke Jackson

R. Brooke Jackson

United States District Judge

_____

**End of Document**

EXHIBIT 12
Page 21 of 21