IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
KOLBY MARTIN, and
TRAVIS THRELKEL

      Plaintiff(s),

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual
capacity, and
MARK HANCOCK, in his official and individual capacity,

      Defendant(s).

_____

### MARK HANCOCK'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

_____

**COMES NOW** Defendant Mark Hancock, who replies in support of his motion for summary judgment (#54).

## I.  INTRODUCTION

Martin Wirth ambushed and murdered Cpl. Nate Carrigan and inflicted grievous bodily and emotional harm on Dpty. Kolby Martin, Dpty. Travis Threlkel, and Cpt. Mark Hancock. Plaintiffs ignore that Mr. Wirth, alone, committed these heinous acts, and instead focus on their narrative that Cpt. Hancock should have predicted Mr. Wirth's murderous intent, and in failing to do so, violated their Fourteenth Amendment rights.  In support of this theory, Plaintiffs point to a single statement which Mr. Wirth made a month before the February 24, 2016 eviction and

Undersheriff Monte Gore's directive to stay out of Mr. Wirth's home.  But in so doing, they lose sight of two important facts: on the morning of the eviction Cpt. Hancock and the Plaintiffs all crafted a tactical plan for entering Mr. Wirth's home, to which no one objected; and everyone involved in the tactical operation was trained law enforcement officer and member of the Park County Sheriff's Office ("PCSO").  Plaintiffs all acknowledged the dangers inherent in their chosen profession; yet, now with the benefit of hindsight, they seek to blame Cpt. Hancock for having to face those dangers head-on.

Looking back on the eviction, Cpt. Hancock expressed concern that trying to use speed and surprise to his tactical advantage was a mistake.  Only now that we know the outcome of the eviction are we able to critique his decision.  But as Cpt. Hancock and the Plaintiffs stood outside Mr. Wirth's front door, the only person who knew what Mr. Wirth would do was Mr. Wirth.  Qualified immunity understands and allows officers to make the very type of split-second decision in a tense situation which is the focus of Plaintiffs' claim.  To deny Cpt. Hancock qualified immunity here imposes a standard on officials which the Fourteenth Amendment never contemplated - imposing a general affirmative duty to protect on the state and guaranteeing law enforcement officers a workplace free of third-party violence.  And even if the law was clearly established, the facts underlying this tragedy are a miserable fit for a substantive due process violation under the Fourteenth Amendment.

## II.      CHRONOLOGICAL SUMMARY OF FACTS

Plaintiffs do not dispute any of the facts set forth in Cpt. Hancock's Chronological Summary of Facts ("CSF").  For the purposes of this motion only, Cpt. Hancock does not dispute

the facts in Plaintiffs' Response.  The factual issues raised in the Motion and the Response are addressed in more detail in § II(A)(2)(b).

### III.   CLAIMS UPON WHICH JUDGMENT IS SOUGHT

**A.   Captain Hancock is entitled to Summary Judgment on his Fourth Affirmative Defense: Qualified Immunity.**

#### 1.   Burden of proof and elements.

Plaintiffs agree they bear the burden to show Cpt. Hancock violated their Fourteenth Amendment substantive due process rights, and that the right was clearly established as of February 24, 2016.  [Response, p. 3.]

#### 2.   Elements that cannot be proven by the Plaintiffs.

##### a.   Clearly established law element.[1]

The constitutional question here – whether Fourteenth Amendment substantive due process extends to protect officers from third-party violence during a tactical operation – remains a long ways from being "clearly established."   A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964 (10th Cir. 2016) ("*Reat*") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).  Plaintiffs insist Cpt. Hancock violated their clearly established right, yet they never actually define with any "degree of specificity" what Fourteenth Amendment right he violated.  *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (*per curiam*).   Plaintiffs criticism that Cpt. Hancock's characterization of the right as "too

---

[1] The Court may resolve an issue of qualified immunity on either of the two prongs, and the Court need not decide whether a violation occurred if it concludes that the right at issue was not clearly established. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  Here, the second prong is dispositive of Plaintiffs' claim under the Fourteenth Amendment against Cpt. Hancock.

restrictive" (Response, p. 24) is just another of way of avoiding defining the issue beyond the most general sense.  The Supreme Court, however, has recently made a point of reminding lower courts not to define clearly established law at a high level of generality.  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (*per curiam*); *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018) ("courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the circumstances that he or she faced.) (internal quotation omitted).

