1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:16-cv-03079-MSK-MJW
 3
        ESTATE OF NATE CARRIGAN,
 4      JOHN CARRIGAN, MELISSA CARRIGAN,
        KOLBY MARTIN, and TRAVIS THRELKEL,
 5
        Plaintiffs,
 6
        v.
 7
        PARK COUNTY SHERIFF'S OFFICE,
 8      SHERIFF FRED WEGENER, in his
        official and individual capacity,
 9      and MARK HANCOCK, in his official
        and individual capacity,
10
        Defendants.
11      _____

12      DEPOSITION OF:  KOLBY MARTIN - October 11, 2017
                        (Confidential Designations Pending)
13      _____

14                  PURSUANT TO NOTICE, the deposition of
        KOLBY MARTIN was taken on behalf of the Defendants
15      Park County Sheriff's Office and Sheriff Fred Wegener
        at 501 South Cherry Street, Suite 920, Denver,
16      Colorado 80246, on October 11, 2017, at 9:58 a.m.,
        before Darcy Curtis, Registered Professional Reporter
17      and Notary Public within Colorado.

18

19

20

21

22

23

24

25
```

H+G

Hunter+Geist, Inc.

303.832.5966
800.525.8490

1900 Grant Street, Suite 1025
Denver, CO 80203

www.huntergeist.com
scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT F

### 205

1  A. I'm not sure who stated that. I know I
2  didn't.
3  Q. Well, you were one of the officers down,
4  right?
5  A. Yes.
6  Q. So based upon this transmission, there's
7  no order or directive by the sheriff to breach the
8  door, is there?
9  A. There's orders there, but I don't know
10 who was giving them.
11 Q. Okay. You don't see any that you
12 attribute to the sheriff?
13 A. I can only speculate.
14 Q. Well, do you see any that you attributed
15 to Sheriff Wegener saying go ahead and breach the
16 door?
17 A. "Copy, breaching the door."
18 Q. Okay. That's in response to line 11 that
19 says, "We're going to go through the door"?
20 A. Correct.
21 Q. Okay. Who was the officer in command in
22 this mission?
23 A. Hancock.
24 Q. Okay. I think you answered this earlier,
25 but my understanding is from the time you were called

### 206

1  to the door to the time you entered the residence, you
2  never once questioned Mark Hancock as to what we are
3  doing or why are we doing this?
4  A. No, I did not.
5  Q. Even though it seemed to be inconsistent
6  with what your recollection of a conversation was at
7  the fire department when Jeremy said, if he goes in,
8  we're not going in, are we?
9  A. Yes. It was a conflict, yes.
10 Q. Okay. Is there a time, place, and
11 circumstance for a breach and enter to be an
12 appropriate tactic?
13 A. As in?
14 Q. That's what I'm asking you: Is there a
15 time, place, and circumstance where a breach and entry
16 is appropriate?
17 A. Someone's life is in danger. To that
18 aspect, someone's life is in danger.
19 Q. Okay. Now I'm back to you are inside and
20 you are pieing. Okay?
21 A. Okay. Back to --
22 Q. 29, if it works for you.
23 A. -- Exhibit 29. Okay.
24 Q. As you are pieing around that corner, you
25 are anticipating -- I think your phrase was do a 180

### 207

1  and take yourself into the living room area?
2  A. Correct. And what we call it in SWAT
3  terms is covering a deep threat. And that's basically
4  doing a 180 and going around into the living room
5  towards to where -- I don't know what that's labeled.
6  I can't read it -- that gray square where I initially
7  would go.
8  Q. That's how you were trained to refer to
9  this maneuver?
10 A. Yes.
11 Q. Is that a SWAT training or patrol
12 training?
13 A. I learned that before I became a police
14 officer through the academy. And then it was more
15 training and more in depth into it as the years that
16 I've been on SWAT.
17 Q. Okay. It's a common refresher
18 training --
19 A. Correct.
20 Q. -- occasion?
21 A. Correct.
22 Q. All right. Now, behind you is Travis?
23 A. Yes.
24 Q. And he's SWAT trained and a member of the
25 team, correct?

### 208

1  A. Correct.
2  Q. So did you assume he knew where he was
3  going to go or what his responsibility was if this
4  kept on going?
5  A. Yes.
6  Q. What would that have been?
7  A. He would have covered into this area or
8  covered this hallway right here that went across into
9  the back room.
10 Q. Okay. You better be more specific.
11 A. I'm sorry.
12 Q. No, that's really my job. Are you
13 talking about this area behind what's marked as the
14 basement?
15 A. No. He would cover -- he would basically
16 go kind of an opposite direction that I would go.
17 Q. So to your left?
18 A. If I would go to right, he would go to
19 left. Then the fourth person would go to right and
20 the fifth -- correction. My apologies. First person,
