1

```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO
 2
        Civil Action No. 1:16-cv-03079-MSK-MJW
 3      _____

 4      ESTATE OF NATE CARRIGAN, JOHN CARRIGAN, MELISSA
        CARRIGAN and KOLBY MARTIN,
 5
        Plaintiffs,
 6
        v.
 7
        PARK COUNTY SHERIFF'S OFFICE, SHERIFF FRED WEGENER, in
 8      his official and individual capacity, and MARK
        HANCOCK, in his official and individual capacity,
 9
        Defendants.
10      _____

11      DEPOSITION OF:  MARK HANCOCK - August 28, 2017
        _____
12
                 PURSUANT TO NOTICE, the deposition of MARK
13      HANCOCK was taken on behalf of the Plaintiffs at 501
        South Cherry Street, Suite 920, Denver, Colorado
14      80246, on August 28, 2017, commencing at 10:00 a.m.,
        before Melanie L. Giamarco, Registered Professional
15      Reporter, Certified Realtime Reporter, and Notary
        Public within Colorado.
16

17

18

19

20

21

22      H+G

23

24      Hunter + Geist, Inc.

25      303.832.5966      1900 Grant Street, Suite 1025    ■ www.huntergeist.com
        800.525.8490      Denver, CO 80203                 ■ scheduling@huntergeist.com

                          Your Partner in Making the Record
```

Court Reporting, Legal Videography, and Videoconferencing

# EXHIBIT G

Case No. 1:16-cv-03079-MSK-NRN   Document 61-2   filed 05/18/18   USDC Colorado   pg 2 of 2

MARK HANCOCK - 8/28/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

### Page 261

1  A. Do I think if they knew that he was armed
2  inside the residence, would that be important?  Yes.
3  Q. Okay.  Why do you say yes?
4  A. That'd be good knowledge to have.
5  Q. Did you believe that entering Mr. Wirth's
6  residence posed a hazardous environment for you and
7  your officers?
8  A. No, not at the time.
9  Q. Why do you say no?
10 A. Well, I didn't believe that at the time.  I
11 thought we were going to go in and grab him quick.
12 Q. But at that point, you didn't even know
13 where he was in the residence, right?
14 A. That's right.
15 Q. So for all you know, he could have been
16 held in some type of room that you weren't even aware
17 of before breaching the residence, right?
18 A. That's possible.
19 Q. I mean, for all you know, where you may not
20 have seen him fortify, you know, outside, he may have
21 been fortifying inside the home before you breached,
22 right?
23 A. That's possible, yeah.
24 Q. Didn't think about that, though, did you?
25 A. No, I didn't encounter that.

### Page 262

1  Q. No, what you encountered was Mr. Wirth
2  opening fire on you and your fellow deputies, right?
3  A. That's right.
4  Q. So he put himself in a position where
5  tactically he was more at an advantage than you were
6  when you entered the residence; is that true?
7  A. I don't know where he was.
8  Q. All right.  Well, I mean, you know, you
9  were -- you were a SWAT commander.  You were on SWAT
10 for a long period of time.
11 A. That's right.
12 Q. So it sounds like, to me, when you wanted
13 to breach and get the suspect or the individual, you
14 want to do it quickly, grab the guy and get out.
15 That's your MO, right?
16 A. That's right.
17 Q. But how do you go in and grab someone and
18 get them out quickly if you have no idea where they
19 are in the home?
20 A. You dynamically flood the room with
21 officers, and you work through the house as quickly as
22 possible until you contact them.
23 Q. Well, let's take that to its logical
24 conclusion.  I mean, if this -- if you have no idea
25 where this man is who is, to use your word, you think

### Page 263

1  most people in Park County are armed --
2  A. Well, that they have weapons.
3  Q. Or that they have weapons, which means that
4  they're armed, right?
5     MR MARKS:  Object to the form of the
6  question.
7  A. See, I --
8  Q. You don't agree with that?
9  A. I don't agree with that.  Armed -- and I
10 told you this before.  Are you talking on you, a
11 holster, strapped with a strap holding it?
12 Brandishing?  What are you -- what do you mean by
13 "armed"?
14 Q. Well, what we do know is Nate Carrigan was
15 armed.
16 A. Yes, he had a sidearm.
17 Q. And did you know that he had an open carry?
18 A. No.
19 Q. Well, you said you knew he had a sidearm.
20 So how do you know that?
21 A. Who?  Nate?
22 Q. I'm sorry.  Did I say Nate Carrigan?  I
23 apologize.  I apologize.  I misspoke.
24    Martin Wirth, did you know -- you knew that
25 Martin Wirth was armed?

### Page 264

1  A. I didn't know that he was armed on him.  I
2  suspected that, he's a Park County resident, he
3  probably owns firearms.
4  Q. Did you ever do a search as to whether or
5  not he had a concealed-weapon permit?
6  A. No.
7  Q. Did you ever -- subsequent to this event,
8  did you ever look to see if Mr. Wirth had a
9  concealed-weapons permit?
10 A. Didn't I just answer that?  I said no.
11 Q. No, I thought -- did you know -- I'm sorry.
12 Did I say prior, prior, did you ever do a search?  I'm
13 thinking prior to the eviction, did you ever do that?
14 A. No.
15 Q. And subsequent to the eviction, you didn't
16 do that either?
17 A. No.
18 Q. Okay.  Now, I think what you testified is
19 that what you like doing is sort of just coming in and
20 flooding the home with law enforcement to get the
21 suspect.  Did I state that correctly?
22 A. Quickly.
23 Q. How does that -- how does that not pose an
24 officer safety issue?
25 A. We've done it many, many times.  Officers