```
                                                                    1

 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 1:16-cv-03079-MSK-MJW
 3
      ESTATE OF NATE CARRIGAN,
 4    JOHN CARRIGAN, MELISSA CARRIGAN,
      KOLBY MARTIN, and TRAVIS THRELKEL,
 5
      Plaintiffs,
 6
      v.
 7
      PARK COUNTY SHERIFF'S OFFICE,
 8    SHERIFF FRED WEGENER, in his
      official and individual capacity,
 9    and MARK HANCOCK, in his official
      and individual capacity,
10
      Defendants.
11    _____

12    DEPOSITION OF:   TRAVIS JAMES THRELKEL
                         January 5, 2018
13    _____

14              PURSUANT TO NOTICE, the deposition of
      TRAVIS JAMES THRELKEL was taken on behalf of the
15    Defendants Park County Sheriff's Office and Sheriff
      Fred Wegener at 501 South Cherry Street, Suite 920,
16    Denver, Colorado 80246, on January 5, 2018, at
      9:36 a.m., before Darcy Curtis, Registered
17    Professional Reporter and Notary Public within
      Colorado.
18

19

20

21

22

23      H+G

24

25      Hunter+Geist, Inc.
```

303.832.5966    1900 Grant Street, Suite 1025    ■ www.huntergeist.com
800.525.8490    Denver, CO 80203                 ■ scheduling@huntergeist.com

Your Partner in Making the Record

Court Reporting, Legal Videography, and Videoconferencing

EXHIBIT H

Case No. 1:16-cv-03079-MSK-NRN   Document 61-3   filed 05/18/18   USDC Colorado   pg 2 of 2

TRAVIS JAMES THRELKEL - 1/5/2018
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

317

1 be stopping?
2     A.  It's either catching the person
3 offguard . . .
4     Q.  For example, go to 38.
5     A.  If he does stop him, yeah, that's exactly
6 what happens.
7     Q.  Go to Deposition Exhibit 38 for me.
8     A.  Okay.
9     Q.  We'll just use the Wirth eviction as an
10 example.  In a perfect world, Kolby Martin would have
11 made his way through the kitchen area with you right
12 behind him and Jeremy Lowrance right behind you,
13 right?
14     A.  Yes.
15         MR. LORENZ:  Object to form and
16 foundation.
17     Q.  (BY MR. GOLDFARB)  And then once Kolby
18 makes it through the kitchen, what should he have
19 done?
20         MR. LORENZ:  Object to form and
21 foundation.
22     A.  It depends on layouts.  That's what
23 you've got to talk about with the team leader.
24 Usually he would stop and hold, hold that area.
25 Because there is a large area on the right, he would

318

1 hold the hallway, make sure nobody comes out there, I
2 would turn right and I would clear the living room.
3     Q.  (BY MR. GOLDFARB)  Okay.  I just want to
4 make sure I understand.  So Kolby should have stopped
5 in the --
6     A.  At the stairs.
7     Q.  He should have continued --
8     A.  He could have continued there and held
9 that.  That would be his area of responsibility, is
10 what's forward of him.
11     Q.  Okay.
12     A.  Me being on the back, because the area on
13 the right is open, nobody is covering, I would go to
14 the right.  I would probably go to the right stairwell
15 where I saw the hallway, because my first glance
16 initial, I wouldn't see anything.  Lowrance would then
17 come behind and actually cover the rear of that.
18     Q.  So you would have done a buttonhook, in a
19 perfect world?
20     A.  Yes.
21     Q.  And then Lowrance would have gone the
22 other way?
23     A.  Yes.
24     Q.  When Kolby says show me your fucking
25 hands, does that indicate to you that he has seen the

319

1 suspect?
2     A.  Sometimes it's just verbal commands.  I
3 mean, you yell in there, you always announce.  Just
4 because you're deputy sheriff, you yell police.  It
5 doesn't matter.  It's the most universal name out
6 there.  It's just like go in the house, show me your
7 hands, come out to me.  I didn't perceive at the time
8 that he saw him.
9     Q.  So his command did not communicate
10 anything in particular to you other than he was just
11 giving a command?
12     A.  It was just a command from what I --
13 that's what I felt.
14     Q.  Okay.  It wasn't -- code is not the right
15 way to put it.  But it's not an instruction to you
16 that now you have a certain responsibility now that
17 I've seen a suspect or something like that?
18     A.  Correct.  Now, if he would have said stop
19 where you are, I would assume that he sees him and he
20 sees what he's doing, but . . .
21     Q.  Okay.  In your training with Park County,
22 have you used this stack before to enter into a home?
23     A.  As in with Kolby or Lowrance or just
24 that's how we've done it?
25     Q.  In general.

320

1     A.  That's the only time I've ever breached a
2 structure with a person in the dwelling.  And through
3 our fake structures in training, we've always had a
4 shield.
5     Q.  Even with the shield, though, did you use
6 a stack?
7     A.  Yes.
8     Q.  Okay.  Is there anything that you believe
9 that was improper about a three-man stack?
10         MR. LORENZ:  Object to form.
11     A.  Not having a shield, that's one thing.
12 Other than that, it is what it is.  You deal with how
13 many guys you have at work.
14     Q.  (BY MR. GOLDFARB)  My question is:  A
15 stack doesn't require five people, six people, ten
16 people; it's just the formation in which you enter?
17     A.  Correct.
18     Q.  I understand the critique about the
19 shield.  The fact that there were three people in the
20 stack --
21     A.  That doesn't change the designation of
22 it.  It's just a stack.  You can have two people if
23 you needed.
24     Q.  In your CBI interview, you were not
25 critical of Mark Hancock?