**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.   16-cv-03079-MSK-MJW

ESTATE OF NATE CARRIGAN,
MELISSA CARRIGAN, as Personal Representative
of the Estate of Nate Carrigan,
KOLBY MARTIN, and
TRAVIS THRELKEL

       Plaintiff,

v.

PARK COUNTY SHERIFF'S OFFICE,
SHERIFF FRED WEGENER, in his official and individual capacity, and
MARK HANCOCK, in his official and individual capacity

       Defendant.

---

**PARK COUNTY SHERIFF'S OFFICE AND SHERIFF FRED WEGENER'S**
**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO**
**FED. R. CIV. P. 56 [DOC. #55]**

---

The Park County Sheriff's Office ("PCSO") and Sheriff Fred Wegener, by and through

counsel, Timothy P. Schimberg, of Fowler, Schimberg, Flanagan & McLetchie, P.C., submit the

following Reply in support of their Motion for Summary Judgment Pursuant to Fed. R. Civ. P.

56(c) [Doc. #55].

## I.      <u>INTRODUCTION</u>

Plaintiffs seek, seemingly without facts or legal precedent, to fit their case into an

extremely narrow exception to the general rule that state actors are not liable for the violent and

criminal acts of a third person. *DeShaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189,

195 (1989).  Plaintiffs invite this Court to transform traditional tort conduct into constitutional

claims that trigger Due Process protection.  Such a transformation would impose standards and duties upon law enforcement officers and agencies, regardless of size or budgetary constraints, that have never before been recognized or considered.  Courts at every level have consistently and frequently repeated the rule that state actors are generally liable under the Due Process Clause only for their own acts, and not for private violence.  *See Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995).  The exceptions to this general rule, to include Plaintiffs' theories, are extremely narrow. *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006).  Liability under the Due Process Clause is narrowly construed, particularly when the claims are based upon a danger creation theory.  *See Uhlrig*, 64 F.3d at 573.

The decisions made at the eviction of Martin Wirth on February 24, 2016, are not the type that the Court should attempt to regulate through constitutional interpretation.  Plaintiffs attempt to elevate Defendant Mark Hancock's conduct, even if characterized as careless, to the level of a Fourteenth Amendment Due Process violation, which would radically broaden the scope of Due Process protection and essentially allow it to replace ordinary tort law in the law enforcement context.  If Plaintiffs' arguments are adopted, the ramifications would be extraordinary.  Virtually every single encounter involving law enforcement and a citizen could later be alleged to have created a danger rendering the participants vulnerable to injury.

While cases caution that courts should exercise self-restraint when asked to expand the scope of substantive Due Process, *see e.g. Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992), Plaintiff's novel theories cannot be sustained even under the most liberal of interpretations.  Captain Hancock's order to breach was not part of an enforcement of an official policy of the PCSO.  Neither the law nor the facts support the idea that Captain Hancock was a "final policymaker," or that his on-the-ground tactical decision was an official "policy" of the

PCSO.  Nor can the facts demonstrate that the PCSO failed to adequately train Plaintiffs, was deliberately indifferent to Plaintiffs' Due Process rights, or that any alleged deficiencies in training caused Plaintiffs' injuries.  Plaintiffs' municipal liability claims against the Park County Sheriff's Office and Sheriff Wegener in his official capacity cannot be shown based on the evidence in the record, and the Court should enter summary judgment in favor of Defendants on all claims.

## II.    ARGUMENT

### A.    Sheriff Wegener in his individual capacity is entitled to summary judgment.

Plaintiffs concede Sheriff Wegener's qualified immunity.  Response [Doc. #60] at 3, 27. They do not raise any arguments in support of any claim against Sheriff Wegener in his individual capacity nor challenge summary judgment in favor of Sheriff Wegener based on qualified immunity.  *Id.*  The Court should therefore enter judgment in favor of Sheriff Wegener in his individual capacity on Plaintiffs' first claim for relief for "Violation of Due Process Under the Fourteenth Amendment" and Plaintiffs' second claim for relief for "Deliberately Indifferent Training and Supervision."

### B.    The facts raised in Defendants' Motion for Summary Judgment are undisputed.

Plaintiffs do not take issue with the facts set forth in Defendant Wegener's and PCSO's Motion for Summary Judgment [Doc. #55], or with the facts set forth in Captain Hancock's Motion for Summary Judgment [Doc. #54].  As a result, the facts are undisputed.

### C.    Defendants are entitled to summary judgment on Plaintiffs' municipal liability claim based on danger creation.

Plaintiffs' Response brief presents new arguments and theories that were not pled in Plaintiffs' Complaint or Amended Complaint—specifically, that Captain Hancock was a "final policymaker" of the PCSO at door when he ordered entry.  Plaintiffs' Response brief [Doc. #60, hereinafter "Response"] does nothing more than raise these new theories contradictory and

internally inconsistent arguments that, when closely examined and considered in context, are insufficient to create a genuine dispute of material fact. Plaintiffs cannot prove each element of their municipal liability claim based on danger creation. They cannot establish the existence of an underlying constitutional violation. Likewise, there is no genuine dispute that no PCSO policy or custom was the moving force of Plaintiffs' alleged constitutional injuries. Plaintiffs' argument that Captain Hancock possessed final policymaking authority delegated by Sheriff Wegener, is a concoction of allegations that were not raised in Plaintiffs' Complaint or Amended Complaint in regard to their danger creation claim. The manufactured assertions of Captain Hancock as a final policymaker, and the characterization of Captain Hancock's on-the-ground tactical decision to enter the residence during the Wirth eviction as an official PCSO "policy," fall short based on the record and the law. The PCSO cannot be held liable.

1. No violation of Plaintiffs' constitutional rights occurred.

Plaintiffs' Fourteenth Amendment Due Process claim, based on danger creation, is premised entirely upon the conduct and decision-making of Defendant Mark Hancock. *See* Response, 7-24. Defendants maintain that Plaintiffs cannot sustain a Fourteenth Amendment substantive Due Process claim for work-related hazards in light of *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 126-28 (1992). The Due Process Clause is not a guarantor of workplace safety. *Id.* at 126 (citing *DeShaney*, 489 U.S. at 195). Tactical operations that inevitably carry risks to officer safety are part of a law enforcement officer's duties. It is an inherent part of their chosen profession. Plaintiffs were injured due to the violent outburst of Martin Wirth during an eviction that was fluid and tactically dynamic. Following *Collins*, Plaintiffs do not have a claim for a violation of their Due Process rights for such injuries while in the course of their duties as law enforcement officers. 503 U.S. at 128.

