**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 10

```
3        Q.    You became POST certified in 2000?
4        A.    Yes, I did.
```

11          Q.    Okay.  Any training in crisis

12   intervention while you were at Elbert County?

13          A.    I've been through CIT.  That's crisis

14   intervention team.  And that was towards the end

15   before I left Elbert County.

12          Q.    What are your basic job duties when you
13    were serving as a patrol deputy with Park County
14    Sheriff's Office?
15          A.    Patrol the areas that I'm supposed to
16    cover, serve civils, serve warrants, handle calls when
17    they come out via our dispatch.  And then I became a
18    Taser instructor and an Intoxilyzer instructor, was
19    able to also get on to the SWAT team.
20          Q.    When were you accepted on the SWAT team?
21          A.    2006.

Case No. 1:16-cv-03079-MSK-NRN   Document 62-1   filed 05/18/18   USDC Colorado   pg 4 of 7
**KOLBY MARTIN - 10/11/2017**
**Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.**

Page 67

16        Q.   I don't know.  Why don't we start with
17   what certifications have you received while you've
18   been with the Park County Sheriff's Office?
19        A.   Intoxilyzer, Taser, SWAT training, and
20   that's pretty close to where I -- that's the only
21   thing I've really received.
22        Q.   Okay.  And let me pester you a little
23   bit, because you were confused by my question.  Are
24   you an instructor-level certification since you've
25   become a member of the Park County Sheriff's Office?

Case No. 1:16-cv-03079-MSK-NRN   Document 62-1   filed 05/18/18   USDC Colorado   pg 5 of 7

KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 68

1     A.    For Taser and Intoxilyzer.

2     Q.    Okay.  Tell me just a little bit about

3  what's entailed to become certified and a certified

4  instructor in Intoxilyzer and Taser.

5     A.    For the Intoxilyzer it's a two-day course

6  that's put on by the Department of Health at their

7  facility, and that's the one out in Lowry.  And they

8  go over the legal aspects of it, how it works, the

9  history of it, to that effect on the first day, and

10 the second day it's all practical hands on, working

11 with the actual instrument.

12    Q.    And how about the Taser?

13    A.    Taser is also a two-day course to be an

14 instructor.  Again, they go over the history, how it

15 works, why it works, what it does to a body when a

16 person is tased via the probes or being drive-stunned.

17 And then like the second day is, again, all practical

18 hands-on scenarios, shooting the actual Taser at

19 targets or with training cartridges that are

20 nonconductive, as in there's no electricity that goes

21 down the wire, to a person that's in a Taser suit that

22 does scenarios for us, stuff like that.

13      Q.   Okay.  Share with us what you recall, in
14 as much detail as you can, sir, from that point
15 forward.
16      A.   I'm gathering about the same time Hancock
17 and Carrigan came up the driveway, Mr. Wirth, I'm
18 assuming, saw them starting to come up the driveway,
19 because by the time they started walking up here --
20 and they might have been out of the vehicle already --
21 Mr. Wirth was out on the porch.
22      Q.   Okay.
23      A.   And then the conversation started.
24      Q.   All right.  And tell me about that
25 conversation.

Case No. 1:16-cv-03079-MSK-NRN   Document 62-1   filed 05/18/18   USDC Colorado   pg 7 of 7
KOLBY MARTIN - 10/11/2017
Estate of Nate Carrigan, et al. v. Park County Sheriff's Office, et al.

Page 171

1    A.  I could not tell you.  I was too far away
2    to hear the conversation.
3        Q.  Okay.  Did you hear anything?
4        A.  You could tell they're talking, the
5    demeanor.  It's one of those things you can hear a
6    conversation going but you can't determine exactly
7    what they were saying.
8        Q.  Okay.  In hearing the conversation, as
9    **you just described it, any indication of elevated**
10   **voices or anger, anything like that?**
11       A.  No.
12       Q.  Okay.  More conversational?
13       A.  It was conversational.  And then the only
14   thing I could tell from Mr. Wirth that he was
15   irritated that we're there is the last part of the
16   conversation where he throws up his hands and then
17   turns around and walks back in the residence.
18       Q.  Okay.  But while they're talking, you
19   **didn't hear any elevated tone or volume out of any of**
20   **them?**
21       A.  No.