**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Senior Judge Marcia S. Krieger**

Civil Action No. 16-CV-3079-MSK-NRN

**ESTATE OF NATE CARRIGAN;**
**MELISSA CARRIGAN, as Personal Representative of the Estate of Nate Carrigan;**
**KOLBY MARTIN; and**
**TRAVIS THRELKEL,**

      **Plaintiffs,**

*v.*

**PARK COUNTY SHERIFF'S OFFICE;**
**FRED WEGENER, Sheriff, in his official and individual capacity; and**
**MARK HANCOCK, in his official and individual capacity,**

      **Defendants.**

_____

**OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT**
_____

      **THIS MATTER** comes before the Court pursuant to Defendant Mark Hancock's Motion

for Summary Judgment (**# 54**) and Defendants Park County Sheriff's Office and Sheriff Fred

Wegener Motion for Summary Judgment (**# 55**), and the Responses and Replies thereto (**## 59**,

**60**, **61**, **62**).  For the reasons that follow, the motions are granted.

**I.  JURISDICTION**

The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.

## II.  BACKGROUND[1]

On February 24, 2016, members of the Park County Sheriff's Office (sometimes "PCSO") attempted an eviction of an individual named Martin Wirth from a property that Mr. Wirth no longer owned.  That eviction ended with the deaths of Sheriff's Corporal Nate Carrigan and Mr. Wirth himself, and gunshot injuries to Deputies Kolby Martin and Travis Threlkel.

Mr. Wirth was known to members of the PCSO to be armed, dangerous, and to harbor anti-government and anti-law enforcement sentiments; he was also known to have recently expressed threats to "shoot the first cop [he] sees," among others.  Although Mr. Wirth had previously been peacefully evicted from a residence by PCSO officers in 2014, Undersheriff Monte Gore considered Mr. Wirth to be "extremely dangerous" and both homicidal and suicidal.  Undersheriff Gore believed that Mr. Wirth "wanted to commit suicide by cop and take as many officers with him as he could."

When it became clear in February 2016 that the PCSO would again be tasked with evicting Mr. Wirth, Undersheriff Gore began devising plans to accomplish that task safely.  Over the span of about two weeks, Undersheriff Gore and the seven PCSO officers that would be involved in the operation held a series of meetings to plan a "tactical operation" to complete the job.  PCSO officers surveilled the property and its surroundings and prepared maps of the residence's entry points.  Most significantly, Undersheriff Gore was concerned that Mr. Wirth "may come out of the residence and go back in."  In his experience, dangerous individuals "will come out of the residence to assess how many officers you have and assess the situation themselves," and then return inside to barricade themselves within the residence.  If Mr. Wirth

---

[1]      The Court summarizes the undisputed relevant facts and elaborates as necessary in its analysis.  To the extent facts are disputed, the Court construes them in the light most favorable to the Plaintiffs.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

did so, Undersheriff Gore instructed that the PCSO officers "were supposed to withdraw to the perimeter, at which time I was supposed to be given a phone call to assess what we were going to do at that point." Undersheriff Gore instructed Captain Mark Hancock, the PCSO officer who would be in charge of the operation, that "under no circumstances whatsoever were they to enter Wirth's residence." This plan was consistent with a formal PCSO policy, which instructs that deputies who are confronted with a barricaded subject "shall not initiate tactical actions other that those necessary to protect the lives and safety of themselves or others." Undersheriff Gore testified that Captain Hancock "understood the order and [said] that he would follow the directive and that I could trust him that no one would be hurt in this operation."[2]

On February 24, the PCSO carried out the eviction plan. Because Corporal Carrigan had a good relationship with Mr. Wirth, he and Captain Hancock made the initial approach to the residence, while the other officers set up a perimeter. Mr. Wirth was sitting on the deck as Captain Hancock and Corporal Carrigan approached. They advised him that they were there to evict him from the house and requested that he leave. Mr. Wirth responded "you're not even going to me time to move my stuff out?" and walked inside the house.

Despite the plan to return to the perimeter and seek advice, Captain Hancock and Corporal Carrigan instead approached the front door of the residence and called out to Mr. Wirth. When Mr. Wirth did not respond, Captain Hancock directed Deputies Martin, Thelkel, and Lowrance to join him and Corporal Carrigan at the door to prepare for the purpose of breaching the house. Captain Hancock testified that he began to get "worried about what [Mr.