In order to satisfy their burden, Plaintiffs must provide pre-existing case law from the Supreme Court, Tenth Circuit, or a collection of the Circuits, putting every law enforcement officer on notice that Cpt. Hancock's conduct here violated the Fourteenth Amendment's substantive due process clause.  *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Wilson v. Wilcox, et al*.  No. 14-CV-MSK, 2018 WL 1304532, at *7 (D. Colo. Mar. 13, 2018) (it is the plaintiff's burden to identify prior authority in a "particularized sense" to satisfy the clearly established law prong).  It is not enough that the rule is "suggested by then-existing precedent," *Wesby*, 138 S. Ct. 577 at 590; the precedent must find a Fourteenth Amendment violation under similar circumstances such that the violative nature of the conduct is "beyond debate," *Reat*, 824 F.3d at 965 (analyzing state of clearly established law under the Fourteenth Amendment state-created danger doctrine as applied to 911 operators) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  These rules require a plaintiff to cite to-preexisting cases holding that the same or analogous conduct of a law enforcement officer violated the constitutional right being asserted by the plaintiff or plaintiffs.  Only then can the court determine if an officer has "fair notice" that his or her conduct was unlawful.  *Kisela*, 138 S. Ct. at 1152 (quotation omitted).

4

Plaintiffs do not come close to satisfying this heavy burden.  Their reference to dicta from *Medina v. City & Cty. of Denver*, 960 F.2d 1493, 1499 (10th Cir. 1992) and *Robbins v. Okla. Ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1252 (10th Cir. 2008) (citing *Uhlrig v. Harder*, 64 F.3d 567, 575 (10th Cir. 1995) ("*Uhlrig*")) in an attempt to identify scenarios which "might" or "could" lead to § 1983 liability is insufficient to sustain their burden.  [*See* Response, pp. 26 and 28.]  Although both cases analyze danger-creation claims, neither provides guidance to a reasonable officer about the duty he owes to his or her team in a tactical operation; especially because both cases focused on a unique set of circumstances, and neither found a violation of the Fourteenth Amendment.  *Medina*, 960 F.2d at 1498-99 (granting qualified immunity to a police officer related to Fourteenth Amendment claim made by a third-party cyclist injured while the police engaged in a car chase with a criminal suspect); *Robbins*, 519 F.3d at 1252-53 (remanding case for dismissal where parents failed to state a viable claim for relief under the danger-creation doctrine for injuries suffered by their infant at a state-subsidized day-care).

Next, Plaintiffs take the unprecedented step of looking to Fourth Amendment case law, *Allen v. Muskogee*, 1197 F.3d 837 (10th Cir. 1997) and *Hastings v. Barnes*, 252 Fed. Appx. 197 (10th Cir. 2007) (unpublished), to define the duties Cpt. Hancock owed to the members of the entry team under Fourteenth Amendment substantive due process.  The Supreme Court and Tenth Circuit cite to Fourth Amendment cases such as *Wesby*, *Mullenix*, and *Pauly* to establish the requirements for establishing whether the law is "clearly established."  However, Courts refer to particular body of case law which is relevant only to the right at issue to determine whether the officer was on notice that his or her conduct was unlawful.  For example, in *Wesby*, the Supreme Court referred to Fourth Amendment jurisprudence on the issue of probable cause to

determine the state of the law. *Wesby*, 138 S. Ct. 577, 592-93. Similarly, in *Reat*, the Tenth Circuit only analyzed prior danger creation cases to evaluate whether the law was clearly established that a 911 operator faced liability for a Fourteenth Amendment substantive due process violation. *Reat*, 824 F.3d at 966-67. Plaintiffs do not cite to any cases which suggest a court can consider a body of law specific to the interpretation of the contours of one constitutional amendment when considering whether the law is clearly established under another amendment. Such a proposition defies logic or commonsense, especially where the point of the clearly established prong of qualified immunity is meant to limit liability to situations where a lay-person knowingly violates pre-existing law or is plainly incompetent. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Not only is it improper to look to the Fourth Amendment to define the state substantive due process jurisprudence, but *Allen* and *Hastings* do not even inform Cpt. Hancock's purported obligations to his fellow deputies. In *Allen*, the Tenth Circuit held that genuine issues of fact precluded summary judgement for officers who engaged in a shootout with an armed driver who had previously threatened family members. In remanding the case to the district court, the Court did not find a constitutional violation as Plaintiffs suggest (Response, p. 26), but rather noted, "While we express no opinion on the merits, a reasonable jury could conclude on the basis of some of the testimony presented that the officers' actions were reckless and precipitated the need to use deadly force." *Id*. at 841. While this decision might inform an officer on the level of force appropriate to confront an armed individual, it does not speak to whether it was conscience shocking under the circumstances for one officer to order his partner to open the car door to remove the armed driver for substantive due process clause purposes.