21 let's say I go right, second person would go left,
22 third person can go straight or follow me to the
23 right, and then it depends on how many people we have
24 on the stack and then so on, left, right, left, right,
25 or straight, depending on how the room is set out, how

Case No. 1:16-cv-03079-MSK-NRN   Document 61-1   filed 05/18/18   USDC Colorado   pg 3 of 3

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

209

1  the room is laid out, obstacles, and stuff like that.
2      Q.  Okay.  Let me take you back.  As I
3  understand it, you're in the mud room still before you
4  walk along the kitchen wall there.  You announce
5  sheriff's office, show me your fucking hands?
6      A.  Correct.
7      Q.  Let's go back to role-playing.  Could you
8  give me a flavor for what Kolby Martin sounds like at
9  that time?
10     A.  It would be in the same -- like I did
11  when I was outside trying to yell at Mr. Wirth not to
12  go back inside the residence.  I would have probably
13  not exactly yelled it, but my voice would have been a
14  lot higher and a lot more of a command.
15     Q.  Was there any doubt, in your mind, that
16  you could have been heard by Mr. Wirth?
17     A.  Doubt, as he couldn't hear me?
18     Q.  Yes.
19     A.  I don't believe so.  I believe he would
20  have heard me.
21     Q.  Yes.  Especially now that you have an
22  idea of where he was positioned?
23     A.  After the fact, yes.
24     Q.  Yes.  He would have heard you?
25     A.  Yes, he would have heard me.

210

1      Q.  Okay.  Now, thinking about it, when you
2  announced it in that way, if I'm behind you, would I
3  be reasonable in thinking that, oh, Deputy Martin sees
4  this guy?
5      A.  No.
6      Q.  Why not?
7      A.  Because I did not challenge.
8      Q.  Maybe that's what I'm missing.  What's
9  the difference between what you said and a challenge?
10     A.  I would have continued on saying show me
11  your hands, turn away from me, more detailed.  I would
12  have continued on giving more verbal commands.
13     Q.  Gotcha.  I am just freezing.  I'm sorry.
14     A.  I'm roasting.
15     Q.  Are you really?
16     A.  Yeah.
17     Q.  And then you get shot?
18     A.  Yes.
19     Q.  And the first one you take is beltline?
20     A.  Just below my beltline, yes.
21     Q.  And then you are shot again?
22     A.  I cannot recall when I got the two rounds
23  in my right leg.  And I cannot tell you when I got the
24  other round that was on my left leg kind of more like
25  to the surface through and through.  When I caught the

211

1  first round after taking my first step and was going
2  to go around the corner, that's when I caught the
3  first round.  To me it felt like -- if anybody has
4  ever been hit by a paintball, that's what it felt
5  like, or if somebody comes and flicks you real hard.
6      Q.  Really?
7      A.  That's what it felt like.  I knew I was
8  hit.  I took a step back and my back was actually up
9  against the stove that's on that diagram.  My back was
10  up against that stove, Travis directly to my left.  I
11  looked at Travis and said, Travis, I'm hit.  He
12  jokingly looked at me and said, no, you're not.  I
13  looked at him again and said, yes, I am, and that's
14  when I started running back out of the house.
15     Q.  That is when you started your retreat?
16     A.  Yes.
17     Q.  You did away with one of my assumptions.
18  I thought you went down immediately?
19     A.  No, I did not.
20     Q.  Okay.  Do you remember going down?
21     A.  Yes, I do.
22     Q.  All right.  Where were you located when
23  you went down?
24     A.  I probably just made one step into the
25  mud room, almost out the door.

212

1      Q.  Okay.  And you went down as a result of
2  the shot to your left femur?
3      A.  Correct.
4      Q.  Okay.  And that one did feel like a
5  bullet?
6      A.  Yeah.  It felt like my leg exploded.
7      Q.  At any time did you return fire?
8      A.  No, I did not.
9      Q.  Why not?
10     A.  I did not know where he was at.  I've
11  been trained and everything of not to spray and pray.
12     Q.  That's an acceptable training technique?
13     A.  As in?
14         MR. ELKUS:  Object to the form of the
15  question.
16     Q.  (BY MR. SCHIMBERG)  Where did you receive
17  that training?
18     A.  Through academy, through SWAT training,
19  just through my career in law enforcement.
20     Q.  Okay.  Do you have a feel for what the
21  rationale of that is?
22     A.  As in spray and pray?
23     Q.  Yes.
24     A.  Is that you're just shooting wildly and
25  trying to hit anything and everything that you can try

53 (Pages 209 to 212)