Summary judgment on Plaintiffs' municipal liability claims is also warranted because no violation of Plaintiffs' constitutional rights occurred.  Plaintiffs' Response completely ignores facts concerning the pre-eviction briefing, where many alternatives were discussed, to include the potential breach of the structure.  *See* Mot. for Summary Judgment [Doc. #54], CSOF ¶¶ 3-5. Plaintiffs knew about the potential, yet did not vocalize any concerns nor confusion.  *See id.*; *see also* Ex. A at 143:8-24, 150:2-151:2, 187:18-25, 205:24-206:4, 232:13-19, 290:22-291:8, 299:18-300:23; Ex. E at 299:1-20, 300:7-302:7.  Given the preparatory planning and discussion, Plaintiffs' knowledge and acceptance of the plan, and Plaintiffs' tactical experience, it cannot be said that Mark Hancock's decision to breach the residence was deliberately indifferent to Plaintiffs' rights, reckless, or conscience shocking.  The full record demonstrates that neither Mark Hancock, nor any other PCSO officer, committed a constitutional rights violation.  For the sake of brevity, these Defendants adopt and incorporate the arguments set forth in Defendant Hancock's Reply, as if fully set forth herein.  Because no underlying constitutional rights violation occurred, the PCSO cannot be liable.  *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997).

2.  Plaintiffs do not identify any PCSO "policy" that was the moving force of Plaintiffs' alleged constitutional injuries.

Plaintiffs cannot dispute the decades-long proposition that municipal entities cannot be held liable on a theory of *respondeat superior* under § 1983.  *See* Response, at 3; *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658, 692 (1978).  Municipal liability is limited to "acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered."  *Starrett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)).  "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and

thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembauer*, 475 U.S. at 479 (emphasis in original).

Plaintiffs do not prove the existence of an official policy of the PCSO that served as the moving force of Plaintiff's alleged constitutional injuries.  Nothing in the record demonstrates that Captain Hancock's decision to breach the residence during the eviction of Martin Wirth was pursuant to an "official policy" of the Park County Sheriff's Office.  Yet, the Response repeatedly submits that, by ordering Plaintiffs and other officers to breach the residence, Captain Hancock acted in contravention to PCSO policy, violated the order of a superior officer, went against his own training and experience, and acted contrary to a previously devised "plan."  *See e.g.* Response at 2, 7-8, 10, 12-16, 19, 21-23.  For example, Plaintiffs argue the following:

- "Hancock's conduct was contrary to PCSO policy that governed the precise situation he was facing."  Response at 21 (referencing PCSO Policy 510, regarding "Hostage/Barricaded Subject Incidents").
- "Under the barricade policy, there was no basis or justification to tactically enter the residence." *Id.* at 22.
- Hancock's order to breach the residence "defies his training and PCSO policy." *Id.* at 23.
- "Gore ordered Hancock that under no circumstances were they to enter the Wirth residence" and "Gore also outlined the plan for the eviction with Hancock." *Id.* at 13.
- Gore testified that under the "plan" that he and Hancock discussed, the officers "were supposed to withdraw to the perimeter, at which time I [Gore] was supposed to be given a phone call to assess what we were going to do at that point." *Id.* at 14.
- "When Hancock did not retreat when Wirth went back inside the residence, and instead began to knock numerous times on the door, Hancock was in violation of Gore's order and Hancock was insubordinate." *Id.* at 16.

These citations and arguments by Plaintiffs unmistakably stand for the proposition that Captain Hancock's order to breach the residence was a *violation of* PCSO policy, not *pursuant to* PCSO policy.  The only conclusion is that no official policy of the PCSO was the moving force of Plaintiffs' alleged constitutional injuries.  There is no "direct causal link" between PCSO policy

and the alleged constitutional violation.  If the decision to enter the residence was contrary to PCSO policy and a direct order, as Plaintiffs argue it was, then the decision was clearly not in accordance with PCSO policy, nor was it custom.  In short, Plaintiffs fail to demonstrate that Captain Hancock's actions and decision-making at the door were pursuant to the "official policy" of PCSO, and instead Plaintiffs insist that the order was a violation of policy.

Plaintiffs' Response refers to PCSO Policy 510—which addresses "Hostage/Barricaded Subject Incidents"—but only to argue that Captain Hancock was the Officer in Command (OIC) and in charge of the eviction.  *See* Response at 24-25.  Plaintiffs do not cite Policy 510 for the proposition that it was the "moving force" of their injuries.  *See id.*  Plaintiffs Martin and Threlkel testified they were not critical of the content of PCSO's policies and procedures, but rather that the decisions made and enforced at the doorstep conflicted with PCSO policy.  *See* Def. Ex. A, 244:19-245:11; Def. Ex. E, 326:12-327:10.   Plaintiffs' Response is silent on these facts. Furthermore, the testimony by Monte Gore concerning Policy 510 cited in Plaintiffs' Response does not address or refute this view.  Mr. Gore's testimony merely states that Policy 510 was effective and in force on the day of the Wirth eviction, and that PCSO officers were required to follow it.  *See* Pl. Ex. 2 at 158:5-159:2 (cited in Response at 24 and 25).  Mr. Gore in fact developed PCSO's policies and procedures, and ensured they were consistent with the law.  *See* Gore Dep. at 259:17-260:16 (attached as supplement to Def. Ex. H).  The testimony above fails to create a genuine dispute whether Policy 510, or any other PCSO policy, was the direct cause or moving force of Plaintiffs' injuries.  Plaintiffs do not attack the integrity of Policy 510 or any other PCSO policy, and fall short of demonstrating that a PCSO policy was the direct cause or moving force of Plaintiffs' injuries.