---

[2]     Captain Hancock disputes that he was involved in any of Undersheriff's Gore's planning and contends that he was never instructed not to breach the residence. Captain Hancock's deposition testimony also generally reflects that although he was aware of Mr. Wirth's reputation and threats, he considered the upcoming eviction to be a routine event, and thus, he did little more preparation for it than he would for any other eviction.

Wirth] was doing, where he's going."  He felt that he had had success in other incidents by moving quickly and he decided that he would breach the door, enter the residence, and apprehend Mr. Wirth.  Regarding this decision, Captain Hancock subsequently acknowledged that it is reflective of his tendency to be "super aggressive."

At about this time, Sheriff Wegener arrived on the scene.  From his vehicle in the driveway, Sheriff Wegener communicated by radio with Captain Hancock.  The record includes a transcript of recorded radio communications, but does not identify the speakers.  Based on context, the Court infers as follows.  Captain Hancock reported to the Sheriff, "He saw us from the upper deck, talked to use, and then went back inside."  A few seconds later, Captain Hancock states "Sheriff, I'm going to go."  The Sheriff responded "You guys are going to go up to the door?" and Captain Hancock responded "I'm going through the door."  Captain Hancock then spoke to other officers about their positions.  About 45 seconds after his prior communication with the Sheriff, Captain Hancock stated "Okay Sheriff, we're giving too much time.  I need to---," and the Sheriff responded "Okay.  See if you can get him, get his attention at the door."  Captain Hancock responded "I'm going to try that.  He's not coming."  Captain Hancock then appears to call out to Mr. Wirth, apparently without any response.  Another roughly 45 seconds pass and Captain Hancock states "We're going to go through the door."  The Sheriff responded "Copy, breaching the door."

The officers then breached the door and entered the residence.  After a short search, they discovered Mr. Wirth had armed and barricaded himself.  He opened fire on the officers, and the officers returned fire.  Corporal Carrigan and Mr. Wirth were fatally injured in the exchange, and Deputies Threlkel and Martin were wounded.

Corporal Carrigan's estate, along with Deputies Martin and Threlkel, commenced this suit against the PCSO, Sheriff Wegener, and Captain Hancock. The Amended Complaint (# 32) nominally asserts two claims pursuant to 42 U.S.C. § 1983, alleging that the Defendants violated the Plaintiffs' Fourteenth Amendment rights to substantive due process. Claim 1 seeks relief based on the theory that the Defendants created the danger that a private actor would harm the Plaintiffs by ordering the breach of Mr. Wirth's residence; Claim 2 seeks relief based on the theory that the Sheriff failed to adequately train and/or supervise his deputies. Both claims are purportedly asserted against Sheriff Wegener and Captain Hancock in both their official and individual capacities, but in briefing, the Plaintiffs conceded that Sheriff Wegener would be entitled to qualified immunity on the individual-capacity claims against him. Thus, the Court treats Claim 1 as asserted against Captain Hancock individually and against Sheriff Wegener in his official capacity, and Claim 2 as asserted only against Sheriff Wegener in his official capacity.

Both Captain Hancock and Sheriff Wegener seek summary judgment (# 54, 55) on the claims against them.

### III. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof, and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis*

*Oil Co. v. Producers Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus. Inc. v. Arvin Indus. Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV.  STATE-CREATED DANGER CLAIM

**A.  Municipal Liability**

Sheriff Wegener and the PCSO seek summary judgment of the claim asserted against Sheriff Wegener in his official capacity. Such a claim is, for all practical purposes, a claim against the PCSO itself. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

The Sheriff and the PCSO are not vicariously liable for the actions of Captain Hancock or other officers; they may only be held liable for their own unconstitutional actions. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010). Typically, to hold a municipal entity like the PCSO liable for an unconstitutional act committed by its employees, a plaintiff must show that the unconstitutional action was either specifically directed by the entity itself or that it occurred as a result of the application of a custom or policy that the entity had enacted. *Pembaur v. City of Cincinnati*, 475 U.S. at 469, 483–84 (1986). Decisions of employees with final policymaking authority, even one-time or *ad hoc* decisions, can constitute a municipal custom or policy if they are made within the scope of the policymaker's authority. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–27 (1988); *Pembaur*, 475 U.S. at 480–81.