In the unpublished *Hastings* decision, the Tenth Circuit again analyzed a claim of excessive force under the Fourth Amendment where officers shot and killed an individual advancing toward them with a large sword.  252 Fed. Appx. at 201.  The Court found a Fourth Amendment violation because the officers' actions (entering the home and acting as the aggressors by excessively pepper-spraying the suspect) created a situation which necessitated their use deadly force.  *Id*. at 201-202.  This holding might be relevant to a claim by Mr. Wirth's estate against Cpt. Hancock and the rest of the entry team, but it is silent as to the constitutional implications of whether one officer is liable to another officer under the Fourteenth Amendment for injuries which might result from the order to enter the home in the first place.

In an effort to sidestep the burden of producing Fourteenth Amendment precedent which found a constitutional violation under similar circumstances to those present here, Plaintiffs label Cpt. Hancock's decision to order the entry "obviously improper," claiming this alleviates them from the specificity requirement.  [Response, p. 25.]  This, however, is not an "obvious case" where "a body of relevant case law" is unnecessary.  *Wesby*, 138 S. Ct. at 582.  *Hope v. Pelzer*, 536 U.S. 730 (2002), in which an inmate, in the heat of the Alabama summer, was twice handcuffed to a hitching post for hours, while guards taunted him and denied him water is such a case.  This tactic "unnecessarily and wantonly inflicted pain" and was a "clear" and "obvious" violation of the Eighth Amendment.  *Id*. at 741.  And although Plaintiffs believe there is a "sliding scale" approach to the clearly established law analysis (Response, p. 25 (citing *Harte v. Bd. of Comm'rs*, 864 F.3d 1154 (10th Cir. 2017) (analyzing Fourth Amendment claims only)), *i.e.*, the more obviously egregious the conduct, the less specificity is required from prior case law, they ignore that this approach is limited to Fourth Amendment excessive force cases and has

no applicability here.  *See Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).  And the Tenth Circuit has questioned whether this approach is still viable.  *See Aldaba v. Pickens*, 844 F.3d 870, 874 n.1 (10th Cir. 2016) (on remand).

The Tenth Circuit, in performing the clearly established law analysis in *Reat*, made clear that the only relevant inquiry is whether a reasonable official could have known that his or her actions would have "resulted in liability under the Fourteenth Amendment."  824 F.3d at 967.  In the Fourteenth Amendment substantive due process context, however, the undersigned are yet to find an example of an "obvious case," such as *Hope* in the Eight Amendment context, presumably because conduct which shocks the conscience "in one environment may not be so patently egregious in another …."  *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("*Lewis*").  Moreover, as discussed below at pgs. 9-11, the existence of *Collins v. Harker Heights*, 503 U.S. 115 (1992) preempts any contention that this is an "obvious case" of a substantive due process violation because *Collins* holds that the theory is unavailable to claims of workplaces injuries against employers and supervisors.  This further highlights the importance of specificity under the clearly established law prong so that the Court may judge whether Cpt. Hancock had fair notice that his conduct was unlawful, *Wesby*, 138 S. Ct. at 590., and counsels against looking to the objective reasonableness standard of the Fourth Amendment to inform the conscience-shocking determination under the Fourteenth Amendment.

When this Court properly performs the clearly established law analysis by referring to relevant Fourteenth Amendment case law, only two cases from the Tenth Circuit inform Cpt. Hancock's decision to order the entry into Mr. Wirth's home – *Moore v. Guthrie*,  438 F.3d 1036 (10th Cir 2006) and *Uhlrig*, and neither case found a constitutional violation.  In *Moore*, the

Tenth Circuit analyzed the police chief's duty to protect one of his officers during a live fire training exercise, a quasi-tactical situation.  There, the Court found the exercise fell within the realm of the officer plaintiff's work environment, and citing to *Collins,* agreed that "substantive due process was not a guarantor of workplace safety."  *Moore*, 438 F.3d at 1040.  Because Plaintiffs' injuries resulted from an incident which occurred in the workplace environment, *Moore*, following *Collins*, counsels against extending due process protection to the circumstances of this case.  *Moore*, 438 F.3d at 1040 (finding "[a]lthough Plaintiffs cannot be said to have a right to bodily integrity in a safe work environment, out of an abundance of caution we will nevertheless review whether the complained of conduct shocks the conscience.") (internal quotation marks omitted).