It is unclear whether Policy 510 was in play at the eviction. Assuming Plaintiffs' speculation is correct and Policy 510 applies, then the text of Policy 510 reveals it was not the direct cause or moving force of Captain Hancock's decision to breach the residence. Policy 510 provides "general guidelines for handling hostage/barricaded subject situations," and lists a host of "CONSIDERATIONS" and "SUGGESTED GUIDELINES" for resolving such situations. *See e.g.* Pl. Ex. 7 at Sec. IV(F) through IV(I). Policy 510 does not mandate specific actions or exact tactical decisions. *See* Pl. Ex. 7. Policy 510 did not require a breach. Whether or not Martin Wirth was to be considered a "barricaded suspect" under Policy 510, nothing in the language of Policy 510 prescribed, directed, or could act as the moving force of the decision to breach.

Plaintiffs do not argue that the decision to breach was part of a widespread practice regarding civil evictions that would rise to the level of a "custom" of the PCSO. The eviction on February 24, 2016, was a singular event. By way of example, Plaintiffs admit it was unprecedented to have Platte Canyon Fire Department on standby at the eviction, or to have more than two officers involved. Response, at 11, 18. It was not customary to have a pre-eviction planning session. There is no evidence showing that Captain Hancock's decisions at the eviction were part of, or pursuant to, a "custom" of the PCSO. In sum, Plaintiffs have not identified any PCSO policy or custom that was the moving force of the series of events and decisions surrounding the eviction. Summary judgment for PCSO is justified on this basis.

3. Captain Mark Hancock was not "delegated" final policymaking authority.

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482 (1986). The authority to make municipal policy may be granted directly by a

legislative enactment or may be delegated by an official who possesses such authority.  *Id.* at 483.

Whether an official has final policymaking authority is a question of state law.  *Id.*

Captain Hancock does not possess policymaking authority by virtue of legislative enactment.  Pursuant to Colorado's state constitution and statutes, the power to set "policy" for the PCSO is vested in the office of the Park County Sheriff.  *See* Colo. Const. art. XIV, § 8; C.R.S. § 30-10-501, et. seq.  Colorado state law does not confer policymaking authority upon deputy sheriffs.  *See id.*

Nor does Captain Hancock possess policymaking authority by virtue of a "delegation" of authority.  A delegation of final policymaking authority is not a passive event.  As stated in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988):

> Simply going along with discretionary decisions made by one's subordinates . . . is not a delegation to them of the authority to make policy. It is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them. It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker.  It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official.  But the mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.  In such circumstances, the purposes of § 1983 would not be served by treating a subordinate employee's decision as if it were a reflection of municipal policy.

In *Praprotnik*, the plaintiff alleged that a series of personnel transfers and layoffs, occurring over several years, were in retaliation for the plaintiff's exercise of his First Amendment rights.  *See id.* at 128.  The Court of Appeals held that two administrators who possessed discretionary authority to initiate transfers and layoffs were municipal "policymakers," on the basis that their decisions were not "individually reviewed" for "substantive propriety" by higher officials, and the

entity responsible for hearing appeals gave substantial deference to the original decisionmaker. *Id.* at 129. The U.S. Supreme Court reversed, finding that these reasons were insufficient to support the conclusion that the two administrators "were authorized to establish employment policy for the city with respect to transfers and layoffs." *Id.*

The Court's reasoning in *Prapotnik* applies here. Captain Hancock made a discretionary tactical decision in the midst of a tense and rapidly evolving tactical situation at ground zero. There is no evidence of a delegation of "policymaking" authority by PCSO/Sheriff Wegener to breach. Plaintiffs cite a statement from Sheriff Wegener's deposition testimony, which merely states that Captain Hancock had general law enforcement authority by virtue of being a sworn officer. *See* Response, at 25 (citing Pl. Ex. 4, at 146:7-146:2). Plaintiffs acknowledge that Captain Hancock was the Officer in Command ("OIC") of the eviction, but there is no evidence showing a "delegation" of final policymaking authority. This comports with Hancock's own testimony, "I think I appointed myself as being the captain, the patrol captain, and the senior officer, but it wasn't—it's not an appointed thing. It's just, you know, when you show up and you're the captain, you're in charge." Hancock Dep. at 139:11-17 (attached as supplement to Def. Ex. C). Plaintiffs have not shown that a "delegation" of policymaking authority by Sheriff Wegener to Captain Hancock occurred.

4. Captain Hancock was not a "final policymaker."

Plaintiffs attempt to advance a new and novel argument, not raised in the initial pleadings, that Mark Hancock was a "final policymaker." The argument depends upon: (1) whether he is meaningfully constrained 'by policies not of his own making'; (2) whether his decisions are final—i.e., whether they are subject to any meaningful review; and (3) whether the "policy decision"

purportedly made by Captain Hancock is within the realm of his grant of authority. *See Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995).

First, Plaintiffs' argument illustrates that Captain Hancock was meaningfully constrained. They argue that Captain Hancock was constrained by an alleged direct order by Undersheriff Gore not to enter the residence; that he was constrained by PCSO policies; and that he was constrained by an alleged "plan" that if Martin Wirth went inside, Captain Hancock would call Undersheriff Gore. *See e.g.* Response, at 13-16, 22. Plaintiffs argue that Captain Hancock clearly did not have authority to overrule written PCSO policies or to countermand orders from his superiors. Plaintiffs cannot meet the requirement of the first element.

Second, there is neither evidence nor case law suggesting that Captain Hancock's on-the-ground tactical decision to breach constituted a "final policy." Plaintiffs' cited case, *Starrett v. Wadley*, 876 F.2d 808, 818-19 (10th Cir. 1989), is distinguishable. *Starrett* involved claims of sexual harassment and retaliatory discharge that developed over several months. In contrast, a dynamic tactical law enforcement operation, deployed over the span of mere minutes, is not the type of scenario subject to meaningful review. Under the logic offered by Plaintiffs, all tactical commanding officers would be considered final policymakers, and their tactical decisions "policies" that would expose the law enforcement agency to unprecedented liability. Plaintiffs offer no legal authority in support of this proposition. No case law exists in which the danger creation theory has been applied to the tactical order of a commanding officer. Nor has any case law been found that states a tactical decision made in the midst of a dynamic tactical operation constitutes an official "policy" of a law enforcement agency. Such a rule would have a disastrous effect on law enforcement. If law enforcement agencies and commanding officers could violate a subordinate officer's substantive Due Process rights by ordering the subordinate officer into

danger, the result would be that law enforcement agencies will stand by and fail to provide the vigorous and brave responses the public needs when tragic and dangerous situations occur. The total absence of case law addressing this issue speaks volumes as to the impracticality of such a rule. Plaintiffs fail to meet the second element required to find Captain Hancock to be "final policymaker."