The parties devote considerable argument to whether the PCSO can be held liable for Captain Hancock's decision to breach the residence (and thus endanger the Plaintiffs). The Court need not examine this issue extensively because the matter can be resolved on other grounds. It is sufficient to note that there is no meaningful dispute that the Sheriff serves as a policymaking employee of the PCSO for matters relating to law enforcement. C.R.S. § 30-10-501 *et seq.* And there is at least a triable question of fact as to whether Sheriff Wegener gave permission to Captain Hancock to breach the door; both Captain Hancock and Sheriff Wegener describe the radio exchange as Sheriff Wegener giving such permission. Thus, the Court finds that there is sufficient evidence to permit the conclusion that the decision to breach the residence

was a policy decision by the PCSO, such that the PCSO can bear liability if that act is found unconstitutional.

**B. State-Created Danger Theory**

The Due Process Clause prevents states from depriving "any person of life, liberty, or property, without due process of law". U.S. Const. amend. XIV § 1. The Supreme Court has interpreted this Clause to create a limited liberty interest in the protection of an individual's bodily integrity. *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006) (collecting cases).

The Plaintiffs' claims here sit at the intersection of several legal principles. First, there is the well-settled doctrine that, in general, state actors are not obligated to protect individuals from violence perpetrated by a private individual. *DeShaney v. Winnebago Cty.*, 489 U.S. 189, 195 (1989). But courts have recognized an exception to that rule where a state actor, through an affirmative act, has "created" or increased the danger faced by the plaintiff. *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1280 (10th Cir. 2003). The elements necessary to invoke the state-created danger theory are: (1) the state actor created the danger or increased the plaintiff's vulnerability to the danger in some way; (2) the plaintiff was a member of a limited and specifically-definable group; (3) the defendant's conduct put the plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) the defendants acted recklessly or in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking. *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1105 (10th Cir. 2014).

But in the context presented here, where the Plaintiffs encountered the danger as part of their jobs as law-enforcement officials, the state-created danger theory also rubs up against well-settled authority that the Constitution does not guarantee state actors a safe workplace. *See Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992). As *Collins* explains, "the Due

Process Clause is not a guarantee against incorrect or ill-advised personnel decisions[, n]or does it guarantee municipal employees a workplace that is free from unreasonable risks of harm." *Id.* at 129.

The friction between the protection offered by the state-created danger theory and *Collins*' declaration that the Due Process Clause does not guarantee a safe workplace is particularly acute where a plaintiff is injured in the course of performing law-enforcement, firefighting, and similarly inherently-dangerous duties. These types of employees are exposed to state-created dangers every day — a police officer assigned to arrest an armed and violent suspect or a firefighter instructed to enter a burning building will always face an increased exposure to danger than he or she had before that assignment, that risk will always be known to the supervisors making the assignment, and the decision to issue the directive will always be made in contemplation (and arguably disregard) of that risk. Yet it simply cannot be that such decisionmaking by supervisors, even if tragically flawed, bears constitutional implications; to hold otherwise would dramatically expand the scope of judicial scrutiny of first-responder operations and would effectively convert the Constitution into the guarantee of workplace safety in violation of *Collins*. *See e.g.*, *Waybright v. Frederick Cty.*, 528 F.3d 199, 208 (4th Cir. 2008).

Courts have sometimes resolved this tension by considering what risks are *inherent* to a particular job. An illustrative juxtaposition is the one between *Witkowski v. Milwaukee County*, 480 F.3d 511 (7th Cir. 2007), and *Kedra v. Schroeter*, 876 F.3d 424 (3d Cir. 2017). In *Witkowski*, the plaintiff was a sheriff's deputy, assigned to provide security at a court hearing involving a violent inmate; two other sheriff's deputies were assigned to secure the inmate. The deputies securing the inmate failed to follow protocol and fit the inmate with a stun belt, and during the court proceedings, the inmate escaped from their control, grabbed the plaintiff's gun,

and shot the plaintiff in the leg.  The plaintiff sued his fellow deputies and the county under § 1983, invoking the state-created danger theory and contending that their recklessness in managing the inmate allowed the inmate to shoot him.  The trial court dismissed the claim and the Seventh Circuit affirmed.  The court of appeals explained that, "to the extent [the plaintiffs job] exposed him to a personal risk he took it willingly, in exchange for pay and fringe benefits," and the court invoked the metaphor that "someone who chooses to enter a snake pit or a lion's den for compensation cannot complain[,] . . . he is a volunteer rather than a conscript.  The state did not force him into a position of danger."  *Id.* at 512–13.  The Court also noted that the two deputies did not shoot the plaintiff, the inmate did; and that "failure to protect someone from private predation is not a constitutional tort."  *Id.* at 512.