If the Court looks beyond *Collins* and *Moore*, *Uhlrig*, although not a law enforcement case, informs officials that decisions preceded by warning subordinates of a potential risk, and planning to face that risk, do not rise to the "degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking," to support liability under the Fourteenth Amendment.  *Uhlrig*, 64 F.3d at 574-76.  These two cases, at worst, are ambiguous about whether the Fourteenth Amendment applies to this workplace tragedy, and demonstrate that preplanning and warnings about risks do not support a claim for Fourteenth Amendment liability.

Plaintiffs have not shown that any relevant case law established that Cpt. Hancock had a constitutional obligation to ensure Plaintiffs were not harmed in this tactical operation.  Nor do they present any general constitutional rule which applies with obvious clarity to the facts of this

specific case.  Therefore, Plaintiffs have not met their burden under the clearly established law prong and Cpt. Hancock is entitled to qualified immunity.

### b.   Constitutional violation element.

#### (1)   Substantive due process does not apply to the facts if this case.

Fourteenth Amendment substantive due process protections do not guarantee anyone, including Plaintiffs, safe working conditions.  "Neither the text nor the history of the Due Process Clause supports [a] claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause."  *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992).  "The bill of rights protects people from the government but does not oblige the government to furnish protection against private violence."  *Witkowski v. Milwaukee Cty.*, 480 F.3d 511, 514 (7th Cir. 2007) (Fourteenth Amendment did not afford any protections to deputy shot by inmate who voiced intent to "create mayhem" if convicted at trial, and following the jury's guilty verdict, gained control of a gun due to the plaintiff's fellow deputies' decision to disregard previously agreed upon measures to secure the prisoner) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989)).  Substantive due process is not meant to "impose federal duties that are analogous to those traditionally imposed by state tort law."  *Collins*, 503 U.S. at 128.  This is especially true in the employment context because "state law, rather than the Federal Constitution, generally governs the substance of the employment relationship."  *Id.*

The Tenth Circuit, in *Moore*, recognized *Collins*' proscription on government employee's ability to assert substantive due process claims arising out of the work environment.  438 F.3d at 1040.  The Court held that "Plaintiff cannot be said to have a right to bodily integrity in a safe

work environment…." *Id.* Only "out of an abundance of caution" did the Court go on to review whether it was conscience shocking for the police chief to allow officers to participate in a live-fire exercise despite not providing the officers with the recommended protective equipment. *Id.* But the Court concluded its opinion by reiterating that the chief was entitled to qualified immunity in-part because "the Supreme Court has only recognized a right to bodily integrity under the Fourteenth Amendment in very limited circumstances, not including working in a safe environment." *Id.* at 1043.

In *Uhlrig*, the Tenth Circuit performed a similar analysis. The Court recognized that the Supreme Court in *Collins* "specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist in the workplace is not necessarily conscience shocking." *Uhlrig*, 64 F.3d at 574 (citing *Collins*, 503 U.S. at 128).

While Plaintiffs argue that they assert a more particularized claim than "the right to work in a safe environment" (Response, p. 6), the main thrust of their claim against Cpt. Hancock is that, during the course of a tactical law enforcement operation, his decision to enter placed Plaintiffs in harm's way; intentionally or otherwise, (Response, p. 16). Plaintiffs attempt to right is just an exercise in semantics. Section 13-40-123(1), C.R.S., places executing a writ of restitution squarely within the purview of the PCSO and Plaintiffs do not deny that their injuries arose from their work environment. [*See* Response, p. 4-5.] Further, allegations of Cpt. Hancock's intent do not distinguish *Moore*; for the police chief there knew of the danger his officers faced, due to being educated by the bullet manufacturer of the risks on three separate occasions, and chose not to authorize the purchase of the protective equipment. *Moore*, 438 F.3d

at 1038.  Nor does it distinguish *Uhlrig*, where officials placed an inmate in the care of a female therapist despite knowing the inmate's violent proclivities, including the rape and assault of a female patient.  *Uhlrig*, F.3d at 570.  Or *Collins*, where the plaintiff alleged the city deliberately failed to train the workers in its sanitation department in safe procedures.  *Collins*, 503 U.S. at 124.  As a result, *Collins* and its progeny from this Circuit preclude Plaintiffs' substantive due process claim.

(2)     **Captain Hancock's actions do not satisfy the elements of a substantive due process violation.**

(i)     **Facts learned after the fact or with the benefit of hindsight cannot support the elements of a constitutional violation.**

If the Court looks past *Collins*, even in an abundance of caution as the *Moore* Court did, no facts support a claim for a substantive due process violation here.  Plaintiffs' entire argument focuses on what we now know to be true – Mr. Wirth hid in the stairwell of his home, ambushed the deputies as they entered the kitchen area, and murdered Cpl. Carrigan and wounded Dpty. Martin and Cpt. Hancock.  [CSF, ¶ 14.]  Yet, hindsight plays no role in the determination of whether Cpt. Hancock's actions violated Plaintiffs' substantive due process rights.  *DeShaney*, 489 U.S. at 202; *Uhlrig*, 64 F.3d at 576 (warning against second guessing a defendant's decisions based on hindsight).