Third, Captain Hancock's decision to breach was not 'within the realm of his grant of authority.' In *Starrett*, the Tenth Circuit reversed the lower court, finding that the county was not liable for a supervisor's acts of sexual harassment because such acts did not constitute "official policy" and were "without any indicia of being 'officially sanctioned or ordered.'" *Starrett*, 876 F.2d at 819-20 (quoting *Pembauer*, 475 U.S. at 480). Plaintiffs maintain that Captain Hancock violated Undersheriff Gore's direct order not to enter the residence. See Response, at 16. If such is the case, then, as in *Starrett*, Captain Hancock clearly was not acting within his grant of authority and cannot be construed as a "final policymaker." Plaintiffs cannot have Captain Hancock be in command and simultaneously not in command of on-the-ground tactical decisions. Plaintiffs fail to meet the required third element.

Plaintiffs offer yet another desperate alternative: if Hancock was not the final policymaker at the doorstep, then late-arriving Sheriff Wegener was. Response, at 26. Plaintiffs cite only from Captain Hancock's testimony, which recounts that he sought "permission" from Sheriff Wegener and that Sheriff Wegener said "go." Response, at 26. However, the unrefuted dispatch transcript of radio communications (attached as Defendants' Exhibit F) shows that Captain Hancock issued the order, and Sheriff Wegener never said "go." Sheriff Wegener's only words were "Copy, breaching the door," which he spoke *after* Captain Hancock gave the order to breach. Ex. F at 17:11-13. Plaintiffs do not dispute the authenticity or accuracy of the dispatch transcript. Plaintiffs

also do not dispute that "Copy" was meant and understood by them as a mere acknowledgement of Captain Hancock's order.  Plaintiffs' desperate alternative theory similarly fails.

Such acts of desperation continue.   Plaintiffs argue that, "at a minimum there are unresolved questions of fact as to who the final policymaker was on February 24, 2016." Response, at 26.  The identification of a policymaking official is decidedly a "question of state law" and "is not a question of fact in the usual sense." *Praprotnik*, 485 U.S. at 124.  Case law is clear there are only three potential avenues for demonstrating who a final policymaker is: (1) directly through legislative enactment; (2) delegated by an official who possesses such authority; or (3) an act by a final policymaker.  *Pembauer*, 475 U.S. at 483.  None of these avenues apply vis-à-vis Captain Hancock.  The facts rejecting the first two avenues are presented in Section B.3 above.  As to the third avenue, the U.S. Supreme Court has explicitly rejected tests that would introduce unpredictability and legal guesswork into the task of defining a "final policymaker."  In *Praprotnik*, the Court noted that the test proposed in Justice Stevens' dissent, which would distinguish between "high" and "low" officials on the basis of various factors, was too imprecise to allow a consistent or principled analysis of the issue and inched too close to *respondeat superior*. 485 U.S. at 125 n.2.  The Court commented:

> "Except perhaps as a step towards overruling *Monell* and adopting the doctrine of *respondeat superior,* ad hoc searches for officials possessing such "*de facto*" authority would serve primarily to foster needless unpredictability in the application of § 1983. . . . We cannot accept either the Court of Appeals' broad definition of municipal policymakers or respondent's suggestion that a jury should be entitled to define for itself which officials' decisions should expose a municipality to liability.  Respondent has suggested that the record will support an inference that policymaking authority was in fact delegated to individuals who took retaliatory action against him and who were not exonerated by the jury. Respondent's arguments appear to depend on a legal standard similar to the one suggested in Justice STEVENS' dissenting opinion . . . which we do not accept."
>
> *Praprotnik*, 485 U.S. at 131.

Under *Praprotnik*, "there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself." *Id.* at 126. Moreover, Plaintiffs' arguments regarding *who* the final policymaker is—whether Captain Hancock or Sheriff Wegener—entirely depend upon the faulty and unfounded assumption that an on-the-ground tactical decision by a law enforcement officer constitutes a "final policy" of the law enforcement agency. There is no legal precedent for this assumption. Plaintiffs' attempt to shoehorn a commanding officer's tactical order, which was given to his subordinates during a dynamic tactical operation, into "danger creation" expands this narrow exception beyond the parameters recognized by legal precedent and the practicalities of effective law enforcement. *See Moore*, 438 F.3d 1042. Plaintiffs fail to meet the fourth element.

Because Plaintiffs cannot meet any of the four required elements to show Captain Hancock was a "final policymaker" of the PCSO, judgment should be entered in favor of PCSO on Plaintiffs' danger creation claim.

**D.**     **Defendants are entitled to summary judgment on Plaintiffs' municipal liability claim: The PCSO and Sheriff Wegener were not deliberately indifferent to training and supervision.**

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Estate of Bleck v. City of Alamosa*, 105 F. Supp. 3d 1222, 1230 (D. Colo. 2015) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Plaintiffs fail to raise a genuine dispute of material fact on each of the required elements of their municipal liability claim for a Fourteenth Amendment failure-to-train: (1) Defendants' conduct exceeded constitutional limitations; (2) Defendants' conduct arose under circumstances that constitute a usual and recurring situation with which the officers must deal; (3) the alleged inadequate training

demonstrates "deliberate indifference" on the part of PCSO toward "persons with whom the [officers] come into contact"; and (4) there is a direct causal link between the alleged constitutional deprivation and the inadequate training. *Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003).