By contrast, in *Kedra*, the plaintiff was a state trooper, assigned to mandatory firearms training at a shooting range.  The defendant safety trainer, believing a gun to be unloaded, pointed it at the trooper and pulled the trigger; in fact, the gun was loaded and the trooper was killed.  The trooper's estate brought suit against the trainer, invoking the state-created danger theory.  The Third Circuit considered the interplay of *Collins*' acknowledgement that the Constitution does not guarantee safe workplaces, but found that principle inapplicable because "a government employee may bring a substantive due process claim against his employer if the state compelled the employee to be exposed to a risk of harm *not inherent in the workplace*."  *Id.* at 436 n.6 (emphasis added).  It found that a firearms-safety training, where protective equipment was not used and safe handling of firearms was to be emphasized, was not a situation that posed inherent risks to law-enforcement officers.

These cases suggest that the dividing line between the state-created danger theory and *Collins* lies where the risk faced by the employee is qualitatively different from the types of risks

the employee agreed to face when he or she accepted employment. The Constitution does not "protect public employees from inherent job-related risks," even where the employer recklessly takes actions that increase employees' exposure to those risks. *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 407 (D.C. Cir. 2006) (employer's actions recklessly increased the intensity of fire while plaintiff was inside building fighting it). In these circumstances, the danger that the employee faced was within the full understanding and contemplation of the employee when he or she took the job, and if the employee feels that the risks of the job — as enhanced by reckless supervisory decisionmaking — are too severe, the employee can always choose to "walk away" from the job. *Slaughter v. Mayor and City Council of Baltimore*, 682 F.3d 317, 322 (4th Cir. 2012) (dismissing claim by estate of firefighter trainee killed during live-burn training exercise); *see also Uhlrig v. Harder*, 64 F.3d 567, 476 (10th Cir. 1995) (no violation where state mental hospital released violent inmate into general population where he killed the plaintiff, his therapist; "hospital staff members all were warned of the general risks inherent in their jobs, and Uhlrig specifically was aware of [the inmate's] background. Defendants did not affirmatively mislead Uhlrig about the risks that she and her fellow workers faced"). But where the risk to the employee is not one within the ordinary contemplation of the job, such as in *Kedra* where police officers do not voluntarily recognize and accept the risk of being fatally shot during safety training at a gun range, a claim may lie when the state creates a new and distinct harm that injures the employee.

Here, the risk of violence at the hands of an evictee known to be unstable and potentially violent is well within the scope of risks that are inherent to the Plaintiffs' jobs as sheriff's deputies. Indeed, the very purpose of such jobs is to deal with the sort of violent and unpredictable persons that cannot be managed through ordinary social conventions and pressures

and the risks of harm at the hands of such individuals are well-understood by every person who accepts a law enforcement position. The Plaintiffs themselves were fully aware of the possibility that Mr. Wirth was armed and would fire at them; indeed, they specifically anticipated and planned for that possibility with Undersheriff Gore. It may be facile to say that, when Captain Hancock (whether or not directed by Sheriff Wegener) informed the Plaintiffs that they would be breaching the residence in contravention of the planned approach, the Plaintiffs could have responded to that increased risk by refusing to continue the encounter and resigning their jobs, but cases like *Witkowski* and *Slaughter* emphasize that the employment relationship is always a voluntary one whereby the employee continuously accepts and agrees to the risks inherent in the job. Thus, this Court finds that because the danger faced by the Plaintiffs was inherent to their work, the state-created danger doctrine does not apply here and *Collins* controls such that the Due Process Clause does not apply here.