This Court, in *Deray v. City of Colorado Springs, Colo.*, No. 11-CV-0269390MSK-CBS, 2013 WL 1149550, at * 8 (D. Colo. Mar. 19, 2013), cautioned against considering facts which only appear conscience-shocking "with the benefit of knowing the outcome of the matter." There, two officers - knowing that a suspect had previously threatened to kill himself - arrested him and placed him in the front seat of their patrol car against department policy.  The suspect

12

managed to unbuckle his seat belt and jump out of the car where he was hit by oncoming traffic and died.  The suspect's estate brought a state created danger claim, which this Court dismissed on summary judgment.   In considering whether the officers' conduct of acting contrary to department policy and not considering the suspect's earlier threats was conscience-shocking, this Court stated:

> [T]o find the act or decision which was pivotal requires traveling back in time to the moment when the Officers placed [the suspect] in the front seat of the car.  Yet it is only hindsight that reveals the importance of that decision. Without knowing the ultimate consequences, were one to "stop the film" at the moment [the suspect] is placed in the front seat, the decision would not be "conscience-shocking" or "outrageous".

*Id*.

Only hindsight reveals that Mr. Wirth hid in the stairwell leading to the basement with the barrel of his rifle trained on the front door.  When the Court strips this fact away, Cpt. Hancock's decision is no more shocking than that in *Deray*.

### (ii)   No substantial risk of serious, immediate, and proximate harm or obvious/known risk of harm.

Plaintiffs argue Mr. Wirth's lone statement that he intended to shoot law enforcement officers coupled with Undersheriff Gore's direction to stay out of Mr. Wirth's home made any interaction with him inherently dangerous.  [Response, pp. 7-9.]  This ignores that the Tenth Circuit permits officials to mitigate risks through planning and preparation.  *Uhlrig*, 64 F.3d at 575.  If mere warnings about a patient's violent proclivities are sufficient to "minimize the risks inherent" in the job of a therapist working in a high risk mental health facility, *id*., preplanning a patrol operation in which all the deputies discussed the risks posed by the suspect, voted on whether to elevate the operation to a SWAT call-out, and devised a plan for entering the home if

necessary, coupled with the fact that the deputies are trained for operations just like this, must also sufficiently reduce the risks such that Plaintiffs' facing Mr. Wirth "could not fairly be described as presenting a substantial risk of harm."  *Id.*[2]  Whether Undersheriff Gore told Cpt. Hancock to stay out of the house or the applicable PCSO policy dictated a different course of action is irrelevant.  Under § 1983, the issue is whether Cpt. Hancock violated the Fourteenth Amendment, not whether he should be disciplined by the sheriff's department.  *See Tanberg v. Sholtis*, 401 F.3d 1151, 1160 (10th Cir. 2005) ("[o]fficials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision.") (quoting *Davis v. Scherer,* 468 U.S. 183, 194 (1984)).

That Plaintiffs overlook the pre-eviction briefing and Mr. Wirth's non-threatening behavior toward Cpt. Hancock and Cpl. Carrigan when they first arrived on his property engages in the outcome-focused reasoning this Court admonished in *Deray*.  If the Court places itself in Cpt. Hancock's position at the moment he ordered entry, it is evident that he and the other deputies were aware of Mr. Wirth's one prior statement, crafted a plan for reducing the likelihood of violence (sending two people to contact Mr. Wirth who had some background in dealing with him), and planned for a possible entry.  Just like *Uhlrig*, this was all done to mitigate the risks Mr. Wirth might pose.