Plaintiffs state there are no cases addressing municipal liability for failure to train "in the law enforcement context" that do not involve a use of force claim "under the Fourth and/or Fourteenth Amendment." Response, at 27. However, *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), which addressed the deliberate indifference standard in a municipal liability claim for failure to train, did not involve a use of force claim. In *Canton*, the Court set a high standard of fault, holding that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Id.* at 388. The facts of this case do not reach that standard.

1. <u>There is no constitutional violation.</u>

As in Section B.1 above, these Defendants adopt and incorporate the arguments set forth in Defendant Hancock's Reply. Defendant Hancock did not commit a constitutional violation. Where there is no underlying constitutional violation, there is no municipal liability. *Bryan Cnty.*, 520 U.S. at 404.

There also is no constitutional violation through a failure to train. Plaintiffs' Response, for the first time in the history of this case, focuses Plaintiffs' failure to train claim on the training provided "to the subordinate officers (i.e. the Plaintiffs)," rather than the training provided to Captain Hancock. *See* Response, at 28. Plaintiffs fail to cite any authority, and none has been found, in which the constitutional rights of involved law enforcement officers were violated because of inadequate training. Plaintiffs admit "there are not a lot of cases where law enforcement has argued that a law enforcement officer's constitutional rights were violated based on the

department's failure to train the officer." Response, at 35. Plaintiffs' admission does not go far enough. There is no precedent for finding a violation of a law enforcement officer's Fourteenth Amendment rights because that officer received inadequate training. Precedent, the facts in the record, and common policing practices do not support the conclusion that Plaintiffs' rights were violated when Captain Hancock ordered the breach. Without an underlying constitutional violation, Plaintiffs do not have a municipal liability claim under § 1983 against the PCSO. *See Carr*, 337 F.3d at 1228.

2. The circumstances surrounding the eviction of Martin Wirth were not "usual and recurring."

Plaintiffs argue that Defendants' conduct arose under circumstances that "constitute a usual and recurring situation with which police officers must deal." Response, at 28. Yet, Plaintiffs "concede that based on the information received in discovery there is no evidence of any previous incident involving a PCSO law enforcement officer being killed by a Park County resident which resident was in the throes of a mental episode that caused private violence." *Id.* at 29-30. Plaintiffs do not allege, in either the Complaint or Amended Complaint, that there was any issue regarding Martin Wirth having a mental illness, or regarding Captain Hancock and Plaintiffs dealing with the mentally ill and PCSO training. It is another belated, attorney manufactured argument.

The singular and unique circumstances of the eviction were not "usual and recurring." A planning session was held the morning of the eviction, which was not typical for an eviction. *See* Mot. [Doc. #54], CSOF ¶ 3; Ex. D at 118:3-8 (attached). Tactical options were discussed. *Id.*; Ex. C at 137:13-16, 138:14-19 (attached). Seven officers were involved in implementing the eviction plan. *Id.*; Response, at 11. An officer was sent ahead of other officers to surveil the property. Mot. [Doc. #54], CSOF ¶ 4. These considerations were unprecedented for evictions, which usually deployed one or two officers. Pl. Ex. 1 at 92:4-7. The Platte Canyon Fire Department was called

out and on standby at the scene of the eviction, another unprecedented consideration. *Id.* at 92:14-22. Plaintiffs also admit there is no "pattern of unconstitutional behavior" by the Park County Sheriff's Office involving circumstances similar to those confronted by the officers at Wirth's doorstep. *See* Response, at 29-30. Plaintiffs admit the uniqueness of the circumstances. Finally, Martin Wirth's ultimate acts of violence were on a scale not previously experienced. There is no evidence of an eviction or other tactical event like the eviction of February 24, 2016, in Park County's history.

Plaintiffs try to avoid the conclusion that the eviction was not a usual or recurring circumstance by suggesting that PCSO officers "interact with mentally ill people on a recurring basis." Response, at 12. Plaintiffs suggest, but have no facts, that Martin Wirth was "in the throes of a mental episode" when he ambushed the officers. *See id.* at 29-30. Perhaps chillingly, but all too often in our society, is the reality that ambushing and shooting law enforcement is not a diagnosis of mental illness. Just as plausible is that Martin Wirth was cold and calculating in his decision-making.

While the testimony of both Sheriff Wegener and Captain Hancock acknowledge a risk associated with mentally ill individuals, they describe it as a general safety risk of unpredictable behavior that our law enforcement officers deal with. Pl. Ex. 4 at 50:15-51:9; Pl. Ex. 1 at 180:15-181:5. There is only speculation, no facts, that Martin Wirth was "mentally ill" or having a mental health episode at the time of the eviction. Plaintiffs cite only two pieces of "evidence" for the proposition. First, Monte Gore testified that he "considered Wirth a significant threat," but there is no mention of mental illness. *See* Response, at 34 (citing Plaintiffs' Ex. 2 at 93:2-13).[1] Plaintiffs

---

[1] It would not have been possible for Monte Gore to know Martin Wirth's behavior on the day of the incident, because Gore was not present at the scene, and could not ascertain Wirth's demeanor. *See* Gore Dep. at 276:10-16, 278:2-13 (attached as supplement to Def. Ex. H).

next cite the unsworn interview statements of Rich Gabrish, a retired neighbor of Martin Wirth, whose statements and assessments regarding Martin Wirth's mental health—where they exist—amount to no more than opinion, speculation, and hearsay.  *See* Pl. Ex. 11 at 3-7, 18, 21, 23.  Such statements are not sufficient to raise a genuine dispute of fact.  *See e.g. Ortiz v. Dowis*, 671 Fed. Appx. 1010, 1013 (10th Cir. 2016) (plaintiff's description of a doctor's hearsay statements did not create a genuine dispute of fact).