## C. Conscience Shocking

Even if the Court were to otherwise assume that the state-created danger theory applied, it would nevertheless find that the Plaintiffs' claims fail on the "conscience-shocking" element as well. Conduct that shocks the judicial conscience must be egregious and outrageous. *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008). It "must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking. The level of conduct required to satisfy this additional requirement cannot precisely be defined, but must necessarily evolve over time from judgments as to the constitutionality of specific government conduct." *Uhlrig*, 64 F.3d at 573. The Court must use its own standards and judgment when undertaking this query; the "ultimate standard for determining whether there has been a substantive due-process violation is whether the challenged government action shocks the

conscience of federal judges." *Moore*, 438 F.3d at 1040.  However, as the Court analyzes

whether the conduct is shocking, it must be mindful that "the Due Process Clause is not a

guarantee against incorrect or ill-advised government decisions." *Uhlrig*, 64 F.3d at 573

(quoting *Collins*, 503 U.S. at 129).

While neither the Supreme Court nor the Tenth Circuit have devised a comprehensive

test for determining if certain conduct is conscience-shocking, both courts have suggested that a

sort of sliding scale would be appropriate, based on the amount of deliberation that was possible

before the conduct in question.  For example, in an emergency situation, in which little or no

time for deliberation is possible, then "only conduct that reaches that far point [of actual intent to

harm] will shock the conscience and result in constitutional liability." *Radecki v. Barela*, 146

F.3d 1227, 1232 (10th Cir. 1998) (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)).  On

the other side of the spectrum, when the state actor has "the luxury to truly deliberate,"

"something less than unjustifiable intent to harm, such as calculated indifference, may suffice to

shock the conscience." *Id.*

Applying that analysis here, and construing the evidence in the light most favorable to the

Plaintiffs, the evidence recounted above is insufficient to shock the conscience.  To be sure,

Captain Hancock's decision was ill-advised, and perhaps even irresponsible and stupid in light of

the extensive, deliberative planning that dictated a particular response to precisely these

circumstances and the absence of any apparent countervailing circumstances compelling a

different approach.  But even "knowingly permitting unreasonable risks to continue does not

necessarily rise to the level of conscience shocking." *DeAnzona v. City & Cty. of Denver*, 222

F.3d 1229, 1235 (10th Cir. 2000).  It cannot be ignored that the decision to breach was made in

the heat of the moment, a split-second decision without the opportunity for extended

deliberation.  In such circumstances, little short of a deliberate intent on the part of the Captain and Sheriff to bring harm to the Plaintiffs would suffice to shock the judicial conscience.  The record discloses nothing of that sort.

Accordingly, the Court finds that, as a matter of law, neither Captain Hancock nor Sheriff Wegener's actions violated the Plaintiffs' due-process rights under the state-created danger theory.  The Defendants are entitled to summary judgment on that claim.

## D.  Qualified Immunity

Although it is not necessary to reach the issue, in the interests of completeness, the Court also considers whether Captain Hancock would be entitled to qualified immunity on the state-created danger theory against him.

Qualified immunity protects individual state actors from liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012).  When a defendant asserts qualified immunity, the burden shifts to the plaintiff, who must: (1) show facts that "make out a violation of a constitutional right," and (2) establish that, at the time of the conduct at issue, it was clearly established under existing law that the defendant's conduct breached the constitutional right.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  If the plaintiff fails to satisfy either prong of this inquiry, the Court "must grant the defendant qualified immunity." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001).

The clearly-established inquiry focuses on whether the contours of the constitutional right were so well-settled in the context of the particular circumstances that a "reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  To satisfy this prong, the burden is on the plaintiff to point to Supreme Court

or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented. *Schwartz v. Booker*, 702 F.3d 573, 587–88 (10th Cir. 2012); *see also Thomas*, 607 F.3d at 669 (plaintiff bears the burden of citing to requisite authority). It is not necessary for the plaintiff to point to a case with identical facts, but he must identify some authority that considers the issue "not as a broad general proposition," but in a "particularized" sense — for example, it is not sufficient to ask whether it is "clearly established" that the Fourth Amendment prohibits the use of excessive force in effecting an arrest; rather, the court examines whether that constitutional principle has previously been found to prohibit particular conduct. *See, e.g.*, *Brosseau v. Haugen*, 543 U.S. 194, 198–200 (2004). The fundamental purpose of the clearly-established prong is to ensure that the state actor has fair notice that his or her conduct is unlawful. *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1252-53 (10th Cir. 2003).