### (iii)     No obvious or known risk.

The relevant inquiry under this factor is whether Cpt. Hancock knew that Mr. Wirth intended to ambush and murder the deputies before he ordered entry into the home.  The answer

---

[2] These facts also undermine any claim that Cpt. Hancock somehow misled any deputies into believing they would not enter the home.  [*See* Response, p. 27-28.]  Plaintiffs do not dispute they all played a role in planning this eviction, to include entry.  Thus, even if entry was a last resort, Plaintiffs all had notice of the possibility of this aspect of the operation.

is, "No."  There is no doubt that on January 20, 2016, Mr. Wirth said he would "go home and get his gun and shoot the first cop he [saw]" as he walked out of the State Farm office in Golden. [CSF, ¶ 2.]  But when officers contacted him on his property later that day, he was not violent – he exited his car and began to walk toward his home, at which point an officer tackled him to the ground and he refused to give up his hands.  [**Exh. E**, pp. PCSO 1002-03.]  Plaintiffs point to no encounters between the January 20 incident and the eviction which evidence any form of aggression by Mr. Wirth toward law enforcement officer.  Further, when the PCSO previously evicted Mr. Wirth, he left his property peacefully.  [CSF, ¶ 1.]  And finally, as discussed above, more than a month later, on the day of the eviction, Mr. Wirth's actions did not indicate to Cpt. Hancock any intent to act violently toward the deputies.  It is true that Cpt. Hancock assumed most residents he interacted with in Park County had access to a firearm, but there was absolutely no indication, as Cpt. Hancock stood at the front door, that Mr. Wirth was setting up an ambush inside the house.  None of this has any bearing on Cpt. Hancock's knowledge of whether Cpt. Hancock knew Mr. Wirth was set-up to ambush the entry team.  Thus, Plaintiffs cannot satisfy this element.

### (iv)      No reckless or conscience disregard of risk.

It cannot be said that Cpt. Hancock "disregarded" the risk Mr. Wirth presented.  Plaintiffs do not address *Uhlrig's* determination that establishing "procedures to address the (arguably) known risk" is sufficient to defeat a claim of conscious disregard to a known or obvious risk.  64 F. 3d at 576.  Again, Cpt. Hancock and the deputies all agreed on a plan for how they would approach and interact with Mr. Wirth during the eviction, to include the possibility of entering the home and forcibly removing him.  All of the deputies who were supposed to enter the

residence had SWAT training.  [CSF, ¶ 3.]  To the extent the plan violated Undersheriff Gore's orders or PCSO policy (Response, p. 16) those are matters for the PCSO to consider in a disciplinary action.  Even if one of the deputies believed there would be no entry (Response, p. 19), there is no dispute the group discussed and formulated a plan to make entry into the home and the deputies on the entry team had the requisite training and experience, due to their SWAT and general law enforcement training, to perform the entry.

That Plaintiffs are critical of Cpt. Hancock for how he looked through the window of the front door or his failure to obtain a complete layout of the home before entry, along with Undersheriff Gore's opinion that Cpt. Hancock was "reckless," is yet another example of analysis through hindsight.  [Response, pp. 15-16.]  Captain Hancock explained at his deposition that blueprints are unnecessary, rather when a suspect's location is unknown, "You dynamically flood the room with officers, and you work through the house as quickly as possible until you contact them."  [**Exh. G**, 262:17-22.]  Deputies Martin and Threlkel testified at their depositions that they were trained to make entry, cover each other, and clear the house until they found the suspect.  [*See* **Exh. F**, 206:24-209:1, **Exh. H**, 317:9-318:23.]  This is also a red-herring.  The real danger was the ambush, not Cpt. Hancock or the team's lack of familiarity with the interior of the home.

Moreover, Captain Hancock had the opportunity to engage in a verbal exchange with Mr. Wirth and observe his behavior.  [CSF, ¶¶ 8 and 9.]  Based on this interaction, Cpt. Hancock had no reason to believe Mr. Wirth intended to shoot anyone.  There is also no evidence that Cpl. Carrigan, the only other person on-scene to have any interaction with Mr. Wirth, second-guessed or voiced any objection to Cpt. Hancock's decision to order entry.  Captain Hancock explained at

his deposition that the deputies' training on dynamic entries is designed to account for entering strange places.  These facts counsel against Plaintiffs' characterization that Cpt. Hancock blindly sent his men into the line of fire.  Indeed, no matter the preparation for a tactical operation, "your tactics and judgment can be perfect, but if you've got a hidden assailant and you don't even know they are there and you're ambushed, not much you can do."  [**Exh. M**, 44:4-7.]

(v)   **Captain Hancock's conduct, when viewed in total, was not conscience shocking.**

Plaintiffs are unable to satisfy the key component of this final element – context-specific-intent.  In *Lewis*, the Court recounted the history of application of substantive due process, and in an effort to discern an appropriate standard by which to evaluate an officer's actions in a police chase under the Fourteenth Amendment, looked to the standard for Fourteenth Amendment liability in the context of prison riots.  *Id*. at 852-53.  Under those circumstances, deliberate indifference does not suffice for constitutional liability when officers are tasked with using force to restore order among inmates.  *Id*. at 852-53.  "Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tug against each other.  Their duty is to maintain lawful order, while not exacerbating disorder more than necessary to do their jobs."  *Id*. at 853.  In the context of a car chase, "[a] police officer … must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers or bystanders."  *Id*. at 853.  With the understanding that prison officials are afforded much more leeway, for purposes of Fourteenth Amendment liability, to carry out their job responsibilities, the *Lewis* Court held that "high-speed chases with no intent to harm suspects physically or to

17

worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by any action under § 1983." *Id*. at 854.