In contrast, Captain Hancock—a person who had an on-the-ground opportunity to assess Martin Wirth and his demeanor—testified that, when Martin Wirth appeared on the deck and spoke to officers, and then went back inside the house, nothing appeared to be amiss or threatening about his demeanor.  Def. Ex. C at 224:20-225:24.  Captain Hancock justifiably thought Wirth went back inside the house to go meet them at the front door.  *Id.*  Captain Hancock's state of mind regarding Wirth is best evidenced by the fact that, immediately prior to the breach, he did not view Martin Wirth as presenting a danger to himself or his fellow officers.  Pl. Ex. 1 at 232:15-25.  There was no evidence of Martin Wirth exhibiting manic, suicidal, or mentally unstable behavior on the deck; regardless, the circumstances of the unprecedented event do not come close to meeting the required "usual and recurring" element.  In sum, the evidence presented by Plaintiffs fails to demonstrate that the situation presented to officers at the eviction site was "usual and recurring."

3.  The evidence is insufficient to create a genuine dispute of material fact that Defendants were "deliberately indifferent."

Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.  *Bryan Cnty.*, 520 U.S. at 410.  "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."  *Canton*, 489 U.S. at 389.  The facts in the record do not come close to raising a genuine issue of

"deliberate indifference" by PCSO to Plaintiffs' constitutional rights.  Inadequate training may serve as the basis for municipal liability *only* where the failure to train amounts to deliberate indifference to the rights "of persons with whom the police come into contact."  *Id.* at 388.  That is not the case here.

Plaintiffs hinge their failure-to-train municipal liability claim on the argument that the alleged violation of Plaintiffs' constitutional rights was "highly predictable," due to the frequency with which PCSO officers encounter individuals who are mentally ill and as such pose a "safety risk" to law enforcement officers.  *Id.* at 30.  Finding deliberate indifference where a constitutional rights violation is highly predictable or plainly obvious is "an exceptional circumstance" and represents an "exceedingly narrow" class of cases.  *See Estate of Bleck v. City of Alamosa*, 105 F. Supp. 3d 1222, 1231 (D. Colo. 2015).  The U.S. Supreme Court "cautioned specifically against judicial micro-management" in this class of cases.  *Id.* (quoting *Canton*, 489 U.S. at 391).  The reason is that, "'[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.'"  *Id.*  Plaintiffs in essence request the Court to elevate and radically broaden the scope of Fourteenth Amendment Due Process protection to replace ordinary tort law.

*Estate of Bleck* was a use of force case in which the plaintiff alleged that deliberate indifference could be found "despite the absence of a pattern of prior unconstitutional behavior." 105 F. Supp. 3d at 1231.  This Court rejected that argument on evidence similar to the evidence presented here.  *Id.* at 1232-33.  The plaintiff in *Bleck* was a suspect who was shot when an officer's unholstered weapon discharged during a hands-on physical struggle.  *Id.* at 1229.  The plaintiff alleged the city was deliberately indifferent for failing to train officers in procedures "for dealing

with mentally ill and/or suicidal suspects." *Id.* at 1229.  The defendants presented evidence regarding "the extensive training" the officers received.  *Id.* at 1231.  The plaintiff countered with the deposition testimony of several officers to highlight that the officers had received "no *written* training materials from the APD [Alamosa Police Department] addressing dealing with the mentally ill." *Id.* at 1232 (emphasis in original).  The Court discussed at length the evidence of the defendant officers' training, which is similar to the training of Plaintiffs.  For example, the Court in *Bleck* reviewed the Police Officer Standards and Training ("POST") certification standards, the curriculum of Field Training Officer programs ("FTO"), and the "additional training" the officers received throughout their careers. *Bleck*, 105 F. Supp. 3d at 1232.  Similarly, Captain Hancock, Plaintiff Kolby Martin, Plaintiff Travis Threlkel, and Nate Carrigan were all POST-certified peace officers, and Plaintiff Threlkel was an FTO.  *See* Ex. A at 10:3-4; Ex. C at 16:4-8; Ex. E at 25:24-26:1, 56:14-58:21 (all attached).  The Court found that the plaintiff's evidence was "insufficient as a matter of law to create a genuine dispute of material fact to permit a reasonable jury to infer that APD officers in general or Officer Martinez in particular did not receive any training on how to approach the mentally ill." *Id.* at 1233.

Defendants' Motion for Summary Judgment [Doc. #55] sets forth ample evidence that Plaintiffs received extensive training during their law enforcement careers, and that the eviction was staffed with some of PCSO's most experienced tactical officers.  *See* Def. Mot. [Doc. #55] at 29-30.  Both Plaintiff Martin and Plaintiff Threlkel were trained in SWAT tactics.  *See* Def. Ex. A at 279:25-280:7; Ex. E at 60:19-61:25.  Plaintiff Martin was a team leader, certified instructor, and assisted in developing and providing training for PCSO officers, including entries into occupied structures.  Def. Ex. A at 65:12-21, 67:16-68:22, 145:15-146:1, and 254:3-14.  Plaintiff Martin was also trained in Crisis Intervention Training ("CIT").  *See* Martin Dep. at 42:11-15 (attached

as supplement to Def. Ex. A).  Plaintiff Threlkel was a Field Training Officer.  Threlkel Dep. at 56:14-58:21 (attached as supplement to Def. Ex. E).  There is no evidence that either Martin or Threlkel ever requested additional or more specific training, or expressed to their supervisors that their training was inadequate.  Nor is there evidence that any requests for training were ever denied them.  *See e.g.* Def. Ex. E at 57:22-57:8 (Threlkel application to be an FTO).  Plaintiffs fail to respond to or refute any of this evidence.

The only specifically alleged "deficiencies" in Plaintiffs' training are: (1) "PCSO had no policy in effect on how PCSO deputies are to deescalate a person that is experiencing a mental health issue"; (2) Plaintiffs were not required to undergo Crisis Intervention Training ("CIT"); and (3) it is unclear whether Plaintiffs received training on using the Colorado Crisis Hotline prior to the eviction.  *See* Response at 30-31.  These allegations were never raised in Plaintiffs' original pleadings, and there is not a single statement by Plaintiffs that Martin Wirth was in fact mentally ill.  By now alleging, without support, that Martin Wirth was "in the throes of a mental episode" at the eviction, Plaintiffs are requesting the Court a make a huge inferential leap.  There is no evidence, nor was there information at the time, regarding Martin Wirth's psychological state.  In stark contrast to the situation described in the case cited by Plaintiffs, *Ceballos v. Husk*, Martin Wirth exhibited no visible signs of a mental illness, nor did PCSO officers have any actual knowledge of mental health hospitalization or treatment.  *See Ceballos v. Husk*, Case No. 15-CV-01783-RPM, 2017 WL 2377118 (D. Colo. June 1, 2017).  Considering Plaintiffs' extensive training and tactical experience, and the lack of any evidence of a mental illness of Martin Wirth, the alleged "deficiencies" in training fail to create a genuine issue of material fact of any deliberate indifference by the PCSO towards Plaintiffs' training.