Mindful of the need for the Plaintiffs to cite authority that demonstrates a cognizable constitutional claim in the *particular* circumstances present here, the Court identifies the pertinent facts that are essential to the Plaintiffs' claims here: (1) a public employee (2) unexpectedly ordered by superior officers to perform a certain duty (3) in contravention of a previously-established plan or an existing order that specifically addressed the instant circumstances, thereby (4) exposing the plaintiffs to a known risk from a third party or external force.[3] The key element is, of course, the third one — the fact most probative of the state-created danger theory in this case is that all of the officers involved had agreed upon a particular

_____

[3]     In this regard, the Court agrees with the Plaintiffs that Captain Hancock's formulation of the essential facts — "a third party who fires at deputies while they participate in a tactical operation" — fails to strike at the particular decision that created the very opportunity for Mr. Wirth to fire.

approach to Mr. Wirth's eviction that would ensure the officers' safety and that Captain Hancock

(and perhaps Sheriff Wegener) unexpectedly chose to deviate from that plan at a critical

moment, thereby exposing the Plaintiffs to the very danger the plan sought to avoid. Without the

pre-approved plan, there is nothing to distinguish this case from a run-of-the-mill encounter with

an unpredictable resident. For the reasons discussed above, the fact that the Plaintiffs are public

employees is important as well, as cases like *Collins* require the Court to exercise some restraint

in recognizing constitutional rights within the scope of public employment. And, it goes without

saying that because the Plaintiffs are attempting to demonstrate that their constitutional rights

were clearly established in the context of the state-created danger theory, that theory must be the

basis of the constitutional violation that is recognized in the authority they invoke.

The Plaintiffs direct the Court to six decisions that they contend show that the law in this

specific context was clearly established. None of those decisions present the essential facts set

forth above.

In *Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir. 1992),[4] the plaintiff

was struck by a suspect involved in a high-speed chase at the time. *Id*. at 1494. In a suit against

the officers giving chase, the Court accepted the plaintiff's allegations that the officers initiated

the pursuit recklessly, the streets were busy, the officers failed to follow communications

policies, they exceeded their reported speeds, and they disobeyed a command to stop the chase.

*Id*. The court of appeals held that, at the time, the law was not clearly established that reckless

conduct could form the basis for a due-process claim and that state actors could be liable for the

---

[4]     Multiple Tenth Circuit panels have noted that *County of Sacramento v. Lewis*, 523 U.S.
833 (1998), overruled *Medina*, albeit on grounds unrelated to the issue presented here. *See
Cummings v. Dean*, 913 F.3d 1227, 1240 (10th Cir. 2019); *Morris v. Noe*, 672 F.3d 1185, 1197
n.5 (10th Cir. 2012).

actions of private actors.  *Id*. at 1498–99.  In other words, the state-created danger doctrine did not exist at the time.  Thus, the Court does not see that *Medina* clearly establishes anything, as it did not even recognize the existence of a cognizable constitutional claim.  Even if it had, *Lewis* held that the only basis for liability for state actors involved in high-speed chases is "a purpose to cause harm unrelated to the legitimate object of arrest."  523 U.S. at 836.

In *Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997), the plaintiff was a civilian, threatening suicide with a loaded firearm.  *Id*. at 839.  Officers responded to the scene and surrounded the plaintiff, ordering him to drop his weapon, but he aimed it at multiple officers, prompting an exchange of fire and his death.  *Id*.  The cause of action was for excessive force under the Fourth Amendment, and the court of appeals remanded the case to the district court due to a dispute of material fact over whether the officers' actions were reasonable based on conflicting evidence.  *Id*. at 839, 841.  Because the case did not involve the state-created danger theory, a public employee as the victim, or a deviation from an established safety plan, this case is inapposite.

In *Hastings v. Barnes*, 252 F. App'x 197, 198-99 (10th Cir. 2007), officers were dispatched to conduct a wellness check on the plaintiff, who was known to be having suicidal thoughts.  They asked him to come outside and talk; he refused to do so without his shoes and retreated into his home.  *Id*. at 199.  The officers followed him in, concerned he would commit suicide, and found him in his bedroom with a sword drawn in a defensive position.  *Id*.  The officers ordered him to drop the blade and he refused.  *Id*. at 200.  While he was distracted, the officers deployed pepper spray to disorient the plaintiff, giving them a chance to disarm him.  *Id*.  Instead, he charged the officers and they shot him.  *Id*.  The plaintiff brought suit for excessive force under the Fourth Amendment.  The court of appeals affirmed the district court's denial of

qualified immunity on both prongs.  *Id*. at 203–04.  This case is inapposite for several reasons: it entails excessive force claims, not the state-created danger theory, and it does not involve a public employee as the victim nor an unexpected deviation from a safety plan.  Most significantly, the court *declined* to find a cognizable constitutional violation in that case; as such, it cannot carry the Plaintiffs' burden of showing that the constitutional rights they claim here have been previously recognized.