Here, the characterization of Cpt. Hancock's decision to enter as "reckless" ignores the context in which he gave the order and again employs the benefit of hindsight. When the Court travels back to the moment Cpt. Hancock ordered the entry he knew:

- Mr. Wirth made a single threat against law enforcement just over a month before the February 24, 2016 eviction. Over the course of the next four weeks, no evidence suggests Mr. Wirth threatened or acted violently toward any law enforcement officer. [CSF, ¶ 2.] Plaintiffs do not address this fact.

- On the morning of the eviction, Cpt. Hancock held a briefing in which he asked all the deputies involved in the operation, including Plaintiffs, if the eviction should be a formal SWAT operation. The group discussed the potential danger Mr. Wirth posed, noting that removing Mr. Wirth from the home could turn into a "shootout and O.K. Corral" situation. Despite this, the deputies voted not to involve SWAT. [CSF, ¶ 3.] Plaintiffs do not address these facts.

- All of the deputies involved in the eviction were trained law enforcement officers. [CSF, ¶ 3; **Exh. L**, 55:13-25 (confirming Cpl. Carrigan was POST certified).]

- Captain Hancock sent Sgt. Leffler to surveil Mr. Wirth's property while he briefed the rest of the deputies. Sergeant Leffler reported no concern about Mr. Wirth to Cpt. Hancock. [CSF, ¶ 4.] Plaintiffs do not address this fact.

- Once it was decided the eviction would remain a patrol operation, Cpt. Hancock and the deputies devised a plan for how they would approach Mr. Wirth and, if necessary, enter the home. Because the deputies had a lawful writ of restitution, they understood the court order permitted them to enter Mr. Wirth's home and forcibly remove him, again if necessary. Captain Hancock chose Dptys. Martin, Threlkel, and Lowrance, all members of the PCSO SWAT team, to join him on the entry team. Corporal Carrigan was assigned to break-in the door. Captain Hancock placed a star next to his name on the white board in the briefing room, as well as the names of Cpl. Carrigan and Dptys. Martin, Threlkel, and Lowrance. The word "Breach" appeared next to Cpl. Carrigan's name on the whiteboard. No one objected to this plan. [CSF, ¶¶ 3-5.] Plaintiffs do not address these facts.

- At the conclusion of the briefing, Cpt. Hancock permitted the deputies to wear whatever body armor they preferred.  Deputy Threlkel elected a plate carrier while Dpty. Martin wore a ballistic vest.  [CSF, ¶ 6.]  Plaintiffs do not address these facts.

The Response makes no mention of this briefing, the writ, or that Cpt. Hancock designated who would make entry into the home with him, to no objection from anyone.  [CSF, ¶ 5.]  Thus, the lens though which the Court must view the facts is that of a law enforcement operation to remove Mr. Wirth from his home, potentially by force, by trained law enforcement officers who agreed on how best to carry out the operation.

Once on-scene, neither Mr. Wirth's demeanor nor his words indicated that he intended to ambush and murder anyone.  [CSF, ¶¶ 8 and 9.]  Plaintiffs cannot dispute this simple fact since Cpt. Hancock is the only living person who had the opportunity to both speak with and observe Mr. Wirth on the day of the eviction.  [CSF, ¶ 8.]  Thus, when Cpt. Hancock and Cpl. Carrigan went to the front door, Cpt. Hancock expected Mr. Wirth comply with the order to exit his residence.  [CSF, ¶ 10.]  But when he did not come to the door, Cpt. Hancock was tasked with making a split-second decision – hold his position and call for back-up, or as discussed in the pre-eviction briefing, enter the home pursuant to the writ.  Captain Hancock believed he could use speed and surprise to his advantage to subdue Mr. Wirth and ensure the eviction was completed peacefully, (**Exh. G**, 161:10-11), especially since he had enjoyed success utilizing this tactic before, (**Exh. G**, 248:15-18) ("What I mean is I've had a lot of success at very quickly getting in on people and getting the situation under control, interrupting their OODA loop before they fortify and plan or do anything to us.").