Additionally, similar to the plaintiff's evidence in *Bleck*, the deposition testimony referenced in Plaintiffs' Response is insufficient to raise a genuine dispute regarding deliberate indifference.   Plaintiffs cite that only one or two PCSO officers received "Crisis Intervention Training."   Response at 31.   Plaintiffs do not disclose that one of these CIT-trained officers was Plaintiff Kolby Martin.   Sheriff Wegener's deposition testimony shows that the small number of CIT-trained PCSO officers was not for lack of a desire to have CIT training, or because Sheriff Wegener did not appreciate the benefit of CIT training.   Indeed, Sheriff Wegener agreed CIT provides a benefit to law enforcement agencies.   *See* Pl. Ex. 4, at 67:4-6.   Sheriff Wegener testified that despite wishing to have more officers trained in CIT, he did not have the staffing resources to take officers away from their shift duties to go to the training—testimony that Plaintiffs' Response fails to mention.   *Id.* at 67:9-68:3.   Sheriff Wegener's choice regarding CIT training due to staffing shortages and budgetary constraints is exactly the kind of "rational decisionmaking process that takes account of competing social, political, and economic forces," which is neither conscious shocking nor "arbitrary in a constitutional sense."   *Collins*, 503 U.S. at 128-29; *see also Uhlrig*, 64 F.3d at 576.   As the Supreme Court stated in *Collins*, "[d]ecisions concerning the allocation of resources to individual programs . . . and to particular aspects of those programs, such as the training and compensation of employees, involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of Government for the entire country."   503 U.S. at 128-29.

Plaintiffs also mention that Sheriff Wegener acknowledged that training officers on the Colorado Crisis Hotline for mentally ill individuals was not mandatory but suggested.   Response, at 31.   Again, that is not an accurate picture of Sheriff Wegener's testimony.   Sheriff Wegener went on to testify that "[t]he procedure's set up" for all sworn PCSO officers to have the

information about the Hotline given to them, either through attending an information training session or through having the information presented through on-the-job training.  *See* Pl. Ex. 4 at 64:13-65:18.  Given the full record of facts, there is no genuine issue of deliberate indifference.

Plaintiffs cite *Ceballos v. Husk*, Case No. 15-CV-01783-RPM, 2017 WL 2377118 (D. Colo. June 1, 2017) as an example of a municipality being subjected to liability for a policy of deliberately indifferent failure to train its officers in dealing with the mentally ill.  It should be noted that *Ceballos* is not binding authority, it is currently pending appeal, and it was decided more than a year after the eviction of February 24, 2016.  *Ceballos* is easily distinguishable, so much so, it is of little value.  In *Ceballos*, a city police officer fatally shot a visibly mentally unstable private citizen.  *Ceballos*, 2017 WL 2377118 at *1.  Mr. Ceballos was a "walk out" resident of a mental health facility, a fact known to one of the responding officers.  *Id.*  He presented to officers wielding a baseball bat, pacing in a private driveway, and yelling and throwing his arms in the air.  *Id.* at *1-*2.  The officers also received information from Ceballos's family and friends at the scene that he was intoxicated, "not acting right," and likely on drugs.  *Id.*  All of the officers could observe Ceballos, had the opportunity to speak with him, and to assess his behavior.  *Id.*  Mr. Ceballos went into a garage, then came back out and walked toward officers.  *Id.* at *2.  He was verbally belligerent and obscene.  *Id.*  All of these facts stand in stark contrast to the attitude and demeanor presented by Mr. Wirth, who, while perhaps understandably irritated at being evicted, did not exhibit any visible signs of being mentally ill, unstable, or in the throes of a mental health episode.  The critical differences in the claims, the roles of the parties, the evidence cited, and the analysis used in *Ceballos* are so distinguishable, that *Ceballos* is not instructive.

As stated in *Bleck*, municipal liability will be found in a single-exception case "only where 'a violation of federal rights is a highly predictable or plainly obvious consequence of a

municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.'" 105 F. Supp. 3d at 1231 (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998)). This is not such a case. As explained in Section C.2 above, the circumstances of the eviction of Wirth was not a recurring situation. Plaintiffs admit its singular and unique context. *See e.g.* Response, at 29-30. It was not highly predictable nor plainly obvious that a constitutional violation, premised upon danger creation by Captain Hancock's order to breach, would occur. This is not a fact pattern involving PCSO's relationship to a third party "with whom officers come into contact," as considered under the deliberate indifference test. Plaintiffs have failed to present evidence of PCSO's "deliberate indifference" to Plaintiffs' constitutional rights based upon inadequate training.

    4. <u>Plaintiffs fail to present evidence of a direct causal link between training and the alleged constitutional injuries.</u>

        Plaintiffs cannot meet their burden on the fourth element. Plaintiffs have failed to present evidence demonstrating that the alleged lack of training in dealing with the mentally ill "directly caused" Captain Hancock's order to enter the residence. It first bears repeating that Plaintiffs' conjured theory of the claim fails because it presupposes that Martin Wirth was mentally ill, a presupposition for which there is no evidence. Martin Wirth's act of violence on February 24, 2016 was seemingly motivated by a hatred of law enforcement, but such views are neither unheard of nor a sign of obvious or visible mental illness. Presuming a mental illness, Plaintiffs still fail to demonstrate the necessary causal link between their alleged lack of training and the order to breach. The Supreme Court specifically observed it is not enough "to prove an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter

resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Canton*, 489 U.S. at 391. That is why such a claim is viewed as "tenuous" at best. *Connick*, 563 U.S. at 61. The Court has held that, "in order for liability to attach in a failure to train case, the identified deficiency in a [municipal entity's] training program must be *closely related* to the ultimate injury, so that it *actually caused* the constitutional violation." *Davies v. City of Lakewood*, Case No. 14-cv-01285-RBJ, 2016 WL 615471, *12 (D. Colo. Feb. 16, 2016) (citation omitted).