In *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008), the plaintiffs' infant daughter died of blunt-force trauma while in custody of a privately-owned daycare.  *Id*. at 1245–46.  The plaintiffs had sought state-subsidized care, and the daycare was the only one available to them. *Id*.  The plaintiffs brought a due-process claim under the state-created danger theory based on the state defendants' licensure of the daycare and assurance of the daycare's quality.  *Id*. at 1251. The Tenth Circuit affirmed the dismissal of those claims primarily because the plaintiffs could only allege the state actors' *negligence*, not deliberate indifference.  *Id.* at 1251–52.  The court noted its own dicta from *Uhlrig* that contemplated whether the state may be liable for "affirmatively misleading an employee of the substantial risks in the workplace", but observed that the plaintiffs were not employees of the state.  *Id*. at 1252.  *Robbins*, too, is inapposite for several reasons: it did not involve a public employee as the victim of the harm, and it did not involve a defendant choosing to deviate from a pre-established safety plan.  Even the issue teased by *Robbins* — the unaddressed question from *Uhlrig* as to whether an employer who *misleads* an employee about the dangers in the workplace — does not conform to the facts here.  The Plaintiffs do not allege that the Defendants concealed any facts about Mr. Wirth from them, and indeed, the planning meeting before the eviction discussed at length the reasons why the officers should avoid entering the residence if Mr. Wirth resisted.  In any event, *Robbins* cannot

demonstrate that the contours of the right claimed by the Plaintiffs here *was* previously recognized because the court found that the plaintiffs there had not sufficiently alleged a claim.

In *Herring v. Keenan*, 218 F.3d 1171 (10th Cir. 2000), the probationer plaintiff alleged that the defendant probation officer violated his constitutional right to privacy by disclosing to his employer that he was HIV-positive. *Id*. at 1172. The court of appeals held that there is such a right that would give rise to liability, but that it was not clearly established at the time. *Id*. at 1173. Clearly, claims involving a right to privacy do not implicate the state-created danger theory, nor do the facts of *Herring* correspond with the essential facts of this case as set forth above. The Plaintiffs here appear to rely upon the dissent in *Herring,* which notes that the probation officer "acted contrary to every written guideline addressing" the issue of disclosure. *Id.* at 1182. Putting aside that a dissenting opinion cannot possibly "clearly establish" the existence of a constitutional violation that the majority did not recognize, the Plaintiffs are relying on a factual similarity (and a dubious one at that), when the qualified immunity analysis is focused on legal principles.

In *Hicks v. Woodruff*, 216 F.3d 1087 (10th Cir. 2000) (table decision), the plaintiff attempted to use a forged check at a convenience store when he was asked to the back for questioning by an off-duty police officer working security at the time. *Id*. at *1. Accounts of what happened next differed but a scuffle ensued, wherein the plaintiff obtained the officer's gun. *Id*. He surrendered it, but the officer shot him in the leg as he was running away. *Id*. The plaintiff brought an excessive-force claim under the Fourth Amendment. As with the cases above, *Hicks* is inapposite insofar as it involves a different constitutional claim and does not share any of the pertinent facts discussed above.

Even though it is the Plaintiffs' burden to produce clearly established authority, the Court undertook its own research on the issue and found no Supreme Court or Tenth Circuit decisions that support the Plaintiffs' claims against Captain Hancock. In *Moore v. Guthrie*, 438 F.3d 1036

(10th Cir. 2006), a law-enforcement officer was injured during a training exercise due to inadequate protective equipment, but the Tenth Circuit expressly held that the state-created danger doctrine was inapplicable because the injury was caused by another state actor. *Id*. at 1042. Additionally, in *Jensen v. City of Oxnard*, 145 F.3d 1078 (9th Cir. 1998), a law-enforcement officer was accidentally shot by a fellow officer during a raid, but it did not involve a state-created danger theory for the same reason that *Moore* did not. *See Jensen v. City of Oxnard*, 145 F.3d 1078, 1084 (9th Cir. 1998). As the discussion above sets forth, it is doubtful that the state-created danger theory can apply to the circumstances presented here, simply because the risk of being injured by a third party is an inherent part of the Plaintiffs' jobs.