Based on the above, whether Undersheriff Gore ordered Cpt. Hancock to stay out of the house is irrelevant.  If Undersheriff Gore did give Cpt. Hancock such an order, Cpt. Hancock and the other deputies still discussed Mr. Wirth's background and created a plan for the eviction – undermining any argument that Cpt. Hancock was deliberately indifferent to the risks of the operation.  And Plaintiffs do not dispute that Undersheriff Gore, when afforded the opportunity to voice an objection to entry, deferred to Cpt. Hancock's judgment and said nothing.  [CSF, ¶ 12.]  Although Dpty. Martin may have questioned why Cpt. Hancock wanted to enter the residence; the Response makes clear that he never actually voiced this thought to Cpt. Hancock. [Response, p. 20.]  Once the entry team had assembled at Mr. Wirth's front door, neither the Sheriff, who Plaintiffs concede is entitled to qualified immunity on their claims, Undersheriff Gore, nor did the Plaintiffs object to entering the house.  [CSF, ¶ 12.]  While such an objection may have constituted an act of insubordination, Plaintiffs recognized that being a deputy is an inherently dangerous job, (CSF, ¶ 16.).  *Cf. Wallace v. Adkins*, 115 F.3d 427, 430 (6th Cir. 1997) (rejecting prison guard's Fourteenth Amendment claim against prison officials for injuries suffered while being stabbed by an inmate because this was a "risk of the guard's job).

Only now do we know that Mr. Wirth, hidden in the stairwell with the muzzle of his rifle trained on the front door, enjoyed the tactical advantage.  While we can speculate about whether prudence may have repressed Mr. Wirth's actions, Cpt. Hancock's intent was to do his job as a law enforcement officer, pursuant to a lawful writ, not to induce Mr. Wirth's "lawlessness, or to terrorize, cause harm or kill."  *Lewis*, 523 U.S. at 855.  Though Cpt. Hancock's decision resulted in tragedy, his intent on the day of the eviction was not sufficient to elevate any of his actions to a conscience shocking level.

**B.     Captain Hancock is entitled to Summary Judgment on Claim 2: Deliberately Indifferent Training and Supervision.**

Plaintiffs concede Cpt. Hancock is entitled to qualified immunity on this claim. [Response, p. 31.]

**C.     Captain Hancock, in his Official Capacity, is entitled to Summary Judgment on Claims 1 and 2.**

Plaintiffs agree to dismiss their claims for relief against Cpt. Hancock in his official capacity.  [Response, p. 31.]

## IV.     CONCLUSION

Plaintiffs have failed to carry their burden under both prongs of the qualified immunity analysis.  The law was not clearly established at the time of the eviction such that Cpt. Hancock had any notice that he was subject to Fourteenth Amendment liability for the decisions he made during a tactical operation.  To the contrary, *Collins*, *Moore*, and *Uhlrig*, the relevant body of law, demonstrates there is no constitutional guarantee to a safe work environment.  Moreover, Plaintiffs have not come forward with any case which found liability against a law enforcement officer under the danger-creation doctrine.  Even if the Court looks beyond the clearly established prong, the facts of this case do not support a claim for a Fourteenth Amendment violation under any theory.  Captain Hancock had no way to know that Mr. Wirth would ambush the entry team.  It is only through an after-the-fact analysis of his decision are we able to critique his decision.  Indeed, in the heat of the moment, no one disagreed with Cpt. Hancock's decision.  For these reasons, and those outlined in the Motion, Cpt. Hancock is entitled to qualified immunity.

Respectfully submitted this 18th day of May, 2018.

BERG HILL GREENLEAF RUSCITTI LLP


*s/ Josh A. Marks*
Josh A. Marks
David J. Goldfarb
1712 Pearl Street
Boulder, CO  80302
Phone:  (303) 402-1600
Fax:  (303) 402-1601
Email:  jam@bhgrlaw.com
            djg@bhgrlaw.com

*Attorneys for Defendant Mark Hancock*

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of May, 2018, I electronically filed the foregoing **MARK HANCOCK'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification to such filing to the following e-mail addresses:

Donald C. Sisson
Reid J. Elkus
Lucas Lorenz
Elkus and Sisson, P.C.
501 South Cherry Street, Suite 920
Denver, CO 80246
dsisson@elkusandsisson.com
relkus@elkusandsisson.com
llorenz@elkusandsisson.com

Timothy P. Schimberg
Fowler, Schimberg, Flanagan &
McLetchie, P.C
1640 Grant Street, Suite 300
Denver, CO 80203
t_schimberg@fsf-law.com

s/ Cheryl Stasiak

_____

Cheryl Stasiak