Plaintiffs offer only conclusory statements in support of the causation element. By way of example, Plaintiffs' Response argues:

- "[A] jury could conclude that with the frequency PCSO deals with armed/mentally ill residents, there is a high risk that a PCSO deputy will be shot by such a person." Response, at 34.

- "Wegener testified that looking back at this situation he would have done things differently such as trying to talk to Wirth and convince him not to take it out on the PCSO." *Id.*

- "If Wegener (or more than one of his officers) would have had at [sic] CIT training, which admittedly Wegener did not have, he would have understood and known he could have used tactics to deescalate the Wirth incident through communication and not taking the extreme measure of breaching the residence to grab Wirth." *Id.* at 34-35.

These conclusory statements and speculative arguments are not evidence that create a genuine issue of material fact. *See In re Ribozyme Pharm., Inc. Securities Litigation*, 209 F. Supp. 2d 1106, 1110 (D. Colo. 2002) ("A scintilla of contrary evidence does not create a genuine dispute, nor does reliance upon the allegations in a party's pleadings."). Alternative courses of action and other possible outcomes, seen in hindsight, do not constitute a "cause" of injury. *See Carr*, 337 F.3d at 1231. No evidence is offered to support the argument that CIT training, Hotline training, or some other form of training in dealing with the mentally ill would have changed PCSO's response or the responses of other officers at the scene (one of whom was CIT trained); precluded

the breach; or prevented Wirth's violent acts.   The testimony of Plaintiffs' expert, Dan Montgomery, which opines only on a general level regarding the benefits of crisis intervention training, is "insufficient."[2]   *See Davies*, 2016 WL 615471, at *12.

To prevail on the causation element, Plaintiffs must show how PCSO's alleged failure to train Plaintiffs in dealing with mentally ill individuals "actually caused" Captain Hancock's supposedly unconstitutional order to breach.   *Carr*, 337 F.3d at 1231.  Plaintiffs' assertions "flunk the causation requirement, for they uniformly partake of the post hoc, ergo propter hoc fallacy rather than providing any evidence of how [Plaintiffs'] training (or lack thereof) actually resulted" in Captain Hancock's order to breach or the private violence that followed.  *Id.*   There is no evidence that the alleged deficiencies in Plaintiffs' training are "closely related" to Captain Hancock's order, or the Plaintiffs' own failure to question that order or suggest alternative tactics. *Id.*  Furthermore, it should not be overlooked that, of the five officers stacked at the front door, Plaintiff Martin was CIT trained.  Martin Dep. at 42:11-15 (attached as supplement to Def. Ex. A). It is undisputed that Plaintiff Martin did not speak up, or suggest alternative tactics.  *See* Def. Ex. A at 143:8-24, 150:2-151:2, 187:18-25, 205:24-206:4, 232:13-19, 290:22-291:8, 299:18-300:23. The point is that CIT training does not guarantee a different result.

Without evidence of a causal relationship between allegedly deficient training in dealing with the mentally ill and Plaintiffs' injuries, Plaintiffs yet again cannot meet their burden of proof on the failure to train claim.

---

[2] Reference to Mr. Montgomery should be stricken.  His rebuttal report will be the subject of another motion for a violation of Rule 26.  Its contents is not proper "rebuttal," but rather raise entirely new issues, to include comments not raised in his original report regarding mental health.  Mr. Montgomery also uses no methodology by simply citing interesting articles.

### III.   CONCLUSION

The "evidence" and arguments offered throughout Plaintiffs' Response [Doc. #60] fail to raise any genuine issues of material fact on Plaintiffs' municipal liability claims against PCSO and Sheriff Wegener in his official capacity.  Captain Hancock did not violate constitutional rights. Nothing in the record demonstrates that Captain Hancock's order was pursuant to an official policy of the PCSO, or that Captain Hancock was a final policymaker when the breach occurred. Plaintiffs also fail to raise a genuine issue of material fact on a claim for failure to train, the most tenuous of claims. There is no genuine dispute that PCSO was not "deliberately indifferent" to Plaintiffs' Fourteenth Amendment Due Process rights, or that the alleged lack of training was the "cause" of Plaintiffs' constitutional injuries.   Finally, Plaintiffs do not challenge summary judgment in favor of Sheriff Wegener in his individual capacity based on qualified immunity.  For these reasons, the Court should grant Defendants' Motion for Summary Judgment [Doc. #55], and enter judgment for Sheriff Wegener and the Park County Sheriff's Office on all claims.

**DATED** this 18th day of May, 2018.

Respectfully Submitted,

*/s/ Timothy P. Schimberg*
Timothy P. Schimberg, Atty. No. 10686
Fowler, Schimberg, Flanagan & McLetchie, P.C.
1640 Grant Street, Suite 300
Denver, Colorado  80203
Tel: 303-298-8603
Fax: 303-298-8748
t_schimberg@fsf-law.com
*Attorney for Defendants Park County Sheriff's Office and Sheriff Fred Wegener*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18th, 2018, I electronically filed the foregoing **PARK COUNTY SHERIFF'S OFFICE AND SHERIFF FRED WEGENER'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56 [DOC. #55]** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Reid J. Elkus
Donald C. Sisson
Lucas Lorenz
ELKUS & SISSON, P.C.
501 S. Cherry Street, Suite 920
Denver, Colorado 80246
relkus@elkusandsisson.com
dsisson@elkusandsisson.com
llorenz@elkusandsisson.com
*Attorneys for Plaintiffs*

David J. Goldfarb, Esq.
Josh A. Marks, Esq.
Berg, Hill, Greenleaf & Ruscitti
1712 Pearl Street
Boulder, CO  80302
dgoldfarb@bhgrlaw.com
jam@bhgrlaw.com
*Attorneys for Defendant Mark Hancock*

*/s/ Eden R. Rolland*
Eden Rolland