In sum, neither the Plaintiffs nor the Court have found any authority that would have been sufficient to put Captain Hancock on notice that subjecting his subordinate deputies to the risk that Mr. Wirth might ambush them could violate their substantive due-process rights. Because Captain Hancock is entitled to qualified immunity, summary judgment in his favor is appropriate.

## V. IMPROPER TRAINING CLAIM

The Plaintiffs' second claim, brought only against Sheriff Wegener is his official capacity — and thus, against PCSO itself — alleges that Sheriff Wegener violated the Plaintiffs' due-process rights by failing to adequately train and supervise PCSO staff. The precise contours of this claim are somewhat unclear. The Amended Complaint recites this claim in almost entirely conclusory terms, apparently contending that the PCSO should have perceived "the obvious need for additional supervision including monitoring Captain Hancock" and failed to give unspecified "training and/or supervision" to deputies despite "PCSO's training and/or supervision standards and practices." (**# 32 ¶¶ 80–81**.)

The Plaintiffs' Response clarifies the issue slightly. It seems to suggest that the PCSO should have recognized the need to have "crisis intervention training" ("CIT") for its officers, teaching them "the recognition of mental illness [and] verbal crisis de-escalation skills." CIT is a training program in use in other Colorado law enforcement offices, but Sheriff Wegener testified that he did not send his officers for CIT because it was not offered near Park County and he could not spare the manpower to send officers for CIT at more distant locations.

The Court finds that a failure to train claim is not cognizable under the facts presented here. The label "failure to train" is a shorthand for the more expansive concept of "a failure to train municipal employees *to avoid committing constitutional violations*." *See Connick*, 563 U.S. 51, 61 (emphasis added) ("[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program"). Put another way, a failure-to-train claim against the PCSO cannot lie without a showing that a PCSO-supervised employee actually violated the Plaintiffs' constitutional rights. *Webber v. Mefford*, 43 F.3d 1340, 1344-45 (10th Cir. 1994). For the reasons set forth above, the Plaintiffs cannot show that Captain Hancock (or, for that matter, Sheriff Wegener) violated their constitutional rights. Thus, defects in the PCSO's training of Captain Hancock cannot have contributed to any such violation. Whether the PCSO's training program is deficient in a broader sense — as in negligently-designed as a matter of tort law or simply bad policy — is a different question that does not pose the constitutional concerns that a

claim under § 1983 does.  As such, it is a question that is beyond the scope of the Court's examination.[5]

## VI.  CONCLUSION

The events of February 24, 2016 were unquestionably tragic.  The PCSO had deliberately planned an operation to evict Mr. Wirth in a way that carefully considered the risks to the officers involved (as well as to Mr. Wirth) and devised a conservative approach that would maximize the likelihood of the situation resolving peacefully.  Captain Hancock's self-described "super aggressiveness" on the day of the event inexplicably discarded that careful planning, unnecessarily sending his coworkers into a chaotic and dangerous situation that cost Corporal Carrigan his life and injured Deputies Martin and Threlkel.  As terrible and unnecessary as those events were, they are part of the inherent risks that law-enforcement officers agree to take on when they take up their badge.  As such, the Constitution does not provide the Plaintiffs a remedy.

Accordingly, the Defendants' Motions for Summary Judgment (## **54**, **55**) are **GRANTED**.  Judgment shall issue in favor of the Defendants.

Dated this 29th day of March, 2019.

**BY THE COURT:**

_Marcia S. Krieger_
_____

Marcia S. Krieger
Senior United States District Judge

_____

[5]  Arguably, if PCSO elects to continue its current policies and not require officers to undergo CIT, the next *resident* — not officer — injured in a standoff with PCSO officers might be able to assert a claim for failure to train, pointing to Mr. Wirth's situation as demonstrating for PCSO the need for such additional training to avoid future constitutional violations.